5590-21
KEF/tlp

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| WYLESHA AYRES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.:   19-2148 |
| | ) | |
| SHERIFF DEPUTIES CORY CHRISTENSEN and | ) | |
| CODY FLOYD, CHAMPAIGN COUNTY SHERIFF'S | ) | |
| OFFICE, and CHAMPAIGN COUNTY, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION FOR SUMMARY JUDGMENT**

NOW COME the Defendants, CORY CHRISTENSEN, CHAMPAIGN COUNTY, ILLINOIS, the

CHAMPAIGN COUNTY SHERIFF'S OFFICE and CODY FLOYD by Heyl, Royster, Voelker & Allen,

their attorneys, and for their MOTION FOR SUMMARY JUDGMENT states:

**I.      INTRODUCTION**

On the night of May 8, 2019, Deputy Cory Christensen was on patrol when he noticed a

Jeep Patriot driving around an area of Champaign that Christensen knew to be have a high

frequency of violent and narcotics-related crimes. Christensen noticed the Jeep had an expired

registration sticker on its license plate, and pulled the car over. Over the next nine minutes,

Deputy Christensen would meet the driver, Plaintiff Wylesha Ayres, for the first time; smell the

odor of cannabis coming from her car; learn that Plaintiff had a gang and criminal history; and

that Plaintiff had smoked marijuana earlier in the day. Accordingly, Christensen patted down Ms.

Ayres, and searched her automobile for marijuana. For the patdown, Christensen used his

gloved hands to pat down the areas his experience told him were most likely to hide a weapon: the waistband and pant pockets. At the end of the search — which only lasted seven seconds — Plaintiff protested that Christensen had touched her buttocks. For the automobile search, Christensen searched the seats and trunk, including opening a backpack in the trunk. Christensen did not find weapons or contrabands during his searches. For his part, Deputy Cody Floyd arrived on the scene around the time Christensen concluded his pre-search investigation, and simply observed the traffic stop's goings-on, rather than participating directly. Roughly 16 minutes after initially being pulled over, Plaintiff was issued a citation for driving with an expired license and sent on her way. The entire incident was captured by the deputies' body cameras.

From this interaction, Plaintiff makes the following allegations:

- **Count I (Defendants Christensen & Floyd): A Fourth Amendment violation** under § 1983, alleging Deputy Christensen conducted a "highly intrusive pat-down search of Plaintiff's private body parts" on May 8, 2019, and 'searched Plaintiff's car without probable cause." (d/e #22, at ¶¶ 17,19, 25–27).

- **Count II (Defendant Floyd): A Fourth Amendment failure-to-intervene claim** under § 1983, alleging Deputy Floyd "stood by without intervening" to prevent Deputy Christensen's alleged unconstitutional conduct. (d/e #22, at ¶27).

- **Count III (Defendants Christensen & Floyd): An Illinois-law Intentional Infliction of Emotional Distress ("IIED") claim**, alleging that Defendant Christensen's conduct (and Floyd's apparent failure to prevent it) constituted "extreme and outrageous" conduct that was "rooted in an abuse of power or authority[.]" (d/e #22, at ¶33–34)

- **Count IV (Champaign County Sheriff's Office): A *respondeat superior* claim** based on Count III. (d/e #22, at ¶¶36–37).

- **Count V (Sheriff's Office & Champaign County): An indemnification claim** based on Counts I through IV. (d/e #22, at ¶¶ 38–40).

Defendants are entitled to summary judgment.

Although the precise scope of Count I is unclear, what *is* clear is that: (1) Christensen's patdown search was justified under three Fourth Amendment doctrines — consent, reasonable suspicion, and probable cause/exigent circumstances; (2) Christensen's seven-second patdown search of Plaintiff's waistband and pant pockets was unremarkable and, contrary to Plaintiff's claims, specifically limited in scope so as to *not* be "intrusive"; and (3) Christensen's automobile search was clearly justified by the smell of marijuana from the car and Plaintiff's admission to smoking marijuana.

For Count II, the undisputed evidence shows that Deputy Floyd could not have failed to prevent a constitutional violation, because (1) there was no underlying constitutional violation, and, even *arguendo*, (2) Floyd could not have seen the allegedly errant parts of the searches in question, and (3) did not have sufficient opportunity to prevent the alleged misconduct.

For the same reasons as Counts I and II, Plaintiff's remaining counts also fail. Therefore, summary judgment should be entered in Defendants' favor on all counts.

## II.    UNDERDISPUTED MATERIAL FACTS

*Note: Because Plaintiff's is a Fourth Amendment claim, the material facts are those that would have appeared to a reasonable person in the position of the officer, not from the position of "an omniscient observer." Carmichael v. Vill. of Palantine, Ill., 605 F.3d 451, 457 (7th Cir. 2010). The Defendant Officers also had their body cameras (attached as Exhibits A and B) on during the subject traffic stop. The below facts will include citations to the body-camera footage by the military time-stamp on the video. To the extent any conversation is quoted from the videos, these quotes are based on Defendants best interpretation of the audio, and are intended for convenience only and should not supplant what this Court concludes the video's audio conveys. See generally Scott v. Harris, 550 U.S. 372 (2007). Citations will be to specific seconds of video, but generally should be considered to include the handful of seconds before and after the cited second unless indicated otherwise. To the extent deposition testimony is provided, it is to describe something not clear from the body-camera footage.*

### A.  The Parties

1.      Defendants Cory Christensen and Cody Floyd are deputies for the Champaign County Sheriff's Office who were on-shift during the afternoon/night hours of May 8, 2019. (Ex. C, Dep. of C. Christensen, 45); (Ex. D, Dep. of C. Floyd, 59–60).

2.      Plaintiff Wylesha Ayres is a female who was driving Letika Graham (another female) to work when she was pulled over by Deputy Christensen on May 8, 2019. (Ex. E, Dep. of W. Ayres, 31–32); (Ex. F, Dep. of L. Graham, 44:14–15, 65:6–9). Plaintiff's and Ms. Graham's two children (one an infant, the other seven years old) were in back seat of the car. (Ex. F, Dep. of L. Graham, 52:10–25).

3.      On May 8, 2019, Plaintiff was 27 years old, and had completed her education up to the 11th grade. (Ex. E, 6:22–25); (Ex. I, Interog. Answers of W. Ayres, #1) (listing date of birth).

4.      By May 8, 2019, Plaintiff had been patted down "a little less than a hundred" times, including at traffic stops. (Ex. E, 17:13–21, 18:10–13).

5.      By May 8, 2019, Plaintiff had been convicted of robbery and burglary. (Ex. E, 14:20–15:21).

6.      Before the subject incident, neither Christensen nor Floyd had ever interacted with Plaintiff. (Ex. C, 48:23–25); (Ex. D, 66:20–67:12).

**B.  The Traffic Stop**

7.      At around 9:55pm on May 8, 2019, Deputy Cory Christensen pulled over a Jeep Patriot (hereinafter, "SUV") that Christensen identified as having an expired registration sticker on her license plate, in violation of the Illinois Motor Code. (Ex. C, Dep. of C. Christensen, 52–56); (Ex. A, at 21:56:02) (showing start of the traffic stop in question).

8.      Christensen activated his lights, and pulled the SUV over near Anthony Drive and Dobbins Drive in Champaign, Illinois. (Ex. C, 56:21–24, 167:16–19); (Ex. E, 61:8–15).

9.      The area where the stop occurred is known as a high-crime area within the Champaign County Sheriff's Office, and Christensen personally knew the area as a significant location for gun violence and narcotics distribution. (Ex. C, 167–171); (Ex. D, 122–125).

10.      During the traffic stop, it was dark out, (*see generally* Ex. A & B), which Deputy Christensen's experience told him was less safe than had the stop occurred earlier in the day. (Ex. C, 172:10–23).

11.      At around 9:56pm, Christensen exited his squad car and approached the passenger side of the SUV. (Ex. A, time stamp 21:56:50–21:57:00).

12.      Christensen informed the driver and passenger (who he learned were Wylesha Ayres and Letika Graham, respectively) that he had stopped them for an expired registration sticker, was not going to issue a citation, but asked to see their driver's license. (Ex. A, time stamp 21:57:00–21:58:07). Both the passenger and the driver gave Christensen their licenses. (*Id.*).

13.     During this communication, the passenger (Letika Graham) told Officer Christensen that she was on her way to work. (Ex. C, 58:15–17); (Ex. A, 21:57:00–21:58:07).

