**In The Matter Of:**

*AYRES v.*
*SHERIFF DEPUTIES CODY CHRISTENSEN, et al.*

---

*CORY CHRISTENSEN*
*February 20, 2020*

---

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Exhibit C

Original File 0220chrt_Original.txt
Min-U-Script® with Word Index

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

WYLESHA AYRES,          )
                        )
    Plaintiff,          )
                        )
    -vs-                )
                        )
SHERIFF DEPUTIES CORY   )
CHRISTENSEN and CODY FLOYD,  )  Case No. 19-CV-2148
CHAMPAIGN COUNTY SHERIFF'S   )
OFFICE, and CHAMPAIGN   )
COUNTY, ILLINOIS,       )
                        )
    Defendants.         )

DEPOSITION OF DEPUTY CORY CHRISTENSEN

FEBRUARY 20, 2020

12:16 p.m.

Janet E. Cummings, CSR, License No. 084-003526
Area Wide Reporting & Video Conferencing
301 West White Street
Champaign, Illinois  61820
(800)747-6789

---

**Page 2**

I N D E X

APPEARANCES:

    Mr. Matthew J. Mc Carter
    NATHAN & KAMIONSKI, LLP
    33 West Monroe Street, Suite 1830
    Chicago, Illinois  60603
    312.612.1943
    mmccarter@nklawllp.com
    Appearing on behalf of the Plaintiff

    Mr. Bryan J. Vayr
    HEYL, ROYSTER, VOELKER & ALLEN
    301 North Neil Street, Suite 505
    Champaign, Illinois  61820
    217.344.0060
    bvayr@heylroyster.com
    Appearing on behalf of the Defendants

EXAMINATION BY:                      PAGE NO.

    Mr. Mc Carter....................      5
    Mr. Vayr.........................    125
    Mr. Mc Carter....................    190
    Mr. Vayr.........................    196
    Mr. Mc Carter....................    199

EXHIBIT NO.:

    1................................     69

---

**Page 3**

STIPULATION

    IT IS HEREBY EXPRESSLY STIPULATED AND
AGREED by and between the parties that the deposition
of DEPUTY CORY CHRISTENSEN may be taken on February
20, 2020, at Heyl, Royster, Voelker & Allen, 301
North Neil Street, Suite 505, Champaign, Illinois,
pursuant to the Rules of the Federal Court and the
Rules of Federal Procedure governing said
depositions.

---

**Page 4**

(Deposition commenced at 12:16 p.m.)
    DEPUTY CORY CHRISTENSEN,
the deponent herein, called as a witness, after
having been first duly sworn, was examined and
testified as follows:
    EXAMINATION
BY MR. Mc CARTER:
    Q.  This is the deposition of Deputy Tyler
(sic) Christensen in 19-CV-2148 in the U.S. District
Court for the Central District of Illinois, Ayres v.
Champaign County, et al.
    Good afternoon, Deputy Christensen.  My name is
Matthew Mc Carter.  I'm an attorney representing the
plaintiff, Wylesha Ayres, in this case.  Can you
please just state your name and spell your last name
for the record?
    **A.  Yeah.  First name is actually Cory.  Last
name is Christensen, C-H-R-I-S-T-E-N-S-E-N.**
    Q.  And, Deputy, have you ever given a
deposition before?
    **A.  I have not.**
    Q.  Okay.  There's a couple rules that we're
going to go over first that'll just help make
everything smoother as we go along.  The first is to
keep all your answers out loud.  No uh-huhs or

---

Page 5

1  huh-uhs.  And the reason for that is when Bryan and I
2  go back to review the transcript in a couple months
3  we'll go crazy trying to figure out exactly what you
4  meant because they both show up the same way on a
5  transcript.  Does that make sense?
6     **A.  Yes, sir.**
7     Q.  The same way, please keep all your answers
8  out loud.  If you have to gesture with your hands or
9  your body, you know, we'll address that on the
10  record.  But, if you can, keep all your answers out
11  loud.
12    **A.  Okay.**
13    Q.  No head shakes, shrugs of the shoulder,
14  things like that.  Next is I do tend to stumble over
15  my words at times, so if I ask a question and you
16  don't understand it, just feel free to ask me to
17  rephrase it and I'll do my best to do so.  But, on
18  the flip side of that, if you do answer a question
19  I'm going to believe that you understood it.  Does
20  that make sense?
21    **A.  Yes, sir.**
22    Q.  Okay.  Next, we do have a court reporter
23  here who's taking down everything that is said in the
24  room.  And to try to make her life a little bit
25  easier, if you could wait for me to finish my

Page 6

1  question before giving your answer, and then I'll
2  wait for you to finish your answer before asking my
3  next question.
4     You'll notice at times we might get a little
5  conversational where you'll be able to know where I'm
6  going with the question before I get there and want
7  to get the answer out, but just to make sure that she
8  only has to listen to one of us at the same time
9  we'll just take our time when going through it.  Does
10  that make sense?
11    **A.  Yes, sir.**
12    Q.  Lastly, we are on your time.  If you want
13  to take a bathroom break or stretch your legs or
14  anything, get a drink of water, let us know and we'll
15  be happy to go off the record for a few moments.  The
16  only thing is if there's a question pending we ask
17  that you answer that question before we go on break.
18  Does that make sense?
19    **A.  Yes, sir.**
20    Q.  Some of the preliminary questions, are you
21  under the influence of any drugs or alcohol today?
22    **A.  No.**
23    Q.  Are you under the -- taking any drugs that
24  affect your memory?
25    **A.  No.**

Page 7

1     Q.  Under the care of a doctor for any chronic
2  long-term disease?
3     **A.  No.**
4     Q.  Do you wear glasses?
5     **A.  No.**
6     Q.  Do you wear hearing aids?
7     **A.  No.**
8     Q.  Other than with your attorney, have you
9  discussed the facts of the case here today?
10    **A.  No.**
11    Q.  Have you talked about it with any of the
12  other deputies or officers at the Champaign County
13  sheriff's department?
14    **A.  No, nothing more than what's been in the
15  newspaper.**
16    Q.  So you talked about it a little bit with
17  other deputies and officers, but nothing more that's
18  been discussed in newspapers; is that correct?
19    **A.  Correct.**
20    Q.  What did you guys talk about?
21    **A.  They essentially just asked me if Wylesha
22  was related to Quantrell Ayres.**
23    Q.  And what did you say?
24    **A.  Yes.**
25    Q.  Do you have a history with Quantrell Ayres?

Page 8

1     **A.  Not personally.**
2     Q.  Did you review any video in preparation for
3  your deposition here today?
4     **A.  Yes.**
5     Q.  I don't want to get into any conversations
6  you had with Bryan or any of your other attorneys,
7  but can you tell me when the last time you watched
8  the video was?
9     **A.  Half hour ago.**
10    Q.  Okay.  Do you recall what video you
11  watched?
12    **A.  My, I think, V view body camera.  Video
13  from the traffic stop.**
14    Q.  Did you watch any other video or only your
15  own body worn camera?
16    **A.  Just my own.**
17    Q.  Have you seen any news reports about this
18  case?
19    **A.  Yes.**
20    Q.  How many?
21    **A.  Two.**
22    Q.  What source did those reports come from?
23  Were they TV?  News articles?  Did you read something
24  in the paper?
25    **A.  Newspaper and television.**

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

Page 9

1   Q.   Do you remember the news channel?
2   A.   WCIA, Channel 3.
3   Q.   Do you remember the paper?
4   A.   The News-Gazette.
5   Q.   Do you recall whether or not you had an
6   opinion about the story that you saw on WCIA?
7   A.   No.
8   Q.   Do you recall having an opinion about the
9   article that you read in The Gazette?
10  A.   No.
11  Q.   Have you heard anyone else talk about the
12  facts of this case other than what we've already
13  discussed?
14  A.   No.  Nothing further than what the media
15  put out.
16  Q.   Okay.  Deputy, what's your date of birth?
17  A.   1|12 of '90.  January 12th, 1990.
18  Q.   So how old are you today?
19  A.   Thirty.
20  Q.   Can you tell me the last four digits of
21  your Social Security number?
22  A.   5836.
23  Q.   And where do you currently live?
24       MR. VAYR: Just give a town.
25       THE WITNESS: Mahomet, Illinois.

Page 10

1   Q.   (by Mr. Mc Carter)  I'm sorry.  Can you say
2   that one more time?
3   A.   Mahomet, M-A-H-O-M-E-T, Illinois.
4   Q.   How long have you lived in Mahomet?
5   A.   Three straight years.  Born and raised
6   there as well.
7   Q.   So I take it by your answer that you were
8   born and raised in Mahomet, moved away for a little
9   bit, and now you're back?
10  A.   Correct.
11  Q.   Where did you live before this second stint
12  in Mahomet?
13  A.   Carbondale, Illinois, for college.
14  Q.   How long did you live in Carbondale?
15  A.   Four and a half years.
16  Q.   Married?
17  A.   Yes.
18  Q.   How long?
19  A.   Year and a half.
20  Q.   Any children?
21  A.   One.
22  Q.   And I understand a young child, correct?
23  A.   Yes, sir.
24  Q.   How old?
25  A.   He'll be six months in about a week and a

Page 11

1   half.  So a little over five months.
2   Q.   I believe congratulations are in order.
3   A.   Thank you.
4   Q.   But six months is also a chaotic time.
5   A.   Oh, yeah.
6   Q.   So I also have sympathy for you.  What does
7   your wife do?
8   A.   She is a -- sounds bad -- drug purchaser
9   for Christie Clinic.
10  Q.   What is Christie Clinic?
11  A.   It's a local clinic in the Champaign-Urbana
12  area.
13  Q.   Okay.  Any family that works in law
14  enforcement?
15  A.   Retired.
16  Q.   Who?
17  A.   My father.
18  Q.   Where was he an officer at?
19  A.   University of Illinois at Urbana-Champaign
20  Police Department.
21  Q.   Do you know how long he was an officer at
22  University of Illinois-Champaign?
23  A.   A little over thirty years.
24  Q.   If you know, do you recall when he retired?
25  A.   2017.

Page 12

1   Q.   Do you have a Facebook account?
2   A.   Yes.
3   Q.   What's your Facebook name?
4   A.   Cory Christiansen.
5   Q.   You'd be surprised the weird answers we
6   get.
7   A.   Yeah.  Mine's straightforward.
8   Q.   Any other social media presence?
9   A.   Yes.
10  Q.   What kind?
11  A.   Twitter, Instagram, Snapchat.
12  Q.   What's your Twitter handle?
13  A.   I don't recall.
14  Q.   Do you recall your Instagram name?
15  A.   Honestly, no.
16  Q.   Do you recall your Snapchat name?
17  A.   No.
18  Q.   Deputy, where did you go to high school?
19  A.   Mahomet-Seymour High School.
20  Q.   Did you graduate?
21  A.   Yes.
22  Q.   After graduation, what'd you do?
23  A.   Went to college.
24  Q.   Where at?
25  A.   SIU-Carbondale.

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

Page 13

1    Q.  What'd you study?
2    A.  I believe the name is criminology and
3  criminal justice.
4    Q.  Criminology in criminal justice or
5  criminology and --
6    A.  "And," yes.
7    Q.  When did you graduate?
8    A.  2012.
9    Q.  After year 2012, did you continue your
10 education?
11   A.  No.
12   Q.  Do you have any trade certificates?
13   A.  No.
14   Q.  An associate's degree?
15   A.  No.
16   Q.  What kind of degree did you earn from SIU?
17   A.  Bachelor's.
18   Q.  That would be bachelor of science or arts?
19   A.  Liberal.  Liberal arts.
20   Q.  After 2012 and graduating from SIU, did you
21 join the work force?
22   A.  Yes.
23   Q.  Where did you work?
24   A.  Champaign County Forest Preserve District.
25   Q.  What was your job title at the forest

Page 14

1  preserve?
2    A.  Essentially grounds maintenance.
3    Q.  What were some of your duties and
4  responsibilities?
5    A.  Mowing, securing all the forest preserves
6  in Champaign County when they were closing, opening
7  the forest preserves, working special events in the
8  forest preserves.
9    Q.  How long did you do that for?
10   A.  I'd say a total of five years, but that
11 includes when I was back home in the summer from
12 college.
13   Q.  So you worked full time after college but
14 also worked part time during the summers when home
15 from college; is that correct?
16   A.  So to clarify, when I was in college
17 obviously I came home, worked part time at the forest
18 preserve, and then right out of college just for less
19 than a year I worked part time at the forest
20 preserve.
21   Q.  Okay.  When did you leave the forest
22 preserve?
23   A.  2013.
24   Q.  Do you recall a month by chance?
25   A.  I do not.

Page 15

1    Q.  Another thing, you know, we're looking for
2  everything that you know about, you know, various
3  facts and situations.  So if at any point you just
4  don't know, feel free to say so, I don't know or I
5  don't recall.  We're looking for everything that you
6  do remember so that lets us know that we've reached
7  the end of that.
8    A.  Yes, sir.
9    Q.  Any disciplinary issues while working at
10 the forest preserve?
11   A.  No.
12   Q.  After the forest preserve where did you go?
13   A.  Champaign County Juvenile Detention Center.
14   Q.  What was your job title?
15   A.  Master control and transporter.
16   Q.  What are some of the duties and
17 responsibilities associated with that position?
18   A.  For master control, you're essentially
19 sitting -- if you've ever been in a jail, it's got
20 the computer screen where you open the doors and so
21 forth, monitoring cells.  Then for transporter, I
22 would transport juveniles to court or to state
23 detention centers when they're sentenced.
24   Q.  How long did you work there?
25   A.  I don't recall.

Page 16

1    Q.  Do you recall when you left?
2    A.  2014.
3    Q.  Do you recall the month?
4    A.  No.
5    Q.  Any disciplinary issues while working at
6  the juvenile detention center?
7    A.  No.
8    Q.  Why'd you leave?
9    A.  I got hired for a full-time police officer
10 position.
11   Q.  Where'd you get hired as a full-time police
12 officer?
13   A.  City of Monticello.
14   Q.  Do you recall when you started as a
15 full-time police officer with the city of Monticello?
16   A.  2014.
17   Q.  You don't know the month?
18   A.  No, sir.
19   Q.  As a police officer for the city of
20 Monticello, what were some of your duties and
21 responsibilities?
22   A.  Serving and protecting, obviously, the
23 citizens of Monticello, responding to calls for
24 service for the citizens of Monticello.
25   Q.  Any disciplinary issues while you were

Page 17

1  there?
2  **A.  No, sir.**
3  Q.  Why'd you want to be a police officer?
4  **A.  Growing up with my father being a police**
5  **officer, I mean, obviously he's my biggest role**
6  **model.  Saw that he enjoyed his job.  Told me he**
7  **never worked a day in his life, so that kind of**
8  **sparked an interest and ever since a young age I'd**
9  **known this is what I want to do.**
10  Q.  Any siblings?
11  **A.  Yes.**
12  Q.  Older or younger?
13  **A.  Younger.**
14  Q.  How many years old are they?
15  **A.  My sister is twenty-five.**
16  Q.  Just the one sister?
17  **A.  Yes.**
18  Q.  And she doesn't work in law enforcement?
19  **A.  No.**
20  Q.  Ever join the military?
21  **A.  No.**
22  Q.  After working as a police officer in
23  Monticello, did you work anywhere after that?
24  **A.  Yes.**
25  Q.  Now, how long were you a police officer in

Page 18

1  Monticello?
2  **A.  Two years.**
3  Q.  So you left about 2016, does that sound
4  about right?
5  **A.  Yes, sir.**
6  Q.  Do you recall the month?
7  **A.  No.**
8  Q.  After working as a police officer in
9  Monticello, where did you work?
10  **A.  Champaign County Sheriff's Office.**
11  Q.  Is that the job that you currently have
12  today?
13  **A.  Yes, sir.**
14  Q.  Do you recall when you were hired by the
15  Champaign County Sheriff's Office?
16  **A.  Not the exact date, no.**
17  Q.  I appreciate your patience as I take some
18  notes as we go along here.  When you were first hired
19  on at the Champaign County Sheriff's Office, did you
20  have to undergo any training?
21  **A.  Yes.**
22  Q.  Where at?
23  **A.  It was in-house field training.**
24  Q.  Field training you said?
25  **A.  Yes.  And can I clarify?**

Page 19

1  Q.  Yeah.  Go ahead.
2  **A.  Did you say Champaign County?**
3  Q.  Yes.
4  **A.  Okay.  Correct, field training program.**
5  Q.  Prior to -- when joining the Monticello
6  Police Department, did you undergo any training?
7  **A.  Yes.**
8  Q.  Where at?
9  **A.  The University of Illinois Police Training**
10  **Institute.**
11  Q.  If I refer to it as the PTI, would you
12  understand that I'm talking about the Police Training
13  Institute at the University of Illinois?
14  **A.  Yes.**
15  Q.  How long was your training at PTI?
16  **A.  I do not recall the exact amount.**
17  Q.  Was it a year?
18  **A.  Less than.**
19  Q.  Less than six months?
20  **A.  Yes.**
21  Q.  Less than three months?
22  **A.  I'm not 100 percent sure.  I believe it was**
23  **around three months.**
24  Q.  Now, would this have taken place in -- is
25  it 2012 that you were hired at Monticello?

Page 20

1  **A.  No, sir.**
2  Q.  Okay.  2014?
3  **A.  Yes, sir.**
4  Q.  Sorry.  My math was off.  So you attended
5  PTI in 2014 prior to being fully commissioned as a
6  police officer in Monticello.  Do I have that
7  correct?
8  **A.  Yes, sir.**
9  Q.  Do you remember the classes that you took
10  at PTI?
11  **A.  There was numerous classes.**
12  Q.  Do you recall any of them?
13  **A.  Yes.**
14  Q.  Which ones?
15  **A.  Basic firearms training, traffic stops,**
16  **felony traffic stops.  Essentially criminal law.**
17  **Control tactics, physical fitness.  That's all I**
18  **recall right now.  It's been six years.**
19  Q.  I understand.  At PTI, did you receive any
20  training on how to conduct a search?
21  **A.  Yes.**
22  Q.  Is searches -- did you receive training on
23  how to conduct a search of a person, as well as of an
24  automobile?
25  **A.  Yes.**

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

Page 21

1    Q.   I'd like to explore your training regarding
2  how to conduct a search of a person.  Can you tell me
3  how long that particular portion of your training
4  lasted at PTI?
5    A.   I don't recall.
6    Q.   During your training of how to conduct a
7  search of a person at PTI, were there different types
8  of searches discussed?
9    A.   Yes.
10    Q.   What were the different types of searches?
11    A.   From what I recall is there was different
12  ways of searching a -- if I can go back, so we went
13  over, from what I can recall and, like I said, it's
14  been a while, Terry stops to search incident to
15  arrest, proper techniques on searching a male
16  incident to arrest, female incident to arrest.
17    Q.   Is that all you recall?
18    A.   Yes.
19    Q.   What's your understanding of what a Terry
20  stop is?
21    A.   A Terry stop -- can I use an example?
22    Q.   Sure.
23    A.   Okay.  So, I mean, just happened the other
24  night is an armed robbery occurs in the City of
25  Urbana.  A description of the subject is given out.

