**In The Matter Of:**

*AYRES v.*
*SHERIFF DEPUTIES CODY CHRISTENSEN, et al.*

---

*CODY FLOYD*
*February 20, 2020*

---

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Exhibit D

Original File 0220floc.txt
Min-U-Script® with Word Index

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

WYLESHA AYRES,                )
                              )
      Plaintiff,              )
                              )
      -vs-                    )
                              )
SHERIFF DEPUTIES CORY         )
CHRISTENSEN and CODY FLOYD,   )  Case No. 19-CV-2148
CHAMPAIGN COUNTY SHERIFF'S    )
OFFICE, and CHAMPAIGN         )
COUNTY, ILLINOIS,             )
                              )
      Defendants.             )

DEPOSITION OF DEPUTY CODY FLOYD

FEBRUARY 20, 2020

9:09 a.m.

Janet E. Cummings, CSR, License No. 084-003526
Area Wide Reporting & Video Conferencing
301 West White Street
Champaign, Illinois  61820
(800)747-6789

## Page 2

### I N D E X

APPEARANCES:

      Mr. Matthew J. Mc Carter
      NATHAN & KAMIONSKI, LLP
      33 West Monroe Street, Suite 1830
      Chicago, Illinois  60603
      312.612.1943
      mmccarter@nklawllp.com
      Appearing on behalf of the Plaintiff

      Mr. Bryan J. Vayr
      HEYL, ROYSTER, VOELKER & ALLEN
      301 North Neil Street, Suite 505
      Champaign, Illinois  61820
      217.344.0060
      bvayr@heylroyster.com
      Appearing on behalf of the Defendants

EXAMINATION BY:                       PAGE NO.

      Mr. Mc Carter.....................    4
      Mr. Vayr.........................  113
      Mr. Mc Carter.................... 145
      Mr. Vayr......................... 150
      Mr. Mc Carter.................... 152

            (No exhibits marked.)

## Page 3

STIPULATION

IT IS HEREBY EXPRESSLY STIPULATED AND

AGREED by and between the parties that the deposition

of DEPUTY CODY FLOYD may be taken on February 20,

2020, at Heyl, Royster, Voelker & Allen, 301 North

Neil Street, Suite 505, Champaign, Illinois, pursuant

to the Rules of the Federal Court and the Rules of

Federal Procedure governing said depositions.

## Page 4

(Deposition commenced at 9:09 a.m.)

DEPUTY CODY FLOYD,
the deponent herein, called as a witness, after
having been first duly sworn, was examined and
testified as follows:

EXAMINATION

BY MR. Mc CARTER:

Q.  Good morning, Deputy Floyd.  My name is
Matthew Mc Carter, and we are here today for your
deposition in the Case 19-CV-2148 that's been filed
in the U.S. District Court for the Central District
of Illinois in the case of Wylesha Ayres versus
Deputy Floyd, Deputy Christensen, and the Champaign
County Sheriff's Office.  I believe there's another
party in there.

MR. VAYR: Champaign County.

Q.  (by Mr. Mc Carter)  Champaign County
proper.  Sorry about that.  First, can you state and
spell your last name for us, please?

A.  Cody Floyd, F-L-O-Y-D.

Q.  And, Deputy Floyd, have you ever given a
deposition before?

A.  I have not.

Q.  Okay.  Before we get started, there's just
a couple ground rules that will make everything a

Page 5

1   little bit smoother going along. As you'll notice,
2   we have a court reporter here that's taking down
3   everything that's said in the room. And just to make
4   her life a little bit easier, if you could wait until
5   I finish my question before giving your answer, and
6   then I'll wait for you to finish your answer before
7   giving my question.
8       You know, we might get a little conversational.
9   You're going to know exactly where I'm going with the
10  question and want to volunteer your answer right
11  away, but just to make sure that she has an
12  opportunity to take down everything that's said and
13  we have a clean record for when Bryan and I go back
14  and review these transcripts in a couple months.
15  Does that make sense?
16      **A. It does.**
17      Q. Next is if you don't understand a question
18  that I ask, feel free to let me know and I'll do my
19  best to rephrase it. If you do answer a question,
20  though, I'm going to understand that you understood
21  the question. Does that make sense?
22      **A. It does.**
23      Q. Okay. Also, if you can, keep all your
24  answers out loud, and what I mean by that is try to
25  avoid hand gestures if you can, but also no uh-huh or

Page 6

1   huh-uh. And the reason is that when our good court
2   reporter here takes us down, it all looks the same
3   and it makes for a little bit of confusion later down
4   the road when we are reviewing the transcript.
5       We are on your time. If you'd like to take a
6   break, stretch your legs, use the washroom at any
7   point just let us know and we'll take five minutes.
8   The only rule is we can't take a break if there's a
9   question pending. Does that make sense?
10      **A. It does.**
11      Q. A couple preliminary questions. Are you
12  under the influence of any drugs or alcohol today?
13      **A. I am not.**
14      Q. Taking any medications that might affect
15  your memory?
16      **A. No.**
17      Q. Are you under the care of a doctor for any
18  continuing chronic illness?
19      **A. No.**
20      Q. Do you wear glasses?
21      **A. I do.**
22      Q. Reading glasses or everyday glasses?
23      **A. Everyday glasses.**
24      Q. I see you don't have glasses on now. Do
25  you have contacts in?

Page 7

1       **A. I do not right now.**
2       Q. Okay. Do you require glasses or contacts
3   in a daily capacity?
4       **A. No.**
5       Q. Okay. What sort of things require you to
6   wear your glasses?
7       **A. I wear them for long distances, especially
8   when driving at night.**
9       Q. Okay. Do you wear a hearing aid?
10      **A. I do not.**
11      Q. Other than with your attorney, have you
12  discussed the facts of this case with anyone?
13      **A. No.**
14      Q. Have you discussed the facts of this case
15  with Deputy Christensen?
16      **A. I don't believe I have.**
17      Q. Did you -- in preparing for this
18  deposition, and other than speaking with your
19  counsel, have you done anything to prepare?
20      **A. I have not.**
21      Q. Did you review any of the videotape that's
22  available in this case?
23      **A. I have.**
24      Q. You have?
25      **A. With counsel.**

Page 8

1       Q. Okay. Other than with counsel, have you
2   watched the videotape prior to meeting with Bryan
3   here?
4       **A. I have not.**
5       Q. Have you seen any news reports about this
6   case?
7       **A. I have.**
8       Q. Do you recall when the last time you saw a
9   news report was?
10      **A. I don't know the exact date. It's been a
11  least a couple months ago.**
12      Q. Can you tell me what kind of news report?
13  Was it a newspaper article? An article on
14  television?
15      **A. It was a newspaper article.**
16      Q. Do you remember the paper?
17      **A. The News-Gazette.**
18      Q. Did you agree or disagree with the
19  characterization of this case in The Gazette when you
20  read that article?
21      **A. It's difficult to answer. I didn't read
22  the full article.**
23      Q. Okay. Any other news reports?
24      **A. No.**
25      Q. Deputy Floyd, what's your date of birth?

Page 9

1    A.  **March 14th, 1987.**
2    Q.  And how old are you today?
3    A.  **Thirty-two.**
4    Q.  And what are the last four digits of your
5  Social Security number?
6    A.  **0430.**
7    Q.  And where do you currently live?
8    A.  **In Champaign, Illinois.**
9    Q.  Okay.  How long have you lived in
10  Champaign?
11   A.  **Approximately one year.**
12   Q.  Prior to living in Champaign where'd you
13  live?
14   A.  **Decatur, Illinois.**
15   Q.  How long did you live in Decatur?
16   A.  **Approximately seven years.**
17   Q.  Another thing that reminds me of is if you
18  don't know the answer to a question, feel free to say
19  I don't know or I don't remember.  We're here today
20  to try to figure out the extent of your knowledge, so
21  we're looking for everything that you do remember.
22  Does that make sense?
23   A.  **It does.**
24   Q.  Okay.  I take it you graduated from high
25  school?

Page 10

1    A.  **I did.**
2    Q.  Where did you go to high school?
3    A.  **Maroa-Forsyth.**
4    Q.  Where is that at?
5    A.  **It's in Macon County, Illinois.**
6    Q.  After high school did you continue your
7  education?
8    A.  **I did.**
9    Q.  Where did you go?
10   A.  **Richland Community College.**
11   Q.  Where is Richland Community College
12  located?
13   A.  **Decatur, Illinois.**
14   Q.  What did you study?
15   A.  **General studies.**
16   Q.  Did you earn any sort of certificate or
17  degree from Richland Community College?
18   A.  **I did not.**
19   Q.  When was the last time you attended class
20  at Richland?
21   A.  **I don't know an exact date.  The last class
22  I took was approximately a few years ago.**
23   Q.  Is it possible for you to narrow it down to
24  just in terms of years?  Do you recall if it was
25  2016?

Page 11

1    A.  **I do not recall.**
2    Q.  You don't recall if it was before 2016 or
3  after 2016?
4    A.  **I don't recall.**
5    Q.  Deputy Floyd, do you have a Facebook
6  account?
7    A.  **I do.**
8    Q.  What is your Facebook name?
9    A.  **Cody Floyd.**
10   Q.  Do you have any other social media
11  accounts?
12   A.  **I do.**
13   Q.  What kind?
14   A.  **I have an Instagram account.  I believe
15  it's still active.**
16   Q.  Do you know the name of your Instagram
17  account?
18   A.  **I do not.**
19   Q.  Do you recall the last time you accessed
20  it?
21   A.  **I do not.**
22   Q.  Deputy Floyd, do you have any tattoos?
23   A.  **I do not.**
24   Q.  After Richland Community College, did you
25  continue your education?

Page 12

1    A.  **I did not.**
2    Q.  Did you ever join the military?
3    A.  **I did.**
4    Q.  When?  Would this be -- strike that.  Let
5  me re-ask the question.  Did you join the military
6  upon graduation of high school?
7    A.  **Not immediately.**
8    Q.  Okay.  Do you recall when you joined the
9  military?
10   A.  **I do.  It was August of two thousand --
11  strike that.  It was January of 2008.  I apologize.**
12   Q.  What branch?
13   A.  **Army.**
14   Q.  How long did you serve?
15   A.  **Approximately four years.**
16   Q.  What was the rank you were discharged at?
17   A.  **Specialist.**
18   Q.  I take it it was an honorable discharge?
19   A.  **It was.**
20   Q.  Are you still active in the Reserves?
21   A.  **I am not.**
22   Q.  Were you ever active in the Reserves upon
23  your honorable discharge from the Army as a
24  specialist?
25   A.  **I was not.**

Page 13

1    Q.   As a specialist, what were some of your
2  duties?  Strike that.  Let me re-ask that question.
3  As a specialist, where was the last place that you
4  were posted?
5    A.   Fort Carson, Colorado.
6    Q.   What was your assignment in Fort Carson?
7    A.   I was assigned to an outpatient clinic.
8    Q.   As security?
9    A.   No.  I was a medic.
10   Q.   Okay.  How long did you work at this
11  outpatient clinic in Fort Carson?
12   A.   Approximately one year.
13   Q.   Do you recall what you were assigned to do
14  before that?
15   A.   I was a platoon medic.
16   Q.   In your four years in the Army, did you
17  ever work as military police?
18   A.   I did not.
19   Q.   Did you ever receive any training in
20  policing techniques?
21   A.   I did not.
22   Q.   Do you recall when you left the Army?
23   A.   November of 2011.
24   Q.   11|11, Armistice Day.  When you were
25  discharged from the Army, did you begin your working

Page 14

1  career?
2    A.   Not in law enforcement, no.
3    Q.   But did you begin working as soon as you
4  were discharged from the Army?
5    A.   Shortly thereafter, yes.
6    Q.   Okay.  What was that first position you
7  took after your discharge from the Army?
8    A.   It was a part-time teller at a community
9  bank.
10   Q.   Which bank?
11   A.   Hickory Point Bank.
12   Q.   Do you recall how long you were a part-time
13  teller at Hickory Point Bank?
14   A.   I don't recall the length of that position.
15   Q.   After Hickory Point Bank, did you take a
16  new job?
17   A.   I did.
18   Q.   Why did you leave Hickory Point Bank?
19   A.   Initially I left to continue education.
20   Q.   Did you continue your education?
21   A.   I did.
22   Q.   Is that when you attended Richland that we
23  talked about earlier?
24   A.   Yes.  For a second time, yes.
25   Q.   Okay.  This is a second time?

Page 15

1    A.   Correct.
2    Q.   Do you recall when your education at
3  Richland restarted?
4    A.   I don't recall.
5    Q.   That's fine.  This second time at Richland,
6  did you earn any degrees?
7    A.   I did not.
8    Q.   Okay.  After working as a teller part time
9  at a bank, did you take any other employment?
10   A.   I did, yes.
11   Q.   Where at?
12   A.   Seno Formal Wear.
13   Q.   I'm sorry.  Can you say that again?  Seno
14  Formal Wear?
15   A.   Seno, S-E-N-O.
16   Q.   What was your job title at Seno?
17   A.   Store manager.
18   Q.   What were some of your job duties as a
19  store manager at Seno?
20   A.   Help people with men's formal wear for
21  their weddings.
22   Q.   Okay.  How long did you work at Seno?
23   A.   I don't recall exactly.  It was probably
24  about half a year.
25   Q.   So would you say it's more than six months

Page 16

1  or less than six months?
2    A.   Probably right about six months.
3    Q.   Okay.  Why did you leave Seno?
4    A.   I was offered a new job.
5    Q.   Where at?
6    A.   Piatt County circuit clerk's office.
7    Q.   You said Piatt County?
8    A.   Piatt, P-I-A-T-T.
9    Q.   If you recall, do you recall when you
10  started working at Piatt County?
11   A.   I don't recall the month and year off the
12  top of my head.
13   Q.   What was your job title when you went to
14  Piatt County?
15   A.   Deputy clerk.
16   Q.   What were some of your job responsibilities
17  as a deputy clerk?
18   A.   Attend court as the clerk, file paperwork.
19   Q.   How long did you work at Piatt County?
20   A.   Approximately two years.
21   Q.   After Piatt County where'd you work?
22   A.   Champaign County Sheriff's Office.
23   Q.   Is that the job that you currently hold
24  now?
25   A.   Correct.

Page 17

1    Q.  Can you tell me your reason for leaving
2  Piatt County?
3    **A.  To pursue a career in law enforcement.**
4    Q.  Do you recall when you were hired by the
5  Champaign County sheriff's department?
6    **A.  I believe it was September of 2018.**
7    Q.  What's your current rank within the
8  sheriff's department?
9    **A.  Deputy sheriff.**
10   Q.  When you were first hired in September of
11 2018, do you recall what your rank was then?
12   **A.  It was the same.**
13   Q.  Has it ever changed?
14   **A.  It has not.**
15   Q.  Deputy, why'd you want to work in law
16 enforcement?
17   **A.  I like helping people.**
18   Q.  Any family members work in law enforcement?
19   **A.  Not that I'm aware of.**
20   Q.  When you were first hired on at the
21 sheriff's department in September of 2018, did you
22 receive any training about how to perform your
23 duties?
24   **A.  I did.**
25   Q.  Okay.  First can you tell me what your

Page 18

1  duties are currently as a deputy sheriff with the
2  Champaign County sheriff's department?
3    **A.  I provide patrol on a team.**
4    Q.  Any others?
5    **A.  Not at this time.**
6    Q.  I'd like to get back to your training now.
7  Can you tell me when your training started, if you
8  recall?
9    **A.  I don't recall the date.  It would have**
10 **been shortly after I was hired.**
11   Q.  So that would have been September of 2018?
12   **A.  Correct.**
13   Q.  When you began training in September of
14 2018, did you have to attend any classes or seminars?
15   **A.  I did.**
16   Q.  Okay.  Can you tell me where those were?
17   **A.  Police Training Institute, University of**
18 **Illinois.**
19   Q.  Would that be the same University of
20 Illinois that is located here in Champaign?
21   **A.  Correct.**
22   Q.  And how long did this Police Training
23 Institute last?
24   **A.  Approximately three months.**
25   Q.  Three months.  Is that Monday through

Page 19

1  Friday, 8:00 to 5:00?
2    **A.  Roughly, yes.**
3    Q.  Okay.  So you're at training for roughly
4  forty hours a week for three months; is that a fair
5  characterization?
6    **A.  Correct.**
7    Q.  Do you recall some of the classes and
8  specific instruction lessons that you had at the PTI?
9    **A.  I do.**
10   Q.  I'm sorry.  When I say PTI, do you
11 understand that I'm referring to the Police Training
12 Institute?
13   **A.  I understand.**
14   Q.  Okay.  Can you tell me about some of the
15 classes that you took at PTI?
16   **A.  Classes had a wide variety of topics.**
17 **Anything from traffic stops, law, policies and**
18 **procedures.**
19   Q.  The training that you received at PTI, was
20 that specific to the Champaign County sheriff's
21 department, or was that more general law enforcement
22 techniques that were being taught?
23   **A.  It was general law enforcement techniques**
24 **for the state of Illinois.**
25   Q.  Okay.  So were there members of your class

Page 20

1  at PTI that were not members of the Champaign County
2  sheriff's department?
3    **A.  Primarily, yes.**
4    Q.  Do you recall how many -- or strike that.
5  Do you recall what percentage of your class at PTI
6  would have been Champaign County sheriff's deputies?
7    **A.  Less than 5 percent.**
8    Q.  If you can, can you approximate how many
9  people would have been in this class?
10   **A.  I don't recall an exact number.**
11 **Approximately sixty.**
12   Q.  Okay.  I want to take some of the classes
13 that you discussed one by one.  You mentioned a
14 traffic stop class?
15   **A.  Correct.**
16   Q.  Can you tell me the subjects that were
17 covered in the traffic stop class?
18   **A.  I don't understand the question.**
19   Q.  What I'm trying to get is I don't
20 understand the class.  So can you explain for me some
21 of the subjects that were covered in the traffic stop
22 class itself?
23   **A.  The class covered how to conduct traffic**
24 **stops.**
25   Q.  Okay.  How long did this particular class

Page 21

1  last, if you recall?
2      A.  I don't recall.
3      Q.  Attending these classes, would this be
4  something that you would do one at a time and then
5  finish a class and restart another class, or would
6  you take traffic stops, law, and policies and
7  procedures at the same time, just at different points
8  throughout the day, if that makes sense?
9      A.  Classes like this would be at least a
10  majority of the day, and then maybe the next day we'd
11  go to something else.  Come back to traffic stops at
12  a later date, either that week, maybe the next week.
13      Q.  I see.  So in the traffic stop class I'm
14  assuming they covered things like what would prompt
15  initiating a traffic stop, correct?
16      A.  Correct.
17      Q.  How to initiate the traffic stop by
18  yourself, along with a partner, correct?
19      A.  Correct.
20      Q.  Did you go over, then, exigent
21  circumstances of things that may occur at a traffic
22  stop?
23      A.  Correct.
24      Q.  Anything that we haven't talked about that
25  you covered at the traffic stop class?

Page 22

1      A.  Not that I can recall.
2      Q.  Okay.  Like you mentioned a law class.  Can
3  you tell me just briefly what the law class covered
4  at PTI?
5      A.  State of Illinois criminal law and the
6  Illinois Vehicle Code.
7      Q.  Do you recall approximately how long this
8  law class lasted?
9      A.  It was continuous throughout the entirety
10  of PTI.
11      Q.  Okay.  So that would have been for the
12  whole three months?
13      A.  Correct.
14      Q.  I can't recall if I asked, and forgive me
15  if I'm repeating myself.  Do you recall how long the
16  traffic stop class lasted?
17      A.  It would have been comparable to the law
18  class.
19      Q.  So the entirety of the three months at PTI?
20      A.  Correct.  It was stop and go throughout the
21  entirety of PTI.
22      Q.  You also mentioned a policies and
23  procedures class.  Can you tell me generally what was
24  covered in the policies and procedures class at PTI?
25      A.  When referring to policies and procedures,

Page 23

1  I don't believe it was in reference to a class --
2      Q.  Okay.
3      A.  -- specifically, but we did cover following
4  your department's policies and procedures.
5      Q.  So following your department's policies and
6  procedures, would that have been something that was
7  covered either in the traffic stop class or the law
8  class?
9      A.  It would have -- I don't recall exactly,
10  but it would have been likely covered in nearly every
11  class.
12      Q.  Were these policies and procedures, were
13  they specific to the Champaign County sheriff's
14  department?
15      A.  Can you rephrase the question?
16      Q.  The policies and procedures that you've
17  mentioned that you studied at PTI, would these have
18  been policies and procedures that were specific to
19  the Champaign County sheriff's department?
20      A.  Maybe I should clarify.  We did not study
21  Champaign County sheriff's office policies and
22  procedures at PTI.
23      Q.  Okay.
24      A.  We were merely taught that from what the
25  teachings of PTI are we should still adhere to our

Page 24

1  policies and procedures of our individual
2  departments.
3      Q.  So if I understand you correctly, and
4  correct me if I'm wrong, PTI kind of taught you how
5  to follow policies and procedures that would be
6  assigned to you once you actually left the Institute
7  and went to work for an individual department; is
8  that a fair characterization?
9      A.  Correct.
10      Q.  At PTI, did you take any classes about
11  filling out reports?
12      A.  We did.
13      Q.  Was that an individual class or part of
14  another class?
15      A.  I don't recall.
16      Q.  Do you recall what the training was at PTI
17  regarding reports?
18      A.  Roughly, yes.
19      Q.  Can you tell me about it?
20      A.  It covered the structure of a report and
21  how to document events.
22      Q.  Anything else?
23      A.  Not that I can recall.
24      Q.  Did they discuss when a report might be
25  necessary?

Page 25

1   A.   I don't recall if they discussed that at
2   PTI or not.
3   Q.   Would you have had training on the
4   different types of reports available?
5   A.   What do you mean by different types of
6   reports available?
7   Q.   I guess that's fair.  Is it your
8   understanding that there are different types of
9   reports available for different types of incidents,
10  or no?
11  A.   I would agree.
12  Q.   In your training at PTI, did you have any
13  lessons or instruction about how to differentiate
14  when a certain report might be necessary for a
15  certain incident?
16  A.   I don't recall if we did.
17  Q.   Did you ever have training regarding a
18  specific report for a specific type of incident after
19  PTI?
20  A.   I don't believe so.
21  Q.   I appreciate your patience as I take some
22  notes as we go along here.  At PTI did you ever take
23  any training regarding search procedure?
24  A.   We did.
25  Q.   Would your training at PTI regarding search

Page 26

1   procedure, would that have been part of a class that
2   was either traffic stop or law, or would that have
3   been its own class?
4   A.   I don't recall if it was its own class or
5   not.  I do recall that it was a part of many classes,
6   though.
7   Q.   At your -- just for lack of a better term,
8   call it -- whether it was part of its own class or
9   part of another class that we've talked about, I'm
10  just going to refer to it all as search training.
11  Does that make sense?
12  A.   That's fair.
13  Q.   As part of your search training, did you
14  learn about different types of searches available to
15  officers?
16  A.   I did.
17  Q.   What is your understanding of the different
18  types of searches that are available?
19  A.   Can you clarify what you mean by what is my
20  understanding of different types of searches?
21  Q.   Well, you received training about -- strike
22  that.  Let me back up.  There are different types of
23  searches available to officers depending on various
24  circumstances, correct?
25  A.   Correct.

Page 27

1   Q.   Can you tell me your understanding of what
2   those different types of searches are?
3   A.   I guess the primary searches would be a pat
4   down search, a search of one's person, and then it
5   can get more intimate from there with a strip search,
6   a body cavity search.
7   Q.   Any others?
8   A.   Not that I can think of off the top of my
9   head.
10  Q.   When would a pat down search -- based on
11  your training, can you tell me when a pat down search
12  might be necessary?
13  A.   A pat down search would be necessary when
14  there's reasonable suspicion that a weapon may be
15  concealed.
16  Q.   Any other situations?
17  A.   I'm sure there are if situations dictate
18  so.
19  Q.   Can you tell me what your understanding of
20  the term reasonable suspicion is?
21  A.   It means I have a reasonable belief to
22  think that a crime has been committed, is being
23  committed, or is about to be committed.
24  Q.   Now, if I understand you, a pat down search
25  can really be applicable in two situations.  One is

Page 28

1   this reasonable suspicion of a weapon, and then the
2   second you've stated if the situation dictates so.
3   Can you give me an example of a time during your
4   career with the Champaign County sheriff's department
5   where you've conducted a pat down search because the
6   situation dictates so that is not based on the
7   reasonable suspicion of a weapon?  Does that make
8   sense?
9   A.   Can you repeat the question because I
10  believe you asked a different question at the
11  beginning of your question and rephrased it again to
12  where the answer might vary at the end of your
13  question.
14  Q.   Entirely possible, so allow me to try to
15  clarify.  Now, you've stated that a pat down search
16  is applicable in two situations, correct?
17  A.   I stated that a pat down search would be
18  conducted if there's reasonable suspicion that a
19  weapon may be concealed, and then I also stated that
20  there could be other scenarios where a pat down
21  search can be conducted.
22  Q.   I'm interested in that other scenarios part
23  of your answer.  Can you tell me during your career
24  as a sheriff's deputy if you've conducted a pat down
25  search because the situation otherwise dictated so?

Page 29

1   A.  I don't have any instances in my career so
2   far.
3   Q.  Now, the second type of search that we were
4   discussing earlier was you mentioned a search of
5   one's person.  Do you recall that?
6   A.  I do.
7   Q.  Can you articulate for me the difference
8   between a pat down search and this search of one's
9   person?
10   A.  A pat down search would be less intrusive.
11   It would just be feeling over top of the clothes in
12   high risk areas where a weapon may be concealed, and
13   a search of one's person would be looking into one's
14   clothing, into pockets, et cetera.
15   Q.  What are some situations that would call
16   for a person's body to be searched in such a manner?
17   A.  It could be done incident to arrest or if
18   the person stated that they do have some sort of
19   contraband on their person.  They could be searched
20   at that point.
21   Q.  Any others?
22   A.  I'm sure there are, but not that I can
23   recall off the top of my head.
24   Q.  The third type of search you mentioned was
25   a strip search.  Can you tell me the difference

Page 30

1   between a strip search and the other two types of
2   searches that we've discussed so far?
3   A.  A strip search would be removing the
4   clothing of the person being searched.
5   Q.  Why would removing the clothing of the
6   person being searched be necessary?
7   A.  In case somebody is concealing something
8   under their clothing that is not accessible by
9   reaching into a pocket or feeling on the outside of
10   the clothing.
11   Q.  Have you personally had an opportunity to
12   conduct a strip search?
13   A.  I have not.
14   Q.  Next you mentioned a body cavity search.
15   First can you tell us when a search of a body cavity
16   might be necessary?
17   A.  If there is a reasonable suspicion that
18   somebody may be concealing contraband inside of their
19   person.
20   Q.  Have you had an opportunity to conduct a
21   body cavity search?
22   A.  I have not.
23   Q.  Fortunately.  I want to get back to the
24   first two types of searches that we were talking
25   about.  So this would be the pat down and the search

Page 31

1   of one's person.  Can you tell me your understanding
2   of the distinction between the two?
3   A.  As I previously stated, a pat down search
4   would be feeling the outside of -- outside of the
5   clothing the person is wearing to search for possible
6   weapons being concealed.
7   Q.  Why would an officer -- they sound pretty
8   similar.  Can you help me understand why an officer
9   might perform a pat down search versus a search of
10   one's person?
11   A.  A pat down search would be to check for
12   potentially concealed weapons.  And it would just be
13   a pat down of the outside of one's clothing without
14   going into pockets, without going inside of the
15   clothing.
16   Q.  Just to get back to your training, PTI
17   lasts about three months, correct?
18   A.  Approximately, yes.
19   Q.  After your training at PTI, did you undergo
20   any additional training?
21   A.  I did.
22   Q.  Where at?
23   A.  Champaign County Sheriff's Office.
24   Q.  What kind of training did you take at the
25   Champaign County Sheriff's Office?

Page 32

1   A.  It was a field training program and
2   training through on-line platforms in addition to
3   in-person training at the Champaign County Sheriff's
4   Office.
5   Q.  Can you tell me how long your training
6   lasted at the Champaign County Sheriff's Office?
7   A.  It's ongoing.
8   Q.  When you say your training is ongoing, are
9   all three field training on-line platforms and
10   in-person training, are they still ongoing or have
11   you finished any of those phases, if they're even
12   considered phases?
13   A.  The on-line platforms and in-person
14   training are ongoing.  It's just mandated training
15   through the State of Illinois.  It's continuing
16   education essentially.  The field training program
17   will terminate -- I believe I'm in the last phase of
18   that right now.
19   Q.  Do you know if your field training will
20   terminate in the next six months or less?
21   A.  I don't recall off the top of my head when
22   exactly it terminates.  I believe it is at two years
23   of employment.
24   Q.  Okay.  And two years of employment would be
25   around September of 2020; is that correct?

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CODY FLOYD
February 20, 2020

Page 33

1   A. Correct.
2   Q. During your field training, are you
3 assigned any particular field training officer?
4   A. Yes.
5   Q. Who would that be?
6   A. The first one was Deputy Malloch.
7   Q. Can you spell Malloch for me if you can?
8   A. M-A-L-L-O-C-H.
9   Q. How long did you train with Officer
10 Malloch?
11   A. One month.
12   Q. Did you receive any sort of written report
13 or evaluation after your training with Officer
14 Malloch?
15   A. I did.
16   Q. Did you receive a satisfactory report from
17 Officer Malloch?
18   A. I did.
19   Q. After Officer Malloch, did you train with
20 another officer?
21   A. I did.
22   Q. Who was that?
23   A. Deputy Brize, B-R-I-Z-E.
24   Q. How long did you train with Deputy Brize?
25   A. One month.

Page 34

1   Q. Did you receive a report after your
2 training with Deputy Brize?
3   A. I did.
4   Q. Was that a satisfactory report?
5   A. It was.
6   Q. After training with Deputy Brize, did you
7 train with another officer?
8   A. I did.
9   Q. Do you recall who that was?
10   A. Deputy Derouchie. D-E-R-O-U-C-H-I-E, I
11 believe.
12   Q. How long did you train with Deputy
13 Derouchie?
14   A. One month.
15   Q. After training with Deputy Derouchie, did
16 you train with another officer?
17   A. I did.
18   Q. Do you recall who that was?
19   A. Deputy Wakefield.
20   Q. Wakefield, W-A-K-E-F-I-E-L-D?
21   A. Correct.
22   Q. How long did you train with Deputy
23 Wakefield?
24   A. One month.
25   Q. After Deputy Wakefield, did you train with

Page 35

1 another officer?
2   A. I did not.
3   Q. Are you currently still conducting field
4 training with any officer?
5   A. Once a month I have a field training
6 officer ride with me for approximately four hours in
7 what's called a check ride.
8   Q. When was the last time you had a check
9 ride?
10   A. Within the last month. I don't recall the
11 date.
12   Q. Do you recall who the officer was that went
13 along with you for this check ride?
14   A. I believe the last one was Deputy Gabra,
15 G-A-B-R-A.
16   Q. Do you happen to know when your next check
17 ride is scheduled to be performed?
18   A. At this time I don't know when the next
19 scheduled one is, no.
20   Q. During any of this field training, have you
21 ever received any evaluations indicating that any
22 disciplinary action was needed?
23   A. No.
24   Q. Have you ever during this field training
25 from any of the officers that you worked with

Page 36

1 received an evaluation that your conduct was somehow
2 unsatisfactory as a police officer?
3   A. No.
4   Q. You also mentioned on-line platforms for
5 training at the Champaign County Sheriff's Office.
6 Can you tell me what the subjects are that are
7 covered in the on-line training?
8   A. It's a wide variety of subjects. Too many
9 to list.
10   Q. Generally how long does an on-line training
11 session last for you?
12   A. It depends on the class. Some classes are
13 more hours than others.
14   Q. Can you tell me the longest on-line
15 training session that you've had?
16   A. I don't recall the number of hours.
17   Q. Would it be more or less than one hour?
18   A. It would be more I'm sure.
19   Q. Would it be more or less than two hours?
20   A. It would be more.
21   Q. Would it be more or less than five hours?
22   A. At this point it's conjecture. I couldn't
23 tell you.
24   Q. Okay. Can you tell me the shortest on-line
25 training session that you've had?

