E-FILED
Monday, 16 November, 2020 07:37:21 PM
Clerk, U.S. District Court, ILCD

# In The Matter Of:

*AYRES v.*
*SHERIFF DEPUTIES CODY CHRISTENSEN, et al.*

---

*WYLESHA AYRES*
*January 28, 2020*

---

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Exhibit E

Original File 0128AYRW.txt
Min-U-Script® with Word Index

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

WYLESHA AYRES
January 28, 2020

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                       URBANA DIVISION

 3
      WYLESHA AYRES,                    )
 4                                      )
           Plaintiff,                   )
 5                                      )
           vs.                          )  No. 19-2148
 6                                      )
      SHERIFF DEPUTIES CODY CHRISTENSEN )
 7    and CORY FLOYD, CHAMPAIGN COUNTY  )
      SHERIFF'S OFFICE and CHAMPAIGN    )
 8    COUNTY, ILLINOIS,                 )
                                        )
 9         Defendants.                  )
      ----------------------------------
10

11

12

13

14            DEPOSITION OF WYLESHA AYRES
                   January 28, 2020
15                    10:00 AM

16

17

18

19

20

21        June Haeme:  CSR # 084-003038
        Area Wide Reporting and Video Conferencing
22             301 West White Street
             Champaign, Illinois  61820
23                800.747.6789

24

25
```

Page 2

```
 1                      INDEX

 2
    APPEARANCES:
 3
    For the Plaintiff:
 4        Matthew J. McCarter
          Attorney at Law
 5        Nathan & Kamionski, LLP
          33 W. Monroe Street, Suite 1830
 6        Chicago, IL  60603
          312.612.1928
 7        mmccarter@nklawllp.com

 8  For the Defendant:
          Bryan Vayr
 9        Attorney at Law
          Heyl, Royster, Voelker & Allen
10        301 North Neil Street, Suite 505
          Champaign, IL  61824-1190
11        217.344.0060
          bvayr@heylroyster.com
12

13  EXAMINATION BY:

14        Mr. Vayr................. 4, 141
15        Mr. McCarter............. 128

16

17  EXHIBITS:

18  Exhibit 1.................................... 128
    first amended complaint
19

20

21

22

23

24

25
```

Page 3

```
 1                   STIPULATION

 2

 3         IT IS HEREBY EXPRESSLY STIPULATED AND

 4  AGREED by and between the parties that the

 5  deposition of WYLESHA AYRES may be taken on January

 6  28, 2020, at the law offices of Heyl, Royster,

 7  Voelker & Allen, 301 N. Neil Street, Suite 505,

 8  Champaign, Illinois, pursuant to the Rules of the

 9  Federal Court and the Rules of Federal Procedure

10  governing said depositions.

11

12

13         IT IS FURTHER STIPULATED that the

14  necessity for calling the Court Reporter for

15  impeachment purposes is waived.