14.     During this communication, Deputy Christensen detected an odor coming from the SUV vehicle that he believed to be marijuana. (Ex. C, Dep. of C. Christensen, 59:19–60:3, 110:3–21). *See also* (Ex. E, Dep. of W. Ayres, 63:15–23) (agreeing car "could have" smelled like marijuana); (*id.* at 66:1–67:18) (Plaintiff testifying she smoked marijuana once a day in either her car or garage for the six months leading up to the subject traffic stop); (Ex. D, Dep. of C. Floyd, 73:14–24) (testifying he never approached Plaintiff's vehicle).

15.     Marijuana possession (outside of possession of small amounts or medical uses) was illegal in Illinois at the time of the subject traffic stop, and even possession of medical marijuana was illegal in a car unless the marijuana was in a sealed, tamper-evidence medical cannabis container. *See* 625 ILCS 5/11-502.1 (effective Jan. 1, 2014) (making it a Class A misdemeanor for a medical-marijuana licensee to have marijuana in a car unless in a specific sealed contained); 720 ILCS 550/4 (LEXIS 2019) (barring possession; amended Dec. 4, 2019 to exempt cannabis issues covered by the Cannabis Regulation and Tax Act (410 ILCS 705 *et seq.*) and the Industrial Hemp Act (505 ILCS 89 *et seq.*), the former of which legalized non-medical possession for individuals over age 21, effective until January 1, 2020)). *See also* 401 ILCS 705/10-5(a)(1) (legalizing certain possession of marijuana "[b]eginning January 1, 2020").

16.     Deputy Christensen then returned to his car with the driver's and passenger's licenses. (Ex. A, time stamp 21:58:08–21:58:10). On the way back, Christensen asked for a second officer to come to the scene so Christensen could search the SUV for cannabis. (*Id.*); (Ex. C, 59:1–60:3).

17.     In Christensen's experience and training, he has learned that individuals who possess illegal drugs or weapons on their person will often try to discard, hide, or destroy those items if given an opportunity to do so, especially if the suspect is able to leave the scene where they are interacting with (and being watched by) law enforcement. (Ex. H, ¶6).

18.     In Christensen's experience, it typically took two hours to obtain a warrant at night, after the courthouse has closed. (Ex. H, ¶7).

19.     Christensen knew that no female Sheriff's deputies were presently on-call. (Ex. C, 190:12–25).

20.     As Christensen got back into his squad car, he was advised that Deputy Cody Floyd (who was nearby) would respond to the scene. (Ex. C, 59:14–18); (Ex. D, 68:14–69:18).

21.     From the computer in his squad car, Christensen ran Ms. Ayres' and Graham's information "through the checks that I do on every traffic stop" — specifically, checking both individuals through the LEADS and ARMS databases. (Ex. C, 61:10–13). *See also* (*id.* at 61:16–63:3) & (Ex. H, ¶¶ 1–2) (generally describing LEADS and ARMS).

22.     In Christensen's experience, ARMS and LEADS were reliable sources of information that he could trust the accuracy of. (Ex. C, 165:20–166:4, 166:22–2).

23.     From his searches of LEADS and ARMS (Ex. A, time stamp 21:58:10–22:02:51), Deputy Christensen obtained information indicating that Wylesha Ayres (the driver of the vehicle):

  a.  Had an expired driver's license. (Ex. C, 65:22–63:5).

  b.  Was not licensed to use medical marijuana. (Ex. C, 185:6–15).

c. Had been arrested numerous times, and had some criminal convictions, including for a robbery. (Ex. C, 66:6–8 & 68:22–69:8).

d. Was documented by the City of Urbana's police department as being a gang member. (Ex. C, 81:13–23).

e. Had a previous contact with the City of Champaign's police department, wherein Wylesha had been in a vehicle with two guns inside, one of which was found to be stolen. (Ex. C, 76:7–22, 77:13–78:2).

f. In the aforementioned City of Champaign incident, the vehicle in question was driven by one Quantrell Ayres, an individual known to Christensen to be a violent/dangerous criminal and suspected drug dealer who shared Wylesha Ayres' last name and was involved in a drug-related shooting. (Ex. C, 79:6–15, 98:7–8, 173:13–22, 175:12–176:14); (Ex. H, ¶3).

24.     Christensen's search did not reveal any alerts about Letika Graham. (Ex. C, 64:19–65:12).

25.     While Christensen was performing his routine searches, Deputy Cody Floyd arrived on scene, parked behind Christensen's squad car, and walked to the passenger side of Christensen's squad car. (Ex. B, start of video); (Ex. D, 71:18–72:2).

26.     From the driver seat of his squad car, Christensen informed Floyd that he (Christensen) had smelled marijuana in the SUV, that Ms. Ayres was reported to be a gang member, and that Christensen intended to have Ms. Ayres and Ms. Graham leave the vehicle so he could search it. (Ex. A, time stamp 21:01:26–22:01:45); (Ex. D, 72:24–73:13).

8

27.     Christensen testified he limited the eventual patdown of Ms. Ayres and his search of the SUV to the actions he believed was necessary to accomplish his purpose, so as not to prolong the stop and further keep Ms. Graham from getting to work. (Ex. C, 116:18–24, 181–182).

**C. The Patdown Search**

28.     Christensen put on a pair of gloves, exited his car, and approached the driver side of the SUV. (Ex. A, time stamp 22:02:51–22:03:35).

29.     While approaching the SUV, Christensen told Floyd to stand back; Floyd stayed back by Christensen's vehicle. (Ex. A, time stamp 22:03:35–22:03:42); (Ex. D, 77:5–9).

30.     When Christensen arrived at the SUV's driver-side door, he said to Ms. Ayres: "Hey Wylesha, hop out real quick. You're not under arrest, okay?" (Ex. A, time stamp 22:03:46–2:03:58). Christen went on to say he would "explain it to ya" after Ms. Ayres asked what was going on. (Ex. A, time stamp 22:03:46–2:03:58).

31.     As Ms. Ayres exited the SUV, Christensen asked if she had any weapons on her; Ms. Ayres said she did not. (Ex. A, time stamp 22:04:01–22:04:05).

32.     Ms. Ayres was wearing jogging pants that Christensen perceived as "baggy" around the waist/back-pocket area, and were loose enough that he could not rule out that Ms. Ayres had a weapon or item that could be used as on weapon on her by sight alone. (Ex. F, Dep. of L. Graham, 43:20–44:3) ("jogging pants"); (Ex. C, 99:20–100:15, 142:21–143:5); (Ex. H, ¶5). *See also* (Ex. D, 80:6–19) (testifying Plaintiff's pants appeared to in "loose fitting pants"); (Ex. A, time stamp 22:03:46–2:03:58).

33.     Christensen and Ayres walked to the back of the SUV, and stopped. (Ex. A, time stamp 22:04:05). "So here's the deal," Christensen said, and began to explain that Ms. Ayres's driver's license has been expired for over a year. (*Id.* at time stamp 22:04:05–22:04:34).

34.     Christensen continued: "My second question is — and I'm not here to ruin your day or anything, okay — but when I walked up to the car I could just smell, just, the plain ol' smell of weed; were you smoking earlier or something?" (Ex. A, time stamp 22:04:34). Ms. Ayres responded "I had smoked earlier." (*Id.* at time stamp 22:04:42).

35.     Christensen's training and personal experience told him that individuals who are drug dealers or drug users often have a weapon or item that could be used as a weapon on their person. (Ex. C, 198:12–199:3); (Ex. H, ¶5). *See also* (Ex. G, Dep. of N. Cook, 166:10–13) (agreeing there is a correlation between cannabis possession and violent crime).

36.     Christensen then asked if Plaintiff had any drugs in the SUV that she was aware of. Plaintiff said she did not. (Ex. A, time stamp 22:04:44).

37.     Christensen then asked: "Do you mind if I just pat you down real quick? Is that okay?" (Ex. A, time stamp 22:04:55–22:04:57).

38.     Before Christensen finished asking, Ms. Ayres extended her arms so they were parallel to the ground, and looked at the ground. (Ex. A, time stamp 22:04:55–22:04:57).

39.     Christensen asked Ms. Ayres to turn around so her back was towards him. She did. (Ex. A, time stamp 22:04:57).

40.     Christensen patted the outside of Ms. Ayres' waistband area and pant pockets with his gloved hands. (Ex. A, time stamp 22:04:59–22:05:06).

41.     The patdown search lasted approximately seven seconds. (Ex. A, time stamp 22:04:59–22:05:06).

42.     During the search, Deputy Floyd could was positioned such that he could not see what (if anything) Deputy Christensen's hands were doing as he searched Ms. Ayres' rear waistband/backside. (Ex. D, 78:21–79:7, 85:6–19).