Page 22

1  Black male, red sweatpants, black jacket.  I'm in the
2  vicinity.  I see that subject.  I get out with that
3  subject.  And a firearm was implied during that
4  robbery.  That I Terry stop -- got out with that
5  person, Terry stopped them, patted them down to
6  ensure that there was no weapon on their person due
7  to them matching the description of where the
8  crime -- in the vicinity where the crime had
9  occurred.
10    Q.   So, if I understand you correctly, it's a
11  search of a weapon of a suspect of a particular
12  crime; is that fair?
13    A.   Can you repeat that?
14    Q.   I'm just trying to understand your
15  description of a Terry stop, and it sounds like it's
16  the search for a weapon on a particular individual
17  who's been suspected of a particular crime.  Is that
18  a fair understanding of your answer?
19    A.   Essentially what I'm saying is I had
20  reasonable suspicion to believe this subject was
21  involved in the crime that was reported to our
22  dispatch center.
23    Q.   You also mentioned a search incident to
24  arrest as one of the types of searches discussed at
25  PTI.  Can you tell me what your understanding is of

Page 23

1  what a search incident to arrest is?
2    A.   So I place someone under arrest for a
3  criminal offense or a warrant and so forth.  Before
4  I'm placing them in my squad car or someone else's
5  squad car, because I can't transport anybody, I'm
6  ensuring that there's no illegal contraband or
7  weapons on that person.
8    Q.   So what are you looking for in a search
9  incident to an arrest?
10    A.   Any illegal contraband or weapons.
11    Q.   What are you looking for in a Terry stop?
12    A.   In a Terry stop?
13    Q.   Yes.
14    A.   Any weapons.
15    Q.   And then you also mentioned, I may have
16  misheard you, but searches specific to males and
17  females that you had training on at PTI.  Did I
18  understand you correctly?
19    A.   Yes, sir.
20    Q.   Can you tell me what your understanding is
21  of the difference between a search of a male suspect
22  and a female suspect?
23    A.   I'd say there's no difference, but I was
24  trained search incident to arrest that specifically
25  when you're doing a search incident to arrest on a

Page 24

1  female, when searching the breast line you were
2  taught to use the side of your hand, go along the
3  bottom of the breast line where presumably a bra,
4  sports bra would be, and then through the middle of
5  the breast just to ensure there was no weapon or
6  anything that could resemble a weapon.
7    Q.   Now, I just want to describe for the record
8  the hand gesture you made.  So you had your palm
9  facing down with your right hand, and you drew your
10  thumb across your chest just below, it looked like,
11  the breast plate; is that correct?
12    A.   Yes, sir.
13    Q.   Then the second gesture you made was you
14  took your left hand at an angle, it looked like, with
15  the palm facing to your right and drew your thumb
16  down the center of your chest.  Was that correct?
17    A.   Yes, sir.
18    Q.   Okay.  Is that the only difference that you
19  understand to be the difference between a male and
20  female search subject to arrest?
21    A.   From what I recall.
22    Q.   If you recall, at PTI did you receive any
23  other training in different types of searches?
24    A.   Not that I can recall.
25    Q.   At PTI did you receive any training in the

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

Page 25

1 production of reports?
2    A. **Yes.**
3    Q. Can you tell me about the training you had
4 in the production of reports at PTI?
5    A. **From what I recall, we had training on**
6 **writing reports, something as simple as a theft of a**
7 **lawn mower. We did a practice report on that. All**
8 **the way up to domestic battery and DUIs.**
9    Q. So you essentially learned the importance
10 of various types of reports, correct?
11    A. **Yes.**
12    Q. Reports are generated so that any
13 subsequent investigation or prosecution has an
14 accurate basis of facts, correct?
15    A. **Correct.**
16    Q. Any other reason why you draft a report?
17    A. **I would say the biggest reason is always**
18 **drafting a report on an arrest when a criminal**
19 **offense has occurred for the court to review. Would**
20 **also draft a report for use of force incident.**
21    Q. I want to get back to the difference
22 between a Terry stop and a -- a Terry stop search and
23 a search incident to an arrest. Can you help me
24 understand the difference between the two? What do
25 you understand to be the difference between a Terry

Page 26

1 stop and a search incident to an arrest?
2    A. **Well, Terry stop is a reasonable suspicion**
3 **that that subject was involved in some kind of crime.**
4 **So essentially you are just patting down the exterior**
5 **of that person, ensuring that they don't have any**
6 **weapons or anything that could harm the deputy or**
7 **officer on their person. You're not digging into**
8 **their pockets. Essentially just a pat down or frisk**
9 **of their exterior.**
10    Q. After PTI but focusing on your time as a
11 police officer from the city of Monticello, did you
12 receive any additional training?
13    A. **Field training.**
14    Q. What did field training in Monticello
15 encompass?
16    A. **Going over policy, report writing.**
17    Q. Do you recall how long this field training
18 lasted?
19    A. **I do not.**
20    Q. Was it less than a year?
21    A. **Yes.**
22    Q. Less than six months?
23    A. **Yes.**
24    Q. Less than three months?
25    A. **Around three months.**

Page 27

1    Q. Did you pass your field training as a
2 police officer in Monticello?
3    A. **Yes.**
4    Q. Do you recall if you were assigned a
5 particular officer as a field training supervisor
6 while a police officer in Monticello?
7    A. **Yes.**
8    Q. Who was that officer?
9    A. **Officer Carolynn Wallenberg.**
10    Q. Can you spell that for me, if you can?
11    A. **Spell the last name?**
12    Q. Can you spell the last name for us?
13    A. **Yes. William Adam Lincoln Lincoln Edward**
14 **Nora Boyd Edward Robert George Edward Robert.**
15    Q. After field training at Monticello, did you
16 receive any additional training for your position as
17 a police officer for the city of Monticello?
18    A. **We received training on Taser and firearms.**
19    Q. How long did that training last?
20    A. **Firearms training was a qualification, so**
21 **an hour of one day. Taser, the same amount of time.**
22    Q. Did you pass both?
23    A. **Yes.**
24    Q. Any additional training as a police officer
25 for the city of Monticello?

Page 28

1    A. **Local MTU courses. I don't recall what**
2 **those were, though.**
3    Q. I'm sorry. You said local MPU?
4    A. **MTU.**
5    Q. MTU?
6    A. **Yes, sir.**
7    Q. What is an MTU course?
8    A. **I believe it stands for mobile training**
9 **unit.**
10    Q. What is a mobile training unit?
11    A. **It's essentially free classes that are held**
12 **with certified instructors locally on various law**
13 **enforcement topics.**
14    Q. Do you recall any of the topics that were
15 covered?
16    A. **I recall two of them. One was criminal law**
17 **update and the second was DUI enforcement.**
18    Q. Now I want to get back to your time with
19 the sheriff's department. When you were hired with
20 the sheriff's department, did you have to undergo any
21 training at PTI?
22    A. **No.**
23    Q. Did you have to undergo any training when
24 you began work as a sheriff's deputy?
25    A. **Yes. Field training.**

Area Wide Reporting and Video Conferencing
1-800-747-6789

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

Page 29

1  Q.  How long did field training last?
2  A.  I don't recall the exact time or amount.
3  Q.  Less than a year?
4  A.  Yes.
5  Q.  Less than three months?
6  A.  Yes.
7  Q.  What are some of the things that are
8  covered in field training for the sheriff's
9  department?
10  A.  For me, the biggest thing was just the
11  different computer systems, report systems.
12  Champaign County used a totally different system to
13  type reports and run local database through.
14  Q.  Different from your time as a police
15  officer for the city of Monticello?
16  A.  Correct.
17  Q.  Okay.  Do you recall any other subjects for
18  field training?
19  A.  Policy and procedure.
20  Q.  What do you mean by policy and procedure
21  training?
22  A.  Sheriff's office obviously has its own
23  policy set, so we were -- as a new deputy, you're
24  required to read through the policies, at which point
25  you acknowledge and go through those policies with

Page 30

1  your field training officer to ensure that they've
2  been gone over.
3  Q.  Is there any sort of test or examination
4  that you need to pass on those policies from the
5  Champaign County sheriff's department?
6  A.  No.
7  Q.  Any other subjects of training in this
8  field training?
9  A.  Essentially it was just training, traffic
10  stops, I mean, responding to calls for service, and
11  then if your field training officer saw a point of
12  improvement or would give you advice on what you
13  could do better or maybe what they do different maybe
14  from what Monticello does.
15  Q.  I want to get back to the policies and
16  procedures quickly.  You mentioned that you would
17  discuss them with your field training officer,
18  correct?
19  A.  Yes.
20  Q.  How would a field training officer ensure
21  that their field trainee would understand the
22  policies and procedures?
23  A.  So when we look over policy and procedure,
24  you have to acknowledge.  It's on the computer.
25  Q.  Sorry to interrupt, but are you talking

Page 31

1  like just a little check box like I have read the
2  information on this page or something like that?
3  A.  Yes.
4  Q.  I'm sorry to interrupt.  Continue.
5  A.  And then you had to also acknowledge that
6  you went over the policy and procedure in your field
7  training booklet.  So there's a ton of paperwork that
8  you get when you're going through field training.
9  Q.  This is a physical booklet?
10  A.  Hard, yeah.  So it's paper, yes.  And then
11  if you had questions, and most the time my field
12  training officer would sit with me as I went through
13  those, the numerous policies and procedures.
14  Q.  Do you recall who your field training
15  officer was?
16  A.  Yes.  I had three of them.
17  Q.  Okay.  Let's start with the first field
18  training officer that you had.  Who was that?
19  A.  Deputy Brian Malloch.
20  Q.  Can you spell Malloch for us?
21  A.  Yeah.  M as in Mary, A as in Adam, L as in
22  Lincoln, L as in Lincoln, O as in ocean, C as in
23  Charles, H as in Henry.
24  Q.  How long did you train with Officer
25  Malloch?

Page 32

1  A.  Month and a half.
2  Q.  At the training with Officer Malloch did
3  you have another field training officer?
4  A.  Yes.
5  Q.  Who was that?
6  A.  Deputy Ted Nemecz.
7  Q.  Can you spell Nemecz for us?
8  A.  N as in Nora, E as in Edward, M as in Mary,
9  E as in Edward, C as in Charles, Z as in zebra.
10  Q.  How long did you train with Officer Nemecz?
11  A.  Couple weeks.
12  Q.  Less than a month then?
13  A.  Yes.
14  Q.  After -- strike that.  Excuse me.  After
15  Officer Nemecz, did you train with any other field
16  training officers?
17  A.  Yes.
18  Q.  Who was that?
19  A.  Well, he's now Investigator Casey Donovan.
20  Q.  How long did you train with now
21  Investigator Donovan?
22  A.  Less than a month.
23  Q.  After Officer Donovan, did you have a new
24  field training officer?
25  A.  No.

Page 33

1    Q.   Any other training that you underwent at
2  the sheriff's department?
3    A.   **We have had numerous annual trainings.**
4    Q.   Annual training?
5    A.   **Yes, sir.**
6    Q.   When was the last time you had an annual
7  training session?
8    A.   **I'm sorry.  Is today Thursday?**
9    Q.   Yes, it is.
10   A.   **So Monday of this week.**
11   Q.   How long did that training session last?
12   A.   **Half hour.**
13   Q.   What was the subject of that training
14 session?
15   A.   **Taser certification.**
16   Q.   Did you pass your Taser certification?
17   A.   **Yes.**
18   Q.   Congratulations.
19   A.   **Thanks.**
20   Q.   Prior to Monday, when was the last time you
21 had one of these annual training sessions with the
22 sheriff's department?
23   A.   **In the fall.**
24   Q.   Would that be the fall of 2019?
25   A.   **Yes.**

Page 34

1    Q.   Do you recall the subject of that training
2  session?
3    A.   **Felony traffic stops.**
4    Q.   What do you mean by a felony traffic stop?
5    A.   **A traffic stop where a vehicle has been**
6  **involved in a felony offense.**
7    Q.   So you already have prior information about
8  that vehicle before even initiating the traffic stop;
9  is that correct?
10   A.   **Correct.**
11   Q.   How long did the felony traffic stop
12 training last in the fall of 2019?
13   A.   **Four hours.**
14   Q.   Do you recall any other subjects that have
15 been covered in an annual training session at the
16 sheriff's department?
17   A.   **Control tactics.**
18   Q.   What do you mean by control tactics?
19   A.   **If a subject is being resistant or if**
20 **you're fighting with a subject, how to use pressure**
21 **or counterpressure holds on one's arm while still**
22 **using reasonable force.  Also proper handcuffing**
23 **techniques was discussed in it.**
24   Q.   How long did that training last, if you
25 remember?

Page 35

1    A.   **I don't recall.**
2    Q.   Less than four hours?
3    A.   **Yes.**
4    Q.   Less than two hours?
5    A.   **I don't recall.**
6    Q.   Any other subjects covered by the annual
7  training sessions for the sheriff's department?
8    A.   **Firearms.**
9    Q.   Any others?
10   A.   **Not that I can recall.**
11   Q.   I want to talk about the policies and
12 procedures.  Strike that.  First, is there any other
13 training that you underwent at the Champaign County
14 Sheriff's Office?
15   A.   **More mobile MTU courses.**
16   Q.   Anything different than the prior MTU
17 courses that you discussed?
18   A.   **Yes.**
19   Q.   How so?
20   A.   **I mean, just -- they weren't DUI**
21 **enforcement like at Monticello or the criminal**
22 **update.**
23   Q.   What was the subject that was covered by
24 the MTU courses while at the sheriff's department?
25   A.   **Crisis intervention, proactive patrol**

Page 36

1  tactics.
2    Q.   What do you mean by proactive patrol
3  tactics?
4    A.   **Essentially case law on criminal**
5  **interdiction.**
6    Q.   Any other subjects?
7    A.   **Not that I recall.  I mean, we're required**
8  **by state to do mandated trainings so I frequently**
9  **attend those, but I can't recall the exact names of**
10 **them.**
11   Q.   It's kind of like a continuing education
12 thing?
13   A.   **Yes.**
14   Q.   Okay.  How long did the crisis intervention
15 training last, if you remember?
16   A.   **Eight hours.**
17   Q.   Do you remember how long the patrol tactic
18 session lasted?
19   A.   **Sixteen hours.**
20   Q.   Any other training that you've received
21 from the Champaign County Sheriff's Office that we
22 haven't discussed yet?
23   A.   **Yes.  One more.  They sent me to a**
24 **statewide criminal interdiction week long conference.**
25   Q.   What was the subject of this conference on

Page 37

1  criminal -- interdiction you said?
2  **A.  Correct.  It was mainly -- they had guest**
3  **speakers from all over the nation on the use of**
4  **narcotic detection, canines on traffic stops,**
5  **observing criminal behavior when on patrol as far as**
6  **traffic stops go.  It was mainly -- had to do with**
7  **interdiction for illegal, large sums of illegal**
8  **narcotics or felony arrest warrants when out on**
9  **patrol.**
10  Q.  Any other training that we haven't talked
11  about that you received as a sheriff's deputy for
12  Champaign County?
13  **A.  Not that I can recall.**
14  Q.  How long did this seminar in crime
15  interdiction last?
16  **A.  Forty hours.**
17  Q.  You said it was statewide, correct?
18  **A.  Yes.**
19  Q.  Where was it held?
20  **A.  The new Macon County Law Enforcement**
21  **Training Center.**
22  Q.  Are you familiar with the Champaign County
23  sheriff's department policies and procedures
24  regarding conducting searches?
25  **A.  Yes.**

Page 38

1  Q.  What's your understanding of the Champaign
2  County policies and procedures of conducting searches
3  of a member of the opposite sex?
4  **A.  When applicable or, in layman's terms, if**
5  **possible have a deputy of the same sex on scene or**
6  **respond to that scene to conduct the search.**
7  Q.  Do you know why that's the case?
8  **A.  To --**
9  MR. VAYR:  For the record, just to
10  repeat, if you don't know an answer to a question as
11  you sit here right now that's not a sin.
12  THE WITNESS:  Okay.  I don't know.
13  Q.  (by Mr. Mc Carter)  Is a female required to
14  conduct -- strike that.  Is a female officer required
15  for every search of a female suspect?
16  **A.  No.**
17  Q.  When are some of the occasions -- strike
18  that.  What are some of the factors that would
19  require the presence of a female officer to search a
20  female suspect?
21  **A.  Again, if applicable, if we have a female**
22  **deputy working, I would always call for that female**
23  **deputy to respond to where I'm at, conduct the search**
24  **or even a pat down just to make that female feel more**
25  **comfortable just having someone of the same sex**

Page 39

1  conducting that.
2  **Also I've had instances where a large bulge**
3  **could be showing out of a female's crotch area and I**
4  **have reasonable suspicion that narcotics were inside**
5  **of that area, I would have the female come and**
6  **conduct that just because they're the same sex.**
7  Q.  If you were at a traffic stop and wanted to
8  request the presence of a female officer to search a
9  female suspect, how would you do it?
10  **A.  I would get on the radio and ask METCAD,**
11  **who's our dispatch center, to have a female deputy**
12  **respond to my location.**
13  Q.  Other than going over your radio, is there
14  any other method of communication that you could use
15  to request the presence of a female officer?
16  **A.  Yes.  We can message on our computers.**
17  Q.  Is that like an instant message?
18  **A.  Yes.**
19  Q.  Do you know what system operates on your
20  computer that allows you to instant message from it?
21  **A.  Premier MDC.  At least that's what the icon**
22  **is on my desktop.**
23  Q.  And that's a computer that's in your squad
24  car, correct?
25  **A.  Yes, sir.**

Page 40

1  Q.  Do you know who that message is able to be
2  viewed by?  Is it something that goes out to the
3  entire department?
4  **A.  No.  You can select who you send it to, but**
5  **our command has the ability to look at any message we**
6  **send.**
7  Q.  But you can select an individual officer,
8  correct?
9  **A.  Yes.**
10  Q.  And you can select several officers?
11  **A.  Yes.**
12  Q.  Or you could choose to send it to the whole
13  department; is that fair?
14  **A.  Yes.**
15  Q.  Are those the only two means of
16  communication that you can use to request the
17  presence of a female officer or are there any others?
18  **A.  Those are the only two.**
19  Q.  Are there any special requirements, as far
20  as you know, based on the policies and procedures of
21  the Champaign County sheriff's department, regarding
22  how to conduct a search of a member of the opposite
23  sex?
24  **A.  No.  Can I add a respectful manner.**
25  Q.  Are you aware of anything in the Champaign