Page 37

1    A.   Maybe just a couple minutes.
2    Q.   Do you recall the subject that was covered
3 in just a couple minutes?
4    A.   There's many different subjects.  Those
5 are -- the trainings I'm referring to are
6 scenario-based trainings where you're provided with a
7 scenario and then a question at the end in reference
8 to a Champaign County Sheriff's Office policy and how
9 that scenario should be handled.  Usually they only
10 take a few minutes to complete, and there's multiple
11 of those each month.
12    Q.   When you say there's multiple of those each
13 month, do you mean that there's multiple sessions
14 where you need to go perform an on-line training
15 session, or there's multiple of these specific
16 questions that you are mentioning?
17    A.   Each month there's approximately twenty of
18 these scenarios that you have to read through and
19 then answer a question at the end based off of the
20 Champaign County Sheriff's Office policy and how it
21 should be handled.
22    Q.   So if my understanding is correct, you just
23 need to answer all twenty of these within about a
24 month; is that correct?
25    A.   Correct, and each one takes approximately

Page 38

1 two to three minutes.
2    Q.   Okay.  The on-line training, is that
3 something that you perform at Champaign County
4 sheriff's department headquarters, or is that
5 something you can do at your own home?
6    A.   We're required to do it on Champaign County
7 Sheriff's Office time.  So it's either at the
8 department or in our squad cars.
9    Q.   In your squad car.  Is it something that
10 you can do on a mobile phone?
11    A.   If we can, I don't know about it.
12    Q.   Okay.
13    A.   I'm sure it could be done, but I've never
14 attempted.
15    Q.   How do you perform the on-line training,
16 then, in the squad car?
17    A.   We have computers in our squad cars.
18    Q.   So it does run on the computers in the
19 squad cars?
20    A.   It does.
21    Q.   Do you recall ever taking an on-line course
22 in report generation?
23    A.   I don't recall.
24    Q.   Do you recall taking an on-line course in
25 searches?

Page 39

1    A.   I'm sure I have, but I don't recall
2 specifically.
3    Q.   Do you recall if it was more than one class
4 that covered searches?
5    A.   I don't recall.
6    Q.   You also mentioned in-person training?
7    A.   Correct.
8    Q.   In-person training is still ongoing,
9 correct?
10    A.   Correct.
11    Q.   About how often in a given month will you
12 be required to attend an in-person training session?
13    A.   Less than monthly.
14    Q.   Less than monthly?
15    A.   Correct.
16    Q.   Once every six months?
17    A.   Approximately, yes.
18    Q.   Once every three months?
19    A.   I would say once every three to six months
20 would be accurate.
21    Q.   Do you recall when the last time you had an
22 in-person training session was?
23    A.   Within the last week.
24    Q.   Do you recall the subject of that training
25 session?

Page 40

1    A.   Taser certification.
2    Q.   Where was that training held?
3    A.   Champaign County Sheriff's Office.
4    Q.   How long did it last?
5    A.   I believe it was approximately one hour.
6    Q.   Are all in-person training sessions more or
7 less one hour long?
8    A.   Approximately.  I would say that's fair.
9    Q.   Do you recall any other subjects that
10 you've had this in-person training on?
11    A.   Yes.
12    Q.   Can you tell it to me?
13    A.   The last one that I recall would have been
14 high risk traffic stops.
15    Q.   Any others?
16    A.   Not that I can recall off the top of my
17 head.
18    Q.   Do you recall when the high risk traffic
19 stop training was?
20    A.   I don't recall the date.  Likely within the
21 last three or four months.
22    Q.   These in-person training sessions that are
23 held at the Champaign County Sheriff's Office, are
24 they conducted by another Champaign County deputy?
25    A.   Correct.

Page 41

1   Q.  What is a high risk traffic stop?
2   **A.  In short, I guess it could be characterized**
3   **as a felony stop.**
4   Q.  A felony stop.  What do you mean by felony
5   stop?
6   **A.  Where the premise of the traffic stop would**
7   **be for a felony charge as opposed to a misdemeanor or**
8   **simple traffic offense.**
9   Q.  So you would have to have -- this isn't a
10  stop that's occurring because somebody has a broken
11  taillight; is that fair?
12  **A.  Correct.**
13  Q.  So you would have to have prior knowledge
14  of who the driver is or at least their conduct in
15  order to determine if something is a high risk
16  traffic stop?
17  **A.  Correct.**
18  Q.  Deputy Floyd, are you doing okay?  Do you
19  need a washroom break, or would you like to keep
20  going?
21  **A.  I'm fine.  Thank you.  We can continue.**
22  Q.  Deputy Floyd, have you ever had one of
23  these in-person training sessions that covered
24  reports?
25  **A.  I don't believe so.**

Page 42

1   Q.  Have you ever had an in-person training
2   session with the Champaign County sheriff's
3   department that covered searches?
4   **A.  I don't believe so.**
5   Q.  Deputy, have you ever heard of somebody,
6   whether it's you or another deputy, being disciplined
7   by the Champaign County sheriff's department by
8   conducting an improper search of an individual?
9   **A.  Not that I'm aware of.**
10  Q.  Have you ever heard of a deputy or any
11  official at the Champaign County sheriff's department
12  being disciplined for conducting an inappropriate
13  search of a female?
14  **A.  Not that I'm aware of.**
15  Q.  Have you ever heard of any other officer at
16  the Champaign County Sheriff's Office who conducted a
17  traffic stop of -- or strike that.
18      Have you ever heard of another officer at the
19  Champaign County Sheriff's Office who conducted a
20  search of a person of the opposite sex?
21  **A.  Yes.**
22  Q.  Do you recall how many instances?
23  **A.  I don't recall.**
24  Q.  Can you tell me if it was more or less than
25  five?

Page 43

1   **A.  I don't recall.**
2   Q.  Was it less than ten?
3   **A.  I don't recall.**
4   Q.  These instances that you recall, do you
5   recall if it was a male searching a female suspect or
6   female officer searching a male suspect?
7   **A.  The instances in my mind have been a male**
8   **searching a female suspect.**
9   Q.  Do you recall the last time you heard of an
10  instance where an officer searched -- a male officer
11  searched a female suspect?
12  **A.  To clarify, are we talking about all kinds**
13  **of searches?**
14  Q.  Yes.  We're talking about the -- any of the
15  four that we discussed earlier.
16  **A.  Yes.  The last time I witnessed one of**
17  **these would have been at approximately midnight this**
18  **past night.**
19  Q.  Just about ten hours or so?
20  **A.  Correct.**
21  Q.  What kind of search was it?
22  **A.  It was a pat down.**
23  Q.  The female that was the subject of the pat
24  down, do you recall why she was searched?
25  **A.  She was searched incident to arrest.**

Page 44

1   Q.  I believe you said you just witnessed the
2   search, right, you didn't actually conduct it?
3   **A.  I conducted the pat down.**
4   Q.  You conducted the pat down.  What was the
5   female arrested for?
6   **A.  Driving under the influence.**
7   Q.  As far as you're aware, in the past ten
8   hours has this female made any sort of complaint to
9   the Champaign County Sheriff's Office regarding the
10  pat down search?
11  **A.  Not that I'm aware of.**
12  Q.  Prior to just last night, do you recall
13  when the last time was you were aware of a male
14  officer from the Champaign County sheriff's
15  department searching a female suspect?
16  **A.  I don't recall when the last time would**
17  **have been.**
18  Q.  The pat down search that you performed last
19  night, were any weapons recovered?
20  **A.  No.**
21  Q.  Any contraband?
22  **A.  No.**
23  Q.  Was it only a search of one female, or were
24  multiple searches conducted of suspects last night?
25  **A.  One pat down search was conducted last**

Page 45

1  night on one female.
2   Q.  You mentioned just one pat down, but just
3  one search in total or were there multiple
4  individuals?
5   A.  One search in total.
6   Q.  Officer Floyd, have you received training
7  in how to conduct a pat down search?
8   A.  I have.
9   Q.  Where at?
10   A.  PTI.
11   Q.  Can you tell me how to conduct a pat down
12  search?
13   A.  A pat down search would be conducted by
14  placing the hands over the top of one's clothing and
15  feeling for contraband that may be underneath the
16  clothing.
17   Q.  You say placing your hands.  Do you mean
18  palm against the suspect or palm facing out from the
19  suspect?
20   A.  It depends on where you are patting down on
21  the suspect.
22   Q.  Can you tell me where you would use your
23  palm facing out from a suspect?
24   A.  If I were to search the -- if I were to do
25  a search of a female, I would use either a bladed

Page 46

1  hand or the back of my hand to search, particularly
2  around private areas of the female.
3   Q.  Why?
4   A.  One reason would be to not have my actions
5  misconstrued.
6   Q.  You mentioned both palm out or blade.  Can
7  you articulate for me what you mean by blade?
8   A.  It would be the side of my hand, either at
9  the pinky side or the thumb side.
10   Q.  Just for the record, you're demonstrating
11  along the ridge of your hand with your hand facing up
12  and down, correct?
13   A.  Correct.
14   Q.  And also on the bottom ridge of your hand
15  with your hand still facing up and down?
16   A.  Correct.
17   Q.  Can you tell me when it may be necessary to
18  conduct a pat down search with your palm facing down
19  against the suspect?
20   A.  I believe that's how I conduct pat down
21  searches, with my palm facing the suspect.
22   Q.  Okay.  Does your conduct during a pat down
23  search change if it's a member of the opposite sex?
24   A.  Can you rephrase the question?  I'm not
25  sure I know exactly what you mean by my conduct

Page 47

1  changing.
2   Q.  So you mentioned three techniques, the palm
3  up, palm down, and the blade.  Does your use of those
4  three techniques when you use them and how you use
5  them change if the suspect is a member of the
6  opposite sex?
7   A.  To clarify, I mentioned two techniques,
8  which would have been the bladed and the palm down.
9  I believe you mentioned the palm up technique.  And,
10  yes, my technique would change depending on which sex
11  the suspect is.
12   Q.  Perhaps I'm combining both the palm out and
13  the bladed.  So you don't search a suspect with the
14  back of your hand; is that correct?
15   A.  Correct.
16   Q.  During a pat down search?
17   A.  I have not.
18   Q.  Sorry.  Just because I got a little
19  confused there, can you tell me if your use of either
20  the bladed hand or the palm down search changes with
21  a member of the opposite sex?
22   A.  It would.
23   Q.  How so?
24   A.  If I was searching the chest of a male, I
25  would have my palm down against them.  If I was

Page 48

1  searching a female, I would use -- searching the
2  chest of a female, I would use a bladed hand to do
3  so.
4   Q.  Any others?
5   A.  Any others what?
6   Q.  Any other changes to your search technique
7  if the subject of the search is a member of the
8  opposite sex?
9   A.  If I was feeling around the waistline of a
10  female, I would use a bladed hand.  If I was
11  searching around the waistline of a male, I would
12  likely use palm down.
13   Q.  And that's because I think you said you
14  didn't want your actions to be misconstrued, correct?
15   A.  Correct.
16   Q.  Members of the opposite sex, they might be
17  particularly sensitive to a search by a male officer
18  with a palm down in either their chest or the areas
19  around their waist, correct?
20   A.  I can't speculate how other people would
21  feel.
22   Q.  Well, that's why you perform the search
23  with a bladed hand when it's a female, correct?
24   A.  It would be to not have my actions
25  misconstrued, to be respectful of the person being

Page 49

1  searched, but I can't speculate as to how somebody
2  would feel.
3      Q.  Is there ever a time to perform -- to use
4  your fingers during a pat down search?
5      A.  I don't understand the question.
6      Q.  So we've talked about palm down and the
7  bladed hand, but is there ever a time when it's
8  necessary to use the fingers for a pat down search?
9      A.  I see my fingers and my palm as one unit
10  when doing a pat down search.  They're not working
11  independently.
12      Q.  Okay.  Do you wear gloves while performing
13  a pat down search?
14      A.  I do.
15      Q.  Do you always wear gloves?
16      A.  I do.
17      Q.  Is that something you were instructed to do
18  based on your training?
19      A.  It was.
20      Q.  If you can, can you tell me your
21  understanding about how to conduct a pat down search
22  of a woman's back side and crotch if just performing
23  a pat down search?  Strike that.  Let me rephrase
24  that question.
25      Can you tell me the specific techniques that you

Page 50

1  understand to be to search a woman's back side?
2      A.  It would be to move the hands along the
3  back side outside the clothing.
4      Q.  What position would your hands have to be
5  in?
6      A.  Is your question what would they have to be
7  in?
8      Q.  Based on your training and your
9  understanding, can you tell me how your hands would
10  be positioned when performing a pat down search of a
11  woman's back side?
12      A.  Okay.  I guess you could use the back
13  handed search the way you described it, but if -- you
14  know, with your palms flat and your fingers flat, you
15  could use the palms of your hand as well.
16      Q.  When you conduct a pat down search of a
17  woman's back side, how do you typically perform it?
18      A.  I have not done a pat down search of a
19  woman's back side.  The closest I've gotten is their
20  waistline.
21      Q.  Have you ever performed a search of a
22  woman's crotch?
23      A.  I have not.
24      Q.  Based on your training and your
25  understanding, when searching a member of the

Page 51

1  opposite sex, is there any sort of specific location
2  at a particular scene that you're supposed to conduct
3  a search at?
4      A.  I'm sorry.  Could you state the question
5  again?
6      Q.  When conducting the search of a member of
7  the opposite sex, a pat down search, is there
8  anything that you understand to be a requirement
9  about where that search can be conducted on the
10  scene?
11      A.  What do you mean by where that search can
12  be conducted?  As far as a geographical location or
13  the location on one's person?
14      Q.  So I don't want to talk about one's person
15  now.  I want to talk about the geographic location at
16  any particular scene.  Based on your training and
17  your understanding, is there any requirement as to
18  where that search is to be performed?
19      A.  Based off of your question, I don't believe
20  there's a requirement of geographically where that
21  search needs to occur.
22      Q.  When searching a member of the opposite
23  sex, are you required to search that person in view
24  of another officer?
25      A.  Yes.

Page 52

1      Q.  Are you required to perform that search in
2  a private location where it would just be you, the
3  other officer, and the suspect of the search?
4      A.  I don't recall.
5      Q.  If conducting the search of a member of the
6  opposite sex, are you required to perform it in an
7  area that is recorded by video camera?
8      A.  If we are, I don't recall.
9      Q.  I'd like to -- a slight transition now and
10  just talk about the Champaign County sheriff's
11  department policies and procedures regarding
12  searches, at least as far as you understand them.
13  Does Champaign County -- when I say Champaign County,
14  do you understand that I'm talking about the
15  Champaign County sheriff's department?
16      A.  I understand.
17      Q.  Does Champaign County have any policies and
18  procedures regarding searches of suspects of the
19  opposite sex of the officer?
20      A.  They do.
21      Q.  What is your understanding of those
22  policies?
23      A.  Deputies can perform searches of suspects
24  of the opposite gender with at least another witness,
25  witnessing deputy, or supervisor present.

Page 53

1  Q. So if I understand you correctly, an
2  individual deputy is not allowed to conduct a search
3  of a member of the opposite sex alone, correct?
4  **A. That's my understanding.**
5  Q. They have to call for backup?
6  **A. Correct.**
7  Q. Do you know if there's any policies and
8  procedures regarding requesting a member of the
9  suspect's sex to come and perform that search? And
10  let me give you an example. If searching a female
11  suspect, is there any policy and procedure that
12  requires a male officer to request the presence of a
13  female officer?
14  **A. My understanding of our policy is that if a**
15  **male deputy would be to search a female suspect, if**
16  **reasonable the male deputy should request a female**
17  **deputy to perform the search.**
18  Q. What do you mean by reasonable?
19  **A. It depends on the circumstances.**
20  Q. Can you tell me some situations that --
21  what your understanding is -- strike that.
22  Can you tell me what your understanding is of
23  when a male officer would need to request the
24  presence of a female officer to conduct a search of a
25  female suspect?

Page 54

1  **A. A circumstance where a male would need to**
2  **request a female for a female search would be, for**
3  **example, if the female suspect requested it.**
4  Q. Any others?
5  **A. Not that I can think of.**
6  Q. Based on the Champaign County policies and
7  procedures, is a male officer required to request the
8  presence of a female prior to conducting a search of
9  a female suspect?
10  **A. I don't believe it's required.**
11  Q. Your current position is you perform
12  patrols on a team, I think you said, correct?
13  **A. Correct.**
14  Q. Now, I would assume that that includes
15  having a radio handy during the entirety of your
16  shift, correct?
17  **A. Correct.**
18  Q. Have you ever been present on a scene where
19  a male officer has requested the presence of a female
20  officer to search a female suspect?
21  **A. I have.**
22  Q. When was the last time that occurred?
23  **A. I don't recall the date.**
24  Q. More or less than six months ago?
25  **A. The last instance I recall would have been**

Page 55

1  **approximately six months ago, maybe more.**
2  Q. And was this a male officer requesting the
3  presence of a female officer to search a female
4  suspect, correct?
5  **A. Correct.**
6  Q. Do you recall the type of search? First --
7  strike that. Do you recall if a female officer
8  arrived on scene?
9  **A. I do.**
10  Q. Did that female search the -- did the
11  female officer search the female suspect?
12  **A. Correct.**
13  Q. What kind of search was performed, if you
14  recall?
15  **A. A search of one's person.**
16  Q. Was that particular suspect arrested, if
17  you recall?
18  **A. No, they were not.**
19  Q. Were they issued any sort of citation, if
20  you recall?
21  **A. I don't recall.**
22  Q. What are some of the factors, as you
23  understand them, of when a male officer would be
24  required to call -- strike that.
25  What are some of the factors that you understand

Page 56

1  them to be of when a male officer is required to call
2  a female officer to conduct a search of a female
3  suspect?
4  **A. I'm unaware of factors that would require a**
5  **male to request a female.**
6  Q. Kind of a similar question, are you aware
7  of any situations when it is encouraged for a male
8  officer to search a female suspect?
9  **A. Encouraged by who?**
10  Q. Well, let me try to rephrase the question.
11  Are you aware of any types of situations that would
12  specifically require, based on your understanding of
13  the Champaign County policies and procedures, a male
14  officer to perform a search of a female suspect?
15  **A. Can you rephrase the question?**
16  Q. Based on your understanding of the policies
17  and procedures -- so you don't have to, you know, try
18  to recall everything that you've read. Just as you
19  sit here today your understanding of when a male
20  officer would be, based on the situation, encouraged
21  or it would be acceptable to those policies and
22  procedures to conduct the search of a female suspect?
23  **MR. VAYR:** Objection to form. You can
24  answer if you understand the question.
25  **THE WITNESS:** I don't understand the

Page 57

1 question, no.
2 Q. (by Mr. Mc Carter) When performing a
3 street stop or a traffic stop, excuse me, how often
4 do you ask the driver of the vehicle out of the
5 vehicle?
6 A. Are you asking for a percentage? I don't
7 have those numbers in front of me.
8 Q. If you could estimate for us based on your
9 experience what percentage of drivers that are pulled
10 over during a traffic stop are asked out of the
11 vehicle.
12 A. Strictly an estimation, 10 percent or less.
13 Q. Of those 10 percent, how many are -- do you
14 then conduct a pat down search? Again, you could
15 give a percentage.
16 MR. VAYR: And I -- actually, please
17 answer the question. Go ahead. I'm sorry.
18 THE WITNESS: Of those 10 percent or
19 less, purely speculating, I would state that it was
20 approximately 50 percent of those 10 percent or less.
21 MR. VAYR: I apologize. I lost the
22 thread. Is this 10 percent of the drivers that he
23 personally pulls over, or is this 10 percent of
24 drivers that the entire Champaign County Sheriff's
25 Office law enforcement division pulls over? I just

Page 58

1 lost what the anchor for that number was.
2 Q. (by Mr. Mc Carter) So if I understand
3 correctly, it is based on your experience, correct?
4 A. That's how I understood the question.
5 MR. VAYR: Perfect. Excellent. Thank
6 you.
7 Q. (by Mr. Mc Carter) Deputy Floyd, would you
8 like to take a brief five minutes to use the washroom
9 or anything, stretch your legs, or are you okay to
10 keep going?
11 A. I would like to take a break, actually.
12 Thank you.
13 (Whereupon a break was taken.)
14 Q. Deputy Floyd, does the Champaign County
15 Sheriff's Office have any policy that you're aware of
16 regarding whether a written report needs to be
17 drafted and submitted to Champaign County when a male
18 officer searches a female suspect?
19 A. I am aware of a report -- generating a
20 report writing policy, yes.
21 Q. What's your understanding of that
22 generating a report policy?
23 A. There is many different reasons that a
24 report could be generated. I believe there is a list
25 in there of reasons why a report should be generated.

Page 59

1 I don't believe that it is a complete list. Of
2 course there are other reasons a report could be
3 generated.
4 Q. Based on your understanding of that policy,
5 is the search of a member of the opposite sex one of
6 the things that requires a report?
7 A. I am unaware of a policy stating that a
8 field report should be generated for search of the
9 opposite sex.
10 Q. Are you aware of any policy or procedure
11 that requires an oral report to a supervisor that a
12 search of a member of the opposite sex was performed?
13 A. If there is, I'm unaware.
14 Q. I want to kind of focus on the issue that
15 brings us here today now. As I stated earlier, we're
16 here in the case of Wylesha Ayres who has brought a
17 lawsuit in federal court for a violation of her
18 rights by two Champaign County deputies, as well as
19 the Champaign County and Champaign County Police
20 Department. Are you -- do you recall an incident
21 involving Wylesha Ayres occurring on May 8th of 2019?
22 A. I do.
23 Q. Okay. Before we get into the specifics of
24 that particular traffic stop, I'd like to back up a
25 little bit. Can you tell me about your shift that

Page 60

1 day, what time you started?
2 A. From what I --
3 Q. If you recall.
4 A. From what I recall, my shifts at that time
5 typically started at 6:00 p.m.
6 Q. When did you typically end your shift
7 during -- around May 8th, 2019?
8 A. Typically shifts then would have ended
9 around 6:00 a.m.
10 Q. So you were working twelve hour shifts?
11 A. Correct.
12 Q. During your career as a Champaign County
13 sheriff's deputy, has that shift, 6:00 p.m. to
14 6:00 a.m., ever changed?
15 A. It has.
16 Q. Prior to May 8th, 2019, were you working
17 the 6:00 p.m. to 6:00 a.m.?
18 A. I was.
19 Q. After May 8th, 2019, were you still working
20 the 6:00 p.m. to 6:00 a.m. shift?
21 A. I have.
22 Q. Are you still working it now?
23 A. I am not.
24 Q. What are you working now?
25 A. 2:00 p.m. to 2:00 a.m.

Page 61

1    Q.  So still a twelve hour shift though?
2    A.  Correct.
3    Q.  Are all officer shifts at the Champaign
4  County sheriff's department twelve hours?
5    A.  Not all of them, no.
6    Q.  Just the lucky ones, huh?  On May 8th,
7  2019, if you recall, were you given any specific
8  assignment?
9    A.  I don't recall.
10    Q.  Were you given any specific area to patrol?
11    A.  I would have been, but I don't recall what
12  it was.
13    Q.  Okay.  Can you -- if you recall generally
14  how large of an area you may have been given on May
15  8th, 2019?
16    A.  Generally the area would be approximately a
17  quarter of the county.
18    Q.  How are areas typically divided for a
19  particular shift, if that makes sense?
20    A.  Sure.  Typically we have four different
21  beats, aptly named south, north, east, and west.
22    Q.  Does each beat get one deputy assigned to
23  it for patrol during any particular shift?
24    A.  Sometimes there's more depending on
25  staffing.

Page 62

1    Q.  On May 8th, 2019, do you recall if your
2  particular beat was assigned more than one sheriff
3  deputy for patrol?
4    A.  I don't recall.
5    Q.  May 8th, 2019, would you have been working
6  with a partner or by yourself?
7    A.  By myself.
8    Q.  Have you ever worked with a canine before?
9    A.  I have.
10    Q.  As a handler or with a partner who was the
11  handler of a canine dog?
12    A.  Alongside a colleague who's a canine
13  handler.
14    Q.  Are you familiar with Deputy Christiansen?
15    A.  I am.
16    Q.  How so?
17    A.  We are employed together at the Champaign
18  County Sheriff's Office.
19    Q.  Are you friends?
20    A.  I'd say we're colleagues.
21    Q.  Do you see each other socially outside of
22  work?
23    A.  We have.
24    Q.  When was the last time?
25    A.  I believe it would have been end of

Page 63

1  December of 2019.
2    Q.  Do you recall the event?
3    A.  I believe the purpose of it was a team
4  Christmas party, holiday party.
5    Q.  Can you approximate how often do you see
6  Deputy Christiansen in a social setting outside of
7  work?
8    A.  I believe it's happened three times.
9    Q.  Have you ever been assigned to work a
10  particular beat with Deputy Christiansen?
11    A.  I don't believe we've ever been assigned
12  the same exact beat at the same time.
13    Q.  Have you ever encountered Deputy
14  Christiansen at a scene?
15    A.  I have.
16    Q.  How often?
17    A.  We're not on the same team anymore so I
18  don't anymore.  However, when we were on the same
19  team, it would have happened nearly every shift.
20    Q.  That's the second time you've mentioned
21  teams, and I want to just kind of follow up on that.
22  You mentioned currently you're on a patrol team; is
23  that correct?
24    A.  Correct.
25    Q.  How many different teams are there?

Page 64

1    A.  Four.
2    Q.  What are the other three?
3    A.  Can you clarify?
4    Q.  So are there four patrol teams?
5    A.  Correct.  When I'm referring to the teams,
6  they're all for patrol, yes.
7    Q.  I see.  Approximately how many officers or
8  deputies are assigned to each patrol team?
9    A.  Approximately eight.
10    Q.  Does a particular patrol team work a
11  particular shift?
12    A.  Correct.
13    Q.  Okay.  So if a -- for instance, if your
14  patrol team is -- it's 6:00 p.m. and your shift is
15  up, does your patrol team then split up to cover each
16  of the four different beats that you discussed
17  earlier?
18    A.  I'm sorry.  Can you rephrase the question?
19    Q.  So if one patrol team works one particular
20  shift, does that patrol team then split up to assign
21  a particular deputy to each of the beats that we were
22  discussing earlier?
23    A.  If I'm understanding your question
24  correctly, the members of the team are each assigned
25  a different beat within the county.

Page 65

1    Q.   Okay.  Are there ever shifts that have more
2  than one particular patrol team working together?
3    A.   No.
4    Q.   And I think you mentioned this earlier.
5  You're not currently on the same patrol team as
6  Deputy Christiansen?
7    A.   I'm not.
8    Q.   But you were at one point?
9    A.   I was.
10    Q.   Do you recall when, the first time that you
11  were assigned the same patrol team?
12    A.   I believe it would have been April of 2019.
13    Q.   How long were you on the same patrol team
14  as Deputy Christiansen?
15    A.   From that date until mid January of 2020.
16    Q.   Was there any particular reason why you and
17  Deputy Christiansen are no longer working on the same
18  patrol team?
19    A.   No particular reason, no.
20    Q.   So why are you and Deputy Christiansen no
21  longer working on the same patrol team?
22    A.   I was assigned to a different team.
23    Q.   Are all the members of a particular patrol
24  team deputies?
25    A.   There are all deputies, and two of them are

Page 66

1  sergeants.
2    Q.   Is that the same for, as far as you know,
3  all other three patrol teams?
4    A.   Typically, yes.
5    Q.   Who are the two sergeants currently
6  assigned to your current patrol team?
7    A.   It's a complicated question.  Maybe more
8  complicated answer.  The teams work at this
9  6:00 o'clock schedule, 6:00 p.m. to 6:00 a.m. or 6:00
10  a.m. to 6:00 p.m.  And since I work 2:00 p.m. to
11  2:00 a.m., I straddle two teams and so I have four
12  different sergeants at this point.
13    Q.   Lucky you.  Can you tell me the name of all
14  four sergeants that you have to report to on your
15  particular patrol team, either at the end of your
16  shift or at the beginning?
17    A.   Sergeant Darr, D-A-R-R; Sergeant Herrig,
18  H-E-R-R-I-G; Sergeant Moody, M-O-O-D-Y; and Sergeant
19  Meeker, M-E-E-K-E-R.
20    Q.   Are you familiar with my client, Wylesha
21  Ayres?
22    A.   I am.
23    Q.   How so?
24    A.   Through this lawsuit.
25    Q.   Prior to May 8th have you had any

Page 67

1  encounters with Wylesha Ayres?
2    A.   Not that I'm aware of.
3    Q.   Since May 8th, 2019, have you had any
4  encounters with Wylesha Ayres?
5    A.   Not that I'm aware of.
6    Q.   Are you familiar with a Latika Graham?
7    A.   I am.
8    Q.   How so?
9    A.   Through this lawsuit.
10    Q.   Prior to May 8th, 2019, have you ever had
11  an encounter with Latika Graham?
12    A.   Not that I'm aware of.
13    Q.   Since May 8th, 2019, have you had an
14  encounter with Latika Graham?
15    A.   Not that I'm aware of.
16    Q.   I'll preface this question just by saying
17  that on May 8th, 2019, Wylesha Ayres was operating a
18  silver Jeep Patriot.  Do you have any -- have you had
19  any previous encounters with a silver Jeep Patriot
20  that Wylesha Ayres was operating on May 8th, 2019?
21    A.   Not that I'm aware of.
22    Q.   On May 8th, 2019, how did you become aware
23  that Deputy Christiansen had initiated a traffic
24  stop?
25    A.   I believe he announced his traffic stop

Page 68

1  over our radios, and I would have heard it.
2    Q.   Do you recall what he said?
3    A.   I do not recall.
4    Q.   When Deputy Christiansen went over the
5  radio to announce his traffic stop, do you recall
6  where you were geographically?
7    A.   I don't recall where I was, no.
8    Q.   That's fair.  Do you recall how far away
9  you were from Deputy Christiansen's location?
10    A.   I don't recall.
11    Q.   You don't know if you were more than five
12  minutes away?
13    A.   I don't recall.
14    Q.   When you heard Deputy Christiansen announce
15  that he had initiated a traffic stop on the radio,
16  did you do anything?
17    A.   I don't believe I did at that time.
18    Q.   What was the next thing that you heard from
19  Deputy Christiansen either over the radio or
20  elsewhere?
21    A.   From my memory, I believe he requested a
22  second unit to come to his traffic stop.
23    Q.   Do you recall if that request was made over
24  the radio?
25    A.   I believe it was.

Page 69

1    Q.   When Deputy Christiansen made a request for
2    a second unit over the radio, what did you do?
3    **A.   I responded that I would go to his traffic**
4    **stop.**
5    Q.   Why?
6    **A.   I don't recall what I was thinking at that**
7    **time.  Likely I would have been geographically close**
8    **to where he was.  How close, I'm not sure.**
9    Q.   So you were not assigned to assist -- to go
10   assist Deputy Christiansen at this traffic stop,
11   correct?
12   **A.   I don't believe so.**
13   Q.   You volunteered for the --
14   **A.   I believe that's how it went.**
15   Q.   -- assistance.  Now, on May 8, 2019, you
16   and Deputy Christiansen were working the same patrol
17   team, correct?
18   **A.   Correct.**
19   Q.   Do you recall the other members of your
20   patrol team that were working on May 8th, 2019?
21   **A.   I recall the other members of the team.  I**
22   **don't recall who specifically may have been working**
23   **that night.**
24   Q.   Okay.  Quickly, can you just tell me the
25   other members of the patrol team?  Whether or not

Page 70

1    they were working that night we'll deal with in a
2    moment.
3    **A.   Deputy Gabra.  Deputy Ping.  Strike that.**
4    **Deputy Ping was not on the team at that point.  I**
5    **believe Deputy Wakefield was.  Sergeant Bolt.**
6    Q.   Bolt, B-O-L-T?
7    **A.   Correct.  Sergeant Good.  Outside of that,**
8    **I can't recall.**
9    Q.   Were any members of your patrol team that
10   you and Deputy Christiansen were members of on May
11   8th, 2019, female?
12   **A.   Sergeant Bolt.**
13   Q.   Any others?
14   **A.   I don't believe so.**
15   Q.   Do you know if there's a female assigned to
16   every patrol team?
17   **A.   I don't believe there is.**
18   Q.   Do you recall if Sergeant Bolt was working
19   May 8th, 2019?
20   **A.   I don't recall.**
21   Q.   Now, you mentioned that you heard Deputy
22   Christiansen request the assistance of another deputy
23   over the radio, correct?
24   **A.   Correct.**
25   Q.   And you volunteered to respond, correct?