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1        (Commencing at 9:53 a.m.)
 2             WYLESHA AYRES,
 3  having first been duly sworn, testified as follows:
 4        EXAMINATION BY
 5        MR. VAYR:
 6     Q.  All right, so we're here for the
 7  deposition of Wylesha Ayres in the case Wylesha
 8  Ayres versus the Champaign County Sheriff's Office,
 9  et al.  Notice has been properly given and we are
10  here to get started.
11        So, Wylesha, just to kind of have my
12  introduction on the record, I represent the
13  defendants in this case, and why we are here is just
14  so I can hear your story.  I'm just trying to figure
15  out, you know, what the facts were and what
16  happened, and I haven't had the benefit of talking
17  to you yet, so this is just so I can hear the truth
18  as you saw it and as you felt it on May 8th, 2019,
19  and that's it.
20        If I ask a question and it's a little
21  confusing, or I will happily suggest that sometimes
22  I have a couple thoughts going on at once and I
23  don't get a very artful question out, if you don't
24  know where I'm going or what I said, just let me
25  know, I'll be happy to try to repeat it so it's
```

Page 5

1  clear. Does that make sense?
2      A.  Yes, I had told him I had been stabbed in
3  my head, so I'll probably ask you to rephrase your
4  question because I don't understand --
5      Q.  Okay.
6      A.  -- as much.
7      Q.  Okay. If you don't mind, did you just say
8  you had been stabbed in the head?
9      A.  Yes, in 2010.
10     Q.  In 2010, okay.
11     A.  Yeah. So my cognitive thinking is kind
12  of --
13     Q.  Okay. Well, I'll try to be sensitive. I
14  appreciate you letting me know that right out of the
15  gate. So just please speak up. Sounds like you
16  will.
17     A.  Okay.
18     Q.  Also perfect. I'll try to be sensitive to
19  that. So first, as is common with depositions and
20  -- I'm sorry, just for the court reporter's benefit,
21  could you please spell your name for the record?
22     A.  W-Y-L-E-S-H-A, Ayres, A-Y-R-E-S.
23     Q.  Perfect, thank you. So to start, I'm just
24  going to ask some background questions, your
25  education, work history, et cetera.

Page 6

1      MR. McCARTER: Bryan, before we go too
2  far, I'm sorry to interrupt so early, but could we
3  take just a quick break? I have to make a phone
4  call that just became immediate and I thought I
5  could put it off for a few minutes.
6      MR. VAYR: That's no problem, counsel.
7  We'll go off the record.
8      (Pause at 9:57 a.m. to 10:00 a.m.)
9  BY MR. VAYR:
10     Q.  All right, so as I was saying before we
11  went off the record, I'm going to ask you some
12  questions about your background, education, work
13  history, et cetera. So let's just start first, so
14  have you lived in the Champaign-Urbana area your
15  entire life?
16     A.  Yes, sir.
17     Q.  Very good. So now I assuming you went to
18  high school here then?
19     A.  Yes.
20     Q.  Which high school?
21     A.  Urbana High School.
22     Q.  Urbana High School. What year did you
23  graduate?
24     A.  I didn't graduate. I dropped out in 12th
25  grade.

Page 7

1      Q.  Got it. And then what year would that
2  have been?
3      A.  2010.
4      Q.  2010, okay. And then after dropping out
5  of high school, did you ever pursue a GED? Did you
6  ever -- any other education?
7      A.  Yes, sir. I went and tried to get my GED
8  at adult education. My -- I couldn't concentrate.
9  I didn't know what was going on. I had got stabbed
10  in my head and it was just like after that I tried
11  to go and --
12     Q.  Right.
13     A.  So I didn't get my GED. And when I was in
14  prison, I actually was going to get my GED, but I
15  got released early.
16     Q.  Which is a happy thing, so --
17     A.  Yeah.
18     Q.  If you don't mind, I'll just go back. So
19  it sounds like then your dropout of high school was
20  closely linked in time with when you suffered your
21  head injuries; is that right?
22     A.  Uh-huh.
23     Q.  Do you mind me asking just a few details
24  about that?
25     A.  No.

Page 8

1      Q.  Okay. What were the, so you said, was it
2  like one -- it was stab wounds to the head you said.
3  Was it like a puncture or was it a scratch or what?
4      A.  No.
5      Q.  Okay.
6      A.  I got stabbed into the main artery of my
7  vein.
8      Q.  Lord. So then I'm assuming there was
9  extensive medical treatment for that.
10     A.  The tip of the knife was left in my head
11  for five months.
12     Q.  Wow, okay. And then I don't mean to dwell
13  on this. Part of why I'm asking is I'm just making
14  sure because you advocated for yourself earlier in
15  the dep, has that -- you said that that stab wound
16  has had some cognitive implications for you for the
17  rest of your life. Could you just kind of explain
18  what those are?
19     A.  Basically you would have to break certain
20  things down a little, like a lower than -- like big
21  words and stuff, I'm not real familiar with those.
22  Like my -- it's just like I don't comprehend like --
23     Q.  Sure.
24     A.  -- other people certain -- sometimes
25  basically. That's all it is, comprehension.

Page 9

1    Q.  Okay.  So you're able to make all the
2  decisions you need.  Like you can balance your
3  budget, you can buy groceries.
4    A.  Yes.
5    Q.  You can drive a car, correct?
6    A.  Yes, sir.
7    Q.  It's just simply a matter of concentration
8  and focus it sounds like.
9    A.  Yep.
10    Q.  Okay.  Is there anything about that injury
11  or anything about any condition you have that we
12  haven't talked about that would implicate your
13  ability to give accurate, truthful answers today?
14    A.  No, sir.
15    Q.  Perfect.  And that's a question I ask
16  everybody, so no offense meant by that.  Okay, so
17  then we talked about school.  Hopefully you get your
18  G -- are you still aiming to get your GED?
19    A.  Yes.
20    Q.  Very good.  Well, fingers crossed for you
21  on that front.  Hope you succeed.
22    A.  I'm going to get it.
23    Q.  So with regards to --
24    A.  Thank you.
25    Q.  We'll just briefly pivot to employment

Page 10

1  history.  I think you and I talked a little bit
2  about a business you run during the break.  Let's
3  back up a little bit.  Did you have a job, let's
4  say, during high school?
5    A.  Yes.
6    Q.  What'd you do?
7    A.  I worked for Arby's.  I was -- it was a
8  program that is called WECEP in high school, that it
9  gives you a credit, so I worked at Arby's in high
10  school for a couple years.
11    Q.  Excellent.  And the program was -- was it
12  a credit for college or was it a credit for high
13  school?
14    A.  For high school.
15    Q.  Well, that's excellent.  Okay, and then
16  after -- so you worked there for a couple years and
17  that was during high school, so is it fair to say
18  that maybe you left Arby's employ around 2010; is
19  that accurate?
20    A.  Yes, sir.
21    Q.  Okay.  After that, what was the next job
22  you had?
23    A.  I don't know what exact, what exact job it
24  was.  I done worked a lot of different jobs.
25    Q.  Sure.

Page 11

1    A.  It's being a teenager.
2    Q.  Sure.  And I apologize, we don't need to
3  get bogged down in every single odd job that you've
4  done.  As a general matter, then, is it fair to say
5  that since leaving Arby's until today that you've
6  done largely odd jobs as for employment?
7    A.  No.
8    Q.  Okay, so what --
9    A.  I've worked consistently with jobs, so --
10  okay, so I'm sorry, so could you rephrase that
11  question because I think I got it --
12    Q.  Absolutely, my pleasure.  So how about we
13  try it this way.  So I'm not going to ask about, you
14  know, jobs maybe you held for only a month or so or
15  for --
16    A.  Okay.
17    Q.  So what would you say after Arby's was
18  your next big job, like what you would identify as,
19  oh, like that was a real job that I had after Arby's
20  or something?
21    A.  I worked for the Department of Theater --
22    Q.  Okay.
23    A.  -- here in Champaign, Illinois.
24    Q.  Department of Theater, is that associated
25  with like the high school or --

Page 12

1    A.  No, University of Illinois.
2    Q.  Oh, good.
3    A.  It was through another program.
4    Q.  It was through the what program?
5    A.  It was through another program I forget.
6  My mom used to sign me up for everything.
7    Q.  Gotcha.  So that was a -- was that an
8  educational program so far as you know or just kind
9  of a cultural participation one?
10    A.  I believe it was for educational.
11    Q.  Okay.  Did you receive a salary through
12  that or, excuse me, were you paid --
13    A.  Yes.
14    Q.  -- for that job?  Very good.  How long
15  were you at the Department of Theater for the U of
16  I?
17    A.  Probably for about three months.
18    Q.  Three months, okay.  So then what would
19  you say are some of the other major employers, folks
20  who have hired you, after the Department of Theater
21  until today?
22    A.  Okay, I done worked for construction
23  companies, like --
24    Q.  Okay.
25    A.  -- I've worked for Roof Doctors.  I worked

Page 13

1  for Roof Doctors for under a private contractor
2  named Curtis. I worked for them for about a year
3  and a half with my dad.
4      Q. Was that fun working with your dad or is
5  that kind of --
6      A. I love construction work. That's what I
7  do now.
8      Q. Gotcha. And you said it -- I'm sorry,
9  what was the private contractor's name? It was
10  Curtis did you say?
11      A. Yes, yes, his name is Curtis.
12      Q. Got it. So it was named after your
13  father?
14      A. No --
15      Q. Oh, I'm sorry.
16      A. -- that's not my father's name.
17      Q. That was my, that was my mistake, I'm
18  sorry. Okay, and then you worked there, I'm sorry,
19  did you say how long?
20      A. For about a year and a half.
21      Q. Roughly a year and a half, okay. So after
22  working with the Curtis private contractor for Roof
23  Doctors --
24      A. Meijer's, I worked for Meijer's in Urbana,
25  Illinois, for a year.

Page 14

1      Q. And that's the grocery store chain,
2  correct?
3      A. Yes, sir. I was a utility worker there.
4      Q. Got it.
5      A. I had a lot of different employments.
6      Q. That's a-okay. And something -- if you'll
7  just forgive me, this is sincere curiosity, I think
8  you also said that you're starting your own business
9  where you make shirts?
10      A. No, I already started my own business. I
11  make shirts, I design clothes, I do pretty much
12  anything that's art.
13      Q. Got it. More of a creative-minded person.
14      A. Yes.
15      Q. Very good, okay. So I apologize for
16  pivoting to this subject. I just wouldn't be doing
17  my job if I didn't ask about this. Do you have any
18  type of a criminal history as well?
19      A. Yes, sir.
20      Q. Very good. So I'm going to try to -- I'm
21  going to narrow this down to just a couple specific
22  categories of crimes, so you can just tell me if you
23  have them or if you have been convicted of them or
24  not. Have you ever been convicted of a felony?
25      A. Yes, sir.

Page 15

1      Q. Okay. When and what was the felony?
2      A. 2012 I believe, I was convicted for
3  residential burglary, and I don't remember the other
4  year I was convicted for robbery.
5      Q. Okay. So sounds like two convictions,
6  2012 residential burglary and then a year that you
7  just don't remember --
8      A. It was like --
9      Q. What was the burglary?
10      A. It was like probably like a year after --
11  well, after I got out of jail. Probably like 2014
12  maybe.
13      Q. Okay.
14      A. I don't know. I don't remember really.
15      Q. Doesn't have to be perfect, that's a-okay.
16      A. Yeah.
17      Q. And that was for robbery, correct, you
18  said?
19      A. Yes, sir.
20      Q. Okay. Any other felonies?
21      A. No.
22      Q. Okay. Have you ever been convicted of a
23  crime involving dishonesty? And so by that I mean,
24  for example, passing a fraudulent check, something
25  like that.

Page 16

1      A. No, sir.
2      Q. Okay, very good. And that's true of
3  Champaign County, that's true of anywhere in the
4  United States, you haven't --
5      A. Yes, sir.
6      Q. -- been convicted? Very good, thank you.
7  And now my understanding also -- so this is a
8  separate question, I'm just making -- this is just
9  to check your availability going forward. My
10  understanding is that there's currently something in
11  Coles County involving you; is that accurate?
12      A. Yes, sir.
13      Q. Very good. Could you just -- I don't need
14  to know the specific details or the incident. Could
15  you just tell me like is there a trial date that's
16  set for that or do you have any understanding of
17  kind of what direction that litigation is going?
18      A. Right now, we do have a trial set right
19  now, but I have a new case -- a new attorney, so --
20      Q. Very good.
21      A. -- I don't know what's going on.
22      Q. Okay, fair enough. If I recall, the trial
23  is set -- does February of this year sound --
24      A. February 25th.
25      Q. All right, trial.

Page 17

1    **THE WITNESS:** Can you hear me well?
2    **COURT REPORTER:** You said February 25th.
3    **THE WITNESS:** Yes, ma'am.
4    Q.   So I think that covers kind of background
5    details.  Forgive me, I want to go to my outline.
6    So I just want, before we turn to -- just to kind of
7    give you an overview, my thought is that I'll ask
8    you what your organic memory is, if I can use that
9    phrase, just as you sit here today what you remember
10   about the subject incident, ask some specific
11   questions, just kind of go through your narrative of
12   events.
13       But before I do, I just want to ask a
14   little bit about your history with patdown searches.
15   So is it fair to say that you have been patdown
16   searched before?
17   **A.   Yes.**
18   Q.   Okay.  If you had to guess, how many times
19   would you say?  Like less than a hundred?
20   **A.   Probably a little less.  I don't know, I**
21   **couldn't tell you, a little less than a hundred.**
22   Q.   Sure.  How about this?  If you had to
23   guess how many times a month you are patdown
24   searched, is it more than zero?
25   **A.   Is it -- a quick question.  Is it --**

Page 18

1    Q.   Please.
2    **A.   -- for like -- is it recently or like my**
3    **past?**
4    Q.   I guess let's limit it to recently if
5    that's okay.  How about in the last two years, is
6    that okay?
7    **A.   They --**
8    **MR. McCARTER:** I'll just object to the
9    form of the question.  You can still answer.
10   **A.   Well, I have not really been patdown, I**
11   **have not really even had any confrontation with**
12   **police, so it's probably just traffic stops that**
13   **I've been patdown.**
14   Q.   Very good.
15   **A.   It's probably like four years since I've**
16   **been in any confrontation with police really.**
17   Q.   Sure.  And just to make sure I understand
18   what you mean by confrontation with police, you mean
19   like they're investigating a burglary or a crime of
20   violence as compared to a stopping on the street or
21   a traffic stop; is that right?
22   **A.   Yeah, patdowns.**
23   Q.   Okay.
24   **A.   Anything, yeah.**
25   Q.   Okay, so let's say -- and you said that

Page 19

1    was within the last four years?
2    **A.   Yes.**
3    Q.   So within the last four years, have you
4    been, have you -- so has every search that at least
5    you recall that you've had with law enforcement been
6    a patdown or have there been other types of searches
7    as well in that four years?
8    **A.   I don't know because I don't know what**
9    **type of patdown -- I didn't know back then what type**
10   **of patdowns they had, you know, so -- well, or now,**
11   **so --**
12   Q.   Sure.  I'll try to phrase it this way.
13   Have the searches all been patting down the outside
14   of your clothes or have you ever been required in
15   the last four years, for example, to take off a
16   jacket, take off your shirt so that the officers
17   could see what was under your clothes?
18   **A.   Just a patdown.**
19   Q.   Okay.  When you're doing -- and forgive
20   me, so you're -- I'm just trying to get a sense of
21   a -- so would you say like you get pat down -- I
22   apologize, I don't know if I got an answer to the
23   question, I'm sorry.  Did you say how many times you
24   would, if you had to guess, within the last four
25   years on any given month you received a patdown?  Is

Page 20

1    it once, maybe half the time or something?
2    **MR. McCARTER:** Object to form.  You can
3    still answer.
4    **A.   I have not really had any confrontation**
5    **with police besides these traffic stops in the last**
6    **four years.**
7    Q.   Okay.  And that's confrontation with the
8    definition as we defined it before, right, like --
9    **A.   Yeah.**
10   Q.   -- it's just been traffic stops.
11   **A.   Yeah, just like traffic stops.  Four years**
12   **I have not --**
13   Q.   Okay.
14   **A.   -- been involved.**
15   Q.   Have you had any traffic stops besides the
16   ones that are at issue in this lawsuit, so on May
17   8th, 2019?  Have there been any other traffic stops
18   within the last two years let's say?
19   **A.   Yes, sir.**
20   Q.   Okay.  If you could, do you generally know
21   what time?  Maybe like September of 2017 or
22   something, just to throw out a random year.
23   **A.   Well, I got pulled over a couple of days**