43.     Deputy Floyd had no reason to suspect that Deputy Christensen would perform an improper patdown search. (Ex. D, Dep. of C. Floyd, 134:5–135:3).

44.     During the search, Christensen testified that he focused on areas where his experience and training informed him there was most likely to be a weapon of some fashion: the pant waistband, pockets, and areas of the pants where a weapon could fall if initially tucked in a waistband. (Ex. C, 100:2–11, 101:1–6, 102:12–18, 133, 135:1–136:2, 140:21–141:2, 141:7–19, 143–145, 179:11–180:16); *see also* (Ex. H, ¶5) (identifying potential weapons).

45.     During the search, Christensen's inner-hands were facing towards plaintiff, and his fingers were closed, akin to a "high five" hand gesture. (Ex. C, 102–103).

46.     Christensen testified he used the technique he did because it improved his ability to feel a small object (such as a weapon or item that could be used as a weapon) on someone's person. (Ex. C, 103:20–24); (Ex. H, ¶5).

47.     During the patdown search, Christensen ran his hands up Plaintiff's inner thighs, but stopped short of touching where Plaintiff's inner thighs would connect to her crotch area. (Ex. C, 101:24–102:5); (Ex. D, 144:20–145:5).

48.     During the patdown search, Christensen also searched a loose-fitting "web" of pant fabric that appeared to be loosely hanging down from Ms. Ayres' buttocks, and which included a portion of her back pant pockets. (Ex. C, 142:21–143:12).

49.     Christensen searched this "web" area because he had personally found weapons (including brass knuckles) in this portion of an individual's pants before May 8, 2019. (Ex. C, 143:13–144:10); *see also* (*id.* at 144:20–145:5) (agreeing weapons may fall from a suspect's waistband and can "catch[]" in the web of pant fabric between the suspect's legs); (Ex. H, ¶5) (identifying potential weapons or weapons-like objects).

50.     Deputy Christensen's hands did not touch or make contact with Ms. Ayres' genitalia. (Ex. E, 122:5–123:7); (Ex. C, 145:6–16).

51.     At the end of the search, Deputy Christensen told Ms. Ayres that "you're good." (Ex. A, time stamp 22:05:05).

52.     Ms. Ayres began to turn towards Christensen and said "Whoa, don't touch my butt." (Ex. A, time stamp 22:05:06).

53.     Prior to this statement, Ms. Ayres did not communicate to Deputy Christensen that his patdown search made her uncomfortable. (Ex. C, 186).

54.     Christensen responded that he was making sure Ms. Ayres did not have any weapons on her. (Ex. A, time stamp 22:05:06.).

55.     Christensen then turned and walked toward the passenger side of the SUV. (Ex. A, time stamp 22:05:10).

**D.  The Automobile Search**

12

56.     After patting down Ms. Ayres, Deputy Christensen searched the SUV for cannabis. (Ex. C, 110:3–16).

57.     Christensen's search of the SUV is depicted on his body camera footage, and included searching the center console, inside a zipped-shut purse/wallet, the glove compartment, and a backpack that was in the SUV's trunk. (Ex. A, time stamp 22:05:58–22:07:45).

58.     Letika Graham and Wylesha Ayres were outside the car during the search, standing near Deputy Floyd, who was by Deputy Christensen's squad car, about 10 feet from the SUV. (Ex. D, 86:1–9, 87:3–7, 89:10–13, 90:11–14). Ms. Graham and Ms. Ayres voiced their displeasure about Christensen's patdown search and automobile search. (Ex. D, 89–90); (Ex. B, time stamp 22:04:28–22:07:05).

59.     The search of the car lasted less than two minutes. (Ex. A, time stamp 22:05:58–22:07:45).

**E.  Conclusion of the Traffic Stop**

60.     After searching the SUV, Christensen, Ms. Ayres and Ms. Graham returned to their respective cars. (Ex. A, time stamp 22:07:45–22:08:07).

61.     Ultimately, Christensen wrote Plaintiff a traffic citation, and concluded the stop at 10:12pm. (Ex. A, time stamp 22:08:07–22:12:53).

62.     Plaintiff suffered no physical injuries as a result of the subject traffic stop. (Ex. E, 59:18–60:3).

**III.     STANDARD OF REVIEW**

Summary judgment is proper when the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

13

those made for purposes of the motion only), admissions, interrogatory answers, or other materials" "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a),(c). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant satisfies this initial burden, the non-movant may not rest upon the mere allegations or denials of the pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011) (quotations omitted).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Id.*

### IV.   ARGUMENT

#### A.  Count I:
#### Deputy Christensen's patdown and automobile searches were legally authorized and completed in accordance with the Fourth Amendment.

Plaintiff believes Deputy Christensen violated her Fourth Amendment rights by (1) patting down the outside of her waistband and pant pockets, and (2) by searching her vehicle. Each claim will be discussed in turn.

Preliminarily, it is undisputed that Plaintiff was "seized" for Fourth Amendment purposes during the traffic stop. Defendants also do not understand Plaintiff to be challenging the validity of the traffic stop itself,[1] of Christensen's ability to research Plaintiff's identification,[2] or to ask Plaintiff to leave her car.[3] Plaintiff also does not appear to be challenging the length of the stop, which was roughly 16 minutes long.[4] This Motion will therefore not address these issues, but Defendants reserve the right to do so should Plaintiff clarify these claims are part of her action.

### 1. *The Patdown Search*

Deputy Cory Christensen conducted a seven (7) second patdown of Plaintiff Wylesha Ayres, focusing on the area around her waistband and pant pockets. (UMF #41). During this patdown, Christensen's hand swept left and right over Plaintiff's rear pant pockets, meaning Christensen's hands were, by necessity, touching the clothing over Plaintiff's buttocks. (UMF #40). Christensen's hands were palms-down/facing toward Plaintiff during the patdown. (UMF #40, 45).

Plaintiff believes there are two Fourth Amendment violation here. First, she alleges that there was no legal justification for the patdown search. Second, she alleges the mechanics of the patdown search were inappropriate because she is a female and Christensen (a male) conducted a 'palms down' patdown search of her waistband-area.

---

[1] *See generally Whren v. United States*, 517 U.S. 806 (1996) (permitting police to stop a vehicle engaged in a traffic violation).

[2] *United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015) (stating that an officer checking the occupants' criminal histories on the officer's car computer is "a procedure permissible even without reasonable suspicion") (citations omitted).

[3] *Ohio v. Robinette*, 519 U.S. 33, 38–39 (1996); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (noting the "inordinate risk confronting an officer as he approaches a person seated in an automobile.").

[4] *Hall v. City of Chi.*, No. 19-1347, 2020 U.S. App. LEXIS 8958 (7th Cir. Mar. 23, 2020) (noting an 11 or 15 minute stop would not be an unreasonable duration of time for a *Terry* seizure).

Plaintiff is incorrect, as discussed below. But first, it is important to note that possession of certain amounts of marijuana was illegal in Illinois on May 8, 2019, particularly if possessed or used in a car — and thus there was a marijuana-related crime Christensen could have suspected Plaintiff of committing. (UMF #15); *see also People v. Hill*, 2020 IL 124595, ¶31 (Mar. 19, 2020) (Stating, for a 2017 arrest, that "[w]hile the decriminalization of cannabis dismissed the penalty for possession of no more than 10 grams of cannabis to a civil law violation punishable by a fine, possession of cannabis remained illegal. [Citation omitted]. Accordingly, the decriminalizing of possessing small amounts of cannabis did not alter the status of cannabis as contraband.")

### a.  Patdown: Legal Justification

Plaintiff alleges that Deputy Christensen's patdown search was not legally justified under the Fourth Amendment. This is incorrect, for at least three reasons: (1) Plaintiff consented to the search; (2) Deputy Christensen had reasonable, articulable suspicion to search Plaintiff for weapons — i.e., he performed a lawful "*Terry* stop"; and (3) Christensen had probable cause that Plaintiff had illegal drugs (marijuana) on her person, and therefore could search her.

### i.  Consent

Consent to a search must be freely and voluntarily given, and not by showing "mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality). The scope of consent requires focuses on what a reasonable officer would have believed the suspect's consent permitted. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The Constitution does not require an individual to know he or she can refuse a search in order for consent to be effective. *Mendenhall*, 446 U.S. 544, 558 (1980).