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

Page 41

1  County policies and procedures requiring a search of
2  a member of the opposite sex to occur at any
3  particular geographic location at a crime scene?  And
4  what I mean by that is -- allow me to rephrase that
5  question.  I got a little lost myself.
6    Is there anything in the policies and
7  procedures, as far as you understand them, that
8  requires the search of a member of the opposite sex
9  to occur at any particular location at a crime scene?
10  **A.  No.**
11  Q.  Anything that you're aware of in the
12  policies and procedures regarding what part of the
13  member of the opposite sex you're allowed to search?
14  **A.  In the policy and procedure, no.**
15  Q.  Other than I think you said with respect to
16  dignity, and sorry if I misquote you, is there
17  anything that changes in how you conduct a search if
18  the subject of that search is a male or female?
19  **A.  No.  They're both going to be conducted in**
20  **a respectful manner, in an unobtrusive way.**
21  Q.  As far as you're aware, have you ever heard
22  of any other officers or members of the Champaign
23  County sheriff's department being disciplined for
24  improperly searching an individual?
25  **A.  No.**

Page 42

1  Q.  Have you ever heard of any other officers
2  at the Champaign County sheriff's department who have
3  been disciplined for an improper search of a member
4  of the opposite sex?
5  **A.  No.**
6  Q.  Obviously we're here today to discuss an
7  incident with my client, Wylesha Ayres, on May 8th of
8  2019.  But other than that incident, have you
9  personally ever had an occasion to search a female
10  suspect?
11  **A.  Yes.**
12  Q.  How many times?
13  **A.  I do not recall.**
14  Q.  More or less than ten?
15  **A.  More.**
16  Q.  More or less than twenty?
17  **A.  I don't recall.**
18  Q.  During these searches that you've performed
19  of female suspects, have you ever prior to conducting
20  that search requested the presence of a female
21  officer?
22  **A.  Yes.**
23  Q.  How many of those?
24  **A.  I don't recall.**
25  Q.  If you can give me a percentage.  Is it

Page 43

1  possible?
2  **A.  And we're talking solely females?**
3  Q.  Let me rephrase my question so we're all on
4  the same page.  If possible, can you give me an
5  estimation as to what percentage of searches that
6  you've performed on female suspects you've previously
7  requested the presence of a female officer, whether
8  through your computer messaging system or over the
9  radio?
10  **A.  I can't give a percentage.  Just when**
11  **applicable.**
12  Q.  Now, we mentioned two types of searches
13  earlier.  There was the Terry search and then the
14  search incident to arrest.  Do you recall that?
15  **A.  Yes.**
16  Q.  Of the searches that you've previously
17  performed on female suspects, is it possible for you
18  to give me an estimation as to what percentage of
19  those were Terry searches as opposed to searches
20  incident to arrest?
21  **A.  I cannot.**
22  Q.  When was the last time you conducted a
23  search of a female suspect?
24  **A.  I don't recall.**
25  Q.  I apologize.  I usually pay attention to

Page 44

1  what time we started and try to take a break
2  approximately every hour.  I don't think we've gone
3  that long but, Deputy, are you okay to keep going?
4  **A.  Yes.**
5  Q.  Or would you like to take a bathroom break
6  or anything?
7  **A.  No.  I'm good.**
8  Q.  Do you know if the sheriff's department,
9  Champaign County sheriff's department, has any
10  written policies and procedures regarding whether or
11  not a report needs to be drafted as the result of any
12  search of a member of the opposite sex?
13  **A.  I do not recall.**
14  Q.  Are you aware of any policy or procedure
15  that exists that requires any sort of reporting to be
16  done if an officer has to search a member of the
17  opposite sex?
18  **A.  No.**
19  Q.  You're just not aware one way or the other?
20  **A.  Correct.**
21  Q.  Have you ever discussed the search of Ms.
22  Ayres on May 8, 2019, with any of your supervisors at
23  the Champaign County sheriff's department?
24  **A.  No.**
25  Q.  Have you ever conducted -- strike that.

Page 45

1 Have you ever discussed the specifics of the search
2 with Ms. Ayres with any of your fellow officers at
3 the Champaign County sheriff's department?
4 **A. No.**
5 Q. Now I want to get to the incident that
6 brings us here today. Do you recall an incident --
7 do you recall -- strike that.
8    Do you recall a traffic stop with Ms. Wylesha
9 Ayres on May 8th, 2019?
10 **A. Yes.**
11 Q. Now, before we get to the traffic stop
12 itself, I'd like to start with your shift. Can you
13 tell me what shift you were working that day?
14 **A. Night shift.**
15 Q. When did that start?
16 **A. 18:00 hours.**
17 Q. So about 6:00 p.m.?
18 **A. Yes, sir.**
19 Q. When was your shift scheduled to end?
20 **A. 5:30 in the morning.**
21 Q. Did you have a specific assignment that
22 day?
23 **A. I would have had a specific assignment.**
24 **We're assigned certain beats. I don't recall what**
25 **the beat was.**

Page 46

1 Q. You don't recall your beat assignment for
2 May 8, 2019?
3 **A. Correct.**
4 Q. Now beat is just an area of patrol,
5 correct?
6 **A. Yes.**
7 Q. Would you have been assigned just to patrol
8 a particular beat, or did you have any additional
9 duties or responsibilities during your shift on May
10 8th, 2019?
11 **A. I would have been assigned to patrol my**
12 **beat, but I do have numerous occasions where I**
13 **respond outside of my beat with my canine to assist**
14 **other agencies or my agency.**
15 Q. I want to explore that a little bit. Now,
16 you're a deputy sheriff, correct?
17 **A. Yes, sir.**
18 Q. But you also work with a canine, correct?
19 **A. Yes.**
20 Q. Okay. When did you begin work with a
21 canine?
22 **A. December of 2017.**
23 Q. So you never worked with a canine before
24 joining the Champaign County sheriff's department,
25 correct?

Page 47

1 **A. Correct.**
2 Q. What training did you have specific to your
3 work as a canine officer?
4 **A. We both went to a two month academy.**
5 Q. Both meaning you and your dog?
6 **A. The dog, yes.**
7 Q. What's your dog's name?
8 **A. Lesan.**
9    **MR. VAYR:** I'm sorry, counsel, but can
10 you spell that for the record? I'm sure the court
11 reporter would appreciate it.
12    **THE WITNESS:** Sure. L as in Lincoln,
13 E as in Edward, S as in Sam, A as in Adam, and N as
14 in Nora.
15 Q. (by Mr. Mc Carter) What kind of dog is
16 Lesan?
17 **A. German shepherd.**
18 Q. Have you only worked with Lesan?
19 **A. Yes.**
20 Q. What are some of the things that were
21 covered at the training that you and Lesan attended?
22 **A. Illinois law, case law as far as use of a**
23 **canine. Most of the training was training the dog.**
24 **When we get the dogs, they're green dogs is what they**
25 **call them so they don't even know how to sit down.**

Page 48

1 **So you're essentially putting narcotic odors on the**
2 **dogs for them to recognize it. So you're training**
3 **the dog so it's ready to work the street.**
4 Q. How old is the dog when you first are
5 assigned to begin training?
6 **A. Less than a year old.**
7 Q. Do you recall when this training took
8 place? Would that have been in December 2017?
9 **A. So we hit the street on December '17. We**
10 **got out of training then. Training began in October**
11 **2017.**
12 Q. How long did it last?
13 **A. Two months.**
14 Q. Where was it?
15 **A. Danville, Illinois.**
16 Q. On May 8th, 2019, were you working with
17 Lesan?
18 **A. Yes.**
19 Q. Are you familiar with Wylesha Ayres?
20 **A. Yes.**
21 Q. How so?
22 **A. From the traffic stop on the 8th.**
23 Q. Have you -- prior to May 8th, 2019, did you
24 have any other encounters with Wylesha Ayres?
25 **A. No, sir.**

Page 49

1    Q.  After May 8th, 2019, have you had any
2  subsequent encounters with Wylesha Ayres?
3    A.  Yes.
4    Q.  Can you tell me about the first one?
5    A.  The first one was the traffic stop on May
6  8th.
7    Q.  After May 8, 2019, can you tell me about
8  the next time that you encountered Wylesha Ayres?
9    A.  Yes.  It was in December 2019.  I don't
10 recall the exact date.  But she was a passenger on a
11 vehicle that I stopped pursuant to an Illinois
12 Vehicle Code violation.
13   Q.  Do you remember what the violation was that
14 you initially stopped this vehicle for?
15   A.  Failure to signal when required.
16   Q.  Do you remember the type of vehicle?
17   A.  Sedan.
18   Q.  So it was not a silver Jeep Patriot?
19   A.  No.
20   Q.  Do you recall who the driver of that
21 vehicle was?
22   A.  I don't recall her name.
23   Q.  But it was a female?
24   A.  Yes.
25   Q.  Were any tickets or citations issued at

Page 50

1  this traffic stop?
2    A.  No, sir.
3    Q.  Any arrests made?
4    A.  No, sir.
5    Q.  Any searches conducted of the two
6  passengers in the sedan?
7    A.  No.
8    Q.  Any search of the sedan itself?
9    A.  No.
10   Q.  Was there just the two passengers?
11   A.  Yes.
12   Q.  After December 2019, have you had any
13 subsequent encounters with Ms. Ayres?
14   A.  No.
15   Q.  Are you familiar with a Latika Graham?
16   A.  Yes.
17   Q.  How so?
18   A.  She was a passenger in the vehicle Wylesha
19 was operating on May 8th, and I also handled a
20 traffic crash that she was operating the Jeep Patriot
21 in.
22   Q.  Do you recall when this crash occurred?
23   A.  In the fall of last year.
24   Q.  Fall of 2019?
25   A.  Yes.

Page 51

1    Q.  You don't remember the month?
2    A.  No.
3    Q.  Where was this crash at?
4    A.  It was on a county road south of Mahomet.
5    Q.  Did it involve another vehicle in addition
6  to Ms. Graham's vehicle?
7    A.  Yes.
8    Q.  Was it just the two vehicles?
9    A.  Yes.
10   Q.  Were there any injuries?
11   A.  Possible injury.
12   Q.  Was EMS called to the scene of this
13 particular crash?
14   A.  Yes.
15   Q.  Was somebody escorted out in an ambulance?
16   A.  Yes.
17   Q.  Was it Ms. Graham?
18   A.  No.
19   Q.  Were any tickets issued?
20   A.  Yes.
21   Q.  Do you recall to who?
22   A.  Ms. Graham.
23   Q.  Do you recall for what?
24   A.  Failure to reduce speed to avoid an
25 accident.

Page 52

1    Q.  Did you issue that ticket or was it another
2  officer?
3    A.  I did.
4    Q.  Other than this crash sometime in the fall
5  of 2019, have you had any subsequent interactions
6  with Latika Graham?
7    A.  No.
8    Q.  Getting back to May 8th, 2019, do you
9  recall the type of vehicle that Ms. Ayres was
10 operating that night?
11   A.  A Jeep Patriot.
12   Q.  Had you had any prior interactions with
13 that Jeep Patriot before May 8th, 2019?
14   A.  Not that I can recall.
15   Q.  If you recall, have you had any subsequent
16 interactions with that Jeep Patriot after May 8th,
17 2019?
18   A.  Yes.
19   Q.  Other than this crash that we just
20 discussed with Latika Graham, have you had any
21 interactions?
22   A.  No.
23   Q.  So on May 8th, 2019, can you tell me the
24 first time that you recognized or noticed the Silver
25 Jeep Patriot that Ms. Graham was operating?

Page 53

1    A.  Yes.  At the intersection of North Mattis
2  and West Bloomington Avenue in Champaign, Illinois.
3    Q.  Do you recall what time of night this was?
4    A.  Evening.  Dark out.
5    Q.  Can you be any more specific?
6    A.  I cannot recall the exact time.
7    Q.  Was the car traveling on Madison (sic) or
8  Bloomington when you first saw it?
9    A.  Mattis.
10    Q.  Mattis.  Which direction?
11    A.  Northbound.
12    Q.  Which direction were you traveling?
13    A.  Southbound.
14    Q.  When you first saw the car, what did you
15  notice?
16    A.  One headlight.  Only one headlight was
17  illuminated.
18    Q.  Anything else?
19    A.  When I first observed it, no.
20    Q.  What'd you do when you saw the car
21  traveling northbound with one headlight?
22    A.  Turned around and got behind the vehicle or
23  behind the Jeep.
24    Q.  Then what?
25    A.  Ran the affixed registration on the back of

Page 54

1  the vehicle.
2    Q.  What happened when you ran the
3  registration?
4    A.  I observed that -- it was expired by two
5  months.
6    Q.  When you say ran the registration, what did
7  you use to run the registration?
8    A.  My in-car computer, specifically LEADS.
9    Q.  Can you tell me what LEADS is?
10    A.  Well, it's essentially a computer program
11  where I can type in a license plate, a name, a serial
12  number to a gun, and it will show, for example, if
13  the license plate is valid, suspended, expired.  Just
14  the status of that license plate.
15    Q.  Do you recall what information you inputted
16  into LEADS on May 8th, 2019, regarding that silver
17  Jeep Patriot?
18    A.  Yes.  The letter or letters and numbers on
19  the rear license plate.
20    Q.  So it would have been just the information
21  from the license plate?
22    A.  Yes.
23    Q.  Anything else?
24    A.  No.
25    Q.  When you inputted the license plate into

Page 55

1  LEADS, what did you learn, if anything?
2    A.  That the plate was expired.
3    Q.  Did you use any other system to search any
4  other information from the silver Jeep Patriot?
5    A.  Not that I can recall.
6    Q.  Did you call over your radio for any
7  information regarding the license plate?
8    A.  Not that I can recall.
9    Q.  Why not?
10    A.  Because I'd already observed on LEADS it
11  was expired, which is probable cause for a traffic
12  stop.
13    Q.  Do you know -- the information that you got
14  back from LEADS, do you know how that information is
15  generated?
16    A.  Through the secretary of state's office.
17    Q.  I want to be clear.  So you learned that
18  the registration was expired, correct?
19    A.  Correct.
20    Q.  Do you know how the information in LEADS is
21  updated?
22    A.  No, sir.
23    Q.  Do you know how that information is
24  maintained?
25    A.  No, sir.

Page 56

1    Q.  Do you know who is responsible or what
2  agency is responsible for updating LEADS?
3    A.  No, sir.
4    Q.  Is LEADS a system that's unique to the
5  Champaign County sheriff's department?
6    A.  No, sir.
7    Q.  Who uses LEADS, if you know?
8    A.  Agencies throughout the state of Illinois,
9  police agencies.
10    Q.  After you learned that the license plate
11  was expired, what did you do?
12    A.  I traveled -- remained behind the vehicle,
13  activated the red and blue emergency lights on my
14  Champaign County Sheriff's Office marked squad car to
15  conduct a traffic stop pursuant to two Illinois
16  Vehicle Code violations.
17    Q.  What kind of squad car do you operate?
18    A.  A Ford Police Interceptor SUV, 2017.
19    Q.  That would be like an Explorer, right?
20    A.  Yes, sir.
21    Q.  When you turned on your overhead lights,
22  what happened?
23    A.  The vehicle pulled off to the right side of
24  Anthony Drive.
25    Q.  What did you do?

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

Page 57

1  **A.  I exited my squad car.**
2  Q.  And what did you do when you exited your
3  squad car?
4  **A.  Approached the stopped vehicle.**
5  Q.  How?  Did you approach the driver's side or
6  the passenger side?
7  **A.  Passenger side.**
8  Q.  Why the passenger side?
9  **A.  Just through my training and experience, I**
10 **approach on the passenger side for officer safety.**
11 Q.  When you approach the passenger side of the
12 vehicle, what happened next?
13 **A.  I identified myself and the reason for the**
14 **stop.**
15 Q.  Were you in uniform?
16 **A.  Yes, sir.**
17 Q.  What did you -- did you talk through the
18 window or did you ask for the window to be rolled
19 down?
20 **A.  Ms. Graham rolled the window down.**
21 Q.  So Ms. Graham was the passenger?
22 **A.  Yes.**
23 Q.  How did you know it was Ms. Graham?
24 **A.  By her identification.**
25 Q.  Did you ask for her identification?

Page 58

1  **A.  Yes.**
2  Q.  Did you ask for the driver's
3  identification?
4  **A.  Yes.**
5  Q.  Did you say anything else to the passenger
6  or the driver at that point when you're outside the
7  passenger window?
8  **A.  Yes.**
9  Q.  What did you say?
10 **A.  That they were being audio and -- that our**
11 **contact was being audio and video recorded, the**
12 **reason why I stopped them, and that I was not going**
13 **to issue her a citation for stopping her for an**
14 **expired registration.**
15 Q.  Did they say anything back?
16 **A.  Ms. Graham informed me that she was on her**
17 **way to work.**
18 Q.  Ms. Ayres say anything?
19 **A.  Not that I can recall.**
20 Q.  Did both of them provide you with their
21 identification?
22 **A.  Yes.**
23 Q.  What happened after you received the
24 identification for both Ms. Graham and Ms. Ayres?
25 **A.  I returned to my squad car.**

Page 59

1  Q.  What did you do when you returned to your
2  squad car?
3  **A.  Well, when I was walking back to my squad**
4  **car I called for a second unit.  Once I got back to**
5  **my squad car I started conducting the checks on my**
6  **computer that I do on every traffic stop.**
7  Q.  So before you got back to your car, you
8  radioed for a second unit?
9  **A.  Yes, sir.**
10 Q.  How'd you do that?
11 **A.  I asked METCAD, who's our dispatch center,**
12 **said my badge number, METCAD 527, start me a second**
13 **PC search.**
14 Q.  How did METCAD respond?
15 **A.  I don't recall.  When I got back to my**
16 **squad car, Deputy Floyd 521 advised he would be**
17 **en route from the Circle K at Mattis and Olympian,**
18 **which is just north of where I was.**
19 Q.  Why did you radio for a second unit at that
20 time?
21 **A.  Due to the odor of cannabis I detected**
22 **emanating from the interior of the vehicle.**
23 Q.  When did you detect an odor of cannabis
24 emanating from the vehicle?
25 **A.  As soon as I walked up to the front**

Page 60

1  passenger window that was rolled down.
2  Q.  How'd you know it was cannabis?
3  **A.  Training and experience.**
4  Q.  Since the time that you radioed for a
5  second unit until the time Deputy Floyd arrived, do
6  you recall how much time had elapsed?
7  **A.  I do not.**
8  Q.  More or less than five minutes?
9  **A.  Less.**
10 Q.  I want to back up a little bit.  On May 8,
11 2019, if you know, can you tell me how many officers
12 or deputies from the Champaign County sheriff's
13 department were working that night?
14 **A.  Would have been more than five.**
15 Q.  Do you know if it was more than ten?
16 **A.  Less.**
17 Q.  Do you know if there were any female
18 officers working that night?
19 **A.  There was not.**
20 Q.  Doing okay so far?
21 **A.  No, I'm good.  Thank you.**
22 Q.  So other than the smell of marijuana, the
23 notice from LEADS that the license plate was expired,
24 and the headlight being out, did you notice anything
25 else that might have been indicative of a violation

Page 61

1  of either the Illinois Vehicle Code or the Illinois
2  Criminal Code?
3      A.  Yes, sir.
4      Q.  What was that?
5      A.  That Ms. Ayres' driver's license was
6  expired.
7      Q.  So in our timeline we're back at your car.
8  You've already radioed for Deputy Floyd, correct?
9      A.  Yes, sir.
10     Q.  Now, what did you do when you reached back
11 to your squad car?
12     A.  I began running through the checks that I
13 do on every traffic stop on the computer.
14     Q.  What do you mean by checks that you do on a
15 traffic stop?
16     A.  So I did a LEADS check on Ms. Graham and
17 Ms. Ayres on my computer, which includes, obviously,
18 their driver's license status.  Will also show if
19 they have any wants or warrants out for their arrest,
20 and it will also show if they have any kind of
21 criminal history.
22     Q.  So if I understand you correctly, you've
23 done three LEADS searches at this time.  One based on
24 the license plate of the vehicle and then one
25 specific to Ms. Ayres and one specific to Ms. Graham;

Page 62

1  is that correct?
2      A.  Correct.
3      Q.  I want to start with Ms. Graham.  What
4  information would you have put into LEADS to conduct
5  this investigation?
6      A.  Her last name, first name, middle initial,
7  gender, date of birth.
8      Q.  Anything else?
9      A.  No, sir.
10     Q.  Did you input Ms. Graham's information into
11 any other system other than LEADS?
12     A.  Yes.
13     Q.  What was that other system?
14     A.  ARMS.
15     Q.  What is ARMS?
16     A.  It stands for something, but it essentially
17 is a shared police database that the Champaign County
18 Sheriff's Office shares in collaboration with the
19 City of Champaign police, University of Illinois
20 police, Rantoul police, and Urbana police.
21     Q.  Do you know of any other departments that
22 use ARMS?
23     A.  No, sir.
24     Q.  Can you tell me the difference between
25 LEADS and ARMS?