Page 71

1    **A.   Correct.**
2    Q.   Did you respond?
3    **A.   I did.**
4    Q.   Do you recall approximately how long it
5    took you to get from your current location to Deputy
6    Christiansen's?
7    **A.   I don't recall.**
8    Q.   When you did get to deputy -- first, do you
9    recall where Deputy Christiansen was?
10   **A.   I do.**
11   Q.   Can you tell us where?
12   **A.   I believe it was on Anthony Drive near the**
13   **intersection with Dobbins in Champaign, Illinois.**
14   **Champaign Township in Illinois.**
15   Q.   So this was unincorporated Champaign,
16   correct?
17   **A.   I believe so, yes.**
18   Q.   When you arrived at Deputy Christiansen's
19   location, what did you see?
20   **A.   I saw Deputy Christiansen's squad car and**
21   **the suspect vehicle that he had performed a traffic**
22   **stop on.**
23   Q.   When you arrived, what did you do?
24   **A.   I approached the passenger side of Deputy**
25   **Christiansen's squad car.**

Page 72

1    Q.   Where did you park?
2    **A.   Behind Deputy Christiansen.**
3    Q.   What kind of squad car does Deputy
4    Christiansen drive?  Sedan?  SUV?
5    **A.   It's an SUV.**
6    Q.   On May 8, 2019, what kind of squad car were
7    you driving?
8    **A.   An SUV.**
9    Q.   Does Champaign County only have SUV squad
10   cars?
11   **A.   I believe there's still some sedans in the**
12   **fleet, but I don't think they're actively used on a**
13   **daily basis.**
14   Q.   What was the next thing that you did after
15   arriving at the scene with Deputy Christiansen on May
16   8th, 2019?
17   **A.   I spoke with him about his traffic stop.**
18   Q.   What did you say?
19   **A.   I asked him -- strike that.  I don't recall**
20   **the exact words exchanged and how the conversation**
21   **was started, but we -- I believe we discussed the**
22   **nature of the traffic stop and his preliminary**
23   **findings.**
24   Q.   Let's start with the nature of the traffic
25   stop.  Do you recall the substance of what he relayed

Page 73

1 to you regarding the nature of the traffic stop, if
2 not the verbatim words?
3 **A. I don't recall exactly. I believe he told**
4 **me that the traffic stop was conducted for an expired**
5 **license plate.**
6 Q. Anything else that you recall that he
7 informed you about the nature of the traffic stop?
8 **A. He informed me that he could smell the odor**
9 **of cannabis coming from inside of the vehicle. He**
10 **also informed me of the driver's criminal history. I**
11 **don't recall exactly what he said. He informed me of**
12 **some kind of criminal history of the driver of the**
13 **vehicle.**
14 Q. Now, earlier you mentioned you did approach
15 the passenger side of the car. Would this
16 conversation with Deputy Christiansen have occurred
17 before you approached the passenger side of the
18 silver Jeep on May 8th?
19 **A. I never approached the silver Jeep.**
20 Q. Okay. I must have misheard you. My
21 apologies. When you arrived at the scene on May 8th,
22 2019, do you recall if you looked at the license
23 plate to determine if it was expired or not?
24 **A. I don't recall.**
25 Q. You said you never approached the car. Did

Page 74

1 you ever smell the odor of marijuana while you were
2 at the scene on May 8th, 2019?
3 **A. I don't recall if I did or not.**
4 Q. After Deputy Christiansen informed you the
5 nature of this traffic stop, did he inform you of
6 anything else?
7 **A. He apprised me of his plan on how he --**
8 **excuse me. He apprised me of how he planned to**
9 **conduct the rest of the traffic stop.**
10 Q. What was his plan for the rest of the
11 traffic stop?
12 **A. I believe he informed me that he wanted to**
13 **have the driver and passenger exit the vehicle, and I**
14 **believe he was going to conduct a search of the**
15 **vehicle and possibly the persons. I don't recall**
16 **exactly what he stated.**
17 Q. Did you say persons, plural?
18 **A. He may have. I don't recall.**
19 Q. Now, we mentioned the license plate. Don't
20 recall if you smelled the odor of marijuana one way
21 or the other. Do you recall if you observed anything
22 else that may have indicated to you that the driver
23 had committed any sort of traffic violation?
24 **A. I don't recall observing anything.**
25 Q. Sorry. I didn't mean to cut you off there.

Page 75

1 Do you recall if you observed anything to indicate
2 that the driver had committed any sort of criminal
3 offense?
4 **A. Not that I recall.**
5 Q. Do you recall observing anything to
6 indicate that the passenger had committed any sort of
7 criminal offense?
8 **A. Not that I recall.**
9 Q. After discussing both the nature of the
10 traffic stop and his plan going forward, did you and
11 Deputy Christiansen discuss anything else at that
12 particular point?
13 **A. If we did, I don't recall.**
14 Q. You mentioned that he informed you about
15 the driver's criminal history, but I just want to be
16 clear, you don't recall what he actually told you
17 about the driver's criminal history?
18 **A. I don't remember the specifics, no.**
19 Q. So just as far as you recall as you sit
20 here today, you just know that he informed you that
21 maybe she had a criminal history?
22 **A. From what I recall, he informed me of a**
23 **criminal history. I don't recall the specifics of**
24 **the criminal history.**
25 Q. Do you know where he got the information

Page 76

1 about her criminal history that he relayed to you,
2 Deputy Christiansen that is?
3 **A. I'm unaware of where he obtained this**
4 **information. You would have to ask him.**
5 Q. After this conversation, what did you do
6 next?
7 **A. I observed Deputy Christiansen approach the**
8 **driver's side of the vehicle, and I believe he asked**
9 **Ms. Ayres to exit the vehicle.**
10 Q. Did Ms. Ayres exit the vehicle?
11 **A. She did.**
12 Q. What happened next?
13 **A. They both relocated to the back of her**
14 **vehicle, in between her vehicle and Deputy**
15 **Christiansen's vehicle.**
16 Q. Do you recall how much distance was between
17 the rear of her vehicle and the front of Deputy
18 Christian's vehicle?
19 **A. I don't recall.**
20 Q. Do you recall what time of night this
21 traffic stop was?
22 **A. I don't recall the time. I believe it was**
23 **dark outside, though.**
24 Q. As Deputy Christiansen approached the
25 driver's side and asked Ms. Ayres out of the vehicle,

Page 77

1  what did you do?
2  **A.  I don't recall exactly, but I believe I**
3  **stayed back from the vehicle and observed the**
4  **vehicle.**
5  Q.  When you say stayed back from the vehicle,
6  are you referring to the silver Jeep?
7  **A.  Correct.  I stayed closer to Deputy**
8  **Christiansen's vehicle while maintaining a visual of**
9  **the silver Jeep.**
10  Q.  What side of the vehicle were you on?
11  **A.  I don't recall.**
12  Q.  Once Deputy Christiansen and Ms. Ayres
13  located to the back of the Jeep, what happened next?
14  **A.  Deputy Christiansen spoke with Ms. Ayres.**
15  **I don't recall exactly what he stated at the very**
16  **beginning of that conversation.  And then I recall**
17  **Deputy Christiansen asking Ms. Ayres for permission**
18  **to search her, and I observed Ms. Ayres turn around**
19  **and put her arms up at her side.**
20  Q.  Other than Deputy Christiansen asking for
21  permission to search, do you recall anything else
22  that he said?
23  **A.  I believe I recall him -- recall him**
24  **informing her of the odor of cannabis coming from**
25  **inside of the vehicle.**

Page 78

1  Q.  Did you hear if Ms. Ayres said anything in
2  response to Deputy Christiansen at that time?
3  **A.  I don't recall anything she may have said.**
4  Q.  Where were -- during this conversation
5  between Ms. Ayres and Deputy Christiansen, were you
6  still standing closer to Deputy Christiansen's
7  vehicle?
8  **A.  I believe so, yes.**
9  Q.  You just don't recall one side or the
10  other?
11  **A.  I don't recall exactly.  I believe I was**
12  **closer to the passenger side, but I don't recall**
13  **exactly.**
14  Q.  Would you have been in front of his car
15  or --
16  **A.  I believe so.**
17  Q.  -- off to the side?
18  **A.  Sorry.  I believe I would have been in**
19  **front of his car, likely towards the passenger side**
20  **of his vehicle.**
21  Q.  What happened next?
22  **A.  Deputy Christiansen performed a pat down**
23  **search of Ms. Ayres.**
24  Q.  Did you see the search?
25  **A.  I witnessed part of the search, yes.**

Page 79

1  Q.  You said part of the search.  Which part of
2  the search?
3  **A.  My attention was divided at that time.  Let**
4  **me backtrack.  From my angle I saw front and I**
5  **believe Ms. Ayres' right side.  And I was also**
6  **watching the passenger side of the vehicle, of the**
7  **silver Jeep.  Excuse me.**
8  Q.  So your attention was divided between Ms.
9  Ayres and Deputy Christiansen and the passenger side
10  of the Jeep; is that correct?
11  **A.  Correct.**
12  Q.  Now, you mentioned that Deputy
13  Christiansen's plan was to ask both the passenger and
14  the driver out of the car.  Did Deputy Christiansen
15  ever ask the passenger out of the car?
16  **A.  He did.**
17  Q.  Do you recall when?
18  **A.  I don't know what time it was, no.**
19  Q.  Do you recall, was it before or after
20  asking the driver out of the car?
21  **A.  I believe it was after he asked the driver**
22  **out of the vehicle.**
23  Q.  Was it before or after performing a search
24  on the driver?
25  **A.  I believe it would have been after.**

Page 80

1  Q.  Okay.  I want to get back to Deputy
2  Christiansen's search of Ms. Ayres.  Now, you
3  testified you could see the front right side of her;
4  is that correct?
5  **A.  Correct.**
6  Q.  Okay.  Do you recall what kind of clothes
7  Ms. Ayres was wearing that night?
8  **A.  I believe she had on a T-shirt with some**
9  **kind of design on the front.  I don't recall what it**
10  **was exactly.  She was wearing a ball cap and loose**
11  **fitting pants.**
12  Q.  Do you recall if they were jeans?
13  **A.  I don't recall the material.**
14  Q.  Do you recall the color?
15  **A.  Not exactly.  I believe they were dark in**
16  **color, though.**
17  Q.  What made you believe they were loose
18  fitting pants?
19  **A.  They appeared to be baggy and hanging.**
20  Q.  Now, you mentioned you saw part of Deputy
21  Christiansen's search.  What did you see Deputy
22  Christiansen's -- what part of -- strike that.  What
23  part of Ms. Ayres did you see Deputy Christiansen
24  search?
25  **A.  From what I recall, I saw him search her**

Page 81

1 waistline.
2   Q.  Is that it?
3   **A.  I believe so.**
4   Q.  When you say waistline, can you tell me
5 what you mean?
6   **A.  I believe the term is self-explanatory.**
7 **Her waistline.**
8   Q.  Did you see Deputy Christiansen search
9 below the waistband of Ms. Ayres' pants?
10   **A.  I didn't observe that, no.**
11   Q.  Do you recall what hand Deputy Christiansen
12 was searching with?
13   **A.  I don't recall.**
14   Q.  Do you recall if Deputy Christiansen was
15 using a bladed hand during his search?
16   **A.  I don't recall.**
17   Q.  Do you recall if Deputy Christiansen was
18 using the palm down technique with his palm against
19 the suspect during his search?
20   **A.  I don't recall.**
21   Q.  Do you recall if Deputy Christiansen was
22 using the palm out technique with his palm facing
23 out?
24   **A.  I don't recall.**
25   Q.  Did you see Deputy Christianson search

Page 82

1 anywhere other than Ms. Ayres' waistband?
2   **A.  I don't recall witnessing it.**
3   Q.  I want to get back to just -- I want to
4 make sure I understand you.  When you say waistband,
5 are you talking -- so below the rib cage, is that a
6 fair estimation of where the top of the waistband
7 might be?
8   **A.  It would be below the rib cage, yes.**
9   Q.  Okay.  And then if you can, can you
10 estimate for me where the bottom of what you believe
11 the waistband to be?
12   **A.  I believe it would be approximately around**
13 **the -- between the hips and hip flexors.**
14   Q.  Okay.  Do you recall how long Deputy -- you
15 observed Deputy Christiansen actually searching Ms.
16 Ayres?
17   **A.  I don't recall the time frame, no.**
18   Q.  Do you know if it was minutes?
19   **A.  I believe it was less.**
20   Q.  Less than five minutes?
21   **A.  Yes.**
22   Q.  Less than two minutes?
23   **A.  I'm sure it was less than one minute.**
24   Q.  During the search of Ms. Ayres by Deputy
25 Christiansen, did Deputy Christiansen say anything to

Page 83

1 Ms. Ayres?
2   **A.  I don't recall.**
3   Q.  Did he say anything to you?
4   **A.  I don't recall.**
5   Q.  Do you recall if you said anything to
6 Deputy Christiansen during the search of Ms. Ayres?
7   **A.  I don't believe I did.**
8   Q.  Do you recall if you said anything to Ms.
9 Ayres during the search?
10   **A.  I don't believe I did.**
11   Q.  Did Deputy Christiansen find any weapons on
12 Ms. Ayres as a result of the search?
13   **A.  He did not.**
14   Q.  Did he find any contraband?
15   **A.  I don't believe so.**
16   Q.  He didn't find any drugs or anything?
17   **A.  I do not believe so.**
18   Q.  No paraphernalia?
19   **A.  Not that I'm aware of.**
20   Q.  If he would have found weapons, drugs, or
21 other contraband on Ms. Ayres during this search, do
22 you believe he would have informed you?
23   **A.  I believe he would have.**
24   Q.  Why?
25   **A.  So I'm aware of the circumstances.**

Page 84

1   Q.  When Deputy Christiansen was searching Ms.
2 Ayres, did Ms. Ayres react?
3   **A.  I believe she did at one point, yes.**
4   Q.  How so?
5   **A.  She stated something to the effect -- of**
6 **course this is not a verbatim --**
7   Q.  Just what you remember.
8   **A.  -- recitation of what she said.  I believe**
9 **she said something to the effect of, whoa, don't**
10 **touch me there.**
11   Q.  Do you have any -- do you know where she
12 was referring to?
13   **A.  I believe later after the search was**
14 **completed, Ms. Ayres informed me that he touched her**
15 **buttocks.**
16   Q.  She told you that after the search was
17 completed?
18   **A.  Correct.**
19   Q.  Before that conversation between you and
20 Ms. Ayres and Deputy Christiansen is searching Ms.
21 Ayres and she says something to the effect of "whoa,"
22 do you recall what Deputy Christiansen did?
23   **A.  I don't recall him doing anything at that**
24 **point.  I believe the search was completed.**
25   Q.  Do you recall if he said anything?

Page 85

1  A.  If he did, I don't recall.
2  Q.  Do you recall if she did anything, Ms.
3  Ayres?
4  A.  If she did, I don't recall.
5  Q.  Other than just saying whoa -- strike that.
6  Did you ever see Deputy Christiansen search Ms.
7  Ayres' back side?
8  A.  I did not witness that.
9  Q.  By back side, I mean buttocks.  Did you
10  ever see Deputy Christiansen search Ms. Ayres'
11  buttocks?
12  A.  I did not witness that, no.
13  Q.  Did you ever see Deputy -- strike that.
14  Did you ever see Deputy Christiansen search Ms.
15  Ayres' crotch?
16  A.  I did not witness that.
17  Q.  Did you ever see Deputy Christiansen use
18  his fingers to search in between Ms. Ayres' legs?
19  A.  I did not witness that.
20  Q.  If you did, would you have said anything?
21  A.  If I witnessed inappropriate action, yes, I
22  would have intervened.
23  Q.  How so?
24  A.  I would have stopped the search if I
25  believed it to be inappropriate.

Page 86

1  Q.  When Deputy Christiansen finished searching
2  Ms. Ayres and she said "whoa," something to the
3  effect of don't search me there, if I understand your
4  testimony correct, what happened next?
5  A.  From what I recall, Deputy Christiansen
6  instructed Ms. Ayres to stand with me at the front of
7  his squad car, and I believe he approached the
8  passenger side of the silver Jeep to speak with the
9  passenger.
10  Q.  Is this the point that you were referring
11  to earlier where Ms. Ayres said something to you
12  about how Deputy Christiansen performed the search of
13  her person?
14  A.  Correct.
15  Q.  What did Ms. Ayres say?
16  A.  I believe she said something along the
17  lines of I don't want or I don't like people to touch
18  my butt.
19  Q.  Did she look upset?
20  A.  She seemed upset, yes.
21  Q.  At this point did you smell the odor of
22  marijuana?
23  A.  I don't recall.
24  Q.  Did you say anything to Ms. Ayres at this
25  point?

Page 87

1  A.  I believe I did, but I don't recall what I
2  said.
3  Q.  Ms. Ayres, she just came to stand by you,
4  you believe in the front of Deputy Christiansen's
5  squad car, right?
6  A.  Yes.  I believe we were both standing at
7  the front of Deputy Christiansen's squad car.
8  Q.  She didn't attempt to flee or anything?
9  A.  She did not.
10  Q.  She didn't attempt to run away?
11  A.  No.
12  Q.  Did any -- at any point during the entirety
13  of the traffic stop on May 8th, 2019, did Ms. Ayres
14  resist complying with Deputy Christiansen's orders?
15  A.  Not that I'm aware of.
16  Q.  Did she seem agitated at any point during
17  the traffic stop on May 8th?
18  A.  She did.
19  Q.  When?
20  A.  While Deputy Christiansen was searching the
21  vehicle.
22  Q.  Did she seem aggravated at all during the
23  search of her person by Deputy Christiansen?
24  A.  Not until she made the, quote, whoa
25  comment.

Page 88

1  Q.  Now, you and Ms. Ayres are standing towards
2  the front of the car, and I believe you said Deputy
3  Christiansen approaches the passenger side; is that
4  correct?
5  A.  I believe so.
6  Q.  What happens next when Deputy Christiansen
7  approaches the passenger side of the Jeep?
8  A.  I believe he instructed the passenger to
9  exit the vehicle.
10  Q.  Did she exit the vehicle?
11  A.  She did.
12  Q.  Was that the first time she had exited the
13  vehicle during that traffic stop?
14  A.  I believe so, yes.
15  Q.  Okay.  Were you able to hear anything that
16  Deputy Christiansen said to the passenger before she
17  exited the vehicle?
18  A.  Not that I recall.
19  Q.  Were you able to hear anything that Deputy
20  Christiansen said to the passenger after she exited
21  the vehicle?
22  A.  Not that I recall.
23  Q.  Were you able to hear anything that the
24  passenger said to Deputy Christiansen before she
25  exited the vehicle?

Page 89

1    A.  Not that I recall.
2    Q.  Were you able to hear anything that the
3  passenger said to Deputy Christiansen after she had
4  exited the vehicle?
5    A.  Not that I recall.
6    Q.  Did you ever come to learn who this
7  passenger was?
8    A.  I don't recall if I was provided her name,
9  no.
10   Q.  Okay.  After the passenger was asked to
11  exit the vehicle and she did, where did she go?
12   A.  She accompanied Ms. Ayres and myself at the
13  front of Deputy Christiansen's squad car.
14   Q.  At that point did you say anything to the
15  passenger?
16   A.  I don't believe I initiated a conversation,
17  no.
18   Q.  Do you recall if she said anything to you?
19   A.  She did.
20   Q.  Do you recall what?
21   A.  Her concern was being late for work, I
22  believe, and didn't want this search to take very
23  long.
24   Q.  Anything else?
25   A.  I believe she and the passenger and Ms.

Page 90

1  Ayres had a conversation about Deputy Christiansen's
2  search of Ms. Ayres.
3    Q.  Do you recall what the passenger said to
4  Ms. Ayres regarding that conversation?
5    A.  I believe it was something to the effect of
6  that's not right and a male shouldn't search a
7  female.
8    Q.  Do you recall what Ms. Ayres said to the
9  passenger regarding Deputy Christiansen's search?
10   A.  I don't recall.
11   Q.  Can you approximate for me how far away you
12  would have been standing from both the passenger and
13  Ms. Ayres during this conversation?
14   A.  Approximately ten feet or so.
15   Q.  Ten feet or so.  While the passenger was
16  with you and Ms. Ayres towards the front, the back of
17  the Jeep, the front of Deputy Christian's car, where
18  was Deputy Christiansen?
19   A.  I'm sorry.  To clarify, you're asking when
20  I was standing with the passenger and the driver of
21  the vehicle at the front of Deputy Christiansen's car
22  where Deputy Christiansen was?
23   Q.  Yeah.  So at this point the passenger has
24  been asked out of the car and has come back towards
25  the front of Christiansen's car which is behind the

Page 91

1  Jeep, correct?
2    A.  Correct.
3    Q.  And so now there's three of you, Ms. Ayres,
4  the passenger, and yourself, correct?
5    A.  Correct.
6    Q.  Where is Deputy Christiansen?
7    A.  He was searching the silver Jeep.
8    Q.  Do you recall where in the silver Jeep he
9  is searching?
10   A.  I believe he searched the main cabin of the
11  Jeep, and I believe he also searched the trunk space
12  of the Jeep.  Or the back hatch of the Jeep, not
13  trunk.  Excuse me.
14   Q.  Do you recall if Deputy Christiansen
15  searched the front passenger side of the Jeep?
16   A.  I believe he did.
17   Q.  Do you recall if Deputy Christiansen
18  searched the front driver's side of the Jeep?
19   A.  I believe he did.
20   Q.  Do you recall if Deputy Christiansen ever
21  searched the back seat?
22   A.  I believe he did.
23   Q.  Are you aware of whether or not there were
24  other passengers in the silver Jeep on May 8th, 2019?
25   A.  I am aware.

Page 92

1    Q.  Were there other passengers?
2    A.  I believe there was one or maybe two
3  children in the back seat.
4    Q.  Did you ever have an interaction with those
5  children on May 8th?
6    A.  No.  I did not see them.
7    Q.  Do you recall approximately how old those
8  two children were?
9    A.  I'm unaware.
10   Q.  Were those two children ever asked to exit
11  the silver Jeep?
12   A.  They were not.
13   Q.  Do you know why not?
14   A.  I believe the passenger requested that the
15  children stay inside the vehicle.
16   Q.  Did the passenger make that request of you
17  or Deputy Christiansen?
18   A.  I believe it was of Deputy Christiansen.
19   Q.  Do you know when she made that request?
20   A.  I believe he gave her the option when he
21  asked her to step out of the vehicle.  The option was
22  to either have the children step out of the vehicle
23  as well or to have them remain in the vehicle.  I
24  believe he gave her the option, and she requested for
25  them to stay inside the vehicle.

Page 93

1    Q.  But Deputy Christiansen was still able to
2  search the back seat, is that what I understand you
3  to say?
4    A.  I believe he did, yes.
5    Q.  Okay.  Do you know how he was able to
6  search the back seat of the Jeep with the two
7  passengers still inside?
8    A.  I believe he searched around them.
9    Q.  Okay.  And then you also mentioned the back
10  hatch, correct?
11    A.  I believe he did, yes.
12    Q.  Other than the back hatch and the passenger
13  compartment, did Deputy Christiansen search anywhere
14  else in the car?
15    A.  Not that I'm aware of.
16    Q.  Do you know if Deputy Christiansen
17  recovered any weapons in the car?
18    A.  I don't believe he did.
19    Q.  Did he recover any drugs?
20    A.  I don't believe he did.
21    Q.  No paraphernalia?
22    A.  Not that I'm aware of.
23    Q.  Any contraband at all?
24    A.  Not that I'm aware of.
25    Q.  Was the passenger ever searched by --

Page 94

1  strike that.  Was the passenger's person ever
2  searched on May 8th, 2019?
3    A.  I don't recall.
4    Q.  If the passenger wasn't searched on May
5  8th, 2019, do you know why that may have been?
6    A.  I did not conduct the search.  I can't
7  speculate as to why or why not searches were
8  conducted.
9    Q.  But you did discuss Deputy Christiansen's
10  plan with him, correct?
11    A.  Briefly, yes.
12    Q.  Do you know whether or not when discussing
13  Deputy Christiansen's plan he indicated if he was
14  planning on searching the passenger?
15    A.  I don't recall if he stated that or not.
16    Q.  Prior to the search of Ms. Ayres, did
17  Deputy Christiansen, as far as you know, ever request
18  the presence of a female officer?
19    A.  I'm unaware if he did.
20    Q.  Did Deputy Christiansen ever use his radio
21  to request the presence of Sergeant Bolt?
22    A.  I'm unaware if he did.
23    Q.  Did you ever request the presence of a
24  female officer?
25    A.  I did not.

Page 95

1    Q.  Did you request the presence of Sergeant
2  Bolt?
3    A.  I did not.
4    Q.  Why not?
5    A.  I don't recall my reasoning for not
6  requesting.
7    Q.  Do you know if you -- do you recall ever
8  mentioning to Detective Christiansen -- strike that.
9  Do you recall ever discussing with Detective --
10  Deputy Christiansen, excuse me, whether or not the
11  two of you should request the presence of a female
12  officer?
13    A.  I don't recall a conversation of that
14  nature.
15    Q.  Children being present in the car that's
16  the subject of a traffic stop, does that change how
17  you determine whether or not that traffic stop may
18  become dangerous?
19    A.  I believe the presence of children could
20  increase risk, yes.
21    Q.  You believe it could increase risk of
22  danger?
23    A.  It could.
24    Q.  How so?
25    A.  With children, I believe we should look out

Page 96

1  for their wellbeing, especially smaller children.  So
2  it's just -- I guess on a traffic stop, we'd be
3  responsible for their welfare as well.
4    Q.  Does the presence of children indicate to
5  you that the driver or other passengers in the car
6  may or may not be more inclined to violence?
7    A.  I don't believe the presence of children
8  would change that.
9    Q.  When Ms. Ayres stepped out of the car -- I
10  know we're backtracking a bit here.  Deputy
11  Christiansen asked Ms. Ayres to step out of the car
12  and they relocated to behind the Jeep in front of
13  Deputy Christiansen's SUV.  Did you have an
14  opportunity to observe Ms. Ayres at that point?
15    A.  I did.
16    Q.  Now, I know we talked about her clothes,
17  but did you see anything that might indicate to you
18  that she had a weapon on her?
19    A.  In my brief observation of her walking from
20  the driver's side of the vehicle to the back of the
21  vehicle, I did not observe anything of that nature,
22  no.
23    Q.  You didn't see any bulge in her clothes
24  that might indicate a weapon?
25    A.  Not that I'm aware of.

Page 97

1  Q. You didn't see the handle of a gun sticking
2  out or anything?
3  **A. No.**
4  Q. No blade of a knife or anything?
5  **A. No.**
6  Q. She didn't have a holster on of any kind?
7  **A. Not that I saw.**
8  Q. After Deputy Christiansen performed his
9  search of the vehicle, what happened next?
10  **A. He returned to the space where the three of**
11  **us were in between the vehicles, and I believe he**
12  **instructed the driver and passenger that they could**
13  **return to the vehicle.**
14  Q. Did you and Deputy Christiansen have a
15  conversation after Ms. -- strike that. First, did
16  Ms. Ayres and the passenger return to their vehicle?
17  **A. I believe so.**
18  Q. Okay. Did you and Deputy Christiansen have
19  a conversation at that point?
20  **A. I don't recall specifically, but I believe**
21  **we would have.**
22  Q. Do you recall the subject of that
23  conversation?
24  **A. I don't.**
25  Q. Okay. You don't recall what you said to

Page 98

1  him?
2  **A. I don't.**
3  Q. Don't recall what he said to you?
4  **A. I don't.**
5  Q. After Ms. Ayres and the passenger returned
6  to their car, what happened next?
7  **A. I don't recall exactly. I believe Deputy**
8  **Christiansen returned to his squad car and I returned**
9  **to mine, and I believe I would have left the scene at**
10  **that point.**
11  Q. Do you know why you would have left the
12  scene at that point?
13  **A. The only reason I would have left is if**
14  **Deputy Christiansen told me that he was okay with me**
15  **leaving at that point.**
16  Q. So he might have told you it's okay, you
17  can go, but you just don't remember the specifics of
18  that conversation; is that fair?
19  **A. Correct.**
20  Q. Was the silver Jeep still at the scene --
21  **A. It was.**
22  Q. -- when you left?
23  **A. It was.**
24  Q. Was Deputy Christiansen still at the scene
25  when you left?

Page 99

1  **A. He was.**
2  Q. When you left the scene, where'd you go?
3  **A. I don't recall.**
4  Q. Would you have returned to your beat to
5  resume your patrol duties?
6  **A. If I was not within my beat at that point,**
7  **I would have returned to it, yes.**
8  Q. Brief diversion. If I asked you, could you
9  tell us how the beats are broken up within Champaign
10  County?
11  **A. The north beat is everything north of**
12  **County Road 2400 North, I believe. So 2400 north is**
13  **a road that travels east and west, and everything**
14  **north of that would be the north beat. The south**
15  **beat would be everything south of -- in Savoy it's**
16  **called Old Church, but that is County Road 1200 North**
17  **which travels east and west. Everything south of**
18  **that would be the south beat.**
19  **The east and west beats are in between the north**
20  **and south beats, and the dividing line of those would**
21  **be -- I think in Champaign it's Market Street.**
22  Q. Since your time as a deputy with the
23  Champaign County Sheriff's Office, has that
24  reorganization changed at all?
25  **A. I don't believe so.**

Page 100

1  Q. After you left the traffic stop on May 8,
2  2019, where Deputy Christiansen and the silver Jeep
3  are still there, do you recall another encounter with
4  the silver Jeep that night?
5  **A. I do.**
6  Q. Can you tell me about it? Strike that.
7  First, when did you encounter the silver Jeep again?
8  **A. I don't recall the time. It would have**
9  **been after this traffic stop.**
10  Q. Can you tell me if it was less than an hour
11  after this traffic stop?
12  **A. I don't recall.**
13  Q. Can you tell me if it was less than a half
14  hour after this traffic stop?
15  **A. I don't recall.**
16  Q. Can you tell me where you encountered the
17  silver Jeep for the second time on May 8th?
18  **A. I believe it was the intersection of Mattis**
19  **and Bloomington roads in Champaign.**
20  Q. Mattis and Bloomington you said?
21  **A. Correct.**
22  Q. What first drew your attention to the
23  silver Jeep before this second stop on May 8th?
24  **A. I believe it was the expired registration.**
25  Q. That would be a sticker on the license

Page 101

1  plate, correct?
2  **A. Correct.**
3  Q. The rear license plate, right?
4  **A. Correct.**
5  Q. When you spotted the expired registration
6  on the silver Jeep, what'd you do?
7  **A. I radioed in to our dispatch that I was**
8  **conducting a traffic stop and provided the vehicle's**
9  **information to our dispatch.**
10  Q. Do you recall what information you provided
11  to dispatch?
12  **A. I would have relayed to them the license**
13  **plate number and a color and make and body type of**
14  **vehicle.**
15  Q. Did dispatch relay any information back to
16  you?
17  **A. If they did, I don't recall.**
18  Q. After this conversation with dispatch
19  regarding the silver Jeep, what happened next?
20  **A. I activated my overhead emergency lights**
21  **and conducted a traffic stop.**
22  Q. Did the silver Jeep stop?
23  **A. It did.**
24  Q. What happened next?
25  **A. At this time I realized who the driver of**

Page 102

1  **the silver Jeep was and realized that this was the**
2  **silver Jeep that was previously stopped by Deputy**
3  **Christiansen and so I did not exit my vehicle. I**
4  **pulled up alongside the silver Jeep and said**
5  **something along the lines of, I apologize. I didn't**
6  **realize this was the same vehicle that was recently**
7  **stopped. You're free to go.**
8  Q. Does -- if you remember, the back of the
9  silver Jeep, other than the license plate, does it
10  have any unique identifying marks?
11  **A. If it does, I don't recall.**
12  Q. You don't recall any bumper stickers?
13  **A. I don't recall.**
14  Q. No stickers in the window or anything?
15  **A. If it did, I don't recall.**
16  Q. None of the baby on board stickers or
17  anything like that?
18  **A. I don't recall.**
19  Q. Okay. So you didn't recognize the silver
20  Jeep Patriot prior to initiating the second traffic
21  stop?
22  **A. Not at first, no.**
23  Q. Okay. Didn't recognize the license plate?
24  **A. No.**
25  Q. Did you see any of the same passengers in

Page 103

1  that silver Jeep that you had initially saw back at
2  the first traffic stop on May 8th with Deputy
3  Christiansen?
4  **A. From what I recall, from when I pulled up**
5  **to the side of the silver Jeep, I only observed Ms.**
6  **Ayres in the driver's seat.**
7  Q. What triggered your recollection that this
8  is actually the silver Jeep from just, you know, a
9  few moments ago or about an hour ago?
10  **A. I don't recall the exact trigger.**
11  Q. Okay. But once you figured out that this
12  was the same car, you mentioned that you pulled to
13  the side of it, correct?
14  **A. Correct.**
15  Q. And you said something to the driver?
16  **A. I did.**
17  Q. Do you recall if the driver said anything
18  back to you?
19  **A. If she did, I don't recall.**
20  Q. What happened after that?
21  **A. I drove away.**
22  Q. Where'd you go?
23  **A. I don't recall.**
24  Q. Would you have returned to your -- resumed
25  your patrol duties?