24   **ago, yesterday or the day before yesterday.**
25   Q.   Okay.

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

WYLESHA AYRES
January 28, 2020

Page 21

1   A.  Got pulled over.  And another time other
2   than this, when I was with my kids again -- every
3   time they pull me over is when I'm with my kids,
4   so --
5   Q.  Got it.
6   A.  And it's been like four times in the last
7   four years.
8   Q.  Okay.  So you would guess roughly four
9   times in the last four years you've had traffic
10  stops.
11  A.  Yeah.
12  Q.  Okay.
13  A.  Yes, sir.
14  Q.  Now, do you recall -- obviously for the
15  two or -- excuse me, because two traffic stops
16  occurred on May 8th, 2019, correct?
17  A.  Two traffic stops, yeah.
18  Q.  Right, and both of those were by Champaign
19  County Sheriff's Office deputies, correct?
20  A.  Yes, sir.
21  Q.  Okay, so the other two traffic stops, do
22  you recall what agency stopped you?  Was it the
23  Urbana police, for example, or Champaign?
24  A.  Urbana one time and Champaign just this
25  last other time.

Page 22

1   Q.  Okay.  And I'm sorry, did you say, I
2   didn't get the note down, this was four stops within
3   the last two years or four stops within the last
4   four years?
5   A.  Within the last four years I --
6   Q.  Very good.  Okay, and so we have two of
7   them on May 8th, 2019.  We have one with Urbana.  Do
8   you recall roughly when that one was?
9   A.  Probably like a year and some ago.
10  Q.  Okay.  So, you know --
11  A.  They're spaced out, like they'd be spaced
12  out.
13  Q.  And then one with the City of Champaign
14  and that was a few days ago is your memory, okay.
15  A.  Yes, sir.
16  Q.  So focussing specifically on the Urbana or
17  the Champaign stops, and I don't want to spend a ton
18  of time on these, do you -- were you issued a
19  ticket, a citation or anything for either of those?
20      MR. McCARTER:  Can I just inter --
21  focussing on the Champaign Police Department stop;
22  is that correct?
23      MR. VAYR:  Oh, I was doing both.  I can
24  focus specifically.
25      MR. McCARTER:  Well, no, I just want to

Page 23

1   make sure that we're only talking about the Urbana
2   PD stop and then the Champaign PD stop not the
3   Champaign Sheriff's Office.  Just those two; is that
4   correct?
5       MR. VAYR:  Yes, we're not focussing on the
6   Champaign Sheriff's Office stops, that's fine.  I'll
7   clarify my question.
8   BY MR. VAYR:
9   Q.  So I want to focus specifically on the
10  stops briefly that the Urbana Police Department and
11  the City of Champaign's police department had.
12  Let's start first with the Urbana one which you said
13  occurred roughly a year ago, correct?
14  A.  Yes.
15  Q.  Were you provided -- do you recall being
16  told why you were stopped, got stopped?
17  A.  Nope.
18  Q.  Okay.  Do you remember at least being --
19  having it explained to you that you were stopped for
20  some reason?
21  A.  To be honest, I was stopped with four
22  police cars, so they was already waiting to stop me
23  when I left my mom's house.
24  Q.  Got it.  So then with that stop, was any
25  type of a search performed --

Page 24

1   A.  Yes, sir.
2   Q.  -- with the City of Urbana?  Yes?
3   A.  Yes, sir.
4   Q.  Was that a search of your person, a search
5   of your car or both?
6   A.  A search of my person and my car.
7   Q.  Okay.  Did they -- and consistent with
8   what you've already said, that would have been a
9   patdown?
10  A.  Yes.
11  Q.  Outside-of-the-clothing search.
12  A.  Yes, sir.
13  Q.  Okay.  And just so that I guess I can just
14  define it for this deposition, when I define the
15  term patdown, I just mean a search where officers
16  are only touching the outside of your clothes.
17  A.  Yes.
18  Q.  That's in contrast to a search where
19  they're reaching under your clothes.  Is that fair
20  enough?
21  A.  Yes, sir.
22  Q.  Okay.  And then you also said they
23  searched your car?
24  A.  Yes, sir.
25  Q.  Okay.  Was any contraband or anything

**Page 25**

1  found during that traffic stop?  And by that, I mean
2  drugs, weapons, et cetera.
3  **A.  No, sir.**
4  Q.  Very good.  Was it a male or a female
5  officer who performed the patdown search of you?
6  **A.  Male.**
7  Q.  Male for the Urbana, okay.  Let's now
8  focus to the -- on the City of Champaign stop with
9  you a couple days ago.  Were you searched by the
10  City of Champaign's police force when they did a
11  traffic stop on you that day?
12  **A.  No, sir.**
13  Q.  You were not, okay.  Your vehicle wasn't
14  searched?
15  **A.  No, sir.**
16  Q.  So it sounds like they maybe stopped you
17  and then just kind of let you go?
18  **A.  Yes, sir.**
19  Q.  All right, very good.
20  **A.  Well, they took the vehicle, but it was a**
21  **taillight out.**
22  Q.  I see.  Those pesky taillights.
23  **A.  Yeah.**
24  Q.  Okay.  I just want to talk now a little
25  bit more generally with your experience as to

**Page 26**

1  patdown searches, if I may.  And so when you are
2  patted down by these searches within the last four
3  years but also just patdowns so far as you remember
4  -- I'm sorry, strike that question.  Let me try to
5  clean this up a little bit.
6  **A.  Okay.**
7  Q.  Any time that you have been patted down,
8  has it -- by law enforcement, have you ever been
9  patted down by a female officer?
10  **A.  Yes, sir.**
11  Q.  And is it -- were you patted down by a
12  female officer less than five times if you had to
13  guess?
14  **A.  I don't recall.**
15  Q.  Okay.  Would it be maybe less than 20 to
16  like -- were you patted down by a female officer 20
17  times or more?
18  **A.  I wouldn't recall.  Like throughout the**
19  **years are you asking?**
20  Q.  Yeah.
21  **A.  I wouldn't recall that.**
22  Q.  Fair enough.  Just trying to -- just
23  trying to map it out, thank you.  Thank you for
24  indulging me.  Okay, and so when you have been
25  patted down by a female officer, was this in a

**Page 27**

1  correctional setting?  And by that, I mean were you
2  in jail or prison or was it like a traffic stop when
3  you were out and about?
4  **A.  Both.**
5  Q.  Both.  Okay, very good.  When you were
6  searched by law enforcement officers -- first off, do you
7  recall what law enforcement agency they were work?
8  Was it -- were with, excuse me.
9  **A.  Urbana, Champaign.**
10  Q.  So the city of Urbana, the city of
11  Champaign.
12  **A.  Uh-huh.**
13  Q.  Okay, have you ever been patted down by a
14  female officer, by the Champaign County Sheriff's
15  Office?
16  **A.  I don't -- I do not recall that.**
17  Q.  So you just don't remember it.
18  **A.  Yeah.**
19  Q.  Could have.
20  **A.  I don't remember if the --**
21  Q.  You just don't remember.
22  **A.  -- what agency it was.  Like I know I've**
23  **been searched by Urbana women before in the prison,**
24  **but I -- and Champaign before, so I don't know if**
25  **it's been actually just the sheriff though, so --**

**Page 28**

1  Q.  That's fine.  I want to focus now on the
2  patdowns in your experience of being -- of having
3  patdown searches performed on you where you're not
4  in prison and you're not in jail.  We're just going
5  to focus on when you're out and about, traffic stop
6  on the street.  So for those searches, do you know,
7  was the officer who searched you the same officer
8  who originally stopped you to the extent you
9  remember?
10  **A.  Okay, I don't know what you're asking**
11  **about now.  Which --**
12  Q.  We're asking about -- so think of the
13  patdown searches you've had performed on you by
14  females --
15  **A.  Uh-huh.**
16  Q.  -- not in the jail setting.
17  **A.  Uh-huh.**
18  Q.  And I'm just trying to ask essentially are
19  you, are you -- did a female search you just because
20  a female officer is who happened to pull you over or
21  interact with you to start?
22  **A.  Yeah.  I believe like in my past a male**
23  **officer has called a female officer to the scene.**
24  Q.  Okay.
25  **A.  But I've been searched outside of jail by**

Page 29

1  female officers as well.
2  Q.  Got it.  And so you've been searched then
3  -- just to sum it up, so you've been searched
4  outside of the jail setting by female officers and
5  by male officers --
6  A.  Yes.
7  Q.  -- and your memory is that there are at
8  least some occasions where a female officer was
9  specifically summoned to perform a patdown on you;
10  is that fair?
11  A.  Yes, sir.
12  Q.  Okay.  All right, so I think we will move
13  on to May 8th, 2019.  So first off, I'm correct,
14  right, that that's the date of the traffic stop that
15  we're -- that's at issue in this lawsuit, correct?
16  A.  Yes, sir.
17  Q.  And now just -- I'm just going to try to
18  narrow things as I can and then we will focus on
19  events.  There was also a traffic stop that happened
20  later in the day that same day.  Is that traffic
21  stop so far as you know a part of your lawsuit?
22  A.  Later in the day --
23  Q.  On --
24  A.  -- on May 8th?
25  Q.  Yes.

Page 30

1      MR. McCARTER: I'll object to the form of
2  the question, but you can answer if you understand.
3  A.  I don't understand.
4  Q.  Fair enough.  It was, to be fair, a poorly
5  phrased question.  So you were -- there were two
6  traffic stops that occurred on May 8th, 2019,
7  correct?
8  A.  Uh-huh.
9  Q.  The first one is the one involving Cory
10  Christensen and Cody Floyd[sic] who are defendants
11  in this lawsuit, correct?
12  A.  (Nods head).
13  Q.  And I just want to make sure, is the
14  second traffic stop something that you are also
15  taking issue with in your lawsuit?
16  A.  The second traffic stop that day?
17  Q.  Yes.
18  A.  That night?
19  Q.  Yes.
20  A.  That was I believe the same -- one of the
21  same officers because he was -- when he pulled me
22  over, he let me go after he said -- oh, well, I
23  shook my ticket out the window because I knew it was
24  them.  They had followed me all the way around.
25  Q.  Okay.  I'll get back to the second traffic

Page 31

1  stop if we need to later, I'm just going to -- on
2  the second one.  I'm just going to focus on the
3  first one for now.  So if you could, could you
4  please describe to me -- I'll try to set you up.  So
5  you're -- do you recall where you were driving
6  before the first traffic stop?
7  A.  Before the first traffic stop?
8  Q.  On May 8th, 2019.
9  A.  Where I was going to?
10  Q.  Not where you were going to.  Do you
11  recall where, what city, what road you were on when
12  you were stopped?
13  A.  I believe it was Dobbins Down Road.
14  Q.  Could you --
15  A.  Dobbins Road I believe.  That's what it's
16  called.
17  Q.  Dobbins Road.  And is that in the city of
18  Champaign?
19  A.  Yes, sir.
20  Q.  What is that by if you don't mind me
21  asking?  Are there any landmarks nearby?
22  A.  I believe it's the Salt & Light right
23  there.  The Salt & Light and stuff is right there
24  by -- Salt & Light, it's like they drop clothes and
25  stuff off there.

Page 32

1  Q.  So you said Sud like S-U-D?
2  A.  No, Salt & Light, I believe it's called
3  Salt & Light.
4  Q.  Okay.  And then you're driving along and
5  eventually presumably you see police lights behind
6  you at some point; is that correct?
7  A.  Yes, sir.
8  Q.  Could you tell me what happens next?
9  A.  The police officer -- well, we were
10  sitting there for a second waiting for the cars that
11  came past.  He came to Letika's window.
12  Q.  Okay.
13  A.  And he said that the back of the plates
14  was expired.
15  Q.  So an officer approached the passenger
16  window and the passenger was Letika Graham, correct,
17  in the car?
18  A.  Yes, sir.
19  Q.  And then also just to briefly establish
20  who else was in the car, I believe you said that
21  there were children in there as well?
22  A.  Yes, sir.
23  Q.  Were those your kids?
24  A.  Yes, sir, our kids.
25  Q.  Our kids.

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

WYLESHA AYRES
January 28, 2020

Page 33

1  A.  Yeah, me and Letika Graham's.
2  Q.  Very good, okay.  And that was Titan?
3  A.  Titan Graham.
4  Q.  Who was one at the time?
5  A.  Yeah.
6  Q.  All right, and then --
7  A.  He's still currently one.
8  Q.  Forget how recent this was, forgive me.
9  And then also King, correct?
10  A.  Yes, sir.
11  Q.  Okay.  So the officer informs you that
12  your license plate was expired it sounds like or
13  informed Letika through the passenger side that the
14  license plate was expired.  What happened next?
15  A.  He said he was going to just run our names
16  and give us a little warning because he could
17  understand people forget about the --
18  Q.  Sure.
19  A.  You know, to get those renewed.  So we
20  gave him our name and our information.  He went to
21  the back and he came back and he said he smelled
22  weed in the car.
23  Q.  I'm going to pause you there briefly if I
24  may.  So you said he went to the back.  Do you mean
25  he went back to his squad car?

Page 34

1  A.  Yes, sir.
2  Q.  Very good.  And so do you recall, if you
3  had to guess, how many minutes, if any, that he was
4  in his squad car before returning to your window
5  again?
6  A.  I don't recall that.
7  Q.  That's fair.  I guess I'll just ask on --
8  this is a bit of a tangent.  Are you aware that
9  there is body camera footage of this interaction?
10  A.  Yes, sir.
11  Q.  Have you had an occasion to look at the
12  body camera footage?
13  A.  It was all over the news, yes, sir.
14  Q.  Okay, so --
15  MR. McCARTER:  Can you just keep your
16  voice up a little bit?
17  A.  Oh, I'm sorry, I'm sorry.
18  Q.  No, that's fine.  So you saw the body
19  camera footage because it was on the news?
20  A.  Yes, sir.
21  Q.  Okay.  Have you seen the, how much body
22  camera -- I'm sorry, a couple of questions at once.
23  So have you only seen the body camera footage in the
24  context of a news story?
25  A.  No.

Page 35

1  Q.  Okay.  So you have also seen it, then,
2  while not reviewing media, correct?
3  A.  Yes.
4  Q.  Okay.  And so can you just briefly
5  describe what -- what circumstances that you saw the
6  body camera footage in otherwise besides the media?
7  A.  My lawyer.
8  Q.  Very good.  I'm not asking for any
9  conversations or any subjects that you had there,
10  fair enough.  Did you have an opportunity to see the
11  entirety of the body camera footage?
12  A.  Yes, sir.
13  Q.  Okay.  And at least with regards to -- I'm
14  sorry, I should ask before that, how recently have
15  you seen the body, the entirety of the body camera
16  footage?
17  A.  Just today.
18  Q.  Just today?  Very good.
19  A.  I watch it all the time, though, because
20  it's all over the news, I mean the whole 16 minute
21  video at the bottom of it.
22  Q.  All right.  So you say you watched it
23  today and you watched the entirety of it?
24  A.  Uh-huh.
25  Q.  Okay.  And then you also say that you

Page 36

1  watch it all the time.
2  A.  The entire video is at the bottom of the
3  News-Gazette clipping.
4  Q.  Right.  And so to the extent that it's
5  relevant, I guess, could you just kind of briefly --
6  so when you say all the time, I mean that could be
7  interpreted literally as in every second of the day
8  you're watching the video, and I'm assuming you
9  don't mean that, right?
10  A.  Uh-huh.
11  Q.  So you watch it daily, weekly?
12  A.  No, I'll be frustrated.
13  Q.  Sure.
14  A.  I'll watch it and I'll get frustrated when
15  I watch it.  I try to see how I've overcome from my
16  mental health classes, if I'm doing any good, but
17  no.
18  Q.  Okay.  So, again, the question was how
19  frequently do you watch the video and --
20  A.  I don't know.
21  Q.  I'm just asking.  So it sounds like --
22  A.  Probably like -- okay, me and my counselor
23  speak probably like once, once a week.
24  Q.  Okay.
25  A.  So I probably like watch it once a week to

Page 37

1   see if the aggression level has went down --
2       Q.   Okay.
3       A.   -- towards it.
4       Q.   Okay.  And I guess this is a decent time
5   since it came up, so I'm going to fast-forward if I
6   may.  So you said that you're seeing a counselor
7   now, correct?
8       A.   Yeah, I've been seeing counselors all my
9   life.
10      Q.   I see, okay.  And so is this -- so first
11  off, who is this counselor if I can ask?
12      A.   Her name is Pat.
13      Q.   Pat.  Does she have a last name?
14      A.   I don't know her last name, but she's in
15  Lincoln Square Mall.
16      Q.   Lincoln Square Mall.
17      A.   Yeah, P.A.T.S. is the program.
18      Q.   So you said Pat's is the program.
19      A.   It is called P.A.T.S. as well.  I mean
20  she's the owner of it.
21      Q.   Sure.  So the name of the business then,
22  is that fair to say, is Pat's?
23      A.   Yes.
24      Q.   Okay.  Is it like Pat's --
25      A.   P.A.T.S like with dots.

Page 38

1       Q.   Sure, but I'm sorry, my question was -- I
2   appreciate that.  My question is is it called just
3   P.A.T.S. or is it called like Pat's Counseling or
4   something?
5       A.   It's P.A.T.S. -- it's something more than
6   P.A.T.S. like at the bottom of it, but --
7       Q.   Okay.  And you said you've been, now is --
8   is it okay if I refer to her as Pat?
9       A.   Yes, sir.
10      Q.   Okay, so have you been seeing Pat, has Pat
11  been the counselor you've seen all your life or have
12  there been other counselors?
13      A.   There's been other counselors.
14      Q.   Okay.  How long have you been seeing Pat
15  specifically?
16      A.   I've been seeing Pat for -- I had to
17  change my psych, my -- the counselors because I
18  moved.  I had to come back from Mattoon, so I had to