The consent to a search may be in the form of words or gestures. *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976). For a pat-down search, a defendant's shrug and raising of his arms is evidence of consent for a pat-down search. *See, e.g.*, *United States v. Wilson*, 895 F.2d 168, 172 (4th Cir. 1990) (noting that the officer was in plain clothes, made no threats, displayed no weapons, and asked to search the suspect in public); *see also United States v. Vongxay*, 594 F.3d 1111, 1119-1120 (9th Cir.) (defendant consented to search by raising his hands to his head in response to officer's request to search for weapons); *United States v. Chrispin*, 181 F. App'x 935, 939 (11th Cir. 2006) (per curiam) ("although [defendant] did not express his verbal assent to be searched, his body language — turning away from [the officer] and placing his hands on the police cruiser as if preparing to be searched — gave implied consent"); *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001) (affirming district court's holding that defendant's gesture of opening his arms in response to request to search constituted an implied consent); *United States v. Mendoza-Cepeda*, 250 F.3d 626, 629 (8th Cir. 2001) (defendant's gesture of raising arms in response to request to search torso constituted implied consent).

Here, it is undisputed that Christensen asked Plaintiff if he could pat her down, and she responded by raising her arms and turning around. (UMF #37–39). Under the aforementioned authority, Plaintiff impliedly consented to the patdown search.

The remaining issue is whether Plaintiff's implied consent was the product of coercion. To analyze this issue in the traffic-stop context, courts within the Seventh Circuit have considered the following factors:

1. The defendant's age, intelligence, and education;

2. Whether the defendant was advised of his/her constitutional rights;

3. How long the defendant was detained prior to giving consent;

4. Whether the consent was immediate, or was prompted by repeated requests by

   authorities;

5. Whether any physical coercion was used;

6. Whether the defendant was in police custody when consenting.

*United States v. Correa*, 2013 U.S. Dist. LEXIS 149366, at *4 (citing *U.S. v. Pineda-Buenaventura*, 622 F.3d 761, 776 (7th Cir. 2010), *aff'd United States v. Correa*, 908 F.3d 208, 215 (7th Cir. 2018).

Here, these factors show Plaintiff's consent was properly given.

**First**, age/education/intelligence. The factor was satisfied when the suspect during a traffic stop was 30 years old, spoke fluent English, and completed two years of high school. *United States v. Correa*, 2013 U.S. Dist. LEXIS 149366, at *15, *aff'd United States v. Correa*, 908 F.3d 208, 215 (7th Cir. 2018). Here, Wylesha Ayres was 27 years old at the time of the search, spoke English (as is evident in the video), and had dropped out during 12th grade. (UMF #3). Plaintiff therefore had a similar background as the *Correa* defendant, cutting in favor of finding proper consent here. *See also United States v. Mendenhall*, 446 U.S. 544, 558 (1980) ("[W]e note that the respondent, who was 22 years old and had an 11th-grade education, was plainly capable of a knowing consent.")

**Second**, whether Plaintiff was advised of her constitutional rights. An officer is not required to tell a suspect he or she can refuse consent, but this information speaks to a given individual's ability to properly consent. *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). In the absence of express instruction on the ability to refuse consent, Courts have found it significant that the suspect had been arrested previously. *Correa*, *supra* at *15 (noting "Although Correa was not advised that he could refuse consent, he previously had been arrested fifteen times for a variety of offenses,

18

several of which stemmed from traffic stops.") Here, Plaintiff has a relatively robust criminal history, and testified she has been patted down "a little less than a hundred" times. (UMF #4). Given this background experience with law enforcement, Plaintiff (like the *Correa* suspect) was not ignorant of her constitutional rights.

**Third**, the length of detention. Here, Plaintiff gave consent to the patdown search roughly nine minutes into the traffic stop, according to the body camera footage. (UMF #40). This is not a case where a suspect was detained for hours at the police station, and, moreover, the consent occurred in less time than the Seventh Circuit has found reasonable for a *Terry* stop. *Hall v. City of Chi.*, No. 19-1347, 2020 U.S. App. LEXIS 8958 (7th Cir. Mar. 23, 2020) (noting an 11 or 15 minute stop would not be an unreasonable duration of time for a *Terry* seizure). Thus, this factor cuts in favor of finding proper consent.

**Fourth**, the immediacy of the consent and frequency of the officer's request. Here, Deputy Christensen only asked Plaintiff for consent once, and she started raising her arms before he finished. (UMF #37–39). Thus, this factor cuts in favor of finding proper consent.

**Fifth**, the use of any physical coercion. Here, neither Christensen nor Floyd touched Ms. Ayres before she was patted down. Neither officer brandished a firearm, reached for their firearm, or threatened to escalate their tactics if Plaintiff refused. Granted, Christensen used a flashlight to illuminate Plaintiff's face when he spoke with her and was dressed in his uniform and armed when he spoke with her. (Ex. A). However, none of this is "physical coercion," or, indeed, particularly remarkable for a traffic stop. *See, e.g.*, *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (noting the "noncoercive aspect of ordinary traffic stops" while concluding *Miranda* "custody" does not occur simply because a driver is stopped by police); *United States v. Correa*,

2013 U.S. Dist. LEXIS 149366, at *4, 15–16 (finding driver's consent to search vehicle valid and there was no "physical coercion" where officer approached stopped car "[d]onned in a bulletproof vest marked 'Police' on both sides," and was joined by another officer who stood by the passenger window), *aff'd United States v. Correa*, 908 F.3d 208, 215 (7th Cir. 2018).

**Sixth (and finally)**, whether Plaintiff was in "custody" (as compared to "detained") when consent was given. Traffic stops are akin to *Terry* stops, because the typical stop is brief, in public, and usually concerns at most two officers — all of which "mitigate the danger that a person questioned will be induced to speak where he would not otherwise do so freely." *Berkemer v. McCarty*, 468 U.S. 420, 437–440 (1984) (internal quotations omitted). Stated differently, absent something akin to arrest, a stopped driver is not in "custody" for Fourth Amendment purposes. It is also noteworthy that even if a suspect is in "custody," "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976) (concluding an *arrestee's* consent to search his car was voluntary when the arrestee was advised any evidence found could be used against him, there was no overt act of force used against the suspect, and the arrestee was on a public street instead of at the police station, even though the arrestee was not told he could refuse to consent to the search).

Here, Plaintiff was detained in a traffic stop; she was not placed in handcuffs; and she was expressly told she was not under arrest shortly before she gave consent. (UMF #30, 37). Thus, Plaintiff was not in police "custody" for Fourth Amendment purposes.

**In summary:** The undisputed evidence shows Plaintiff properly consented to a patdown search. Leading up to the patdown search, Ms. Ayres was expressly told she was not under

arrest, was politely asked if she could be patted down, impliedly consented to the patdown by raising her arms, and did not protest the patdown until after it was completed. Christensen did not threaten Ms. Ayres, brandish his gun, or say he could search her without his consent. Moreover, Ms. Ayres was not ignorant of her rights: she was aged and educated enough to give a valid consent; her criminal history and experience with hundreds of patdowns meant she was more familiar with the idea she could refuse consent than the vast majority of people; and Ms. Ayres' consent was immediate. Deputy Christensen therefore had Plaintiff's consent, and his patdown was constitutionally permissible.

### ii.      Reasonable Articulable Suspicion (Terry v. Ohio)

For *arguendo* only: even if Plaintiff did not validly consent to the patdown search, Officer Christensen has a reasonable, articulable suspicion that Ms. Ayres posed a threat to his safety, and therefore the patdown is additionally justified by the doctrine articulated in *Terry v. Ohio*.

A *Terry* patdown is permitted if an officer has a reasonable, articulable suspicion (a degree of proof less rigorous than probable cause) that a given suspect may be armed and present a danger to the officer or others. *United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999); *see generally Terry v. Ohio*, 392 U.S. 1 (1968). An officer "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of otherwise was in danger." *Terry*, 392 U.S. at 27. "Reasonable suspicion" is measured against the totality of the circumstances, an objective test, and can include an officer's factual inferences, whether based on police training or "common sense." *Kansas v. Glover*, 140 S.Ct. 1183, 1189–90 (Apr. 6, 2020); *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006); *see also Brigham City, Utah v. Stuart*, 547 U.S. 398,

404 (2006) (explaining an officer's subjective motivation to intrude within a home "is irrelevant" under the Fourth Amendment).

What are the relevant facts here (as known to Christensen), that would provide a law enforcement officer in Christensen's position a reasonable suspicion that Plaintiff might be armed?