Page 63

1      A.  ARMS is a local database that has
2  information pertinent to just the agencies that I
3  just listed.
4      Q.  When you ran Ms. Graham's information
5  through LEADS, did any information come back?
6      A.  That her driver's license was valid.
7      Q.  Anything else?
8      A.  Not that I can recall.
9      Q.  When you ran Ms. Graham's information
10 through ARMS, did any information come back?
11     A.  Yes.
12     Q.  Do you recall what?
13     A.  I just recall that she had numerous
14 contacts with different agencies that share ARMS.
15     Q.  What do you mean by contacts?
16     A.  So any time -- if I get out with Joe Smith
17 on the side of the road and I get a -- fill out a
18 contact FI form, so field identification form, turn
19 that in at the end of shift, our secretaries will
20 enter that into ARMS.
21     So say a different agency gets out with that
22 subject, they can put his name in ARMS and be like,
23 hey, Deputy Christensen got out with this guy on the
24 20th of February and this is what it was for.
25     Q.  You mentioned a secretary will enter the

Page 64

1  information from that contact into ARMS.  Have you
2  personally ever had an occasion to enter information
3  into ARMS?
4      A.  Yes.
5      Q.  What kind of information would you be
6  required to enter into ARMS that might be different
7  from the secretary who's entering information from a
8  contact card?
9      A.  I would be entering in FI's if I'm typing
10 uniformed or in a police report.  I have to enter
11 that person's name and all their information into the
12 police report, and that would also show up.
13     Q.  Is that -- is Ms. Graham's prior contacts
14 with the various agencies that use ARMS the only
15 thing that you recall coming back when you searched
16 her name or searched her information on May 8th,
17 2019?
18     A.  Yes.
19     Q.  What -- when the information came back on
20 Ms. Graham from searching ARMS, what did you take
21 that to mean?
22     A.  I saw that she had numerous contacts, and I
23 left it at that.
24     Q.  Did it inform your decisionmaking about how
25 to conduct the traffic stop on May 8th, 2019?

Page 65

1    **A.** No.
2    Q. Why not?
3    **A.** Because she didn't have any alerts by her
4 **name in ARMS.**
5    Q. What do you mean by alerts?
6    **A.** If a subject has been arrested or if
7 **they're affiliated with any kind of officer**
8 **information, what we call 10-0, so officer safety,**
9 **someone's name will be -- they'll either have a red**
10 **by their name or there will be an A by their name**
11 **meaning they've been arrested. I did not see any,**
12 **essentially, red flags by Ms. Graham's name.**
13    Q. You also mentioned that you -- strike that.
14 First, did you search Ms. Graham's information in any
15 other manner other than LEADS or ARMS?
16    **A.** Not that I can recall.
17    Q. You also mentioned that you searched Ms.
18 Ayres' information, correct?
19    **A.** Yes, sir.
20    Q. Did you search that in both LEADS and ARMS?
21    **A.** Yes, sir.
22    Q. When you entered Ms. Ayres' information
23 into LEADS, what information did you enter?
24    **A.** Her last name, first name, middle initial,
25 **gender, date of birth.**

Page 66

1    Q. When you entered that information into
2 LEADS, did you get any information back?
3    **A.** Yes.
4    Q. What was that information?
5    **A.** That her driver's license was expired.
6    Q. Anything else?
7    **A.** I also observed via her criminal history
8 **that she's had numerous arrests and some convictions.**
9    Q. And that came back from the LEADS search?
10    **A.** Yes, sir.
11    Q. How did those two pieces of information
12 inform your decisionmaking about how to conduct the
13 search on May 8th, 2019?
14    **A.** Essentially just officer safety after
15 **observing what she'd been arrested for.**
16    Q. So you were just a little more on edge; is
17 that fair?
18    **A.** I wouldn't say on edge. It was just due to
19 **my training and experience with the arrests that she**
20 **has or the offenses she's been arrested for I -- like**
21 **if you -- not on edge. I just -- I would -- had**
22 **more -- kind of didn't have my blinders on. Just**
23 **wanted to make sure for officer safety, for my**
24 **safety, Deputy Floyd's safety, that I had a**
25 **background on what she'd been arrested for, and that**

Page 67

1 was just in the back of my mind when I had contact
2 with her.
3    Q. As you sit here today, do you recall what
4 information came back to you about what Ms. Ayres was
5 arrested for?
6    **A.** I don't recall via LEADS.
7    Q. Anything else that you learned of from
8 LEADS regarding Ms. Ayres?
9    **A.** No, sir.
10    Q. And, again, you don't know how this LEADS
11 system is maintained, correct?
12    **A.** By the secretary of state.
13    Q. But -- I'm sorry. I cut you off. Go
14 ahead.
15    **A.** No, I don't know specifically how it is
16 **maintained.**
17    Q. Nobody in the Champaign sheriff's
18 department is responsible for maintaining LEADS,
19 correct?
20          **MR. VAYR:** Objection, speculation. To
21 the extent you know the answer.
22    Q. (by Mr. Mc Carter) You can go ahead and
23 answer if you understand the question.
24    **A.** They do not maintain it. They can add
25 **information into it, but they do not maintain it.**

Page 68

1    Q. You don't know who is responsible for
2 updating that system, correct?
3    **A.** No, sir.
4    Q. You also ran Ms. Ayres' information through
5 ARMS, correct?
6    **A.** Yes, sir.
7    Q. What information did you input into ARMS?
8    **A.** Her last name, first name, and I believe
9 **middle initial.**
10    Q. Anything else?
11    **A.** I don't recall.
12    Q. Do you recall what information came back
13 from ARMS?
14    **A.** Yes, sir. I was able to positively
15 **identify the names returning on ARMS to information**
16 **that she verbally supplied me with on the traffic**
17 **stop.**
18    Q. So the name that you searched was the name
19 that she had given you, correct?
20    **A.** Yes, sir.
21    Q. Any other information that you learned of
22 from the ARMS search?
23    **A.** Yes, sir.
24    Q. What was that?
25    **A.** That Ms. Ayres had been arrested locally

Page 69

1 and out of county, that she had been paroled, that
2 she had been an offender of numerous robberies, that
3 she had recently been in a vehicle where a stolen
4 firearm was inside of it.
5   I also observed a booking -- numerous booking
6 photos of a Wylesha Ayres which enabled me to
7 positively identify the booking photo to the driver
8 as Wylesha.
9           MR. Mc CARTER: Can you mark this as
10 an exhibit, please.
11           (Whereupon Deposition
12           Exhibit No. 1 was marked for
13           identification by the court
14           reporter.)
15   Q.  Deputy, I've marked as Exhibit 1 something
16 that's been produced in this case, and for the record
17 this is Ayres Bates 217 through 221.  And I'll just
18 clarify for the record, the last page of this exhibit
19 is stating that Bates number 222 are recordings of
20 the dispatch traffic associated with the subject
21 incident.  This audio is on one CD and will be mailed
22 under separate cover.
23   Bryan, I don't intend on getting into this last
24 page.  It just happened to be the next page in the
25 document.

Page 70

1           MR. VAYR: Okay.
2           MR. Mc CARTER: It printed on the back
3 of my exhibit.
4           MR. VAYR: I gotcha.  Okay.
5   Q.  (by Mr. Mc Carter)  Deputy, if you could
6 just take a moment to look over the few pages that
7 I've put in front of you.  Let me know when you've
8 had a chance to review it and then we'll discuss it.
9           MR. VAYR: Actually if we could go off
10 the record for one moment.
11           MR. Mc CARTER: Sure.
12           (Whereupon a discussion was
13           held off the record.)
14   Q.  Have you had a chance to review it?
15   A.  Yes, sir.
16   Q.  Now, Deputy, in the top left corner it says
17 ARMS view names, correct?
18   A.  Yes, sir.
19   Q.  Do pages -- and I'm looking at the bottom
20 right, Ayres 217, 218, 219, 220, and 221, do these
21 reflect the information that you received from LEADS
22 on May 8, 2019, after inputting Wylesha Ayres'
23 information?
24   A.  Yes, sir.
25           MR. VAYR: Just correction for the

Page 71

1 record.  Do you mean ARMS, not LEADS?
2   Q.  (by Mr. Mc Carter)  ARMS.  Excuse me.  Yes.
3 Deputy, I want to walk through this a little bit
4 here.  This first page, so 217, if you'll notice it
5 lists several names, correct, in the center of this
6 document?
7   A.  Yes, sir.
8   Q.  Now, to the left of that there seem to be
9 several columns with different abbreviations and
10 checkmarks, correct?
11   A.  Yes, sir.
12   Q.  That first column that has an X in the
13 first box and then no X's after, can you tell me what
14 that indicates?
15   A.  That would indicate that is -- you're
16 specifically selecting to look at information to the
17 name where the X is by.
18   Q.  Okay.  So the first X indicates to you that
19 you have selected to look at the information for that
20 first entry; is that correct?
21   A.  Yes.
22   Q.  Now, moving to the right, the next column
23 there, you'll see that that column contains several
24 other letters.  Do you see that?
25   A.  The second column?

Page 72

1   Q.  It starts C, then moves to U, then moves to
2 I.
3   A.  Oh, yes.
4   Q.  Do you see that column?
5   A.  Yes, sir.
6   Q.  Can you tell me, a C in that column, what
7 does that indicate?
8   A.  City of Champaign Police Department.
9   Q.  What does a U indicate?
10   A.  City of Urbana Police Department.
11   Q.  What does an I indicate?
12   A.  University of Illinois Police Department.
13   Q.  And the next one is a C, correct?
14   A.  Yes, sir.
15   Q.  What is -- the next one is a red U.  Do you
16 see that?
17   A.  Yes, sir.
18   Q.  What does that indicate?
19   A.  Indicates that that name entry,
20 specifically Ayres Wylesha Kaprice, 4|23|92, 910.5
21 Busey Avenue, that she -- if you click on it, she'll
22 have special alerts or it means she has an alias or
23 that there's some kind of gang affiliation.
24   Q.  Is that the only information that could be
25 indicated by this red U?

Page 73

1    A.   To my knowledge, yes.
2    Q.   Does the red U mean that there's further
3  information available but this is still something
4  that indicates information by the Urbana Police
5  Department?
6    A.   Can you repeat that?
7    Q.   So the U still means Urbana Police
8  Department; is that correct?
9    A.   Yes.
10   Q.   And the red indicates that there's more
11 information available; is that correct?
12   A.   Yes.
13   Q.   Now, moving two spots down you'll see
14 there's an R?
15   A.   Yes, sir.
16   Q.   What does that R mean?
17   A.   Village of Rantoul Police Department.
18   Q.   And, lastly, what does the S indicate?
19   A.   Champaign County Sheriff's Office.
20   Q.   Now, there's eight entries on this first
21 page, correct, for Wylesha Ayres?
22   A.   Yes, sir.
23   Q.   What are each of these entries?  Are these
24 individual arrests or just contacts with these
25 various departments, as far as you know?

Page 74

1    A.   It would be contacts with the various
2  departments.
3    Q.   I want to move now again one column to the
4  right.  You'll see there's an A in the first spot of
5  that column?
6    A.   Yes, sir.
7    Q.   What does that A indicate?
8    A.   That that subject has been arrested in the
9  past.
10   Q.   It doesn't tell you what she's been
11 arrested for?
12   A.   Not on this screen.
13   Q.   Does it tell you if she's been arrested for
14 a misdemeanor or felony?
15   A.   Not on this screen.
16   Q.   Moving again one column to the right,
17 you'll see the first space in that column is blank
18 and the next space down there's a J in it?
19   A.   Yes, sir.
20   Q.   What does that J indicate?
21   A.   That that contact was when Wylesha was a
22 juvenile.
23   Q.   I want to move down to the second page of
24 that exhibit.  How might one get from, while sitting
25 in a squad car conducting a search in ARMS, how might

Page 75

1  an individual deputy get from the first page to the
2  information that's displayed on this second page?
3        MR. VAYR: Second page being Bates
4  number 218?
5    Q.   (by Mr. Mc Carter)  Correct.  Thank you,
6  counsel.
7    A.   As we saw on the first page where that X
8  is, putting an X in the box and either pressing enter
9  or clicking on that specified line where the name is.
10   Q.   So page 218 is information that's available
11 from the first entry on page 217; is that correct?
12   A.   To my knowledge, yes.
13   Q.   Is there anything on this second page that
14 would have indicated to you that Ms. Ayres has a
15 criminal history?
16   A.   Yes.
17   Q.   What's that?
18   A.   The booking photographs.
19   Q.   Does anything on this page say what Ms.
20 Ayres was booked for?
21   A.   No, sir.
22   Q.   I want to move now to the next page.  So
23 that's Bates stamp Ayres 219.
24   A.   Yes.
25   Q.   Can you tell me how an officer who's using

Page 76

1  ARMS would get from the first screen back on 217 to
2  this screen, Bates 219?
3    A.   Yes.  If you look at 218, you would click
4  F1, equals contacts, and that would pull up all the
5  contacts that Ms. Ayres has had with the respective
6  agency for that entry.
7    Q.   So 219 is information from prior contacts
8  with the Champaign Police Department; is that
9  correct?
10   A.   Yes.
11   Q.   Now, 219, in the roughly bottom third of
12 the information displayed, there is a summary
13 section.  Do you see that?
14   A.   Yes, sir.
15   Q.   In that summary section it says city tow
16 and then it spaces down.  Two guns located in a
17 vehicle.  One found to be stolen.  Correct?
18   A.   Yes, sir.
19   Q.   What did that information mean to you?
20   A.   That Ms. Ayres had been in a vehicle on 7/7
21 of 2018 where two guns were located inside, one which
22 was to be found stolen.
23   Q.   Next it says disposition just below that.
24 Do you see that?
25   A.   Yes.

Page 77

1  Q.  And then it says I-N-V LEADS exhausted,
2  correct?
3  A.  Yes.
4  Q.  Can you tell me what that means?
5  A.  I cannot answer that due to them being a
6  different agency.
7  Q.  Okay.  I want to move down to the next
8  page, 220.  Can you tell me how a deputy might get to
9  this particular page that displays the information on
10  Ayres 220?
11  A.  Yes.  If you look at 219 by clicking on
12  people involved.
13  Q.  And on this page we see Ms. Ayres' name,
14  correct?
15  A.  Yes, sir.
16  Q.  She's listed as an "other?"
17  A.  Yes, sir.
18  Q.  She's not listed as the offender, correct?
19  A.  Correct.
20  Q.  She's not listed as the victim?
21  A.  Correct.
22  Q.  Can you tell me, if you know, why somebody
23  would be listed as an other?
24  A.  Yes.  When a pass -- if you're a passenger
25  inside a vehicle and the offender is arrested,

Page 78

1  there's no option to enter in that person as a
2  passenger.  They'd be entered in as "other."
3  Q.  Could somebody be entered as an "other" if
4  they're not a passenger in a vehicle that the driver
5  is arrested?
6  A.  Yes.
7  Q.  What are some of those situations?
8  A.  It could be it's something related to this
9  case where they are outside of the vehicle.  That's
10  really all I can think of.  And there also could be
11  an instance where someone could be listed as an
12  "other" from a previous contact in reference to this
13  case where information was developed, but that would
14  be in a different report or supplemental report.  It
15  will not show up on this screen.  This is just
16  specifically for this report.
17  Q.  Somebody could be listed as an "other" for
18  multiple reasons is what you're saying?
19  A.  Yes, but my training and experience with
20  ARMS, most of the time an "other" suggests that they
21  were inside that vehicle because there's an option to
22  list someone as a witness, as a reporting person, and
23  so forth.
24  Q.  But we don't see Ms. Ayres listed as
25  anything other than an "other," correct?

Page 79

1  A.  Correct.
2  Q.  And you don't know just looking at this
3  page, Bates 220, specifically why Ms. Ayres is listed
4  as an "other," correct?
5  A.  No, sir.
6  Q.  Are you familiar with Quantrell Ayres?
7  A.  Yes, sir.
8  Q.  How so?
9  A.  Two summers ago he was shot on a drug deal
10  gone bad in Urbana Township and I was working.
11  Q.  Was he killed?
12  A.  No, sir.
13  Q.  Were you present at the scene of that
14  investigation?
15  A.  Yes, sir.
16  Q.  Have you had occasion to talk with
17  Quantrell before?
18  A.  No, sir.
19  Q.  Have you ever had occasion to speak with
20  Quantrell Ayres?
21  A.  Attempted but, no, sir.
22  Q.  Have you ever arrested Quantrell Ayres?
23  A.  No, sir.
24  Q.  Have you ever seen Quantrell Ayres and
25  Wylesha Ayres in the same vicinity?