Page 104

1  **A. Yes.**
2  Q. As a result of that first traffic stop with
3  Ms. Ayres, the passenger, the silver Jeep on May 8th,
4  did you complete any reports?
5  **A. I did not.**
6  Q. Why not?
7  **A. According to my training and experience, I**
8  **didn't believe it was necessary to generate a report.**
9  Q. As a result of the second stop with the
10  silver Jeep, did you generate any reports?
11  **A. I did not.**
12  Q. Why not?
13  **A. I did not believe it was necessary to**
14  **generate a report.**
15  Q. You're doing good so far, Deputy Floyd, but
16  if you could just keep your voice up a little bit to
17  make sure our court reporter --
18  **A. I apologize.**
19  Q. No, you're doing great. After the two
20  stops on May 8th, did you ever discuss these two
21  stops with any other officers within the Champaign
22  County sheriff's department?
23  **A. Not that I recall.**
24  Q. Did you discuss them with Deputy
25  Christiansen?

Page 105

1    A. Not that I recall.
2    Q. Discuss with your supervisors?
3    A. Not that I recall.
4    Q. Do you know if Deputy Christiansen received
5  any disciplinary action as a result of the traffic
6  stop with Ms. Ayres on May 8th, 2019?
7    A. I'm not aware of any.
8    Q. Did you receive any disciplinary action as
9  a result of the traffic stop on May 8, 2019?
10    A. I did not.
11    Q. I know given recent events that this number
12 is going to be slightly askew, but in the past
13 twenty-four hours can you tell me how many times
14 you've stopped a suspect for suspicion of possession
15 of marijuana?
16    A. Are we talking about vehicle stops, traffic
17 stops?
18    Q. First, have you stopped an individual just
19 by themselves without being in a vehicle for
20 suspicion of possession with marijuana?
21    A. I have.
22    Q. And have you stopped vehicles for the
23 suspected possession of marijuana?
24    A. No.
25    Q. Okay. How many times in the past

Page 106

1  twenty-four months have you stopped individuals for
2  the suspected possession of marijuana?
3    A. From what I recall, one time.
4    Q. Do you recall when that one time would have
5  been?
6    A. I don't recall the date, and I don't recall
7  a rough time frame.
8    Q. Do you recall where that stop would have
9  taken place?
10    A. I don't recall which street we were on, but
11 it was in Urbana. In the vicinity of Washington and
12 Lierman streets in Urbana. Within five blocks.
13    Q. That general area, though?
14    A. Correct.
15    Q. Okay. What was your articulable suspicion
16 that this individual had marijuana in their
17 possession?
18    A. Myself and another deputy, I don't recall
19 who it was at this time, were on foot patrol in that
20 area for a different matter separate from this stop.
21 There was nobody else walking or out of their
22 residences on the street, sidewalks, at this time of
23 night except for one couple. And as they walked by I
24 could smell the odor of cannabis, and the odor of
25 cannabis dissipated as they passed.

Page 107

1    Q. I take it this took place before
2  January 1st of 2020, correct?
3    A. Of course, yes.
4    Q. And that was when marijuana was legalized
5  to a certain extent within the state of Illinois,
6  correct?
7    A. Correct.
8    Q. You mentioned this was late at night and
9  that was one of the bases for your suspicion. So
10 would this have been after 10:00 p.m. at night?
11    A. I don't recall the time, but based off of
12 the very limited movement in a well-established
13 neighborhood, I would say it was late night or early
14 morning hours.
15    Q. You mentioned that this was a couple. Was
16 it a man and a woman?
17    A. It was.
18    Q. Do you recall how old they were?
19    A. I don't recall exact age.
20    Q. You were working with a partner. Did I
21 understand that correct?
22    A. It wasn't necessarily a partner. We were
23 just on the same call.
24    Q. Okay. Did you and this other officer stop
25 this couple?

Page 108

1    A. We did.
2    Q. Did you search the couple?
3    A. We did.
4    Q. Do you recall if the female was searched?
5    A. She was.
6    Q. Do you recall if -- strike that. First,
7  the other officer that you were on this call with,
8  was that a female officer or a male officer?
9    A. I don't recall who it was, but I believe it
10 was a male.
11    Q. Who searched the female during this stop
12 for suspected possession of marijuana?
13    A. I did.
14    Q. How did you search her?
15    A. Can you be more specific?
16    Q. We talked about four types of search
17 earlier. Can you tell me which type of search you
18 performed on the female during this stop of suspected
19 possession of marijuana?
20    A. Sure. It was a consent search of one's
21 person.
22    Q. Consent search meaning you asked permission
23 and she granted permission prior to?
24    A. Correct. Both parties granted permission
25 to search.

Page 109

1    Q.  Did you search both parties?
2    **A.  I did.**
3    Q.  Did you search the back side of the female
4    suspect?
5    **A.  Can you be more specific as to what you**
6    **mean by back side?**
7    Q.  Did you search the butt of the female
8    suspect?
9    **A.  I did not.**
10   Q.  Did you search the crotch of the female
11   suspect?
12   **A.  I did not.**
13   Q.  Why not?
14   **A.  From what I recall, she was wearing tight**
15   **pants.**
16   Q.  Do you recall the time of -- the season
17   that this was?
18   **A.  To the best of my knowledge and**
19   **recollection, I believe it was late summer, early**
20   **fall.  Somewhere around there.**
21   Q.  As a result of this search, did you recover
22   any weapons?
23   **A.  No.**
24   Q.  Any drugs?
25   **A.  Yes.**

Page 110

1    Q.  What kind of drugs?
2    **A.  Cannabis.**
3    Q.  Do you remember the quantity of cannabis
4    you recovered?
5    **A.  It was not weighed.  It was such a small**
6    **amount that it was destroyed on scene in front of the**
7    **suspects.**
8    Q.  Did you issue any citations?
9    **A.  I did not.**
10   Q.  Issue any tickets?
11   **A.  No tickets.**
12   Q.  Was anyone arrested?
13   **A.  No.**
14   Q.  Did your fellow officer at the scene issue
15   any citations or tickets?
16   **A.  No.**
17   Q.  Did they arrest anyone?
18   **A.  No.**
19   Q.  I want to get back to Ms. Ayres' search
20   during the first stop on May 8th, 2019.  You
21   mentioned that she said something to the effect of,
22   whoa, don't search me there.  Did Ms. Ayres seem
23   upset by the search performed by Deputy Christiansen?
24   **A.  After the search was completed, she**
25   **appeared upset, yes.**

Page 111

1    Q.  How did she appear?
2    **A.  Can you be more specific?**
3    Q.  Can you tell me how she appeared to you
4    after the search of Deputy Christiansen, Ms. Ayres?
5    **A.  Her tone changed into a more upset tone,**
6    **that she was displeased with how the search was**
7    **conducted.**
8    Q.  What do you mean by more upset tone?
9    **A.  I'm afraid that's hard to explain.  She**
10   **appeared agitated.**
11   Q.  A clear difference than her conduct prior
12   to the search; is that fair?
13   **A.  Her agitation was elevated at this point,**
14   **yes.**
15   Q.  Okay.  Different than prior to the search?
16   **A.  Correct.**
17   Q.  As far as you know, was Ms. Ayres arrested
18   on May 8th, 2019?
19   **A.  She was arrested by citation, I believe.**
20   Q.  She was issued a citation for the expired
21   sticker on the license plate, correct?
22   **A.  Incorrect.  She was -- I believe that was**
23   **the basis for the traffic stop, but I believe she was**
24   **issued a citation for an expired driver's license.**
25   Q.  She was not taken into custody, though,

Page 112

1    correct?
2    **A.  Correct.**
3    Q.  Do you know if the passenger ever received
4    any citations?
5    **A.  I don't believe she did.**
6    Q.  Do you know if the passenger was ever taken
7    into custody?
8    **A.  Not that I'm aware of.**
9    Q.  As far as you know, was any evidence ever
10   seized during that first traffic stop?
11   **A.  Not that I'm aware of.**
12   Q.  If something was seized, would you have
13   been aware of it?
14   **A.  Likely, yes.**
15   Q.  If you'll give me just a moment, I'm going
16   to look over my notes here.  You mentioned that when
17   you first arrived at the first traffic stop on May
18   8th that Deputy Christiansen informed you of a
19   criminal history of Ms. Ayres, correct?
20   **A.  Correct.**
21   Q.  Did you ever conduct any sort of
22   investigation or request for information maybe over
23   the radio into the criminal history of Ms. Ayres?
24   **A.  I don't believe I did.**
25   Q.  So you never used your ARMS system in your

Page 113

1  squad car to look up her criminal history; is that
2  correct?
3  **A.  I don't believe I did.**
4  Q.  Okay.  Did you ever become aware of any of
5  Ms. Ayres' criminal history other than what Deputy
6  Christiansen may or may not have told you?
7  **A.  Not that I recall.**
8  **MR. Mc CARTER:** At this point, I think
9  that's all I have subject to any redirect after
10  Mr. Vayr.  Bryan, before we get started, Deputy,
11  we're going to transition a little bit now.  Your
12  counsel is going to have an opportunity to ask
13  questions.  Before we get into that, would you like
14  to take another break?
15  **THE WITNESS:** I'm okay.  Thank you.
16  **EXAMINATION**
17  **BY MR. VAYR:**
18  Q.  I'll probably be jumping around a lot as I
19  just work through my notes.  So you mentioned four
20  types of searches, pat downs, searches of a person,
21  strip searches, and body cavity searches.  Those are
22  the four you identified, correct?
23  **A.  Correct.**
24  Q.  Now, is it fair to say that as I listed
25  those, that's kind of in order of least intrusive to

Page 114

1  most intrusive?
2  **A.  I would agree.**
3  Q.  Okay.  So a pat down search, then, in your
4  understanding is the least intrusive search that an
5  officer can do that at least involves physical
6  touching of a person?
7  **A.  I believe so, yes.**
8  Q.  Okay.  Very good.  And are pat down
9  searches normally long, lengthy endeavors?
10  **A.  No, they're not.**
11  Q.  Okay.  How long would you say an average --
12  let me rephrase this.  How long would you say your
13  average pat down search is when you do one
14  personally?
15  **A.  Less than thirty seconds.**
16  Q.  Less than thirty seconds.  Okay.  Are they
17  sometimes even shorter than, let's say, fifteen
18  seconds or ten seconds?
19  **A.  They can be.**
20  Q.  Okay.
21  **A.  Depending on the circumstances.**
22  Q.  Sure.  So, for example, if you're doing a
23  pat down search of someone's shoulders, armpits,
24  chest, waist, knees, down to their shoes, that would
25  take longer than just searching someone's waistband,

Page 115

1  correct?
2  **A.  Correct.**
3  Q.  So if it was just a search of someone's
4  waistband, it could take a handful of seconds, that's
5  conceivable in your experience?
6  **A.  Correct.**
7  Q.  Okay.  Now, you were also asked about the
8  context in which you would do a pat down search and
9  one of them you mentioned was -- well, I'll call it a
10  Terry stop, reasonable suspicion for a weapon.  Do
11  you know what I mean when I use that term?
12  **A.  Correct.**
13  Q.  And you also said if a situation dictates
14  so.  So is it possible that a pat down might, the
15  type of search, a pat down would be performed absent
16  the Terry stop legal justification in your mind?  I
17  can rephrase.
18  Is it possible that you would perform a pat down
19  search but not search for weapons?  I'm sorry.  I'm
20  seeing a deer in the headlights look.  Let me try to
21  rephrase the question.
22  Is it possible that, let's say, if you wanted to
23  check to see if someone had contraband on them but
24  you wanted to do it in a minimally invasive way, you
25  would maybe do a pat down search as compared to a

Page 116

1  search of a person?
2  **A.  I could elect to do a pat down search**
3  **instead, yes.**
4  Q.  So if you have -- if you believe, for
5  example, you are justified in doing a search of
6  someone's person, you could walk that back and carry
7  out the less intrusive pat down search if you believe
8  that will accomplish the purpose of the search?
9  **A.  I could do that, yes.**
10  **MR. Mc CARTER:** Object to the form,
11  but you can still answer.
12  Q.  (by Mr. Vayr) And it's fair to say that
13  Ms. Ayres was not strip searched or body cavity
14  searched, correct?
15  **A.  She was not.**
16  Q.  So you were asked questions about -- you
17  were asked questions about when a, quote unquote,
18  search generally speaking was required to be done by
19  an officer of the same sex.  Do you recall those
20  questions or at least that line of questioning?
21  **A.  I do.**
22  Q.  Okay.  Now, is it your understanding, I
23  believe you testified -- strike that.  Forgive me.
24  Is it your understanding that the level of
25  intrusiveness of a search can play into whether a

Page 117

1  same sex officer is warranted to perform that search?
2  **A. Absolutely.**
3  Q. So, for example, if a female is going to
4  have a body cavity search done, that would not be
5  done by a male officer, correct?
6  **A. Correct.**
7  Q. And if a pat down search, the least
8  intrusive type of search, is being done, that can be
9  done by a male officer if consistent to the policy
10  you described before; is that fair?
11  **A. Correct.**
12  Q. You were asked about a documentation
13  policy. So obviously I'm not going to ask you to
14  quote chapter and verse, but just in your experience
15  at the sheriff's office, is it possible that there
16  are other modes of documentation besides preparing a
17  written report?
18  **A. Correct, there are other forms of**
19  **documentation other than a field report.**
20  Q. Right. And so beyond a field report, you
21  could document something with your body cam footage,
22  correct?
23  **A. Correct.**
24  Q. You could also document something where if
25  a ticket or citation is issued, information is filled

Page 118

1  out on the back, correct?
2  **A. Correct.**
3  Q. All right. So those would be forms of
4  documentation --
5  **A. Correct.**
6  Q. -- for a particular law enforcement
7  interaction?
8  **A. Correct.**
9  Q. All right. You mentioned that -- you
10  mentioned that there was -- you don't recall whether
11  or not she was specifically working, but on your team
12  that you were on during the subject incident there
13  was one female sergeant named Bolt who would have
14  been on your team, correct?
15  **A. Correct.**
16  Q. And you just don't recall whether or not
17  she was on shift?
18  **A. I don't recall.**
19  Q. All right. Now, if you can't answer that
20  that's fine. I'm just curious. How -- taking all of
21  the beats that you described and putting them
22  together, how big of a geographic range is that? Is
23  that the entire Champaign County?
24  **A. Correct, the entirety of Champaign County.**
25  Q. How many square miles is that roughly?

Page 119

1  **A. Can I use a calculator?**
2  Q. If you had to guess. And if you don't
3  know, that's okay.
4  **A. I believe north to south we're at**
5  **thirty-six miles, and east to west we're**
6  **approximately twenty-eight miles.**
7  Q. So if you had to go from, for example, one
8  side of the county to the other side, north to south,
9  how long of a car ride would that be?
10  **A. If you were on the county lines, it would**
11  **be approximately thirty-six miles.**
12  Q. Minutes. I apologize if I wasn't clear.
13  How many minutes would that be, would that trip take?
14  **A. Of course route depending, it could take**
15  **forty-five minutes, maybe, north to south.**
16  Q. Got it. And then east and west, if you're
17  going from one side of the county to the other,
18  conceivably it would be about that much of a drive in
19  minutes?
20  **A. Thirty to forty-five minutes.**
21  Q. Okay. Got it. Now, presumably when backup
22  is being requested, if someone is, you know, a thirty
23  plus minute drive away, that person probably would be
24  considered to be unreasonably proximate to the
25  incident to respond; is that fair?

Page 120

1  **A. Correct.**
2  Q. Absent some other officer that is not
3  closer -- strike that. I think I made my point
4  there. This probably came out in the record and it's
5  a really minor thing, but you were asked why you
6  responded to Christiansen's call for service. Is it
7  just common that when an officer responds and you're
8  able to respond that you simply respond --
9  **A. Correct.**
10  Q. -- as a matter of course? That's pretty
11  unremarkable?
12  **A. Correct.**
13  Q. When you -- so now focusing on the subject
14  incident, again when I say subject incident you
15  realize I'm talking about the first traffic stop May
16  8th, 2019, involving Ms. Ayres, correct?
17  **A. I understand.**
18  Q. All right. So from the subject incident,
19  when you arrived would you say that things were at a
20  state of rest?
21  **A. Yes.**
22  Q. So, you know, people were in their
23  respective cars and you just walked up to
24  Christiansen and it was a relatively -- it was a calm
25  scene all things considered?

Page 121

1  **A.  Correct.**
2  Q.  Okay.  And where I'm going with that, like
3  why I ask that question is because it sounds like
4  when you spoke with Christiansen the investigation
5  was basically done at that point in time, like he
6  just told you his findings; is that fair?
7  **A.  Correct.**
8  MR. Mc CARTER: Object to
9  mischaracterization of testimony, but you can answer
10  if you haven't already.
11  THE WITNESS: I believe his
12  investigation was completed at that point.
13  Q.  (by Mr. Vayr)  Sure.  So he didn't tell
14  you, hey, Deputy Floyd, can you please look into X,
15  Y, and Z or something for me?
16  **A.  He did not make any such request of me.**
17  Q.  Okay.  And you didn't have any impression
18  from your conversation with him that additional
19  investigation steps needed to be completed?
20  **A.  I did not.**
21  Q.  Okay.  So when you arrived, then, you were
22  essentially relying on the information that
23  Christiansen had reported from his own investigation?
24  **A.  Correct.**
25  Q.  Okay.  Now, let's talk about the

Page 122

1  circumstances, kind of the surrounding context and
2  geography of the traffic stop.  I believe you
3  mentioned where it was.  Please forgive me.  Do you
4  recall what intersection it was?
5  **A.  I believe it was Anthony and Dobbins in**
6  **Champaign Township.**
7  Q.  Okay.  And in your experience, to the
8  extent you can answer this question, I might be
9  phrasing this poorly, but in your experience, is that
10  location, is that in an area where it is known for
11  having criminal activity?
12  MR. Mc CARTER: Objection.  Form,
13  speculation.
14  THE WITNESS: Yes, I believe that's in
15  a higher crime area.
16  Q.  (by Mr. Vayr)  Okay.  Now, when you say --
17  MR. Mc CARTER: Objection.  I'm sorry.
18  Go ahead.
19  MR. VAYR: No, did you make
20  your objection?
21  MR. Mc CARTER: Yeah, we're square.
22  Q.  (by Mr. Vayr)  Okay.  So when you say
23  higher crime area and you say yes it was in a higher
24  crime area, have you personally responded beyond the
25  subject incident to calls in that area?

Page 123

1  **A.  Yes.**
2  Q.  Have any of those responses been for crimes
3  of violence or felonies?
4  **A.  Yes.**
5  Q.  And then are you also aware -- have you
6  also heard over the radio, for example, when you're
7  on duty have you personally heard people requesting
8  service to that area for crimes of violence or
9  felonies?
10  **A.  Correct.**
11  Q.  Okay.  And would you say -- I won't ask you
12  how often necessarily, but in relation to other parts
13  that you have personal experience responding to or
14  hearing calls of service for, it sounds like the area
15  where the subject incident was would have more
16  requests and more criminal activity than others in
17  town; is that fair?
18  MR. Mc CARTER: Objection.  Lack of
19  foundation.  You can go ahead.
20  THE WITNESS: It's an area where there
21  are typically more calls for service.
22  Q.  (by Mr. Vayr)  Okay.  And again in your
23  capacity as a sheriff's deputy who has been on
24  patrol, do you have -- so obviously the sources of
25  calls that you would know would be the ones that you

Page 124

1  personally responded to, correct?
2  **A.  Correct.**
3  Q.  The ones that you hear over the radio?
4  **A.  Correct.**
5  Q.  Is there any other source of information
6  you would be able to learn personally about whether a
7  particular area is considered high crime or not?
8  **A.  Yes.  If certain incidents happen, more**
9  **violence especially, even if you're not on shift**
10  **you're made aware of them.  Whoever responded to that**
11  **event will likely send out a message to the rest of**
12  **the department and possibly surrounding departments**
13  **to make them aware of the criminal activity that**
14  **happened.**
15  Q.  And that's for a specific criminal
16  incident?
17  **A.  Correct.**
18  Q.  And now is there also any type of, let's
19  just say, reputation within the sheriff's office
20  or within -- within the sheriff's office and your
21  colleagues for, hey, that's an area to be a little
22  bit more on guard?
23  **A.  Correct.  We're routinely directed to**
24  **patrol that area more heavily than other areas.**
25  Q.  And that is because of the association of

Page 125

1 that area with crime?
2   **A. Correct.**
3   Q. And you said -- I believe you testified
4 that you didn't recall the exact time of the stop.
5 You said it was dark out, correct?
6   **A. Correct.**
7   Q. Now, when it's dark out, does that cut --
8 does that suggest that the risk, whatever there may
9 be, is decreased or increased?
10   **A. From my personal experience, the risk would**
11 **be increased in dark hours.**
12   Q. Okay. And that is based on -- what is that
13 conclusion based on?
14   **A. It's based off of my training and**
15 **experiences.**
16   Q. Gotcha. Basically when it's dark out,
17 that's when the criminal activity has a more likely
18 rate of occurring?
19   **A. Correct.**
20   Q. Or greater rate of occurring. I want to
21 talk a little bit about the body camera footage. So
22 first -- because you weren't asked about it. So
23 first I see you're wearing your uniform today and it
24 looks like you have indeed your body camera attached
25 to your left breast lapel of your shirt; is that

Page 126

1 correct?
2   **A. Correct.**
3   Q. And you were wearing presumably a similar
4 uniform and the body camera, similar spot, during the
5 subject incident, correct?
6   **A. Correct.**
7   Q. And you had the body camera on during the
8 subject incident?
9   **A. I did.**
10   Q. Now, did you turn the camera on the second
11 that you arrived at the scene, or did you walk to
12 Christensen's car first and then turn it on?
13   **A. I believe I was at Deputy Christensen's**
14 **squad car before I turned it on.**
15   Q. All right. Now, before you turned on
16 your -- so the period of time after you showed up but
17 before you turned on your body camera footage, is all
18 you did that you walked to Christensen's car?
19   **A. Correct.**
20   Q. Okay. And that's -- how long would you
21 guess that was? Handful of seconds?
22   **A. Approximately. Less than a minute, yes.**
23   Q. And now you turned your video off -- let me
24 rephrase it. When did you turn your body camera off;
25 do you recall?

Page 127

1   **A. I don't recall.**
2   Q. Okay. Would it presumably -- as a matter
3 of how the -- would you say you turned your body
4 camera off after you've done what you needed to do at
5 a scene and you're about to leave?
6   **A. Correct. I would turn it off at that**
7 **point.**
8   Q. Okay. Do you have -- and it sounds like
9 you don't have any memory once Christensen told you
10 to go doing anything else at the scene besides
11 leaving; is that correct?
12   **A. That's correct.**
13   Q. All right. So if your body camera footage
14 was still -- if we were to look at your body camera
15 footage, after it turns off you simply leave the
16 scene after that; is that fair?
17   **A. That's fair.**
18   Q. Okay. Now, speaking of body camera
19 footage, presumably body camera footage is uploaded
20 somewhere?
21   **A. It is.**
22   Q. Okay. Do you know where?
23   **A. Are you asking where the docking station is**
24 **for the body cameras or what the software program is**
25 **that we upload it to?**

Page 128

1   Q. Not necessarily the software program. Let
2 me try it this way. This might streamline things.
3 So the footage goes from your camera to somewhere in
4 the sheriff's office where it's stored, correct?
5   **A. It does.**
6   Q. What is that storage place called? Is it a
7 hard drive? Is it a database? Beyond your
8 knowledge?
9   **A. I'm unaware. I don't know how that works.**
10   Q. Let's put it this way. So when you need to
11 upload your body camera footage, what do you do to
12 make sure it goes on the storage system?
13   **A. I place my body camera into a docking**
14 **station, and then a short time later I log into an**
15 **on-line portal where I can view body camera footage**
16 **and tag it with incident numbers.**
17   Q. And so when you say tag it, it sounds like
18 you're just marking it like, hey, this was that
19 traffic stop with this traffic stop report or
20 something?
21   **A. Correct.**
22   Q. And when you say docking station, forgive
23 me, what I'm imagining, it sounds like there's a --
24 like is there something you plug it into like a
25 charging station?

Page 129

1    A.   Correct.  It's like a charging station.
2  There's a dock where there's eight or ten slots, and
3  one body camera can go into each slot.  And so when
4  you get to the department, you can just set your body
5  camera in this charging station which additionally
6  uploads your body camera footage.
7    Q.   All right.  Now, do you have a specific
8  memory of doing that for your body camera footage for
9  the subject incident?
10   A.   I don't have a specific memory of that day,
11 no.
12   Q.   Sure, okay.  But just as a matter of what
13 your routine practice is is that your shift is done,
14 you put your body camera in the docking station, you
15 upload your body camera footage; is that fair?
16   A.   That's typical.
17   Q.   All right.  And you would suspect that
18 since we have body camera footage for this traffic
19 stop that that's what you in fact did here?
20   A.   Correct.
21   Q.   All right.  Very good.  And then once the
22 body camera footage is on the storage device,
23 whatever it is, after that do you have any
24 involvement with the footage at all?
25   A.   Once it's on there, I provide the tagging

Page 130

1  with the event number and then I don't do anything
2  with it after that.
3    Q.   Very good.  And the body camera footage, so
4  you have not, for example, accessed this footage and
5  clipped out footage or adjusted anything out of the
6  footage, it's pristine from when you uploaded it so
7  far as you know?
8    A.   To the best of my knowledge it is.
9    Q.   Okay.  Very good.  Now, given that you had
10 body camera footage running during, it sounds like,
11 the entirety of the subject incident, any
12 conversations you had with Deputy Christiansen would
13 presumably be captured on the footage, correct?
14   A.   They would.
15   Q.   And to the extent that you testified today
16 to something that is a little inconsistent or
17 inconsistent with what is depicted on the body camera
18 footage, you would defer to the body camera footage
19 as a more accurate representation; is that fair?
20   A.   I would say it's more accurate than my
21 memory, correct.
22   Q.   Almost a year later or, yeah, sometime
23 later.  Okay.  I think you described this, and again
24 I think this'll show up on the video -- sorry.  First
25 a threshold question.  Forgive me.

Page 131

1    When you're wearing your body camera, I'm
2  assuming it's possible for you to turn your head one
3  direction or the other and not change the position
4  that the camera is pointing?
5    A.   Correct.
6    Q.   Okay.  So you can be steady from the
7  shoulders down but turn your head to look or talk to
8  someone else, and the camera image won't shift,
9  correct?
10   A.   Correct.  As like right now I'm looking at
11 you.  The camera is obviously not facing towards you.
12   Q.   Right.  And so now when you said you were
13 watching the pat down search of Ms. Ayres, I think
14 you described her as -- you could see kind of -- you
15 could see her front side and maybe she was angled a
16 bit so that kind of the right portion of her body was
17 pointed a little bit towards you.  Is that an
18 accurate characterization?
19   A.   As I recall it, yes.
20   Q.   I think you testified to this already.
21 Forgive me if you did.  So you didn't see her back
22 side or her back during the search, correct?
23   A.   I did not.
24   Q.   Okay.  Now, you also mentioned that you
25 were, or at least I believe you mentioned -- strike

Page 132

1  that.  I'm sorry.  Did the passenger in the car
2  during the pat down search say anything to you during
3  the pat down search?
4    A.   She did.
5    Q.   Okay.  Do you recall what it was?
6    A.   I don't recall exactly what she said.
7  Something to the effect of the time delay.  I believe
8  she was running late for work or something to that
9  effect.
10   Q.   Okay.  And prior to that interaction or
11 prior to that interaction with the passenger, had you
12 had any interaction during this traffic stop with the
13 passenger?
14   A.   I had not.
15   Q.   I believe you testified you didn't know who
16 the passenger was?
17   A.   I did not know her name.
18   Q.   Okay.  So this was something of an
19 unidentified person talking to you from the vehicle
20 at a traffic stop, correct?
21   A.   Correct.  I did not know who she was.
22   Q.   And she didn't leave the vehicle to say
23 this to you.  Was she shouting it from the window,
24 for example?
25   A.   Correct.  She remained inside the vehicle

Page 133

1  while shouting out the window.
2      Q.  Okay.  And so presumably then that kind
3  of -- you pointed your attention to the passenger
4  while she was communicating with you during the
5  search, is that fair, the pat down search?
6      **A.  I don't recall exactly, but if somebody was**
7  **yelling out a window to me, I would have likely**
8  **turned my head and addressed them, yes.**
9      Q.  Okay.  And again I think you, just to
10  confirm, I think you said that Ms. Ayres -- you don't
11  recall Ms. Ayres actually saying anything during the
12  pat down search itself, it's afterwards she made the
13  "whoa" statement, correct?
14      **A.  Correct.  It would have been immediately**
15  **after the pat down search concluded.**
16      Q.  Have you had -- so presumably you have seen
17  deputy -- let me take this back.  You said you were
18  on the same team as Deputy Christiansen.
19      **A.  Correct.**
20      Q.  And you were at the time?
21      **A.  Correct.**
22      Q.  And for a number of months, then, you had
23  responded to calls or scenes where you were alongside
24  Deputy Christiansen, correct?
25      **A.  Correct.**

Page 134

1      Q.  Had anything in any of your experience with
2  Deputy Christiansen led you to put you on guard
3  against -- let me put that back.  Strike that.  I'm
4  sorry.
5      Was there anything in your experience with
6  Deputy Christiansen that would lead you to believe he
7  would do an improper pat down search?
8      **MR. Mc CARTER:** Object to form,
9  foundation, speculation, but you can answer if you
10  understand the question.
11      **THE WITNESS:** Nothing from my
12  experience with working with Deputy Christiansen
13  indicated that I needed to be on guard for any ill
14  doing.
15      Q.  (by Mr. Vayr)  Sure.  So, for example, you
16  hadn't had -- I'm going to take this out of a pat
17  down search.  So, for example, you hadn't seen Deputy
18  Christiansen sucker punch somebody in a previous
19  search, correct?
20      **A.  Nothing of that nature.**
21      Q.  So, therefore, if Deputy Christiansen were
22  suddenly to sucker punch somebody, you wouldn't have
23  any basis for thinking he was about to do that based
24  on your past experience with him, correct?
25      **A.  Correct.  I'd be completely surprised.**

Page 135

1      Q.  And so that logic would also apply to the
2  search here, correct?
3      **A.  Correct.**
4      Q.  Okay.  In your experience, would you say
5  that the normal person that you perform a traffic
6  stop on request out of the vehicle and do a pat down
7  search on, are they happy that that happened to them?
8      **MR. Mc CARTER:** Objection, vague, but
9  you can go ahead and answer if you understand.
10      **THE WITNESS:** I understand the
11  question.  Typically they're not happy about it, no.
12      Q.  (by Mr. Vayr)  So when we're saying not
13  happy, it's beyond just like they're not smiling or
14  joking with you or anything, they seem actively
15  irritated or irked to be in that situation?
16      **A.  Typically people are displeased with me in**
17  **that situation.**
18      Q.  So the fact that someone was agitated or
19  displeased or was complaining about a pat down search
20  in and of itself was not remarkable to you based on
21  your experience at the time of the subject incident?
22      **A.  Correct.**
23      Q.  Okay.  Would you say that most stops you do
24  folks complain to you about a search or being
25  stopped?