19  change my counselors.  I've been seeing Pat for
20  roughly about six, seven months.
21      Q.   Roughly six to seven months, okay.  So
22  that pegs you -- then that would be about like --
23  I'm trying to do math with months and it's not
24  working, it's too early.
25           MR. McCARTER: So mid summer about?

Page 39

1       Q.   Yeah, it's like June or July of 2019 is
2   about when you started seeing her, does that sound
3   right?
4       A.   I believe so, yeah.
5       Q.   Okay, thank you.
6       A.   I believe so that's when it was.
7       Q.   Okay.
8       A.   Well, I have a lot that --
9           MR. McCARTER: Just hold on.  Only answer
10  if he asks a question.
11          THE WITNESS: Okay.
12          MR. McCARTER: You don't need to volunteer
13  anything.
14          THE WITNESS: Okay.
15  BY MR. VAYR:
16      Q.   So I'll explain -- I'll ask about Pat more
17  specifically in a second, but just before I lose
18  track, so before you saw Pat, you said you were
19  living in Mattoon?
20      A.   Yes, sir.
21      Q.   And because you moved from Mattoon back to
22  Champaign-Urbana, that area --
23      A.   I --
24      Q.   -- that's why you had to switch
25  counselors, correct?

Page 40

1       A.   I had to get everything switched over,
2   yeah.
3       Q.   Very good.  Who were you seeing while you
4   lived in Mattoon as a counselor?
5       A.   That's almost three years, I forgot her
6   name.  It's been almost three years, so I forget her
7   name because I was there for only like ten months
8   with them.
9       Q.   Okay.  So I guess there's a couple time
10  lines I just want to make sure I understand.  When
11  did you move to Mattoon, let's start there?
12      A.   It was for my court case.  I had to stay
13  there, reside there.
14      Q.   Do you recall what year that was?
15      A.   2015.
16      Q.   So in 2015 you moved to Mattoon, and you
17  leave Mattoon it sounds like around June or July of
18  2019.  Does that sound right?
19      A.   Yeah.
20      Q.   Okay.
21      A.   Yes, sir.
22      Q.   And so were you seeing a counselor the
23  whole time you were living in Mattoon that 2015 to
24  June/July 2019 period?
25      A.   Yes, sir.

Page 41

1    Q.   Okay, and was it the same counselor the
2  whole time or did you see multiple counselors?
3    **A.  I seen multiple counselors, too, in that**
4  **time.**
5    Q.   Okay.  And were these counselors -- I
6  guess I should ask it this way.  Did you go to one
7  center, for example, one business for counseling or
8  did you go to multiple businesses for counseling?
9    **A.  I went to one business and they have an**
10  **inpatient and an outpatient, so you see two**
11  **different counselors.**
12    Q.   Very good.  Do you recall what the name of
13  this business was in Mattoon?
14    **A.  CEAD.**
15    Q.   S-E-E-D?
16    **A.  I think it's C-E-A-D, CEAD.  It's just a**
17  **home, basically one of the homes --**
18    Q.   Is there anything -- is it called like
19  CEAD and Associates or CEAD Counseling, anything
20  like that?
21    **A.  CEAD -- no, it's just CEAD program.**
22    Q.   Hey, that's fine.  And so -- and then
23  while there, you -- so while at CEAD, which is the
24  only place you went, you saw multiple counselors?
25    **A.  Two.**

Page 42

1    Q.   Two, okay.  So an inpatient and an
2  outpatient counselor I believe you were saying
3  before; is that right?
4    **A.  Yes, sir.**
5    Q.   Do you recall the names of your inpatient
6  counselor?
7    **A.  Tammy and I believe the other one from the**
8  **other CEAD was Jessica, but everything's on file, so**
9  **I don't -- I don't remember, it's been four years.**
10    Q.   Sure, no, and it's not a memory test.  I'm
11  just asking what you do remember.  I'm not expecting
12  perfection.
13    **A.  Okay.**
14    Q.   So it sounds like Tammy and Jessica, were
15  those both inpatient counselors you saw or was Tammy
16  the inpatient and Jessica was the outpatient?
17    **A.  Tammy was the inpatient and Jessica was**
18  **the outpatient, no.**
19    Q.   Okay.  I'm going to go back one more gap
20  of time if that's okay.  So you moved to Mattoon in
21  2015.  Where did you live before you moved to
22  Mattoon for your court case?
23    **A.  With my mom.**
24    Q.   Where was that?
25    **A.  With my mom.**

Page 43

1    Q.   With your mom.  And was that in the
2  Urbana-Champaign area?
3    **A.  Urbana.**
4    Q.   Urbana, okay.  And now would that have
5  been -- so if you were living with your mom, was
6  that the childhood home for example, so you --
7    **A.  No, sir.**
8    Q.   Okay.  How long did you live -- I guess
9  ultimately before you moved to Mattoon, did you
10  spend your -- did you live in either Urbana or
11  Champaign?
12    **A.  Urbana.**
13    Q.   Very good.  While you were in Urbana, did
14  you only -- to the extent you received counseling,
15  did you only go to one business?
16    **A.  While I was in Urbana?**
17    Q.   Yes, while you were in Urbana.
18    **A.  Yeah, I went to Rosecrance when I was in**
19  **Urbana.**
20    Q.   Rosecrance, okay.  Do you recall roughly
21  the period of time that you would have been seeing a
22  counselor at Rosecrance?  It sounds like 2015 is the
23  end date.  Do you recall what the start date was?
24    **A.  No, I do not recall when I seen her.**
25    Q.   Okay.  What event in your -- do you recall

Page 44

1  the age that you first had to go to see a counselor?
2  Were you in middle school, for example, or high
3  school?
4    **A.  2010.**
5    Q.   2010.  So you started going to a counselor
6  in any capacity in 2010?
7    **A.  Yes, sir.**
8    Q.   And so if Rosecrance was the only place
9  you went to for counseling in Urbana, is it fair to
10  say that you would have started going there in 2010?
11    **A.  No, I wasn't going to Rosecrance.  I was,**
12  **I been at, we were -- I don't remember if it was**
13  **with Carle.  I believe when I got locked up in the**
14  **county, that's when I got to seeing a psychiatrist.**
15    Q.   Okay.
16    **A.  A real psychiatrist.**
17    Q.   And when you say locked up in the county,
18  is that Champaign County?
19    **A.  Yes, sir.**
20    Q.   Okay.  Okay, so let's focus -- and given
21  that you started seeing counselors in 2010, I assume
22  that this was related to the head injuries that we
23  described earlier that happened at about that time;
24  is that right?
25    **A.  Yes, sir, likely so.**

Page 45

1    Q.  Okay.  So, for example, before you had
2  those injuries you weren't seeing counselors.
3    A.  No, but I needed them.
4    Q.  I could ask, I'll just drive right past
5  that, that's okay, it's not my business.  So --
6  okay, so when you started seeing, so when you went
7  to, let's focus -- let's go back to Pat who was who
8  you had been seeing for the last six months or so in
9  Lincoln Square Mall.  Has that been associated still
10  with the -- kind of the consequences of your head
11  injuries in 2010?
12    A.  I really don't understand what you're --
13    Q.  That's fair.  Let me try to break it down.
14  Just let me know if I get anything wrong.  So it
15  sounds like in 2010 you suffered a head injury that
16  had -- that had implications for your mental health.
17    A.  Yes, sir.
18    Q.  Right so far?  And then to treat that
19  injury, the mental health implications, you went to
20  counseling for a number of years up until the
21  present; is that fair?
22    A.  Yes.  No, I've been incarcerated in
23  between times, so I --
24    Q.  Understood.
25    A.  -- lost counselors and had to get more.

Page 46

1    Q.  Okay, so if I said then -- but even while
2  incarcerated, you were still receiving some type of
3  mental help, mental health help or counseling,
4  right?
5    A.  Yes, sir.
6    Q.  Okay.  And that mental health help or
7  counseling was associated with the 2010 injuries,
8  correct, to the extent that you know.
9    A.  (Shakes head.)
10    Q.  New stuff had -- you're nodding your head
11  no.
12    A.  Just life, just life it itself.  Like as
13  things come upon me, you know, that that's what
14  counseling -- counseling wasn't just for my head.
15    Q.  Got it.
16    MR. McCARTER:  Wylesha, just be careful of
17  nodding your head or answering with like an uh-huh
18  or uh-uh, because the reason is our court reporter
19  when she takes that down and then Bryan and I go to
20  read it in six months, we can't necessarily tell if
21  that was an uh-huh yes or an uh-uh no.
22    THE WITNESS:  Okay.
23    MR. McCARTER:  And so if you could just
24  answer yes or no, it will make things a little
25  easier down the line.

Page 47

1    THE WITNESS:  Okay.
2    MR. McCARTER:  Sorry to interrupt.
3    MR. VAYR:  No, that's okay.  No, don't be
4  sorry, I should have explained that at the start and
5  I did not, so thank you, counsel.
6  BY MR. VAYR:
7    Q.  Okay, so it sounds like, then, so
8  counseling started in 2010.  Maybe the thing that
9  sparked the need for counseling were your head
10  injuries, and then as you continued to receive
11  counseling, just as circumstances bubbled up in your
12  life, counseling was there to address those.  Does
13  that --
14    A.  Yes, sir.
15    Q.  -- sound accurate?
16    A.  Yes, sir.
17    Q.  Okay.  Have you -- so since the May 8th,
18  2019, traffic stop that's the basis of this lawsuit,
19  have you received counseling specifically for
20  anything, any mental stress or issue relating from
21  that traffic stop?
22    MR. McCARTER:  I'll object to form --
23    A.  Yes.
24    MR. McCARTER:  -- but you can answer.  Go
25  ahead.

Page 48

1    Q.  You have, yes.
2    A.  Yes, sir.
3    Q.  Okay.  Could you -- to the extent that
4  you're comfortable doing so, could you please
5  explain just generally speaking what kind of
6  counseling, what kind of services you've received?
7    A.  One-on-one counseling.
8    Q.  One-on-one counseling.  And this is with
9  Pat so far as you know.
10    A.  Yes, sir.
11    Q.  Okay.  Did you see, did you talk to --
12  because it looks like you may have been at the tail
13  end of your time in Mattoon, Illinois, when this,
14  when the -- I'm just going to call it the subject
15  incident.  When I say that, I mean the traffic stop
16  that we're talking about.  It sounds like, did you
17  receive any counseling -- I'll strike that.  Here's
18  the question.
19    Did you receive any counseling at CEAD in
20  Mattoon relating to the traffic stop at issue in
21  this lawsuit?
22    A.  No, sir.  When I was in CEAD, this traffic
23  stop didn't even --
24    Q.  Very good, okay, and that I was just
25  trying to match up the time lines, okay.  So any

Page 49

1  counseling you have received after related to this
2  traffic stop would have been from P.A.T.S. in
3  Lincoln Square Mall in Urbana.
4      A.  Yes, sir.
5      Q.  Very good.  And you said it was one-to-one
6  counseling?
7      A.  Yes, sir.
8      Q.  Could you -- so I don't -- I sincerely
9  don't know if I'm allowed to ask this question.
10  What is --
11      MR. VAYR:  Could I go off the record for a
12  moment?  I apologize.
13      (Pause at 10:41 a.m. to 10:44 a.m.)
14  BY MR. VAYR:
15      Q.  All right, we can go back on the record.
16  So I've asked you some questions about your mental
17  health treatment.  I'm going to do what I can to try
18  to condense this to just a few more questions and
19  then maybe we can leave the subject.
20      A.  Okay.
21      Q.  So could you, so how -- let's put it this
22  way.  How many times were you seeing your counselor
23  before the traffic stop on May 8th, 2019?
24      A.  It wasn't as often.
25      Q.  So it wasn't as often.  So let's put it,

Page 50

1  did you see a counselor one time a week?
2      A.  Yes.
3      Q.  Okay.
4      A.  That's -- that's what we do now.  We see
5  once a week.
6      Q.  All right, so now it is one time a week.
7  Do you recall how many times you saw your counselor
8  let's say a month before the May 8th, 2019,
9  incident?
10      A.  I do not recall.
11      Q.  Okay.  Was it once a month, was it -- let
12  me put it this way.  Was it less than once a month?
13  Would you have multiple months before seeing a
14  counselor?
15      A.  No.  Probably like once a month.
16      Q.  Okay.
17      A.  And Pat's a very busy lady, she do
18  one-on-ones with everybody, so --
19      Q.  Got it.  Now, focussing on treatment
20  before, and I realize -- treatment before the May 8,
21  2019, incident, so this would be after at Mattoon,
22  correct?  Let's focus on there.  What type of --
23  were there any exercises or were there any actions
24  that you were supposed to take with regards to your
25  treatment to help further it along?

Page 51

1      A.  In 2015?
2      Q.  So let's focus on Mattoon, so that would
3  be 2015 --
4      A.  Okay.
5      Q.  -- to June/July of 2019 it sounds like.
6      A.  Okay.
7      Q.  So during that period of time.
8      A.  Could you ask me the question again?
9      Q.  Of course.
10      A.  Sorry about that.
11      Q.  So while at Mattoon, so 2015 to 2019 while
12  you were receiving services there, do you, were you
13  ever told -- do you recall, you know, certain
14  exercises you were supposed to do or certain -- kind
15  of what your treatment was supposed to be?
16      A.  My treatment was -- in Mattoon was based
17  on drug abuse, and yes, like they gave me like
18  different exercises to work on as far as getting
19  through things, and I had to follow-up, I mean it
20  was court ordered as well, so --
21      Q.  Okay.  So I'm going to unpack just a
22  little bit of that.  So you said exercises for
23  things.  So first off, let's focus on things.  When
24  you say exercises for things, what do you mean?  Is
25  that withdrawal, for example?

Page 52

1      A.  Sorry, what was that?
2      Q.  So what were these exercises for in
3  Mattoon?  What were -- what were they trying to
4  address?
5      A.  They was trying to address mental health
6  and drug abuse.
7      Q.  Okay.  And what were -- if you don't mind
8  me asking, what were some of the exercises?
9      A.  I do not recall.  I got so many exercises
10  from different counselors, so I -- like exercises as
11  in what?
12      Q.  I guess I'm -- so you said that you
13  received exercises for things and I guess I'm really
14  trying to ask what you mean by exercises.  And
15  again, this is Mattoon 2015 to 2019.
16      A.  Exercises for like triggers with drug
17  abuse, triggers which are anger problems, triggers
18  with emotions, so that's like basically what we
19  worked on and --
20      Q.  Okay.
21      A.  Like I don't want to get into details.
22      Q.  No, that's okay, I'm not asking you to.
23  I'm just trying to get a general sense.  So it
24  sounds like your exercises were maybe -- is it fair
25  to say that you were asked to self-evaluate things

Page 53

1  that triggered behaviors that you were trying to
2  correct?
3      A.  Yes, sir.
4      Q.  Very good.  Were there any other types of
5  exercises from Mattoon that you were asked to do
6  beyond this self-evaluation?
7      A.  Not that I recall.
8      Q.  Okay.  Now, let's focus on while you were
9  at P.A.T.S., so that's it sounds like mid summer
10  2019 until today.  So you said you're going there
11  once a week.  You said you were going to Mattoon for
12  drug abuse.  What were you going -- what are you
13  going to P.A.T.S. for currently?
14      A.  I'm going to P.A.T.S. for drug abuse
15  still.
16      Q.  Okay.
17      A.  Like --
18      Q.  You can leave it at drug abuse.  You don't
19  have to go into specific examples or anything.
20      A.  And just everything else that occurred
21  with me in life.
22      Q.  Okay.
23      A.  It's just not really specific what I go in
24  and talk to Pat about.
25      Q.  Sure.  So I'm just going to -- I'm not

Page 54

1  asking for specific conversations you've had with
2  Pat.  I'm just trying to get a sense of at least
3  what some of the subjects of, quote, everything else
4  in life, unquote, is.  So, for example, if you -- if
5  you had issues with like a criminal case or
6  something, would that be something possibly that
7  would come up?
8      A.  Yes, sir.
9      Q.  Okay.  Maybe issues with the kids at home,
10  they're sick or something, would that be something
11  that could possibly be talked --
12      A.  No, sir.
13      Q.  No, sir.  So you didn't talk about family
14  issues necessarily at these things.
15      A.  Yes, sir, I do talk about family issues.
16      Q.  Okay.  So I think for now I'll just leave
17  that as a -- because I don't want to bog us down
18  there, I'll just leave that as a catch-all category.
19      A.  Thank you.
20      Q.  Is it fair to say that while you're at
21  P.A.T.S. you have talked -- it sounds like you have
22  talked about the traffic stop on May 8, 2019, with
23  her?
24      A.  Yes, sir.
25      Q.  Now, have you -- has Pat generally

Page 55

1  prescribed any exercises that you should be doing as
2  part of your treatment?
3      A.  Right now, no.  We don't work on any
4  exercises right now.  What we're doing is just
5  talking about it first.
6      Q.  Okay.  So it sounds like perhaps you're
7  doing a preliminary discussion and exercises would
8  be forthcoming, is that your sense of things?
9      A.  Yes.
10      Q.  Okay.
11      A.  So basically she's evaluating me and then
12  she's going to put me something together to be able
13  to work on exercises.
14      Q.  Okay.  So beyond -- and you'll just have
15  to forgive me because I sincerely just don't know
16  what word to use.  So beyond exercises and talking