- It was a traffic stop on a public street, at night, and in a high-crime area known to Christensen for narcotics and violent crimes. (UMF #7, 9–10); *see Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (noting the "inordinate risk confronting an officer as he approaches a person seated in an automobile."); *Illinois v. Wardlow*, 528 U.S. 119, 123–124 (2000) ("[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis.").

- Deputy Christensen pulled Plaintiff (the driver) over for having an expired registration sticker for the vehicle that she was driving.  Thereafter, he discovered that she was also driving the car at a time that her driver's license had expired.  Finally, he also discovered that the interior of Plaintiff's vehicle smelled of marijuana when Plaintiff lowered the driver's window to speak with Christensen.  These three facts taken together can be reasonably interpreted as indicia of a person more likely than not to be engaged in illicit drug activity given the law in Illinois at that time. *See* (UMF #15).

- Plaintiff admitted to smoking an illegal drug (marijuana) earlier, her car smelled of the drug, and Christensen's experience and training told him that illegal drug users are often armed. (UMF # 14, 34–35); *see United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999) ("The indications that Brown might be involved with drugs — the fact of the FBI

surveillance, enhanced by the strong marijuana smoke odor in his vehicle — contributed

to reasonable suspicion that Brown was armed and dangerous. Drug dealing is a crime

infused with violence.") (internal quotations/citations omitted).; *Jeans v. Varga*, 2019 U.S.

Dist. LEXIS 171401, *24 (N.D. Ill. 2019) (citing authorities); *United States v. Noble*, 364 Fed.

Appx. 961, 965 (6th Cir. 2010) (unpublished) (proper *Terry* pat-down for officer safety

during a traffic stop when (1) the officer smelled weed in the driver's car, (2) thus causing

suspicion that the driver was involved in illegal drug activity coupled with (3) the officer's

experience that persons engaged in drug activity are often armed).

- Christensen learned that Plaintiff was a reported gang member, had been stopped by

  police for an incident involving Quantrell Ayres (a known violent/dangerous criminal and

  suspected drug dealer), and that this incident with Quantrell Ayres involved an illegal

  firearm being found in a car. (UMF #23(d)–(f)). "An individual's criminal association 'is a

  permissible component of the articulable suspicion required for a *Terry* stop.'" *United

  States v. Lyons*, 856 F. Supp. 2d 946, 954 (C.D. Ill. 2012) (quoting *United States v. Feliciano*,

  45 F.3d 1070, 1074 (7th Cir. 1995) (gang membership), affm'd, 733 F.3d 777, 782–83 (7th

  Cir. 2013).

- Plaintiff's pants were baggy enough that Christensen could not rule out the possibility

  Plaintiff had a weapon in her waistband/pants by sight alone. (UMF #32).

Defendants acknowledge that none of these factors *alone* may necessarily justify a *Terry*

patdown. However, taken together, Deputy Christensen's knowledge of the context (traffic stop

at night in a high-crime area), Plaintiff's reported gang membership and affiliation with known

violent criminals, and the association between Plaintiff's conduct (the marijuana-scented car and

admission to consuming the drug) and being armed gave on officer in Christensen's position the minimum amount of suspicion needed to justify patting Plaintiff down.

### iii.      *Probable Cause/Exigent Circumstances*

Finally (and, again, *arguendo*): *even if* Deputy Christensen did not have valid consent to search Plaintiff, or a reasonable suspicion that she posed a threat to his safety, Christensen undisputedly *did* have probable cause to search Plaintiff for marijuana, and sufficient exigent circumstances justify a warrantless search.

First, a reasonable officer in Christensen's position would have had probable cause to believe Plaintiff had marijuana on her person (which, again, could have been a crime in May of 2019). If an officer smells weed and this scent can be localized to an individual, then probable cause exists to believe the person has committed or is committing the crime of possession of marijuana, and an arrest can be made. *United States v. Paige*, 870 F.3d 693, 700 (7th Cir. 2017); *see also Lessley v. City of Madison*, 654 F. Supp. 2d 877, 894 (S.D. Ind. 2009) (citing *United States v. Humphries*, 372 F.3d 653, 659 (4th Cir. 2004)). It does not matter if weed is not ultimately discovered during a search — a "reasonable belief" need not be a "perfectly accurate one." *United States v. Moore*, 2008 U.S. Dist. LEXIS 9384, *26 (N.D. Ill. 2008).

Here, Deputy Christensen smelled weed in Plaintiff's car. (UMF #14). Plaintiff than traced this smell to herself, when she admitted that she had smoked marijuana earlier. (UMF #34). Thus, an officer in Christensen's position would have had probable cause to believe Plaintiff had committed or was committing the crime of possession of marijuana — indeed, Christensen could have arrested Plaintiff on this basis, under *United States v. Paige*, *supra*.

Second, there was a sufficient exigency to excuse getting a warrant. Exigent circumstances exist if officers have an objectively reasonable fear that evidence may be destroyed or removed before a warrant can be secured. *United States v. Rivera*, 248 F.3d 677, 680–681 (7th Cir. 2001). For example, in *Schmerber v. California*, the United States Supreme Court concluded exigent circumstances justified submitting a suspected intoxicated driver to a warrantless blood test, because a delay to get a warrant would have given the driver time for his blood alcohol levels to drop. 384 U.S. 757, 770–771 (1966). In *Kentucky v. King*, the Supreme Court reiterated that a warrantless search is permissible on exigency grounds to prevent destruction of evidence if "the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment[.]" 563 U.S. 452, 462 (2011) (discussing exigency to enter a dwelling). The Court also rejected multiple attempts to limit this rule — such as by imposing a "good faith" or "foreseeability" requirement for officers. *Id.* at 465–468. Among the rejected arguments was the idea that officers could not claim an exigency if they failed to obtain a warrant once probable cause was established. *Id.* at 466–67. Such a requirement would prevent officers from attempting to further investigate a "marginal" case, or streamlining an investigation by obtaining consent. *Id.* at 467. As the Court noted, "[f]aulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution." *Id.*

Here, Christensen had probable cause that an individual had an illegal drug on herself and in her car. Christensen's experience was that it would take prohibitively long to get a warrant (roughly two hours), and that individuals with illegal drugs on them are prone to quickly fleeing and destroying evidence. (UMF #17–18). Moreover, this was a traffic stop, and, as the Supreme

Court has recognized, cars pose the inherent exigency of ready flight (alongside increased safety risks). *Collins v. Virginia*, 138 S. Ct. 1663, 1669–70 (2018) (automobile exception/exigency); *Arizona v. Johnson*, 555 U.S. 323, 331–32 (2009) (safety concerns; discussing authorities). Although the exigency exception for cars only extends to the car itself, *Collins*, *supra* at 1671, this does not foreclose consideration of the simple fact that Plaintiff had the ability to get in her car, drive away, and destroy whatever evidence may have been on her person.  Finally, Deputy Christensen did not 'create the exigency' with any misconduct: the traffic stop itself and questioning of Plaintiff were proper.

Thus, a reasonable officer in Christensen's position would have been faced with a choice: extend the stop by roughly two hours (creating a potential Fourth Amendment violation) to obtain a warrant to search Plaintiff; let Plaintiff leave the scene (and risk destroying evidence) while Christensen obtained a warrant and subsequently tried to track Plaintiff down to search her person; arrest Plaintiff and search her incident to arrest at the scene or at the police station (which would have been lawful, but a maximum deployment of law enforcement authority); or decide to limit his use of lawful authority by conducting an outside-the-clothes search. Christensen chose to address the exigency with the least amount of law enforcement authority he could exert, and it would be peculiar for Christensen to be unable to do so when the fullest use of authority (arrest) would have been legal.

### b.  Patdown: Mechanics

Shifting from the "why" of the patdown to the "how": Plaintiff originally alleged that Deputy Christensen rubbed/groped/fondled her "female private parts" during the patdown search. But Plaintiff's testimony and Christensen's body camera footage belie this allegation. (UMF #40). So

what *is* the basis for Plaintiff's claim? As best Defendants can ascertain, Plaintiff appears to advance two arguments: First, that the fact Christensen and Plaintiff are of opposite sexes made the search Constitutionally inappropriate; Second, Christensen's decision to have his "palms in" during the search and pass over/around Plaintiff's back pockets was inappropriate, tantamount to touching Plaintiff's buttocks.

Defendants respectfully disagree. As discussed in more detail below, the Fourth Amendment does not require same-sex patdown searches. Moreover, Christensen's conduct falls far short of the type that would violate Plaintiff's Fourth Amendment privacy rights.