Page 80

1  A.  Not to my knowledge.
2  Q.  I'd like to move to the next page,
3  page 221.  Can you tell us how a deputy performing a
4  search of an individual in ARMS would get to this
5  page?
6  A.  Yes, sir.  This is from an Urbana contact.
7  So if you look back at the first page, it has the U
8  by it.  So if you were to put an X by that U where
9  it's red, this is what would pull up.  So essentially
10  I'd put that X, press enter or click on the name by
11  the red U and this is the page that would pull up.
12  Q.  So if I understand you correctly, the X on
13  the far left column of the first page indicates what
14  other information is going to be pulled up, and the X
15  indicating the first column of that first page gets
16  us the information on the next two pages; is that
17  fair?
18  A.  Yes.
19  Q.  Okay.  Now, a deputy performing an
20  investigation into ARMS of an individual, if they
21  were to put the X next to the column with the red U,
22  they would have gotten to the information on
23  page 221; is that correct?
24  A.  Correct.
25  Q.  And you said this is information that would

Page 81

1  have come from the Urbana Police Department, correct?
2   **A. Yes, sir.**
3   Q. Now, you don't know how Urbana Police
4  Department maintains their records, correct?
5   **A. Can we clarify?**
6   Q. You don't know who at the Urbana Police
7  Department is responsible for inputting information
8  into the ARMS system?
9   **A. I can see on this page that Sergeant**
10  **Kokeral entered this name in, and I'm under the**
11  **assumption it was when he was writing a field report**
12  **where Ms. Ayres was involved.**
13  Q. Does anything in this, on this page 221,
14  indicate what that field report might have been for?
15  **A. No, sir.**
16  Q. Now, we see roughly the bottom quarter of
17  this page on the right-hand side in red is listed 4
18  Corner Hustler, correct?
19  **A. Yes, sir.**
20  Q. Can you tell us what that means?
21  **A. It just is letting the deputy or officer**
22  **know that the subject was or is affiliated and has**
23  **gang affiliation.**
24  Q. You don't know if that indicates past
25  affiliation or current affiliation, correct?

Page 82

1   **A. Correct.**
2   Q. You don't know how the officer who input
3  this information reached a determination that Ms.
4  Ayres is or was associated with the 4 Corner
5  Hustlers, correct?
6   **A. Correct.**
7   Q. Did anything else on this page, 221, inform
8  your decisionmaking process for May 8th, 2019?
9   **A. Yes. It just heightened my officer safety.**
10  Q. Why?
11  **A. Due to the contacts I observed Ms. Ayres**
12  **being involved in, as well as gang affiliation.**
13  Q. If an individual was at one point
14  associated with a gang but has since for whatever
15  reason become disassociated with that gang, would the
16  information that's displayed on a particular ARMS
17  report change?
18  **A. I am not sure.**
19  Q. You don't know how the system is updated;
20  is that fair?
21  **A. Yes, sir.**
22  Q. You don't know how the system is maintained
23  by any individual department, correct?
24  **A. Correct.**
25  Q. Are you aware of any policies and

Page 83

1  procedures for ensuring that the data in the ARMS
2  system is as up to date as possible?
3   **A. We have a policy at the sheriff's office --**
4  **well, I won't say it's policy, but we have been sent**
5  **numerous e-mails from our command and been told when**
6  **entering someone's information, in make sure it is**
7  **the most current information. And there is an option**
8  **when we're filling out field identification cards**
9  **that if we have knowledge or if we know that subject**
10  **is a gang member that we're listing that. But I**
11  **can't speak for other deputies or officers saying**
12  **that they're doing what their command is asking them**
13  **to do.**
14  Q. Is there any other source of information
15  that a deputy can use while at a traffic stop to gain
16  up-to-date information on a particular suspect other
17  than LEADS and ARMS?
18  **A. Yes, sir.**
19  Q. What is that?
20  **A. Police Intel.**
21  Q. What do you mean by Police Intel?
22  **A. It's a website utilized by the Champaign**
23  **Police Department, Champaign County Sheriff's Office,**
24  **Urbana Police Department, University of Illinois**
25  **Police Department, and Mahomet Police Department to**

Page 84

1  share information and has recent warrants, hard
2  copies of arrest warrants listed on them.
3   Q. Did you on May 8, 2019, conduct a search of
4  Police Intel website of Ms. Wylesha Ayres?
5   **A. No, sir.**
6   Q. Did you conduct an investigation into
7  Latika Graham on Police Intel website on May 8, 2019?
8   **A. No, sir.**
9   Q. Why not?
10  **A. I had already checked at the beginning of**
11  **my shift, and I observed that their names were not in**
12  **it or on the website.**
13  Q. I just want to be clear. You checked at
14  the beginning of your shift whether or not these two
15  individuals were in the Police Intel website?
16  **A. No, sir.**
17  Q. Okay. I must have misunderstood you then.
18  Can you tell me again why you didn't run either of
19  the two women from the stop on May 8, 2019, through
20  the Police Intel website?
21  **A. Yes. I have a common practice whenever I**
22  **get in my squad car at home to go on duty, that's one**
23  **of the first websites I look at because it has recent**
24  **crimes committed, of still security, video**
25  **surveillance of a suspect, as well as all the recent**

Page 85

1  warrants that have been issued by Champaign County
2  judges. I scroll through all that, look at the
3  names, look at the photos of people, and I did not
4  observe either of these subjects on that website when
5  I looked at it at the beginning of my shift.
6      Q. So it's more of a current events database;
7  is that a fair characterization?
8      A. Yes.
9      Q. Okay. Any other sources of information
10 that are available other than LEADS, ARMS, or the
11 Police Intel website?
12     A. Yes, sir.
13     Q. What is that?
14     A. Messages sent from any agency around the
15 state of Illinois via the messaging system that we
16 were talking about earlier.
17     Q. Did you conduct any review of that
18 messaging system for information regarding Wylesha
19 Ayres on May 8, 2019?
20     A. Not during the traffic stop.
21     Q. Why not?
22     A. Because I monitor it. My computer rings
23 every time a message comes in, and I check that
24 message immediately. And prior to the traffic stop
25 and during the traffic stop, I did not receive any

Page 86

1  messages containing their names.
2      Q. Those messages, that's something that's
3  communicated through various departments you said?
4      A. Yes, sir.
5      Q. What are those departments again?
6      A. Any department throughout the state of
7  Illinois that has LEADS.
8      Q. Other than LEADS, both the database and the
9  messaging system, ARMS and this Police Intel website,
10 any other source of information that's available?
11     A. No, sir.
12     Q. If you wanted to find out more information
13 regarding Ms. Ayres' involvement in the incident
14 that's described at Ayres 219, city tow, two guns
15 located in a vehicle, one found to be stolen, how
16 would you do it?
17     A. I could use my messenger to message Officer
18 Nichol with the Champaign Police Department or any
19 officer that's had contact with her to see if I could
20 get background as far as officer safety or anything I
21 should know about her or Ms. Graham. Or I could use
22 my cell phone to call any officer that has had
23 contact with her, which I did not do either.
24     Q. You didn't make any attempt to find out
25 more information regarding the information that's

Page 87

1  displayed on page 219?
2      A. No, sir. I would have, but I'm unable to
3  look at the field report for the City of Champaign
4  because I'm a different agency.
5      Q. Well, you stated you could have contacted
6  the officer through your messaging system, correct?
7      A. Correct.
8      Q. But you didn't do that on May 8th, 2019?
9      A. No, sir. Champaign was all tied up.
10     Q. How do you know that Champaign was all tied
11 up?
12     A. Because we share the same dispatch center,
13 and I scan on my radio and I can look at every
14 officer's event status on my computer.
15     Q. Did you look at every officer's event
16 status on your computer for the Champaign Police
17 Department prior to pulling over Ms. Ayres on May 8,
18 2019?
19     A. No, sir.
20     Q. Did you look at the event status on your
21 computer for the officers at the Champaign Police
22 Department during the traffic stop on May 8, 2019?
23     A. No, sir.
24     Q. You also mentioned you could call an
25 officer on your cell phone, correct?

Page 88

1      A. Yes, sir.
2      Q. You didn't do that on May 8, 2019, at all,
3  correct?
4      A. No.
5      Q. If you wanted to find out more information
6  about Ms. Ayres' association with the 4 Corner
7  Hustlers as detailed on Bates 221, what could you do?
8      A. I could call one of our street crime task
9  force, slang term, guys who are familiar, more so
10 familiar, and they more so focus on the local gangs.
11     Q. Did you do that regarding Ms. Ayres on May
12 8, 2019?
13     A. No, sir.
14     Q. Why not?
15     A. Due to I was treating it as a simple
16 traffic stop with the odor of cannabis detected from
17 the interior of the vehicle.
18     Q. I think that's all the questions I have
19 about the exhibit if you'd like to put that away at
20 this point. Deputy, how you doing? You want to take
21 a break? I think we've been going for well over an
22 hour.
23     A. I'm good.
24     Q. Back to May 8, 2019, eventually Deputy
25 Floyd arrived, correct?

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

Page 89

1    A.  Yes, sir.
2    Q.  Do you recall when Deputy Floyd arrived on
3  scene?
4    A.  Shortly after.  I don't recall the specific
5  time.
6    Q.  Do you recall what you were doing when
7  Deputy Floyd pulled up on scene?
8    A.  Yes, sir.  I was still going through my
9  routine checks on my MDC, my mobile data computer.
10   Q.  When Deputy Floyd arrived, what did he do?
11   A.  He walked up to my squad car.
12   Q.  Did you guys talk?
13   A.  Yes, sir.
14   Q.  What did you tell him?
15   A.  That I could detect weed coming from inside
16  the vehicle.
17   Q.  Anything else?
18   A.  I recall that LEADS was running slow, and I
19  had just discovered when he got up to my squad car
20  that Ms. Ayres' license was expired.
21   Q.  Anything else?
22   A.  That I lost my good gloves.  That's all I
23  can recall.
24   Q.  Anything other than the loss of a fine pair
25  of gloves?

Page 90

1    A.  That's all I can recall.
2    Q.  When having this conversation with Deputy
3  Floyd, do you recall -- you mentioned LEADS was
4  running slow.  Had you already run the ARMS report or
5  were you running the ARMS report after LEADS, if you
6  remember?
7    A.  I don't recall.
8    Q.  Do you recall if Deputy Floyd said anything
9  to you?
10   A.  Yes.  After I informed him that I would be
11  conducting a probable cause search of the vehicle, he
12  asked -- he mistook me and thought that I had gotten
13  consent to search the vehicle.
14   Q.  Anything else?
15   A.  That's all I can recall.
16   Q.  Do you recall informing -- whether or not
17  you informed Deputy Floyd of the information that you
18  learned from this ARMS report that we just went
19  through?
20   A.  I recall mentioning information to what I
21  observed via ARMS.  I don't recall specifically
22  verbatim what I told him.
23   Q.  Okay.  After Deputy Floyd arrived on scene,
24  what did you do?
25   A.  I again informed him that I could smell the

Page 91

1  odor of cannabis, or I believe I said weed, coming
2  from the vehicle.  I proceeded to put my snow gloves
3  on, exited my squad car, and approached the stopped
4  vehicle.
5    Q.  Have you since gotten a new pair of gloves?
6    A.  I have, and I've lost them already.
7    Q.  As you approached the vehicle, what
8  happened?
9    A.  I asked Ms. Ayres if she would please exit
10  the vehicle in a respectful manner.
11   Q.  So you approached the driver's side of the
12  vehicle?
13   A.  Yes, sir.
14   Q.  And you asked Ms. Ayres to exit the
15  vehicle?
16   A.  Yes, sir.
17   Q.  Did you say anything else to her?
18   A.  I informed her she's not under arrest.
19   Q.  Did she say anything to you?
20   A.  Not that I can recall.
21   Q.  Did she exit the vehicle?
22   A.  Yes, sir.
23   Q.  What happened next?
24   A.  We walked back in between the rear of the
25  vehicle she was operating and the front of my squad

Page 92

1  car.
2    Q.  So you repositioned yourselves between the
3  Jeep and the front of your squad car, correct?
4    A.  Yes, sir.
5    Q.  Do you recall where Deputy Floyd was at
6  this point?
7    A.  He was standing in the vicinity of my front
8  passenger headlight.
9    Q.  And did Deputy Floyd say anything to Ms.
10  Ayres at this point?
11   A.  Not that I can recall.
12   Q.  Do you recall what Deputy Floyd was doing
13  at this point?
14   A.  No, sir.
15   Q.  After you and Ms. Ayres relocated to the
16  back of the Jeep in front of your squad car, what
17  happened next?
18   A.  I informed her that I could detect the odor
19  of cannabis coming from the interior of the vehicle.
20  I asked her if there was any cannabis inside the
21  vehicle, at which she stated there was not.  And she
22  admitted to me that she had smoked earlier.
23   Q.  Did she say when --
24   A.  No, sir.
25   Q.  -- she had smoked?

Page 93

1    A.  No, sir.
2    Q.  At what point did you decide to search Ms.
3  Ayres?
4    A.  I asked her if I could ensure that she
5  didn't have any weapons on her person.
6    Q.  Prior to asking her, at what point did you
7  make the determination that you were going to be
8  searching Ms. Ayres?
9    A.  When I observed that she was included on a
10 Champaign uniform police report where a stolen
11 firearm and another firearm were located inside the
12 vehicle.
13   Q.  How did that information lead you to the
14 conclusion that you were going to search Ms. Ayres on
15 May 8th, 2019?
16   A.  Officer safety.
17   Q.  And prior to that, gaining that information
18 through ARMS, did you have any reason to believe that
19 Ms. Ayres might be a threat to any others in the
20 silver Jeep?
21   A.  Can you repeat that?  I apologize.
22   Q.  Prior to learning the information that we
23 just talked about in the ARMS report, did you have
24 any information to indicate that Ms. Ayres might be a
25 danger or a threat to the other individuals in the

Page 94

1  silver Jeep Patriot?
2    A.  No, sir.
3    Q.  Prior to learning the information from the
4  ARMS report, did you have any information to believe
5  that Ms. Ayres might be a danger or a threat to
6  herself?
7    A.  No, sir.
8    Q.  Prior to learning the information from the
9  ARMS report, did you have any information to believe
10 that Ms. Ayres might be a danger or a threat to you?
11   A.  I had suspicion that due to her past, being
12 involved in felony arrests or felony crimes, that I
13 had reasonable suspicion to believe that there could
14 be a weapon on her person.
15   Q.  So it was just her past that kind of
16 informed that opinion, correct?
17   A.  Yes.
18   Q.  It wasn't anything that happened at that
19 search on May 8, 2019?
20   A.  No, sir.
21   Q.  You didn't see a firearm in the car?
22   A.  No, sir.  There was a lot of clutter in the
23 car.
24   Q.  So that's a no, you didn't see a firearm,
25 correct?

Page 95

1    A.  Yes, sir.
2    Q.  You didn't see any weapons in the car,
3  correct?
4    A.  No, sir.
5    Q.  When Ms. Ayres stepped out of the car, did
6  you ask her if she had any weapons on her?
7    A.  I don't recall.
8    Q.  Is that something that's in your normal
9  course of procedure to ask somebody when asking a
10 suspect to step out of a vehicle?
11   A.  Yes.
12   Q.  If you would have asked Ms. Ayres if she
13 had any weapons and she would have responded in the
14 affirmative, what would you have done?
15   A.  I would have taken control of her hands to
16 maintain officer safety and asked her, assuming
17 there's compliance, where the weapon was and retrieve
18 that weapon for officer safety, as well as the other
19 occupants safety and Ms. Ayres' safety.
20   Q.  On May 8th, 2019, you never -- I'm sorry.
21        MR. VAYR:  Very briefly.  Objection,
22 hypothetical.  Please continue.
23   Q.  (by Mr. Mc Carter)  On May 8th, 2019, you
24 never had to take control of Ms. Ayres' hands,
25 correct?

Page 96

1    A.  No, sir.
2    Q.  Back to our timeline.  So you and
3  Ms. Ayres, she stepped out of the vehicle.  You're
4  back between the Jeep Patriot and your squad car.
5  What happened next?
6    A.  I recall asking her if I could ensure that
7  she didn't have any weapons on her person, at which
8  point I observed her bring her left and right arms up
9  essentially like an airplane.
10   Q.  When you say like an airplane, so
11 perpendicular to the ground, straight out to her
12 side?
13   A.  Yes, sir, like that.
14        MR. VAYR:  Parallel to the ground.
15   Q.  (by Mr. Mc Carter)  Thank you, counsel.
16 Prior to asking Ms. Ayres for consent to search, did
17 you at any point request the presence of a female
18 officer?
19   A.  No, sir.
20   Q.  If you were going to request the presence
21 of a female officer, how would you have done it?
22   A.  I would have asked METCAD over the radio
23 with my badge number if there's a female officer
24 available.
25   Q.  And you never did that?

Page 97

1  A.  No, sir.
2  Q.  Do you know if Deputy Floyd ever asked the
3  presence of a female officer at the scene on May 8,
4  2019?
5  A.  He did not.
6  Q.  Do you know if there were any women working
7  on the night of May 8, 2019, in the Champaign County
8  sheriff's department?
9  A.  There was not.
10  Q.  Prior to conducting the search of Ms.
11  Ayres, what were you looking for?
12  A.  Any weapons that could either harm Deputy
13  Floyd or myself.
14  Q.  And can you articulate for me the basis of
15  your suspicion that Ms. Ayres might have had a weapon
16  that could have harmed you or anyone else?
17  A.  Yes.  Due to her past contacts with law
18  enforcement.
19  Q.  Just that past contact with law
20  enforcement?
21  A.  Well, and we also presume, good training
22  and experience, that anyone could be armed.
23  Q.  So it's her past contact from the ARMS that
24  we just went through, correct?
25  A.  Yes.

Page 98

1  Q.  And there's two instances in there that
2  informed your decision, correct?
3  A.  Yes.
4  Q.  There's the incident where she's listed as
5  an "other" on a report involving her brother,
6  correct?
7  A.  I'm not sure if it's her brother.  I just
8  know they share the same last name.
9  Q.  Fair.  Allow me to rephrase.  You're aware
10  that she's listed as an "other" on a report involving
11  a Quantrell Ayres?
12  A.  Yes, sir.
13  Q.  And there's also the mention that she may
14  have had at one point or is associated with the 4
15  Corner Hustlers?
16  A.  Yes, sir.
17  Q.  And then a general suspicion from your
18  training that everyone could be armed, correct?
19  A.  Yes, sir.
20  Q.  No other facts from that day to inform the
21  conclusion that she may be armed, correct?
22  A.  Correct.
23  Q.  Prior to searching Ms. Ayres, how was she
24  acting?
25  A.  She was respectful, but again no one is

Page 99

1  happy when they get pulled over.  She was compliant.
2  Q.  Did she make any threats to you?
3  A.  No, sir.
4  Q.  Did she make any threats to anyone else in
5  the vehicle at that time?
6  A.  No, sir.
7  Q.  Did she curse at you?
8  A.  Not that I recall.
9  Q.  Did she seem upset at all?
10  A.  Frustrated.
11  Q.  After asking for consent to search Ms.
12  Ayres and then she indicated as such by placing her
13  hands parallel to the ground, what did you do?
14  A.  She was still facing me when she raised her
15  arms parallel from the ground.  I asked her if she
16  would turn around and put her back towards me.
17  Q.  And then what did you do?
18  A.  I checked the exterior of her clothing for
19  any bulges that would resemble a weapon.
20  Q.  Do you remember what kind of clothing she
21  was wearing?
22  A.  I don't remember the exact material.  It
23  was a loose or baggy pair of red pants.
24  Q.  Do you remember the top she was wearing?
25  A.  Black in color top and it was not tight

Page 100

1  fitting.
2  Q.  Did you conduct a search of Ms. Ayres
3  person?
4  A.  Yes, sir.  I checked the areas of her
5  person where she could possibly be concealing a
6  weapon.
7  Q.  Where were those areas?
8  A.  Her waistband, down her -- so right of her
9  thigh, inside of her thigh, right of her thigh, on
10  each leg.  So each side of the thigh, and then also
11  her back pockets.
12  Q.  Did you see any bulge in her pants that may
13  indicate that she had a weapon?
14  A.  No, sir.  I was unable due to the baggy
15  pants.
16  Q.  You didn't see the handle of a gun sticking
17  out?
18  A.  No, sir.
19  Q.  You didn't see a knife sticking out?
20  A.  No, sir.
21  Q.  No club or anything?
22  A.  No.
23  Q.  Now, you mentioned that you searched both
24  thighs on the outside, correct?
25  A.  Outside of her pants, yes, sir.