Page 136

1      **A.  Are you asking most traffic stops in which**
2  **a search is conducted?**
3      Q.  Sure.  We can limit it that way, sure.
4      **A.  Correct.  Most people are not happy at that**
5  **point.**
6      Q.  Did you ever see -- so you had an
7  opportunity to observe Ms. Ayres.  Did you ever hear
8  Ms. Ayres communicate to you or Christiansen
9  that she was particularly sensitive to being
10  physically contacted by men?
11      **A.  I'm sorry.  Could you re-ask the question?**
12      **MR. VAYR:** Could you repeat the
13  question for me?
14      (Whereupon the requested
15      portion of the record was read by
16      the court reporter.)
17      **A.  Not that I recall.**
18      Q.  Did she -- and so presumably, then, you
19  also do not recall if she ever said anything to the
20  effect of she particularly does not like being
21  searched, for example, or pat down searched?
22      **A.  I don't recall her stating anything to the**
23  **effect.**
24      Q.  And now you mentioned -- strike that.
25  During the automobile search during the subject

Page 137

1  incident, just to put a bow on it, you were not
2  standing over Christiansen's shoulder watching what
3  he was doing inside the car during the search,
4  correct?
5    A. I was not.
6    Q. Okay. So you were generally aware that he
7  was searching the car, but you didn't specifically
8  know what he was searching beyond where he was
9  geographically in relation to the car; is that fair?
10   A. That's fair. My focus was not on him.
11   Q. Got it. Your focus was presumably on the
12  two individuals, Wylesha and the passenger who were
13  next to you and talking to you, correct?
14   A. Correct.
15   Q. Now, you mentioned that Ms. Ayres -- so
16  going back to what Ms. Ayres was wearing during the
17  subject incident, you said she was wearing loose
18  pants, correct?
19   A. Correct.
20   Q. Could you give me some type of a
21  description about how loose or what you mean by loose
22  pants?
23   A. They were baggy and fit to the point where
24  you couldn't see any leg definition through them.
25   Q. Okay. And then did they seem to be riding

Page 138

1  particularly low or high or anything?
2    A. I believe they were riding below the
3  waistline. More along the hips. I believe the
4  crotch of the pants was down fairly low.
5    Q. And this is just based on your perception.
6  You don't actually know how she was wearing the
7  pants, but at least based on what you witnessed
8  that's what you saw?
9    A. Based on my observation of the fit of the
10  pants, they appeared that they would be seated lower
11  on her hips rather than on her waistline.
12   Q. Okay. And now you mentioned, for example,
13  a pat down search where you did not check someone's
14  waistline because they were wearing tight pants. Do
15  you recall testifying about that?
16   A. I do.
17   Q. So you would not put Ms. Ayres' pants that
18  she was wearing during the subject incident in that
19  category of tight pants?
20   A. I would not categorize them as such.
21   Q. So were they -- and you testified that you
22  didn't see, for example, a shotgun handle or a knife
23  blade poking out of her pants, correct?
24   A. Correct.
25   Q. But is it possible that the pants were

Page 139

1  loose enough that some type of small weapon or
2  contraband could have been concealed under them and
3  would not leave a distinguishing feature that's
4  visibly obvious from the pants themselves?
5    A. It's possible.
6    Q. Okay. And that doesn't necessarily mean
7  that she did have a weapon, it's just that you
8  couldn't rule it out because she wasn't wearing tight
9  pants; is that fair?
10   A. Correct.
11   Q. Okay. Now, after you left the scene you
12  testified that presumably you returned to your beat
13  and you just don't recall what your exact beat was at
14  the time; is that right?
15   A. Correct.
16   Q. Now, is it possible that after the subject
17  incident, that initial traffic stop, perhaps you
18  stopped to get gas or to get a cola or a coffee or
19  something?
20   A. It's possible.
21   Q. Presumably you don't remember, but it's
22  conceivable?
23   A. I don't recall.
24   Q. Okay. So you don't remember any side stops
25  you might have made?

Page 140

1    A. I don't recall.
2    Q. Between traffic stop one and the latter
3  traffic stop that May 8th, 2019?
4    A. I don't recall if there were any incidents
5  in between those two.
6    Q. Okay. Now, when you were at -- so you
7  testified that when you arrived at the scene you were
8  under the impression at least that Christiansen had
9  essentially completed his investigation, or at least
10  I believe that was your testimony.
11   A. Correct.
12   Q. Okay. So now, given that, then, were you
13  paying particular attention to the license plate of
14  the vehicle that was stopped?
15   A. I was not.
16   Q. Okay. Were you paying particular attention
17  to the fact that it was a Jeep Patriot or a silver
18  car or anything?
19   A. No, I was not.
20   Q. So these are details that maybe you
21  perceived at the time but you weren't etching them
22  into your memory or anything?
23   A. That's fair.
24   Q. Given that you were the second on the
25  scene?

Page 141

1   A.   Correct.
2   Q.   Because presumably your priorities were
3   more on backing up Christiansen, maintaining security
4   of the scene, et cetera?
5   A.   Correct.  Well, standing at his passenger's
6   window I would have just been looking for any kind of
7   movement or activity at the vehicle, not specifically
8   the make and model of the vehicle or the license
9   plate.
10   Q.   I believe you already testified, but just
11   to make sure, you didn't yourself during that first
12   traffic stop, the subject incident, run the license
13   plate numbers or anything?
14   A.   I did not.
15   Q.   Okay.  I think you said that.  All right.
16   Now, is one of the -- so with pat down searches, you
17   mentioned that that can be -- so that's the least
18   intrusive type of physical search that can be done,
19   correct?
20   A.   Correct.
21   Q.   And you also said those can be done in a
22   relatively quick amount of time, correct?
23   A.   Correct.
24   Q.   Compared to a search of a person or a strip
25   or body cavity search, correct?

Page 142

1   A.   Correct.
2   Q.   Okay.  Now, during a traffic stop, do
3   you -- so I'm just asking you to speak from your
4   experiences and your training.  During a traffic
5   stop, do you normally try to keep the traffic stop as
6   short as you can?
7   A.   Correct.
8   Q.   Okay.  And so if you had to perform a -- if
9   you had to perform a search and you had to pick from
10   the option of searches that you were going to
11   perform, would presumably pick one that required
12   the least amount of time to accomplish the purpose
13   you were trying to accomplish; is that fair?
14   A.   Correct.
15   Q.   So, for example, if you were doing a -- if
16   you had probable cause that someone did indeed have
17   something smuggled in a body cavity, you would then
18   take the appropriate steps to have that search done,
19   but then in contrast, if you were checking to see if
20   someone had an obvious weapon or to see if they had
21   contraband on their person, you would do a less
22   invasive, more quick search that could accomplish
23   that, fair?
24   A.   Correct.
25   Q.   And then presumably a pat down search is

Page 143

1   also, I'll use the term, less invasive than a search
2   of a person; is that correct?
3   A.   That's correct.
4   Q.   That's a fair characterization of it?
5   A.   It is.
6   Q.   Okay.  So then if you're picking a pat down
7   search -- strike that.  Never mind.  I think I'm
8   good.  If you'll humor me one moment.  I just want to
9   look through my notes.
10   A.   Sure.
11   Q.   Now, you also mentioned Champaign County's
12   policies and you were questioned about those.  Is it
13   your understanding that the policies of the Champaign
14   County Sheriff's Office are guidelines?
15   A.   Correct.
16   Q.   They're not a prescriptive set of thou
17   shall's and thou shalt's, they're supposed to be
18   guidelines to help you deal with the circumstances
19   that you may confront in a live law enforcement
20   context; is that fair?
21   A.   That's fair.
22   Q.   Okay.  And, now, since they are guidelines,
23   do you recall one of them -- is it your understanding
24   that one of the guidelines is to, as a general
25   matter, be respectful of the person you are searching

Page 144

1   and to try to respect their privacy rights while also
2   doing a search?
3   A.   Correct.
4   Q.   So it's not the policy of the Champaign
5   County Sheriff's Office to do highly intrusive, you
6   know, searches when they're unwarranted?
7   A.   Correct.
8   Q.   You were asked a question about when a male
9   officer might be required to call a female to search
10   a female.  Now, we've been using the term search kind
11   of generally in this.  Of course when we're saying
12   search, that could include four different types of
13   searches that you testified to, right?
14   A.   Correct.
15   Q.   And so in a circumstance where you are
16   required to call off a search, I think you said you
17   were unaware of any.  Would it be your understanding
18   that you as a male -- would it be fair to say that
19   the Champaign County sheriff policy as you understand
20   it is that if a body cavity search has to be done of
21   a female, a male can't do that search barring some
22   kind of remarkable exigency?
23   A.   Correct.
24   Q.   That's kind of the rule of thumb as you
25   understand it?

Page 145

1  A.  Correct.
2  Q.  And so that would, for example, be a
3  circumstance where, for all intents and purposes, a
4  female is required to do that type of search of a
5  female?
6  A.  For that type of search, yes.
7  MR. VAYR:  Okay.  That's all I have.
8  EXAMINATION
9  BY MR. Mc CARTER:
10  Q.  Deputy Floyd, I hope not to take too much
11  more of your time and then we'll get you out of here.
12  We've been talking about a pat down search and its
13  level of intrusiveness, and you would agree with me
14  that a pat down search, it still involves the search
15  of an individual person's body, correct?
16  A.  To some degree, yes.
17  Q.  You still have to put your hands on a
18  suspect?
19  A.  You do, yes.
20  Q.  You're searching for a weapon, correct?
21  A.  Yes.
22  Q.  Now, when searching a female, even with a
23  pat down search, that could involve just a level of
24  intrusiveness that that female is not otherwise
25  accustomed to being that you're a male that she

Page 146

1  doesn't know, correct?
2  A.  It's possible.
3  Q.  On May 8th, 2019, there was no particular
4  rush to complete this traffic stop in any sort of
5  time, was there?
6  A.  The passenger of the vehicle was
7  complaining about time restraints.
8  Q.  There was no restraints placed on the two
9  deputies at the scene by the Champaign County
10  sheriff's department?
11  A.  That's fair.
12  Q.  There was no emergency situation happening
13  in the county that required your immediate attention?
14  A.  Correct.
15  Q.  You wanted to be thorough in conducting the
16  traffic stop, correct?
17  A.  Correct.
18  Q.  Now, you also testified that when you
19  arrived on scene -- I'll never get the wording quite
20  as eloquently as counsel here, but the scene was
21  relatively calm, correct?
22  A.  Correct.
23  Q.  But that did change at one point, correct?
24  A.  It did slightly, yes.
25  Q.  Ms. Ayres became upset at the conduct

Page 147

1  during the search, correct?
2  A.  Correct.
3  Q.  And she said as much?
4  A.  Yes, she did voice that complaint.
5  Q.  And I want to get back to the high crime
6  area.  As far as you know, there's been nothing --
7  you were not aware of any facts to indicate that this
8  particular silver Jeep Patriot was involved in any
9  prior crimes, correct?
10  A.  Not that I was aware of.
11  Q.  You were not aware of anything to indicate
12  that the driver, Wylesha Ayres, was involved in any
13  active crime investigation by the Champaign County
14  sheriff's department, correct?
15  A.  Correct, not that I was aware of.
16  Q.  You were not aware of the passenger being
17  involved in any active crime investigation by the
18  Champaign County sheriff's department, correct?
19  A.  Correct, not that I was aware of.
20  Q.  When determining if something is a high
21  crime area, does the race of the individuals who live
22  in that area factor into your determination?
23  A.  It does not.
24  Q.  When pulling up to a car that has been
25  previously stopped by another deputy in what is maybe

Page 148

1  understood amongst the Champaign County sheriff's
2  department to be a high crime area, does the race of
3  the occupants of that vehicle factor into how you
4  approach that particular traffic stop?
5  A.  It does not.
6  Q.  I know we've kind of gone over this, but
7  it's kind of important so I just want to make sure
8  I'm clear in my understanding.  When you observed Ms.
9  Ayres say something to the effect of, woo, don't
10  search me there or, whoa, don't search me there, was
11  the pat down search still in effect or had Detective
12  Christiansen walked away from Ms. Ayres at that
13  point?
14  A.  I believe the pat down search had been
15  completed at that point.
16  Q.  What makes you say that?
17  A.  Because Deputy Christiansen did not have
18  his hands on Ms. Ayres at that point.
19  Q.  Where was Deputy Christiansen standing in
20  relation to Ms. Ayres at that point?
21  A.  He would have been directly behind her.
22  Q.  Can you approximate for me how far behind
23  her?
24  A.  I don't know exactly.  Likely within five
25  feet.

Page 149

1  Q. Would it be -- is it possible it was less
2  than five feet?
3  A. Very possible.
4  Q. Could it have been less than two feet?
5  A. It's possible.
6  Q. Less than one foot?
7  A. Possible.
8  Q. Have you ever seen Deputy Christiansen
9  search a female before?
10  A. If I have, I don't recall.
11  Q. Do you know if Deputy Christiansen is
12  married?
13  A. Yes, he is.
14  Q. Do you know how long he's been married?
15  A. I don't know.
16  Q. Is his wife a female?
17  A. She is.
18  Q. Have you met his wife before?
19  A. I have.
20  Q. Now, I want to focus on the time frame that
21  you arrived on scene and you've spoken with Deputy
22  Christiansen and now Deputy Christiansen is
23  attempting to ask the driver, Ms. Ayres, out of the
24  car. And when Ms. Ayres stepped out of the car, you
25  had an opportunity to observe her, correct?

Page 150

1  A. I did.
2  Q. You didn't see any bulge of a weapon,
3  correct?
4  A. I did not.
5  Q. And prior to her stepping out of the car,
6  you had no opportunity to observe her, correct?
7  A. Correct.
8  Q. And when she stepped out of the car and
9  then her and Deputy Christiansen relocated closer to
10  you towards the back of the Jeep, that's when the
11  search began, correct?
12  A. Correct.
13  Q. Can you estimate for me how much time took
14  place between Ms. Ayres stepping out of the car and
15  the start of the search?
16  A. I don't recall.
17  MR. Mc CARTER: That's all I have.
18  EXAMINATION
19  BY MR. VAYR:
20  Q. Just to expound a little bit. So you were
21  asked whether the Champaign County Sheriff's Office
22  had any reason for you to try to rush this subject
23  traffic stop, or a question to that effect. You
24  recall the question at least?
25  A. I do.

Page 151

1  Q. And I think you were saying something to
2  the effect of, well, you know, the passenger was
3  saying that she was in a rush and she wanted to go to
4  work and that was kind of -- that's true that she was
5  saying that, correct?
6  A. She was saying that.
7  Q. Did she seem irritated or angry while
8  saying that?
9  A. She did.
10  Q. Okay. And then also it was your
11  understanding that there were children in the car as
12  well?
13  A. Correct.
14  Q. Okay. And now separate and aside from what
15  the Champaign County Sheriff's Office might have
16  demanded of you, just when you're in that
17  circumstance where I just described where there are
18  kids and you have someone kind of angrily saying,
19  hey, I'm trying to go to work, would that make you
20  want to make the stop go longer or try to make the
21  stop go shorter in time?
22  A. Neither. I would still complete my task at
23  the same level of haste. I wouldn't attempt to rush
24  or delay.
25  Q. Fair enough. All right. This might seem

Page 152

1  like a really stupid question, but I realized after I
2  asked the questions that there are some terms that
3  are kind of loaded in the law enforcement context
4  with various meanings. And so when I was using the
5  term high crime area, I wasn't referring -- when I
6  was asking you those questions, my intent was not to
7  communicate to you that these had any particular type
8  of economic or racial or other composition other than
9  that these are incidents where crimes are more likely
10  to occur. Is that how you understood my questions?
11  A. I understood the questions in reference to
12  the volume of calls for service in the area.
13  Q. Okay. And so based on that criteria, the
14  race, socioeconomics of a particular area, the
15  language spoken there would not factor into that,
16  it's just the number of calls?
17  A. Strictly call volume, correct.
18  MR. VAYR: Okay. That's all I got.
19  Anything?
20  EXAMINATION
21  BY MR. Mc CARTER:
22  Q. Deputy, have we now talked about everything
23  that you recall from the two stops that you had with
24  Wylesha Ayres on May 8th of 2019?
25  A. That and likely more than I recall, yes.

Page 153

1    Q.   Deputy, you get two options now.  One is
2  you can trust our court reporter that has taken down
3  everything that's been said by the three of us here
4  and has done so accurately and you can waive your
5  signature.  The second option is you could request a
6  copy of your transcript to review for any mistakes
7  that she may have made in transcribing it.
8       Now, what that means is you can't change the
9  substance of your testimony but any misspellings or
10  just taking down something that was not actually
11  accurate to what you said.  You can submit a sheet
12  and we'll determine if that needs to be changed.  I
13  will advise you that most do waive signature, but it
14  is entirely up to you.
15           **MR. VAYR:** For what it's worth, I
16  usually advise most of my clients to trust the court
17  reporter and just simply waive signature but it's
18  your choice.
19           **THE WITNESS:** I intend to waive
20  signature.
21           **MR. Mc CARTER:** With that, we'll go
22  off the record.
23       (Deposition concluded at 12:07 p.m.)
24
25

Page 154

1  STATE OF ILLINOIS  )
                       )
2  COUNTY OF CHAMPAIGN)

3

4       I, Janet E. Cummings, a Certified Shorthand
   Reporter, in and for the County of Champaign, State
5  of Illinois, do hereby certify that DEPUTY CODY
   FLOYD, the deponent herein, was by me first duly
6  sworn to tell the truth, the whole truth and nothing
   but the truth, in the aforementioned cause of action.

7

8       That the foregoing deposition was taken on
   behalf of the Plaintiff, at the offices of Heyl,
   Royster, Voelker & Allen, 301 North Neil Street,
9  Suite 505, Champaign, Illinois, on February 20, 2020;

10       That said deposition is a true record of
   the testimony given by the deponent and was taken
11  down in stenograph notes and afterwards reduced to
   typewriting under my instruction; and that it was
12  agreed by and between the witness and attorneys that
   said signature on said deposition would be waived.

13

14       I do hereby certify that I am a
   disinterested person in this cause of action; that I
15  am not a relative of any party or any attorney of
   record in this cause, or an attorney for any party
   herein, or otherwise interested in the event of this
16  action, and am not in the employ of the attorneys for
   either party.

17

18       IN WITNESS WHEREOF, I have hereunto set my
   hand this 5th day of March 2020.

19

20

21           _____
               JANET E. CUMMINGS, CSR

22

23

24

25

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CODY FLOYD
February 20, 2020

## A

**able (8)**
88:15,19,23;89:2;
93:1,5;120:8;124:6
**absent (2)**
115:15;120:2
**Absolutely (1)**
117:2
**acceptable (1)**
56:21
**accessed (2)**
11:19;130:4
**accessible (1)**
30:8
**accompanied (1)**
89:12
**accomplish (4)**
116:8;142:12,13,22
**According (1)**
104:7
**account (3)**
11:6,14,17
**accounts (1)**
11:11
**accurate (5)**
39:20;130:19,20;
131:18;153:11
**accurately (1)**
153:4
**accustomed (1)**
145:25
**action (5)**
35:22;85:21;105:5,8
**actions (3)**
46:4;48:14,24
**activated (1)**
101:20
**active (5)**
11:15;12:20,22;
147:13,17
**actively (2)**
72:12;135:14
**activity (5)**
122:11;123:16;
124:13;125:17;141:7
**actually (10)**
24:6;44:2;57:16;
58:11;75:16;82:15;
103:8;133:11;138:6;
153:10
**addition (1)**
32:2
**additional (2)**
31:20;121:18
**additionally (1)**
129:5
**addressed (1)**
133:8
**adhere (1)**
23:25
**adjusted (1)**

130:5
**advise (2)**
153:13,16
**affect (1)**
6:14
**afraid (1)**
111:9
**afterwards (1)**
133:12
**again (9)**
15:13;28:11;51:5;
57:14;100:7;120:14;
123:22;130:23;133:9
**against (5)**
45:18;46:19;47:25;
81:18;134:3
**age (1)**
107:19
**aggravated (1)**
87:22
**agitated (3)**
87:16;111:10;135:18
**agitation (1)**
111:13
**ago (6)**
8:11;10:22;54:24;
55:1;103:9,9
**agree (4)**
8:18;25:11;114:2;
145:13
**ahead (4)**
57:17;122:18;
123:19;135:9
**aid (1)**
7:9
**alcohol (1)**
6:12
**allow (1)**
28:14
**allowed (1)**
53:2
**Almost (1)**
130:22
**alone (1)**
53:3
**along (9)**
5:1;21:18;25:22;
35:13;46:11;50:2;
86:16;102:5;138:3
**Alongside (3)**
62:12;102:4;133:23
**always (1)**
49:15
**amongst (1)**
148:1
**amount (3)**
110:6;141:22;142:12
**anchor (1)**
58:1
**angle (1)**
79:4
**angled (1)**
131:15

**angrily (1)**
151:18
**angry (1)**
151:7
**announce (2)**
68:5,14
**announced (1)**
67:25
**Anthony (2)**
71:12;122:5
**anymore (2)**
63:17,18
**apologies (1)**
73:21
**apologize (5)**
12:11;57:21;102:5;
104:18;119:12
**appear (1)**
111:1
**appeared (5)**
80:19;110:25;111:3,
10;138:10
**applicable (2)**
27:25;28:16
**apply (1)**
135:1
**appreciate (1)**
25:21
**apprised (2)**
74:7,8
**approach (3)**
73:14;76:7;148:4
**approached (6)**
71:24;73:17,19,25;
76:24;86:7
**approaches (2)**
88:3,7
**appropriate (1)**
142:18
**approximate (4)**
20:8;63:5;90:11;
148:22
**Approximately (29)**
9:11,16;10:22;12:15;
13:12;16:20;18:24;
20:11;22:7;31:18;35:6;
37:17,25;39:17;40:5,8;
43:17;55:1;57:20;
61:16;64:7,9;71:4;
82:12;90:14;92:7;
119:6,11;126:22
**April (1)**
65:12
**aptly (1)**
61:21
**area (25)**
52:7;61:10,14,16;
106:13,20;122:10,15,
23,24,25;123:8,14,20;
124:7,21,24;125:1;
147:6,21,22;148:2;
152:5,12,14
**areas (5)**

29:12;46:2;48:18;
61:18;124:24
**Armistice (1)**
13:24
**armpits (1)**
114:23
**arms (2)**
77:19;112:25
**Army (7)**
12:13,23;13:16,22,
25;14:4,7
**around (12)**
32:25;46:2;48:9,11,
19;60:7,9;77:18;82:12;
93:8;109:20;113:18
**arrest (3)**
29:17;43:25;110:17
**arrested (5)**
44:5;55:16;110:12;
111:17,19
**arrived (11)**
55:8;71:18,23;73:21;
112:17;120:19;121:21;
126:11;140:7;146:19;
149:21
**arriving (1)**
72:15
**article (5)**
8:13,13,15,20,22
**articulable (1)**
106:15
**articulate (2)**
29:7;46:7
**aside (1)**
151:14
**askew (1)**
105:12
**assign (1)**
64:20
**assigned (15)**
13:7,13;24:6;33:3;
61:22;62:2;63:9,11;
64:8,24;65:11,22;66:6;
69:9;70:15
**assignment (2)**
13:6;61:8
**assist (2)**
69:9,10
**assistance (2)**
69:15;70:22
**association (1)**
124:25
**assume (1)**
54:14
**assuming (2)**
21:14;131:2
**attached (1)**
125:24
**attempt (3)**
87:8,10;151:23
**attempted (1)**
38:14
**attempting (1)**

149:23
**Attend (3)**
16:18;18:14;39:12
**attended (2)**
10:19;14:22
**Attending (1)**
21:3
**attention (4)**
79:3,8;100:22;133:3;
140:13,16;146:13
**attorney (1)**
7:11
**August (1)**
12:10
**automobile (1)**
136:25
**available (7)**
7:22;25:4,6,9;26:14,
18,23
**average (2)**
114:11,13
**avoid (1)**
5:25
**aware (41)**
17:19;42:9,14;44:7,
11,13;56:6,11;58:15,
19;59:10;67:2,5,12,15,
21,22;83:19,25;87:15;
91:23,25;93:15,22,24;
96:25;105:7;112:8,11,
13;113:4;123:5;
124:10,13;137:6;
147:7,10,11,15,16,19
**away (8)**
5:11;68:8,12;87:10;
90:11;103:21;119:23;
148:12
**Ayres (84)**
4:12;59:16,21;66:21;
67:1,4,17,20;76:9,10,
25;77:12,14,17,18;
78:1,5,23;79:9;80:2,7,
23;82:16,24;83:1,6,9,
12,21;84:2,2,14,22,21;
85:3;86:2,6,11,15,24;
87:3,13;88:1;89:12;
90:1,2,4,8,13,16;91:3;
94:16;96:9,11,14;
97:16;98:5;103:6;
104:3;105:6;110:22;
111:4,17;112:19,23;
116:13;120:16;131:13;
133:10,11;136:7,8;
137:15,16;146:25;
147:12;148:9,12,18,20;
149:23,24;150:14;
152:24
**Ayres' (10)**
79:5;81:9;82:1;85:7,
10,15,18;110:19;
113:5;138:17

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CODY FLOYD
February 20, 2020

# B

**baby (1)**
102:16
**back (50)**
5:13;18:6;21:11;
26:22;30:23;31:16;
46:1;47:14;49:22;50:1,
3,11,12,17,19;59:24;
76:13;77:3,5,13;80:1;
82:3;85:7,9;90:16,24;
91:12,21;92:3;93:2,6,9,
12;96:20;101:15;
102:8;103:1,18;109:3,
6;110:19;116:6;118:1;
131:21,22;133:17;
134:3;137:16;147:5;
150:10
**backing (1)**
141:3
**backtrack (1)**
79:4
**backtracking (1)**
96:10
**backup (2)**
53:5;119:21
**baggy (2)**
80:19;137:23
**ball (1)**
80:10
**bank (7)**
14:9,10,11,13,15,18;
15:9
**barring (1)**
144:21
**based (25)**
27:10;28:6;37:19;
49:18;50:8,24;51:16,
19;54:6;56:12,16,20;
57:8;58:3;59:4;107:11;
125:12,13,14;134:23;
135:20;138:5,7,9;
152:13
**bases (1)**
107:9
**basically (2)**
121:5;125:16
**basis (3)**
72:13;111:23;134:23
**beat (13)**
61:22;62:2;63:10,12;
64:25;99:4,6,11,14,15,
18;139:12,13
**beats (7)**
61:21;64:16,21;99:9,
19,20;118:21
**became (1)**
146:25
**become (3)**
67:22;95:18;113:4
**began (2)**
18:13;150:11

**begin (2)**
13:25;14:3
**beginning (1)**
28:11;66:16;77:16
**Behind (5)**
72:2;90:25;96:12;
148:21,22
**belief (1)**
27:21
**below (4)**
81:9;82:5,8;138:2
**besides (2)**
117:16;127:10
**best (3)**
5:19;109:18;130:8
**better (1)**
26:7
**beyond (5)**
117:20;122:24;
128:7;135:13;137:8
**big (1)**
118:22
**birth (1)**
8:25
**bit (12)**
5:1,4;6:3;59:25;
96:10;104:16;113:11;
124:22;125:21;131:16,
17;150:20
**blade (5)**
46:6,7;47:3;97:4;
138:23
**bladed (9)**
45:25;47:8,13,20;
48:2,10,23;49:7;81:15
**blocks (1)**
106:12
**Bloomington (2)**
100:19,20
**board (1)**
102:16
**body (43)**
27:6;29:16;30:14,15,
21;101:13;113:21;
116:13;117:4,21;
125:21,24;126:4,7,17,
24;127:3,13,14,18,19,
24;128:11,13,15;129:3,
4,6,8,14,15,18,22;
130:3,10,17,18;131:1,
16;141:25;142:17;
144:20;145:15
**Bolt (7)**
70:5,6,12,18;94:21;
95:2;118:13
**B-O-L-T (1)**
70:6
**both (9)**
46:6;47:12;75:9;
76:13;79:13;87:6;
90:12;108:24;109:1
**bottom (2)**
46:14;82:10

**bow (1)**
137:1
**branch (1)**
12:12
**break (6)**
6:6,8;41:19;58:11,
13;113:14
**breast (1)**
125:25
**brief (3)**
58:8;96:19;99:8
**briefly (2)**
22:3;94:11
**brings (1)**
59:15
**Brize (4)**
33:23,24;34:2,6
**B-R-I-Z-E (1)**
33:23
**broken (2)**
41:10;99:9
**brought (1)**
59:16
**Bryan (3)**
5:13;8:2;113:10
**bulge (2)**
96:23;150:2
**bumper (1)**
102:12
**butt (2)**
86:18;109:7
**buttocks (3)**
84:15;85:9,11

# C

**cabin (1)**
91:10
**cage (2)**
82:5,8
**calculator (1)**
119:1
**call (12)**
26:8;29:15;53:5;
55:24;56:1;107:23;
108:7;115:9;120:6;
144:9,16;152:17
**called (4)**
4:3;35:7;99:16;
128:6
**calls (7)**
122:25;123:14,21,
25;133:23;152:12,16
**calm (2)**
120:24;146:21
**cam (1)**
117:21
**came (2)**
87:3;120:4
**camera (33)**
52:7;125:21,24;
126:4,7,10,17,24;
127:4,13,14,18,19;

**camera (1)** *(continued)*
128:3,11,13,15;129:3,
5,6,8,14,15,18,22;
130:3,10,17,18;131:1,
4,8,11
**cameras (1)**
127:24
**can (118)**
4:18;5:23,25;8:12;
15:13;17:1,25;18:7,16;
19:14;20:8,8,16,20;
22:1,2,23;23:15;24:19,
23;26:19;27:1,5,8,11,
19,25;28:3,9,21,23;
29:7,22,25;30:15;31:1,
8;32:5;33:7,7;36:6,14,
24;38:5,10,11;40:12,
16;41:21;42:24;45:11,
22;46:6,17,24;47:19;
49:20,20,25;50:9;51:9,
11;52:23;53:20,22;
54:5;56:15,23;59:25;
61:13;63:5;64:3,18;
66:13;69:24;71:11;
81:4;82:9,9;90:11;
98:17;100:6,10,13,16;
105:13;108:15,17;
109:5;111:2,3;114:5,
19;115:17;116:11,25;
117:8;119:11;121:9,14;
122:8;123:19;128:15;
129:3,4;131:6;134:9;
135:9;136:3;141:17,
18,21;142:6;148:22;
150:13;153:2,4,11
**canine (3)**
62:8,11,12
**cannabis (6)**
73:9;77:24;106:24,
25;110:2,3
**cap (1)**
80:10
**capacity (2)**
7:3;123:23
**captured (1)**
130:13
**car (48)**
38:9,16;71:20,25;
72:3,6;73:15,25;78:14,
19;79:14,15,20;86:7;
87:5,7;88:2;89:13;
90:17,21,24,25;93:14,
17;95:15;96:5,9,11;
98:6,8;103:12;113:1;
119:9;126:12,14,18;
132:1;137:3,7,9;
140:18;147:24;149:24,
24;150:5,8,14;151:11
**care (1)**
6:17
**career (6)**
14:1;17:3;28:4,23;
29:1;60:12
**carry (1)**

**116:6**
**cars (5)**
38:8,17,19;72:10;
120:23
**Carson (3)**
13:5,6,11
**CARTER (19)**
4:7,9,17;57:2;58:2,7;
113:8;116:10;121:8;
122:12,17,21;123:18;
134:8;135:8;145:9;
150:17;152:21;153:21
**Case (9)**
4:10,12;7:12,14,22;
8:6,19;30:7;59:16
**categorize (1)**
138:20
**category (1)**
138:19
**cause (1)**
142:16
**cavity (10)**
27:6;30:14,15,21;
113:21;116:13;117:4;
141:25;142:17;144:20
**Central (1)**
4:11
**certain (4)**
25:14,15;107:5;
124:8
**certificate (1)**
10:16
**certification (1)**
40:1
**cetera (2)**
29:14;141:4
**Champaign (74)**
4:13,16,17;9:8,10,
12;16:22;17:5;18:2,20;
19:20;20:1,6;23:13,19,
21;28:4;31:23,25;32:3,
6;36:5;37:8,20;38:3,6;
40:3,23,24;42:2,7,11,
16,19;44:9,14;52:10,
13,13,15,17;54:6;
56:13;57:24;58:14,17;
59:18,19,19;60:12;
61:3;62:17;71:13,14,
15;72:9;99:9,21,23;
100:19;104:21;118:23,
24;122:6;143:11,13;
144:4,19;146:9;
147:13,18;148:1;
150:21;151:15
**change (8)**
46:23;47:5,10;95:16;
96:8;131:3;146:23;
153:8
**changed (5)**
17:13;60:14;99:24;
111:5;153:12
**changes (1)**
47:20;48:6