17  one-on-one with Pat, is there anything else that you
18  receive from Pat in the aspect of counseling?
19      A.  I don't get what you're trying to say.
20      Q.  Sure.  So, for example, have you been
21  prescribed some type of medication --
22      A.  No, sir.
23      Q.  -- or something?  Very good.  And that was
24  true at Mattoon as well, you weren't prescribed --
25      A.  No, I was prescribed medication, but I did

Page 56

1  not take it.
2      Q.  At Mattoon you didn't take the medication
3  you were prescribed?
4      A.  No.
5      Q.  Okay.
6      A.  Because it didn't work.
7      Q.  So presumably you took it for some period
8  of time, determined it didn't work, and then stopped
9  taking it after that.
10      A.  Yes, sir.
11      Q.  Okay.  Did you tell your counselor that
12  the medication wasn't working?
13      A.  Yes, sir.
14      Q.  And he or she just continued prescribing
15  it anyway?
16      A.  They tried to give me higher dosages and I
17  denied it.
18      Q.  I see.  And so now at P.A.T.S. -- I'm just
19  trying to summarize and then we'll move on.  Correct
20  me where I make a mistake.  So it sounds like you're
21  going to P.A.T.S. once a week.  Subjects of
22  discussion include drug abuse but also just
23  circumstances that are popping up in your life, some
24  of -- one of which is the traffic stop on May 8,
25  2019.  Am I right so far?

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

WYLESHA AYRES
January 28, 2020

Page 57

1   A.  Yes, sir.
2   Q.  Okay.  And then with regards to your
3   treatment itself, you have not been given any
4   exercises to do yet.  Your understanding is that you
5   are in an evaluation process right now with Pat.
6   Does that sound right?
7   A.  Yes, sir, because she had been audited, so
8   we had to -- yeah, I had a period of time where I
9   didn't get to see her, so --
10  Q.  Oh, I see.
11  A.  So it was audited.  So now I'm -- so
12  that's why I'm still under the evaluation.
13  Q.  Do you recall roughly when the audit
14  started?
15  A.  No.  For a while.
16  Q.  Okay.  When you say for a while, like was
17  there a couple months you couldn't see Pat?
18  A.  Yeah, about a month and a half.
19  Q.  Do you recall -- I think I asked this
20  already.  Was this recently because you've only been
21  seeing her for about six months, right?
22  A.  Yes, sir.
23  Q.  So for the six months you've seen her, at
24  least one and a half of those months you weren't
25  able to see her because she was undergoing an audit?

Page 58

1   A.  Yes, sir.
2   Q.  Do you have any insight into what the
3   audit for was, like who was auditing her?
4   A.  The state, just making sure her files and
5   everything was together.
6   Q.  Okay.  So far as you know, there was
7   nothing untoward or that you should be concerned
8   about.
9   A.  No.
10  Q.  It was just a routine audit, okay.  Okay.
11  Okay, thank you.  I know that's not the easiest
12  subject to talk about, so I appreciate your patience
13  with me as we muddled through that.
14      MR. McCARTER:  Bryan, we've been going for
15  about an hour and it seems like you're on the verge
16  of making a transition.  Would this be a good time
17  to take a quick five minute break?
18      MR. VAYR:  Sure, if you want to.  Do you
19  need a break?
20      MR. McCARTER:  Why don't we just step out.
21  Can we go off the record?
22      (Recess at 10:55 a.m. to 10:59 a.m.)
23  BY MR. VAYR:
24  Q.  All right, I'm just going to round out
25  this subject and then we'll finally get to talking

Page 59

1   about the traffic stop.
2   A.  Okay.
3   Q.  So I think we've talked about mental
4   health.  From the traffic stop to -- the May 8th,
5   2019, traffic stop, have you suffered any physical
6   injuries?
7   A.  I don't understand.  Like hurt or did I
8   have to go to the doctor or something like that?
9   Q.  Essentially.  Have you just like -- did
10  you suffer any injury, not an emotional one but
11  anything to your person, on the physical side, that
12  you had to receive treatment for?  Examples could be
13  like broken fingers or something.
14  A.  No, sir.
15  Q.  Could be like a scratch or something as
16  well.  No?
17  A.  No, sir.
18  Q.  No, okay.  So just to confirm, no physical
19  injuries from the, from the traffic stop --
20  A.  Yes, sir.
21  Q.  -- for this lawsuit.  Very good.  As a
22  result of the traffic stop, have you been unable to
23  work?
24  A.  No, sir.
25  Q.  Okay.  So you haven't lost any wages or

Page 60

1   anything because of injuries, be they physical or
2   emotional, resulting from the traffic stop.
3   A.  No, sir.
4   Q.  Okay.  And then is there any other type of
5   injury that I am just not smart enough to ask you
6   about that you -- that you said that you have
7   suffered or believe you have suffered as a result of
8   the traffic stop besides the emotional and mental
9   ones we've already talked about?
10  A.  No, sir.
11  Q.  Okay.  So again to confirm, then, it
12  sounds like the repercussions of the traffic stop
13  have been on your mental state, like your mental
14  health, your emotional health, is that fair to say?
15  A.  Yes, sir.
16  Q.  Okay, very good.  All right, so with that,
17  I can -- just one more quick prelude and then we'll
18  pick up our narration of events for the traffic
19  stop.  You mentioned that your -- that Titan and
20  King were your and Letika's kids.  If you don't mind
21  me asking, what's the nature of the relationship
22  between you and Letika?
23  A.  That is my girlfriend.
24  Q.  Excellent.  How long have you guys been
25  together?

Page 61

1    A.  Almost two years now.
2    Q.  Congratulations.  Doing anything for the
3  two year anniversary?
4    A.  No, not right now.
5    Q.  You have time, no worries.
6    A.  All right.
7    Q.  So don't want you, don't want you to get
8  in trouble.  Okay, so when we -- I'm just going to
9  summarize the story thus far and then I'll have you
10  pick it up from there.  May 8th, 2019, you're
11  driving down, you're driving in Champaign on -- was
12  it Downers --
13    A.  Dobbins.
14    Q.  Dobbins.  I almost said Downers Grove.
15    A.  Yeah.
16    Q.  Dobbins.  You see the lights behind you,
17  you pull over.  Christensen -- a deputy approached
18  the passenger side, spoke to Letika, said that your
19  license was -- your license plate was expired.  Am I
20  right so far?
21    A.  Yes, sir.
22    Q.  And then he goes back to his car and I
23  think that's where we left it, right?
24    A.  Yes, sir.
25    Q.  Okay, so he goes back to his car, and I

Page 62

1  think I had asked you do you remember how long he
2  was in his car, and I think you responded you don't
3  recall specifically?
4    A.  Yes, sir.
5    Q.  Was it some -- was it like a handful of
6  minutes, was it half an hour?
7    A.  It was some minutes probably.
8    Q.  Okay.  And so while he's in the car, what
9  are you and Letika doing, if anything, in the car?
10  Just hanging out?
11    A.  Just sitting there --
12    Q.  Gotcha.
13    A.  -- waiting on him to come back.
14    Q.  Gotcha.  And so when he, when he does come
15  back -- so eventually Christensen leaves his car and
16  he approaches yours.  What happens next?
17    A.  He came back and he said he smelled
18  marijuana in the car.
19    Q.  Okay.  So your memory is that he told you
20  that after talking to you through the driver's side
21  door?
22    A.  When he came back from the -- from his
23  vehicle?
24    Q.  Right.
25    A.  Yes, sir.

Page 63

1    Q.  Okay.  Did he say anything else?
2    A.  He said he would need to, you know, search
3  the vehicle and I already knew.  Sorry, he said he
4  would need to search the vehicle and I already knew
5  that he, that that was --
6    Q.  What was coming?
7    A.  Yes.
8    Q.  Okay.  And again, so I'm just trying to
9  create the time line of events in my head.  So this
10  is Christensen walking up to the driver's side door
11  and he's telling you through the window, "Hey, I
12  smell weed in the car and I need to search the
13  vehicle?"
14    A.  Yes, sir.
15    Q.  Okay.  So he said that, so you -- so
16  Christensen reported to you that he smelled weed.
17  Did your car smell like weed?
18    A.  Could have.
19    Q.  Could have?
20    A.  Yes, sir.
21    Q.  Okay, what makes you say it could have?
22    A.  Because earlier I had -- was cleaning out
23  my vehicle and I was smoking around my vehicle.
24    Q.  Gotcha.  And you were smoking cannabis
25  specifically?

Page 64

1    A.  Yes, sir.
2    Q.  All right.  So when Christensen said I
3  smell weed in the car, do you have any reason to
4  think he was lying when he said that?
5    MR. McCARTER:  Objection, calls for
6  speculation.
7    Q.  Fair enough.  You can answer if you think
8  you know it, if you think you can answer the
9  question.
10    A.  I mean just like -- I mean marijuana smoke
11  is just as thick as cigarette smoke, so I mean I
12  didn't argue with it.
13    Q.  Okay.  Now, do you smoke -- have you ever
14  smoked marijuana in your car before?
15    A.  Yes, sir.
16    Q.  You have?
17    A.  Sitting outside, yes, sir.
18    Q.  Sure.  Do you tend to do that like once a
19  month, is that a frequent thing, or is that like a
20  once-a-year-on-Christmas you kind of do it in your
21  car?
22    A.  No.
23    Q.  Okay.
24    A.  Just wherever I'm -- if I'm at home and
25  I'm in the driveway, I'll just sit in my car.

---

Page 65

1    Q.  Gotcha.
2    **A.  Stay away from the kids.**
3    Q.  Sure, absolutely.  So I guess I'm just
4    trying to get some type of a sense.  So if you had
5    to guess -- I mean it's okay if you can't, that's
6    fine, I'll try to rephrase the question, but if you
7    had to guess --
8           MR. McCARTER: I'm going to object to any
9    guessing --
10          MR. VAYR: Okay.
11          MR. McCARTER: -- right off the bat.
12          MR. VAYR: Fair enough, fair enough.
13          MR. McCARTER: So a reasonable estimation
14   perhaps --
15          MR. VAYR: Okay.
16          MR. McCARTER: -- but I don't want you to
17   guess.
18          MR. VAYR: Fair enough.  The law doesn't
19   want you to guess either, so thank you, counsel.
20   Fair enough.
21   BY MR. VAYR:
22   Q.  Okay, do you have -- do you have a good
23   sense of whether you smoked weed in your -- or
24   cannabis in your car once a week or more?
25   **A.  No, I don't.**

---

Page 66

1    Q.  Okay.  Would you say, then, that you --
2    and let me try to lock this in time as well.  So
3    let's say the traffic stop and then six months
4    before the traffic stop, okay?  So we're going from
5    like December 2018 to May 2019.  During that six
6    month period, would you smoke weed in your car once
7    a month?
8    **A.  I don't, it would just -- you know, we**
9    **have a garage, we have a car, so it's just like --**
10   Q.  Sure.
11   **A.  -- any place away from the kids, you know.**
12   Q.  Right.
13   **A.  So I just don't -- rarely, just like**
14   **rarely, just like it wouldn't be a certain day I**
15   **smoke in the car once a month.  It'd just be like**
16   **if -- whichever place we can get away from the kids.**
17   **And I didn't smoke like that back then, so --**
18   Q.  During that six month period of time?
19   **A.  Yeah, I didn't smoke weed often like that.**
20   Q.  Okay.  How would you define smoking weed
21   often?
22   **A.  I didn't smoke it -- probably I smoked it**
23   **like once a day, level me out.**
24   Q.  Sure.  So during the six month period of
25   time we're talking, so again December 2018 to the

---

Page 67

1    traffic stop itself, May 2019, you'd smoke weed
2    about once a day --
3    **A.  Yes.**
4    Q.  -- to level you out?
5    **A.  Just a bowl.**
6    Q.  Sure.  And you said a bowl?
7    **A.  Yes, sir.**
8    Q.  Okay.  And again, so where you would --
9    and it sounds like the places you would smoke would
10   be -- I think you've identified your car, your
11   garage.  Is there anywhere else you would smoke
12   weed?
13   **A.  Just them's the only two places really.**
14   Q.  Gotcha.  Like you wouldn't smoke in the
15   apartment or in the house --
16   **A.  No.**
17   Q.  -- or something.  Very good.
18   **A.  Kids in the house.**
19   Q.  Sure.  Sorry, I really need to learn
20   shorthand.  Okay, so going back, so you're saying
21   that at the window Christensen told you, hey, you
22   know, I smelled weed in the car, I'm going to search
23   your vehicle, and you said you kind of expected that
24   this was coming.  Do you mind me asking, like so why
25   did you expect that it was coming, the vehicle

---

Page 68

1    search?
2    **A.  Because I did smoke around my vehicle**
3    **earlier that day and I know --**
4    Q.  Gotcha.
5    **A.  -- marijuana smoke is very strong.**
6    Q.  Right, and it kind of lingers.
7    **A.  Yes, sir.**
8    Q.  Oh, I forgot to ask.  So you said that you
9    had smoked weed earlier in the day while you were
10   cleaning your car.  Like you just had the --
11   **A.  I wasn't necessarily cleaning.  I was**
12   **looking for some stuff.  I had just got off of work,**
13   **so --**
14   Q.  I see.
15   **A.  -- I was looking for some stuff in the car**
16   **and I had it in my mouth, so --**
17   Q.  Okay.  And roughly do you recall what time
18   of day on May 8th, 2019, that that was when you were
19   looking through your car with the -- while smoking?
20   **A.  No, sir.**
21   Q.  Was it -- would you feel confident saying
22   that it was within an hour of your traffic stop?
23   **A.  It was after I had got off of work and got**
24   **out of the shower and stuff, so yeah.**
25   Q.  So you had said that you had smoked weed

Page 69

1  within --
2  **A.  About like -- no, not an hour.  Probably**
3  **like a -- got off of work at 5:00 or 6:00.  Probably**
4  **like two hours, two, three hours.**
5  Q.  Okay.  All right, so Christensen tells you
6  I need to -- I need to search your vehicle, I smell
7  weed.  What happens next?
8  **A.  He told me to get out of the car and I got**
9  **out of -- well, I got out of the car and he was --**
10 **told me to step to the side, and he asked me can he**
11 **search me and I just turned around.  I mean that's**
12 **what you're supposed to do.**
13 Q.  Okay.  So you -- did he say anything,
14 because presumably you were walking out of your
15 driver's side door to about the back of your car,
16 right, during this period of time?
17 **A.  Yes, sir.**
18 Q.  And Christensen is talking to you and
19 telling you during that walk, you know, I'm going to
20 need to search you, is that what you're saying, is
21 that your testimony?
22 **A.  No.  He said he was going to need to**
23 **search me, can he -- yes, sir, that's when it**
24 **happened, I'm sorry.**
25 Q.  No, that's fine.  And so first off, your

Page 70

1  vehicle, if I recall, it looked like it was a gray
2  Jeep of some --
3  **A.  Gold.**
4  Q.  Or a gray SUV?
5  **A.  It was gold.**
6  Q.  Gold?  Oh.
7  **A.  Yeah.**
8  Q.  My eyes are terrible.  Okay, what type
9  of -- what make and model of car was it?
10 **A.  2010 Jeep Patriot.**
11 Q.  Jeep Patriot.  And it was gold?
12 **A.  Yes, sir.**
13 Q.  And is this your car?
14 **A.  No, that's Letika Graham's car.**
15 Q.  Letika's car, okay.  Okay.  So then does
16 Christensen say anything else?  During this walk
17 while you're going from the driver's seat -- side
18 seat to the back of the car, does he say anything
19 else to you besides can I search you?
20 **A.  It was little things, it was something**
21 **little, but I don't remember what it was, but it**
22 **was -- like I said, "Just can we hurry this up so I**
23 **can get my kids home?"**
24 Q.  Okay.  And now I just want to focus on
25 something specifically.  So did Christensen say,

Page 71

1  "Can I search you?" in your memory or did he say
2  "I'm going to search you."
3  **A.  I don't recall.**
4  Q.  That's fine.
5  **A.  He said he needed to search me.**
6  Q.  Okay.  And now you've seen the video.
7  Presumably you would trust that whatever is depicted
8  in the video is like a fair version of what -- like
9  that would be an accurate depiction of what
10 happened?  Do you have any reason to suspect that
11 the video is not accurate for example?
12 **A.  I mean if I see the video how it is and --**
13 Q.  Sure.
14 **A.  I mean I couldn't see what he was doing,**
15 **but I felt it, so --**
16 Q.  Sure, and we'll get to that in a couple
17 minutes.  Okay.  So you don't -- so as you sit here
18 today, you don't specifically recall, you just --
19 how Christensen phrased it.  You just recall him
20 saying a search is going to, a search of your
21 person -- something about a search of your person;
22 is that fair?
23 **A.  Yes, sir.**
24 Q.  Did he say you're under arrest at any
25 point?

Page 72

1  **A.  No, sir.**
2  Q.  Did he yell at you or anything?
3  **A.  No, sir.**
4  Q.  Did he pull out his gun or gesture towards
5  his gun or anything?
6  **A.  No.**
7  Q.  Did he --
8  **A.  Not that I recall.**
9  Q.  Okay.  Did he put handcuffs on you?
10 **A.  No, sir.**
11 Q.  Okay.  And now presumably at this point
12 did you -- did you see any other deputies besides
13 Christensen, who I'm just going to stipulate was the
14 individual walking you to the back of the car, did
15 you see any other deputies or law enforcement on the
16 scene?
17 **A.  Yes, sir.**
18 Q.  Could you please -- so do you know who
19 that individual was?
20 **A.  No.  He was another sheriff I believe.**
21 Q.  Sure.  Just so I can use names instead of
22 saying deputy A or deputy B, I'm just going to
23 stipulate that Christensen walked you to the back of
24 the car, and it was Deputy Floyd who is the other