Preliminarily: The scope of a Fourth Amendment search is set by a balance between the individual's privacy rights and the state's interest in conducting the particular search in question. *Mary Beth G. v. Chicago*, 723 F.2d 1263, 1268, (7th Cir. 1983) (discussing *Bell v. Wolfish*, 441 U.S. at 559).  Defendants do not believe there is any dispute that preserving community safety by removing weapons or illegal drugs from a suspect's person are legitimate state interests. There issue is therefore the extent to which Plaintiff's privacy rights were implicated.

Turning to Plaintiff's apparent arguments:

**First**, there mere fact Christensen was a male and Plaintiff was a female did not violate her Fourth Amendment rights. Stated differently, there is no constitutional right to being patted down by a member of the same sex. Candidly, Defendants are not certain that Plaintiff is sincerely claiming same-sex searches are mandatory, but address the argument out of a surplus of caution.

Counsel has not found a case in this Circuit where the Fourth Amendment was violated simply because a male officer conducted a patdown search of a female suspect during a traffic

27

stop. Within this Circuit, the bulk of the decisions appear to arise in the correctional context — a more-controlled setting removed from the isolation of a traffic stop, not least of which because there are multiple officers readily available in a jail/prison setting to conduct a given search, and (usually) no ongoing criminal activity requiring an urgent investigation. Nonetheless, even in the correctional context, the Seventh Circuit has held that officers of the opposite sex can patdown inmates. *See, e.g.*, *Madyun v. Franzen*, 704 F.2d 954, 956 (7th Cir. 2983) ("We hold that the state may require male prison inmates — even those with religious objections — to submit to frisk searches by women guards[.]"); *Smith v. Fairman*, 678 F.2d 52, 54–55 (7th Cir. 1982) (Fourth Amendment privacy; upholding jail's policy to permit female guards to frisk male inmates so long as genitals/anal area not searched). It is also worth noting that there are potential Equal Protection issues posed by searching suspects differently based on their sex/gender. *See, e.g.*, *Doe v. City of Chicago*, 1982 U.S. Dist. LEXIS 14417, *11–12 (N.D. Ill. 1982) (Fourth Amendment and Equal Protection violation; concluding police may not *strip search* female arrestees at the station as a blanket policy — and regardless of any reasonable suspicion or probable cause — while only doing pat-down searches of male arrestees).

These Seventh Circuit decisions are consistent with what appears to be the general rule: An otherwise lawful search does not become unlawful simply because the patdown was conducted by an officer of the opposite sex. [5] Indeed, requiring same-sex searches would undercut an

---

[5] ***See, e.g.,*** *Martin v. Swift,* 781 F. Supp. 1250, 1253 (E.D. Mich. 1992) (holding that there is "no question that [the pat-down search of a female arrestee on a misdemeanor by a male officer] *would* pass constitutional muster" and noting "[t]o find otherwise would require every police car to carry two officers, one male and one female, so that misdemeanants would be searched by officers of the same sex") (emphasis in original); ***see also*** *Talman Caldwell v. Rubbo,* 1993 U.S. App. LEXIS 20412, at *3 (4th Cir. 1993) ("Caldwell had no constitutional right to have the pat-down search performed by someone of her own gender."); ***and*** *Walton v. City of Southfield,* 995 F.2d 1331, 1339 (6th Cir. 1993) (summary judgment granted to male officer who conducted search of female suspect), *overruled on other grounds by Saucier v.*

important state interest: for male and female employees to have equal employment opportunities. *Canedy v. Boardman*, 16 F.3d 183, 185-87 (7th Cir. 1994); *Smith v. Fairman*, 678 F.2d 52, 54–55 (7th Cir. 1982) (Fourth Amendment privacy; upholding jail's policy to permit female guards to frisk male inmates). The deleterious impact of Plaintiff's apparent proposed rule is apparent: it would reduce a female deputy (for example) to only being able to frisk female suspects or arrestees, preventing the deputy from being able to ensure a large swath of the population is not armed and dangerous, and thus reducing the scope of a female deputy's job.

In short, Defendants recognize that privacy sensibilities may evolve over time, but has struggled to find authority supporting Plaintiff's apparent position.

**To Plaintiff's second argument**: it is not unconstitutional for a male officer to have his "palms in" during a patdown search, and or to check her back pant pockets (by passing over the pockets and approaching from underneath to ensure the "web" of loose fabric around her back pockets was empty). (UMF #40, 48–49).

It is first important to note what is not at issue in this case. This is *not* a case where Plaintiff was strip-searched or otherwise made to expose bare skin to a member of the opposite sex. *Cf. Canedy v. Boardman*, 16 F.3d 183, 185-87 (7th Cir. 1994) (noting greater privacy violation when an individual's body is viewed by a member of the opposite sex); *Doe v. Calumet City*, 754 F.

---

*Katz,* 533 U.S. 194 (2001); *and Stokes v. City of N.Y.,* 2007 U.S. Dist. LEXIS 32787, at *44 n.9 (E.D.N.Y. May 3, 2007); *and Ziegler v. Kedron,* 2003 U.S. Dist. LEXIS 14273, at *3 (E.D. Mich. Jun. 11, 2003) ("[T]he plaintiff alleges a generalized right to a non-invasive pat-down search by an officer of the same sex, a rule that would not only be impractical, but also has no support in the jurisprudence."); *and Wyatt v. Slagle,* 240 F. Supp. 2d 931, 939-940 (S.D. Iowa 2002) (holding that opposite-sex patdown searches conducted incident to arrest were reasonable under the Fourth Amendment and granting summary judgment for defendant officer in Section 1983 action); *and Greiner v. City of Champlin,* 816 F. Supp. 528, 543 (D. Minn. 1993) ("Plaintiffs do not specifically argue that the method in which [the police officer] conducted the search gave rise to the constitutional violation, but instead implies [sic] that the fact that a male officer rather than a female officer conducted the search means a *per se* constitutional violation occurred. The Court disagrees."), *aff'd in part, remanded in part on other grounds,* 27 F.3d 1346 (8th Cir. 1994).

Supp. 1211 (N.D. Ill. 1990) (strip searches). This is *not* a case where the officer conducting the patdown touched any of the suspect's bare skin, grabbed the suspect's breasts, genitals, or made lewd comments during the search. *Smith v. Fairman*, 678 F.2d 52, 54–55 (7th Cir. 1982) (female correctional officer could patdown male detainees, but not the male detainee's "genital area"); *Cf. Stewart v. Rouse*, 1999 U.S. Dist. LEXIS 1985, *11–12 (N.D. Ill. 1999) (search incident to arrest; denying defendant-officer summary judgment when plaintiff's testimony was that the officer "aggressively groped her, grabbed her groin, and grabbed her breasts with both hands," but noting the officer's motion may have been "well-taken" if the defendant only placed "his hands on [plaintiff's] breasts and between her legs."); *Banaei v. Messing*, 547 Fed. Apx. 774, (7th Cir. 2013) (unpublished) (strip-search in front of male officers who made lewd comments warranted reversing summary judgment entered in officers' favor).

Instead, this case is about whether the Constitution permits an officer to pat down the outside a suspect's back pant pockets and inner thighs with a palms-in technique, when the suspect is a female and the officer is a male. The law suggests this is permissible.

First, patting down a suspect's pants or inner thighs is unremarkable, and such searches have been documented to reveal concealed items.[6] Although Seventh Circuit precedent shows opposite-sex patdowns of "genital areas" can be constitutionally problematic, *Smith, supra*, the

---

[6] *See, e.g.*, *United States v. Robinson*, 615 F.3d 804, 805–806, 807–808 (7th Cir. 2010) (no Fourth Amendment violation when *Terry* patdown of suspect's backside detecting a hard object that turned out to be a bag of crack wedged in the suspect's buttocks); *United States v. Thomas*, 512 F.3d 383, 388–89 (7th Cir. 2008) (search incident to arrest; no Fourth Amendment violation when officer patted down suspect's backside, revealing a bag of drugs between the suspect's buttocks); *United States v. Williams*, 209 F.3d 940, 944 (7th Cir. 2000) ("The officer running his hands up Williams' leg felt a hard object between the cheeks of Williams' buttocks, which was readily identifiable to him as contraband."); *United States v. Rankins*, 118 Fed. Appx. 62, 66 (7th Cir. 2004) (unpublished) (officer's patdown did not include crotch or buttocks area, failing to detect a gun the suspect then deposited in the officer's squad car during transport).