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

Page 101

1   Q.  Did you also search her buttocks?
2   A.  Her two back pockets.
3   Q.  Why?
4   A.  Because she had baggy pants on, and due to
5   my training and experience, numerous types of weapons
6   could be concealed in a pocket.
7   Q.  Did you search -- you said you searched her
8   inner thigh, correct?
9   A.  Yes, sir.
10  Q.  How did you search her inner thigh?
11  A.  With my hand.
12  Q.  Can you elaborate?
13  A.  I ran my hand down her inner thigh where
14  her pants were baggy.  That was due to me not being
15  able to --
16  Q.  How -- I'm sorry.  I interrupted you.
17  A.  Go ahead.
18  Q.  How far down her inner thigh did you go
19  with your hand?
20  A.  Above her knee.
21  Q.  Can you estimate for me how far above the
22  knee you stopped?
23  A.  No, sir.
24  Q.  How far up her inner thigh did you go?
25  A.  I cannot recall.  I didn't go all the way

Page 102

1   up to where it would touch her torso or whatever part
2   of her body, near her crotch.
3   Q.  Did you repeat that hand gesture for the
4   other thigh?
5   A.  Yes, sir.
6   Q.  You went down to just above the knee?
7   A.  Yes, sir.
8   Q.  And then you came up the inner thigh but
9   claim you never reached as far as to touch the start
10  of her torso?
11  A.  Yes, sir, from what I recall.
12  Q.  How did you search her buttocks?
13  A.  I at first just ran my hands over it, and
14  then due to them being baggy, as I concluded the
15  check of her person for weapons I ran my hand over --
16  my right hand, I believe it was, over her right back
17  pocket due to it being baggy to ensure there was no
18  weapon inside of her rear right back pocket.
19  Q.  Did you repeat that gesture for the rear
20  left pocket?
21  A.  No, sir.
22  Q.  Why just the one pocket?
23  A.  Because I was getting ready to finish my
24  search and that's where it was done.  Honestly I have
25  no --

Page 103

1   Q.  You didn't think it was important searching
2   for places that a weapon might be stored in that it
3   was important to search the other pocket?
4   A.  I can't recall.
5   Q.  You mentioned that you -- I think you said
6   slide your hand or moved your hand across her
7   buttocks while searching for a weapon.  Can you
8   describe how you did that with your hand?  Does that
9   make sense, or would you like me to break that down a
10  little more?
11  A.  Can you break it down, please?
12  Q.  Moving your hand across her buttocks
13  searching her back side for a weapon, was your palm
14  against Ms. Ayres' body or was your palm facing out?
15  A.  Against.
16  Q.  Were your fingers closed or were your
17  fingers open?
18  A.  Closed.
19  Q.  And why was that?
20  A.  Because that's just how I always do it.
21  You can feel better when you're -- I mean, you can
22  feel objects when your fingers are closed rather than
23  if there's a small object on someone's person.  With
24  your fingers open, you could miss that object.
25      MR. VAYR: I apologize.  Just to try

Page 104

1   to make the physical descriptions, because like
2   closed I can almost see that being like a fist or
3   something.  So when we're saying fingers closed, to
4   the extent it's helpful, the image I have in my head
5   is like the Forrest-Gump-is-running hand.  So it's
6   just rigid, kind of like a fan.
7       MR. Mc CARTER: High five.
8       MR. VAYR: Sure, a high five.  That's
9   a way better way of putting it.  And then when you're
10  saying open, it's like the fingers are spread out
11  like a web or something; is that fair?
12      MR. Mc CARTER: That's fair.
13      MR. VAYR: Just so that we down the
14  road know what gestures you're talking about.  Thank
15  you.
16  Q.  (by Mr. Mc Carter)  Is searching the
17  private parts of a person's body, including their
18  buttocks, with the palm of your hand, fingers closed
19  in a high five gesture, something that you learned of
20  through your training with the Champaign County
21  sheriff's department?
22  A.  No, sir.  And if I can elaborate?
23  Q.  Please.
24  A.  The last training for search of a person
25  that was held was at the Police Training Institute

Page 105

1    six years ago.
2        Q.  Is conducting a search of a person's
3    private areas, including their buttocks, with your
4    palm against the person's body, fingers closed in a
5    high five gesture, something that you learned at PTI?
6        A.  I do not recall.
7        Q.  Do you happen to recall any of your
8    training sessions that covered how to conduct a
9    search of a person's private area?
10       A.  I recall, again as we were saying earlier,
11   with the breast line, using the side of your hand to
12   check the breast line.
13       Q.  Any of your training ever inform you of how
14   to conduct a search of a person's private area other
15   than their chest?
16       A.  Can you repeat that?  I apologize.
17       Q.  So you mentioned that you did receive some
18   special training in how to conduct a search of a
19   person's private area and specifically included their
20   chest.  But did you ever receive any training on how
21   to conduct such a search of an individual of the
22   opposite sex in either their buttocks or their
23   crotch?
24       A.  We could have at PTI.  I cannot recall.
25       Q.  Now, you mentioned that you searched her

Page 106

1    buttocks, her back pockets, the inner thigh, the
2    outer thigh.  Did you search anywhere else?
3        A.  Waistline.
4        Q.  And how did you conduct that search?
5        A.  We're using the high five hands as an
6    example.  Running that across her waistline to make
7    sure there was no object that could resemble or
8    suggest there's a weapon in her waistband.
9        Q.  Did you search anywhere else?
10       A.  No, sir.
11       Q.  During this search, did you say anything to
12   Ms. Ayres?
13       A.  I recall her stating along the lines, whoa,
14   dude, don't touch my butt as I was finishing or
15   concluding the search, at which time I informed her
16   that I was not touching her butt.  I was just
17   ensuring that she had no weapons on her.
18       Q.  Did she say anything else beyond that?
19       A.  Not that I can recall.
20       Q.  Did you say anything else beyond what you
21   just indicated?
22       A.  Not that I can recall.
23       Q.  After Ms. Ayres said something to the
24   effect of whoa, dude, don't touch my butt, what did
25   she do?

Page 107

1        A.  I don't recall.
2        Q.  What did you do?
3        A.  I approached the passenger side of the
4    vehicle.
5        Q.  Do you know where Ms. Ayres went after
6    you -- strike that.  So obviously after she said
7    such, whoa, dude, don't touch my butt, or words to
8    that effect, you completed your search, correct?
9        A.  Yes, sir.
10       Q.  Do you know where Ms. Ayres then relocated,
11   if anywhere, after you completed your search?
12       A.  With Deputy Floyd.  She stood by Deputy
13   Floyd.
14       Q.  And if I understand correctly, you went to
15   the passenger side of the car?
16       A.  Yes, sir.
17       Q.  You never used your canine to conduct a
18   search of Ms. Ayres' person?
19       A.  Not allowed to.
20       Q.  You're not allowed to use a canine to
21   search an individual?
22       A.  Because he's a bite dog, yes, sir.
23       Q.  What do you mean by bite dog?
24       A.  He's an apprehension, I should say.  Sorry.
25   It's not bite.

Page 108

1        Q.  After you went to the passenger side, what
2    did you do next?
3        A.  I asked Ms. Graham if she would exit the
4    vehicle.
5        Q.  So Ms. Graham had not exited the vehicle
6    prior to that at all?
7        A.  Correct.
8        Q.  Okay.  When you asked Ms. Graham to exit
9    the vehicle, what did she say?
10       A.  That she needed to get to work.
11       Q.  Anything else?
12       A.  That she smokes Black & Milds.
13       Q.  Anything else?
14       A.  Not that I can recall.
15       Q.  Did she exit the vehicle?
16       A.  Eventually, yes.
17       Q.  When she exited the vehicle, where did she
18   go?
19       A.  She stood in between my squad car and the
20   Jeep on the shoulder of the road.
21       Q.  Did you -- after she exited the vehicle,
22   did you exchange any other words with Ms. Graham?
23       A.  Yes.  It was in reference to the children
24   in the back seat.
25       Q.  What did you say?

Page 109

1    A.  I cannot recall.  I believe I gave her the
2  option to stay in the vehicle or get the children out
3  of the vehicle, whichever she's most comfortable
4  with.
5    Q.  Do you recall what she said?
6    A.  No, sir.  I know she elected not to get the
7  kids out of the car, though.
8    Q.  How many kids were in the car?
9    A.  Two.
10    Q.  If you can approximate, how old were the
11  kids?
12    A.  I don't recall.  Young.  Two and four.
13    Q.  Boys or girls?
14    A.  I don't recall.
15    Q.  After Ms. Ayres had now relocated to in
16  between your squad car and the silver Jeep, what did
17  you do?
18    A.  Ms. Graham did you say?  I'm sorry.
19    Q.  Yes.
20    A.  Okay.
21    Q.  Just to make sure we're all on the same
22  page, so after Ms. Graham is now relocated to in
23  between the two cars, you've had the conversation
24  regarding whether or not the children should be asked
25  to leave the vehicle, and the kids have not left the

Page 110

1  car, correct?
2    A.  Correct.
3    Q.  What did you do next?
4    A.  I approached the front driver's door of the
5  Jeep.
6    Q.  Why?
7    A.  To conduct a probable cause search.
8    Q.  A search of the car?
9    A.  Yes, sir.
10    Q.  What were you searching the car for?
11    A.  Cannabis.
12    Q.  Can you articulate for me all the facts
13  that you believe indicated to you that cannabis may
14  have been in the car?
15    A.  The plain odor of cannabis emanating from
16  the interior.
17    Q.  Anything else?
18    A.  Ms. Ayres mentioned she had smoked earlier,
19  but I was unsure if it was in that car.  So
20  essentially the plain odor of cannabis coming from
21  the vehicle.
22    Q.  You didn't see any cannabis laying around
23  in the car, correct?
24    A.  No, sir.
25    Q.  You didn't see any paraphernalia?

Page 111

1    A.  No.
2    Q.  You didn't see a marijuana pipe or
3  anything?
4    A.  No.
5    Q.  When you searched the driver's side, did
6  you recover any cannabis?
7    A.  No, sir.
8    Q.  Any contraband at all?
9    A.  No, sir.
10    Q.  Any weapons?
11    A.  No, sir.
12    Q.  What did you do after you searched the
13  driver's side?
14    A.  I went around to the front passenger door
15  and searched the front passenger compartment of any
16  area where cannabis could be concealed or stored.
17    Q.  Did you find any cannabis?
18    A.  No, sir.
19    Q.  Find any paraphernalia?
20    A.  No, sir.
21    Q.  Find any weapons?
22    A.  No, sir.
23    Q.  After you searched the passenger side, what
24  did you do next?
25    A.  Briefly looked in the back seat while

Page 112

1  talking, saying, hey, Bubba, to one of the kids.
2    Q.  Kids say anything back?
3    A.  I don't recall.
4    Q.  Did -- when looking into the back seat did
5  you see anything that might indicate that there would
6  be cannabis in the back seat?
7    A.  No, sir.
8    Q.  Didn't see a bag of cannabis?
9    A.  No.
10    Q.  Didn't see any drug paraphernalia?
11    A.  No.
12    Q.  No pipe?
13    A.  No, sir.
14    Q.  Did you see any weapons?
15    A.  No, sir.
16    Q.  After viewing into the back seat -- I just
17  want to be clear.  Did you ever open the back door?
18    A.  No.  I believe I peaked my head through the
19  back via the front seat compartment.
20    Q.  So leaning in the front passenger seat and
21  just kind of looked over the passenger seat into the
22  back compartment?
23    A.  Yes.
24    Q.  After looking over the passenger seat into
25  the back seat compartment, what did you do next?

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

Page 113

1    A.   I walked to the trunk of the vehicle.
2    Q.   What did you do there?
3    A.   Opened up the lift gate, or the trunk
4    essentially.
5    Q.   And what did you do next?
6    A.   Opened the trunk.
7    Q.   And then what'd you do?
8    A.   I checked the trunk, specifically a
9    backpack, where, in my training and experience,
10   cannabis could be concealed, as well as other areas,
11   and I did not locate any.
12   Q.   Did you open the backpack?
13   A.   Yes, sir.
14   Q.   Did you find any cannabis in the backpack?
15   A.   No, sir.
16   Q.   Did you find any paraphernalia?
17   A.   No, sir.
18   Q.   Did you find any weapons?
19   A.   No, sir.
20   Q.   When you were conducting the search of Ms.
21   Ayres, did you find any cannabis?
22   A.   No, sir.
23   Q.   Did you find any paraphernalia?
24   A.   No, sir.
25   Q.   Any weapons?

Page 114

1    A.   No, sir.
2    Q.   Any contraband at all?
3    A.   No, sir.
4    Q.   After searching the trunk of the silver
5    Jeep Patriot, what did you do?
6    A.   I informed Ms. Ayres and Ms. Graham that
7    they could get back into the vehicle.
8    Q.   Did you ever search Ms. Graham?
9    A.   No, sir.
10   Q.   Why not?
11   A.   Because I observed that she didn't have any
12   contacts as far as weapons.  And, in all honestly,
13   it's my own fault, but she stated she was going to be
14   late to work and it was again a traffic stop for the
15   odor of cannabis which I encounter quite often.  I
16   was trying to expedite the process so I could get her
17   to work.
18   Q.   You had a dog with you that night, right?
19   A.   Yes, sir.
20   Q.   Did you use the dog and -- forgive me.  I
21   forgot your --
22   A.   Lesan.
23   Q.   Lesan.  Did you use Lesan to search the
24   silver Jeep Patriot?
25   A.   No, sir.

Page 115

1    Q.   Why not?
2    A.   Because I could already detect the odor of
3    cannabis, and I'm not sending a full service
4    apprehension canine for an interior search when
5    there's two children inside the vehicle.
6    Q.   Is your full service apprehension canine
7    trained in the identification and recognition of
8    marijuana?
9    A.   Yes.
10   Q.   It would have been entirely possible to ask
11   the two children to step out of the back seat,
12   correct?
13   A.   Yes, sir.
14   Q.   And then use the dog to search the car?
15   A.   Yes, sir.
16   Q.   But you didn't do that?
17   A.   No, sir.
18   Q.   Why?
19   A.   Because I had already detected the odor of
20   cannabis emanating from the interior.  And if I could
21   just search the vehicle myself rather than having my
22   dog sniff through the entire vehicle trying to
23   pinpoint where -- pinpoint source, so where actual
24   product could be, as well as Ms. Graham telling me
25   she wanted to get to work, for a simple traffic

Page 116

1    violation I decided to search myself to get the
2    traffic stop concluded in a quicker manner.
3    Q.   Is there any timeline that you have to
4    conduct the traffic stop in?
5    A.   It depends.
6    Q.   There's no sheriff's department rules or
7    regulation regarding how long you should be at any
8    particular traffic stop?
9    A.   Reasonable amount of time.
10   Q.   Was there any emergency situation happening
11   in Champaign County that required your immediate
12   attention?
13   A.   No, sir.
14   Q.   Were you called to any other scene of any
15   other investigative action that was taking place in
16   Champaign County?
17   A.   No, sir.
18   Q.   Did you have any burden upon your time
19   which prevented you from taking your time at the
20   traffic stop with Ms. Ayres and Ms. Graham on May
21   8th, 2019?
22   A.   No, sir.  Just my courtesy of understanding
23   them, their frustration of Ms. Graham wanting to get
24   to work.
25   Q.   After searching the silver Jeep, completing

Page 117

1 the search all the way through to the trunk, what did
2 you do next?
3   **A.  Returned to my squad car.**
4   Q.  What for?
5   **A.  To complete a traffic citation.**
6   Q.  What was the traffic citation for?
7   **A.  No valid Illinois license.**
8   Q.  Is that the only citation that you issued
9 that night?
10   **A.  Yes, sir.**
11   Q.  If you don't mind, I'm just going to take a
12 few moments to review my notes here.  Deputy, the
13 presence of children at a traffic stop, in your
14 experience does that have any tendency to increase or
15 decrease the likelihood for violence at that traffic
16 stop?
17   **A.  No.**
18   Q.  It doesn't have any effect on the
19 likelihood that that traffic stop becomes hostile?
20   **A.  Repeat that.  I apologize.**
21   Q.  Just the presence of children at a traffic
22 stop, in your experience does that have any
23 indication to either increase or decrease the
24 likelihood that a particular traffic stop becomes
25 hostile?

Page 118

1   **A.  No, sir.**
2   Q.  It has no effect is what you're saying?
3   **A.  Correct.**
4   Q.  After you returned to your squad cars after
5 performing the search of the silver Jeep Patriot, did
6 you conduct any other additional investigation into
7 either Ms. Ayres or Ms. Graham?
8   **A.  No, sir.**
9   Q.  After issuing -- drafting the citation in
10 your squad car, what did you do?
11   **A.  I approached the driver's door of the
12 stopped vehicle.**
13   Q.  And did you say anything?
14   **A.  Yes.  I informed Ms. Ayres I was issuing
15 her a citation for no valid driver's license.**
16   Q.  Ms. Ayres say anything back?
17   **A.  I don't recall exactly what she said.  She
18 was frustrated and refused to sign the citation.**
19   Q.  After she expressed that she was frustrated
20 and refused to sign the citation, what did you do?
21   **A.  I issued her her yellow copy of the
22 citation for her record and a blue copy, which is her
23 court communication copy, informing her that she must
24 appear at her traffic court date.**
25   Q.  Anything else?