**changing (1)**
47:1
**chapter (1)**
117:14
**characterization (5)**
8:19;19:5;24:8;
131:18;143:4
**characterized (1)**
41:2
**charge (1)**
41:7
**charging (3)**
128:25;129:1,5
**check (7)**
31:11;35:7,8,13,16;
115:23;138:13
**checking (1)**
142:19
**chest (4)**
47:24;48:2,18;
114:24
**children (13)**
92:3,5,8,10,15,22;
95:15,19,25;96:1,4,7;
151:11
**choice (1)**
153:18
**Christensen (3)**
4:13;7:15;127:9
**Christensen's (3)**
126:12,13,18
**Christian's (2)**
76:18;90:17
**Christiansen (118)**
62:14;63:6,10,14;
65:6,14,17,20;67:23;
68:4,14,19;69:1,10,16;
70:10,22;71:9;72:2,4,
15;73:16;74:4;75:11;
76:2,7,24;77:12,14,17,
20;78:2,5,22;79:9,14;
80:23;81:8,11,14,17,
21;82:15,25,25;83:6,
11;84:1,20,22;85:6,10,
14,17;86:1,5,12;87:20,
23;88:3,4,6,16,20,24;
89:3;90:18,22;91:6,14,
17,20;92:17,18;93:1,
13,16;94:17,20;95:8,
10;96:11;97:8,14,18;
98:8,14,24;100:2;
102:3;103:3;104:25;
105:4;110:23;111:4;
112:18;113:6;120:24;
121:4,23;130:12;
133:18,24;134:2,6,12,
18,21;136:8;140:8;
141:3;148:12,17,19;
149:8,11,22,22;150:9
**Christiansen's (25)**
68:9;71:6,18,20,25;
76:15;77:8;78:6;79:13;
80:2,21,22;87:4,7,14;

89:13;90:1,9,21,25;
94:9,13;96:13;120:6;
137:2
**Christianson (1)**
81:25
**Christmas (1)**
63:4
**chronic (1)**
6:18
**Church (1)**
99:16
**circuit (1)**
16:6
**circumstance (4)**
54:1;144:15;145:3;
151:17
**circumstances (7)**
21:21;26:24;53:19;
83:25;114:21;122:1;
143:18
**citation (5)**
55:19;111:19,20,24;
117:25
**citations (3)**
110:8,15;112:4
**clarify (7)**
23:20;26:19;28:15;
43:12;47:7;64:3;90:19
**class (35)**
10:19,21;19:25;20:5,
9,14,17,20,22,23,25;
21:5,5,13,25;22:2,3,8,
16,18,23,24;23:1,7,8,
11;24:13,14;26:1,3,4,8,
9;36:12;39:3
**classes (10)**
18:14;19:7,15,16;
20:12;21:3,9;24:10;
26:5;36:12
**clean (1)**
5:13
**clear (4)**
75:16;111:11;
119:12;148:8
**clerk (3)**
16:15,17,18
**clerk's (1)**
16:6
**client (1)**
66:20
**clients (1)**
153:16
**clinic (2)**
13:7,11
**clipped (1)**
130:5
**close (2)**
69:7,8
**closer (5)**
77:7;78:6,12;120:3;
150:9
**closest (1)**
50:19

**clothes (4)**
29:11;80:6;96:16,23
**clothing (11)**
29:14;30:4,5,8,10;
31:5,13,15;45:14,16;
50:3
**Code (1)**
22:6
**CODY (3)**
4:2,20;11:9
**coffee (1)**
139:18
**cola (1)**
139:18
**colleague (1)**
62:12
**colleagues (2)**
62:20;124:21
**College (4)**
10:10,11,17;11:24
**color (3)**
80:14,16;101:13
**Colorado (1)**
13:5
**combining (1)**
47:12
**coming (2)**
73:9;77:24
**commenced (1)**
4:1
**comment (1)**
87:25
**committed (6)**
27:22,23,23;74:23;
75:2,6
**common (1)**
120:7
**communicate (2)**
136:8;152:7
**communicating (1)**
133:4
**Community (5)**
10:10,11,17;11:24;
14:8
**comparable (1)**
22:17
**compared (2)**
115:25;141:24
**compartment (1)**
93:13
**complain (1)**
135:24
**complaining (2)**
135:19;146:7
**complaint (2)**
44:8;147:4
**complete (5)**
37:10;59:1;104:4;
146:4;151:22
**completed (8)**
84:14,17,24;110:24;
121:12,19;140:9;
148:15

**completely (1)**
134:25
**complicated (2)**
66:7,8
**complying (1)**
87:14
**composition (1)**
152:8
**computers (2)**
38:17,18
**concealed (6)**
27:15;28:19;29:12;
31:6,12;139:2
**concealing (2)**
30:7,18
**conceivable (2)**
115:5;139:22
**conceivably (1)**
119:18
**concern (1)**
89:21
**concluded (2)**
133:15;153:23
**conclusion (1)**
125:13
**conduct (26)**
20:23;30:12,20;36:1;
41:14;44:2;45:7,11;
46:18,20,22,25;49:21;
50:16;51:2;53:2,24;
56:2,22;57:14;74:9,14;
94:6;111:11;112:21;
146:25
**conducted (19)**
28:5,18,21,24;40:24;
42:16,19;44:3,4,24,25;
45:13;51:9,12;73:4;
94:8;101:21;111:7;
136:2
**conducting (8)**
35:3;42:8,12;51:6;
52:5;54:8;101:8;
146:15
**confirm (1)**
133:10
**confront (1)**
143:19
**confused (1)**
47:19
**confusion (1)**
6:3
**conjecture (1)**
36:22
**consent (2)**
108:20,22
**considered (4)**
32:12;119:24;
120:25;124:7
**consistent (1)**
117:9
**contacted (1)**
136:10
**contacts (2)**

6:25;7:2
**context (4)**
115:8;122:1;143:20;
152:3
**continue (5)**
10:6;11:25;14:19,20;
41:21
**continuing (2)**
6:18;32:15
**continuous (1)**
22:9
**contraband (10)**
29:19;30:18;44:21;
45:15;83:14,21;93:23;
115:23;139:2;142:21
**contrast (1)**
142:19
**conversation (17)**
72:20;73:16;76:5;
77:16;78:4;84:19;
89:16;90:1,4,13;95:13;
97:15,19,23;98:18;
101:18;121:18
**conversational (1)**
5:8
**conversations (1)**
130:12
**copy (1)**
153:6
**correctly (4)**
24:3;53:1;58:3;
64:24
**counsel (5)**
7:19,25;8:1;113:12;
146:20
**County (79)**
4:14,16,17;10:5;
16:6,7,10,14,19,21,22;
17:2,5;18:2;19:20;
20:1,6;23:13,19,21;
28:4;31:23,25;32:3,6;
36:5;37:8,20;38:3,6;
40:3,23,24;42:2,7,11,
16,19;44:9,14;52:10,
13,13,15,17;54:6;
56:13;57:24;58:14,17;
59:18,19,19;60:12;
61:4,17;62:18;64:25;
72:9;99:10,12,16,23;
104:22;118:23,24;
119:8,10,17;143:14;
144:5,19;146:9,13;
147:13,18;148:1;
150:21;151:15
**County's (1)**
143:11
**couple (10)**
4:25;5:14;6:11;8:11;
37:1,3;106:23;107:15,
25;108:2
**course (8)**
38:21,24;59:2;84:6;
107:3;119:14;120:10;

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CODY FLOYD
February 20, 2020

144:11
**Court (9)**
4:11;5:2;6:1;16:18;
59:17;104:17;136:16;
153:2,16
**cover (2)**
23:3;64:15
**covered (15)**
20:17,21,23;21:14,
25;22:3,24;23:7,10;
24:20;36:7;37:2;39:4;
41:23;42:3
**crime (12)**
27:22;122:15,23,24;
124:7;125:1;147:5,13,
17,21;148:2;152:5
**crimes (4)**
123:2,8;147:9;152:9
**criminal (20)**
22:5;73:10,12;75:2,
7,15,17,21,23,24;76:1;
112:19,23;113:1,5;
122:11;123:16;124:13,
15;125:17
**criteria (1)**
152:13
**crotch (5)**
49:22;50:22;85:15;
109:10;138:4
**curious (1)**
118:20
**current (4)**
17:7;54:11;66:6;
71:5
**currently (7)**
9:7;16:23;18:1;35:3;
63:22;65:5;66:5
**custody (2)**
111:25;112:7
**cut (2)**
74:25;125:7

**D**

**daily (2)**
7:3;72:13
**danger (1)**
95:22
**dangerous (1)**
95:18
**dark (6)**
76:23;80:15;125:5,7,
11,16
**Darr (1)**
66:17
**D-A-R-R (1)**
66:17
**database (1)**
128:7
**date (10)**
8:10,25;10:21;18:9;
21:12;35:11;40:20;
54:23;65:15;106:6

**Day (6)**
13:24;21:8,10,10;
60:1;129:10
**deal (2)**
70:1;143:18
**Decatur (3)**
9:14,15;10:13
**December (1)**
63:1
**decreased (1)**
125:9
**deer (1)**
115:20
**defer (1)**
130:18
**definition (1)**
137:24
**degree (2)**
10:17;145:16
**degrees (1)**
15:6
**delay (2)**
132:7;151:24
**demanded (1)**
151:16
**demonstrating (1)**
46:10
**department (27)**
17:5,8,21;18:2;
19:21;20:2;23:14,19;
24:7;28:4;38:4,8;42:3,
7,11;44:15;52:11,15;
59:20;61:4;104:22;
124:12;129:4;146:10;
147:14,18;148:2
**departments (2)**
24:2;124:12
**department's (2)**
23:4,5
**depending (5)**
26:23;47:10;61:24;
114:21;119:14
**depends (3)**
36:12;45:20;53:19
**depicted (1)**
130:17
**deponent (1)**
4:3
**Deposition (5)**
4:1,10,22;7:18;
153:23
**deputies (7)**
20:6;52:23;59:18;
64:8;65:24,25;146:9
**DEPUTY (199)**
4:2,8,13,13,21;7:15;
8:25;11:5,22;16:15,17;
17:9,15;18:1;28:24;
33:6,23,24;34:2,6,10,
12,15,19,22,25;35:14;
40:24;41:18,22;42:5,6,
10;52:25;53:2,15,16,
17;58:7,14;60:13;

61:22;62:3,14;63:6,10,
13;64:21;65:6,14,17,
20;67:23;68:4,9,14,19;
69:1,10,16;70:3,3,4,5,
10,21,22;71:5,8,9,18,
20,24;72:2,3,15;73:16;
74:4;75:11;76:2,7,14,
17,24;77:7,12,14,17,
20;78:2,5,6,22;79:9,12,
14;80:1,20,21,23;81:8,
11,14,17,21,25;82:14,
15,24,25;83:6,11;84:1,
20,22;85:6,10,13,14,
17;86:1,5,12;87:4,7,14,
20,23;88:2,6,16,19,24;
89:3,13;90:1,9,17,18,
21,22;91:6,14,17,20;
92:17,18;93:1,13,16;
94:9,13,17,20;95:10;
96:10,13;97:8,14,18;
98:7,14,24;99:22;
100:2;102:2;103:2;
104:15,24;105:4;
106:18;110:23;111:4;
112:18;113:5,10;
121:14;123:23;126:13;
130:12;133:17,18,24;
134:2,6,12,17,21;
145:10;147:25;148:17,
19;149:8,11,21,22;
150:9;152:22;153:1
**Derouchie (3)**
34:10,13,15
**D-E-R-O-U-C-H-I-E (1)**
34:10
**described (6)**
50:13;117:10;
118:21;130:23;131:14;
151:17
**description (1)**
137:21
**design (1)**
80:9
**destroyed (1)**
110:6
**details (1)**
140:20
**Detective (3)**
95:8,9;148:11
**determination (1)**
147:22
**determine (4)**
41:15;73:23;95:17;
153:12
**determining (1)**
147:20
**device (1)**
129:22
**dictate (1)**
27:17
**dictated (1)**
28:25
**dictates (3)**

28:2,6;115:13
**difference (3)**
29:7,25;111:11
**different (22)**
21:7;25:4,5,8,9;
26:14,17,20,22;27:2;
28:10;37:4;58:23;
61:20;63:25;64:16,25;
65:22;66:12;106:20;
111:15;144:12
**differentiate (1)**
25:13
**difficult (1)**
8:21
**digits (1)**
9:4
**directed (1)**
124:23
**direction (1)**
131:3
**directly (1)**
148:21
**disagree (1)**
8:18
**discharge (3)**
12:18,23;14:7
**discharged (3)**
12:16;13:25;14:4
**disciplinary (3)**
35:22;105:5,8
**disciplined (2)**
42:6,12
**discuss (6)**
24:24;75:11;94:9;
104:20,24;105:2
**discussed (8)**
7:12,14;20:13;25:1;
30:2;43:15;64:16;
72:21
**discussing (5)**
29:4;64:22;75:9;
94:12;95:9
**dispatch (5)**
101:7,9,11,15,18
**displeased (3)**
111:6;135:16,19
**dissipated (1)**
106:25
**distance (1)**
76:16
**distances (1)**
7:7
**distinction (1)**
31:2
**distinguishing (1)**
139:3
**District (2)**
4:11,11
**diversion (1)**
99:8
**divided (3)**
61:18;79:3,8
**dividing (1)**

99:20
**division (1)**
57:25
**Dobbins (2)**
71:13;122:5
**dock (1)**
129:2
**docking (5)**
127:23;128:13,22;
129:14
**doctor (1)**
6:17
**document (3)**
24:21;117:21,24
**documentation (4)**
117:12,16,19;118:4
**dog (1)**
62:11
**done (17)**
7:19;29:17;38:13;
50:18;116:18;117:4,5,
8,9;121:5;127:4;
129:13;141:18,21;
142:18;144:20;153:4
**down (98)**
5:2,12;6:2,3;10:23;
27:4,10,11,13,24;28:5,
15,17,20,24;29:8,10;
30:25;31:3,9,11,13;
43:22,24;44:3,4,10,18,
25;45:2,7,11,13,20;
46:12,15,18,18,20,22;
47:3,8,16,20,25;48:12,
18;49:4,6,8,10,13,21,
23;50:10,16,18;51:7;
57:14;78:22;81:18;
114:3,8,13,23,24;
115:8,14,15,18,25;
116:2,7;117:7;131:7,
13;132:2,3;133:5,12,
15;134:7,17;135:6,19;
136:21;138:4,13;
141:16;142:25;143:6;
145:12,14,23;148:11,
14;153:2,10
**downs (1)**
113:20
**drafted (1)**
58:17
**drew (1)**
100:22
**Drive (5)**
71:12;72:4;119:18,
23;128:7
**driver (18)**
41:14;57:4;73:12;
74:13,22;75:2;79:14,
20,21,24;90:20;96:5;
97:12;101:25;103:15,
17;147:12;149:23
**drivers (3)**
57:9,22,24
**driver's (9)**

73:10;75:15,17;76:8,
25;91:18;96:20;103:6;
111:24
**driving (3)**
7:8;44:6;72:7
**drove (1)**
103:21
**drugs (6)**
6:12;83:16,20;93:19;
109:24;110:1
**duly (1)**
4:4
**during (48)**
28:3,23;33:2;35:20,
24;46:22;47:16;49:4;
54:15;57:10;60:7,12;
61:23;78:4;81:15,19;
82:24;83:6,9,21;87:12,
16,22;88:13;90:13;
108:11,18;110:20;
112:10;118:12;126:4,
7;130:10;131:22;
132:2,2,12;133:4,11;
136:25,25;137:3,16;
138:18;141:11;142:2,
4;147:1
**duties (6)**
13:2;15:18;17:23;
18:1;99:5;103:25
**duty (1)**
123:7

**E**

**earlier (10)**
14:23;29:4;43:15;
59:15;64:17,22;65:4;
73:14;86:11;108:17
**early (2)**
107:13;109:19
**earn (2)**
10:16;15:6
**easier (1)**
5:4
**east (6)**
61:21;99:13,17,19;
119:5,16
**economic (1)**
152:8
**education (6)**
10:7;11:25;14:19,20;
15:2;32:16
**effect (14)**
84:5,9,21;86:3;90:5;
110:21;132:7,9;
136:20,23;148:9,11;
150:23;151:2
**eight (2)**
64:9;129:2
**either (12)**
21:12;23:7;26:2;
38:7;45:25;46:8;47:19;
48:18;66:15;68:19;

92:22;136:8
**elect (1)**
116:2
**elevated (1)**
111:13
**eloquently (1)**
146:20
**else (12)**
21:11;24:22;73:6;
74:6,22;75:11;77:21;
89:24;93:14;106:21;
127:10;131:8
**elsewhere (1)**
68:20
**emergency (2)**
101:20;146:12
**employed (1)**
62:17
**employment (3)**
15:9;32:23,24
**encounter (4)**
67:11,14;100:3,7
**encountered (2)**
63:13;100:16
**encounters (3)**
67:1,4,19
**encouraged (3)**
56:7,9,20
**end (6)**
28:12;37:7,19;60:6;
62:25;66:15
**endeavors (1)**
114:9
**ended (1)**
60:8
**enforcement (10)**
14:2;17:3,16,18;
19:21,23;57:25;118:6;
143:19;152:3
**enough (1)**
139:1;151:25
**entire (2)**
57:24;118:23
**Entirely (2)**
28:14;153:14
**entirety (7)**
22:9,19,21;54:15;
87:12;118:24;130:11
**especially (3)**
7:7;96:1;124:9
**essentially (3)**
32:16;121:22;140:9
**estimate (3)**
57:8;82:10;150:13
**estimation (2)**
57:12;82:6
**et (2)**
29:14;141:4
**etching (1)**
140:21
**evaluation (2)**
33:13;36:1
**evaluations (1)**

35:21
**even (4)**
32:11;114:17;124:9;
145:22
**event (3)**
63:2;124:11;130:1
**events (2)**
24:21;105:11
**everyday (2)**
6:22,23
**evidence (1)**
112:9
**exact (9)**
8:10;10:21;20:10;
63:12;72:20;103:10;
107:19;125:4;139:13
**exactly (18)**
5:9;15:23;23:9;
32:22;46:25;73:3,11;
74:16;77:2,15;78:11,
13;80:10,15;98:7;
132:6;133:6;148:24
**EXAMINATION (5)**
4:6;113:16;145:8;
150:18;152:20
**examined (1)**
4:4
**example (17)**
28:3;53:10;54:3;
114:22;116:5;117:3;
119:7;123:6;130:4;
132:24;134:15,17;
136:21;138:12,22;
142:15;145:2
**Excellent (1)**
58:5
**except (1)**
106:23
**exchanged (1)**
72:20
**excuse (5)**
57:3;74:8;79:7;
91:13;95:10
**exigency (1)**
144:22
**exigent (1)**
21:20
**exit (8)**
74:13;76:9,10;88:9,
10;89:11;92:10;102:3
**exited (5)**
88:12,17,20,25;89:4
**experience (15)**
57:9;58:3;104:7;
115:5;117:14;122:7,9;
123:13;125:10;134:1,
5,12,24;135:4,21
**experiences (2)**
125:15;142:4
**expired (6)**
73:4,23;100:24;
101:5;111:20,24
**explain (2)**

20:20;111:9
**expound (1)**
150:20
**extent (4)**
9:20;107:5;122:8;
130:15

**F**

**Facebook (2)**
11:5,8
**facing (8)**
45:18,23;46:11,15,
18,21;81:22;131:11
**fact (3)**
129:19;135:18;
140:17
**factor (3)**
147:22;148:3;152:15
**factors (3)**
55:22,25;56:4
**facts (3)**
7:12,14;147:7
**fair (33)**
19:4;24:8;25:7;
26:12;40:8;41:11;68:8;
82:6;98:18;111:12;
113:24;116:12;117:10;
119:25;121:6;123:17;
127:16,17;129:15;
130:19;133:5;137:9,
10;139:9;140:23;
142:13,23;143:4,20,21;
144:18;146:11;151:25
**fairly (1)**
138:4
**fall (1)**
109:20
**familiar (3)**
62:14;66:20;67:6
**family (1)**
17:18
**far (16)**
29:2;30:2;44:7;
51:12;52:12;66:2;68:8;
75:19;90:11;94:17;
104:15;111:17;112:9;
130:7;147:6;148:22
**feature (1)**
139:3
**federal (1)**
59:17
**feel (4)**
5:18;9:18;48:21;
49:2
**feeling (5)**
29:11;30:9;31:4;
45:15;48:9
**feet (5)**
90:14,15;148:25;
149:2,4
**fellow (1)**
110:14

**felonies (2)**
123:3,9
**felony (4)**
41:3,4,4,7
**female (67)**
42:13;43:5,6,8,11,
23;44:5,8,15,23;45:1,
25;46:2;48:1,2,10,23;
53:10,13,15,16,24,25;
54:2,2,3,8,9,19,20;
55:3,3,7,10,11,11;56:2,
2,5,8,14,22;58:18;
70:11,15;90:7;94:18,
24;95:11;108:4,8,11,
18;109:3,7,10;117:3;
118:13;144:9,10,21;
145:4,5,22,24;149:9,16
**few (4)**
10:22;37:10;103:9
**field (13)**
32:1,9,16,19;33:2,3;
35:3,5,20,24;59:8;
117:19,20
**fifteen (1)**
114:17
**figure (1)**
9:20
**figured (1)**
103:11
**file (1)**
16:18
**filed (1)**
4:10
**filled (1)**
117:25
**filling (1)**
24:11
**find (3)**
83:11,14,16
**findings (2)**
72:23;121:6
**fine (3)**
15:5;41:21;118:20
**fingers (5)**
49:4,8,9;50:14;85:18
**finish (3)**
5:5,6;21:5
**finished (2)**
32:11;86:1
**first (31)**
4:4,18;14:6;17:10,
20,25;30:15,24;33:6;
55:6;65:10;71:8;88:12;
97:15;100:7,22;
102:22;103:2;104:2;
105:18;108:6;110:20;
112:10,17,17;120:15;
125:22,23;126:12;
130:24;141:11
**fit (2)**
137:23;138:9
**fitting (2)**
80:11,18

**five (9)**
6:7;36:21;42:25;
58:8;68:11;82:20;
106:12;148:24;149:2
**flat (2)**
50:14,14
**flee (1)**
87:8
**fleet (1)**
72:12
**flexors (1)**
82:13
**FLOYD (17)**
4:2,8,13,20,21;8:25;
11:5,9,22;41:18,22;
45:6;58:7,14;104:15;
121:14;145:10
**F-L-O-Y-D (1)**
4:20
**focus (4)**
59:14;137:10,11;
149:20
**focusing (1)**
120:13
**folks (1)**
135:24
**follow (2)**
24:5;63:21
**following (1)**
23:3,5
**follows (1)**
4:5
**foot (2)**
106:19;149:6
**footage (24)**
117:21;125:21;
126:17;127:13,15,19,
19;128:3,11,15;129:6,
8,15,18,22,24;130:3,4,
5,6,10,13,18,18
**forgive (6)**
22:14;116:23;122:3;
128:22;130:25;131:21
**form (4)**
56:23;116:10;
122:12;134:8
**Formal (3)**
15:12,14,20
**forms (2)**
117:18;118:3
**Fort (3)**
13:5,6,11
**Fortunately (1)**
30:23
**forty (1)**
19:4
**forty-five (2)**
119:15,20
**forward (1)**
75:10
**found (1)**
83:20
**foundation (2)**

123:19;134:9
**four (16)**
9:4;12:15;13:16;
35:6;40:21;43:15;
61:20;64:1,4,16;66:11,
14;108:16;113:19,22;
144:12
**frame (3)**
82:17;106:7;149:20
**free (3)**
5:18;9:18;102:7
**Friday (1)**
19:1
**friends (1)**
62:19
**front (21)**
57:7;76:17;78:14,19;
79:4;80:3,9;86:6;87:4,
7;88:2;89:13;90:16,17,
21,25;91:15,18;96:12;
110:6;131:15
**full (1)**
8:22

**G**

**Gabra (2)**
35:14;70:3
**G-A-B-R-A (1)**
35:15
**gas (1)**
139:18
**gave (2)**
92:20,24
**Gazette (1)**
8:19
**gender (1)**
52:24
**General (5)**
10:15;19:21,23;
106:13;143:24
**generally (7)**
22:23;36:10;61:13,
16;116:18;137:6;
144:11
**generate (3)**
104:8,10,14
**generated (4)**
58:24,25;59:3,8
**generating (2)**
58:19,22
**generation (1)**
38:22
**geographic (2)**
51:15;118:22
**geographical (1)**
51:12
**geographically (4)**
51:20;68:6;69:7;
137:9
**geography (1)**
122:2
**gestures (1)**

5:25
**given (9)**
4:21;39:11;61:7,10,
14;105:11;130:9;
140:12,24
**giving (2)**
5:5,7
**glasses (7)**
6:20,22,22,23,24;7:2,
6
**gloves (2)**
49:12,15
**goes (2)**
128:3,12
**Good (9)**
4:8;6:1;70:7;104:15;
114:8;129:21;130:3,9;
143:8
**Gotcha (1)**
125:16
**graduated (1)**
9:24
**graduation (1)**
12:6
**Graham (3)**
67:6,11,14
**granted (2)**
108:23,24
**great (1)**
104:19
**greater (1)**
125:20
**ground (1)**
4:25
**guard (3)**
124:22;134:2,13
**guess (7)**
25:7;27:3;41:2;
50:12;96:2;119:2;
126:21
**guidelines (4)**
143:14,18,22,24
**gun (1)**
97:1

**H**

**half (2)**
15:24;100:13
**hand (17)**
5:25;46:1,1,8,11,11,
14,15;47:14,20;48:2,
10,23;49:7;50:15;
81:11,15
**handed (1)**
50:13
**handful (2)**
115:4;126:21
**handle (2)**
97:1;138:22
**handled (2)**
37:9,21
**handler (3)**

62:10,11,13
**hands (7)**
45:14,17;50:2,4,9;
145:17;148:18
**handy (1)**
54:15
**hanging (1)**
80:19
**happen (2)**
35:16;124:8
**happened (13)**
63:8;19;76:12;77:13;
78:21;86:4;97:9;98:6;
101:19,24;103:20;
124:14;135:7
**happening (1)**
146:12
**happens (1)**
88:6
**happy (4)**
135:7,11,13;136:4
**hard (2)**
111:9;128:7
**haste (1)**
151:23
**hatch (3)**
91:12;93:10,12
**head (8)**
16:12;27:9;29:23;
32:21;40:17;131:2,7;
133:8
**headlights (1)**
115:20
**headquarters (1)**
38:4
**hear (7)**
78:1;88:15,19,23;
89:2;124:3;136:7
**heard (11)**
42:5,10,15,18;43:9;
68:1,14,18;70:21;
123:6,7
**hearing (2)**
7:9;123:14
**heavily (1)**
124:24
**held (2)**
40:2,23
**Help (3)**
15:20;31:8;143:18
**helping (1)**
17:17
**herein (1)**
4:3
**Herrig (1)**
66:17
**H-E-R-R-I-G (1)**
66:18
**hey (4)**
121:14;124:21;
128:18;151:19
**Hickory (4)**
14:11,13,15,18

**high (15)**
9:24;10:2,6;12:6;
29:12;40:14,18;41:1,
15;124:7;138:1;147:5,
20;148:2;152:5
**higher (3)**
122:15,23,23
**highly (1)**
144:5
**hip (1)**
82:13
**hips (3)**
82:13;138:3,11
**hired (4)**
17:4,10,20;18:10
**history (12)**
73:10,12;75:15,17,
21,23,24;76:1;112:19,
23;113:1,5
**hold (1)**
16:23
**holiday (1)**
63:4
**holster (1)**
97:6
**home (1)**
38:5
**honorable (2)**
12:18,23
**hope (1)**
145:10
**hour (8)**
36:17;40:5,7;60:10;
61:1;100:10,14;103:9
**hours (12)**
19:4;35:6;36:13,16,
19,21;43:19;44:8;61:4;
105:13;107:14;125:11
**huh (1)**
61:6
**huh-uh (1)**
6:1
**humor (1)**
143:8

**I**

**identified (1)**
113:22
**identifying (1)**
102:10
**ill (1)**
134:13
**Illinois (14)**
4:12;9:8,14;10:5,13;
18:18,20;19:24;22:5,6;
32:15;71:13,14;107:5
**illness (1)**
6:18
**image (1)**
131:8
**imagining (1)**
128:23

**immediate (1)**
146:13
**immediately (2)**
12:7;133:14
**important (1)**
148:7
**impression (2)**
121:17;140:8
**improper (2)**
42:8;134:7
**inappropriate (3)**
42:12;85:21,25
**incident (24)**
25:15,18;29:17;
43:25;59:20;118:12;
119:25;120:14,14,18;
122:25;123:15;124:16;
126:5,8;128:16;129:9;
130:11;135:21;137:1,
17;138:18;139:17;
141:12
**incidents (4)**
25:9;124:8;140:4;
152:9
**inclined (1)**
96:6
**include (1)**
144:12
**includes (1)**
54:14
**inconsistent (2)**
130:16,17
**Incorrect (1)**
111:22
**increase (2)**
95:20,21
**increased (2)**
125:9,11
**indeed (2)**
125:24;142:16
**independently (1)**
49:11
**indicate (7)**
75:1,6;96:4,17,24;
147:7,11
**indicated (3)**
74:22;94:13;134:13
**indicating (1)**
35:21
**individual (8)**
24:1,7,13;42:8;53:2;
105:18;106:16;145:15
**individuals (4)**
45:4;106:1;137:12;
147:21
**influence (2)**
6:12;44:6
**inform (1)**
74:5
**information (9)**
75:25;76:4;101:9,10,
15;112:22;117:25;
121:22;124:5

**informed (12)**
73:7,8,10,11;74:4,
12;75:14,20,22;83:22;
84:14;112:18
**informing (1)**
77:24
**initial (1)**
139:17
**Initially (2)**
14:19;103:1
**initiate (1)**
21:17
**initiated (3)**
67:23;68:15;89:16
**initiating (2)**
21:15;102:20
**in-person (12)**
32:3,10,13;39:6,8,12,
22;40:6,10,22;41:23;
42:1
**inside (9)**
30:18;31:14;73:9;
77:25;92:15,25;93:7;
132:25;137:3
**Instagram (2)**
11:14,16
**instance (3)**
43:10;54:25;64:13
**instances (4)**
29:1;42:22;43:4,7
**instead (1)**
116:3
**Institute (4)**
18:17,23;19:12;24:6
**instructed (4)**
49:17;86:6;88:8;
97:12
**instruction (2)**
19:8;25:13
**intend (1)**
153:19
**intent (1)**
152:6
**intents (1)**
145:3
**interaction (5)**
92:4;118:7;132:10,
11,12
**interested (1)**
28:22
**intersection (3)**
71:13;100:18;122:4
**intervened (1)**
85:22
**intimate (1)**
27:5
**into (20)**
29:13,14;30:9;31:14;
59:23;111:5,25;112:7,
23;113:13;116:25;
121:14;128:13,14,24;
129:3;140:22;147:22;
148:3;152:15

**intrusive (8)**
29:10;113:25;114:1,
4;116:7;117:8;141:18;
144:5
**intrusiveness (3)**
116:25;145:13,24
**invasive (3)**
115:24;142:22;143:1
**investigation (30)**
112:22;121:4,12,19,
23;140:9;147:13,17
**involve (1)**
145:23
**involved (3)**
147:8,12,17
**involvement (1)**
129:24
**involves (2)**
114:5;145:14
**involving (2)**
59:21;120:16
**irked (1)**
135:15
**irritated (2)**
135:15;151:7
**issue (4)**
59:14;110:8,10,14
**issued (4)**
55:19;111:20,24;
117:25

**J**

**January (3)**
12:11;65:15;107:2
**jeans (1)**
80:12
**Jeep (46)**
67:18,19;73:18,19;
77:6,9,13;79:7,10;
86:8;88:7;90:17;91:1,
7,8,11,12,12,15,18,24;
92:11;93:6;96:12;
98:20;100:2,4,7,17,23;
101:6,19,22;102:1,2,4,
9,20;103:1,5,8;104:3,
10;140:17;147:8;
150:10
**job (7)**
14:16;15:16,18;16:4,
13,16,23
**join (2)**
12:2,5
**joined (1)**
12:8
**joking (1)**
135:14
**jumping (1)**
113:18
**justification (1)**
115:16
**justified (1)**
116:5