25 person there.  So do you happen to recall where

Page 73

1  Floyd was specifically when you're walking back?
2  **A. He was literally right next -- well, he**
3  **was like standing right next to me.**
4  Q. So you --
5  **A. I believe. I don't know if he was**
6  **standing -- yeah, I think he was standing --**
7  **MR. McCARTER:** Just looking for the best
8  you remember.
9  Q. Right.
10 **A. Yeah.**
11 Q. And it's okay. So again, to the best of
12 your memory then -- and when you say right next to
13 you, like an arm's length; is that fair? You think
14 Deputy Floyd was within an arm's length of you?
15 **A. Yes, sir.**
16 Q. Okay. So now, and did -- so just a
17 similar roster of questions for Floyd. Did Floyd
18 yell at you or anything during this?
19 **A. No, sir.**
20 Q. Did he threaten you?
21 **A. No, sir.**
22 Q. Did he pull a gun on you or anything?
23 **A. No, sir.**
24 Q. Put you in handcuffs?
25 **A. No, sir.**

Page 74

1  Q. Okay. How would you -- would you agree
2  with me that at least up until this point
3  Christensen -- so before any search has happened,
4  that both Christensen and Floyd were acting
5  professionally?
6  **MR. McCARTER:** I'll object to the form of
7  the question, but you can answer if you understand.
8  **A. I don't know.**
9  Q. Sure.
10 **A. I mean he -- they wasn't acting --**
11 **MR. McCARTER:** Just have to answer the
12 question that's been asked.
13 **THE WITNESS:** Okay.
14 **MR. McCARTER:** You don't have to go
15 further than that.
16 Q. Let me try it again. Let me try a
17 different way. Did Christensen or Floyd do anything
18 up until -- ah, just strike it.
19 So a patdown search is mentioned. You
20 said that you had -- you turned around because
21 that's what you're supposed to do. Did I remember
22 that correctly?
23 **A. Yes, sir.**
24 Q. When you say that's what you're supposed
25 to do, could you describe what you mean for me by

Page 75

1  that?
2  **A. Because they're the official, so if they**
3  **tell you they need to do something to you, you're**
4  **supposed to abide by what they say, right?**
5  Q. Did you feel like you could've said, no, I
6  don't want you to search me?
7  **A. No, I've never felt like that.**
8  Q. All right. So we'll now -- so now we're
9  at the patdown search. Well, let me just back up
10 again. So do you -- okay, so now we're at the
11 patdown search itself, so Christensen is the one who
12 does the patdown search, correct? Could you please
13 describe to me in your own words as best as you
14 recall what the search entailed? Could you please
15 describe it to me?
16 **A. Could you rephrase --**
17 Q. Sure.
18 **A. -- that please?**
19 Q. Could you please describe to me to the
20 best of your recollection what Officer Christensen's
21 patdown search was like? Like what -- where his
22 hands were --
23 **A. It was --**
24 Q. -- et cetera.
25 **A. It was very feely toward my private areas.**

Page 76

1  Q. Okay.
2  **A. Yeah. Yeah.**
3  Q. Okay.
4  **A. Like he was more so rubbing than patting.**
5  Q. Okay.
6  **A. And like in between these areas**
7  **[indicating].**
8  Q. Okay. So when you said in between these
9  areas, so first let's just establish the scope of
10 the search. Did he search your shoulders for
11 example?
12 **A. No, sir.**
13 Q. Did he search your chest area?
14 **A. No, sir.**
15 Q. Did he look under your armpits?
16 **A. No, sir.**
17 Q. Did he search your arms?
18 **A. No, sir.**
19 Q. Did he make you open your mouth and search
20 your -- like go "ah" or anything?
21 **A. No, sir.**
22 Q. So was his search -- did he search below
23 your rib cage but above your waistline?
24 **A. Yes, sir.**
25 Q. Okay, so we have that. Did he search your

Page 77

1  waistline itself?
2      A.  I believe when he went in here
3  [indicating], I think so.
4      Q.  Okay.
5          MR. McCARTER:  Wylesha, can you please
6  keep your voice up?
7          THE WITNESS:  Sorry about that.
8      Q.  No, that's okay.
9          MR. McCARTER:  You're doing good so far.
10     Q.  Now, we're going to go from the other
11 direction.  Did he search your shoes --
12     A.  No.
13     Q.  -- or socks?
14     A.  No, sir.
15     Q.  Did he search below your knee?
16     A.  No, sir.
17     Q.  Did he search between your knee and your
18 waist?
19     A.  Knee and my waist?  None that I recall if
20 he searched, but I know he searched below, so --
21     Q.  Okay.  So what -- I just want to make sure
22 I understand what you're saying.  So you're saying
23 he searched above your waist, he searched your
24 waistline.
25     A.  (Shakes head).

Page 78

1      Q.  I'm trying to combine your answers.
2  You're nodding no.  So you don't think he
3  searched --
4      A.  He didn't search none of this area
5  [indicating].
6      Q.  Okay.
7      A.  I mean not that I recall of searching it.
8  I mean I had on a short sleeve shirt, so --
9          MR. McCARTER:  And I just want to be
10 clear.  When you say none of this area, you're
11 gesturing from your shoulders to about your belly
12 button, is that fair to say?
13         THE WITNESS:  Yeah.  Like when he searched
14 me, it seems as if he went right for my pants
15 pockets and stuff, like around my -- like this area
16 [indicating] and stuff like that.
17     Q.  Okay.  And when you say this area, you
18 were just kind of gesturing towards your waist --
19     A.  Yeah.
20     Q.  -- it looked like.  Okay.  So then is it
21 fair to say, then, that as you recall it
22 Christensen's search was below the belly button and
23 maybe below like your mid -- above, excuse me, your
24 mid thigh, so kind of encompassing that belly
25 button, waist and then kind of mid thigh area about

Page 79

1  where your pant pockets would be?
2      A.  I would say about probably right here
3  [indicating].
4      Q.  And so you're referring to about -- would
5  you say that that's about --
6      A.  About --
7      Q.  -- eight inches above your knee?
8      A.  Yeah, that's like right here, this is like
9  right here [indicating].
10     Q.  And you're wearing pants right now.  Is
11 that about the bottom of your pant pockets on the
12 pants you're wearing right now where you're
13 gesturing?
14     A.  I don't know if that is where --
15 different, you know, pants are made different.
16     Q.  Oh, no, sure.  I was asking specifically
17 about the pants you're wearing today.
18     A.  Okay.  So yeah, just about below here
19 [indicating], yes, sir.
20     Q.  All right, so it looks like then the
21 target of the search -- I mean so it's like at least
22 where -- as you recall the search, it was basically
23 your waistline, kind of pocket area of your pants.
24     A.  Uh-huh.
25     Q.  Okay.  And now you described -- so first

Page 80

1  off, I want to establish your posture.  So you were
2  -- your back was towards Christensen during the
3  search, correct?
4      A.  Yes, sir.
5      Q.  And so you're facing forward and your arms
6  are held out and parallel to the ground, right, like
7  wings or something, correct?
8      A.  Uh-huh.
9      Q.  Okay.
10     A.  Yes, sir.
11     Q.  And so he was searching the area we
12 already described.  Do you recall where Deputy Floyd
13 was during the patdown search?
14     A.  He was right there.
15     Q.  Still within arm's length is your memory?
16     A.  Yes.
17     Q.  Okay.  Did you look at Deputy Floyd, like
18 his eyes, and see that he was looking at you or
19 anything?
20     A.  No, sir.
21     Q.  So during the search, your eyes are
22 just kind of staring straight ahead; is that fair?
23     A.  Yes, sir.
24     Q.  Okay.  And so that's for the entirety of
25 the search, your eyes are just going -- were just

Page 81

1 looking straight ahead?
2 **A. No, sir.**
3 Q. Okay, where else did you look during the
4 search?
5 **A. After he touched my butt, yeah, that's**
6 **when I got to looking around and I'm like, yeah,**
7 **either -- yeah, that's when I got to looking around.**
8 Q. Okay. I'm going to try to peg that in
9 time. So where you're saying Christensen touched
10 your butt, if I can use the term, was that the very
11 end of the search, was that the very beginning of
12 the search, do you know when that was?
13 **A. That was, I believe, like as he got down**
14 **lower in the middle of the search and then it was in**
15 **the end as well.**
16 Q. Okay, so the middle to the end of the
17 search it sounds like you're saying is when the butt
18 touch happened.
19 **A. Fondled, yes, sir.**
20 Q. Okay. Do you recall as you sit here today
21 roughly how long the patdown search was?
22 **A. No, sir.**
23 Q. Okay. Do you think it lasted -- would you
24 be confident in saying it was less than a minute?
25 **A. No, I wouldn't be confident saying that.**

Page 82

1 Q. Okay, so you -- so the search could have
2 lasted longer than a minute in your memory?
3 **A. Yes, sir.**
4 Q. Okay. All right, so you said your eyes
5 started to look around after the butt touch near the
6 middle to the end of the search if I recall. Where
7 did your eyes go? Did you look down for example?
8 **A. My -- well, when he -- when it first**
9 **happened, I was thinking maybe, you know, it was an**
10 **accident, so I was like looking around because I was**
11 **going to say something. And I kind of looked like**
12 **[indicating] and then he did it again and that's**
13 **when I dropped my arms.**
14 Q. I see. And so I just want to -- because
15 you were pantomiming some stuff, I just want to make
16 sure it's clear on the record. So you said that
17 when you looked you kind of angled your head down
18 towards like your waist but kind of tilting your
19 head back so you could maybe see what was beside
20 you? Is that an accurate way to describe the head
21 gesture you made?
22 **A. Kind of. I was scared to move --**
23 Q. Sure.
24 **A. -- really as much, but I was trying to see**
25 **what was going on.**

Page 83

1 Q. Okay. And then did you -- besides the
2 look and the gesture that I just described and you
3 just testified to, did your eyes go -- did you look
4 anywhere else before the search was over?
5 **A. I don't recall that.**
6 Q. You don't recall, okay. Do you recall, do
7 you have a specific memory of looking at Deputy
8 Floyd during the search?
9 **A. During the search, no, sir.**
10 Q. Okay. Okay, so let's get to -- actually I
11 just want to clarify because my question was do you
12 have a specific memory of looking at Floyd. Did you
13 look at Floyd during the search?
14 **A. Not that I recall.**
15 Q. Okay. So now getting to Christensen's
16 search itself, so you described it as very feely I
17 believe when I first asked you to describe it, more
18 as a rub not a pat. Could you possibly -- am I
19 accurately remembering your testimony there?
20 **A. Yes, sir.**
21 Q. Could you please kind of expound on that?
22 What do you mean it was more of a rub than a pat?
23 What was Christensen doing with his hands?
24 **A. Well, what I'm used to is when I'm**
25 **searched by a male, I'm patted --**

Page 84

1 Q. Okay.
2 **A. -- or like this [indicating], you know,**
3 **something like that. It was more groovier than**
4 **anything.**
5 Q. Okay, was that the -- okay, I just want to
6 make sure. That was the end of your answer?
7 **A. Yes, sir.**
8 Q. Okay. And so, again, you were
9 demonstrating physically. I just want to try to
10 capture it to the extent I can for the record. So
11 you said normally it's a pat, I think we all know
12 what a pat is, and you said sometimes it's also like
13 this.
14 **A. Yes.**
15 Q. And you demonstrated by taking what looked
16 like kind of the crook between your pointer and your
17 thumb and kind of gliding it down or rubbing it down
18 your quadricep muscle. Is that a fair
19 characterization?
20 **A. I didn't understand that.**
21 Q. No, that's fair. So when you, because you
22 said in your -- often what you're used to with
23 patdown searches is a pat, like an actual pat.
24 **A. Yeah.**
25 Q. Or you said "this" and you made a physical

Page 85

1 gesture. I'm just trying to describe the gesture.
2 **A. It's like a quick [indicating].**
3 Q. Running, running hands like --
4 **A. Yes.**
5 Q. So the hands are continuously making
6 contact with the body, but they're gliding down it.
7 **A. Yeah, but not to a certain each thing.**
8 **It's like they know what parts to do it like.**
9 **They're not touching -- that's what I'm calling male**
10 **officers searching me, what it is.**
11     MR. McCARTER: And it looks like you're
12 starting just above the knee and then --
13     THE WITNESS: Yeah, it is like --
14     MR. McCARTER: -- sliding your hands down
15 your calf; is that right?
16     THE WITNESS: That's how they would do it.
17 Q. Normally, okay.
18 **A. Yes, sir.**
19 Q. And so it sounds like, then, what you're
20 used to, and I'm just going to try to summarize it,
21 and please correct me if I make a mistake, so you're
22 used to a pat where an officer will make physical
23 contact with your body, lift the hand away, pat
24 somewhere else, and so it's broken up physical
25 contact with you, a patting motion.

Page 86

1 **A. Yes, sir.**
2 Q. Is that right? And then the second way is
3 someone will make continuous physical contact with
4 your body, but -- as in they're not patting it and
5 removing it, it's continuous contact, but they're
6 quickly kind of shifting their hand down the part of
7 your body that they're searching.
8 **A. Yes, sir.**
9 Q. Okay. Sorry for that time. It's just
10 hard to get physical gestures in a deposition
11 transcript. Okay, and so now you described
12 Christensen's feeling as -- Christensen's search as
13 it was more groovy than -- because you said you're
14 used to a patdown or used to this, the slide down
15 the leg, and then you said Christensen's feeling was
16 more groovy than what you're used to. Could you
17 please describe what that means?
18 **A. Like it was more so touching areas that**
19 **I've never in my life known that a male officer**
20 **could touch.**
21 Q. Okay. I know that this is painful to ask.
22 I'm sorry to ask these questions. I wouldn't be
23 doing my job if I don't. What parts specifically do
24 you recall Christensen touching?
25 **A. The first time was my butt and I tried to**

Page 87

1 say, okay, maybe it's close, just swiped across it,
2 **and the second time was like in between, in between**
3 **my butt.**
4 Q. Okay, so I'm going to try to -- because
5 I'm not quite sure. So it sounds like -- so it
6 sounds like we're talking about two distinct moments
7 of the search, and it sounds like once Christensen
8 searched or, you know, his hand made contact with
9 your butt, and it sounds like the first time you're
10 like maybe it was an accident, you kind of --
11 **A. Roughly.**
12 Q. That's about right?
13 **A. Yeah.**
14 Q. Okay. And then the second time you said
15 he went in between, I'm assuming you meant in
16 between, for example, the distinct muscles in the
17 butt; is that fair?
18 **A. Like right in between. Like, okay, you**
19 **know, you got your pants, so --**
20 Q. Right.
21 **A. -- in between, like up in there with his**
22 **hands, and I'm like, "Don't touch my butt," and I**
23 **walked off.**
24 Q. Okay. So let's talk about the first one
25 and then we'll switch to the second, the second

Page 88

1 touch then. So the first time he touches your butt,
2 is his hand -- like is his hand just kind of like
3 the sliding motion you described before, is his hand
4 making continuous contact with your clothes and it
5 passes over your butt?
6 **A. Repeatedly.**
7 Q. Repeatedly.
8 **A. Yes, sir.**
9 Q. Do you recall how many times if you had to
10 guess? Or not if you had to guess. How many times
11 do you feel confident?
12 **A. The first time he did it was a swipe and**
13 **the second time he ran across both parts of my butt.**
14 Q. Okay.
15 **A. And then the third time was the end when**
16 **it went in between, but I mean it's all in the same**
17 **-- it's all in the same time. It's all right then**
18 **and there.**
19 Q. Right, because the search was -- his hands
20 were continuously moving, right? Like there wasn't
21 a part, for example, where he stopped and like his
22 hands stopped, right? Like they were -- were they
23 continuously moving over your body as best you
24 recall?
25 **A. They were -- they were moving in the same.**

Page 89

1  Like he repeatedly went to my butt constantly.
2  Q.  Okay.
3  A.  There's not nothing there.
4  Q.  Okay.  So do you -- did he touch any other
5  part of you that you took offense to, for lack of a
6  better phrase, besides your butt?
7  A.  The rubbing was kind of -- everything was
8  kind of weird.  The search was kind of weird in the
9  beginning.  Like I -- you know, like I said, what
10  I'm used to is what I'm used to, and I've been
11  searched by several males and ain't never had a
12  problem with it.
13  Q.  Sure.
14  A.  So the feeling of it is like he was trying
15  to belittle me as opposed --
16  Q.  To searching.
17  A.  Yeah.
18  Q.  So you thought he was, you thought he was
19  specifically -- I mean so far you don't know
20  precisely what --
21  A.  I don't know.
22  Q.  -- Christensen was thinking, right?
23  A.  I don't know.
24  Q.  Okay.
25  A.  I felt like that.

Page 90

1  Q.  Sure.  That was the feeling of the gesture
2  to you.
3  A.  Of?
4  Q.  Of the search, of the conduct to you.
5  A.  Yeah.
6  Q.  Okay.
7  A.  A little rough with it as well.
8  Q.  So you said he was a little rough.
9  A.  Yeah.
10  Q.  Okay.  What do you mean by he was rough?
11  A.  The way he was grabbing me.
12  Q.  Okay.  So I guess I apologize, it's hard
13  to describe what a physical search is like.  So when
14  he was grabbing you, you're saying the grabbing was
15  rough.  Like was he like with a death grip grabbing