Seventh Circuit has also noted (again, in the correctional setting) that frisks/patdowns of "buttocks" and "between [plaintiff's] legs in close proximity to or actual contact with plaintiff's genitals" or in the "crotch area" are constitutionally permissible, even when done by members of the opposite sex — as such a search "would have been no more than a simple frisk or pat-down, done outside the clothing, without any deliberate attempt to examine the 'genital-anal' areas." *Madyun v. Franzen*, 704 F.2d 954, 956–57 (7th Cir. 1983) (Fourth Amendment).

Second, there is no binding authority counsel can find establishing that a 'palms-out' technique is required for an opposite-sex patdown (or required at all). Granted, Plaintiff retained an expert who opined that Christensen's patdown search was inconsistent with police policies and practices. But policies-and-practices testimony do not established the Fourth Amendment's requirements. *Biegert v. Molitor*, 968 F.3d 693, 698–699 (7th Cir. July 31, 2020) (citing *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)).

Finally, it is worth reiterating the entire context of the search. The entire patdown lasted only seven seconds, and video shows Christensen patting down Plaintiff's back pockets for a mere fraction of the search — a length of contact deemed *de minimus* in other contexts. *See, e.g.*, *Payne v. Stacy*, 2020 U.S. Dist. LEXIS 30863, at *10–11 (E.D. Wis. Feb. 24, 2020) (Fourth Amendment/Excessive Force; concluding the fact a male and female correctional officer on separate occasions touched the plaintiff's buttocks for "several seconds" with a metal detector while the plaintiff was visiting an inmate to be a *de minimus* use of force). Christensen also put gloves on before patting Plaintiff down, placing another layer of privacy protection. (UMF #28, 40). Although the patdown search occurred in public, it was at night and Christensen posited himself between Plaintiff and the road, limiting Plaintiff's exposure to passers-by/observers. (Ex.

A). Indeed, even Plaintiff's passenger, Letika Graham, was blocked from seeing the patdown search. (Ex. F, Dep. of L. Graham, 53:7–13) (testifying she could not see — from her vantage point in the passenger seat of the SUV — where Christensen's hands were searching after she believes she saw Christensen search Plaintiff's torso).

In sum: The search is clearly depicted on Christensen's body camera footage. (Ex. A). What the footage shows is an unremarkable patdown of a suspect's back pant pockets and inner thigh. The law permits such patdowns. Summary judgment is warranted.

### c.  <u>Automobile Search</u>

Deputy Christensen had probable cause to search Plaintiff's SUV, because he smelled the odor of marijuana coming from the vehicle.

A warrant is not required to search a vehicle stopped on a public roadway so long as there is probable cause to believe that the vehicle contains contraband or evidence of a crime, and this search may include compartments and containers within the vehicle so long as supported by probable cause. *California v. Acevedo*, 500 U.S. 565, 569–571 (1991) (discussing cases). Moreover, there is a "lesser expectation of privacy in an automobile" because it is mobile, "seldom" the "repository of personal effects," and travels on public roads where "both its occupants and its contents are in plain view." *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974).

An officer "who smells marijuana coming from a car has probable cause to search that car." *United States v. Peters*, 743 F.3d 113, 1118 (7th Cir. 2014) (quoting *United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008)) *United States v. Mosby*, 541 F.3d 764, 768-69 (7th Cir. 2008) (citing sources); *see also People v. Stout*, 106 Ill. 2d 77, 87 (1985). This search can extend to contents of the car. *See Wyoming v. Houghton*, 526 U.S. 295, 301 (1999).

Here, it is undisputed that Christensen smelled the odor of marijuana coming from Plaintiff's car, and that Plaintiff is on video admitting that she smoked "weed" earlier in the day. The aforementioned authorities suggest this is more than a sufficient basis for probable cause to search the car for marijuana, as well as search the contents of the car where the marijuana could be (such as the backpack in the trunk). Summary judgment is therefore warranted on this claim.

### B.   Count II (Failure to Intervene):
### Deputy Floyd had no reasonable opportunity to prevent any constitutional violation, assuming there was one *arguendo*.

Plaintiff alleges Deputy Floyd failed to intervene and prevent Deputy Christensen's patdown or automobile searches. But, as already discussed, Christensen did not violate the constitution, and therefore Deputy Floyd had no wrong he was compelled to prevent. *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004). That ends the analysis for Deputy Floyd; the below is *arguendo*.

Police officers may be liable for their failure to protect a plaintiff when a fellow officer violates a plaintiff's rights in their presence. *Byrd v. Brishke*, 466 F.2d 6, 10 (7th Cir. 1972). To be liable, the officer must have (1) "had reason to know" that any constitutional violation has been committed by a law enforcement officer, *and* (2) "a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Each element will be discussed in turn.

First, Deputy Floyd had no reason to know that any constitutional violation was occurring. Deputy Floyd was not privy to Christensen's rationale for patting down Plaintiff. (*See* UMF #26). Therefore, Floyd was permitted to rely on Christensen's own investigation and conclusions. *Spiegel v. Cortese*, 196 F.3d 717, 726 (7th Cir. 1999) (noting "it would be odd . . . to hold than an officer relying on reasonable information from a fellow officer" is not entitled to

qualified immunity); *Tangwall v. Stuckey*, 135 F.3d 510, 520 (7th Cir. 2002) ("[A]n officer can lawfully act solely on the basis of fellow officers' statements if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of probable cause."); *see also Alcorn v. City of Chicago*, 2018 U.S. Dist. LEXIS 126034, at *31–33 (N.D. Ill. 2018) (citing cases). The simple fact Christensen was a male officer patting down a female also was not a constitutional violation, as already discussed. Finally, for the automobile search, Christensen told Floyd that he smelled marijuana in the car — a fact that justified searching Plaintiff's car. Therefore, Floyd had no reason to believe the simple fact that Christensen searched Plaintiff or her car *at all* was a constitutional violation he should have intervened in.

Furthermore, Deputy Floyd could not even see the allegedly inappropriate portion of Christensen's patdown search. Plaintiff testified the only part of Christensen's search she objected to was his "touching" her "butt." (UMF #52). However, Christensen testified that he was standing *in front* of Plaintiff, and therefore was not able to see how Christensen was allegedly searching Plaintiff's backside.  (UMF #42). Floyd's body camera footage proves this — and also that his attention was diverted for a portion of the seconds-long patdown search by Plaintiff's passenger, who was yelling at the officers from the passenger side of the car.

Second (and for the sake of argument), even if Deputy Floyd *did* see Deputy Christensen perform an inappropriate patdown search of Plaintiff's backside, Deputy Floyd did not have a reasonable opportunity to intervene.

The case law shows a defendant-office cannot be faulted for failing to intervene in a one-off, near-instantaneous constitutional violation. The excessive-force context best demonstrates the point. For example, when an individual who was ordered to leave his bed was tased before

being able to say the sentence "I can't get up", the Seventh Circuit concluded "if the time between the order and the shot was so brief that [the observing officer] could not respond, we decline to hold [him] liable for failing to respond as well." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009) (Eighth Amendment). The same result followed when one officer witnessed another knee an arrestee in the chest: the attack happened "just once and stopped, so there was no chance for the officers to step in and no need to warn the [attacking officer] to stop." *Green v. Chvala*, 567 Fed. Appx. 458, 461 (7th Cir. 2014) (Fourth Amendment; unpublished). Other courts have echoed this logic in the excessive-force context.[7] In contrast, if an officer is repeatedly attacking in individual, then an observing officer's passivity may be a basis for liability. *Byrd v. Brishke*, 466 F.2d 6, 9–11 (7th Cir. 1972) (arrestee testified he was taken to a back room and repeatedly beaten by a number of police officers; reversing directed verdict for defendant officers who observed the beating).

Here, Floyd had no reason to expect Christensen would (again, *arguendo*) perform an inappropriate search, as every search Floyd had seen Christensen do before was proper. (Ex. D, Dep. of C. Floyd, 134:5–135:3). The patdown search in question lasted seven (7) seconds total, and Deputy Floyd was about 10 feet away from Plaintiff the entire time. (UMF #29, 41). The allegedly inappropriate part of the search happened just before the search was over (UMF #40)

---

[7] *Samuels v. Cunningham*, 2003 U.S. Dist. LEXIS 14479, at *6–7 & n.3 (D. Del. 2003) (dismissing officers who witnessed another officer sucker-punch a handcuffed defendant one time; "Under the facts alleged, these defendants could not have anticipated that Hall would throw a single punch after Plaintiff was handcuffed."); *Jones v. City of Hartford*, 2003 U.S. Dist. LEXIS 17340 (Dist. Conn. 2003) (*inter alia*, dismissing officers who witnessed another officer use excessive force, but did not have an opportunity to intercede before the use of force had ended); *see also Jackson v. Gerl*, 622 F. Supp. 2d 738, 753–54 (W.D. Wis. 2009) (granting summary judgment for correctional officers who allegedly failed to stop a correctional officer from squeezing an inmate's genitals during a strip search; "There is no evidence [these defendants] had any reason to know defendant Esser would perform the squeeze or body cavity search and the video demonstrates that, if these things happened, they happened very quickly.")