Page 119

1   **A.  I informed her that her refusing the
2 citation on body camera was captured, that Judge Dill
3 could view it.**
4   Q.  Did you say anything to Ms. Graham?
5   **A.  I don't recall.**
6   Q.  Do you recall if Ms. Graham said anything
7 to you?
8   **A.  No.  I do recall her -- she appeared
9 frustrated, almost as if she was yelling, but I don't
10 recall if it was at me or at Ms. Ayres.**
11   Q.  But you don't remember specifically what
12 she was yelling?
13   **A.  I do not.**
14   Q.  After you informed Ms. Graham about the
15 consequences of not signing the citation, what did
16 you do?
17   **A.  You mean Ms. Ayres?**
18   Q.  Ms. Ayres.  Excuse me.
19   **A.  I again gave her her yellow copy for her
20 records, blue copy for communication copy, and I
21 walked back to my squad car while informing METCAD to
22 document and log that the driver was refusing to sign
23 the citation --**
24   Q.  That effectively --
25   **A.  -- for the records.**

Page 120

1   Q.  I'm sorry.  I cut you off.  Were you done?
2   **A.  Yes, sir.**
3   Q.  Did that effectively terminate the traffic
4 stop?
5   **A.  Yes, sir.**
6   Q.  Who was the first to leave the scene, you
7 or the silver Jeep Patriot?
8   **A.  I don't recall.**
9   Q.  After the completion of this traffic stop,
10 did you return to patrol?
11   **A.  Yes.**
12   Q.  And did you have any other encounters with
13 Ms. Ayres on the night of May 8th, 2019?
14   **A.  No, sir.**
15   Q.  Any other encounters with Ms. Graham on the
16 night of May 8, 2019?
17   **A.  No, sir.**
18   Q.  Any other encounters with the silver Jeep
19 Patriot on May 8, 2019?
20   **A.  No, sir.**
21   Q.  Did you ever document the traffic stop in
22 any formal written report?
23   **A.  No, sir.**
24   Q.  Why not?
25   **A.  Because it was a traffic stop where a**

Page 121

1  citation was issued.  No arrest was made.  No one was
2  taken to the Champaign County satellite jail.
3     Q.  Are you aware of any policies or procedures
4  that the sheriff's department may have regarding
5  documenting searches of members of the opposite sex?
6     A.  No, sir.
7     Q.  So as far as you're aware, there's no
8  mandated report for performing such a search?
9     A.  We have to fill out information on a
10  citation, but as far as like a uniformed ARMS report,
11  no, sir.
12     Q.  Filling out the citation, though, that's in
13  regards to the traffic citation, correct?
14     A.  Yes, sir.
15     Q.  Is there anything in the citation that
16  indicates that a search was performed of the suspect?
17     A.  Yes, sir.
18     Q.  Is there anything in the citation to
19  indicate that the search was performed of the suspect
20  by a male officer?
21     A.  No, sir.
22     Q.  Is that citation filed or recorded anywhere
23  in the Champaign County sheriff's department?
24     A.  To my knowledge, yes.
25     Q.  Okay.  Have you ever had any discussions

Page 122

1  with any of your supervisors regarding the search of
2  Ms. Ayres on May 8th, 2019?
3     A.  No, sir.
4     Q.  Did you seize any evidence on May 8, 2019?
5     A.  No, sir.
6     Q.  Your body camera captured the search on
7  video, correct?
8     A.  Yes, sir.
9     Q.  Did you ever notify any of your supervisors
10  that you conducted a search of a female suspect and
11  that it was captured on body camera?
12     A.  No, sir.
13     Q.  Did you ever -- strike that.  In order for
14  you to upload video that's captured by your body
15  camera, you plug it into a docking station, I
16  understand.  Is that correct?
17     A.  Yes.
18     Q.  And in that docking station, then, the
19  video footage is uploaded to a computer software
20  program, correct?
21     A.  Yes.
22     Q.  And in that program you can identify
23  various videos as being related to a particular
24  incident report or incident number; is that correct?
25     A.  Yes, sir.

Page 123

1     Q.  Did you ever upload the video footage from
2  the search of Ms. Ayres on May 8, 2019?
3     A.  Yes.
4     Q.  Did you ever flag that or somehow indicate
5  that that search was related to a particular traffic
6  citation?
7     A.  I just tagged the video as traffic, dash,
8  arrest.
9     Q.  Did you ever indicate to any supervisors
10  that that particular video footage also involved the
11  search of a female suspect?
12     A.  No.
13     Q.  Why not?
14     A.  I was never trained or told we had to do
15  that.
16     Q.  This question is getting trickier and
17  trickier given recent developments in Illinois laws,
18  but in the past twenty-four months, and I know that
19  since January this has changed, but in the past
20  twenty-four months can you estimate for me how many
21  times you stopped an individual for suspected
22  possession of marijuana?  Does that make sense or
23  would you like me to rephrase?
24     A.  Can you rephrase it, please?
25     Q.  In the past twenty-four months, can you

Page 124

1  estimate for me how many individuals you've stopped
2  for the suspected possession of marijuana?
3     A.  Zero.
4     Q.  In the past twenty-four months, can you
5  estimate for me how many vehicles you've stopped for
6  the suspected possession of marijuana?
7     A.  Zero.
8     Q.  Wylesha was not arrested on May 8, 2019,
9  correct?
10     A.  Correct.  She was released on a citation.
11     Q.  Why did you decide not to arrest Wylesha?
12     A.  Officer discretion.  I don't think it's
13  worth taking anyone to jail for driving on an expired
14  license just over a year.
15     Q.  When you were performing the search of Ms.
16  Ayres person, did her demeanor seem to change during
17  the course of the search?
18     A.  Just at the end of it.
19     Q.  How did it change?
20     A.  Standoffish.
21     Q.  Did she seem upset?
22     A.  She didn't seem happy, which in my
23  experience no one is really happy to get pulled over.
24     Q.  But I want to focus on just the time from
25  asking Ms. Ayres out of the car to the completion of

Page 125

1  the search. And from the start of that time period
2  until the end, her demeanor did change, correct?
3      A. Yes.
4      Q. And, in your opinion, did it change because
5  of the conduct of the search?
6      A. Yes. I don't believe anyone enjoys being
7  searched by a police officer.
8          MR. VAYR: And also if I could just
9  register a speculation objection, but you answered so
10 that's cool.
11         MR. Mc CARTER: I'm going to take a
12 few moments to review my notes, but at this time I
13 don't have anything additional to ask subject to
14 redirect. But thank you for your time, Deputy, and
15 counsel.
16         MR. VAYR: All right. My turn at the
17 wheel.
18     (Whereupon a break was taken.)
19         EXAMINATION
20 BY MR. VAYR:
21     Q. All right. So at the top of your
22 deposition you testified about seeing news reports
23 about this lawsuit. Do you recall being asked those
24 questions?
25     A. Yes.

Page 126

1      Q. Okay. And so I think you said something to
2  the effect of you haven't talked to anyone beyond
3  what is in the media reports. I might be
4  mischaracterizing your testimony, but does that sound
5  about right?
6      A. Yes.
7      Q. All right. And so I just wanted to clarify
8  because like what's in the media reports are, you can
9  argue, are the substantive facts of this case. You
10 haven't talked about the substantive facts of this
11 case with anybody, right?
12     A. No.
13     Q. Okay. So am I correct in thinking, then,
14 that what you meant was just like, hey, here's an
15 article about a lawsuit and that's kind of the extent
16 of the discussion?
17     A. Can I use an example? I mean --
18     Q. Sure.
19     A. When I've been asked about it is I was on
20 the treadmill at the gym and, boom, the WCIA 3 news
21 popped up. So someone walked up to me and be like,
22 man, is that you? And obviously confirm it's me
23 because my name is on the TV or it's in the paper.
24 All I would confirm is yes, that's me. I would not
25 go into information regarding --

Page 127

1      Q. Got it. So that was it?
2      A. Yes.
3      Q. Okay. And then -- and that was just all I
4  wanted to confirm. So that's the level of depth of
5  conversation you had with folks?
6      A. Yes.
7      Q. Okay. And that includes co-workers or
8  colleagues or anything?
9      A. Yes.
10     Q. Okay. Very good. Again, I think that's
11 what you meant. Just not sure if the transcript is
12 going to show that clearly. So you talked a great
13 deal about your training. Let's talk a little bit
14 about that briefly. So you mentioned that at the
15 Monticello Police Department you received PTI there
16 and you received training on searches, et cetera.
17 That's true, correct?
18     A. Yes.
19     Q. Okay. Was that training with regards to
20 searches or how to comport yourself as an officer
21 different than any training you received at the
22 Champaign County Sheriff's Office?
23     A. Can you repeat it?
24     Q. Sure. Essentially was there a different --
25 so I don't mean like computer software or anything,

Page 128

1  but was there a difference between like when a search
2  should be done, how a search should be done between
3  the Monticello Police Department and the Champaign
4  County Sheriff's Office as you recall?
5      A. Not that I recall.
6      Q. Okay. And you also mentioned PTI. I think
7  this was implicit. So you didn't undergo PTI again
8  when you joined the sheriff's office, correct?
9      A. Correct.
10     Q. And that was presumably because the
11 sheriff's office saw that you had already gone
12 through that and so you didn't need to go to school
13 again, if you will; is that fair?
14     A. Correct.
15     Q. Okay. With that said, they still gave you
16 the in-house training so you're aware of the
17 Champaign County Sheriff's Office specific issues,
18 correct?
19     A. Yes.
20     Q. So about training, and this is more
21 generally speaking about your training now, you were
22 asked questions about types of searches and the two
23 that you mentioned were Terry stops and search
24 incident to arrest. You recall that testimony?
25     A. Yes.

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

Page 129

1    Q.  All right.  So I'm going to make a
2  distinction here and you tell me if you understand
3  it.  Do you understand a Terry stop or a search
4  incident to arrest to be the legal justifications for
5  a given search as compared to a search itself, the
6  mechanics of the search?
7    A.  Yes.
8    Q.  Okay.  So when you say Terry stop, you're
9  referring to the legal justification that the, and
10  your training, the Supreme Court case called Terry v.
11  Ohio says you can do certain conduct for, correct?
12    A.  Yes.
13    Q.  Okay.  So then continuing the distinction,
14  so then there's the mechanics of the search itself
15  which is distinct from the legal justifications.  Do
16  you understand the distinction I'm making?
17    A.  Yes.
18    Q.  Now, I don't think you were questioned
19  about the mechanics or the different types of
20  mechanics of searches that you were trained on, so
21  I'd just like to explore that a little bit now.  So
22  first off, again, mechanics, not the legal
23  justification.  So first off, what is the least
24  intrusive type of search that you are aware of or you
25  were trained on?

Page 130

1    A.  Well, a pat down.
2    Q.  Okay.  So a pat down is the least
3  intrusive.  Okay.  And now let's just define that for
4  the record.  I believe you already did, but just so
5  it's all in one spot.  So pat down search entails
6  what from a mechanical standpoint?
7    A.  Essentially patting down the exterior of a
8  person's clothing, whatever they're wearing, to where
9  any weapon could be concealed.
10    Q.  Okay.  And so again, key words, exterior?
11    A.  (Witness nods head.)
12    Q.  And you use the word weapon.  Is it
13  possible to conduct a pat down search while not
14  searching for a weapon?  Mechanics, not legal
15  justification.  Is it possible the mechanics of a pat
16  down search without searching for a weapon?  Do you
17  understand the question?
18    A.  Can you repeat it?
19    Q.  Of course.  I have a tendency to ask
20  terrible questions.  So again can you only do -- so
21  I'm not asking about the legal justification.  You've
22  been trained that you absolutely cannot do a pat
23  down, the mechanics of an outside the clothes search,
24  unless you're searching for weapons, or were you told
25  you can do that pat down search if it seems

Page 131

1  appropriate?
2    A.  If given consent you can do a pat down
3  search.
4    Q.  All right.  Fair enough.  Okay.  So that's
5  a pat down search.  What's the next -- so let's work
6  towards more intrusive.  What's the next level of
7  search?
8    A.  A probable cause search.
9    Q.  I'm sorry.  I spoke over you.  Can you
10  repeat yourself?
11    A.  Probable cause search.
12    Q.  Okay.  And so when you say probable cause
13  search, what are the mechanics of that search in your
14  mind?
15    A.  Anywhere an item -- so, I mean, for
16  example, my canine alerts to a car.  Get the
17  occupants out of the car.  I locate narcotics inside
18  the car, at which point we're conducting a probable
19  cause search of the occupants due to narcotics being
20  located inside the vehicle they were in.  So
21  searching anywhere where narcotics could be located
22  on their person.
23    Q.  Okay.  And I want to get back to that, but
24  for now, just to walk back, so when I'm talking about
25  the mechanics of a probable cause pat down search,

Page 132

1  for what you're calling probable cause search --
2  sorry, I said pat down by mistake -- what you're
3  calling a probable cause search, can that go
4  underneath the clothing?
5    A.  On a probable cause search?
6    Q.  Correct.  Not a pat down, probable cause
7  search.
8    A.  Yes.
9    Q.  Can you reach into someone's pockets for
10  that?
11    A.  Yes.
12    Q.  Okay.  Can you reach into someone's jacket
13  if need be?
14    A.  Yes.
15    Q.  Ask them to take off their shoes, et
16  cetera?
17    A.  Yes.
18    Q.  Okay.  So more intrusive, you can go
19  further in the search than a pat down for what you
20  are calling a probable cause search, right?
21    A.  Yes.
22    Q.  And now it sounds -- so going back, you
23  said, you know, you would be able to search where you
24  have probable cause.  I'm just going to use the term
25  contraband.  You said that when you have a -- during

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CORY CHRISTENSEN
February 20, 2020

Page 133

1  a probable cause search you have probable cause to
2  search where contraband may be.  Is there in your
3  training or experience, let's call them hot spots,
4  where contraband, loosely defined, can be?
5      A.  Yes.
6      Q.  Okay.  And those are spots presumably that
7  when you're doing a probable cause search you would
8  focus your search on, correct?
9      A.  Correct.
10     Q.  All right.  And then presumably there are
11 also, again using the imperfect legal phrase, there
12 are also presumably hot spots for a pat down search
13 as well, correct?
14     A.  Correct.
15     Q.  And so during a pat down search you would
16 focus your search on those areas as well, correct?
17     A.  Correct.
18     Q.  Okay.  So now does the hot spot, the
19 definition of what constitutes a hot spot, does that
20 change depending on what you are searching for?  Let
21 me give you an example.  So if you're searching for a
22 bazooka, can you search somewhere differently than if
23 you are searching for a dime bag of cocaine?
24     A.  Yes.
25     Q.  Okay.  And could you explain the difference

Page 134

1  of what your search would entail on those two
2  examples?
3      A.  Yes.  So if I'm conducting a search for a
4  dime bag of cocaine, I'm searching, I mean,
5  essentially socks, shoes, anywhere where that could
6  be placed on someone's person.  Essentially where a
7  bazooka, if someone gets out of the car with a
8  bazooka on them, I'm going to see that sticking out
9  of their person.  Any area where the contraband could
10 be stored, and again that comes with training and
11 experience, knowing the size of a dime bag and so
12 forth.
13     Q.  Got it.  And so what I'm taking from that
14 answer, then, is like if it's something really
15 obvious like a bazooka you don't necessarily feel the
16 need because of that alone to search someone's shoes
17 for the bazooka?
18     A.  Correct.
19     Q.  Now, the fact that they have a bazooka
20 might suggest to you that maybe they have other
21 weapons and then you would search for those, but you
22 don't have probable cause to search for a bazooka
23 again, fair enough?
24     A.  Yes, sir.
25     Q.  Okay.  And now you said -- so I'm going to

Page 135

1  use the phrase hot spots again.  Let's focus on drugs
2  or smaller weapons.  What are some of the hot -- one,
3  are those hot spots one in the same for those two
4  categories, drugs or smaller weapons?  By that I mean
5  a handgun, small knife.
6      A.  Yes.
7      Q.  They are one in the same?
8      A.  Yes.
9      Q.  Okay.  So what are the hot spots in your
10 experience, then, for that category of contraband?
11 Where does someone store that on their person?
12     A.  Pockets, waistline, crotch, socks, shoes,
13 hat, body cavities.
14     Q.  So in a way the possibilities are kind of
15 endless?
16     A.  Yes.
17     Q.  The limits are that of the human
18 imagination.  So when you are facing a situation
19 where you are just performing a pat down search, so
20 you have probable cause that someone has contraband
21 on them and you're performing a search of their
22 person, what are -- so it sounds like the waistband
23 is a common area, pockets, right?
24     A.  Yes.
25     Q.  Because presumably people store things in

Page 136

1  their pockets, that's what pockets are for, correct?
2      A.  Yes.
3      Q.  Okay.  So now let's go back.  We've talked
4  about the mechanics of a pat down search, we've
5  talked about the mechanics of what you're calling a
6  probable cause search.  What's the next level up of
7  searching?
8      A.  Search incident to arrest.
9      Q.  Okay.  So how is a search -- again, not
10 legal justification, mechanics.  How are the
11 mechanics of a search incident to arrest different
12 than a probable cause body search as you understand
13 it?
14     A.  Essentially you're ensuring that there's no
15 illegal contraband, weapons, so forth on that person
16 while they are in custody.  So we're ensuring that
17 before they go into our vehicle or into a secured
18 facility that they're not concealing any weapons,
19 narcotics, contraband, that they could essentially
20 conceal anywhere on their person.
21     Q.  So then is this a more thorough search than
22 a probable cause body search?
23     A.  Yes.
24     Q.  Okay.  And by -- well, I guess for current
25 purposes, if you could just say, you did not perform

Page 137

1  a search incident to arrest, the mechanics of that on
2  Wylesha Ayres during the subject incident, correct?
3  **A. Correct.**
4  Q. And when I say subject incident, I mean the
5  traffic stop on May 8th, 2019. You understand that's
6  what I'm saying?
7  **A. Yes.**
8  Q. Okay. So after search incident to arrest,
9  what's the next level of intrusive search?
10  **A. Warrant.**
11  Q. Let me -- I think we're talking about
12  justification. Would it be fair to say that after
13  you search the outside of someone in a pat down
14  search, you search kind of inside their clothes for
15  probable cause search, is the next level, then, to
16  have someone take clothes off?
17  **MR. Mc CARTER:** Objection, foundation.
18  You can answer.
19  **THE WITNESS:** We would not -- not on
20  the street, no. That would be conducted at the jail.
21  Q. (by Mr. Vayr) Correct. And so obviously
22  what I'm referring to is what's called a strip
23  search. Are you familiar with --
24  **A. Yes, yes.**
25  Q. And so what does a strip search entail in