**intrusive (8)**

**K**

**keep (5)**
5:23;41:19;58:10;
104:16;142:5
**kids (1)**
151:18
**kind (30)**
8:12;11:13;24:4;
31:24;43:21;55:13;
56:6;59:14;63:21;72:3,
6;73:12;80:6,9;97:6;
110:1;113:25;122:1;
131:14,16;133:2;
141:6;144:10,22,24;
148:6,7;151:4,18;
152:3
**kinds (1)**
43:12
**knees (1)**
114:24
**knife (2)**
97:4;138:22
**knowledge (5)**
9:20;41:13;109:18;
128:8;130:8
**known (1)**
122:10

**L**

**lack (2)**
26:7;123:18
**language (1)**
152:15
**lapel (1)**
125:25
**large (1)**
61:14
**last (30)**
4:19;8:8;9:4;10:19,
21;11:19;13:3;18:23;
21:1;32:17;35:8,10,14;
36:11;39:21,23;40:4,
13,21;43:9,16;44:12,
13,16,18,24,25;54:22,
25;62:24
**lasted (3)**
22:8,16;32:6
**lasts (1)**
31:17
**late (5)**
89:21;107:8,13;
109:19;132:8
**later (6)**
6:3;21:12;84:13;
128:14;130:22,23
**Latika (3)**
67:6,11,14
**latter (1)**
140:2
**law (19)**

14:2;17:3,15,18;
19:17,21,23;21:6;22:2,
3,5,8,17;23:7;26:2;
57:25;118:6;143:19;
152:3
**lawsuit (3)**
59:17;66:24;67:9
**lead (1)**
134:6
**learn (3)**
26:14;89:6;124:6
**least (17)**
8:11;21:9;41:14;
52:12,24;113:25;
114:4,5;116:20;117:7;
131:25;138:7;140:8,9;
141:17;142:12;150:24
**leave (6)**
14:18;16:3;127:5,15;
132:22;139:3
**leaving (3)**
17:1;98:15;127:11
**led (1)**
134:2
**left (12)**
13:22;14:19;24:6;
98:9,11,13,22,25;99:2;
100:1;125:25;139:11
**leg (1)**
137:24
**legal (1)**
115:16
**legalized (1)**
107:4
**legs (3)**
6:6;58:9;85:18
**length (1)**
14:14
**lengthy (1)**
114:9
**less (31)**
16:1;20:7;29:10;
32:20;36:17,19,21;
39:13,14;40:7;42:24;
43:2;54:24;57:12,19,
20;82:19,20,22,23;
100:10,13;114:15,16;
116:7;126:22;142:21;
143:1;149:1,4,6
**lessons (2)**
19:8;25:13
**level (4)**
116:24;145:13,23;
151:23
**license (13)**
73:5,22;74:19;
100:25;101:3,12;
102:9,23;111:21,24;
140:13;141:8,12
**Lierman (3)**
106:12
**life (1)**
5:4

**lights (1)**
101:20
**likely (12)**
23:10;40:20;48:12;
69:7;78:19;112:14;
124:11;125:17;133:7;
148:24;152:9,25
**limit (1)**
136:3
**limited (1)**
107:12
**line (2)**
99:20;116:20
**lines (3)**
86:17;102:5;119:10
**list (3)**
36:9;58:24;59:1
**listed (1)**
113:24
**little (13)**
5:1,4,8;6:3;47:18;
59:25;104:16;113:11;
124:21;125:21;130:16;
131:17;150:20
**live (5)**
9:7,13,15;143:19;
147:21
**lived (1)**
9:9
**living (1)**
9:12
**loaded (1)**
152:3
**located (3)**
10:12;18:20;77:13
**location (9)**
51:1,12,13,15;52:2;
68:9;71:5,19;122:10
**log (1)**
128:14
**logic (1)**
135:1
**long (30)**
7:7;9:9,15;12:14;
13:10;14:12;15:22;
16:19;18:22;20:25;
22:7,15;32:5;33:9,24;
34:12,22;36:10;40:4,7;
65:13;71:4;82:14;
89:23;114:9,11,12;
119:9;126:20;149:14
**longer (4)**
65:17,21;114:25;
151:20
**longest (1)**
36:14
**look (9)**
86:19;95:25;112:16;
113:1;115:20;121:14;
127:14;131:7;143:9
**looked (1)**
73:22
**looking (4)**

9:21;29:13;131:10;
141:6
**looks (2)**
6:2;125:24
**loose (6)**
80:10,17;137:17,21,
21;139:1
**lost (2)**
57:21;58:1
**lot (1)**
113:18
**loud (1)**
5:24
**low (2)**
138:1,4
**lower (1)**
138:10
**lucky (2)**
61:6;66:13

**M**

**Macon (1)**
10:5
**main (1)**
91:10
**maintaining (2)**
77:8;141:3
**majority (1)**
21:10
**makes (4)**
6:3;21:8;61:19;
148:16
**male (32)**
43:5,6,7,10;44:13;
47:24;48:11,17;53:12,
15,16,23;54:1,7,19;
55:2,23;56:1,5,7,13,19;
58:17;90:6;108:8,10;
117:5,9;144:8,18,21;
145:25
**Malloch (6)**
33:6,7,10,14,17,19
**M-A-L-L-O-C-H (1)**
33:8
**man (1)**
107:16
**manager (2)**
15:17,19
**mandated (1)**
32:14
**manner (1)**
29:16
**many (14)**
20:4,8;26:5;36:8;
37:4;42:22;57:13;
58:23;63:25;64:7;
105:13,25;118:25;
119:13
**March (1)**
9:1
**marijuana (11)**
74:1,20;86:22;

105:15,20,23;106:2,16;
107:4;108:12,19
**Market (1)**
99:21
**marking (1)**
128:18
**marks (1)**
102:10
**Maroa-Forsyth (1)**
10:3
**married (2)**
149:12,14
**material (1)**
80:13
**matter (5)**
106:20;120:10;
127:2;129:12;143:25
**Matthew (1)**
4:9
**Mattis (2)**
100:18,20
**may (66)**
21:21;27:14;28:19;
29:12;30:18;45:15;
46:17;59:21;60:7,16,
19;61:6,14,14;62:1,5;
66:25;67:3,10,13,17,
20,22;69:15,20,22;
70:10,19;72:6,15;
73:18,21;74:2,18,22;
78:3;87:13,17;91:24;
92:5;94:2,4,5;95:17;
96:6,6;100:1,17,23;
103:2;104:3,20;105:6,
9;110:20;111:18;
112:17;113:6,6;
120:15;125:8;140:3;
143:19;146:3;152:24;
153:9
**maybe (14)**
21:10,12;23:20;37:1;
55:1;66:7;75:21;92:2;
112:22;115:25;119:15;
131:15;140:20;147:25
**Mc (19)**
4:7,9,17;57:2;58:2,7;
113:8;116:10;121:8;
122:12,17,21;123:18;
134:8;135:8;145:9;
150:17;152:21;153:21
**mean (18)**
5:24;25:5;26:19;
37:13;41:4;45:17;46:7,
25;51:11;53:18;74:25;
81:5;85:9;109:6;111:8;
115:11;137:21;139:6
**meaning (1)**
108:22
**meanings (1)**
152:4
**means (2)**
27:21;153:8
**media (1)**

11:10
**medic (2)**
13:9,15
**medications (1)**
6:14
**Meeker (1)**
66:19
**M-E-E-K-E-R (1)**
66:19
**meeting (1)**
8:2
**member (12)**
46:23;47:5,21;48:7;
50:25;51:6,22;52:5;
53:3,8;59:5,12
**members (11)**
17:18;19:25;20:1;
48:16;64:24;65:23;
69:19,21,25;70:9,10
**memory (7)**
6:15;68:21;127:9;
129:8,10;130:21;
140:22
**men (1)**
136:10
**men's (1)**
15:20
**mentioned (41)**
20:13;22:2,22;23:17;
29:4,24;30:14;36:4;
39:6;45:2;46:6;47:2,7,
9;63:20,22;65:4;70:21;
73:14;74:19;75:14;
79:12;80:20;93:9;
103:12;107:8,15;
110:21;112:16;113:19;
115:9;118:9,10;122:3;
131:24,25;136:24;
137:15;138:12;141:17;
143:11
**mentioning (2)**
37:16;95:8
**merely (1)**
23:24
**message (1)**
124:11
**met (1)**
149:18
**mid (1)**
65:15
**midnight (1)**
43:17
**might (20)**
5:8;6:14;24:24;
25:14;27:12;28:12;
30:16;31:9;48:16;82:7;
96:17,24;98:16;
115:14;122:8;128:2;
139:25;144:9;151:15,
25
**miles (3)**
118:25;119:5,6,11
**military (4)**

12:2,5,9;13:17
**mind (3)**
43:7;115:16;143:7
**mine (1)**
98:9
**minimally (1)**
115:24
**minor (1)**
120:5
**minute (3)**
82:23;119:23;126:22
**minutes (15)**
6:7;37:1,3,10;38:1;
58:8;68:12;82:18,20,
22;119:12,13,15,19,20
**mischaracterization (1)**
121:9
**misconstrued (3)**
46:5;48:14,25
**misdemeanor (1)**
41:7
**misheard (1)**
73:20
**misspellings (1)**
153:9
**mistakes (1)**
153:6
**mobile (1)**
38:10
**model (1)**
141:8
**modes (1)**
117:16
**moment (3)**
70:2;112:15;143:8
**moments (1)**
103:9
**Monday (1)**
18:25
**month (12)**
16:11;33:11,25;
34:14,24;35:5,10;
37:11,13,17,24;39:11
**monthly (2)**
39:13,14
**months (20)**
5:14;8:11;15:25;
16:1,2;18:24,25;19:4;
22:12,19;31:17;32:20;
39:16,18,19;40:21;
54:24;55:1;106:1;
133:22
**Moody (1)**
66:18
**M-O-O-D-Y (1)**
66:18
**more (40)**
15:25;19:21;27:5;
36:13,17,18,19,20,21;
39:3;40:6;42:24;54:24;
55:1;61:24;62:2;65:1;
66:7;68:11;96:6;
108:15;109:5;111:2,5,

8;123:15,16,21;124:8,
22,24;125:17;130:19,
20;138:3;141:3;
142:22;145:11;152:9,
25
**morning (2)**
4:8;107:14
**most (6)**
114:1;135:23;136:1,
4;153:13,16
**move (1)**
50:2
**movement (2)**
107:12;141:7
**much (5)**
76:16;119:18;
145:10;147:3;150:13
**multiple (6)**
37:10,12,13,15;
44:24;45:3
**must (1)**
73:20
**myself (4)**
22:15;62:7;89:12;
106:18

**N**

**name (7)**
4:8,19;11:8,16;
66:13;89:8;132:17
**named (2)**
61:21;118:13
**narrow (1)**
10:23
**nature (9)**
72:22,24;73:1,7;
74:5;75:9;95:14;96:21;
134:20
**near (1)**
71:12
**nearly (2)**
23:10;63:19
**necessarily (4)**
107:22;123:12;
128:1;139:6
**necessary (10)**
24:25;25:14;27:12,
13;30:6,16;46:17;49:8;
104:8,13
**need (6)**
37:14,23;41:19;
53:23;54:1;128:10
**needed (4)**
35:22;121:19;127:4;
134:13
**needs (3)**
51:21;58:16;153:12
**neighborhood (1)**
107:13
**Neither (1)**
151:22
**new (2)**

14:16;16:4
**news (4)**
8:5,9,12,23
**News-Gazette (1)**
8:17
**newspaper (2)**
8:13,15
**Next (20)**
5:17;21:10,12;30:14;
32:20;35:16,18;68:18;
72:14;76:6,12;77:13;
78:21;86:4;88:6;97:9;
98:6;101:19,24;137:13
**night (15)**
7:8;43:18;44:12,19,
24;45:1;69:23;70:1;
76:20;80:7;100:4;
106:23;107:8,10,13
**nobody (1)**
106:21
**None (1)**
102:16
**normal (1)**
135:5
**normally (2)**
114:9;142:5
**north (12)**
61:21;99:11,11,12,
12,14,14,16,19;119:4,
8,15
**notes (4)**
25:22;112:16;
113:19;143:9
**notice (1)**
5:1
**November (1)**
13:23
**number (9)**
9:5;20:10;36:16;
58:1;101:13;105:11;
130:1;133:22;152:16
**numbers (3)**
57:7;128:16;141:13

**O**

**Object (6)**
116:10;121:8;134:8
**Objection (6)**
56:23;122:12,17,20;
123:18;135:8
**observation (2)**
96:19;138:9
**observe (6)**
81:10;96:14,21;
136:7;149:25;150:6
**observed (8)**
74:21;75:1;76:7;
77:3,18;82:15;103:5;
148:8
**observing (2)**
74:24;75:5
**obtained (1)**

76:3
**obvious (2)**
139:4;142:20
**obviously (3)**
117:13;123:24;
131:11
**occupants (1)**
148:3
**occur (3)**
21:21;51:21;152:10
**occurred (2)**
54:22;73:16
**occurring (4)**
41:10;59:21;125:18,
20
**o'clock (1)**
66:9
**odor (7)**
73:8;74:1,20;77:24;
86:21;106:24,24
**off (18)**
16:11;27:8;29:23;
32:21;37:19;40:16;
51:19;74:25;78:17;
107:11;125:14;126:23,
24;127:4,6,15;144:16;
153:22
**offense (3)**
41:8;75:3,7
**offered (1)**
16:4
**Office (29)**
4:14;16:6,22;23:21;
31:23,25;32:4,4,6;36:5;
37:8,20;38:7;40:3,23;
42:16,19;44:9;57:25;
58:15;62:18;99:23;
117:15;124:19,20;
128:4;143:14;144:5;
150:21;151:15
**officer (61)**
31:7,8;33:3,9,13,17,
19,20;34:7,16;35:1,4,6,
12;36:2;42:15,18;43:6,
10,10;44:14;45:6;
48:17;51:24;52:3,19;
53:12,13,23,24;54:7,
19,20;55:2,3,7,11,23;
56:1,2,8,14,20;58:18;
61:3;94:18,24;95:12;
107:24;108:7,8,8;
110:14;114:5;116:19;
117:1,5,9;120:2,7;
144:9
**officers (5)**
26:15,23;35:25;64:7;
104:21
**official (1)**
42:11
**often (5)**
39:11;57:3;63:5,16;
123:12
**old (4)**

9:2;92:7;99:16;
107:18
**once (10)**
24:6;35:5;39:16,18,
19;77:12;103:11;
127:9;129:21,25
**one (61)**
9:11;13:12;20:13,13;
21:4;27:25;33:6,11,25;
34:14,24;35:14,19;
36:17;37:25;39:3;40:5,
7,13;41:22;43:16;
44:23,25;45:1,2,3,5;
46:4;49:9;59:5;61:22;
62:2;64:19,19;65:2,8;
74:20;78:9;82:23;84:3;
92:2;106:3,4,23;107:9;
114:13;115:9;118:13;
119:7,17;129:3;131:2;
140:2;141:16;142:11;
143:8,23,24;146:23;
149:6;153:1
**ones (3)**
61:6;123:25;124:3
**one's (13)**
27:4;29:5,8,13,13;
31:1,10,13;45:14;
51:13,14;55:15;108:20
**ongoing (5)**
32:7,8,10,14;39:8
**on-line (14)**
32:2,9,13;36:4,7,10,
14,24;37:14;38:2,15,
21,24;128:15
**only (6)**
6:8;37:9;44:23;72:9;
98:13;103:5
**operating (2)**
67:17,20
**opportunity (8)**
5:12;30:11,20;96:14;
113:12;136:7;149:25;
150:6
**opposed (1)**
41:7
**opposite (16)**
42:20;46:23;47:6,21;
48:8,16;51:1,7,22;52:6,
19,24;53:3;59:5,9,12
**option (5)**
92:20,21,24;142:10;
153:5
**options (1)**
153:1
**oral (1)**
59:11
**order (2)**
41:15;113:25
**orders (1)**
87:14
**others (10)**
18:4;27:7;29:21;
36:13;40:15;48:4,5,

54:4;70:13;123:16
**otherwise (2)**
28:25;145:24
**out (46)**
5:24;9:20;24:11;
45:18,23;46:6;47:12;
57:4,10;76:25;79:14,
15,20,22;81:22,23;
90:24;92:21,22;95:25;
96:9,11;97:2;103:11;
106:21;116:7;118:1;
120:4;124:11;125:5,7,
16;130:5,5;133:1,7;
134:16;135:6;138:23;
139:8;145:11;149:23,
24;150:5,8,14
**outpatient (1)**
13:7,11
**outside (9)**
30:9;31:4,4,13;50:3;
62:21;63:6;70:7;76:23
**over (18)**
21:20;29:11;45:14;
57:10,23,25;68:1,4,19,
23;69:2;70:23;112:16,
22;123:6;124:3;137:2;
148:6
**overhead (1)**
101:20
**own (5)**
26:3,4,8;38:5;121:23

**P**

**palm (21)**
45:18,18,23;46:6,18,
21;47:2,3,8,9,12,20,25;
48:12,18;49:6,9;81:18,
18,22,22
**palms (2)**
50:14,15
**pants (16)**
80:11,18;81:9;
109:15;137:18,22;
138:4,7,10,14,17,19,23,
25;139:4,9
**paper (1)**
8:16
**paperwork (1)**
16:18
**paraphernalia (2)**
83:18;93:21
**park (1)**
72:1
**part (14)**
15:8;24:13;26:1,5,8,
9,13;28:22;78:25;79:1,
1;80:20,22,23
**particular (29)**
20:25;33:3;51:2,16;
55:16;59:24;61:19,23;
62:2;63:10;64:10,11,
19,21;65:2,16,19,23;

66:15;75:12;118:6;
124:7;140:13,16;
146:3;147:8;148:4;
152:7,14
**particularly (5)**
46:1;48:17;136:9,20;
138:1
**parties (2)**
108:24;109:1
**partner (5)**
21:18;62:6,10;
107:20,22
**parts (1)**
123:12
**part-time (2)**
14:8,12
**party (3)**
4:15;63:4,4
**passed (1)**
106:25
**passenger (53)**
71:24;73:15,17;
74:13;75:6;78:12,19;
79:6,9,13,15;86:8,9;
88:3,7,8,16,20,24;89:3,
7,10,15,25;90:3,9,12,
15,20,23;91:4,15;
92:14,16;93:12,25;
94:4,14;97:12,16;98:5;
104:3;112:3,6;132:1,
11,13,16;133:3;
137:12;146:6;147:16;
151:2
**passengers (5)**
91:24;92:1;93:7;
96:5;102:25
**passenger's (2)**
94:1;141:5
**past (5)**
43:18;44:7;105:12,
25;134:24
**pat (77)**
27:3,10,11,13,24;
28:5,15,17,20,24;29:8,
10;30:25;31:3,9,11,13;
43:22,23;44:3,4,10,18,
25;45:2,7,11,13;46:18,
20,22;47:16;49:4,8,10,
13,21,23;50:10,16,18;
51:7;57:14;78:22;
113:20;114:3,8,13,23;
115:8,14,15,18,25;
116:2,7;117:7;131:13;
132:2,3;133:5,12,15;
134:7,16;135:6,19;
136:21;138:13;141:16;
142:25;143:6;145:12,
14,23;148:11,14
**patience (1)**
25:21
**Patriot (5)**
67:18,19;102:20;
140:17;147:8

**patrol (33)**
18:3;61:10,23;62:3;
63:22;64:4,6,8,10,14,
15,19,20;65:2,5,11,13,
18,21,23;66:3,6,15;
69:16,20,25;70:9,16;
99:5;103:25;106:19;
123:24;124:24
**patrols (1)**
54:12
**patting (1)**
45:20
**paying (2)**
140:13,16
**pending (1)**
6:9
**people (9)**
15:20;17:17;20:9;
48:20;86:17;120:22;
123:7;135:16;136:4
**perceived (1)**
140:21
**percent (8)**
20:7;57:12,13,18,20,
20,22,23
**percentage (4)**
20:5;57:6,9,15
**perception (1)**
138:5
**Perfect (1)**
58:5
**perform (21)**
17:22;31:9;37:14;
38:3,15;48:22;49:3;
50:17;52:1,6,23;53:9,
17;54:11;56:14;
115:18;117:1;135:5;
142:8,9,11
**performed (13)**
35:17;44:18;50:21;
51:18;55:13;59:12;
71:21;78:22;86:12;
97:8;108:18;110:23;
115:15
**performing (5)**
49:12,22;50:10;57:2;
79:23
**Perhaps (2)**
47:12;139:17
**period (1)**
126:16
**permission (5)**
77:17,21;108:22,23,
24
**person (33)**
27:4;29:5,9,13,18,
19;30:4,6,19;31:1,5,10;
42:20;48:25;51:13,14,
23;55:15;86:13;87:23;
94:1;108:21;113:20;
114:6;116:1,6;119:23;
132:19;135:5;141:24;
142:21;143:2,25

**personal (2)**
123:13;125:10
**personally (7)**
30:11;57:23;114:14;
122:24;123:7;124:1,6
**persons (2)**
74:15,17
**person's (2)**
29:16;145:15
**phase (1)**
32:17
**phases (2)**
32:11,12
**phone (1)**
38:10
**phrasing (1)**
122:9
**physical (2)**
114:5;141:18
**physically (1)**
136:10
**Piatt (8)**
16:6,7,8,10,14,19,21;
17:2
**P-I-A-T-T (1)**
16:8
**pick (2)**
142:9,11
**picking (1)**
143:6
**Ping (2)**
70:3,4
**pinky (1)**
46:9
**place (6)**
13:3;106:9;107:1;
128:6,13;150:14
**placed (1)**
146:8
**placing (2)**
45:14,17
**plan (6)**
74:7,10;75:10;79:13;
94:10,13
**planned (1)**
74:8
**planning (1)**
94:14
**plate (12)**
73:5,23;74:19;101:1,
3,13;102:9,23;111:21;
140:13;141:9,13
**platforms (4)**
32:2,9,13;36:4
**platoon (1)**
13:15
**play (1)**
116:25
**please (4)**
4:19;57:16;121:14;
122:3
**plug (1)**
128:24

**plural (1)**
74:17
**plus (1)**
119:23
**pm (11)**
60:5,13,17,20,25;
64:14;66:9,10,10;
107:10;153:23
**pocket (1)**
30:9
**pockets (2)**
29:14;31:14
**point (39)**
6:7;14:11,13,15,18;
29:20;36:22;65:8;
66:12;70:4;75:12;84:3,
24;86:10,21,25;87:12,
16;89:14;90:23;96:14;
97:19;98:10,12,15;
99:6;111:13;113:8;
120:3;121:5,12;127:7;
136:5;137:23;146:23;
148:13,15,18,20
**pointed (2)**
131:17;133:3
**pointing (1)**
131:4
**points (1)**
21:7
**poking (1)**
138:23
**police (6)**
13:17;18:17,22;
19:11;36:2;59:19
**policies (23)**
19:17;21:6;22:22,24,
25;23:4,5,12,16,18,21;
24:1,5;52:11,17,22;
53:7;54:6;56:13,16,21;
143:12,13
**policing (1)**
13:20
**policy (14)**
37:8,20;53:11,14;
58:15,20,22;59:4,7,10;
117:9,13;144:4,19
**poorly (1)**
122:9
**portal (1)**
128:15
**portion (2)**
131:16;136:15
**position (5)**
14:6,14;50:4;54:11;
131:3
**positioned (1)**
50:10
**possession (7)**
105:14,20,23;106:2,
17;108:12,19
**possible (17)**
10:23;28:14;31:5;
115:14,18,22;117:15;

131:2;138:25;139:5,
16,20;146:2;149:1,3,5,
7
**possibly (2)**
74:15;124:12
**posted (1)**
13:4
**potentially (1)**
31:12
**practice (1)**
129:13
**preface (1)**
67:16
**preliminary (2)**
6:11;72:22
**premise (1)**
41:6
**prepare (1)**
7:19
**preparing (2)**
7:17;117:16
**prescriptive (1)**
143:16
**presence (13)**
53:12,24;54:8,19;
55:3;94:18,21,23;95:1,
11,19;96:4,7
**present (3)**
52:25;54:18;95:15
**presumably (14)**
119:21;126:3;127:2,
19;130:13;133:2,16;
136:18;137:11;139:12,
21;141:2;142:11,25
**pretty (2)**
31:7;120:10
**previous (2)**
67:19;134:18
**previously (3)**
31:3;102:2;147:25
**Primarily (1)**
20:3
**primary (1)**
27:3
**prior (17)**
8:2;9:12;41:13;
44:12;54:8;60:16;
66:25;67:10;94:16;
102:20;108:23;111:11,
15;132:10,11;147:9;
150:5
**priorities (1)**
141:2
**pristine (1)**
130:6
**privacy (1)**
144:1
**private (2)**
46:2;52:2
**probable (1)**
142:16
**probably (5)**
15:23;16:2;113:18;

119:23;120:4
**procedure (4)**
  25:23;26:1;53:11;
  59:10
**procedures (20)**
  19:18;21:7;22:23,24,
  25;23:4,6,12,16,18,22;
  24:1,5;52:11,18;53:8;
  54:7;56:13,17,22
**program (4)**
  32:1,16;127:24;
  128:1
**prompt (1)**
  21:14
**proper (1)**
  4:18
**provide (2)**
  18:3;129:25
**provided (4)**
  37:6;89:8;101:8,10
**proximate (1)**
  119:24
**PTI (25)**
  19:8,10,15,19;20:1,
  5;22:4,10,19,21,24;
  23:17,22,25;24:4,10,
  16;25:2,12,19,22,25;
  31:16,19;45:10
**pulled (4)**
  57:9;102:4;103:4,12
**pulling (1)**
  147:24
**pulls (2)**
  57:23,25
**punch (2)**
  134:18,22
**purely (1)**
  57:19
**purpose (3)**
  63:3;116:8;142:12
**purposes (1)**
  145:3
**pursue (1)**
  17:3
**put (8)**
  77:19;128:10;
  129:14;134:2,3;137:1;
  138:17;145:17
**putting (1)**
  118:21

**Q**

**quantity (1)**
  110:3
**quarter (1)**
  61:17
**quick (2)**
  141:22;142:22
**Quickly (1)**
  69:24
**quite (1)**
  146:19

**quote (3)**
  87:24;116:17;117:14

**R**

**race (3)**
  147:21;148:2;152:14
**racial (1)**
  152:8
**radio (11)**
  54:15;68:5,15,19,24;
  69:2;70:23;94:20;
  112:23;123:6;124:3
**radioed (1)**
  101:7
**radios (1)**
  68:1
**range (1)**
  118:22
**rank (3)**
  12:16;17:7,11
**rate (2)**
  125:18,20
**rather (1)**
  138:11
**reaching (1)**
  30:9
**react (1)**
  84:2
**read (5)**
  8:20,21;37:18;56:18;
  136:15
**Reading (1)**
  6:22
**realize (2)**
  102:6;120:15
**realized (3)**
  101:25;102:1;152:1
**really (3)**
  27:25;120:5;152:1
**rear (2)**
  76:17;101:3
**re-ask (3)**
  12:5;13:2;136:11
**reason (7)**
  6:1;17:1;46:4;65:16,
  19;98:13;150:22
**reasonable (10)**
  27:14,20,21;28:1,7,
  18;30:17;53:16,18;
  115:10
**reasoning (1)**
  95:5
**reasons (3)**
  58:23,25;59:2
**recall (269)**
  8:8;10:24;11:1,2,4,
  19;12:8;13:13,22;
  14:12,14;15:2,4,23;
  16:9,9,11;17:4,11;18:8,
  9;19:7;20:4,5,10;21:1,
  2;22:1,7,14,15;23:9;
  24:15,16,23;25:1,16;

26:4,5;29:5,23;32:21;
34:9,18;35:10,12;
36:16;37:2;38:21,23,
24;39:1,3,5,21,24;40:9,
13,16,18,20;42:22,23;
43:1,3,4,5,9,24;44:12,
16;52:4,8;54:23,25;
55:6,7,14,17,20,21;
56:18;59:20;60:3,4;
61:7,9,11,13;62:1,4;
63:2;65:10;68:2,3,5,7,
8,10,13,23;69:6,19,21,
22;70:8,18,20;71:4,7,9;
72:19,25;73:3,6,11,22,
24;74:3,15,18,20,21,
24;75:1,4,5,8,13,16,19,
22,23;76:16,19,20,22;
77:2,11,15,16,21,23,
23;78:3,9,11,12;79:17,
19;80:6,9,12,13,14,25;
81:11,13,14,16,17,20,
21,24;82:2,14,17;83:2,
4,5,8;84:22,23,25;85:1,
2,4;86:5,23;87:1;
88:18,22;89:1,5,8,18,
20;90:3,8,10;91:8,14,
17,20;92:7;94:3,15;
95:5,7,9,13;97:20,22,
25;98:3,7;99:3;100:3,
8,12,15;101:10,17;
102:11,12,13,15,18;
103:4,10,17,19,23;
104:23;105:1,3;106:3,
4,6,6,8,10,18;107:11,
18,19;108:4,6,9;
109:14,16;113:7;
116:19;118:10,16,18;
122:4;125:4;126:25;
127:1;131:19;132:5,6;
133:6,11;136:17,19,22;
138:15;139:13,23;
140:1,4;143:23;
149:10;150:16,24;
152:23,25
**receive (6)**
  13:19;17:22;33:12,
  16;34:1;105:8
**received (7)**
  19:19;26:21;35:21;
  36:1;45:6;105:4;112:3
**recent (1)**
  105:11
**recently (1)**
  102:6
**recitation (1)**
  84:8
**recognize (2)**
  102:19,23
**recollection (2)**
  103:7;109:19
**record (5)**
  5:13;46:10;120:4;
  136:15;153:22

**recorded (1)**
  52:7
**recover (2)**
  93:19;109:21
**recovered (3)**
  44:19;93:17;110:4
**redirect (1)**
  113:9
**refer (1)**
  26:10
**reference (3)**
  23:1;37:7;152:11
**referring (8)**
  19:11;22:25;37:5;
  64:5;77:6;84:12;86:10;
  152:5
**regarding (13)**
  24:17;25:17,23,25;
  44:9;52:11,18;53:8;
  58:16;73:1;90:4,9;
  101:19
**registration (2)**
  100:24;101:5
**relation (3)**
  123:12;137:9;148:20
**relatively (3)**
  120:24;141:22;
  146:21
**relay (1)**
  101:15
**relayed (3)**
  72:25;76:1;101:12
**relocated (3)**
  76:13;96:12;150:9
**relying (1)**
  121:22
**remain (1)**
  92:23
**remained (1)**
  132:25
**remarkable (2)**
  135:20;144:22
**remember (10)**
  8:16;9:19,21;75:18;
  84:7;98:17;102:8;
  110:3;139:21,24
**reminds (1)**
  9:17
**removing (2)**
  30:3,5
**reorganization (1)**
  99:24
**repeat (2)**
  28:9;136:12
**repeating (1)**
  22:15
**rephrase (11)**
  5:19;23:15;46:24;
  49:23;56:10,15;64:18;
  114:12;115:17,21;
  126:24
**rephrased (1)**
  28:11

**report (28)**
  8:9,12;24:20,24;
  25:14,18;33:13;12,16;
  34:1,4;38:22;58:16,19,
  20,22,24,25;59:2,6,8,
  11;66:14;104:8,14;
  117:17,19,20;128:19
**reported (1)**
  121:23
**reporter (6)**
  5:2;6:2;104:17;
  136:16;153:2,17
**reports (10)**
  8:5,23;24:11,17;
  25:4,6,9;41:24;104:4,
  10
**representation (1)**
  130:19
**reputation (1)**
  124:19
**request (20)**
  53:12,16,23;54:2,7;
  56:5;68:23;69:1;70:22;
  92:16,19;94:17,21,23;
  95:1,11;112:22;
  121:16;135:6;153:5
**requested (7)**
  54:3,19;68:21;92:14,
  24;119:22;136:14
**requesting (4)**
  53:8;55:2;95:6;
  123:7
**requests (1)**
  123:16
**require (4)**
  7:2,5;56:4,12
**required (15)**
  38:6;39:12;51:23;
  52:1,6;54:7,10;55:24;
  56:1;116:18;142:11;
  144:9,16;145:4;146:13
**requirement (1)**
  51:8,17,20
**requires (3)**
  53:12;59:6,11
**Reserves (2)**
  12:20,22
**residences (1)**
  106:22
**resist (1)**
  87:14
**respect (1)**
  144:1
**respectful (2)**
  48:25;143:25
**respective (1)**
  120:23
**respond (5)**
  70:25;71:2;119:25;
  120:8,8
**responded (6)**
  69:3;120:6;122:24;
  124:1,10;133:23