16  you or like what exactly --
17  A.  It's just --
18  MR. McCARTER: I'll object to the form of
19  the question, but you can answer.
20  A.  Just not normal.  Just something I'm not
21  used to with males, like the -- you could tell the
22  way my body was moving.
23  Q.  Okay.  So there were the -- so there was
24  the touching of the butt.  There was generally you
25  thought that he was rubbing you rather than kind of

Page 91

1  maybe a lighter contact that you're used to from
2  your patdown searches.  Was there anything else,
3  anything else about the search that bothered you or
4  that you took offense to?
5  A.  So are you asking me what, basically
6  what --
7  MR. McCARTER: You can just ask him to
8  rephrase the question.
9  Q.  Sure.
10  A.  Yeah, could you --
11  Q.  No, that's fine.
12  A.  -- rephrase?
13  Q.  So -- and my intent of the question is,
14  because I just want to make sure that anything of
15  the search that was -- that you believed and
16  perceived it as being problematic, I just want to
17  make sure I ask you about that, get the benefit of
18  your insight, so why I'm asking is just because I
19  want to make sure I'm identifying the areas.  If
20  we've identified them all, that's fine.
21  A.  Okay.
22  Q.  So the question is you have identified
23  that his touching your butt was something that was
24  problematic, correct?
25  A.  In between.

Page 92

1  Q.  And there were a couple butt touches as
2  we've described in the past.  We can go back to
3  that.  It was that you believed he was -- the
4  rubbing nature of the search was problematic; is
5  that correct?
6  A.  Yeah, it felt more like a grope, like he's
7  groping me instead of patting, pushing, patting
8  down, doing what he was supposed to do --
9  Q.  So you felt --
10  A.  -- like I know of.
11  Q.  So then is the, so with that, so --
12  because you've alternatively phrased it as rubbing,
13  rough grabbing and groping.  Are those all part and
14  parcel, are those the same thing?
15  A.  Same thing to me.
16  Q.  Okay.
17  A.  Probably, you know, it's most likely
18  different to you.  I just think of those things --
19  Q.  Sure.
20  A.  -- as the same.
21  Q.  No, that's okay.  I guess, because you're
22  using multiple words to describe, I just want to
23  make sure --
24  A.  Right.
25  Q.  -- are these using multiple words to

Page 93

1  describe --
2  **A. The same.**
3  Q. -- the same conduct? Okay, so then it
4  sounds like we have two things that I'll ask you
5  about a little bit more in depth and that's going to
6  be the butt touches and then also let's just call it
7  the nature, like how -- the strength and the nature
8  of contact that Christensen was making with your
9  body during the search regardless of where he was
10  searching. Is that fair?
11  **A. Yes, sir.**
12  Q. Okay. So besides those two things,
13  there's nothing else about the search?
14  **A. Yes, sir.**
15  Q. Okay, so now let's -- so the butt touches
16  we've already talked a little bit about, and so it
17  sounds like there was an initial butt touch that you
18  thought was maybe accidental where Christensen's
19  hand was kind of passing over your butt. Is that an
20  accurate way to describe it?
21  **A. Yes, sir.**
22  Q. Okay. Now, you said that there was a
23  second butt touch where he went in between, and I
24  just want to make sure it's clear for the record.
25  When you're saying in between, do you mean he was

Page 94

1  searching in like your -- in between your butt
2  cheeks, the butt crack, or do you mean he's
3  searching in between kind of like where your legs
4  meet like, like if you're just standing? This is
5  going to look terrible on the record.
6  But like where you're standing, for
7  example, you know, your legs come up and ultimately
8  they meet kind of in your waist area. There's this
9  little like upside down U of space there. Is that
10  what you're referring to when you say in between or
11  are you saying in between, he was reaching in
12  between your butt cheeks?
13  **A. He was reaching -- it was in between my
14  butt cheeks --**
15  Q. Okay.
16  **A. -- because I felt it.**
17  Q. Okay. Okay, so again I just want to make
18  sure I have this. So butt touch one, continue --
19  he's making continuous contact, his hand is passing
20  over your butt, that's one, and you're thinking
21  maybe it's an accident, you don't know, at that
22  time. That's the thought in your head at least,
23  correct?
24  **A. Yes, sir.**
25  Q. And now does he then immediately make butt

Page 95

1  touch two or does he search a little bit, does he
2  feel elsewhere first?
3  **A. He's going in the same areas over and over
4  again.**
5  Q. Okay.
6  **A. So I don't really know what to tell you
7  after that. He's --**
8  Q. That's fine.
9  **A. -- searching the same area over and over
10  again.**
11  Q. Okay. So then I guess what I'm just
12  trying to ask is with regards to time, is there any
13  amount of time between butt touch one and then that
14  butt touch two where he goes in between or are those
15  immediately after each other?
16  **A. They was, they were, they were -- he was
17  going in my pocket, then he went to the butt part,
18  went in the pocket again, went to the butt part --**
19  Q. Okay.
20  **A. -- and checking it over.**
21  Q. Got it. So he was all -- so in your
22  memory, he's alternating between checking your, for
23  lack of a better phrase, I guess I'll just say your
24  behind area, like your back, in that waist area
25  we're talking, and then your front pockets, is that

Page 96

1  what we are saying?
2  **A. I guess, yes, sir.**
3  Q. Okay. And so we have butt touch one, he
4  goes to the front pockets, butt touch two, and we've
5  talked about that before and --
6  **A. And then he came back after butt touch two
7  and --**
8  Q. To the pockets.
9  **A. No.**
10  Q. Oh, okay.
11  **A. To the butt. The last one was when he
12  was -- that's when I walked off.**
13  Q. Okay. So there are three butt touches
14  then?
15  **A. My butt --**
16  Q. I realize that your memory doesn't have to
17  be perfect, it's -- do you just recall there being
18  three distinct --
19  **A. I just --**
20  Q. -- butt touches?
21  **A. I just recall my butt being fondled
22  with --**
23  Q. Okay.
24  **A. -- in a way that I've never been fondled
25  with in the first place.**

Page 97

1    Q.   Sure.  And so I'm going to set -- so now
2   let's focus on Christensen's, like how his, how
3   he's -- let's say how his hands, how his fingers are
4   acting during this, during this search.  So it
5   sounds like with butt touch one, is he like
6   squeezing as he's making the pass or is his hand
7   just passing over in your memory?
8    **A.   In my memory, it was just probably like**
9   **passing over.**
10   Q.   Okay.
11   **A.   And I think -- I thought it was passing**
12  **over.**
13   Q.   Okay.  And again, this is just to the best
14  of your memory.  So for butt touch two where he's
15  going in between, is he just sticking his hand in
16  between or is he sticking his hand in between and
17  doing anything with his fingers?
18   **A.   His hand was -- I don't know.**
19   Q.   You don't know?
20   **A.   I do know, but I just -- talking about**
21  **this is uncomfortable.**
22   Q.   I understand.
23   **A.   His -- it felt like when he went to go,**
24  **you can feel this -- these fingers.  I don't know, I**
25  **don't recall them moving or anything like that.  I'm**

Page 98

1   **not even going to lie.  I don't recall them moving.**
2    Q.   Okay.
3    **A.   But I recall him putting his hands in**
4   **between the -- I felt it in there, yeah, the butt**
5   **part.**
6    Q.   Okay.  So it sounds like then -- I'm just
7   going to try to summarize and you tell me if I have
8   it wrong.  It sounds like, then, for what we're
9   calling butt touch two where he goes up, you don't
10  remember his fingers doing anything, moving or
11  anything.  You just remember the hand going up in
12  that area.
13   **A.   Like that [indicating].**
14   Q.   Okay.
15       MR. McCARTER:  I'll object to the extent
16  it mischaracterizes the testimony, but you can
17  answer.  I think you already did.
18   Q.   All right, okay.  So that's -- so we
19  talked about pass one, we talked about pass two.
20  Was there anything else during the search that you
21  recall Christensen's fingers doing?  You mentioned
22  grabs before for example.
23   **A.   Just the way the whole search, it was not**
24  **a normal search to me.**
25   Q.   Okay.  And I apologize, I know it feels

Page 99

1   like I'm just asking the same questions again and
2   again.  I'm just trying to explore what specifically
3   about the search made it feel that way to the extent
4   that you can.
5        So I think we've talked about the butt
6   touches sufficiently.  Do you recall -- so do you
7   recall him searching anything else on your body?
8   You mentioned pockets before for example, so he
9   searched your -- he felt in the area of your
10  pockets.
11   **A.   No, he went in my pockets.**
12   Q.   You recall him going inside your pockets.
13   **A.   Yes, sir.**
14   Q.   Did you say you're sure or sure?
15   **A.   I believe he went inside my pockets, yes,**
16  **sir, because I had on sweatpants.**
17   Q.   Did you feel his hands -- do you recall
18  Christensen reaching under any of your clothes
19  during this patdown?
20   **A.   No, sir.**
21   Q.   So he didn't stick his hand like up your
22  shirt or anything like that.
23   **A.   No, sir.**
24   Q.   Okay.
25   **A.   Nothing like that.**

Page 100

1    Q.   He didn't take off any clothes during the
2   search, correct?
3    **A.   No, sir.**
4    Q.   Okay.  And so you're saying his hand went
5   in your pockets.  Was that something you saw or
6   something you felt?  Like when you were looking
7   down, did you see his hands --
8    **A.   That was the main, his main areas --**
9    Q.   Were the --
10   **A.   -- was the pockets and the behind.**
11   Q.   So of the areas that he searched, the main
12  ones, to use your term, were -- I think you were
13  gesturing towards your front pant pockets?
14   **A.   Yes, sir.**
15   Q.   Okay.  So that -- so to the extent that
16  his hands were on you during his search, would you
17  say that the majority of the time he was searching
18  like he was feeling your front pockets or what --
19  I'll just leave it there.
20       MR. McCARTER:  Object to form.  You can
21  answer.
22   **A.   Sorry, say that again.**
23   Q.   That's okay.  So you said that the main
24  point or the -- you just used the word main, saying
25  like it seemed like the main target of his search

2:19-cv-02148-CSB-EIL   # 53-5   Page 27 of 32

AYRES v.                                                           WYLESHA AYRES
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.                        January 28, 2020

Page 101

1  and the main thing he was searching were your front
2  pockets.
3      A.  And my buttocks.
4          MR. McCARTER: Same objection.  Go ahead
5  and finish your answer.
6          MR. VAYR: I'm sorry, could you read back
7  what her answer was?
8          (Requested portion of the deposition was
9  read by the court reporter.)
10 BY MR. VAYR:
11     Q.  So you said you were wearing sweatpants.
12 Were those sweatpants -- to the extent that you
13 recall, were those like skintight yoga pants, were
14 they baggy?
15     A.  They're not skintight yoga pants, but
16 they're not baggy either.  You can see right -- you
17 can see if there's any object, especially a gun, in
18 sweatpants, those sweatpants I had on.
19     Q.  Okay, so your memory then is that your
20 sweatpants were, so did they fit like a -- I'm
21 sorry, I'm trying to think.
22         Do you recall if you were wearing your
23 pants kind of lower that evening?
24         MR. McCARTER: Object to form, but you can
25 answer if you understand.

Page 102

1      A.  They wasn't -- they was not sagged.  I
2  don't have a butt like, a big butt, so of course it
3  may look like -- but you can tell.  No, I was not
4  sagging.
5      Q.  Okay.  So your memory, then, is that you
6  were wearing your sweatpants at your -- like the
7  waistline of your sweatpants were at your
8  hipbones --
9      A.  Yes, sir.
10     Q.  -- is your memory?  Okay.  Let's step
11 aside from the search of your person for a while.
12 So the search happens.  Do you recall one way or the
13 other if Christensen said anything to the effect of
14 the search is done?
15     A.  At that point I ain't care what he said.
16 I walked off.
17     Q.  Sure.
18     A.  I was walking off.
19     Q.  So your memory, then, is that you walked
20 off because of that second butt touch that we were
21 talking about before and not because Christensen
22 said the search is over?
23     A.  Yeah, I was walking off regardless because
24 he had did too much.
25     Q.  Okay.  So now after the patdown search,

Page 103

1  what happens next?
2      A.  He -- I went over there to, he told me to
3  stand -- I stood next to Officer Floyd, and me and
4  Officer Floyd was -- I was like bickering back with
5  him about what he had did.
6      Q.  So you were talking with -- so you were
7  talking with Floyd about what Christensen had
8  done --
9      A.  Yeah.
10     Q.  -- in the patdown?
11     A.  Yes, sir.
12     Q.  Okay.  And then -- so at some point your
13 car is searched, correct?
14     A.  Yes, sir.
15     Q.  And I'm assuming you were back with Deputy
16 Floyd with Letika is my memory while Christensen was
17 doing the car search, correct?
18     A.  Yes, sir.
19     Q.  So did you not see like Christensen or
20 what Christensen searched or did not search within
21 the car itself?  You just saw Christensen kind of
22 leaning into or entering your car?
23     A.  Yes, sir.
24     Q.  Okay.  So then after the search of the
25 car, what happens?

Page 104

1      A.  After the search of the car, he let us get
2  back in the car.
3      Q.  Okay.  And then I should try to clarify as
4  well.  Do you have -- do you remember approximately
5  how much time passed after the patdown search but
6  before the car search started?
7      A.  So what time -- the patdown and then did
8  the car get searched right after it?
9      Q.  I'm basically asking do you have a memory
10 or are you confident with -- like, for example, did
11 seconds pass between the patdown being over and the
12 car search starting?  Was it a handful of minutes?
13 Was it a half-hour?
14     A.  I don't recall.  It wasn't a half an hour,
15 no.
16     Q.  Okay, okay.  And so then he searches the
17 car.  Do you have any memory or do you remember
18 roughly how long the car search lasted?
19     A.  No, sir.
20     Q.  Was it less than half an hour?
21     A.  Yes, sir.
22     Q.  Was it less than 20 minutes?
23     A.  Yes, sir.
24     Q.  Less than ten minutes?
25     A.  I believe, yes, sir.

Page 105

1  Q. Okay. Would you say that it was less than
2  five minutes?
3  A. I can't say less than five minutes.
4  Q. Fair enough. So somewhere between one and
5  five minutes is your memory about how long -- of
6  roughly how long the car search was?
7  A. Yes, sir.
8  Q. Okay. And now after the car search, you
9  testified that you and Letika were allowed to return
10  to the car, correct?
11  A. Yes, sir, I believe.
12  Q. All right. And then you guys are in your
13  car. Presumably Christensen then returned to his
14  squad car after that, do you know?
15  A. Yes, sir.
16  Q. Okay. And roughly how long were you
17  and Letika in the car before Christensen came back
18  if you had to guess? Or not guess, if you're -- how
19  confident are you that it was --
20  A. I don't recall.
21  MR. McCARTER: I'll object to the form of
22  the question. Bryan, can you rephrase that one?
23  MR. VAYR: Sure.
24  MR. McCARTER: I didn't follow.
25  MR. VAYR: No, that's fine. It was a

Page 106

1  poorly phrased question.
2  BY MR. VAYR:
3  Q. How much time passed between Christensen
4  -- basically how long were you and Letika in the car
5  alone after the car search before Christensen
6  arrived again?
7  A. I don't recall that.
8  Q. Okay. And then Christensen ultimately
9  does arrive at your driver's side window again,
10  correct?
11  A. Yes, sir.
12  Q. What does he -- do you recall what happens
13  next?
14  A. He gave me two tickets.
15  Q. He gave you two tickets?
16  A. Well, one ticket and a warning.
17  Q. Okay. What was the ticket for, do you
18  recall?
19  A. Driving on an expired driver's license.
20  Q. Okay. So he gives you the ticket. Did
21  you sign the ticket?
22  A. No.
23  Q. So he gives you the ticket and then are
24  you allowed to go then or are you -- do you leave
25  the scene at that point?

Page 107

1  A. Yes, sir.
2  Q. Okay. And that is traffic stop -- that is
3  the traffic stop that is the biggest of your
4  lawsuit; is that correct?
5  A. I guess. I don't know what you're saying
6  by that.
7  Q. That's fine.
8  MR. McCARTER: I'll object to the form and
9  to the extent it states a legal conclusion. More
10  than one traffic stop is the subject of the lawsuit.
11  But you can go ahead and answer if you understand
12  the question.
13  MR. VAYR: I think she already said she
14  didn't, so --
15  Q. And now let's briefly talk, then, about
16  the second traffic stop. So do you have any -- do
17  you remember roughly how much time passed between
18  you leaving the first traffic stop that we just
19  talked about and then you being pulled over again?
20  A. Probably like -- I think it was already
21  late, so she ran right into there. I was on my way
22  right back home because it was almost 10:00 and the