— meaning Floyd would have had one second to close this 10-foot gap and stop Christensen from searching Plaintiff. This is simply too brief/instantaneous a violation to charge Christensen with "failing" to prevent it. Summary judgment is therefore warranted in Deputy Floyd's favor.

### C.   Qualified Immunity

At minimum, Defendants Christensen and Floyd are entitled to qualified immunity, as it was not clearly established in May of 2019 that their conduct violated the Constitution.

Qualified immunity asks whether it was "clearly established" at the time of the alleged constitutional violation that the misconduct in question was, in fact, unconstitutional. *Campbell v. Kallas*, 936 F.3d 536, 545–46 (7th Cir. 2019). The burden is upon the Plaintiff to show that a particular right is "clearly established." *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019).

If an officer's conduct is not clearly unconstitutional at the time of his or her conduct (here, May 8, 2019), then the officer cannot be liable. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). The idea is that officers should not be retroactively penalized for conduct whose illegality was not "beyond debate" at the time. *Id.* To be "clearly established," unconstitutional conduct either needs to be deemed as such by a court and not contradicted by others, or be so obviously unconstitutional that a court need not first weigh in. *Id.; Warlick v. Cross*, 969 F.2d 303, 309 (7th Cir. 1992). A "clearly established" right cannot be defined at a "high level of generality," such as a simple requirement to "not use excessive force." *Kisela,* at 1152. Crucially, Qualified Immunity is an issue the Court must determine; the jury cannot make the legal conclusion that a law was "clearly established" or not. As the Seventh Circuit recently put it: "Frame the constitutional right in terms granular enough to provide fair notice[,] because qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Campbell*, 936 F.3d at 545–46.

### 1. *Christensen*

Assuming *arguendo* that Deputy Christensen violated Plaintiff's rights by patting her down or by searching her vehicle, Deputy Christensen is still immunized from liability.

In relevant part, on May 8, 2019, it was not clearly established that:

- A police officer cannot rely on the implied consent of an individual who raises his or her arms parallel to the ground when asked if he or she can be patted down;

- A police officer could not search a suspect for weapons when the suspect was driving on an expired driver's license at night in a high-crime area with expired registration; was known to the officer to be a gang member who had been previously associated with a known violent criminal and suspected drug dealer in an incident involving a stolen firearm in a car; who admitted to smoking marijuana and exited a car that smelled like marijuana; and was wearing pants that were baggy enough to conceal a weapon;

- A police officer lacked probable cause to search a suspect who was driving a car that smelled like cannabis and admitted to having smoke cannabis "earlier";

- A male police officer could not patdown a female suspect during a traffic stop;

- A male police officer was constitutionally prohibited from conducting a patdown search of a female "palms down" or of the female's rear pant pockets;

- An officer who smelled cannabis in a pulled-over car could not search the vehicle and containers therein for cannabis.

As already discussed, Defendants believe the law shows the aforementioned conduct is constitutional. *See* Part IV.A, *supra*. Therefore, qualified immunity is warranted here, and judgment should be entered in Christensen's favor.

### 2. *Floyd*

Similar to Christensen, there is no case law Defendants have found clearly establishing by May 8, 2019 that an officer must prevent a purported constitutional offense that they did not see, and that was concluded before they could have acted. Summary judgment is thus warranted.

### D. Count III (Intentional Infliction of Emotional Distress, or "IIED"): Deputies Christensen's and Floyd's legitimate police work does not constitute "outrageous" conduct.

The tort of IIED requires proof of four elements: (1) extreme and outrageous conduct; (2) intent or recklessness to cause emotional distress; (3) severe or extreme emotional distress suffered by the plaintiff; and (4) actual and proximate causation of the emotional distress by defendant's outrageous conduct. *Pub. Fin. Corp. v. Davis*, 66 Ill. 2d 85, 360 N.E. 2d 765, 676–768 (1976); *see also Williams v. City of Champaign*, 2007 U.S. Dist. LEXIS 10494, at *67-68 (C.D. Ill. 2007).

With regards to what constitutes "outrageous" conduct, latitude is given to authorities who "reasonably believed that [their] objective was legitimate". *Doe v. Calumet City*, 161 Ill. 2d 374, 393 (1994). Police conduct that does not stray from "reasonable and ordinary police practices" cannot be said to constitute the required "outrageous" conduct needed for an IIED claim. *Cairel v. Alderden*, 821 F.3d 823, 836 (7th Cir. 2016) (applying Illinois law). *Cf. Doe*, 161 Ill. 2d at 393–94 (finding IIED when police officer, *inter alia*, refused to break down locked door in order to reach endangered children, because the officer was afraid of liability for damage to door), *with Miller v. Whalen*, 2009 U.S. Dist. LEXIS 70208, *30–31 (N.D. Ill. 2009) (no IIED when no evidence that police officers fabricated or suppressed criminal evidence).

Here, Defendants have already articulated how the Defendants have acted consistent with police practices, as they searched Plaintiff and her car in compliance with the Fourth Amendment. *See* Part IV.A–B, *supra*. Moreover, the other prongs of IIED are not satisfied as well. There is no evidence beyond Plaintiff's speculation suggesting any Defendant had any "intent" to cause Plaintiff emotional distress, or were reckless to the possibility of the same. To the contrary, the Defendant Deputies were actively trying to reduce the burden on Plaintiff by only searching common areas where weapons are found, rather than patting down Plaintiff's torso, for example. (UMF #40, 44). Summary judgment is warranted.

### E.   Count IV (*Respondeat Superior*) & V (Indemnification): Because there is no underlying violation, there is no vicarious liability for the Sheriff's Office or Champaign County.

For Count IV: Because *respondeat superior* does not exist in § 1983, Count IV must be predicated on Plaintiff's state-law theories. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 691 (1978); *Thompson v. Boggs*, 33 F.3d 847, 859, n. 11 (7th Cir. 1994). Since *respondeat superior* only offers derivative liability, it is axiomatic that there must be some underlying tortious act for the employer to be liable for. As already argued in the previous sections, Plaintiff's state IIED claim fails. *See* Part IV.D, *supra*. Therefore, there is no state-law liability for the Sheriff's Office to be vicariously liable for, and it is entitled to summary judgment on Count IV Plaintiff's Complaint.

Similarly for Count V: Because there is no liability triggering any responsibility to indemnify, *see* Part IV.A–D, *supra*, summary judgment is warranted on Count V.

## V.   <u>**CONCLUSION**</u>

For the reasons stated above, summary judgment is warranted in Defendants' favor on all

counts.

Respectfully submitted,

CORY CHRISTENSEN, CHAMPAIGN
COUNTY, ILLINOIS,  the CHAMPAIGN
COUNTY SHERIFF'S OFFICE, and CODY
FLOYD, Defendants

<u>BY: s/Keith E. Fruehling</u>
Keith E. Fruehling, ARDC #: 6216098
Bryan Vayr, ARDC #: 6327729
HEYL, ROYSTER, VOELKER & ALLEN
Suite 505, 301 N. Neil Street
Champaign, IL 61820
Telephone  217.344.0060
Email:  kfruehling@heylroyster.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2020, I electronically filed the foregoing MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will send notification to:

Shneur Z. Nathan – snathan@nklawllp.com
Avi Kamionski – akamionski@nklawllp.com
Natalie Adeeyo – nadeeyo@nklawllp.com
Matthew J. Mc Carter – mmccarter@nklawllp.com; amanda@nklawllp.com; jalcala@nklawllp.com
Nathan & Kamionski, LLP
33 W. Monroe, Suite 1830
Chicago, IL 60603

Ms. Barbara J. Mann – bmann@co.champaign.il.us
Julia R. Rietz, Champaign County State's Attorney
101 E. Main St.
Urbana, IL 61801

I also hereby certify that I have mailed by United States Postal Service the above-referenced document to the following non-CM/ECF participant:  None.

BY: s/Keith E. Fruehling
 Heyl, Royster, Voelker & Allen