Page 138

1  your experience and training?
2  **A. Honestly I'm not sure because I've never**
3  **seen one performed. The correctional officers**
4  **perform it.**
5  Q. Understood. And so what you're saying is
6  that in your capacity as a roadside deputy you have
7  never performed and you have never seen performed a
8  strip search?
9  **A. Correct.**
10  Q. All right. Very good. That's something
11  that the correctional side does --
12  **A. Yes.**
13  Q. -- of the sheriff's office. And now just
14  for the sake of completion, at least what comes to
15  mind is that then there are body cavity searches,
16  which you referred to. Do you know what a body
17  cavity search is?
18  **A. Yes.**
19  Q. In your experience and training?
20  **A. Yes.**
21  Q. Okay. What does a body cavity search
22  entail?
23  **A. We usually go to a search warrant. For**
24  **example, at a traffic stop where the dog alerted on**
25  **the driver's seat when the driver wasn't there but**

Page 139

1  **the driver had a ball of heroine up his butt. So we**
2  **took him to the hospital, got a warrant to get that.**
3  Q. Sure. Get that checked.
4  **A. Now, again, if he's in custody at the jail,**
5  **they're going to conduct a body cavity search to make**
6  **sure that there's no illegal contraband on their**
7  **person, but I've never seen that performed as a**
8  **correctional officer.**
9  Q. Sure. And setting -- forgive me. Setting
10  aside so what's done in the correctional setting, is
11  it fair to say, to describe the body mechanics of a
12  body cavity search, that's either a visual or
13  physical inspection of someone's body cavity, so
14  their anus, et cetera; is that right?
15  **A. Yes.**
16  **MR. Mc CARTER:** Objection, foundation.
17  Q. (by Mr. Vayr) Okay. And obviously that
18  type of search was not performed on Ms. Ayres during
19  the subject incident, correct?
20  **A. Correct.**
21  Q. All right. So now that we've talked about
22  the types of searches, let's focus on pat downs. So
23  again distinct from the legal justification of Terry,
24  just the mechanics of a pat down, how long in your
25  experience does a -- let me just ask you this. Do

Page 140

1  you recall how long the pat down was you performed on
2  Ms. Ayres during the subject incident?
3  **A. Less than fifteen seconds. Less than**
4  **fifteen seconds.**
5  Q. Less than fifteen seconds. Are you
6  confident to say less than ten?
7  **A. Yes.**
8  Q. Okay. Are you confident to say less than
9  five?
10  **A. No.**
11  Q. Okay. So less than ten seconds?
12  **A. Yes.**
13  Q. Now, is that about how long a pat down
14  search takes in your experience?
15  **A. Yes.**
16  Q. Okay. And now presumably the search would
17  be longer if you had searched armpits, arms, the
18  torso area, or asked her to take off her hat,
19  correct?
20  **A. Yes.**
21  Q. But you focused your search instead on the
22  waistband and her pant pockets; is that correct?
23  **A. Yes.**
24  Q. And now was that focus on that area because
25  you perceived those to be hot spots for where a

Page 141

1  weapon or contraband could be?
2      A.  Yes.
3              MR. Mc CARTER: Objection.  Misstates
4  testimony.
5              THE WITNESS: Yes, due to my training
6  and experience.
7      Q.  (by Mr. Vayr)  Okay.  And so as I
8  understood your testimony, correct me if I'm wrong,
9  so when you're doing the pat down of Ms. Ayres during
10  the subject incident, you're not so much searching
11  her, quote unquote, thigh or, quote unquote,
12  buttocks, you're searching her pants pockets,
13  you're feeling the outside of where her pockets are,
14  correct?
15      A.  Yes.
16      Q.  And it just so happens that pockets hang
17  over the thigh and the buttock of an individual, fair
18  enough?
19      A.  Yes.
20      Q.  Okay.  And now when you were performing
21  your pat down search, you said that you passed over
22  the back pockets once, correct?
23      A.  Yes.
24      Q.  And did you feel anything at that time?
25      A.  Not that I can recall.

Page 142

1      Q.  Okay.  And then you also, while feeling the
2  inner thigh, came up and you've testified, I believe,
3  that you felt the right pant pocket from underneath;
4  is that correct?
5      A.  I don't recall if it was from underneath.
6      Q.  That's fair, and that might not be a proper
7  way to characterize it.
8      A.  I remember feeling the red pant pocket.
9      Q.  Okay.  Very good.  And then did you testify
10  that you just didn't recall or that you affirmatively
11  did not check the left pant pocket in a similar way?
12      A.  I don't recall.
13      Q.  You don't recall checking the pocket or you
14  don't recall your testimony?
15      A.  I don't recall my testimony.
16      Q.  Okay.  Fair enough.  Let's not confuse the
17  issue then.  So you mentioned that Ms. Ayres had
18  baggy pants but you don't recall what the material
19  was; is that correct?
20      A.  Correct.
21      Q.  Okay.  Now, were you able to -- did it seem
22  to you while you were watching Ms. Ayres that the,
23  for lack of a better phrase I'm going to call it the
24  crotch portion of the pants seemed to be hanging low
25  as in sagging or bagging?

Page 143

1      A.  Yes.
2      Q.  Okay.  And now -- so that would mean, then,
3  that presumably the butt pockets were part of that
4  sagging or bagging fabric, fair?
5      A.  Yes.
6      Q.  Okay.  And now when you were searching
7  those pockets, did you also -- were you also while
8  searching the pockets looking to see if there was
9  anything in that loose hanging fabric, do you recall
10  one way or the other, with your high five hand
11  technique that we discussed?
12      A.  Yes.
13      Q.  And so just simultaneously you're also
14  seeing if something had dropped, for example, into
15  that web of fabric there between the legs?
16      A.  Yes.
17      Q.  Okay.  And I want to -- and so is that
18  also, when someone is wearing baggy pants, have you
19  personally discovered contraband kind of sitting in
20  that loose web of fabric of someone who is wearing
21  baggy pants?
22      A.  Yes.
23      Q.  Okay.  Do you recall the last time that
24  that occurred?
25      A.  I don't recall the last time.  I remember

Page 144

1  what I've discovered.
2      Q.  Sure.  We don't need to go down that route.
3  Was it before the subject incident?
4      A.  Yes.
5      Q.  Okay.  And so then -- I guess I should ask.
6  Was it a weapon or was it a drug contraband that you
7  found on this individual?
8      A.  Weapon.
9      Q.  Weapon.  Okay.  What was the weapon?
10      A.  Brass knuckles.
11      Q.  Brass knuckles.  Okay.  And so explain to
12  me how a weapon could -- I guess how would a weapon
13  get there?  If you had to -- I realize I'm kind of
14  asking you to speculate, but just in your experience,
15  like how -- why there?  How could that -- seems like
16  a weird place to put something.
17              MR. Mc CARTER: Objection,
18  speculation.  You can answer.
19              THE WITNESS: Can you clarify where?
20      Q.  (by Mr. Vayr)  Sure.  I'm referring to what
21  I've been calling in the last few questions this web
22  of fabric in baggy pants between the legs.  So do you
23  have any training or experience that leads you to
24  believe how weapons get there?
25      A.  Yes.  The subject could place it in their

Page 145

1  waistband and as they're walking or getting out of a
2  vehicle, especially wearing baggy pants, an object
3  can fall out of that waistband.
4      Q.  And then it catches in that web of fabric?
5      A.  Yes.
6      Q.  Okay.  Very good.  I think you testified to
7  this already, but just so it's affirmative on the
8  record.  So your testimony is that you did not grab
9  Ms. Ayres' buttocks?
10     A.  Correct.
11     Q.  You did not grab her crotch?
12     A.  No, sir.
13     Q.  You did not search -- you did not, like,
14  search or insert your hand into her buttocks,
15  correct?
16     A.  Absolutely not.
17     Q.  You did not search or insert your hand into
18  her crotch?
19     A.  No, sir.
20     Q.  Okay.  Did you feel any other -- so did
21  you -- besides the waistband and the searches that we
22  were discussing, did you search anywhere else of Ms.
23  Ayres?
24     A.  No.
25     Q.  Okay.  Also -- I'm now rewinding a bit.

Page 146

1  Going back to your training, you mentioned that in
2  the context of explaining the legal justification for
3  pat down search that the Terry v. Ohio case gives,
4  you mentioned something, I believe, to the effect of
5  if you have a reasonable suspicion to believe that a
6  weapon involved with a crime or something like that
7  was on the person.  Is that a vaguely accurate way
8  of -- is that at least accurate with your memory?
9      A.  Yes, yes.
10     Q.  So what I just want to ask is, is it your
11  understanding of Terry that the question isn't so
12  much whether the weapon involved was associated with
13  a crime, it's just whether the individual has a
14  weapon?
15     A.  Yes.
16     Q.  So the focus is on yes, no, do they possess
17  a weapon?
18     A.  Yes.
19     Q.  So -- okay.  You were asked some questions
20  about documentation.  I just want to explore that a
21  little bit with you.  So obviously one way to
22  document something that you've testified to is you
23  could write a formal report, correct?
24     A.  Yes.
25     Q.  And, now, a formal report, I would imagine,

Page 147

1  is something where you sit down at a computer, you
2  type in words into a document, you print it out, and
3  that is your incident report, correct?
4      A.  Yes, the ARMS.
5      Q.  Okay.  Now, does -- when would you write a
6  formal report like that?
7      A.  If Ms. Ayres was placed under arrest and
8  transported to the Champaign County satellite jail.
9      Q.  So I'm going to take that -- is it fair to
10  say that you would generate an incident report if it
11  was an offense or a circumstance that was serious
12  enough that it rose to the level of a felony or an
13  arrest, something that warranted someone's
14  incarceration?
15     A.  Yes.
16     Q.  So that's at least one circumstance you're
17  aware of where you would draft one of those reports?
18     A.  Yes.
19     Q.  Now, are there other ways of documenting a
20  law enforcement interaction beyond that type of a
21  formal incident report?
22     A.  Yes.
23     Q.  Okay.  Now, would one of these ways
24  presumably be recording something on a body camera?
25     A.  Yes.

Page 148

1      Q.  One of these ways could presumably be
2  filling out a citation ticket and the information
3  required on the back of it; is that fair?
4      A.  Yes.
5      Q.  Are there other ways you can think of?
6      A.  Yes.
7      Q.  Okay.  Which are?
8      A.  Our dispatch center, we have what's called
9  CAD, a computer system to where any time I go on a
10  call or a call comes in for service, I make a traffic
11  stop, so any contact, there's an event number or a
12  certain ticket created.  So obviously there's a
13  certain event number, I don't know if you guys have
14  my dispatch ticket, that has all the information.
15      And then right before I cleared, for example,
16  this traffic stop I could, which I did not, add
17  what's called a disposition which would attach to
18  that ticket which would -- essentially in the past I
19  would state citation issued for no valid driver's
20  license to Wylesha Ayres.  Mandatory court date on,
21  blah-blah-blah, on a certain date.
22     Q.  Okay.  So there's a couple things going on
23  there, which I'm assuming we probably both want to
24  ask questions about.  So just so we have a label, did
25  you refer to this as a METCAD ticket?

Page 149

1  A.  Yes.
2  Q.  And just for the court reporter, that's --
3  METCAD, how do you spell that?
4  A.  M as in Mary, E as in Edward, T as in Tom,
5  C as in Charles, A as in Adam, D as in David.
6  Q.  And this is in all caps, correct?
7  A.  Yes.
8  Q.  It's an acronym?
9  A.  Yes.
10  Q.  Okay.  And so it sounds like, if I heard
11  you correctly, it sounds like what happens is that
12  when you -- when you are dispatched or you pick up a
13  call that you're responding to an incident, that fact
14  gets recorded in METCAD somehow; is that correct?
15  A.  Yes.
16  Q.  Okay.  And then presumably, if other
17  officers responded, that would also be documented?
18  A.  Yes.  They would join onto that specific --
19  Q.  That call.  Okay.  Would anything else be
20  captured in that METCAD ticket before you concluded
21  the stop?
22  A.  Yes.  Any of my radio traffic.
23  Q.  Okay.
24  A.  So, for example, when I advised over the
25  radio after issuing Ms. Ayres her citation, I asked

Page 150

1  METCAD to please -- I believe I said note or document
2  that she refused to sign the citation.  So the
3  dispatcher types that in to the dispatch ticket, as
4  well as the license plate when I make the traffic
5  stop and when I run local checks.
6  Q.  Okay.  And so then -- so it sounds like,
7  then, so in addition to your capturing when officers
8  respond or maybe leave the scene, it also captures
9  the radio traffic?
10  A.  Yes.
11  Q.  Okay.  Very good.  And so -- and then is
12  there anything else included in that ticket, that
13  METCAD ticket would capture before you leave a stop?
14  A.  Not to my knowledge.
15  Q.  Okay.  And now then presumably, if I heard
16  you correctly, when you leave a stop it's going to
17  capture your vacating the scene in that ticket and
18  that kind of puts a bow on things and that's the
19  conclusion of the ticket, the METCAD ticket?
20  A.  Yes.  It would close it out and have the
21  time that I cleared myself from the stop.
22  Q.  Okay.  And now you also mentioned that
23  there was something, and I forget the phrase, but
24  there would be a summary or an addendum or something
25  that could be written on that you did not do for this

Page 151

1  particular incident.  Could you please explain what
2  it was that you were referring to?
3  A.  Yes.  A disposition.
4  Q.  Okay.  Disposition.
5  A.  So a disposition is essentially on that
6  ticket you can pull up a little box, almost like a
7  Word document, and type in any kind of information
8  you would like.  And the reason for that being is
9  mainly it's logged into the dispatch system and for
10  future memory.  If I needed to remember that I got
11  out on a verbal domestic dispute, why it was verbal,
12  I could put that into the disposition.  So
13  essentially as deputies we utilize that as just kind
14  of a history so we can look back and see what
15  occurred.
16  Q.  Okay.  And you said that you did not do
17  this for this particular incident?
18  A.  No, sir.
19  Q.  Okay.  Now, is there kind of a threshold
20  where if it's a serious incident, if it's a serious
21  incident you'll make a disposition, is that --
22  presumably that's true?
23  A.  If it's a serious incident I'd pull a
24  report number on it.
25  Q.  So in addition to making an official

Page 152

1  incident report, you would put a disposition in the
2  METCAD ticket, correct?
3  A.  If I pull a report, I'm not adding
4  disposition.  There's already a report number on
5  the ticket.
6  Q.  I see.  So that would be redundant, in
7  other words?
8  A.  Correct.
9  Q.  Okay.  Now, would you not do a disposition
10  if there was a run-of-the-mill stop that didn't
11  really seem to require much explanation?
12  A.  Yes, I would not.
13  Q.  All right.  Fair enough.  Some methods of
14  documentation, then, in summary, besides an official
15  incident report, stop me if I'm missing something,
16  would be body camera footage, it could be the METCAD
17  ticket, it could be the citation ticket itself which
18  will capture some information.  It sounds like that's
19  kind of the universe; is that fair?
20  A.  Yes.
21  Q.  So as we sit here today, that's at least
22  what we can think of?
23  A.  Yes.
24  Q.  Let's talk about the citation a little bit.
25  When you fill out the information on a citation, is

Page 153

1 the sex or gender of the suspect one of the facts
2 that's included on that ticket or citation?
3   **A.  Yes.**
4   Q.  And so if an individual happened to be
5 female or identified as a woman, then that would be
6 noted on the citation itself, correct?
7   **A.  Yes.**
8   Q.  Just as part of the biographical
9 information?
10   **A.  Yes.**
11   Q.  And then presumably if a male officer signs
12 that, that would be evident from the name or do you
13 put your sex or gender as well?
14   **A.  We put our name and badge number.**
15   Q.  Very good.  And then the officers just kind
16 of know who you are because you are their employees?
17   **A.  Yes.**
18   Q.  Okay.  Very good.  You talked a little bit
19 about policies of the Champaign County Sheriff's
20 Office, your training thereon.  In your experience,
21 if someone just really had the policies wrong, either
22 as an initiate or in practice, they're just
23 absolutely not following the policies, is it your
24 experience and expectation they would be punished,
25 then, or disciplined in some way?

Page 154

1   **A.  Yes.**
2   Q.  Some corrective action would be taken?
3   **A.  Yes.**
4   Q.  Okay.  So there's no reason that you're
5 aware of, then -- let me rephrase that.  Strike that.
6   So it's your understanding, then, that the
7 practice at the Champaign County Sheriff's Office, at
8 least in your experience, is that if someone breaks
9 the rules an appropriate corrective action is taken,
10 correct?
11   **A.  Yes.**
12   Q.  Okay.  You mentioned your continuing
13 education.  I can do this really quickly.  Do you
14 also take on-line, like do you receive e-mails about
15 scenario-based training or anything at the Champaign
16 County Sheriff's Office?
17   **A.  Yes.  And I apologize.  I remembered this**
18 **as he brought it up.  I believe you asked as far as**
19 **training.  We are required to do what's called DTB,**
20 **daily training bulletins, monthly, for each month.**
21 **And then certain scenario questions.  And had to**
22 **answer it correctly to move on to the next question.**
23 **We also have to acknowledge a certain amount of**
24 **policies monthly, and obviously command keeps track**
25 **of that.  And there's been deputies in the past who**

Page 155

1 **have not done it in the proper time and they've been**
2 **written up or there's been some --**
3   Q.  They got a talking to?
4   **A.  There's been formal documentation filled**
5 **out.**
6   Q.  Okay.  So let's talk very briefly, then.
7 So the scenario-based training, I'm imagining that
8 that's a series of questions where you're given a
9 fact pattern and, you know, here's options A, B, C,
10 D, which one is consistent with the Champaign County
11 Sheriff's Office policies?
12   **A.  Yes.**
13   Q.  Does that sound right?
14   **A.  Yes.**
15   Q.  All right.  Very good.  Do you know roughly
16 how many questions you have to do a month?
17   **A.  Roughly twenty-five.**
18   Q.  Okay.  And what kind of scenario -- do
19 these cover the gamut of scenarios you might
20 encounter, or were they focused, for example, one
21 month is on weapons and the next month is on traffic
22 stops?
23   **A.  It's a variation of everything each month.**
24   Q.  Got it.  And now you also said that every
25 month deputies have to acknowledge, I think was the

Page 156

1 word you used, acknowledge policies.  Can you explain
2 what you mean by that?
3   **A.  Yes.  So the program uses Lexipol,**
4 **L-E-X-I-P-O-L, and you log into that on computer.  On**
5 **the left-hand side there's your policy**
6 **acknowledgments that you have to do, and then on the**
7 **right-hand side is your daily training bulletins for**
8 **each month.  It might vary.  In January there's only**
9 **three policies, to where this month there's eight**
10 **policies that you have to acknowledge.**
11   Q.  So it sounds like that you only have to
12 acknowledge policies when they're new, that's what
13 triggers the need to acknowledge it, or is it a
14 continuing refresher course on already existing
15 policies?
16   **A.  It's both.  I've read over policies that**
17 **are the same and we have to acknowledge it again.**
18 **And then there's also been adjustments made to**
19 **policies that you had to acknowledge.**
20   Q.  Got it.  So you were asked a question,
21 speaking of policies, about when a female is required
22 to perform a search of another female.  First off, do
23 you remember that line of questioning?
24   **A.  Yes.**
25   Q.  All right.  And I think the term search was