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

CODY FLOYD
February 20, 2020

**responding (1)**
123:13
**responds (1)**
120:7
**response (1)**
78:2
**responses (1)**
123:2
**responsibilities (1)**
16:16
**responsible (1)**
96:3
**rest (4)**
74:9,10;120:20;
124:11
**restart (1)**
21:5
**restarted (1)**
15:3
**restraints (2)**
146:7,8
**result (6)**
83:12;104:2,9;105:5,
9;109:21
**resume (1)**
99:5
**resumed (1)**
103:24
**return (2)**
97:13,16
**returned (8)**
97:10;98:5,8,8;99:4,
7;103:24;139:12
**review (3)**
5:14;7:21;153:6
**reviewing (1)**
6:4
**rib (2)**
82:5,8
**Richland (8)**
10:10,11,17,20;
11:24;14:22;15:3,5
**ride (6)**
35:6,7,9,13,17;119:9
**ridge (2)**
46:11,14
**riding (2)**
137:25;138:2
**right (27)**
5:10;7:1;16:2;32:18;
44:2;79:5;80:3;87:5;
90:6;101:3;117:20;
118:3,9,19;120:18;
126:15;127:13;129:7,
17,21;131:10,12,16;
139:14;141:15;144:13;
151:25
**rights (2)**
59:18;144:1
**risk (9)**
29:12;40:14,18;41:1,
15;95:20,21;125:8,10
**road (4)**

6:4;99:12,13,16
**roads (1)**
100:19
**room (1)**
5:3
**rough (1)**
106:7
**Roughly (4)**
19:2,3;24:18;118:25
**route (1)**
119:14
**routine (1)**
129:13
**routinely (1)**
124:23
**rule (3)**
6:8;139:8;144:24
**rules (1)**
4:25
**run (3)**
38:18;87:10;141:12
**running (2)**
130:10;132:8
**rush (3)**
146:4;150:22;151:3,
23

**S**

**same (23)**
6:2;17:12;18:19;
21:7;63:12,12,17,18;
65:5,11,13,17,21;66:2;
69:16;102:6,25;
103:12;107:23;116:19;
117:1;133:18;151:23
**satisfactory (2)**
33:16;34:4
**Savoy (1)**
99:15
**saw (8)**
8:8;71:20;79:4;
80:20,25;97:7;103:1;
138:8
**saying (11)**
67:16;85:5;133:11;
135:12;144:11;151:1,
3,5,6,8,18
**scenario (2)**
37:7,9
**scenario-based (1)**
37:6
**scenarios (3)**
28:20,22;37:18
**scene (29)**
51:2,10,16;54:18;
55:8;63:14;72:15;
73:21;74:2;98:9,12,20,
24;99:2;110:6,14;
120:25;126:11;127:5,
10,16;139:11;140:7,
25;141:4;146:9,19,20;
149:21

**scenes (1)**
133:23
**schedule (1)**
66:9
**scheduled (2)**
35:17,19
**school (4)**
9:25;10:2,6;12:6
**search (241)**
25:23,25;26:10,13;
27:4,4,5,6,10,11,13,24;
28:5,15,17,21,25;29:3,
4,8,8,10,13,24,25;30:1,
3,12,14,15,21,25;31:3,
5,9,9,11;42:8,13,20;
43:21;44:2,10,18,23,
25;45:3,5,7,12,13,24,
25;46:1,18,23;47:13,
16,20;48:6,7,17,22;
49:4,8,10,13,21,23;
50:1,10,13,16,18,21;
51:3,6,7,9,11,18,21,23;
52:1,3,5;53:2,9,15,17,
24;54:2,8,20;55:3,6,10,
11,13,15;56:2,8,14,22;
57:14;59:5,8,12;74:14;
77:18,21;78:23,24,25;
79:1,2,23;80:2,21,24,
25;81:8,15,19,25;
82:24;83:6,9,12,21;
84:13,16,24;85:6,10,
14,18,24;86:3,12;
87:23;89:22;90:2,6,9;
93:2,6,13;94:6,16;
97:9;108:2,14,16,17,
20,22,25;109:1,3,7,10,
21;110:19,22,23,24;
111:4,6,12,15;114:3,4,
13,23;115:3,8,15,19,
19,25;116:1,2,5,7,8,18,
25;117:1,4,7,8;131:13,
22;132:2,3;133:5,5,12,
15;134:7,17,19;135:2,
7,19,24;136:2,25;
137:3;138:13;141:18,
24,25;142:9,18,22,25;
143:1,7;144:2,9,10,12,
16,20,21;145:4,6,12,
14,14,23;147:1;148:10,
10,11,14;149:9;150:11,
15
**searched (24)**
29:16,19;30:4,6;
43:10,11,24,25;49:1;
91:10,11,15,18,21;
93:8,25;94:2,4;108:4,
11;116:13,14;136:21,
21
**searches (28)**
26:14,18,20,23;27:2,
3;30:2,24;38:25;39:4;
42:3;43:13;44:24;
46:21;52:12,18,23;

58:18;94:7;113:20,20,
21,21;114:9;141:16;
142:10;144:6,13
**searching (26)**
43:5,6,8;44:15;
47:24;48:1,1,11;50:25;
51:22;53:10;81:12;
82:15;84:1,20;86:1;
87:20;91:7,9;94:14;
114:25;137:7,8;
143:25;145:20,22
**season (1)**
109:16
**seat (5)**
91:21;92:3;93:2,6;
103:6
**seated (1)**
138:10
**second (15)**
14:24,25;15:5;28:2;
29:3;63:20;68:22;69:2;
100:17,23;102:20;
104:9;126:10;140:24;
153:5
**seconds (6)**
114:15,16,18,18;
115:4;126:21
**Security (3)**
9:5;13:8;141:3
**Sedan (1)**
72:4
**sedans (1)**
72:11
**seeing (1)**
115:20
**seem (7)**
87:16,22;110:22;
135:14;137:25;151:7,
25
**seemed (1)**
86:20
**seized (2)**
112:10,12
**self-explanatory (1)**
81:6
**seminars (1)**
18:14
**send (1)**
124:11
**Seno (7)**
15:12,13,15,16,19,
22;16:3
**S-E-N-O (1)**
15:15
**sense (8)**
5:15,21;6:9;9:22;
21:8;26:11;28:8;61:19
**sensitive (2)**
48:17;136:9
**separate (2)**
106:20;151:14
**September (6)**
17:6,10,21;18:11,13;

32:25
**Sergeant (11)**
66:17,17,18,18;70:5,
7,12,18;94:21;95:1;
118:13
**sergeants (4)**
66:1,5,12,14
**serve (1)**
12:14
**service (5)**
120:6;123:8,14,21;
152:12
**session (8)**
36:11,15,25;37:15;
39:12,22,25;42:2
**sessions (4)**
37:13;40:6,22;41:23
**set (2)**
129:4;143:16
**setting (1)**
63:6
**seven (1)**
9:16
**sex (19)**
42:20;46:23;47:6,10,
21;48:8,16;51:1,7,23;
52:6,19;53:3,9;59:5,9,
12;116:19;117:1
**shall's (1)**
143:17
**shalt's (1)**
143:17
**sheet (1)**
153:11
**sheriff (4)**
17:9;18:1;62:2;
144:19
**Sheriff's (54)**
4:14;16:22;17:5,8,
21;18:2;19:20;20:2,6;
23:13,19,21;28:4,24;
31:23,25;32:3,6;36:5;
37:8,20;38:4,7;40:3,
23;42:2,7,11,16,19;
44:9;14;52:10,15;
57:24;58:15;60:13;
61:4;62:18;99:23;
104:22;117:15;123:23;
124:19,20;128:4;
143:14;144:5;146:10;
147:14,18;148:1;
150:21;151:15
**shift (17)**
54:16;59:25;60:6,13,
20;61:1,19,23;63:19;
64:11,14,20;66:16;
118:17;124:9;129:13;
131:8
**shifts (5)**
60:4,8,10;61:3;65:1
**shirt (1)**
125:25
**shoes (1)**

114:24
**short (3)**
    41:2;128:14;142:6
**shorter (2)**
    114:17;151:21
**shortest (1)**
    36:24
**Shortly (2)**
    14:5;18:10
**shotgun (1)**
    138:22
**shoulder (1)**
    137:2
**shoulders (2)**
    114:23;131:7
**shouting (2)**
    132:23;133:1
**show (1)**
    130:24
**showed (1)**
    126:16
**side (42)**
    46:8,9,9;49:22;50:1,
    3,11,17,19;71:24;
    73:15,17;76:8,25;
    77:10,19;78:9,12,17,
    19;79:5,6,9;80:3;85:7,
    9;86:8;88:3,7;91:15,
    18;96:20;103:5,13;
    109:3,6;119:8,8,17;
    131:15,22;139:24
**sidewalks (1)**
    106:22
**signature (4)**
    153:5,13,17,20
**silver (33)**
    67:18,19;73:18,19;
    77:6,9;79:7;86:8;91:7,
    8,24;92:11;98:20;
    100:2,4,7,17,23;101:6,
    19,22;102:1,2,4,9,19;
    103:1,5,8;104:3,10;
    140:17;147:8
**similar (4)**
    31:8;56:6;126:3,4
**simple (1)**
    41:8
**simply (3)**
    120:8;127:15;153:17
**sit (2)**
    56:19;75:19
**situation (8)**
    28:2,6,25;56:20;
    115:13;135:15,17;
    146:12
**situations (8)**
    27:16,17,25;28:16;
    29:15;53:20;56:7,11
**six (8)**
    15:25;16:1,2;32:20;
    39:16,19;54:24;55:1
**sixty (1)**
    20:11

**slight (1)**
    52:9
**slightly (2)**
    105:12;146:24
**slot (1)**
    129:3
**slots (1)**
    129:2
**small (1)**
    110:5;139:1
**smaller (1)**
    96:1
**smell (4)**
    73:8;74:1;86:21;
    106:24
**smelled (1)**
    74:20
**smiling (1)**
    135:13
**smoother (1)**
    5:1
**smuggled (1)**
    142:17
**Social (3)**
    9:5;11:10;63:6
**socially (1)**
    62:21
**socioeconomics (1)**
    152:14
**software (2)**
    127:24;128:1
**somebody (8)**
    30:7,18;41:10;42:5;
    49:1;133:6;134:18,22
**somehow (1)**
    36:1
**someone (7)**
    115:23;119:22;
    131:8;135:18;142:16,
    20;151:18
**someone's (5)**
    114:23,25;115:3;
    116:6;138:13
**sometime (1)**
    130:22
**Sometimes (2)**
    61:24;114:17
**Somewhere (3)**
    109:20;127:20;128:3
**soon (1)**
    14:3
**Sorry (16)**
    4:18;15:13;19:10;
    47:18;51:4;57:17;
    64:18;74:25;78:18;
    90:19;115:19;122:17;
    130:24;132:1;134:4;
    136:11
**sort (12)**
    7:5;10:16;29:18;
    33:12;44:8;51:1;55:19;
    74:23;75:2,6;112:21;
    146:4

**sound (1)**
    31:7
**sounds (6)**
    121:3;123:14;127:8;
    128:17,23;130:10
**source (1)**
    124:5
**sources (1)**
    123:24
**south (9)**
    61:21;99:14,15,17,
    18,20;119:4,8,15
**space (2)**
    91:11;97:10
**speak (2)**
    86:8;142:3
**speaking (3)**
    7:18;116:18;127:18
**Specialist (4)**
    12:17,24;13:1,3
**specific (17)**
    19:8,20;23:13,18;
    25:18,18;37:15;49:25;
    51:1;61:7,10;108:15;
    109:5;111:2;124:15;
    129:7,10
**specifically (8)**
    23:3;39:2;56:12;
    69:22;97:20;118:11;
    137:7;141:7
**specifics (4)**
    59:23;75:18,23;
    98:17
**speculate (3)**
    48:20;49:1;94:7
**speculating (1)**
    57:19
**speculation (2)**
    122:13;134:9
**spell (2)**
    4:19;33:7
**split (2)**
    64:15,20
**spoke (3)**
    72:17;77:14;121:4
**spoken (2)**
    149:21;152:15
**spot (1)**
    126:4
**spotted (1)**
    101:5
**squad (17)**
    38:8,9,16,17,19;
    71:20,25;72:3,6,9;
    86:7;87:5,7;89:13;
    98:8;113:1;126:14
**square (2)**
    118:25;122:21
**staffing (1)**
    61:25
**stand (2)**
    86:6;87:3
**standing (8)**

78:6;87:6;88:1;
    90:12,20;137:2;141:5;
    148:19
**start (2)**
    72:24;150:15
**started (7)**
    4:24;16:10;18:7;
    60:1,5;72:21;113:10
**state (8)**
    4:18;19:24;22:5;
    32:15;51:4;57:19;
    107:5;120:20
**stated (11)**
    28:2,15,17,19;29:18;
    31:3;59:15;74:16;
    77:15;84:5;94:15
**statement (1)**
    133:13
**stating (2)**
    59:7;136:22
**station (7)**
    127:23;128:14,22,
    25;129:1,5,14
**stay (2)**
    92:15,25
**stayed (3)**
    77:3,5,7
**steady (1)**
    131:6
**step (3)**
    92:21,22;96:11
**stepped (3)**
    96:9;149:24;150:8
**stepping (2)**
    150:5,14
**steps (2)**
    121:19;142:18
**sticker (2)**
    100:25;111:21
**stickers (3)**
    102:12,14,16
**sticking (1)**
    97:1
**still (23)**
    11:15;12:20;23:25;
    32:10;35:3;39:8;46:15;
    60:19,22;61:1;72:11;
    78:6;93:1,7;98:20,24;
    100:3;116:11;127:14;
    145:14,17;148:11;
    151:22
**stop (97)**
    20:14,17,21;21:13,
    15,17,22,25;22:16,20;
    23:7;26:2;40:19;41:1,
    3,4,5,6,10,16;42:17;
    57:3,3,10;59:24;67:24,
    25;68:5,15,22;69:4,10;
    71:22;72:17,22,25;
    73:1,4,7;74:5,9,11;
    75:10;76:21;87:13,17;
    88:13;95:16,17;96:2;
    100:1,9,11,14,23;

101:8,21,22;102:21;
    103:2;104:2,9;105:6,9;
    106:8,20;107:24;
    108:11,18;110:20;
    111:23;112:10,17;
    115:10,16;120:15;
    122:2;125:4;128:19,
    19;129:19;132:12,20;
    135:6;139:17;140:2,3;
    141:12;142:2,5,5;
    146:4,16;148:4;
    150:23;151:20,21
**stopped (11)**
    85:24;102:2,7;
    105:14,18,22;106:1;
    135:25;139:18;140:14;
    147:25
**stops (13)**
    19:17;20:24;21:6,11;
    40:14;104:20,21;
    105:16,17;135:23;
    136:1;139:24;152:23
**storage (3)**
    128:6,12;129:22
**Store (2)**
    15:17,19
**stored (1)**
    128:4
**straddle (1)**
    66:11
**streamline (1)**
    128:2
**street (4)**
    57:3;99:21;106:10,
    22
**streets (1)**
    106:12
**stretch (2)**
    6:6;58:9
**Strictly (2)**
    57:12;152:17
**strike (26)**
    12:4,11;13:2;20:4;
    26:21;42:17;49:23;
    53:21;55:7,24;70:3;
    72:19;80:22;85:5,13;
    94:1;95:8;97:15;100:6;
    108:6;116:23;120:3;
    131:25;134:3;136:24;
    143:7
**strip (8)**
    27:5;29:25;30:1,3,
    12;113:21;116:13;
    141:24
**structure (1)**
    24:20
**studied (1)**
    23:17
**studies (1)**
    10:15
**study (2)**
    10:14;23:20
**stupid (1)**

152:1
**subject (24)**
37:2;39:24;43:23;
48:7;95:16;97:22;
113:9;118:12;120:13,
14,18;122:25;123:15;
126:5,8;129:9;130:11;
135:21;136:25;137:17;
138:18;139:16;141:12;
150:22
**subjects (6)**
20:16,21;36:6,8;
37:4;40:9
**submit (1)**
153:11
**submitted (1)**
58:17
**substance (2)**
72:25;153:9
**sucker (2)**
134:18,22
**suddenly (1)**
134:22
**suggest (1)**
125:8
**summer (1)**
109:19
**supervisor (2)**
52:25;59:11
**supervisors (1)**
105:2
**supposed (2)**
51:2;143:17
**sure (23)**
5:11;27:17;29:22;
36:18;38:13;39:1;
46:25;61:20;69:8;82:4,
23;104:17;108:20;
114:22;121:13;128:12;
129:12;134:15;136:3,
3;141:11;143:10;148:7
**surprised (1)**
134:25
**surrounding (2)**
122:1;124:12
**suspect (37)**
43:5,6,8,11;44:15;
45:18,19,21,23;46:19,
21;47:5,11,13;52:3;
53:11,15,25;54:3,9,20;
55:4,11,16;56:3,8,14,
22;58:18;71:21;81:19;
105:14;109:4,8,11;
129:17;145:18
**suspected (4)**
105:23;106:2;
108:12,18
**suspects (4)**
44:24;52:18,23;
110:7
**suspect's (1)**
53:9
**suspicion (11)**

27:14,20;28:1,7,18;
30:17;105:14,20;
106:15;107:9;115:10
**SUV (5)**
72:4,5,8,9;96:13
**sworn (1)**
4:4
**system (2)**
112:25;128:12

---

**T**

**tag (2)**
128:16,17
**tagging (1)**
129:25
**taillight (1)**
41:11
**talk (6)**
51:14,15;52:10;
121:25;125:21;131:7
**talked (7)**
14:23;21:24;26:9;
49:6;96:16;108:16;
152:22
**talking (10)**
30:24;43:12,14;
52:14;82:5;105:16;
120:15;132:19;137:13;
145:12
**Taser (1)**
40:1
**task (1)**
151:22
**tattoos (1)**
11:22
**taught (3)**
19:22;23:24;24:4
**teachings (1)**
23:25
**team (33)**
18:3;54:12;63:3,17,
19,22;64:8,10,14,15,
19,20,24;65:2,5,11,13,
18,21,22,24;66:6,15;
69:17,20,21,25;70:4,9,
16;118:11,14;133:18
**teams (7)**
63:21,25;64:4,5;
66:3,8,11
**technique (5)**
47:9,10;48:6;81:18,
22
**techniques (7)**
13:20;19:22,23;47:2,
4,7;49:25
**television (1)**
8:14
**teller (3)**
14:8,13;15:8
**ten (7)**
43:2,19;44:7;90:14,
15;114:18;129:2

**term (7)**
26:7;27:20;81:6;
115:11;143:1;144:10;
152:5
**terminate (2)**
32:17,20
**terminates (1)**
32:22
**terms (2)**
10:24;152:2
**Terry (2)**
115:10,16
**testified (13)**
4:5;80:3;116:23;
125:3;130:15;131:20;
132:15;138:21;139:12;
140:7;141:10;144:13;
146:18
**testifying (1)**
138:15
**testimony (4)**
86:4;121:9;140:10;
153:9
**thereafter (1)**
14:5
**therefore (1)**
134:21
**thinking (2)**
69:6;134:23
**third (1)**
29:24
**thirty (4)**
114:15,16;119:20,22
**thirty-six (2)**
119:5,11
**Thirty-two (1)**
9:3
**this'll (1)**
130:24
**thorough (1)**
146:15
**thou (2)**
143:16,17
**though (7)**
5:20;26:6;61:1;
76:23;80:16;106:13;
111:25
**thousand (1)**
12:10
**thread (1)**
57:22
**three (19)**
18:24,25;19:4;22:12,
19;31:17;32:9;38:1;
39:18,19;40:21;47:2,4;
63:8;64:2;66:3;91:3;
97:10;153:3
**threshold (1)**
130:25
**throughout (3)**
21:8;22:9,20
**thumb (2)**
46:9;144:24

**ticket (1)**
117:25
**tickets (3)**
110:10,11,15
**tight (4)**
109:14;138:14,19;
139:8
**times (3)**
63:8;105:13,25
**title (2)**
15:16;16:13
**today (9)**
4:9;6:12;9:2,19;
56:19;59:15;75:20;
125:23;130:15
**together (3)**
62:17;65:2;118:22
**told (8)**
73:3;75:16;84:16;
98:14,16;113:6;121:6;
127:9
**tone (3)**
111:5,5,8
**took (6)**
10:22;14:7;19:15;
71:5;107:1;150:13
**top (8)**
16:12;27:8;29:11,23;
32:21;40:16;45:14;
82:6
**topics (1)**
19:16
**total (2)**
45:3,5
**touch (2)**
84:10;86:17
**touched (1)**
84:14
**touching (1)**
114:6
**towards (7)**
78:19;88:1;90:16,24;
131:11,17;150:10
**town (1)**
123:17
**Township (2)**
71:14;122:6
**traffic (86)**
19:17;20:14,17,21,
23;21:6,11,13,15,17,
21,25;22:16;23:7;26:2;
40:14,18;41:1,6,8,16;
42:17;57:3,10;59:24;
67:23,25;68:5,15,22;
69:3,10;71:21;72:17,
22,24;73:1,4,7;74:5,9,
11,23;75:10;76:21;
87:13,17;88:13;95:16,
17;96:2;100:1,9,11,14;
101:8,21;102:20;
103:2;104:2;105:5,9,
16;111:23;112:10,17;
120:15;122:2;128:19,

19;129:18;132:12,20;
135:5;136:1;139:17;
140:2,3;141:12;142:2,
4,5;146:4,16;148:4;
150:23
**train (8)**
33:9,19,24;34:7,12,
16,22,25
**training (73)**
13:19;17:22;18:6,7,
13,17,22;19:3,11,19;
24:16;25:3,12,17,23,
25;26:10,13,21;27:11;
31:16,19,20,24;32:1,2,
3,5,8,9,10,14,14,16,19;
33:2,3,13;34:2,6,15;
35:4,5,20,24;36:5,7,10,
15,25;37:14;38:2,15;
39:6,8,12,22,24;40:2,6,
10,19,22;41:23;42:1;
45:6;49:18;50:8,24;
51:16;104:7;125:14;
142:4
**trainings (2)**
37:5,6
**transcribing (1)**
153:7
**transcript (2)**
6:4;153:6
**transcripts (1)**
5:14
**transition (2)**
52:9;113:11
**travels (2)**
99:13,17
**trigger (1)**
103:10
**triggered (1)**
103:7
**trip (1)**
119:13
**true (1)**
151:4
**trunk (2)**
91:11,13
**trust (2)**
153:2,16
**try (11)**
5:24;9:20;28:14;
56:10,17;115:20;
128:2;142:5;144:1;
150:22;151:20
**trying (3)**
20:19;142:13;151:19
**T-shirt (1)**
80:8
**turn (7)**
77:18;126:10,12,24;
127:6;131:2,7
**turned (6)**
126:14,15,17,23;
127:3;133:8
**turns (1)**

127:15
**twelve (3)**
60:10;61:1,4
**twenty (2)**
37:17,23
**twenty-eight (1)**
119:6
**twenty-four (2)**
105:13;106:1
**two (30)**
12:10;16:20;27:25;
28:16;30:1,24;31:2;
32:22,24;36:19;38:1;
47:7;59:18;65:25;66:5,
11;82:22;92:2,8,10;
93:6;95:11;104:19,20;
137:12;140:5;146:8;
149:4;152:23;153:1
**type (15)**
25:18;29:3,24;55:6;
101:13;108:17;115:15;
117:8;124:18;137:20;
139:1;141:18;145:4,6;
152:7
**types (15)**
25:4,5,8,9;26:14,18,
20,22;27:2;30:1,24;
56:11;108:16;113:20;
144:12
**typical (1)**
129:16
**typically (10)**
50:17;60:5,6,8;
61:18,20;66:4;123:21;
135:11,16

## U

**unaware (9)**
56:4;59:7,13;76:3;
92:9;94:19,22;128:9;
144:17
**under (6)**
6:12,17;30:8;44:6;
139:2;140:8
**undergo (1)**
31:19
**underneath (1)**
45:15
**understood (5)**
5:20;58:4;148:1;
152:10,11
**unidentified (1)**
132:19
**uniform (2)**
125:23;126:4
**unincorporated (1)**
71:15
**unique (1)**
102:10
**unit (3)**
49:9;68:22;69:2
**University (2)**

18:17,19
**unquote (1)**
116:17
**unreasonably (1)**
119:24
**unremarkable (1)**
120:11
**unsatisfactory (1)**
36:2
**unwarranted (1)**
144:6
**up (22)**
26:22;46:11,15;47:3,
9;59:24;63:21;64:15,
15,20;77:19;99:9;
102:4;103:4;104:16;
113:1;120:23;126:16;
130:24;141:3;147:24;
153:14
**upload (3)**
127:25;128:11;
129:15
**uploaded (2)**
127:19;130:6
**uploads (1)**
129:6
**upon (2)**
12:6,22
**upset (7)**
86:19,20;110:23,25;
111:5,8;146:25
**Urbana (2)**
106:11,12
**use (21)**
6:6;45:22,25;47:3,4,
4,19;48:1,2,10,12;49:3,
8;50:12,15;58:8;85:17;
94:20;115:11;119:1;
143:1
**used (2)**
72:12;112:25
**using (5)**
81:15,18,22;144:10;
152:4
**Usually (2)**
37:9;153:16

## V

**vague (1)**
135:8
**variety (2)**
19:16;36:8
**various (2)**
26:23;152:4
**vary (1)**
28:12
**VAYR (20)**
4:16;56:23;57:16,21;
58:5;113:10,17;
116:12;121:13;122:16,
19,22;123:22;134:15;
135:12;136:12;145:7;

150:19;152:18;153:15
**Vehicle (62)**
22:6;57:4,5,11;
71:21;73:9,13;74:13,
15;76:8,9,10,14,14,15,
17,18,25;77:3,4,5,8,10,
25;78:7,20;79:6,22;
87:21;88:9,10,13,17,
21,25;89:4,11;90:21;
92:15,21,22,23,25;
96:20,21;97:9,13,16;
101:14;102:3,6;
105:16,19;132:19,22,
25;135:6;140:14;
141:7,8;146:6;148:3
**vehicles (2)**
97:11;105:22
**vehicle's (1)**
101:8
**verbatim (2)**
73:2;84:6
**verse (1)**
117:14
**versus (2)**
4:12;31:9
**vicinity (1)**
106:11
**video (3)**
52:7;126:23;130:24
**videotape (2)**
7:21;8:2
**view (2)**
51:23;128:15
**violation (2)**
59:17;74:23
**violence (4)**
96:6;123:3,8;124:9
**visibly (1)**
139:4
**visual (1)**
77:8
**voice (2)**
104:16;147:4
**volume (2)**
152:12,17
**volunteer (1)**
5:10
**volunteered (2)**
69:13;70:25

## W

**waist (2)**
48:19;114:24
**waistband (7)**
81:9;82:1,4,6,11;
114:25;115:4
**waistline (9)**
48:9,11;50:20;81:1,
4,7;138:3,11,14
**wait (2)**
5:4,6
**waive (4)**

153:4,13,17,19
**Wakefield (5)**
34:19,20,23,25;70:5
**W-A-K-E-F-I-E-L-D (1)**
34:20
**walk (2)**
116:6;126:11
**walked (4)**
106:23;120:23;
126:18;148:12
**walking (2)**
96:19;106:21
**warranted (1)**
117:1
**Washington (1)**
106:11
**washroom (3)**
6:6;41:19;58:8
**watched (1)**
8:2
**watching (3)**
79:6;131:13;137:2
**way (3)**
50:13;74:20;115:24;
128:2,10;136:3
**weapon (3)**
27:14;28:1,7,19;
29:12;96:18,24;
115:10;139:1,7;
142:20;145:20;150:2
**weapons (8)**
31:6,12;44:19;83:11,
20;93:17;109:22;
115:19
**wear (9)**
6:20;7:6,7,9;15:12,
14,20;49:12,15
**wearing (13)**
31:5;80:7,10;109:14;
125:23;126:3;131:1;
137:16,17;138:6,14,18;
139:8
**weddings (1)**
15:21
**week (4)**
19:4;21:12,12;39:23
**weighed (1)**
110:5
**welfare (1)**
96:3
**wellbeing (1)**
96:1
**well-established (1)**
107:12
**weren't (2)**
125:22;140:21
**west (6)**
61:21;99:13,17,19;
119:5,16
**what'd (1)**
101:6
**what's (4)**
8:25;17:7;35:7;

58:21
**where'd (4)**
9:12;16:21;99:2;
103:22
**Whereupon (2)**
58:13;136:14
**whoa (8)**
84:9,21;85:5;86:2;
87:24;110:22;133:13;
148:10
**whole (1)**
22:12
**who's (1)**
62:12
**why'd (1)**
17:15
**wide (2)**
19:16;36:8
**wife (2)**
149:16,18
**window (5)**
102:14;132:23;
133:1,7;141:6
**within (15)**
17:7;35:10;37:23;
39:23;40:20;64:25;
99:6,9;104:21;106:12;
107:5;124:19,20,20;
148:24
**without (3)**
31:13,14;105:19
**witness (15)**
4:3;52:24;56:25;
57:18;85:8,12,16,19;
113:15;121:11;122:14;
123:20;134:11;135:10;
153:19
**witnessed (5)**
43:16;44:1;78:25;
85:21;138:7
**witnessing (2)**
52:25;82:2
**woman (1)**
107:16
**woman's (6)**
49:22;50:1,11,17,19,
22
**woo (1)**
148:9
**wording (1)**
146:19
**words (2)**
72:20;73:2
**work (19)**
13:10,17;15:22;
16:19,21;17:15,18;
24:7;62:22;63:7,9;
64:10;66:8,10;89:21;
113:19;132:8;151:4,19
**worked (2)**
35:25;62:8
**working (22)**
13:25;14:3;15:8;

16:10;49:10;60:10,16,
19,22,24;62:5;65:2,17,
21;69:16,20,22;70:1,
18;107:20;118:11;
134:12
**works (2)**
64:19;128:9
**worth (1)**
153:15
**writing (1)**
58:20
**written (3)**
33:12;58:16;117:17
**wrong (1)**
24:4
**Wylesha (11)**
4:12;59:16,21;66:20;
67:1,4,17,20;137:12;
147:12;152:24

## Y

**year (5)**
9:11;13:12;15:24;
16:11;130:22
**years (8)**
9:16;10:22,24;12:15;
13:16;16:20;32:22,24
**yelling (1)**
133:7

## 0

**0430 (1)**
9:6

## 1

**10 (6)**
57:12,13,18,20,22,23
**10:00 (1)**
107:10
**11|11 (1)**
13:24
**12:07 (1)**
153:23
**1200 (1)**
99:16
**14th (1)**
9:1
**1987 (1)**
9:1
**19-CV-2148 (1)**
4:10
**1st (1)**
107:2

## 2

**2:00 (4)**
60:25,25;66:10,11
**2008 (1)**
12:11

**2011 (1)**
13:23
**2016 (3)**
10:25;11:2,3
**2018 (5)**
17:6,11,21;18:11,14
**2019 (37)**
59:21;60:7,16,19;
61:7,15;62:1,5;63:1;
65:12;67:3,10,13,17,
20,22;69:15,20;70:11,
19;72:6,16;73:22;74:2;
87:13;91:24;94:2,5;
100:2;105:6,9;110:20;
111:18;120:16;140:3;
146:3;152:24
**2020 (3)**
32:25;65:15;107:2
**2400 (2)**
99:12,12

## 5

**5 (1)**
20:7
**5:00 (1)**
19:1
**50 (1)**
57:20

## 6

**6:00 (14)**
60:5,9,13,14,17,17,
20,20;64:14;66:9,9,9,9,
10

## 8

**8 (4)**
69:15;72:6;100:1;
105:9
**8:00 (1)**
19:1
**8th (41)**
59:21;60:7,16,19;
61:6,15;62:1,5;66:25;
67:3,10,13,17,20,22;
69:20;70:11,19;72:16;
73:18,21;74:2;87:13,
17;91:24;92:5;94:2,5;
100:17,23;103:2;
104:3,20;105:6;
110:20;111:18;112:18;
120:16;140:3;146:3;
152:24

## 9

**9:09 (1)**
4:1