23  kids had to be in bed.
24  Q. Uh-huh.
25  A. Well, it was actually past 10:00 I

Page 108

1  believe, so around like ten minutes is all it took.
2  Q. And so you're pulled over again. Describe
3  to me, so does an officer -- so presumably you pull
4  over to the side of the road.
5  A. Yes, sir.
6  Q. The squad car pulls up behind you.
7  A. Uh-huh.
8  Q. Did you see what law enforcement agency it
9  was?
10  A. It was the sheriff. It was one of the
11  same two officers that already had pulled me over.
12  Q. Got it. Do you recall -- do you know
13  which one it was?
14  A. No. He stuck his head out the window. He
15  was like, "I thought you was somebody else, I
16  already pulled you over."
17  Q. And is that the extent of that traffic
18  stop then?
19  A. Yes, sir.
20  Q. Okay. Is there anything else, can't
21  really -- okay. So the officer never left his car,
22  correct, for traffic stop number two?
23  A. No, because I flagged my ticket out the
24  window.
25  Q. Gotcha.

Page 109

1    A.  I knew it was one of the same officers --
2    Q.  I gotcha.
3    A.  -- that just had pulled me over.  It was
4  the same sheriff's vehicle from over in the same
5  area.  Them two had been the only two patrolling
6  that area.
7    Q.  So you know the -- so you weren't searched
8  during -- for traffic stop two?
9    A.  No.
10   Q.  Your car was not searched for traffic stop
11 two?
12   A.  No.
13   Q.  Okay.  Would you say, how -- do you have a
14 memory of roughly how long traffic stop two lasted?
15   A.  When I flagged my -- I knew it was one of
16 them and I knew they already had gave me a warning
17 for the same thing they were going to probably pull
18 me over for, which I flagged my ticket out the
19 window to show I already got my warning and I
20 already got my ticket.  And he was like, "Oh, I just
21 pulled you over, huh, sorry about that, I thought
22 you was --" so he said something else, I don't know.
23   Q.  Okay, but you were allowed to leave, you
24 weren't given another ticket or anything?
25   A.  I wasn't going to take another ticket.

Page 110

1    Q.  But you weren't given -- they didn't
2  attempt to give you one.
3    A.  No, sir.
4    Q.  Okay.  And then it sounds like -- so would
5  you say that between you pulling over and you
6  driving away again, would you say that that was less
7  than five minutes?
8    A.  Me pulling over from where?
9    Q.  So by the time your car has -- you've
10 stopped, you have pulled over because you were --
11 the deputy asked you to stop and then you drive away
12 again completing the stop, would you say that that
13 took less than five minutes?
14   A.  Yeah.
15   Q.  Okay.  Would you say that took less than
16 three minutes?
17   A.  Yes, sir.
18   Q.  Would you say it was less than one minute?
19   A.  No.
20   Q.  Okay, so somewhere between a minute and
21 three minutes.
22   A.  He was talking, yes, sir.
23   Q.  Okay.  Just had a couple more questions
24 generally about traffic stop one let's call it.  So
25 this is the stop where you were patted down, the car

Page 111

1  was searched.  Do you recall -- I might have asked
2  you some of these already and I apologize if I did.
3  Do you recall at any point during the stop being
4  told you were under arrest?
5    A.  No, sir.
6    Q.  Do you recall at any point during the stop
7  being asked if you had weapons on you?
8    A.  No, sir.
9    Q.  You don't remember?
10   A.  No, I'm telling you, no, they did not.
11   Q.  So your testimony is that you were not
12 asked if you had weapons on you?
13   A.  Well, when I was patted down, yeah.  I
14 thought you said when I was right stopped right then
15 and there.
16   Q.  Oh, no, I'm sorry, I should be -- to the
17 extent I wasn't clear, so I'm asking the entirety of
18 traffic stop one.
19   A.  Okay.
20   Q.  So from being pulled over to you driving
21 away with a ticket.  At any point during that period
22 of time, were you told you were under arrest?
23   A.  No, sir.
24   Q.  At any point in that time, were you asked
25 if you had weapons on you?

Page 112

1    A.  Yes, sir.
2    Q.  When were you -- if you recall, when were
3  you asked if you had any weapons on you?
4    A.  When he pulled me out of the car, he said,
5  "Do you have any illegal things or weapons in the
6  car that I need to know about?"
7    Q.  And your answer was?
8    A.  No, sir.
9    Q.  Okay.  Were you ever asked -- I think your
10 previous answer kind of encompasses this.  Were you
11 ever asked if you had any drugs or contraband on you
12 during the entire stop?
13   A.  Yes, sir.
14   Q.  When was that?
15   A.  I believe that was all in the question
16 that he had asked me about did I have any drugs,
17 guns in the car, anything on me or something.
18   Q.  Got it.  So you think it was at the same
19 time, okay.  And that's all before the patdown
20 happens.
21   A.  Yes, sir.
22   Q.  Okay.  And so if I recall your testimony,
23 you don't remember if Christensen asked you or told
24 -- asked you if he could search you or told you he
25 could search you, correct?

Page 113

1  A. Yes, sir.
2  Q. Okay. But regardless, through the search
3  you turned around and you raised your -- you turned
4  around so you could be searched and you raised your
5  arms in a parallel fashion to the ground?
6  A. I mean because if an officer tells you you
7  had to be searched, what does that mean? You have
8  to be searched, right, especially when they smell
9  weed in the car. Right?
10  Q. I don't --
11  A. I mean is that right?
12  MR. McCARTER: Bryan is not allowed to
13  answer any questions --
14  THE WITNESS: Oh, I'm sorry.
15  MR. McCARTER: -- during the deposition.
16  A. I'm sorry, Bryan.
17  Q. No, no, it's okay.
18  A. I'm sorry, I'm like I don't know that. I
19  mean I turned around and did what he --
20  MR. McCARTER: No, you're doing good so
21  far.
22  Q. No, you're doing great. You have
23  withstood -- you have tolerated two hours of me
24  asking you questions so far, so you're doing
25  wonderfully, so no worries. You have nothing to

Page 114

1  apologize for.
2  Do you recall saying anything during the
3  patdown search?
4  A. I said -- yeah, I was like "whoa" when he
5  first, when he first was coming by my -- like maybe
6  I said "whoa," but like it wasn't loud, it was like
7  "whoa," like, I don't know, okay, maybe that was a
8  different type of patdown, it's like an unconscious
9  thing, it was -- it came out, but I wasn't saying
10  nothing to him until the end of the search when I
11  told him, "Don't touch my butt."
12  Q. Okay. So the two things you said during
13  the search it sounds like, then, are the -- kind of
14  an involuntary --
15  A. Whoa.
16  Q. -- "whoa" and then at the end "Don't touch
17  my butt." Is that right?
18  A. Yeah.
19  Q. Okay. Do you recall at what point in --
20  you testified earlier that Christensen reached into
21  your pockets, you remember that?
22  A. Yes.
23  Q. That testimony?
24  A. Yes, sir.
25  Q. Do you recall at what point in the search

Page 115

1  he reached into your pockets?
2  A. When he was searching down this
3  [indicating], below the waist.
4  Q. Below the waist. I guess I'm trying to
5  break it up temporally. Was it before or after butt
6  touch one that he reached into your pockets?
7  A. He was already reaching in my pockets
8  first.
9  Q. So you think he went immediate -- he
10  immediately inserted his hands into your pockets?
11  A. No, I don't recall how he did his actual
12  search like. I don't recall like how he did it, but
13  I know he was in my pants pocket before. One of my
14  pants pockets, which is the left pants pocket, I
15  recall him going into --
16  Q. Okay.
17  A. -- before.
18  Q. So you recall him going into your left
19  pant pocket --
20  A. Yes.
21  Q. -- before. I just --
22  A. Before he were touching -- before the butt
23  situation happened.
24  Q. Okay. So -- and then did he go into your
25  pockets again after the butt situation happened?

Page 116

1  A. I believe so.
2  Q. You believe so, okay. Do you recall which
3  pocket he went into?
4  A. My right one.
5  Q. Okay. So your testimony is that before
6  the butt -- so before the butt incident, the butt
7  touches happen, he reaches into your left pocket,
8  and then after both butt touches happen, he reaches
9  in your right pocket?
10  A. I believe he reached into my pocket. I
11  don't even know if he reached into my pocket. I
12  don't know.
13  Q. So -- okay.
14  A. But I believe he reached in my left
15  pocket, but my right pocket I don't know.
16  Q. Just checking my -- between -- so traffic
17  stop one, after Christensen tells you to leave the
18  car but before the patdown search, do you recall
19  making any movements with your hands? For example,
20  were you reaching for your pocket or your waistband
21  or anything?
22  A. (Shakes head).
23  Q. So you don't -- you're nodding no.
24  A. No, sir.
25  Q. So you don't recall making those movements

Page 117

1  or you affirmatively know you did not make a
2  movement like that?
3      **A.  I don't recall making no movements like
4  that.**
5      Q.  Sure.  So you said -- so now I'm going
6  back to before the patdown, and you don't recall
7  precisely how Christensen phrased it, but you turn
8  around and you raise your arms.  I think you
9  testified that you did that because you believed you
10  can't say no to a law enforcement officer when they
11  ask for a patdown.  Is that what you said or am I
12  mischaracterizing that?
13      **A.  Yes, sir, I was told that when they ask
14  you to do something, you was supposed to do it or
15  you go to jail.**
16      Q.  And so when you say you were told, were
17  you told that by Christensen?
18      **A.  No, I've been told that over the years.**
19      Q.  I see, so like parents, friends,
20  colleagues.
21      **A.  No.**
22      Q.  Okay.
23      **A.  Officers.**
24      Q.  Other officers.
25      **A.  Yeah.**

Page 118

1      Q.  I see, okay.  So that was not something
2  that was communicated to you by Christensen or Floyd
3  during this stop?
4      **A.  He -- no, but --**
5      Q.  Like they didn't --
6      **A.  -- just normal, that's just been normal.
7  If they tell you to do something, you have to follow
8  or you go to jail.**
9      Q.  Okay.
10      **A.  It's normal.**
11      Q.  And so it sounds like, then, that that --
12  that that belief was a product of previous law
13  enforcement experiences, is that fair to say?
14      **A.  Yes, sir.**
15      Q.  Okay.  Did Christensen or Floyd do
16  anything during this -- did they communicate to you
17  in any way that if they weren't allowed to search
18  you you were going to go to jail?
19      **A.  No.**
20      Q.  Okay.  Did they insinuate that you would
21  be in trouble if you -- like did they let you know
22  that some kind of consequence would follow if they
23  weren't allowed to search?
24      **MR. McCARTER:** Object to the form of the
25  question.  You can answer if you understand.

Page 119

1      **A.  It didn't get that -- I mean it didn't get
2  that -- I didn't let it get that far first.  You
3  know, I got kids in the car, so --**
4      Q.  Sure, sure.
5      **A.  You know, I know how officials is with me,
6  so I didn't want even to see it even get that far
7  with them.**
8      Q.  Okay, and so -- and so you didn't want to
9  get that far -- when you say you didn't let it get
10  that far with them, what do you mean?
11      **A.  Like when he asked me to do something, I
12  just responded to just do it because I had kids in
13  the car and I didn't want to have no other
14  altercations that the kids could have seen or
15  anything, so I just --**
16      Q.  Okay.
17      **A.  -- did everything he asked me to do.**
18      Q.  Okay.  And again, that was based -- that
19  was already asked.  And so that that thought, then,
20  the thought that you had to permit the search to
21  happen, I think you said that that was based on
22  previous law enforcement experiences not necessarily
23  with Christensen and Floyd; is that right?
24      **MR. McCARTER:** Objection, asked and
25  answered.

Page 120

1      Q.  Fair enough, but that's right, right?
2      **A.  Yes, sir.**
3      Q.  Okay.
4      **MR. McCARTER:** Bryan, just quickly, I
5  usually like to take a break every hour.  Do you
6  have much more to go?
7      **MR. VAYR:** I think I can be done in about
8  five minutes if that's okay.
9      **MR. McCARTER:** Yeah, that's fine.
10  **BY MR. VAYR:**
11      Q.  I think you testified during the search
12  that where your eyes -- so during the patdown search
13  you were looking straight ahead and then you looked
14  down at Christensen at some point during the search,
15  like you kind of tilted your head down [indicating]
16  to see what his hands were doing, but you didn't --
17  one, do I have that correct?
18      **A.  Not the way you like tilted it down.  I
19  tried to look like with the corner of my eye.**
20      Q.  I see.
21      **A.  I wasn't trying to move so much to cause
22  any other conflict with the police.**
23      Q.  I gotcha.  But so your eyes, you were kind
24  of looking down with your eyes down towards one of
25  your --

Page 121

1    A.  Yes, sir.
2    Q.  Okay.  Did you at any point during the
3  search make eye contact with Floyd?
4    A.  I don't recall.
5    Q.  Don't recall, all right.  I'm going to
6  hand you what I will mark as Defense Exhibit 1.
7        MR. VAYR:  Counsel.  This will be my copy.
8  No, I had one for you if you want.
9    Q.  I circled the allegation I'm going to have
10  you look at.  That is your complaint in this case.
11  Please look at paragraph 17 which I circled.  You'll
12  see a phrase that I underlined there and it's -- and
13  what I specifically phrased -- just to read the
14  allegation, paragraph 17 says one of the defendant
15  officers, who plaintiff believes was Defendant
16  Christensen, a male, proceeded to conduct a highly
17  intrusive patdown search of plaintiff's body parts,
18  including improper touching and rubbing of
19  plaintiff's lower female private area.  My --
20        MR. McCARTER:  I just quickly have an
21  objection.  You missed one word in there.
22        MR. VAYR:  Oh, did I?
23        MR. McCARTER:  Plaintiff's private body
24  parts, including improper touching or rubbing of
25  plaintiff's lower female private area, but other

Page 122

1  than that, you --
2        MR. VAYR:  No, no, fair enough.  Always
3  got to miss something, right?
4  BY MR. VAYR:
5    Q.  Okay.  So 17, what I want you to focus on
6  is the including improper -- the phrase including
7  improper touching and rubbing of plaintiff's lower
8  female private area.  Now is this allegation, is
9  that what you and I were talking about before with
10  the butt touches, butt touch one, butt touch two?
11  Okay, so your --
12    A.  Okay.
13    Q.  I'm sorry, your answer wasn't clear.  Was
14  that a yes?
15    A.  Yes, sir.
16    Q.  Okay, because -- so you're not alleging or
17  you're not -- it doesn't sound like you described
18  that Christensen, for example, touched your crotch
19  or your vagina or anything; is that accurate?
20    A.  Yes, sir.
21    Q.  Okay.  So Christensen did not touch your
22  -- he didn't touch your vagina, he didn't touch your
23  crotch.  We were talking about touches that he made
24  of your rear, your butt; is that right?
25        MR. McCARTER:  Objection.

Page 123

1    A.  Yes, sir.
2        MR. McCARTER:  Asked and answered.
3    Q.  Fair enough, okay.  And so when this
4  allegation is saying improper touching and rubbing
5  of plaintiff's lower female private area, what
6  that's referring to is your butt.
7    A.  Yes, sir.
8    Q.  Okay, very good.  I want you to focus now
9  on paragraph 19.  I'm just going to read a part of
10  it, if I may, where after the comment says one or
11  more defendant officers then searched plaintiff's
12  car without probable cause.  Do you have, do you
13  have any idea why -- why do you believe that the
14  officers didn't have probable cause to search your
15  car?
16        MR. McCARTER:  Objection, call -- I'm
17  sorry, can you rephrase the question --
18        MR. VAYR:  Sure.
19        MR. McCARTER:  -- or repeat the question?
20    Q.  So the allegation is saying that the
21  officers didn't have probable cause to search your
22  vehicle.  Earlier it sounded like you testified
23  that, if I remember correctly, that the officer
24  smelled weed in your car and you kind of expected
25  that your car was going to be searched.  I'm just

Page 124

1  trying to square the two.  So what is, do you
2  believe, what do you believe the officer -- why do
3  you believe the officers didn't have a reason to
4  search your car?
5        MR. McCARTER:  Object to the extent that
6  the question calls for a legal conclusion and it's
7  answered, but if you understand the question, you
8  can go ahead and answer it.
9    A.  Searched the car.  I didn't say I didn't
10  suspect they had probable cause.
11    Q.  Okay, so you're -- and again, given
12  counsel's -- I'm just going to sidetrack to your
13  previous objection.  So at least as you sit here
14  today, you're not arguing that -- you are not
15  arguing the position that Christensen didn't have
16  probable cause or a reason to search your car?
17        MR. McCARTER:  Same objection.
18        MR. VAYR:  Sure.
19    A.  What I'm saying is I didn't -- whatever he
20  said I just went along with.  I didn't say he didn't
21  have probable cause.  If he said he had probable
22  cause, he had probable cause.  I didn't never say
23  this, so --
24    Q.  Okay, and I realize that probable cause is
25  a legal phrase.  I guess I was just trying to say