E-FILED
Monday, 16 November, 2020  07:37:21 PM
Clerk, U.S. District Court, ILCD

# In The Matter Of:

*AYRES v.*
*SHERIFF DEPUTIES CODY CHRISTENSEN, et al.*

---

*LETIKA GRAHAM*
*January 28, 2020*

---

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Exhibit F

Original File 0128GRAL.txt
**Min-U-Script® with Word Index**

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

LETIKA GRAHAM
January 28, 2020

---

Page 1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
2                URBANA DIVISION

3
WYLESHA AYRES,                        )
4                                     )
       Plaintiff,                     )
5                                     )
       vs.                            )  No. 19-2148
6                                     )
SHERIFF DEPUTIES CODY CHRISTENSEN     )
7  and CORY FLOYD, CHAMPAIGN COUNTY   )
   SHERIFF'S OFFICE and CHAMPAIGN     )
8  COUNTY, ILLINOIS,                  )
                                      )
9      Defendants.                    )
   --------------------------------
10

11

12

13

14          DEPOSITION OF LETIKA GRAHAM
                 January 28, 2020
15                   3:00 PM

16

17

18

19

20

21       June Haeme:  CSR # 084-003038
22   Area Wide Reporting and Video Conferencing
             301 West White Street
23         Champaign, Illinois  61820
                 800.747.6789
24

25

---

Page 2

1                      INDEX

2
APPEARANCES:
3
For the Plaintiff:
4       Matthew J. McCarter
        Attorney at Law
5       Nathan & Kaminonski, LLP
        33 W. Monroe Street, Suite 1830
6       Chicago, IL  60603
        312.612.1928
7       mmccarter@nklawllp.com

8  For the Defendant:
        Bryan Vayr
9       Attorney at Law
        Heyl, Royster, Voelker & Allen
10      301 North Neil Street, Suite 505
        Champaign, IL  61824-1190
11      217.344.0060
        bvayr@heylroyster.com
12

13  EXAMINATION BY:

14      Mr. Vayr................. 4, 82
15      Mr. McCarter............. 77

16

17  EXHIBITS:

18           (No exhibits marked.)

19

20

21

22

23

24

25

---

Page 3

1                   STIPULATION

2

3          IT IS HEREBY EXPRESSLY STIPULATED AND

4  AGREED by and between the parties that the

5  deposition of LETIKA GRAHAM may be taken on January

6  28, 2020, at the law offices of Heyl, Royster,

7  Voelker & Allen, 301 N. Neil Street, Suite 505,

8  Champaign, Illinois, pursuant to the Rules of the

9  Federal Court and the Rules of Federal Procedure

10  governing said depositions.

11

12

13          IT IS FURTHER STIPULATED that the

14  necessity for calling the Court Reporter for

15  impeachment purposes is waived.

16

17

18

19

20

21

22

23

24

25

---

Page 4

1          (Commencing at 2:56 p.m.)
2              LETIKA GRAHAM,
3  having first been duly sworn, testified as follows:
4          EXAMINATION BY
5      MR. VAYR:
6      Q.  All right, Letika, could you please state
7  and spell your name for the court reporter?
8      A.  Letika Graham, L-E-T-I-K-A.
9      Q.  Okay.
10     A.  One middle initial R, last name Graham,
11  G-R-A-H-A-M.
12     Q.  Perfect.  Have you ever given a deposition
13  before?
14     A.  No, sir, I have not.
15     Q.  Okay.  I'm going to go over just a few
16  ground rules just to help make the court reporter's
17  life and hopefully your life easier as well.  So as
18  you can see, the court reporter is taking down
19  everything that I'm saying and you're saying as we
20  say it.  You can imagine it's really difficult to
21  take down what one person is saying.
22     A.  I actually was just trying to figure that
23  out.  How's she doing it?
24     Q.  It's a science unto itself.  My point was
25  simply that just to try to make her life easier,

---

Page 5

1   it's best if we only talk one at a time.  So, for
2   example, I might be asking you a question and you
3   100 percent know the answer and you're wanting, you
4   know, just to be polite, like let me save you the
5   time, Bryan, here's the answer.  Please let me get
6   out the full question so that she can take it down,
7   it's clean in the record, and then when you speak, I
8   will try to resist the urge to go uh-huh, okay,
9   hmm-hmm and et cetera.
10   **A.   Okay.**
11   Q.   Speaking of uh-huhs, um-kays and stuff
12   like that, since she's taking down words, if you
13   answer a question with a head nod or an uh-huh, now
14   I clearly know what you were meaning, but it's not
15   going to show up in the transcript.  So please
16   answer questions with an out loud yes, no, just a
17   clear answer.  Everyone lapses.  If I catch you
18   doing it, I'll just say like that's a yes, all
19   right?  So it's not the end of the world.
20   **A.   Okay.**
21   Q.   Just put it on your radar.  Also it's
22   possible there might be some objections during the
23   deposition.  You know, in a trial when there's an
24   objection, the judge rules on it right then and
25   there and it's done.  Since there is no judge here,

Page 6

1   the objection is just being made for purposes of the
2   record.  So if, for example, Mr. McCarter makes an
3   objection, you would still need to answer the
4   question.  So the objection is just being made for
5   conversation down the road, it's being preserved for
6   conversation with the judge down the road.  We still
7   need the benefit of your answer so we can determine
8   if the objection was founded in some circumstances,
9   et cetera.  Does everything I say make sense so far?
10   **A.   Yes, sir.**
11   Q.   Perfect.  So as you know, we are here for
12   a lawsuit brought by Wylesha Ayres against the
13   Champaign County Sheriff's Office and a number of
14   other defendants.  As I previously said, I'm the
15   attorney representing those defendants, and why we
16   are here today is just so I can have the benefit of
17   what your insights are into what happened that day
18   during the traffic stop on May 8th, 2019.  I'm only
19   asking what you know.  I'm not asking you to
20   speculate, I'm not asking you to make up anything,
21   just the truth as best you can tell it as you sit
22   here today and that's it.  And hopefully this will
23   be relatively quick and I'll try to make it as quick
24   and painless as I can.  Any questions before we get
25   started?

Page 7

1   **A.   No.**
2   Q.   All right, very good.  So first off, when
3   I allude to a May 8th, 2019, traffic stop, do you
4   know what traffic stop I'm talking about?
5   **A.   Yes, sir.**
6   Q.   Okay.  And so that traffic stop being one
7   where the defendants in this case, Cory Christensen
8   and Cody Floyd[sic], pulled over Wylesha with you in
9   the passenger car, the car was searched and also Ms.
10   Ayres herself had a patdown search performed on her,
11   correct?
12   **A.   Yes, sir.**
13   Q.   All right, very good.  Now, have you had
14   an opportunity to look at any body camera footage
15   from this incident?
16   **A.   Well, the video was online, sir.**
17   **A.   Sure, so --**
18   **A.   So I did get a view of it.  It was**
19   **embarrassing, so I turned it off.**
20   Q.   Understood.  And so when you say online,
21   you're referring to a news article --
22   **A.   Yes, sir.**
23   Q.   -- correct?  And so the news article had
24   video at the bottom, and did you watch -- it sounds
25   like you made it through maybe a portion of the

Page 8

1   video and then you stopped watching it.
2   **A.   Yes, sir.**
3   Q.   Do you recall off the top of your head how
4   much of the video you watched?
5   **A.   A few minutes maybe.**
6   Q.   A few minutes, okay.
7   **A.   I can't really probably even say the exact**
8   **amount of time because, yeah, I don't know.**
9   Q.   That's fair, that's fair.  If you don't
10   know, you don't know.  That's also something I
11   probably should have said in the beginning.  If you
12   don't know the answer to a question, you can just
13   say I don't know, that's perfectly fine.
14   **A.   Okay.**
15   Q.   Okay.  I guess last thought on the video,
16   so to the extent you've seen it, do you recall at
17   what point in the video you saw it?  Like so what
18   was occurring, what was being depicted on the
19   footage when you turned it off?
20   **A.   Well, I think I only watched a clip of**
21   **it --**
22   Q.   Okay.
23   **A.   -- actually.  I don't -- I don't recall.**
24   Q.   Okay.  Do you recall what was in that clip
25   that you saw, what was being depicted?

Page 9

1    A.   What I did see or recall was when the
2  officer had come back to the car, I do remember that
3  part.
4    Q.   Okay.
5    A.   When they come back to the car and asked
6  her to step out of the vehicle.
7    Q.   And this is from --
8    A.   Up until I believe that point.
9    Q.   Got it.  So again, we're just talking
10 about what you recall from seeing on the video.
11   A.   Uh-huh.
12   Q.   You recall Christensen or some deputy
13 approaching the vehicle and asking Ms. Ayres to step
14 out, and that's kind of where you paused, where you
15 turned it off?
16   A.   Yes.
17   Q.   Very good.  I'm sorry, there was a gesture
18 to the court reporter.  Was there anything to add?
19   A.   No, I said uh-huh, so I wanted to --
20   Q.   Excellent.
21        MR. McCARTER:  Caught yourself already,
22 very good.
23   Q.   Great witness, okay.  Have you seen -- so
24 that's the extent of the body camera footage.  Have
25 you read anything else about this incident?  I would

Page 10

1  assume you read the article that that video was
2  attached to, correct?
3    A.   No, sir, I actually didn't.
4    Q.   Just scrolled down to the bottom and
5  looked at the video, okay.
6    A.   Yes.
7    Q.   No sin.  Okay, have you read anything else
8  about this incident?  Any -- like did you read the
9  complaint for example or --
10   A.   No.  I actually didn't know it was this
11 serious until --
12   Q.   Understood.  Until the deposition notices
13 were going out.
14   A.   Exactly.
15   Q.   Understood, okay.  So then -- so it sounds
16 like then, as you sit here today, basically the
17 source of your knowledge about what you'll be able
18 to testify to will be what you personally
19 experienced, what you personally saw --
20   A.   Uh-huh.
21   Q.   -- during the subject incident, correct?
22   A.   Yes.
23   Q.   All right, very good.  You're doing an
24 excellent job catching yourself on the uh-huhs.
25 Okay, so then that's just what we'll talk about.

Page 11

1  And then just to kind of give you an overview, a
2  roadmap, I'll ask you a few questions just about
3  your background.  It's routine stuff that I would
4  ask of any witness.  I'll try to make it quick.  We
5  will talk a little bit about your relationship with
6  Ms. Ayres.
7    A.   Uh-huh.
8    Q.   And then we will talk about the subject
9  incident, and if anything else comes up, we'll
10 address it at that time.  It'll probably be the
11 subject incident and then how Ms. Ayres has been
12 after that incident, how you have been after that
13 incident.  Make sense?
14   A.   Yes.
15   Q.   All right, very good.  So let's start
16 first with your background a little bit.  So have
17 you lived in the Urbana-Champaign area your whole
18 life?
19   A.   No, sir, I've not.
20   Q.   Okay, excellent.  Where did you, when --
21 where did you grow up, if you don't mind me asking?
22   A.   Peoria, Illinois.
23   Q.   Peoria.  At what point in time did you
24 move to Champaign or Urbana?
25   A.   In 2015.

Page 12

1    Q.   2015?
2    A.   November 2015.
3    Q.   That is uncannily accurate memory.  Can I
4  ask, was it like a job opportunity, relationship or
5  something?  Why the move in 2015?
6    A.   Just a change.  I move around a lot.  I
7  came from Decatur and then I moved back to Peoria,
8  then I come here.
9    Q.   Gotcha, okay.  So when you came -- so I
10 would assume, then, was high school Peoria for you
11 or was it --
12   A.   Yes.
13   Q.   Okay, and then did you graduate?
14   A.   Yes.
15   Q.   Very good.  Did you receive any -- like
16 did you go to a community college?
17   A.   Yes.
18   Q.   Graduate?
19   A.   I have my certified nursing assistant
20 license.  I got that in 2015 May.  After that,
21 that's when I moved to Champaign in November.
22   Q.   Got it.
23   A.   I'm currently in college right now.  I'm
24 going for my LPN.
25   Q.   Excellent.  Well, congratulations.

Page 13

1  A.  Thank you.
2  Q.  So certified nursing certificate.  Do you
3  recall what the college was?
4  A.  Illinois Central College.
5  Q.  Illinois Central.
6  A.  I'm currently attending Parkland.
7  Q.  Perfect, okay.  Parkland.  And how long
8  have you been attending Parkland?
9  A.  This is my second semester.
10  Q.  So calendar year 2019 to calendar year
11  2020 so far, correct?
12  A.  Yes, sir.
13  Q.  All right, very good.  Well, I wish you
14  luck with that.
15  A.  Thank you.
16  Q.  So setting aside education, then, so I
17  would assume then that your -- I'll call it your
18  adult employment, I'm not asking about like, you
19  know, making sandwiches for Subway in high school or
20  something.
21  A.  Right.
22  Q.  I assume your adult employment, then, is
23  in your capacity as a nurse?
24  A.  Yes, sir.
25  Q.  Very good.  Where do you work?

Page 14

1  A.  Champaign Urbana Nursing and Rehab.
2  Q.  Okay.  Give me -- I'm writing as quick as
3  I can.  And how long have you worked there?
4  A.  I just started back working there.  Before
5  that, I was working at Piatt County.  I had been
6  there for a while.
7  Q.  Piatt County.  Piatt County --
8  A.  Nursing home.  Transportation was an
9  issue, so tried something closer in the area even
10  though I love that nursing home.
11  Q.  Sure.  Well, good on you for loving where
12  you work, I'm sorry that transportation was an
13  issue, but things going okay at the Champaign Urbana
14  Nursing and Rehab Center?
15  A.  Oh, yes, yes.
16  Q.  Perfect.  And you said you started
17  working, I'm -- you said it and I forgot it, forgive
18  me.  You started working at the Champaign place, was
19  that 2019 you said?
20  A.  No, I just --
21  Q.  Okay, I'm sorry.
22  A.  -- started working there --
23  Q.  There you go.
24  A.  -- over the last week.  I'm a rehire
25  actually.

Page 15

1  Q.  Got it.  Okay, so 2020.  And then when did
2  you work there previously if you're a rehire?
3  A.  2017.
4  Q.  2017.  Did you work there like, you know,
5  2015 to 2017 or --
6  A.  It was more like 2017 -- I mean '16 to
7  2017.
8  Q.  Okay.
9  A.  '18.  Not '18.  '17 was it.
10  Q.  Okay.  And then Piatt County presumably
11  would be 2017 until a week ago?
12  A.  No, actually I was at Champaign Urbana
13  Nursing and Rehab up until 2019 and then I've
14  been -- I've been there at Piatt County.
15  Q.  Gotcha, okay.  Any other major employment
16  or anything else?  Like so again I'm just -- not odd
17  jobs.  Just like --
18  A.  No.
19  Q.  Okay.
20  A.  I've been at Champaign County in Urbana up
21  until they've had done the sale.
22  Q.  Okay.
23  A.  Back in December of, yeah, 2018 I went
24  back to --
25  Q.  Okay.

Page 16

1  A.  Not went back, but I had started Piatt
2  County.  I done a little medical staffing.
3  Q.  Okay.
4  A.  Pay was very well, so, you know, I'm still
5  on p.r.n. there for whenever I want, you know, to
6  travel --
7  Q.  Sure.
8  A.  -- and do some work.
9  Q.  Sure.
10  A.  But I needed something more stable,
11  something that was, you know, going to be for sure
12  income, so --
13  Q.  Absolutely.
14  A.  -- I said let me go to Piatt County.
15  Piatt County was a really nice nursing home.
16  Q.  Sure.
17  A.  It's just 20 minutes, 20 to 24 minutes
18  away from my home.
19  Q.  Right.
20  A.  I had gotten into an accident back in
21  November and messed my vehicle up, so --
22  Q.  Got it.
23  A.  -- that was an issue.
24  Q.  So hence, something closer to home with a
25  little less travel.

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

LETIKA GRAHAM
January 28, 2020

Page 17

1    A.  Exactly.
2    Q.  Got it.  Well, glad you landed on it,
3  sounds like you've landed on your feet.  I'm happy
4  to hear, happy to hear that's going well, for
5  whatever that's worth.
6    A.  Yes.
7    Q.  Probably not much --
8    A.  Thank you so much.
9    Q.  -- but thank you.  Okay, so that's
10  employment.  Again, this is just something I ask of
11  anybody, and so have you had any criminal
12  convictions that are either felonies or involve
13  crimes of dishonesty, so I'm just going to limit it
14  to that.  So have you ever been convicted of a
15  felony before?
16    A.  Yes.
17    Q.  Okay, do you mind if I ask, what was it,
18  about what time, year if you recall, and what was
19  the offense?
20    A.  I can give you the year --
21    Q.  Okay.
22    A.  -- and I'll give you the offense, but I
23  don't want to talk further --
24    Q.  No, no.
25    A.  -- about it.

Page 18

1    Q.  I'm not going to ask details at all beyond
2  what I've already said.
3    A.  Back in 2006 I believe the year, between
4  2006 and 2009, I'm not sure of the exact year.
5    Q.  Okay.
6    A.  So long ago I rarely ever get into
7  anything other than minor traffic violations.
8    Q.  Sure.
9    A.  There was an obstruction of justice.
10    Q.  Okay.  I won't ask details, just
11  obstruction of justice was the charge?
12    A.  Yes, sir.
13    Q.  Do you recall what county it was in?
14    A.  Peoria County.
15    Q.  That makes sense given the time.  Are
16  there any other felonies?
17    A.  No, sir.
18    Q.  Okay.  Are there any crimes now of what
19  I'll call crimes of dishonesty?  What I mean by that
20  is, you know, passing of a fake check, impersonating
21  a judge, something like that.  No?
22    A.  No, sir, you can't have any of those in
23  the medical field.
24    Q.  Fair enough.  I would assume the
25  background check would screen that out.

Page 19

1    A.  Yes.
2    Q.  All right, perfect.  And then besides
3  that, minor traffic offenses.  Not --
4    A.  They --
5    Q.  -- going to waste your time with that.
6  All right, find me someone who doesn't have a
7  traffic offense, so --
8    A.  Right.
9    Q.  Okay, so that's the criminal history.
10  Employment.  Okay, so if you don't mind, hopefully a
11  happier topic, what is your relationship with Ms.
12  Ayres?
13    A.  We've been seeing each other for about
14  almost two years now.
15    Q.  Got it.  Anything -- like any plans or
16  anything, like a big two year, two year evening out
17  or something?
18    A.  Not sure.  We really haven't been on --
19  you know, we're trying to work things out.
20    Q.  I understand.  Just correct me if I'm
21  wrong, so you guys are seeing each other, you're
22  together maybe in the conventional sense, but it's
23  something of a rough patch right now, is that fair?
24  I don't want to delve too much into your personal
25  life.  It's just relevant to the case probably.

Page 20

1    A.  Yes, that's fine, I understand.
2    Q.  Okay.
3    A.  Yes, actually you're right.  We are --
4  we're working on things.
5    Q.  Very good.
6    A.  We're not sure if we're going to be
7  together or not.
8    Q.  Okay.
9    A.  She's a very good person, she has a really
10  good heart, she loves my babies --
11    Q.  Right.
12    A.  -- she loves our kids, but we just --
13  we're working on things.
14    Q.  Understood.
15    MR. McCARTER:  Letika, quickly, I just
16  want to interrupt, you only have to answer the
17  question asked, so --
18    THE WITNESS:  Okay, just --
19    MR. McCARTER:  Bryan is very good --
20    THE WITNESS:  Okay.
21    MR. McCARTER:  -- about asking pointed
22  questions.
23    THE WITNESS:  Just say --
24    MR. McCARTER:  If you take a moment, we're
25  in no rush --

Area Wide Reporting and Video Conferencing
1-800-747-6789

Page 21

1    THE WITNESS: Okay.
2    MR. McCARTER: -- listen to it and then
3  give your answer, that'd be great.
4    THE WITNESS: Gotcha.
5  BY MR. VAYR:
6    Q.  Okay.  Promise, I'm not going to pry into
7  the personal details.  You guys are working it out.
8    A.  Yeah.
9    Q.  That's good enough for me.  Okay, so you
10  guys have been -- if I can use the phrase you've
11  been together, so you've been together for two years
12  you were saying or almost two years, so that would
13  put you guys meeting around, if I'm doing my math
14  correct, 2017ish, 2018ish, does that sound about
15  right?
16    A.  Uh-huh.
17    Q.  Okay.  And during -- on May 8th, 2019, so
18  during the incident, were you guys -- so you guys
19  were presumably together --
20    A.  Yes.
21    Q.  -- as well at that time?
22    A.  Yes.
23    Q.  Very good, okay.  Now, do you have, I'll
24  ask those -- I guess I could ask these questions
25  now.  Forgive me, a couple thoughts going on at

Page 22

1  once.
2    A.  Okay.
3    Q.  So with regards to Ms. Ayres, in the time
4  that you have known her, have you known her to
5  receive any type of like psychological counseling or
6  anything like that?
7    A.  She currently is.
8    Q.  Currently is, okay.  Has she done that
9  throughout your time of knowing her?  Has she always
10  received some form of counseling?
11    A.  No, sir.
12    Q.  She has not, okay.  Do you know
13  approximately -- if you don't, it's okay.  Do you
14  know approximately what time she did start receiving
15  any type of mental health counseling?
16    A.  I'll backtrack.  She tries to keep --
17  well, we keep that type of stuff private to each
18  other, so I really can't say exactly when.
19    Q.  That's fine, I can respect that.  So then
20  I'll just do one of these again.  Just tell me if
21  I'm wrong.  So essentially -- you say stuff like
22  that.  So personal health issues?  Is it fair to say
23  that personal health issues you guys are just kind
24  of like to each their own?  When you're together,
25  you're not going to talk about that, and if

Page 23

1  something really serious came up, maybe you'd talk
2  about it.  Does that sound about right?
3    A.  Exactly.
4    Q.  Okay, very good.  And so then is it fair
5  to say that when it comes to Ms. Ayres's -- if she
6  had any mental health counseling or something, the
7  only stuff you personally are aware of is that she
8  currently is receiving it; is that right?  Am I
9  getting your testimony correct?
10    A.  Yes.
11    Q.  Okay.  Around what time did you learn, if
12  you recall, a month is fine or a year, around what
13  time do you recall learning that Ms. Ayres was
14  receiving any type of mental health counseling?
15    A.  I cannot say.
16    Q.  Fair enough.  I'm just going to take --
17  I'm just going to ask a couple questions.  I'll
18  probably do this a few times throughout the dep.  My
19  intent is just to try to -- try to get the ball
20  park.  So did you learn within the last, was it more
21  than -- well, it couldn't have been more than two
22  years ago, you didn't know each other.  Okay, so did
23  you learn about this within the past year?
24    A.  This past year, yes.
25    Q.  Okay.  And by this past year, I'm assuming

Page 24

1  you mean like a calendar year from --
2    A.  Well, 2019.
3    Q.  Right, correct.
4    A.  2019 year.
5    Q.  So within a calendar year of now, okay.
6  Do you recall, would you be confident saying that
7  you learned about the mental health issues within
8  the past six months?
9    A.  Yes.
10    Q.  Okay.  How about the past four months?
11    A.  Yes.
12    Q.  Okay, and so I'll just keep walking it
13  down.  So did you learn within -- was it within this
14  month, between December and January, that you
15  learned that she was receiving mental health
16  counseling for the first time?
17    A.  I cannot give a specific date.
18    Q.  And I'm not -- that's fine, I'm not
19  asking --
20    A.  Not even a month, honey.  I have kids --
21    Q.  Oh, of course.
22    A.  -- I work a lot, I have a lot going on.
23  Even me giving you six months would kind of be, you
24  know, iffy --
25    Q.  Sure.

Page 25

1    A. -- of me giving a for sure. I can't do
2 that.
3    Q. That's okay. So if you don't, so if you
4 don't know -- it sounds like at the end of the day,
5 then, you don't necessarily know when she started --
6 when at least you learned that she was receiving
7 mental health --
8    A. Right.
9    Q. -- counseling. Okay. And then just to
10 try to summarize your testimony, it sounds like if
11 -- you suspect, like you think that maybe it was
12 within the past six months, but you're just not
13 positive. Fair enough?
14    A. Fair enough.
15    Q. Okay. Is there -- I anticipated given
16 what you said that you -- that the answer would be
17 similar. Are you aware of any -- so the mental
18 health counseling, are you aware of any like
19 prescription medications or medications or anything
20 that Ms. Ayres takes on a day-to-day basis?
21    A. No.
22    Q. Okay, none, okay.
23    A. No, I don't know of any.
24    Q. No, no, no.
25    A. I don't know.

Page 26

1    Q. I understand, no. Thank you for
2 clarifying. You answered my question perfectly.
3 That's proof that you're paying attention, so that
4 was -- thumbs up.
5    A. Thank you.
6    Q. Okay. So in -- are you aware of whether
7 Ms. Ayres has suffered any physical injuries, for
8 example, within, with your time -- within your time
9 with her?
10    A. Physical meaning?
11    Q. I guess I'm using the term very broadly,
12 so physical meaning something that isn't affecting
13 her -- not a mental injury. Could be --
14    A. I know what physical means. What I --
15    Q. Sure.
16    A. -- mean is like battery, assault?
17    Q. Oh, no, I'm so sorry. No, I'm not trying
18 to think of causes. Like has she had a broken
19 finger, has she had any broken bones, any --
20    A. No.
21    Q. Okay, very good. So then it sounds like,
22 then, at least to the extent that if I were -- if
23 you were called to testify about Ms. Ayres's mental
24 treatment, mental health treatment or physical
25 health treatment, you really wouldn't be able to

Page 27

1 speak too much to that topic because --
2    MR. McCARTER: I'll object to -- I'm
3 sorry, you didn't finish your question. I
4 interrupted.
5    MR. VAYR: And so I'll try to restate it.
6 Then you can make your objection.
7    MR. McCARTER: I'm sorry.
8    MR. VAYR: No, it's okay.
9 BY MR. VAYR:
10    Q. So it sounds like, then, that if you were
11 -- if I were to ask you, as I have, about your --
12 about Ms. Ayres's mental health treatment, treatment
13 for physical injuries or physical injuries she may
14 have or what medication she's on, that's just
15 something that is kind of outside of your knowledge
16 base.
17    A. Exactly.
18    Q. Okay.
19    MR. VAYR: Objection, counsel?
20    MR. McCARTER: Yeah, I'll make an
21 objection that it, it -- I'll object to the form of
22 the question, excuse me. But if she's -- I was
23 going to instruct her to answer anyway and she's
24 done so, so I'm sorry I interrupted.
25    MR. VAYR: It's okay. An example of the

Page 28

1 objections, so -- okay.
2 BY MR. VAYR:
3    Q. So now I want to turn to the subject
4 incident itself, and when I say subject incident, I
5 mean that traffic stop that we've already talked
6 about. So I'm going to try to tee it up for you and
7 then I'll ask you to just tell me what happens next
8 as best as you recall, okay?
9    So my understanding is that it is May 8th,
10 2019, you were in the passenger seat driving in a
11 Jeep Patriot with Wylesha Ayres, she is driving, and
12 you're in -- I think I said already you're in the
13 city of Champaign when suddenly police lights or
14 something --
15    A. Sheriff's.
16    Q. -- signifying a -- yes, signifying
17 "police, pull over." Am I right so far?
18    A. Yes, you are.
19    Q. All right, so you guys pull the car over
20 without incident, like it wasn't a crazy car chase
21 or anything.
22    A. Uh-huh.
23    Q. You're on the side of the road. Could you
24 please tell me what happens next?
25    A. The officer got out of the car and walked

Page 29

1  over to the vehicle.
2      Q.  Okay.  Were you -- have you ever seen that
3  officer before?  Like did you recognize him?
4      A.  No, I've not.
5      Q.  Okay.  What side of the vehicle did he
6  approach?
7      A.  The passenger.
8      Q.  The passenger side.  So he was talking to
9  you first then.
10     A.  He was speaking into the passenger window.
11     Q.  Okay.  So then whoever -- presumably he
12  was speaking to both of you then at the same time?
13     A.  He was speaking to Wylesha, the driver.
14     Q.  Got it, okay.  So he goes up to the
15  passenger side window.  What does he say to Wylesha?
16     A.  Our plates -- well, my plates were
17  suspended, and he was very nice about it.  He said
18  that I see your plates are -- basically he told us
19  that they were -- I can't give you word for word
20  what he said.
21     Q.  Oh, that's okay.
22     A.  I'll just give you a good little -- he
23  said that they were expired and that it's okay.  He
24  saw that they had just went expired, he was going to
25  write us up a little citation, he knows that this

Page 30

1  kind of thing happens sometimes, and he was going to
2  let us go.
3      Q.  Okay.  And then so if that was the
4  description -- I'm sorry, I should back up.  So this
5  was your car, correct, the --
6      A.  Correct.
7      Q.  All right, very good.  So he says
8  essentially that.  What happens next?
9      A.  He gets our information and he walks back
10  to his vehicle.
11     Q.  Okay.
12     A.  Then he comes back and asks Wylesha to
13  step out of the vehicle.
14     Q.  Very good.  If I may pause for a brief
15  moment, do you recall roughly how long the deputy
16  was in his squad car before returning to your car
17  the second time?
18     A.  I'm sure long enough to check our IDs.
19     Q.  Fair enough, a good answer.  If you had to
20  guess, like was it a handful of minutes, was it a
21  half-hour?
22     A.  A few minutes.
23     Q.  Few minutes.
24     A.  Pretty quick.
25     Q.  Okay.  So far as these things go I guess,

Page 31

1  okay.  So he comes back.  What -- so he's walking
2  back to the car.  You said that he asked Wylesha to
3  step out, so I'm assuming he approached the driver's
4  side of the car when he goes the second time; is
5  that correct?  Or does he ask --
6      A.  Can't really remember.
7      Q.  Sure.
8      A.  I should have re-watched the video, but
9  can't really remember.
10     Q.  Okay.  So I guess the point is, though,
11  does he say -- does the deputy, to the extent that
12  you remember, does he say anything to Wylesha before
13  or aside from, "hey, step out of the car," before
14  she leaves the car?
15     A.  I don't recall.  I believe he did say just
16  can she please step out of the vehicle.
17     Q.  Okay.  Do you recall him saying like
18  Wylesha's under arrest or anything at that point in
19  time?
20     A.  No, he never --
21     Q.  Okay.
22     A.  -- said that.
23     Q.  Very good.  Do you recall him saying that
24  she was not under arrest?
25     A.  Don't recall.

Page 32

1      Q.  Perfectly fine.  So Wylesha gets out of
2  the car and now I'm assuming that you are still in
3  the passenger seat while Wylesha leaves the car; is
4  that correct?
5      A.  Yes.
6      Q.  Okay.  And then do you remain in the
7  passenger seat until you are yourself asked to leave
8  the car?
9      A.  No.  I got out of the vehicle when I saw
10  that they were searching her.
11     Q.  Okay.  So -- and we'll unpack that in a
12  second then.  Okay, so you're in the passenger seat,
13  Wylesha steps out.  Can you see -- can you see where
14  Wylesha goes?
15     A.  I'm in the passenger seat, Wylesha steps
16  out, I turn around, I put on my camera because I'm
17  trying to watch and see what's going on.
18     Q.  Got it.  And when you say your camera, you
19  mean I'm assuming a cell phone camera --
20     A.  Yes.
21     Q.  -- is that fair?  Okay, do you happen to
22  have -- do you happen to have a video of the
23  incident, then, your own personal video?
24     A.  No, my phone was dying, that's the reason
25  why I stepped out of the vehicle, to see what was

Page 33

1   better going on.
2   Q.  Got it, okay.  So you were -- so if I
3   understand correctly, then, so you were filming from
4   the car, from the passenger seat, everything that
5   was happening after Wylesha --
6   A.  Stepped out of the vehicle.
7   Q.  -- left the car, correct?  And then after
8   your phone started dying, you stepped out of the
9   car; is that right?
10  A.  My phone was already dying.
11  Q.  Okay.
12  A.  As I was turning around turning my camera
13  on, I realized that it was dying.  So instead, I
14  looked, I saw her do this [indicating], and I
15  stepped out of the vehicle and said, "Hold on, what
16  are you doing?"
17  Q.  Got it.
18  A.  "You're not supposed to be searching her."
19  Q.  Okay, so I'm --
20  A.  The officer asked me to step back in
21  the --
22      MR. McCARTER:  Just wait for him to ask
23  you --
24      THE WITNESS:  Okay.
25      MR. McCARTER:  -- a question.

Page 34

1   Q.  No, you're fine.  I'm just going to say a
2   couple things because you were pantomiming some
3   stuff, you were physically reenacting some things,
4   so I'm just going to make it clear for the record
5   what you were doing.  So you said that you were
6   turning around in your car and you kind of craned
7   your neck to the back with your hand kind of
8   extended to hold your phone.
9   A.  [Indicating].
10  Q.  Exactly.  And then you also said that you
11  saw Wylesha do this [indicating], and by this, you
12  meant you saw her hold her arms out parallel to --
13  A.  Spread her arms, yes.
14  Q.  -- the ground.  Yeah, like wings or
15  something.
16  A.  Uh-huh.
17  Q.  Okay, so you saw that.  And then at what
18  point did you step out of the car?  For -- I'm
19  sorry, go ahead.  It looked like you were about to
20  answer.
21  A.  As soon as I saw them.
22  Q.  And so as soon as you saw her arms start
23  to go parallel to the ground, she started to raise
24  her arms, you left the car?
25  A.  I can't say I just jumped right out of the

Page 35

1   vehicle, but what I can say is that as soon as I saw
2   it, I -- I instantly was like this isn't right.
3   Q.  Okay.
4   A.  And I turned around and I -- you know, I
5   turned back to the door, opened the door, stepped
6   out of the vehicle.
7   Q.  Okay.  So then, so what was -- so you
8   stepped out of the vehicle.  Where did you end up
9   out of the -- like did you just hang out by the
10  passenger door, for example, or did you instead when
11  you exited the vehicle walk all the way to the back
12  of the car so you kind of were looking straight at
13  the search?  Do you recall?
14  A.  I can, I could have -- I saw the whole
15  search from the vehicle, but as --
16  Q.  Okay.
17  A.  -- I got out of the vehicle, Wylesha was
18  standing at the -- basically at the back of the
19  driver's side with the other officer.  The other one
20  was standing over here [indicating].  They asked me
21  to get back into the vehicle after --
22  Q.  Okay.
23  A.  -- I told them that they're not supposed
24  to be searching her.
25  Q.  Okay.  You'll have to forgive me, I had a

Page 36

1   few --
2   A.  Okay.
3   Q.  -- a few thoughts going on at once, I
4   apologize.  So you stepped out of the vehicle.  So
5   you see the arms go parallel to the ground, the arms
6   being Wylesha's, you step out of the vehicle, and
7   then an officer tells you, "hey, please get back in
8   the vehicle," and that's what you turn around and
9   do, is that what you -- did I hear that correctly or
10  did I goof somewhere?
11  A.  Basically.
12  Q.  Basically that's what happened or
13  basically --
14  A.  That's what happened.
15  Q.  Okay, got it.  I was just like -- because
16  that could also be basically I goofed and that would
17  be, oh, no.
18  A.  No.
19  Q.  Okay.  So then you said you saw the entire
20  search from the car.  Do you have a memory about
21  roughly how long the search, the patdown search was
22  of Ms. Ayres?
23  A.  Just a couple minutes.  Probably about
24  maybe -- I can't give you a roundabout exact time.
25  I would say about --

Page 37

1 Q. That's okay.
2 A. She was out of the vehicle maybe three
3 to --
4 Q. Okay.
5 A. -- possibly five minutes.
6 Q. So out of the vehicle maybe three to five
7 minutes.
8 A. Then they asked me.
9 Q. And then it sounds like, so I want to --
10 there might be a distinction to be made here because
11 you said that the search itself lasted multiple
12 minutes. When you say the search itself, do you
13 mean the actual physical patdown lasted multiple
14 minutes or just that Wylesha was out of the car for
15 multiple minutes? Did that make sense?
16 A. A little bit of both.
17 Q. A little bit of both. Could you explain?
18 A. You know, talking happens during the
19 search, so when people interrupt, it causes a little
20 extra time, so --
21 Q. Okay, so you're -- okay, so again just to
22 confirm, so your memory, at least as we sit here
23 today, is that there was a patdown search that
24 occurred and lasted a couple minutes, multiple
25 minutes I think is what you said, and it sounds like

Page 38

1 what you're saying is that maybe part of that length
2 was talking, like the search started and then there
3 was a conversation and then the search continued, is
4 that what you were saying?
5 A. Yes, I might have interrupted, but yes,
6 pretty much -- I can't give an exact time, hon, this
7 was months ago, back almost --
8 Q. Of course.
9 A. -- a year ago. I can't say it happened
10 three minutes, it happened five minutes. All I can
11 say is I know it happened. It was -- it was a few
12 minutes.
13 Q. Okay, no, and for -- there's no need to
14 apologize. I don't think I could tell you what I
15 had for breakfast this morning, so you're already
16 more than impressing me with your memory.
17 A. Well, I didn't have breakfast.
18 Q. Okay. So I guess why I'm asking these
19 questions -- it might seem like such piddling
20 details. Why I'm asking these questions, because
21 I'm just trying to get a clear understanding of what
22 your vantage point was when you say that you saw the
23 search. And so I'm just going to focus strictly on
24 the actual act of the patdown search because your
25 memory is that it was a patdown search, right?

Page 39

1 Correct? She wasn't asked to remove clothes or
2 anything, for example.
3 A. No, she was not asked to remove clothes.
4 Q. Got it, okay. So of that physical patdown
5 search, did you see that while you were in the car
6 looking backwards or did you see that outside of the
7 car when you were standing there before you were
8 ordered to go back into the car, do you recall?
9 A. I could see pretty good out of that back
10 window. The lights were going off, so I saw them
11 touch her --
12 Q. Sure.
13 A. -- physically.
14 Q. Sure.
15 A. And that's when I had turned and got out
16 of the vehicle and asked the officer what were they
17 doing, that they weren't supposed to be searching
18 her.
19 Q. Sure. Okay, do you recall, were you
20 able -- while you were in the car, were you able to
21 hear what the -- what Wylesha or what the officers
22 were saying to each other, if anything?
23 A. No.
24 Q. Okay. So were the windows up in the car
25 then, if you recall?

Page 40

1 A. My windows might have been cracked because
2 -- still because of the police.
3 Q. Sure.
4 A. But I'm not -- I have kind of bad hearing
5 in one of my ears [indicating]. It's partially
6 deaf.
7 Q. Oh, no. And you were gesturing to your
8 right ear there, right?
9 A. Oh, well, I was just saying one of my
10 ears.
11 Q. Okay.
12 A. Sorry if I made it seem like it was --
13 Q. No, that's fair.
14 A. -- the right ear.
15 Q. That's fair. Which ear -- if you don't
16 mind me asking, which ear is partially --
17 A. It's the left ear.
18 Q. Your left ear, got it, okay. So what --
19 sorry.
20 MR. McCARTER: Just wait for the question.
21 Q. So you were in, so you were in the
22 passenger seat of the car, so let's -- I'm going to
23 break this down into what you saw while you were in
24 the car and what you saw outside of the car, okay?
25 So while you were inside the car and you

Page 41

1  were trying to -- you were trying to film it or you
2  were filming it, were your eyes on your phone or
3  were you -- were your eyes on the event itself, the
4  patdown itself?
5  **A.  The event itself.**
6  Q.  Got it.  So you weren't like checking to
7  make sure that your phone was -- the aim was
8  accurate or anything.
9  **A.  No, I actually did at first.  That's how I**
10 **realized that the phone was dying.**
11 Q.  Oh, got it.  Okay, so phone goes down,
12 you're now watching it.  So what do you see when you
13 turn around and you start looking at the patdown
14 search?  What are you witnessing for the search
15 itself?
16 **A.  Just her open her arms [indicating].**
17 Q.  Okay.
18 **A.  I couldn't see her legs down low until I**
19 **got out of the vehicle.**
20 Q.  Okay.
21 **A.  But at that time the officer was doing**
22 **[indicating], you know.**
23 Q.  Sure, and so --
24 **A.  He was patting.**
25 Q.  Sure.  And just to make it clear for the

Page 42

1  record, again I appreciate the physical gestures,
2  please bear with me as I awkwardly try to describe
3  them.  So you stood up and you said -- so to
4  summarize, it sounds like while you were in the
5  passenger car you couldn't see her legs, but you saw
6  her arms up and you saw the officer patting, you
7  kind of gestured to like kind of the armpit area and
8  then put your arms like down your side.  Is that an
9  accurate characterization?
10 **A.  It was -- yes, I do believe, yeah.**
11 Q.  Okay, and so you were seeing a search up
12 there from your vantage point within the car --
13 **A.  Yes.**
14 Q.  -- right?  Okay, so you couldn't see Ms.
15 Ayres's legs.  Were you able to see -- kind of where
16 did the car cut off?  Presumably you were able to
17 see up here [indicating].  Where did the back seat
18 or whatever in the car, what was the end of your
19 vision of Ms. Ayres?
20 **A.  I can't recall.**
21 Q.  Can't recall.  Were you able to see --
22 **A.  I just know I didn't see that part of her**
23 **legs until I got out, and that's when I saw the**
24 **officer with --**
25 Q.  Sure.

Page 43

1  **A.  -- the legs.**
2  Q.  And now -- so you couldn't see her legs,
3  and so when I -- at least when I'm hearing legs, I'm
4  thinking the entire leg.  Could you see --
5  **A.  Her lower half of her body.**
6  Q.  Okay, so could you see from the waist
7  down?
8  **A.  Torso down.**
9  Q.  So you could --
10 **A.  Could not.**
11 Q.  I'm sorry, please go ahead.
12 **A.  I saw up, I saw up in the --**
13 Q.  Torso up.
14 **A.  When I was in the vehicle --**
15 Q.  Okay.
16 **A.  -- that's what I saw.  When I stepped out**
17 **is when I saw the clear view of her whole body and**
18 **the officer doing the pat, the other officer to the**
19 **left of me.**
20 Q.  Got it.  So when Ms. Ayres was -- do you
21 recall what Ms. Ayres was wearing that day?
22 **A.  Don't recall.  I believe it was jogging**
23 **pants.**
24 Q.  Jogging pants.
25 **A.  I can't give a specific kind.**

Page 44

1  Q.  That's okay.  I'm not too concerned if it
2  was Adidas or Nike or something.
3  **A.  Yeah, they were jogging pants.**
4  Q.  Do you recall if they were -- what color
5  they were, either from your memory or from what you
6  saw of the body cam footage?
7  **A.  I -- I don't know.  Were they red?  I**
8  **don't know or --**
9  **MR. McCARTER:** It's fine if you don't
10 remember.
11 Q.  If you don't, that's okay.
12 **A.  I don't remember.**
13 Q.  Okay.
14 **A.  Everything happened so fast.  I was more**
15 **concerned with getting to work.  I was late.**
16 Q.  Right, and that's my -- I'll ask you about
17 that in a few minutes.  I just want to try to bundle
18 this up.  So you saw, so you saw, it sounds like
19 for -- this might sound unnecessarily precise and
20 forgive me, so you saw from the -- did you say from
21 the waist up of Ms. Ayres or waist -- you could only
22 see from the waist up?
23 **A.  In the vehicle --**
24 Q.  While you were --
25 **A.  -- the waist up.**

Page 45

1   Q.   -- in the vehicle, okay.  And now could
2   you possibly -- like could you see kind of her pants
3   at all or was it just T-shirt?
4   **A.   That's the reason why I actually got out**
5   **of the vehicle --**
6   Q.   Okay.
7   **A.   -- is when I was turning back to see, I**
8   **was trying to lean up to see the officer searching.**
9   Q.   Got it.
10  **A.   All I saw was this part [indicating].**
11  **That's when I, you know --**
12  Q.   Sure.
13  **A.   I saw them doing this [indicating].  I**
14  **knew it wasn't, you know, so I stepped out --**
15  Q.   Sure.
16  **A.   -- and that's when I said that.**
17  Q.   So the only -- and again this is just kind
18  of confirming.  So when you said "this," you saw her
19  arms out, him, the deputy, kind of rubbing down it
20  looked like armpits down of her torso, and part of
21  the reason why you left or the reason you said you
22  left the car was so that you could get out and kind
23  of see below the waist, like a path -- like where
24  his hands were going after that part of the search.
25  **A.   Yes.**

Page 46

1   Q.   Is that fair?
2   **A.   I'm not going to say there was a rub, but**
3   **I'm going to say it was a, you know, a search.**
4   Q.   Sure.
5   **A.   Not going to say he just slid them down**
6   **because, you know --**
7   Q.   Got it.
8   **A.   -- that's not what they do in a search.**
9   **They --**
10  Q.   I will ask -- I might ask you about that
11  in a little bit.  Now, so just trying to complete
12  the narrative, so that's what you saw in the car.
13  You step out of the car, presumably you have to kind
14  of -- you know, you're walking out of the car and
15  you have to pivot and turn yourself to focus towards
16  the back of the car.  How far outside of the car did
17  you get, do you recall?
18  **A.   I was all the way out of the car.**
19  Q.   All the way out.  So you're standing up,
20  like you don't have a foot, you know, still in the
21  car or something like --
22  **A.   No, I was standing up.**
23  Q.   Okay, very good.  And so you were
24  standing.  Did you then start to walk towards the
25  back of the car?

Page 47

1   **A.   I was going to, but the officer told me to**
2   **get back into the car.**
3   Q.   Very good.  So you're -- so then your
4   memory is that you got all the way out of the car.
5   Some deputy, someone, can you identify -- do you not
6   recall which deputy it was of the --
7   **A.   I believe it was the one that was to the**
8   **left of me that was not doing the search.  It was**
9   **the other one.**
10  Q.   Got it.  And I guess that was a
11  foundational question I probably should have asked.
12  There were two deputies at the scene, right?
13  **A.   Yes, there were.**
14  Q.   Okay.  So you get out of the car, he tells
15  you to get back in the car, so from the passenger --
16  so while you were physically outside of the car,
17  would you say that you're there for like a handful
18  of seconds, is it for a minute?
19  **A.   Basically --**
20  Q.   Handful of seconds.
21  **A.   -- a handful of seconds.**
22  Q.   Sure.  I'm sorry, the devil's always in
23  the details, right --
24  **A.   It's okay.**
25  Q.   -- so I have to ask.  So you were outside

Page 48

1   for a couple of seconds.  Were you able to see the
2   search?  Were you able to see Ms. Ayres in the
3   patdown search from your vantage point when you were
4   outside the car for a few seconds?
5   **A.   I saw the standing and how the officer was**
6   **and how she was.  That's pretty much it.  You know,**
7   **they kind of -- everything froze when I --**
8   Q.   Got -- oh, okay.  So I kind of have the
9   image of like, I don't know, a squirrel just passes
10  in front of a dog and the dog's just like what?
11  **A.   [Indicating].**
12  Q.   Yeah, exactly, exactly.  Okay, so everyone
13  just kind of froze and looked up at you and were
14  like, "Get back in the car."  That's your memory?
15  **A.   (Nods head).**
16  Q.   Okay.  So for the little bit that you did
17  see, then, it looks like -- are you testifying that
18  then the search effectively stopped when you were
19  outside the car and then you turned around and got
20  back in?
21  **A.   From what I believe -- I can't recall it**
22  **was so long ago.**
23  Q.   Sure, and that's okay.  I'm not asking you
24  to guess, I'm not asking you to speculate.
25  **A.   Once I got out of the vehicle and I was**

Page 49

1  told to get back in, my focus left off of her and I
2  was --
3  Q. You're just like, okay --
4  A. Yeah.
5  Q. -- back in the car. Officer said back in
6  the car, I'm getting back in the car basically.
7  A. Exactly.
8  Q. Fair enough. Pretty reasonable response.
9  Okay, final question from when you're outside the
10  car. To the extent that you were able to see Ms.
11  Ayres, were you seeing her through the car, like
12  through the back window of the car, or was she
13  standing separate enough from the car that you could
14  just see her unobstructed?
15  A. She wasn't directly in the back of the
16  window. She was a little -- a couple feet away.
17  Q. Okay.
18  A. More in front of the truck, I mean the
19  vehicle, the police vehicle.
20  Q. Sure.
21  A. But the lights were going off, so I could
22  see everything that was --
23  Q. Got it.
24  A. -- coming through like that window. Not
25  everything, but --

Page 50

1  Q. Sure.
2  A. -- I could see pretty clear --
3  Q. Got it.
4  A. -- through the window.
5  Q. So you had a -- if I recall correctly
6  like, you know, I think the sirens, like the red and
7  blues are going, right, when you step out of the
8  car; is that right?
9  A. (Nods head).
10  Q. You're nodding yes.
11  A. Yes.
12  Q. Yes, okay. And then also presumably the
13  car's headlights were on as well, correct?
14  A. Yes.
15  Q. And those are presumably pretty bright?
16  A. Yes.
17  Q. So were -- so you have that light behind
18  Ms. Ayres and the deputies and then that's kind of
19  the light that you're seeing them through?
20  A. Yes.
21  Q. Okay, very good. And then just
22  confirming, it's for my own dumb brain, so when you
23  step out of the car and you see them, they kind of
24  just freeze and you're told to go back in the car.
25  A. Yes.

Page 51

1  Q. Okay, fair enough. So then you get back
2  into the car. Are you able to see -- do you turn
3  around then to -- let me just ask. So you get back
4  in the car. What happened next?
5  A. I continued to watch --
6  Q. Very good.
7  A. -- as much as I could.
8  Q. Got it. And was that vantage point, then,
9  the same as what you and I were talking about
10  previously when you were watching from the car?
11  A. Yes.
12  Q. Presumably because you were in the
13  passenger seat again.
14  A. Except I was trying to like get over the
15  seat a little better and see. I just couldn't.
16  Q. Sure. You were trying to perch your neck
17  a little bit --
18  A. Yes.
19  Q. -- and lean over. Okay, and were you able
20  to have any more complete of a visual of the search
21  the second time you're looking from the car than the
22  first time?
23  A. No, not really.
24  Q. Okay, not really. So -- again, so it
25  sounds like, then, the second time of the car --

Page 52

1  correct me if I'm wrong, the second time you looked
2  out of the car you're perching your neck, but it was
3  still basically waist up for Ms. Ayres, right, is
4  what you were seeing?
5  A. Yeah, I wasn't going to -- well, a little
6  further down, but I wasn't going to climb in the
7  back seat --
8  Q. Okay.
9  A. -- just to see. You know, I felt --
10  Q. Sure, and also the back seat was
11  occupied --
12  A. It had --
13  Q. -- at the time.
14  A. -- my kids in there.
15  Q. Very good. And your kids, what are --
16  what are their names and how old were they at the
17  time?
18  A. King Johnson, he was seven years old.
19  Q. Okay.
20  A. And Titan Graham.
21  Q. Okay.
22  A. He's an infant.
23  Q. Got it, okay. So presumably they were in
24  car seats or -- well, I don't know if --
25  A. Yes, they were.

Page 53

1  Q.  Is a seven-year-old in a car seat still?
2  **A.  I still do boosters just to be safe.  Just**
3  **makes me feel better.**
4  Q.  Fair enough.  I'm speaking here as having
5  no kids, so I just don't know, thank you.
6  **A.  Okay.**
7  Q.  Okay.  Were you able -- so the second time
8  you're in the car or the first time you're in the
9  car after Christensen or, excuse me, the deputy does
10  the rundown of Ms. Ayres's torso that we described
11  before, are you able to see what he's doing with his
12  hands after that?
13  **A.  No.**
14  Q.  Okay.  So now you're in the car, you're in
15  the car, you're trying to see the search.
16  Presumably at some point the search ends; is that
17  fair?
18  **A.  Yes.**
19  Q.  Okay.  Could you just describe for me that
20  moment like because you're watching it.  How does
21  it -- how does the search conclude as you remember
22  it?
23  **A.  After the search ended, the officer made**
24  **me step back out of the vehicle so he could search**
25  **the vehicle.**

Page 54

1  Q.  Got it.  I just want to unpack -- before
2  we get there, I'm just going to back up a little
3  bit, excuse me.  So you testify -- were you able to
4  hear anything -- I know I asked this generally.  So
5  when the search concluded, were you able to hear
6  anything that Wylesha, excuse me, Ms. Ayres, or the
7  deputy said to each other or may have said to each
8  other?
9  **A.  No.**
10  Q.  Very good.  Okay, so now the next -- so
11  the next thing you recall, you're just in the car
12  and you see an officer approach you.  Was this the
13  same officer who had approached you before from the
14  passenger side?
15  **A.  I don't recall.**
16  Q.  Fair enough.  But regardless --
17  **A.  I was upset at that point.**
18  Q.  I don't doubt.  So this officer then asks
19  you to exit the car so he can search the car you
20  said, is that --
21  **A.  Yes.**
22  Q.  Is that essentially what he said?
23  **A.  Yes.**
24  Q.  Okay.  Did he give any rationale?  Did he
25  say why he was searching the car?

Page 55

1  **A.  He said then -- I think he said something**
2  **about he had smelled drugs, but there weren't any**
3  **drugs in the vehicle.**
4  Q.  Right.  And so ultimately, then, the
5  search -- so, one, there weren't any drugs in the
6  vehicle to your knowledge and then --
7  **A.  No, there weren't any drugs in the**
8  **vehicle.  I believe the officer was searching the**
9  **vehicle because he wanted to find something on**
10  **Wylesha, and there was nothing in the vehicle.  They**
11  **never searched me, sir.**
12  Q.  No, that's -- that's fine.  So for the --
13  so he said he was looking for drugs.  Do you recall
14  him mentioning any specific drug, any specific --
15  did he say he was looking for heroin, cocaine?
16  **A.  No, sir.**
17  Q.  Okay, so you don't recall what drug it
18  was?
19  **A.  No.**
20  Q.  Do you recall him saying that the car
21  smelled of something, some type of drug?
22  **A.  I don't recall, I can't remember, but I do**
23  **believe he said drugs or no --**
24  Q.  Just drugs, generic drugs?
25  **A.  I don't do drugs.  I work at a nursing**

Page 56

1  home, sir.  I don't know anything --
2  Q.  No worries.
3  **A.  -- about them.**
4  Q.  I am not going to ask you at all about
5  that, don't worry.  Like there's -- I'm not going --
6  **A.  Right.**
7  Q.  I'm not going there at all.  I guess my
8  question was it was -- so he said he was going to do
9  a car search for drugs.  Do you recall -- you were
10  in the passenger seat.  Do you recall or remember
11  there being a smell of any type, like cigarette
12  smoke or marijuana smoke or scent at all in the car
13  that night, do you remember?
14  **A.  I smoke Black & Milds, sir.**
15  Q.  I --
16  **A.  Cherry BLKs, I smoke them, and I was**
17  **smoking on my way, so that's why I tried to tell the**
18  **officer that I don't do drugs, sir, I work at a**
19  **nursing home.**
20  Q.  Right.
21  **A.  I'm on my way to work, I'm going to be**
22  **late.  I was smoking a Black & Mild and I show -- I**
23  **thought I showed it to him, but, you know, I'm not**
24  **sure.**
25  Q.  Got it.  And so you'll have to -- this is

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

LETIKA GRAHAM
January 28, 2020

Page 57

1 ignorance on my part. A Black & Mild, I'm assuming
2 that's a cigarette, correct?
3 **A. It's a cigar, sir.**
4 Q. Oh, it's a cigar?
5 **A. Yes, sir. Well, it's the cigar with a**
6 **tip.**
7 Q. Gotcha.
8 **MR. McCARTER:** It's like a cigarillo it's
9 commonly referred to as.
10 **MR. VAYR:** Got it. Thank you, counsel.
11 Sorry, speaking to pure little bunny-eared innocence
12 over here about what kind of cigars there are.
13 Q. So do those have like a particular type of
14 pungency, like an odor or anything, like other
15 cigars?
16 **A. More like a cherry flavor. It's Cherry**
17 **BLK. Like I said, it's not -- I can't really say**
18 **it's like a, did you call it a --**
19 **MR. McCARTER:** A cigarillo I referred to
20 it as.
21 **A. They have like a plastic tip on it.**
22 Q. Okay.
23 **A. And, you know, that's -- I've always**
24 **smoked them.**
25 Q. Sure. I guess my question wasn't so much

Page 58

1 so -- wasn't so much what it tastes like although I
2 am --
3 **A. What it smelled like.**
4 Q. Right.
5 **A. Like strawberries or something.**
6 Q. So it smells like --
7 **A. Cherries.**
8 Q. Cherries, okay. Does it smell like smoke
9 at all?
10 **A. Yes, it does.**
11 Q. Okay, so it also smells like smoke. Have
12 you -- so if, for example, you smoked one of those,
13 if you smoked a Black & Mild in your car, would you
14 expect that car to then have a smoky smell of some
15 kind?
16 **A. Yes.**
17 Q. Okay.
18 **A. Yes.**
19 Q. Are you familiar at all just in your
20 personal experience, I'm not asking if you ever did
21 it, have you just ever been in proximity to the
22 smell of marijuana smoke?
23 **A. I -- I really try to keep myself away from**
24 **that kind of stuff, so no.**
25 Q. Okay, fair enough, fair enough.

Page 59

1 **A. I don't like drugs around me or my kids.**
2 Q. An admirable policy. So at least when it
3 comes then -- so if I were to ask you, you know,
4 would you be able to tell the difference between
5 Black & Mild cigar smoke and marijuana smoke, it
6 sounds like you just don't have enough experience
7 with marijuana smoke, you don't really know what
8 that smells like; is that right?
9 **A. I can tell the difference between my Black**
10 **& Mild --**
11 Q. You can tell the --
12 **A. -- and a cigarette, so I can sure tell the**
13 **difference between other things. It's just I**
14 **wouldn't be able to, you know, distinctively tell**
15 **you, oh, that's what that is, I know for sure.**
16 Q. Okay. Okay. All right, and you said that
17 you were smoking that in the car while you were
18 driving before you guys were pulled over for the --
19 excuse me, while you were in the passenger seat
20 before you guys were pulled over; is that correct?
21 **A. Yes.**
22 Q. All right, very good. So he said he was
23 going to search the car, he asked you to leave,
24 presumably you stepped out of the car. What happens
25 next?

Page 60

1 **A. I stepped out of the car, I was very**
2 **upset, I started to tell the officer that I had to**
3 **be at work, why was he going to search my vehicle,**
4 **that I'm running late. I do recall that because I**
5 **had missed the day before that and I really wanted**
6 **to get to work on time.**
7 Q. Understood. And so you -- for lack of a
8 better phrase, let's just say you protested to the
9 officer. Did you -- do you recall physically where
10 you were during the car search? Like were you right
11 next to the car or did you --
12 **A. I can't recall, I was upset.**
13 Q. Okay.
14 **A. I was way upset.**
15 Q. Do you recall if you -- if you stepped
16 back from the car and joined the other deputy and
17 Ms. Ayres?
18 **A. Yes, I did not watch the officer search**
19 **the vehicle.**
20 Q. Got it. So you didn't watch the -- so at
21 least so far as you know, you didn't watch the
22 search at all then.
23 **A. Not of the vehicle.**
24 Q. Okay, very good.
25 **A. I didn't -- no, I wasn't standing right by**

Page 61

1　him like, hey, what are you doing, are you in that,
2　but when -- I did hear that he was going through a
3　lot of my personal belongings.
4　　Q.　You heard that he was going through a lot
5　of your personal belongings?
6　　A.　From people that had saw the video.　It
7　was --
8　　Q.　I see, okay.　So you didn't see that at
9　the time, you weren't told at the time what the
10　scope of the car search was, but you had heard after
11　the fact from folks who have seen the video
12　presumably through the media.
13　　A.　Yes, very embarrassing, sir.
14　　Q.　I bet, yeah.　So then I think I can
15　probably just summarize, we can just kind of quickly
16　go through the rest.　So the car search is
17　completed.　You said before, no contraband,
18　nothing's found.　Presumably you guys are allowed
19　back into your car; is that correct?
20　　A.　Yes, sir.
21　　Q.　You get back in the passenger seat,
22　Wylesha in the driver; is that right?
23　　A.　Yes, sir.
24　　Q.　I would assume, then, that the officer
25　then left to go back to his squad car and probably

Page 62

1　was gone for some handful of minutes, does that
2　sound about right, before --
3　　A.　Yes.
4　　Q.　Yes.
5　　A.　And he forgot to give me my ID.
6　　Q.　He forgot to give you his ID -- your ID?
7　　A.　My ID.　He took my driver's license.　I
8　had to call the next day and get them.
9　　Q.　And you were able to get your ID back,
10　correct?
11　　A.　I was.
12　　Q.　Okay.　Do you recall roughly how long you
13　were without your ID?　Was it just the night and
14　you --
15　　A.　24 hours.
16　　Q.　24 hours.　So this incident, do you
17　recall -- you were on your way to work.　Do you
18　recall when your shift started that day?
19　　A.　My shift I believe started -- I can't -- I
20　think it was like at 10:00.
21　　Q.　10:00?
22　　A.　Or 11:00, one of the two.　I can't
23　remember.
24　　Q.　So if I -- would you be willing to --
25　would you see any reason to disagree with the

Page 63

1　statement that this traffic stop happened at about
2　9:30, 9:40, 9:50, I'm not going to get too specific,
3　but about that period of time, does that sound
4　right, in the afternoon or at night?
5　　A.　Yes, if that's -- if that's what it said
6　on the report I believe.　I could get my times from
7　work.
8　　Q.　Sure.
9　　A.　I could call if I really needed to and
10　find out exactly what time the shift started that
11　night, but I believe -- usually my shift is like --
12　okay, at some nursing homes I work at 10:00, some at
13　11:00.
14　　Q.　Sure.
15　　A.　I can't tell you.
16　　Q.　No, that's --
17　　A.　I've always worked third shift though.
18　　Q.　No, that's okay, I'll just -- I think we
19　can probably just agree for purposes of at least my
20　next question we'll just say that sometime between
21　9:30 and 10:00 at night --
22　　A.　Yes.
23　　Q.　-- I mean.　So you lost your -- so not
24　lost, excuse me.　So your license, you were without
25　your license for that period of time, and so then it

Page 64

1　wasn't until about 9:30 p.m. the next day that you
2　called and successfully obtained your license back
3　from the --
4　　A.　I called before that when I realized they
5　were gone, but the officer wasn't on duty, so --
6　　Q.　I see.
7　　A.　-- had to wait.
8　　Q.　I see, okay.　But ultimately within 24
9　hours you got them.
10　　A.　Yes.
11　　Q.　Okay, very good.　Do you need -- I realize
12　I've been talking for a bit, you're blowing your
13　nose, do you need a break?　Do you need a couple
14　minutes or anything or are you good to just keep
15　going?
16　　　　MR. McCARTER:　Need a bathroom break or
17　anything?　We're on your time, so if you want to
18　take a --
19　　Q.　Yeah, just trying to be sensitive to that.
20　　　　MR. McCARTER:　Bryan, why don't we just
21　take five minutes real quick.　Can we go off the
22　record?
23　　　　(Pause at 3:45 p.m. to 3:46 p.m.)
24　BY MR. VAYR:
25　　Q.　And then so you guys -- so presumably the

Page 65

1  deputy came back, he gave you guys a ticket of some
2  form; is that right?
3      **A.  Yes, sir.**
4      Q.  Do you recall what the ticket was for?
5      **A.  No.**
6      Q.  That's okay.  And then presumably you guys
7  drive away from the scene and you successfully make
8  it to work; is that accurate?
9      **A.  Yes, sir.**
10     Q.  Okay.  And then you're dropped off at work
11 and so whatever -- and then presumably you were at
12 work and you're not -- you weren't present then for
13 anything else that happened with Ms. Ayres for the
14 rest --
15     **A.  Correct, sir.**
16     Q.  -- of the night.  Okay, what time did your
17 shift end that day?
18     **A.  Depends.  It could have been 6:00, it
19 could have been 7:00 that morning.**
20     Q.  So the morning of -- so if your shift
21 started on May 8th around ten o'clock, your shift
22 would have ended about 6:00 or 7:00 --
23     **A.  Exactly.**
24     Q.  -- thereabouts May 9th?
25     **A.  Exactly.**

Page 66

1      Q.  Very good, okay.  So that's -- is there
2  anything else that you -- is there anything else
3  that you observed of the subject incident beyond
4  what I've already questioned you about?
5      **A.  No, sir.**
6      Q.  Okay.  So the last part of my questioning,
7  then, so I've already asked you -- so could you
8  possibly speak to if Ms. Ayres was -- I'm trying to
9  combine a couple things, I apologize.
10     **A.  It's okay.**
11     Q.  So I think you testified earlier that you
12 and Ms. Ayres kind of keep your respective health
13 issues to yourself?
14     **A.  To an extent.**
15     Q.  To an extent okay.  Did Ms. Ayres speak
16 with you about this traffic stop after it happened?
17     **A.  Other than the fact that she felt
18 violated --**
19     Q.  Okay.
20     **A.  -- you know, and she's, you know, she's --
21 she's gay, she doesn't like men touching her, she
22 really doesn't, and I mean it's -- she's just really
23 been all over the place I believe ever since then,
24 and I'm being honest.  Like I don't -- she's going
25 through counseling right now and I think she needs**

Page 67

1      it because I think that really bothers her.  She
2  talks about how he touched her and I wasn't even --
3  I feel bad for her.
4      Q.  Understood.  I think that's a very human
5  reaction.  So she's receiving -- and as we've talked
6  about before, you're aware that she's receiving
7  counseling, mental health counseling --
8      **A.  Yes --**
9      Q.  -- now.
10     **A.  -- but I don't know the extent.**
11     Q.  Sure.  Do you know -- I think I asked this
12 before.  You don't know exactly when she started
13 receiving counseling, is that, is that -- am I
14 remembering that right?
15     **A.  I know it was -- it had to have been
16 after.  I've never -- we've never spoke about her
17 going to a counselor other than after that
18 situation --**
19     Q.  Okay.
20     **A.  -- you know.**
21     Q.  So at least the only time that she has
22 spoken to you about it was after this traffic stop.
23     **A.  (Nods head).**
24     Q.  Okay.  Did she tell you -- so you
25 mentioned before that she felt, she told you that

Page 68

1  she felt violated.  Did she --
2      **A.  She cries to me.  She says she doesn't,
3  she doesn't, basically she -- nobody knows how she
4  feels and everybody thinks it's a joke.  And it's
5  not right.  They shouldn't be able to do her like
6  that.**
7      Q.  Sure.
8      **A.  And I feel bad for her because when she
9  gets pulled over or anything, they treat her like
10 that.**
11     Q.  So you're -- so when you're saying any
12 time she's pulled over, she's always --
13     **A.  No, she's never been pulled out of the car
14 and searched, but --**
15     Q.  Sure.
16     **A.  -- you know, she's a good person.  Like
17 she does things for kids and she makes positive
18 things, she cuts hair for free and she -- you know,
19 she's active in going to games and being involved
20 with kids, and she's not a bad person.  I've never
21 seen her be a bad person.  And she really feels
22 violated.**
23     Q.  Okay.  So --
24     **A.  I didn't believe she did at first, but she
25 really does.**

Page 69

1  Q. So she didn't --
2  A. She didn't ex -- like I said, we don't
3  express these things to each other.
4  Q. Okay. So what I'll -- I guess, to the
5  extent it matters, I had the pleasure of talking
6  with Ms. Ayres earlier today, and I agree with your
7  assessment that she's a good person.
8  A. She is.
9  Q. So there's absolutely no insinuation --
10 A. Right. No --
11 Q. -- to the contrary, so --
12 A. -- I don't believe that you think that.
13 You're here just, you know, refereeing this thing.
14 Q. That may be the best description I've ever
15 heard. Okay, so you said -- if you don't mind, like
16 does she ever delve into any kind of specifics?
17 Like does she ever describe what the search was
18 like, what was searched, et cetera, or did she just
19 kind of say incidentally I --
20 A. "You don't know how I feel."
21 Q. She --
22 A. Because, you know, I try to downplay
23 things. I'm sometimes like, "oh, it was a
24 search" --
25 Q. Sure.

Page 70

1  A. -- you know, and she's like "you don't
2  know." She -- she's a woman in a man's body, she
3  doesn't want another man touching her in that way,
4  and she said he groped her butt [indicating].
5  Q. Groped her butt, okay. Does she say
6  anything else specific about the search? And by
7  specific, I mean like did she say what the deputy
8  did, that she believes -- that she believes the
9  deputy did?
10 A. No.
11 Q. Okay. So you said groped and you made
12 kind of a cup motion, like a, like an upside down C
13 with your hand. So is that how she's described it
14 to you in the past was it was like he cupped her
15 rear end or cupped some part of her?
16 A. (Nods head).
17 Q. You're nodding yes.
18 A. Yes.
19 Q. Okay. Is that the -- I think I asked this
20 already, just to -- it's just making sure. So then
21 to the extent that she ever described any specific
22 actions that the deputy did --
23 A. That was it.
24 Q. -- that was the description, it was
25 groped. Did she ever use a hand gesture to --

Page 71

1  A. She didn't say groped. I call it
2  groped --
3  Q. Got it.
4  A. -- because that's how I refer to it as.
5  Q. Sure. Do you recall what words she did
6  use when talking -- when describing that to you?
7  A. Grabbed my ass.
8  Q. Grabbed my ass, okay. So it's -- so you
9  said that Wylesha, excuse me, Ms. Ayres, was -- did
10 you say that she was a woman in a man's body before?
11 Was that the phrase that you said?
12 A. She's gay.
13 Q. I understand. No, I guess what I'm --
14 A. That's what I meant.
15 Q. Sure. I guess what I was specifically
16 asking is, is she -- you said that she was
17 sensitive, she doesn't like guys touching her. Are
18 you aware, like is she like particularly sensitive
19 to that, like more than you would expect your
20 average bearer to be, to the extent that you know
21 what an average person feels like about something?
22      MR. McCARTER: I'll object --
23 A. No.
24      MR. McCARTER: -- to the form of the
25 question, but you can still answer if you understand

Page 72

1  that.
2  Q. So not particularly sensitive so far as
3  you know.
4  A. No.
5  Q. Okay.
6  A. I can grab her ass.
7  Q. Sure. Okay, does she, but you said she
8  doesn't like -- is she particularly sensitive to
9  being touched by members of the opposite sex though?
10 If you don't know --
11 A. I can't say.
12 Q. Okay.
13 A. I know she doesn't want a man touching
14 her.
15 Q. Sure.
16      MR. McCARTER: And I'll just object to the
17 extent the question calls for speculation, but you
18 can still answer if you understand.
19 Q. Sure. So just based -- so again, just
20 based on your two years of -- roughly two years of
21 knowing Ms. Ayres and kind of seeing her interact
22 and having conversations with her, your impression
23 of that then, from your perspective, is that she
24 doesn't like having men touch her and would you --
25 so then would you -- correct?

Page 73

1     MR. McCARTER: Same objection. Go ahead.
2     A. I believe if it was appropriate it would
3  be okay.
4     Q. Okay.
5     A. If she felt like it was, if it was
6  comfortable -- what's comfortable to me isn't
7  comfortable to you.
8     Q. Sure.
9     A. Okay?
10     Q. Sure.
11     A. It's all about comfort and that's where it
12  goes beyond --
13     Q. I see.
14     A. -- you know.
15     Q. Got it. So if it was a search -- not
16  search, excuse me. If it was a physical contact, if
17  it was a physical touch that's kind of within her
18  comfort level, obviously not an issue.
19     A. Uh-huh.
20     Q. But if it goes beyond her comfort level,
21  then, you know, clearly there's an issue. I guess
22  my question is just like do you have any -- based on
23  your time with Ms. Ayres, do you have any insights
24  or impression about whether her comfort level with
25  physical contact, let's say, is less than --

Page 74

1     A. No.
2     Q. Okay.
3     A. She is -- it's normal.
4     Q. Fair enough, very good. Okay, and again
5  so you, how -- how frequently have you and Ms. Ayres
6  talked about this patdown since it happened?
7     A. Only -- not even a handful of times.
8     Q. Okay. So less than five --
9     A. Uh-huh.
10     Q. -- is your memory?
11     A. Uh-huh.
12     Q. Okay. And -- excuse me, and that in these
13  conversations with her, were -- did they all kind of
14  follow the arc that you described before where she
15  would say that she felt violated and he grabbed her
16  ass, et cetera, or was there anything --
17     A. I try not to, we try not to -- I try not
18  to talk about it because I know it upsets her.
19     Q. I understand.
20     A. So, yeah, it would always go to that
21  extent because I would downplay the issue.
22     Q. I see.
23     A. You know, but that's -- it's not fair.
24     Q. Did she, did you guys -- have you guys
25  ever had any conversations about this lawsuit at

Page 75

1  all?
2     A. No, I wasn't even sure it was going on
3  until I was contacted.
4     Q. Okay. And by contacted, you mean
5  contacted by my office for purposes of this
6  deposition or --
7     A. Yes, sir.
8     Q. Okay. Have you ever had any conversations
9  with either Mr. McCarter who's to your right or to
10  the law firm that he works with?
11     A. Yes, when I found out that everything was
12  going on.
13     Q. Got it. So --
14     A. Just recently though.
15     Q. Right. No, of course. And so presumably
16  just a conversation like, hey, you know, a
17  deposition is going to be asked, what's your
18  availability? Is that kind of the --
19     A. Yes, that's --
20     Q. -- long short of it?
21     A. -- pretty much it.
22     Q. Very good. You guys didn't talk about the
23  substance of the lawsuit or anything?
24     A. No.
25     Q. Okay.

Page 76

1     A. This is my first time ever other -- you
2  know, really talking about the incident. Never
3  really spoke to the lawyer at all about it. He's
4  her lawyer. I didn't know I had to be involved.
5  Kind of forgot --
6     Q. Sure.
7     A. -- that I had to be here today.
8     Q. No, I understand. Lawsuits are not fun,
9  it takes time, takes you away from your life, but
10  you were a witness, you were there and so --
11     A. I know, I know. I tried to dodge the
12  subpoena though. You guys got my son.
13     Q. So I heard, okay. I'm trying to think if
14  there's -- so just review with me. So we've talked
15  about your background, we've talked about your
16  education, your employment history, we've talked
17  about your criminal history to the extent that there
18  is one. We've talked about your relationship with
19  Ms. Ayres, your observations of her, you know,
20  physical and mental well-being both before and after
21  the physical accident, and we've also talked about
22  your knowledge of the subject incident. That sounds
23  like what we covered, right?
24     A. Yes, sir.
25     Q. Is there anything -- did I miss anything?

Page 77

1  Is there like a --
2  **A. No.**
3  Q. -- ten foot gorilla that I just haven't
4  asked you about yet?
5  **A. No.**
6  Q. Okay.
7  MR. VAYR: Well, then with that, you know,
8  I'll turn it over to Mr. McCarter, he will have an
9  opportunity to ask you some questions, and then if I
10 have follow-up, I'll be able to go after him again,
11 but again, hopefully we'll get you out of here.
12 **A. Please.**
13 MR. McCARTER: Ms. Graham, I hope not to
14 keep you here too long. We do appreciate you coming
15 in and giving your testimony here today.
16 EXAMINATION BY
17 MR. McCARTER:
18 Q. You testified that you don't spend a lot
19 of time talking with Wylesha regarding her treatment
20 for some of her mental issues, but have you ever had
21 conversations with her about maybe how treatment is
22 going?
23 **A. You know, she has mentioned to me about**
24 **conversations of her and Pat, you know, that Pat**
25 **understands her and that, you know, stuff, but we've**

Page 78

1  **never really went into --**
2  Q. Okay.
3  **A. -- detail.**
4  MR. VAYR: And if I can just -- I
5  apologize. Just to make clear for the record, when
6  you say Pat, you're referring to presumably the
7  counselor --
8  THE WITNESS: Yes.
9  MR. VAYR: -- that's she's talking to.
10 THE WITNESS: Yes.
11 MR. VAYR: Okay, very good.
12 THE WITNESS: That's all I know her by is
13 Pat.
14 MR. VAYR: That's fine. Thank you,
15 counsel.
16 **BY MR. McCARTER:**
17 Q. But being in a relationship with Wylesha,
18 you do -- you share intimate moments, so you're --
19 **A. Yes, we do.**
20 Q. -- aware of her demeanor, correct?
21 **A. Yes, yes. Oh, I know how she is and she's**
22 **changed.**
23 Q. And you've noticed a change since this
24 incident until today --
25 **A. Yes.**

Page 79

1  Q. -- correct? Okay. You mentioned that you
2  were upset before the search of the car started, and
3  I'm just a little unclear. Can you tell us again
4  why you were upset at that particular point right
5  before the search of the car actually took place?
6  **A. Because I felt like that they were just**
7  **trying to find something and there was nothing to**
8  **find. You know, I felt like they were basically**
9  **harassing us because why would they want to search**
10 **my vehicle? Why did they search her, but they never**
11 **searched me?**
12 Q. Did --
13 **A. They never touched me at all.**
14 Q. Did --
15 **A. Why did they search her but not me?**
16 Q. I'm sorry, I keep trying to interrupt
17 you --
18 **A. All right.**
19 Q. -- and I apologize for that. You said you
20 were never searched. Are you aware of whether or
21 not your two boys in the back seat were searched?
22 **A. No, they were not searched.**
23 Q. Were they asked to step out of the car?
24 **A. I can't remember. I was really upset. I**
25 **think my eight-year-old, I think -- I believe he was**

Page 80

1  **in the car. I don't -- I believe they both were in**
2  **the car.**
3  Q. That's fine if you don't remember, but --
4  **A. I don't recall.**
5  Q. -- you think they were both --
6  **A. Yeah, I do --**
7  Q. -- in the car?
8  **A. -- believe they were both in the car, but**
9  **I don't remember.**
10 Q. Okay. You're not aware of any of the boys
11 telling you that one of the officers actually
12 searched them, correct?
13 **A. No.**
14 Q. And --
15 **A. I'm not sure.**
16 Q. -- I would have to venture it would only
17 be King who's old enough to actually --
18 **A. Yes.**
19 Q. -- relay that information.
20 **A. Yes.**
21 Q. Did King ever say that the officer
22 searched the back seat of the car?
23 **A. Meaning the back seat as in the trunk part**
24 **or the back seat where he was at?**
25 Q. The back seat where King was sitting at.

Page 81

1      A.  He did.
2      Q.  He did mention it?
3      A.  No, he did look in the back seat.
4      Q.  Okay, the deputy did look in the back
5  seat.
6      A.  Because I recall him saying, "It's okay,
7  buddy."
8      Q.  Okay.
9      A.  I'm -- "Your mom's right there."
10     Q.  Now, as far as you know, no weapons were
11 found in the car, correct?
12     A.  Nothing was found in the vehicle.
13     Q.  There was no drugs found in the car?
14     A.  Nothing was found in the vehicle --
15     Q.  Do you know --
16     A.  -- other than me and the kids.
17     Q.  Do you know if anything resembling like a
18 weapon was found on Wylesha?
19     A.  No.
20     Q.  Do you know if Wylesha was found with any
21 drugs --
22     A.  No.
23     Q.  -- on her person?
24     A.  She was not.
25     Q.  Okay.

Page 82

1          MR. McCARTER: That's all I have.
2          MR. VAYR: Okay, I think I might just have
3  a couple.
4          REEXAMINATION BY
5          MR. VAYR:
6      Q.  You said you've had conversations with
7  Wylesha about Pat, the counselor, correct?
8      A.  Very few.
9      Q.  Very few.  And were those conversations,
10 like was that just kind of like, "hey, I'm talking
11 to Pat and she seems to get me" or was it in the
12 alternative a conversation like "I talked to Pat
13 about this specific thing and we did this?"
14     A.  It was pretty much she seems to get me.  I
15 don't --
16     Q.  Okay.
17     A.  Yeah.
18     Q.  So generally just complimentary of Pat.
19     A.  Yes.
20     Q.  And that's --
21     A.  And she, I don't -- I don't discuss with
22 her what goes on in their --
23     Q.  Sure.
24     A.  -- appointments.
25     Q.  And so then to the extent, then, that you

Page 83

1  have had any conversations it sounds like with Ms.
2  Ayres about her mental health counseling, it would
3  be these conversations you just described with Pat;
4  is that accurate?
5      A.  (Nods head).
6      Q.  Okay.  You described -- you said that you
7  noticed a change between Ms. Ayres between before
8  the incident and now.
9      A.  Her moods I mean.  She's more on edge.
10 She's really jumpy when the police -- she sees them.
11 She gets really nervous.  She just gets frantic like
12 something's going to happen, like she's worried, and
13 it's not how the police are supposed to make us
14 feel.
15     Q.  No, it's not.  Is there anything else that
16 you've noticed about her that has changed?
17     A.  No, she's still a good person, she still
18 loves the kids, she still loves to do things like
19 that.  That type of thing makes her happy.  It's
20 just, you know, thinking about being harassed.  She
21 really, really feels harassed.
22     Q.  Okay, feels harassed on an ongoing basis
23 or just felt harassed with that specific incident,
24 to the extent you know?  I realize in a way I'm kind
25 of asking you to --

Page 84

1      A.  I believe it's because of that situation.
2      Q.  Sure, okay.  And I guess my question was
3  just a little bit more specific.  Like is she
4  telling you that she feels like --
5      A.  She's not telling me anything.  I can see
6  her, I know her, I've been with her for two years.
7      Q.  Very good, all right.
8      A.  And I feel like she needs some medicine
9  for anxiety because of it.  In the medical field, I
10 can tell you.  Taking psychology classes, boy,
11 they'll give you -- they'll make you think you're a
12 psychiatrist.
13         MR. McCARTER: Good teachers.
14     Q.  Okay.
15     A.  My teacher said, "Don't go diagnosing
16 people."
17     Q.  I'm sorry, I just want a second just to
18 make sure.  I just want -- I would hate to like
19 think, oh, I should have asked you that and then we
20 have to come back or something, so forgive me.
21         I think you said that you have -- so you
22 did not actually record any video at all.
23     A.  Didn't get it, phone was dying.
24     Q.  Okay.  So you don't have a picture.
25 There's absolutely zero image on your phone from

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

LETIKA GRAHAM
January 28, 2020

Page 85

1   what you're --
2   **A.   Zero.**
3   Q.   Okay.
4        **MR. VAYR:** I think that's all I've got.
5        **MR. McCARTER:** I've got nothing further.
6   Letika, at this point you have two options.  So you
7   get an opportunity to review the transcript and see
8   if our phenomenal court reporter here made any
9   errors in taking down your testimony.  Now you can't
10  change the substance of your testimony, but you
11  could change, you know, spellings of names or a
12  mispronunciation or something, but that's one
13  option.  You can review the whole testimony and
14  submit what's called an errata sheet about those
15  corrections.  Or, and this is the most common
16  option, you can trust that our professional court
17  reporter has done her job professionally and you can
18  waive signature and the transcript will just stand
19  as is.  So what would you like to do?
20  **A.   I feel confident with you guys.**
21       **MR. McCARTER:** All right, so we'll waive
22  signature and that will conclude the deposition, so
23  we can go off the record.
24       (Adjourned at 4:04 p.m.)
25

Page 86

1   STATE OF ILLINOIS    )
                         )SS
2   COUNTY OF FORD       )

3
         I, June Haeme, a Notary Public in and for
4   the County of Ford, State of Illinois, do hereby
    certify that LETIKA GRAHAM, the deponent herein, was
5   by me first duly sworn to tell the truth, the whole
    truth and nothing but the truth, in the
6   aforementioned cause of action.
         That the following deposition was taken on
7   behalf of the Defendants at the law offices of Heyl,
    Royster, Voelker & Allen, 301 N. Neil Street, Suite
8   505, Champaign, Illinois, on January 28, 2020.
         That the said deposition was taken down in
9   stenograph notes and afterwards reduced to
    typewriting under my instruction; that the
10  deposition is a true record of the testimony given
    by the deponent; and that it was agreed by and
11  between the witness and attorneys that said
    signature on said deposition would be waived.
12       I do further certify that I am a
    disinterested person in this cause of action; that I
13  am not a relative, or otherwise interested in the
    event of this action, and am not in the employ of
14  the attorneys for either party.
         IN WITNESS WHEREOF, I have hereunto set my
15  hand and affixed my notarial seal this 7th day of
    February, 2020.
16

17

18

19                    JUNE HAEME, CSR
                      NOTARY PUBLIC
20

21
    "OFFICIAL SEAL"
22  June Haeme
    Notary Public, State of Illinois
23  My Commission Expires:
    September 28, 2020
24

25

**[**

**[indicating] (12)**
33:14;34:9,11;35:20;
40:5;41:16,22;42:17;
45:10,13;48:11;70:4

**A**

**able (21)**
10:17;26:25;39:20,
20;42:15,16,21;48:1,2;
49:10;51:2,19;53:7,11;
54:3,5;59:4,14;62:9;
68:5;77:10
**Absolutely (3)**
16:13;69:9;84:25
**accident (2)**
16:20;76:21
**accurate (5)**
12:3;41:8;42:9;65:8;
83:4
**act (1)**
38:24
**actions (1)**
70:22
**active (1)**
68:19
**actual (2)**
37:13;38:24
**actually (13)**
4:22;8:23;10:3,10;
14:25;15:12;20:3;41:9;
45:4;79:5;80:11,17;
84:22
**add (1)**
9:18
**address (1)**
11:10
**Adidas (1)**
44:2
**Adjourned (1)**
85:24
**admirable (1)**
59:2
**adult (2)**
13:18,22
**affecting (1)**
26:12
**afternoon (1)**
63:4
**again (14)**
9:9;15:16;17:10;
22:20;37:21;42:1;
45:17;51:13,24;72:19;
74:4;77:10,11;79:3
**against (1)**
6:12
**ago (6)**
15:11;18:6;23:22;
38:7,9;48:22
**agree (2)**

63:19;69:6
**ahead (3)**
34:19;43:11;73:1
**aim (1)**
41:7
**allowed (1)**
61:18
**allude (1)**
7:3
**almost (3)**
19:14;21:12;38:7
**alternative (1)**
82:12
**although (1)**
58:1
**always (6)**
22:9;47:22;57:23;
63:17;68:12;74:20
**amount (1)**
8:8
**answered (1)**
26:2
**anticipated (1)**
25:15
**anxiety (1)**
84:9
**apologize (5)**
36:4;38:14;66:9;
78:5;79:19
**appointments (1)**
82:24
**appreciate (2)**
42:1;77:14
**approach (2)**
29:6;54:12
**approached (2)**
31:3;54:13
**approaching (1)**
9:13
**appropriate (1)**
73:2
**approximately (2)**
22:13,14
**arc (1)**
74:14
**area (3)**
11:17;14:9;42:7
**armpit (1)**
42:7
**armpits (1)**
45:20
**arms (10)**
34:12,13,22,24;36:5,
5;41:16;42:6,8;45:19
**around (14)**
12:6;21:13;23:11,12;
32:16;33:12;34:6;35:4;
36:8;41:13;48:19;51:3;
59:1;65:21
**arrest (2)**
31:18,24
**article (3)**
7:21,23;10:1

**aside (2)**
13:16;31:13
**ass (4)**
71:7,8;72:6;74:16
**assault (1)**
26:16
**assessment (1)**
69:7
**assistant (1)**
12:19
**assume (6)**
10:1;12:10;13:17,22;
18:24;61:24
**assuming (5)**
23:25;31:3;32:2,19;
57:1
**attached (1)**
10:2
**attending (2)**
13:6,8
**attention (1)**
26:3
**attorney (1)**
6:15
**availability (1)**
75:18
**average (2)**
71:20,21
**aware (9)**
23:7;25:17,18;26:6;
67:6;71:18;78:20;
79:20;80:10
**away (5)**
16:18;49:16;58:23;
65:7;76:9
**awkwardly (1)**
42:2
**Ayres (34)**
6:12;7:10;9:13;11:6,
11;19:12;22:3;23:13;
25:20;26:7;28:11;
36:22;42:19;43:20,21;
44:21;48:2;49:11;
50:18;52:3;54:6;60:17;
65:13;66:8,12,15;69:6;
71:9;72:21;73:23;74:5;
76:19;83:2,7
**Ayres's (5)**
23:5;26:23;27:12;
42:15;53:10

**B**

**babies (1)**
20:10
**back (60)**
9:2,5;12:7;14:4;
15:23,24;16:1,20;18:3;
30:4,9,12;31:1,2;
33:20;34:7;35:5,11,18,
21;36:7;38:7;39:8,9;
42:17;45:7;46:16,25;
47:2,15;48:14,20;49:1,

5,5,6,12,15;50:24;51:1,
3;52:7,10;53:24;54:2;
60:16;61:19,21,25;
62:9;64:2;65:1;79:21;
80:22,23,24,25;81:3,4;
84:20
**background (4)**
11:3,16;18:25;76:15
**backtrack (1)**
22:16
**backwards (1)**
39:6
**bad (5)**
40:4;67:3;68:8,20,21
**ball (1)**
23:19
**base (1)**
27:16
**based (3)**
72:19,20;73:22
**basically (12)**
10:16;29:18;35:18;
36:11,12,13,16;47:19;
49:6;52:3;68:3;79:8
**basis (2)**
25:20;83:22
**bathroom (1)**
64:16
**battery (1)**
26:16
**bear (1)**
42:2
**bearer (1)**
71:20
**beginning (1)**
8:11
**behind (1)**
50:17
**believes (2)**
70:8,8
**belongings (2)**
61:3,5
**below (1)**
45:23
**benefit (2)**
6:7,16
**besides (1)**
19:2
**best (3)**
5:1;6:21;28:8;69:14
**bet (1)**
61:14
**better (4)**
33:1;51:15;53:3;
60:8
**beyond (2)**
18:1;66:3;73:12,20
**big (1)**
19:16
**bit (10)**
11:5,16;37:16,17;
46:11;48:16;51:17;
54:3;64:12;84:3

**Black (6)**
56:14,22;57:1;58:13;
59:5,9
**BLK (1)**
57:17
**BLKs (1)**
56:16
**blowing (1)**
64:12
**blues (1)**
50:7
**body (7)**
7:14;9:24;43:5,17;
44:6;70:2;71:10
**bones (1)**
26:19
**boosters (1)**
53:2
**both (7)**
29:12;37:16,17;
76:20;80:1,5,8
**bothers (1)**
67:1
**bottom (2)**
7:24;10:4
**boy (1)**
84:10
**boys (2)**
79:21;80:10
**brain (1)**
50:22
**break (3)**
40:23;64:13,16
**breakfast (1)**
38:15,17
**brief (1)**
30:14
**bright (1)**
50:15
**broadly (1)**
26:11
**broken (2)**
26:18,19
**brought (1)**
6:12
**Bryan (3)**
5:5;20:19;64:20
**buddy (1)**
81:7
**bundle (1)**
44:17
**bunny-eared (1)**
57:11
**butt (2)**
70:4,5

**C**

**calendar (4)**
13:10,10;24:1,5
**call (6)**
13:17;18:19;57:18;
62:8;63:9;71:1

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

LETIKA GRAHAM
January 28, 2020

**called (4)**
26:23;64:2,4;85:14
**calls (1)**
72:17
**cam (1)**
44:6
**came (4)**
12:7,9;23:1;65:1
**camera (6)**
7:14;9:24;32:16,18,
19;33:12
**can (40)**
4:18,20;5:6;6:7,16,
21,24;8:12;12:3;14:3;
17:20;21:10;22:19;
27:6;31:16;32:13,13;
35:1,14;38:10;47:5;
54:19;59:9,11,12;
61:14,15;63:19;64:21;
71:25;72:6,18;78:4;
79:3;84:5,10;85:13,16,
17,23
**capacity (1)**
13:23
**car (109)**
7:9,9;9:2,5;28:19,20,
25;30:5,16,16;31:2,4,
13,14;32:2,3,8;33:4,7,
9;34:6,18,24;35:12;
36:20;37:14;39:5,7,8,
20,24;40:22,24,24,25;
42:5,12,16,18;45:22;
46:12,13,14,16,16,18,
21,25;47:2,4,14,15,16;
48:4,14,19;49:5,6,6,10,
11,12,13;50:8,23,24;
51:2,4,10,21,25;52:2,
24;53:1,8,9,14,15;
54:11,19,19,25;55:20;
56:9,12;58:13,14;
59:17,23,24;60:1,10,
11,16;61:10,16,19,25;
68:13;79:2,5,23;80:1,2,
7,8,22;81:11,13
**car's (1)**
50:13
**case (2)**
7:7;19:25
**catch (1)**
5:17
**catching (1)**
10:24
**Caught (1)**
9:21
**causes (2)**
26:18;37:19
**cell (1)**
32:19
**Center (1)**
14:14
**Central (2)**
13:4,5
**certificate (1)**

13:2
**certified (2)**
12:19;13:2
**cetera (4)**
5:9;6:9;69:18;74:16
**Champaign (9)**
6:13;11:24;12:21;
14:1,13,18;15:12,20;
28:13
**change (5)**
12:6;78:23;83:7;
85:10,11
**changed (2)**
78:22;83:16
**characterization (1)**
42:9
**charge (1)**
18:11
**chase (1)**
28:20
**check (3)**
18:20,25;30:18
**checking (1)**
41:6
**Cherries (2)**
58:7,8
**Cherry (3)**
56:16;57:16,16
**Christensen (3)**
7:7;9:12;53:9
**cigar (4)**
57:3,4,5;59:5
**cigarette (3)**
56:11;57:2;59:12
**cigarillo (2)**
57:8,19
**cigars (2)**
57:12,15
**circumstances (1)**
6:8
**citation (1)**
29:25
**city (1)**
28:13
**clarifying (1)**
26:2
**classes (1)**
84:10
**clean (1)**
5:7
**clear (7)**
5:17;34:4;38:21;
41:25;43:17;50:2;78:5
**clearly (2)**
5:14;73:21
**climb (1)**
52:6
**clip (2)**
8:20,24
**closer (2)**
14:9;16:24
**clothes (2)**
39:1,3

**cocaine (1)**
55:15
**Cody (1)**
7:8
**college (4)**
12:16,23;13:3,4
**color (1)**
44:4
**combine (1)**
66:9
**comfort (4)**
73:11,18,20,24
**comfortable (3)**
73:6,6,7
**coming (2)**
49:24;77:14
**Commencing (1)**
4:1
**common (1)**
85:15
**commonly (1)**
57:9
**community (1)**
12:16
**complaint (1)**
10:9
**complete (2)**
46:11;51:20
**completed (1)**
61:17
**complimentary (1)**
82:18
**concerned (2)**
44:1,15
**conclude (2)**
53:21;85:22
**concluded (1)**
54:5
**confident (2)**
24:6;85:20
**confirm (1)**
37:22
**confirming (2)**
45:18;50:22
**congratulations (1)**
12:25
**contact (2)**
73:16,25
**contacted (3)**
75:3,4,5
**continued (2)**
38:3;51:5
**contraband (1)**
61:17
**contrary (1)**
69:11
**conventional (1)**
19:22
**conversation (5)**
6:5,6;38:3;75:16;
82:12
**conversations (10)**
72:22;74:13,25;75:8;

77:21,24;82:6,9;83:1,3
**convicted (1)**
17:14
**convictions (1)**
17:12
**corrections (1)**
85:15
**correctly (3)**
33:3;36:9;50:5
**Cory (1)**
7:7
**counsel (3)**
27:19;57:10;78:15
**counseling (13)**
22:5,10,15;23:6,14;
24:16;25:9,18;66:25;
67:7,7,13;83:2
**counselor (3)**
67:17;78:7;82:7
**County (12)**
6:13;14:5,7,7;15:10,
14,20;16:2,14,15;
18:13,14
**couple (10)**
21:25;23:17;34:2;
36:23;37:24;48:1;
49:16;64:13;66:9;82:3
**course (3)**
24:21;38:8;75:15
**court (6)**
4:7,16,18;9:18;85:8,
16
**covered (1)**
76:23
**cracked (1)**
40:1
**craned (1)**
34:6
**crazy (1)**
28:20
**cries (1)**
68:2
**crimes (3)**
17:13;18:18,19
**criminal (3)**
17:11;19:9;76:17
**cup (1)**
70:12
**cupped (2)**
70:14,15
**currently (5)**
12:23;13:6;22:7,8;
23:8
**cut (1)**
42:16
**cuts (1)**
68:18

**D**

**date (1)**
24:17
**day (8)**

6:17;25:4;43:21;
60:5;62:8,18;64:1;
65:17
**day-to-day (1)**
25:20
**deaf (1)**
40:6
**Decatur (1)**
12:7
**December (2)**
15:23;24:14
**defendants (3)**
6:14,15;7:7
**delve (2)**
19:24;69:16
**demeanor (1)**
78:20
**dep (1)**
23:18
**Depends (1)**
65:18
**depicted (2)**
8:18,25
**deposition (6)**
4:12;5:23;10:12;
75:6,17;85:22
**deputies (2)**
47:12;50:18
**deputy (14)**
9:12;30:15;31:11;
45:19;47:5,6;53:9;
54:7;60:16;65:1;70:7,
9,22;81:4
**describe (3)**
42:2;53:19;69:17
**described (6)**
53:10;70:13,21;
74:14;83:3,6
**describing (1)**
71:6
**description (3)**
30:4;69:14;70:24
**detail (1)**
78:3
**details (5)**
18:1,10;21:7;38:20;
47:23
**determine (1)**
6:7
**devil's (1)**
47:22
**diagnosing (1)**
84:15
**difference (3)**
59:4,9,13
**difficult (1)**
4:20
**directly (1)**
49:15
**disagree (1)**
62:25
**discuss (1)**
82:21

**dishonesty (2)**
17:13;18:19
**distinction (1)**
37:10
**distinctively (1)**
59:14
**dodge (1)**
76:11
**dog (1)**
48:10
**dog's (1)**
48:10
**done (6)**
5:25;15:21;16:2;
22:8;27:24;85:17
**door (3)**
35:5,5,10
**doubt (1)**
54:18
**down (20)**
4:18,21;5:6,12;6:5,6;
10:4;24:13;40:23;
41:11,18;42:8;43:7,8;
45:19,20;46:5;52:6;
70:12;85:9
**downplay (2)**
69:22;74:21
**drive (1)**
65:7
**driver (2)**
29:13;61:22
**driver's (3)**
31:3;35:19;62:7
**driving (3)**
28:10,11;59:18
**dropped (1)**
65:10
**drug (3)**
55:14,17,21
**drugs (14)**
55:2,3,5,7,13,23,24,
24,25;56:9,18;59:1;
81:13,21
**duly (1)**
4:3
**dumb (1)**
50:22
**during (7)**
5:22;6:18;10:21;
21:17,18;37:18;60:10
**duty (1)**
64:5
**dying (6)**
32:24;33:8,10,13;
41:10;84:23

**E**

**ear (6)**
40:8,14,15,16,17,18
**earlier (2)**
66:11;69:6
**ears (2)**

40:5,10
**easier (2)**
4:17,25
**edge (1)**
83:9
**education (2)**
13:16;76:16
**effectively (1)**
48:18
**eight-year-old (1)**
79:25
**either (3)**
17:12;44:5;75:9
**else (9)**
9:25;10:7;11:9;
15:16;65:13;66:2,2;
70:6;83:15
**embarrassing (2)**
7:19;61:13
**employment (6)**
13:18,22;15:15;
17:10;19:10;76:16
**end (6)**
5:19;25:4;35:8;
42:18;65:17;70:15
**ended (2)**
53:23;65:22
**ends (1)**
53:16
**enough (17)**
18:24;21:9;23:16;
25:13,14;30:18,19;
49:8,13;51:1;53:4;
54:16;58:25,25;59:6;
74:4;80:17
**entire (2)**
36:19;43:4
**errata (1)**
85:14
**errors (1)**
85:9
**essentially (3)**
22:21;30:8;54:22
**et (4)**
5:9;6:9;69:18;74:16
**even (7)**
8:7;14:9;24:20,23;
67:2;74:7;75:2
**evening (1)**
19:16
**event (2)**
41:3,5
**everybody (1)**
68:4
**Everyone (2)**
5:17;48:12
**ex (1)**
69:2
**exact (4)**
8:7;18:4;36:24;38:6
**Exactly (13)**
10:14;17:1;22:18;
23:3;27:17;34:10;

48:12,12;49:7;63:10;
65:23,25;67:12
**EXAMINATION (2)**
4:4;77:16
**example (8)**
5:2;6:2;10:9;26:8;
27:25;35:10;39:2;
58:12
**Excellent (4)**
9:20;10:24;11:20;
12:25
**Except (1)**
51:14
**excuse (9)**
27:22;53:9;54:3,6;
59:19;63:24;71:9;
73:16;74:12
**exit (1)**
54:19
**exited (1)**
35:11
**expect (1)**
58:14;71:19
**experience (2)**
58:20;59:6
**experienced (1)**
10:19
**expired (2)**
29:23,24
**explain (1)**
37:17
**express (1)**
69:3
**extended (1)**
34:8
**extent (16)**
8:16;9:24;26:22;
31:11;49:10;66:14,15;
67:10;69:5;70:21;
71:20;72:17;74:21;
76:17;82:25;83:24
**extra (1)**
37:20
**eyes (2)**
41:2,3

**F**

**fact (2)**
61:11;66:17
**fair (23)**
8:9,9;18:24;19:23;
22:22;23:4,16;25:13,
14;30:19;32:21;40:13,
15;46:1;49:8;51:1;
53:4,17;54:16;58:25,
25;74:4,23
**fake (1)**
18:20
**familiar (1)**
58:19
**far (8)**
6:9;13:11;28:17;

30:25;46:16;60:21;
72:2;81:10
**fast (1)**
44:14
**feel (7)**
53:3;67:3;68:8;
69:20;83:14;84:8;
85:20
**feels (6)**
68:4,21;71:21;83:21,
22;84:4
**feet (2)**
17:3;49:16
**felonies (2)**
17:12;18:16
**felony (1)**
17:15
**felt (9)**
52:9;66:17;67:25;
68:1;73:5;74:15;79:6,
8;83:23
**few (14)**
4:15;8:5,6;11:2;
23:18;30:22,23;36:1,3;
38:11;44:17;48:4;82:8,
9
**field (2)**
18:23;84:9
**figure (1)**
4:22
**film (1)**
41:1
**filming (2)**
33:3;41:2
**final (1)**
49:9
**find (5)**
19:6;55:9;63:10;
79:7,8
**fine (11)**
8:13;20:1;22:19;
23:12;24:18;32:1;34:1;
44:9;55:12;78:14;80:3
**finger (1)**
26:19
**finish (1)**
27:3
**firm (1)**
75:10
**first (10)**
4:3;7:2;11:16;24:16;
29:9;41:9;51:22;53:8;
68:24;76:1
**five (5)**
37:5,6;38:10;64:21;
74:8
**flavor (1)**
57:16
**Floyd[sic] (1)**
7:8
**focus (3)**
38:23;46:15;49:1
**folks (1)**

61:11
**follow (1)**
74:14
**follows (1)**
4:3
**follow-up (1)**
77:10
**foot (2)**
46:20;77:3
**footage (4)**
7:14;8:19;9:24;44:6
**forgive (5)**
14:17;21:25;35:25;
44:20;84:20
**forgot (4)**
14:17;62:5,6;76:5
**form (4)**
22:10;27:21;65:2;
71:24
**found (8)**
61:18;75:11;81:11,
12,13,14,18,20
**foundational (1)**
47:11
**founded (1)**
6:8
**four (1)**
24:10
**frantic (1)**
83:11
**free (1)**
68:18
**freeze (1)**
50:24
**frequently (1)**
74:5
**front (2)**
48:10;49:18
**froze (2)**
48:7,13
**full (1)**
5:6
**fun (1)**
76:8
**further (3)**
17:23;52:6;85:5

**G**

**games (1)**
68:19
**gave (1)**
65:1
**gay (2)**
66:21;71:12
**generally (2)**
54:4;82:18
**generic (1)**
55:24
**gesture (2)**
9:17;70:25
**gestured (1)**
42:7

**gestures (1)**
42:1
**gesturing (1)**
40:7
**gets (5)**
30:9;32:1;68:9;
83:11,11
**given (3)**
4:12;18:15;25:15
**giving (3)**
24:23;25:1;77:15
**glad (1)**
17:2
**goes (7)**
29:14;31:4;32:14;
41:11;73:12,20;82:22
**good (43)**
7:2,13;9:17,22;
10:23;11:15;12:15;
13:13,25;14:11;20:5,9,
10,19;21:9,23;23:4;
26:21;29:22;30:7,14,
19;31:3;33:9;46:23;
47:3;50:21;51:6;52:15;
54:10;59:22;60:24;
64:11,14;66:1;68:16;
69:7;74:4;75:22;78:11;
83:17;84:7,13
**goof (1)**
36:10
**goofed (1)**
36:16
**gorilla (1)**
77:3
**Gotcha (4)**
12:9;15:15;21:4;
57:7
**grab (1)**
72:6
**Grabbed (3)**
71:7,8;74:15
**graduate (2)**
12:13,18
**GRAHAM (5)**
4:2,8,10;52:20;77:13
**G-R-A-H-A-M (1)**
4:11
**Great (2)**
9:23;21:3
**groped (6)**
70:4,5,11,25;71:1,2
**ground (4)**
4:16;34:14,23;36:5
**grow (1)**
11:21
**guess (16)**
8:15;21:24;26:11;
30:20,25;31:10;38:18;
47:10;48:24;56:7;
57:25;69:4;71:13,15;
73:21;84:2
**guys (20)**
19:21;21:7,10,13,18,

18;22:23;28:19;59:18,
20;61:18;64:25;65:1,6;
71:17;74:24,24;75:22;
76:12;85:20

## H

**hair (1)**
68:18
**half (1)**
43:5
**half-hour (1)**
30:21
**hand (3)**
34:7;70:13,25
**handful (6)**
30:20;47:17,20,21;
62:1;74:7
**hands (2)**
45:24;53:12
**hang (1)**
35:9
**happen (3)**
32:21,22;83:12
**happened (12)**
6:17;36:12,14;38:9,
10,11;44:14;51:4;63:1;
65:13;66:16;74:6
**happening (1)**
33:5
**happens (6)**
28:7,24;30:1,8;
37:18;59:24
**happier (1)**
19:11
**happy (3)**
17:3,4;83:19
**harassed (4)**
83:20,21,22,23
**harassing (1)**
79:9
**hate (1)**
84:18
**head (7)**
5:13;8:3;48:15;50:9;
67:23;70:16;83:5
**headlights (1)**
50:13
**health (15)**
22:15,22,23;23:6,14;
24:7,15;25:7,18;26:24,
25;27:12;66:12;67:7;
83:2
**hear (7)**
17:4,4;36:9;39:21;
54:4,5;61:2
**heard (4)**
61:4,10;69:15;76:13
**hearing (1)**
40:4;43:3
**heart (1)**
20:10
**help (1)**

4:16
**hence (1)**
16:24
**here's (1)**
5:5
**heroin (1)**
55:15
**herself (1)**
7:10
**hey (5)**
31:13;36:7;61:1;
75:16;82:10
**high (2)**
12:10;13:19
**history (3)**
19:9;76:16,17
**hmm-hmm (1)**
5:9
**Hold (3)**
33:15;34:8,12
**home (7)**
14:8,10;16:15,18,24;
56:1,19
**homes (1)**
63:12
**hon (1)**
38:6
**honest (1)**
66:24
**honey (1)**
24:20
**hope (1)**
77:13
**hopefully (4)**
4:17;6:22;19:10;
77:11
**hours (3)**
62:15,16;64:9
**How's (1)**
4:23
**human (1)**
67:4

## I

**ID (6)**
62:5,6,6,7,9,13
**identify (1)**
47:5
**IDs (1)**
30:18
**iffy (1)**
24:24
**ignorance (1)**
57:1
**Illinois (3)**
11:22;13:4,5
**image (2)**
48:9;84:25
**imagine (1)**
4:20
**impersonating (1)**
18:20

**impressing (1)**
38:16
**impression (2)**
72:22;73:24
**incident (20)**
7:15;9:25;10:8,21;
11:9,11,12,13;21:18;
28:4,4,20;32:23;62:16;
66:3;76:2,22;78:24;
83:8,23
**incidentally (1)**
69:19
**income (1)**
16:12
**infant (1)**
52:22
**information (2)**
30:9;80:19
**initial (1)**
4:10
**injuries (3)**
26:7;27:13,13
**injury (1)**
26:13
**innocence (1)**
57:11
**inside (1)**
40:25
**insights (2)**
6:17;73:23
**insinuation (1)**
69:9
**instantly (1)**
35:2
**instead (2)**
33:13;35:10
**instruct (1)**
27:23
**intent (1)**
23:19
**interact (1)**
72:21
**interrupt (3)**
20:16;37:19;79:16
**interrupted (3)**
27:4,24;38:5
**intimate (1)**
78:18
**into (14)**
6:17;16:20;18:6;
19:24;21:6;29:10;
35:21;39:8;40:23;47:2;
51:2;61:19;69:16;78:1
**involve (1)**
17:12
**involved (2)**
68:19;76:4
**issue (6)**
14:9,13;16:23;73:18,
21;74:21
**issues (5)**
22:22,23;24:7;66:13;
77:20

## J

**January (1)**
24:14
**Jeep (1)**
28:11
**job (3)**
10:24;12:4;85:17
**jobs (1)**
15:17
**jogging (3)**
43:22,24;44:3
**Johnson (1)**
52:18
**joined (1)**
60:16
**joke (1)**
68:4
**judge (3)**
5:24,25;6:6;18:21
**jumped (1)**
34:25
**jumpy (1)**
83:10
**justice (2)**
18:9,11

## K

**keep (8)**
22:16,17;24:12;
58:23;64:14;66:12;
77:14;79:16
**kids (10)**
20:12;24:20;52:14,
15;53:5;59:1;68:17,20;
81:16;83:18
**kind (39)**
9:14;11:1;22:23;
24:23;27:15;30:1;34:6,
7;35:12;40:4;42:7,7,
15;43:25;45:2,17,19,
22;46:13;48:7,8,13;
50:18,23;57:12;58:15,
24;61:15;66:12;69:16,
19;70:12;72:21;73:17;
74:13;75:18;76:5;
82:10;83:24
**King (4)**
52:18;80:17,21,25
**knew (1)**
45:14
**knowing (2)**
22:9;72:21
**knowledge (4)**
10:17;27:15;55:6;
76:22
**known (2)**
22:4,4
**knows (2)**
29:25;68:3

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

LETIKA GRAHAM
January 28, 2020

## L

lack (1)
60:7
landed (2)
17:2,3
lapses (1)
5:17
last (5)
4:10;8:15;14:24;
23:20;66:6
lasted (3)
37:11,13,24
late (3)
44:15;56:22;60:4
law (1)
75:10
lawsuit (3)
6:12;74:25;75:23
Lawsuits (1)
76:8
lawyer (2)
76:3,4
lean (2)
45:8;51:19
learn (4)
23:11,20,23;24:13
learned (3)
24:7,15;25:6
learning (1)
23:13
least (8)
25:6;26:22;37:22;
43:3;59:2;60:21;63:19;
67:21
leave (2)
32:7;59:23
leaves (2)
31:14;32:3
left (10)
33:7;34:24;40:17,18;
43:19;45:21,22;47:8;
49:1;61:25
leg (1)
43:4
legs (7)
41:18;42:5,15,23;
43:1,2,3
length (1)
38:1
less (3)
16:25;73:25;74:8
LETIKA (5)
4:2,6,8;20:15;85:6
L-E-T-I-K-A (1)
4:8
level (3)
73:18,20,24
license (5)
12:20;62:7;63:24,25;
64:2
life (6)

4:17,17,25;11:18;
19:25;76:9
light (2)
50:17,19
lights (3)
28:13;39:10;49:21
limit (1)
17:13
listen (1)
21:2
little (19)
11:5,16;16:2,25;
29:22,25;37:16,17,19;
46:11;48:16;49:16;
51:15,17;52:5;54:2;
57:11;79:3;84:3
lived (1)
11:17
long (10)
13:7;14:3;18:6;
30:15,18;36:21;48:22;
62:12;75:20;77:14
look (3)
7:14;81:3,4
looked (6)
10:5;33:14;34:19;
45:20;48:13;52:1
looking (6)
35:12;39:6;41:13;
51:21;55:13,15
looks (1)
48:17
lost (2)
63:23,24
lot (6)
12:6;24:22,22;61:3,
4;77:18
loud (1)
5:16
love (1)
14:10
loves (4)
20:10,12;83:18,18
loving (1)
14:11
low (1)
41:18
lower (1)
43:5
LPN (1)
12:24
luck (1)
13:14

## M

major (1)
15:15
makes (5)
6:2;18:15;53:3;
68:17;83:19
making (2)
13:19;70:20

man (2)
70:3;72:13
man's (2)
70:2;71:10
marijuana (4)
56:12;58:22;59:5,7
math (1)
21:13
matters (1)
69:5
May (11)
6:18;7:3;13:20;
21:17;27:13;28:9;
30:14;54:7;65:21,24;
69:14
maybe (10)
7:25;8:5;19:22;23:1;
25:11;36:24;37:2,6;
38:1;77:21
McCarter (31)
6:2;9:21;20:15,19,
21,24;21:2;27:2,7,20;
33:22,25;40:20;44:9;
57:8,19;64:16,20;
71:22,24;72:16;73:1;
75:9;77:8,13,17;78:6;
82:1;84:13;85:5,21
mean (13)
15:6;18:19;24:1;
26:16;28:5;32:19;
37:13;49:18;63:23;
66:22;70:7;75:4;83:9
meaning (4)
5:14;26:10,12;80:23
means (1)
26:14
meant (2)
34:12;71:14
media (1)
61:12
medical (3)
16:2;18:23;84:9
medication (1)
27:14
medications (2)
25:19,19
medicine (1)
84:8
meeting (1)
21:13
members (1)
72:9
memory (9)
12:3;36:20;37:22;
38:16,25;44:5;47:4;
48:14;74:10
men (2)
66:21;72:24
mental (15)
22:15;23:6,14;24:7,
15;25:7,17;26:13,23,
24;27:12;67:7;76:20;
77:20;83:2

mention (1)
81:2
mentioned (3)
67:25;77:23;79:1
mentioning (1)
55:14
messed (1)
16:21
middle (1)
4:10
might (9)
5:2,22;37:10;38:5,
19;40:1;44:19;46:10;
82:2
Mild (5)
56:22;57:1;58:13;
59:5,10
Milds (1)
56:14
mind (5)
11:21;17:17;19:10;
40:16;69:15
minor (2)
18:7;19:3
minute (1)
47:18
minutes (22)
8:5,6;16:17,17;
30:20,22,23;36:23;
37:5,7,12,14,15,24,25;
38:10,10,12;44:17;
62:1;64:14,21
mispronunciation (1)
85:12
miss (1)
76:25
missed (1)
60:5
moment (3)
20:24;30:15;53:20
moments (1)
78:18
mom's (1)
81:9
month (3)
23:12;24:14,20
months (5)
24:8,10,23;25:12;
38:7
moods (1)
83:9
more (12)
15:6;16:10;23:20,21;
38:16;44:14;49:18;
51:20;57:16;71:19;
83:9;84:3
morning (3)
38:15;65:19,20
most (1)
85:15
motion (1)
70:12
move (3)

11:24;12:5,6
moved (2)
12:7,21
much (12)
8:4;17:7,8;19:24;
27:1;38:6;48:6;51:7;
57:25;58:1;75:21;
82:14
multiple (4)
37:11,13,15,24
myself (1)
58:23

## N

name (2)
4:7,10
names (2)
52:16;85:11
narrative (1)
46:12
necessarily (1)
25:5
neck (3)
34:7;51:16;52:2
need (7)
6:3,7;38:13;64:11,
13,13,16
needed (2)
16:10;63:9
needs (2)
66:25;84:8
nervous (1)
83:11
news (2)
7:21,23
next (11)
28:7,24;30:8;51:4;
54:10,11;59:25;60:11;
62:8;63:20;64:1
nice (2)
16:15;29:17
night (6)
56:13;62:13;63:4,11,
21;65:16
Nike (1)
44:2
nobody (1)
68:3
nod (1)
5:13
nodding (2)
50:10;70:17
Nods (5)
48:15;50:9;67:23;
70:16;83:5
none (1)
25:22
normal (1)
74:3
nose (1)
64:13
nothing's (1)

61:18
**noticed (3)**
78:23;83:7,16
**notices (1)**
10:12
**November (3)**
12:2,21;16:21
**number (1)**
6:13
**nurse (1)**
13:23
**nursing (11)**
12:19;13:2;14:1,8,
10,14;15:13;16:15;
55:25;56:19;63:12

**O**

**object (4)**
27:2,21;71:22;72:16
**objection (9)**
5:24;6:1,3,4,8;27:6,
19,21;73:1
**objections (2)**
5:22;28:1
**observations (1)**
76:19
**observed (1)**
66:3
**obstruction (2)**
18:9,11
**obtained (1)**
64:2
**obviously (1)**
73:18
**occupied (1)**
52:11
**occurred (1)**
37:24
**occurring (1)**
8:18
**o'clock (1)**
65:21
**odd (1)**
15:16
**odor (1)**
57:14
**off (12)**
7:2,19;8:3,19;9:15;
39:10;42:16;49:1,21;
64:21;65:10;85:23
**offense (3)**
17:19,22;19:7
**offenses (1)**
19:3
**Office (2)**
6:13;75:5
**officer (28)**
9:2;28:25;29:3;
33:20;35:19;36:7;
39:16;41:21;42:6,24;
43:18,18;45:8;47:1;
48:5;49:5;53:23;54:12,

13,18;55:8;56:18;60:2,
9,18;61:24;64:5;80:21
**officers (1)**
39:21;80:11
**old (3)**
52:16,18;80:17
**once (3)**
22:1;36:3;48:25
**One (16)**
4:10,21;5:1;7:6;
22:20;35:19;40:5,9;
47:7,9;55:5;58:12;
62:22;76:18;80:11;
85:12
**ongoing (1)**
83:22
**online (2)**
7:16,20
**only (10)**
5:1;6:18;8:20;20:16;
23:7;44:21;45:17;
67:21;74:7;80:16
**open (1)**
41:16
**opened (1)**
35:5
**opportunity (4)**
7:14;12:4;77:9;85:7
**opposite (1)**
72:9
**option (2)**
85:13,16
**options (1)**
85:6
**ordered (1)**
39:8
**out (63)**
4:23;5:6,16;9:6,14;
10:13;18:25;19:16,19;
21:7;28:25;30:13;31:3,
13,16;32:1,9,13,16,25;
33:6,8,15;34:12,18,25;
35:6,8,9,9,17;36:4,6;
37:2,6,14;39:9,15;
41:19;42:23;43:16;
45:4,14,19,22;46:13,
14,18,19;47:4,14;
48:25;50:7,23;52:2;
53:24;59:24;60:1;
63:10;68:13;75:11;
77:11;79:23
**outside (9)**
27:15;39:6;40:24;
46:16;47:16,25;48:4,
19;49:9
**over (16)**
4:15;7:8;14:24;
28:17,19;29:1;35:20;
51:14,19;57:12;59:18,
20;66:23;68:9,12;77:8
**overview (1)**
11:1
**own (3)**

22:24;32:23;50:22

**P**

**painless (1)**
6:24
**pantomiming (1)**
34:2
**pants (4)**
43:23,24;44:3;45:2
**parallel (1)**
34:12,23;36:5
**park (1)**
23:20
**Parkland (3)**
13:6,7,8
**part (10)**
9:3;38:1;42:22;
45:10,20,24;57:1;66:6;
70:15;80:23
**partially (2)**
40:5,16
**particular (2)**
57:13;79:4
**particularly (3)**
71:18;72:2,8
**passenger (20)**
7:9;28:10;29:7,8,10,
15;32:3,7,12,15;33:4;
35:10;40:22;42:5;
47:15;51:13;54:14;
56:10;59:19;61:21
**passes (1)**
48:9
**passing (1)**
18:20
**past (7)**
23:23,24,25;24:8,10;
25:12;70:14
**pat (10)**
43:18;77:24,24;78:6,
13;82:7,11,12,18;83:3
**patch (1)**
19:23
**patdown (11)**
7:10;36:21;37:13,23;
38:24,25;39:4;41:4,13;
48:3;74:6
**path (1)**
45:23
**Patriot (1)**
28:11
**patting (2)**
41:24;42:6
**pause (2)**
30:14;64:23
**paused (1)**
9:14
**Pay (1)**
16:4
**paying (1)**
26:3
**people (3)**

37:19;61:6;84:16
**Peoria (5)**
11:22,23;12:7,10;
18:14
**percent (1)**
5:3
**perch (1)**
51:16
**perching (1)**
52:2
**Perfect (5)**
4:12;6:11;13:7;
14:16;19:2
**perfectly (3)**
8:13;26:2;32:1
**performed (1)**
7:10
**period (2)**
63:3,25
**person (9)**
4:21;20:9;68:16,20,
21;69:7;71:21;81:23;
83:17
**personal (8)**
19:24;21:7;22:22,23;
32:23;58:20;61:3,5
**personally (3)**
10:18,19;23:7
**perspective (1)**
72:23
**phenomenal (1)**
85:8
**phone (14)**
32:19,24;33:8,10;
34:8;41:2,7,10,11;
84:23,25
**phrase (3)**
21:10;60:8;71:11
**physical (15)**
26:7,10,12,14,24;
27:13,13;37:13;39:4;
42:1;73:16,17,25;
76:20,21
**physically (4)**
34:3;39:13;47:16;
60:9
**Piatt (8)**
14:5,7,7;15:10,14;
16:1,14,15
**picture (1)**
84:24
**piddling (1)**
38:19
**pivot (1)**
46:15
**place (3)**
14:18;66:23;79:5
**plans (1)**
19:15
**plastic (1)**
57:21
**plates (3)**
29:16,16,18

**please (9)**
4:6;5:5,15;28:24;
31:16;36:7;42:2;43:11;
77:12
**pleasure (1)**
69:5
**pm (5)**
4:1;64:1,23,23;85:24
**point (15)**
4:24;8:17;9:8;11:23;
31:10,18;34:18;38:22;
42:12;48:3;51:8;53:16;
54:17;79:4;85:6
**pointed (1)**
20:21
**police (6)**
28:13,17;40:2;49:19;
83:10,13
**policy (1)**
59:2
**polite (1)**
5:4
**portion (1)**
7:25
**positive (2)**
25:13;68:17
**possible (1)**
5:22
**possibly (3)**
37:5;45:2;66:8
**precise (1)**
44:19
**prescription (1)**
25:19
**present (1)**
65:12
**preserved (1)**
6:5
**presumably (18)**
15:10;21:19;29:11;
42:16;46:13;50:12,15;
51:12;52:23;53:16;
59:24;61:12,18;64:25;
65:6,11;75:15;78:6
**Pretty (9)**
30:24;38:6;39:9;
48:6;49:8;50:2,15;
75:21;82:14
**previously (2)**
6:14;15:2;51:10
**private (1)**
22:17
**prn (1)**
16:5
**probably (11)**
8:7,11;11:10;17:7;
19:25;23:18;36:23;
47:11;61:15,25;63:19
**professional (1)**
85:16
**professionally (1)**
85:17
**Promise (1)**

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

LETIKA GRAHAM
January 28, 2020

21:6
**proof (1)**
26:3
**protested (1)**
60:8
**proximity (1)**
58:21
**pry (1)**
21:6
**psychiatrist (1)**
84:12
**psychological (1)**
22:5
**psychology (1)**
84:10
**pull (2)**
28:17,19
**pulled (6)**
7:8;59:18,20;68:9,
12,13
**pungency (1)**
57:14
**pure (1)**
57:11
**purposes (3)**
6:1;63:19;75:5
**put (4)**
5:21;21:13;32:16;
42:8

**Q**

**quick (6)**
6:23,23;11:4;14:2;
30:24;64:21
**quickly (2)**
20:15;61:15

**R**

**radar (1)**
5:21
**raise (1)**
34:23
**rarely (1)**
18:6
**rationale (1)**
54:24
**reaction (1)**
67:5
**read (4)**
9:25;10:1,7,8
**real (1)**
64:21
**realize (2)**
64:11;83:24
**realized (3)**
33:13;41:10;64:4
**really (30)**
4:20;8:7;16:15;
19:18;20:9;22:18;23:1;
26:25;31:6,9;51:23,24;
57:17;58:23;59:7;60:5;

63:9;66:22,22;67:1;
68:21,25;76:2,3;78:1;
79:24;83:10,11,21,21
**rear (1)**
70:15
**reason (5)**
32:24;45:4,21,21;
62:25
**reasonable (1)**
49:8
**recall (51)**
8:3,16,23,24;9:1,10,
12;13:3;17:18;18:13;
23:12,13;24:6;28:8;
30:15;31:15,17,23,25;
35:13;39:8,19,25;
42:20,21;43:21,22;
44:4;46:17;47:6;48:21;
50:5;54:11,15;55:13,
17,20,22;56:9,10;60:4,
9,12,15;62:12,17,18;
65:4;71:5;80:4;81:6
**receive (2)**
12:15;22:5
**received (1)**
22:10
**receiving (8)**
22:14;23:8,14;24:15;
25:6;67:5,6,13
**recently (1)**
75:14
**recognize (1)**
29:3
**record (8)**
5:7;6:2;34:4;42:1;
64:22;78:5;84:22;
85:23
**red (2)**
44:7;50:6
**reenacting (1)**
34:3
**REEXAMINATION (1)**
82:4
**refer (1)**
71:4
**refereeing (1)**
69:13
**referred (2)**
57:9,19
**referring (2)**
7:21;78:6
**regarding (1)**
77:19
**regardless (1)**
54:16
**regards (1)**
22:3
**Rehab (3)**
14:1,14;15:13
**rehire (2)**
14:24;15:2
**relationship (5)**
11:5;12:4;19:11;

76:18;78:17
**relatively (1)**
6:23
**relay (1)**
80:19
**relevant (1)**
19:25
**remain (1)**
32:6
**remember (14)**
9:2;31:6,9,12;44:10,
12;53:21;55:22;56:10,
13;62:23;79:24;80:3,9
**remembering (1)**
67:14
**remove (2)**
39:1,3
**report (1)**
63:6
**reporter (5)**
4:7,18;9:18;85:8,17
**reporter's (1)**
4:16
**representing (1)**
6:15
**resembling (1)**
81:17
**resist (1)**
5:8
**respect (1)**
22:19
**respective (1)**
66:12
**response (1)**
49:8
**rest (2)**
61:16;65:14
**restate (1)**
27:5
**returning (1)**
30:16
**review (3)**
76:14;85:7,13
**re-watched (1)**
31:8
**right (64)**
4:6;5:19,24;7:2,13;
10:23;11:15;12:23;
13:13,21;16:19;19:2,6,
8,23;20:3,11;21:15;
23:2,8;24:3;25:8;
28:17,19;30:7;33:9;
34:25;35:2;38:25;40:8,
8,14;42:14;44:16;
47:12,23;50:7,8;52:3;
55:4;56:6,20;58:4;
59:8,16,22;60:10,25;
61:22;62:2;63:4;65:2;
66:25;67:14;68:5;
69:10;75:9,15;76:23;
79:4,18;81:9;84:7;
85:21
**road (3)**

6:5,6;28:23
**roadmap (1)**
11:2
**rough (1)**
19:23
**roughly (4)**
30:15;36:21;62:12;
72:20
**roundabout (1)**
36:24
**routine (1)**
11:3
**rub (1)**
46:2
**rubbing (1)**
45:19
**rules (2)**
4:16;5:24
**rundown (1)**
53:10
**running (1)**
60:4
**rush (1)**
20:25

**S**

**safe (1)**
53:2
**sale (1)**
15:21
**same (4)**
29:12;51:9;54:13;
73:1
**sandwiches (1)**
13:19
**save (1)**
5:4
**saw (35)**
8:17,25;10:19;29:24;
32:9;33:14;34:11,12,
17,21,22;35:1,14;
36:19;38:22;39:10;
40:23,24;42:5,6,23;
43:12,12,16,17;44:6,
18,18,20;45:10,13,18;
46:12;48:5;61:6
**saying (14)**
4:19,19,21;21:12;
24:6;31:17,23;38:1,4;
39:22;40:9;55:20;
68:11;81:6
**scene (2)**
47:12;65:7
**scent (1)**
56:12
**school (2)**
12:10;13:19
**science (1)**
4:24
**scope (1)**
61:10
**screen (1)**

18:25
**scrolled (1)**
10:4
**search (53)**
7:10;35:13,15;36:20,
21,21;37:11,12,19,23;
38:2,3,23,24,25;39:5;
41:14,14;42:11;45:24;
46:3,8;47:8;48:2,3,18;
51:20;53:15,16,21,23,
24;54:5,19;55:5;56:9;
59:23;60:3,10,18,22;
61:10,16;69:17,24;
70:6;73:15,16;79:2,5,9,
10,15
**searched (10)**
7:9;55:11;68:14;
69:18;79:11,20,21,22;
80:12,22
**searching (7)**
32:10;33:18;35:24;
39:17;45:8;54:25;55:8
**seat (23)**
28:10;32:3,7,12,15;
33:4;40:22;42:17;
51:13,15;52:7,10;53:1;
56:10;59:19;61:21;
79:21;80:22,23,24,25;
81:3,5
**seats (1)**
52:24
**second (9)**
13:9;30:17;31:4;
32:12;51:21,25;52:1;
53:7;84:17
**seconds (2)**
47:18,20,21;48:1,4
**seeing (8)**
9:10;19:13,21;42:11;
49:11;50:19;52:4;
72:21
**seem (2)**
38:19;40:12
**seems (2)**
82:11,14
**sees (1)**
83:10
**semester (1)**
13:9
**sense (5)**
6:9;11:13;18:15;
19:22;37:15
**sensitive (5)**
64:19;71:17,18;72:2,
8
**separate (1)**
49:13
**serious (2)**
10:11;23:1
**setting (1)**
13:16
**seven (1)**
52:18

**seven-year-old (1)**
53:1
**sex (1)**
72:9
**share (1)**
78:18
**sheet (1)**
85:14
**Sheriff's (2)**
6:13;28:15
**shift (8)**
62:18,19;63:10,11,
17;65:17,20,21
**short (1)**
75:20
**show (2)**
5:15;56:22
**showed (1)**
56:23
**side (8)**
28:23;29:5,8,15;
31:4;35:19;42:8;54:14
**signature (2)**
85:18,22
**signifying (2)**
28:16,16
**similar (1)**
25:17
**simply (1)**
4:25
**sin (1)**
10:7
**sirens (1)**
50:6
**sit (3)**
6:21;10:16;37:22
**sitting (1)**
80:25
**situation (2)**
67:18;84:1
**six (3)**
24:8,23;25:12
**slid (1)**
46:5
**smell (4)**
56:11;58:8,14,22
**smelled (3)**
55:2,21;58:3
**smells (3)**
58:6,11;59:8
**smoke (10)**
56:12,12,14,16;58:8,
11,22;59:5,5,7
**smoked (3)**
57:24;58:12,13
**smoking (3)**
56:17,22;59:17
**smoky (1)**
58:14
**someone (2)**
19:6;47:5
**something's (1)**
83:12

**sometime (1)**
63:20
**sometimes (2)**
30:1;69:23
**somewhere (1)**
36:10
**son (1)**
76:12
**soon (3)**
34:21,22;35:1
**sorry (16)**
9:17;14:12,21;26:17;
27:3,7,24;30:4;34:19;
40:12,19;43:11;47:22;
57:11;79:16;84:17
**sound (5)**
21:14;23:2;44:19;
62:2;63:3
**sounds (15)**
7:24;10:15;17:3;
25:4,10;26:21;27:10;
37:9,25;42:4;44:18;
51:25;59:6;76:22;83:1
**source (1)**
10:17
**speak (4)**
5:7;27:1;66:8,15
**Speaking (6)**
5:11;29:10,12,13;
53:4;57:11
**specific (11)**
24:17;43:25;55:14,
14;63:2;70:6,7,21;
82:13;83:23;84:3
**specifically (1)**
71:15
**specifics (1)**
69:16
**speculate (2)**
6:20;48:24
**speculation (1)**
72:17
**spell (1)**
4:7
**spellings (1)**
85:11
**spend (1)**
77:18
**spoke (2)**
67:16;76:3
**spoken (1)**
67:22
**Spread (1)**
34:13
**squad (2)**
30:16;61:25
**squirrel (1)**
48:9
**stable (1)**
16:10
**staffing (1)**
16:2
**stand (1)**

85:18
**standing (9)**
35:18,20;39:7;46:19,
22,24;48:5;49:13;
60:25
**start (5)**
11:15;22:14;34:22;
41:13;46:24
**started (17)**
6:25;14:4,16,18,22;
16:1;25:5;33:8;34:23;
38:2;60:2;62:18,19;
63:10;65:21;67:12;
79:2
**state (1)**
4:6
**statement (1)**
63:1
**step (14)**
9:6,13;30:13;31:3,
13,16;33:20;34:18;
36:6;46:13;50:7,23;
53:24;79:23
**stepped (12)**
32:25;33:6,8,15;
35:5,8;36:4;43:16;
45:14;59:24;60:1,15
**steps (2)**
32:13,15
**still (14)**
6:3,6;16:4;32:2;
40:2;46:20;52:3;53:1,
2;71:25;72:18;83:17,
17,18
**stood (1)**
42:3
**stop (8)**
6:18;7:3,4,6;28:5;
63:1;66:16;67:22
**stopped (2)**
8:1;48:18
**straight (1)**
35:12
**strawberries (1)**
58:5
**strictly (1)**
38:23
**stuff (8)**
5:11;11:3;22:17,21;
23:7;34:3;58:24;77:25
**subject (7)**
10:21;11:8,11;28:3,
4;66:3;76:22
**submit (1)**
85:14
**subpoena (1)**
76:12
**substance (2)**
75:23;85:10
**Subway (1)**
13:19
**successfully (2)**
64:2;65:7

**suddenly (1)**
28:13
**suffered (1)**
26:7
**summarize (3)**
25:10;42:4;61:15
**supposed (4)**
33:18;35:23;39:17;
83:13
**Sure (56)**
7:17;14:11;16:7,9,
11,16;18:4,8;19:18;
20:6;24:25;25:1;26:15;
30:18;31:7;39:12,14,
19;40:3;41:7,23,25;
42:25;45:12,15;46:4;
47:22;48:23;49:20;
50:1;51:16;52:10;
56:24;57:25;59:12,15;
63:8,14;67:11;68:7,15;
69:25;70:20;71:5,15;
72:7,15,19;73:8,10;
75:2;76:6;80:15;82:23;
84:2,18
**suspect (1)**
25:11
**suspended (1)**
29:17
**sworn (1)**
4:3

T

**talk (9)**
5:1;10:25;11:5,8;
17:23;22:25;23:1;
74:18;75:22
**talked (9)**
28:5;67:5;74:6;
76:14,15,16,18,21;
82:12
**talking (13)**
7:4;9:9;29:8;37:18;
38:2;51:9;64:12;69:5;
71:6;76:2;77:19;78:9;
82:10
**talks (1)**
67:2
**tastes (1)**
58:1
**teacher (1)**
84:15
**teachers (1)**
84:13
**tee (1)**
28:6
**telling (3)**
80:11;84:4,5
**tells (2)**
36:7;47:14
**ten (2)**
65:21;77:3
**term (1)**

26:11
**testified (3)**
4:3;66:11;77:18
**testify (3)**
10:18;26:23;54:3
**testifying (1)**
48:17
**testimony (6)**
23:9;25:10;77:15;
85:9,10,13
**that'd (1)**
21:3
**thereabouts (1)**
65:24
**thinking (2)**
43:4;83:20
**third (1)**
63:17
**though (6)**
14:10;31:10;63:17;
72:9;75:14;76:12
**thought (2)**
8:15;56:23
**thoughts (2)**
21:25;36:3
**three (3)**
37:2,6;38:10
**throughout (2)**
22:9;23:18
**thumbs (1)**
26:4
**ticket (2)**
65:1,4
**times (3)**
23:18;63:6;74:7
**tip (2)**
57:6,21
**Titan (1)**
52:20
**today (8)**
6:16,22;10:16;37:23;
69:6;76:7;77:15;78:24
**together (6)**
19:22;20:7;21:11,11,
19;22:24
**told (7)**
29:18;35:23;47:1;
49:1;50:24;61:9;67:25
**took (2)**
62:7;79:5
**top (1)**
8:3
**topic (2)**
19:11;27:1
**Torso (4)**
43:8,13;45:20;53:10
**touch (3)**
39:11;72:24;73:17
**touched (3)**
67:2;72:9;79:13
**touching (4)**
66:21;70:3;71:17;
72:13

**towards (2)**
46:15,24
**traffic (11)**
6:18;7:3,4,6;18:7;
19:3,7;28:5;63:1;
66:16;67:22
**transcript (3)**
5:15;85:7,18
**Transportation (2)**
14:8,12
**travel (2)**
16:6,25
**treat (1)**
68:9
**treatment (7)**
26:24,24,25;27:12,
12;77:19,21
**trial (1)**
5:23
**tried (3)**
14:9;56:17;76:11
**tries (1)**
22:16
**truck (1)**
49:18
**trunk (1)**
80:23
**trust (1)**
85:16
**truth (1)**
6:21
**try (16)**
4:25;5:8;6:23;11:4;
23:19,19;25:10;27:5;
28:6;42:2;44:17;58:23;
69:22;74:17,17,17
**trying (17)**
4:22;19:19;26:17;
32:17;38:21;41:1,1;
45:8;46:11;51:14,16;
53:15;64:19;66:8;
76:13;79:7,16
**T-shirt (1)**
45:3
**turn (7)**
28:3;32:16;36:8;
41:13;46:15;51:2;77:8
**turned (7)**
7:19;8:19;9:15;35:4,
5;39:15;48:19
**turning (4)**
33:12,12;34:6;45:7
**two (13)**
19:14,16,16;21:11,
12;23:21;47:12;62:22;
72:20,20;79:21;84:6;
85:6
**type (8)**
22:5,15,17;23:14;
55:21;56:11;57:13;
83:19

## U

**uh-huhs (2)**
5:11;10:24
**ultimately (2)**
55:4;64:8
**um-kays (1)**
5:11
**uncannily (1)**
12:3
**unclear (1)**
79:3
**under (2)**
31:18,24
**understands (1)**
77:25
**Understood (6)**
7:20;10:12,15;20:14;
60:7;67:4
**unnecessarily (1)**
44:19
**unobstructed (1)**
49:14
**unpack (2)**
32:11;54:1
**unto (1)**
4:24
**up (33)**
5:15;6:20;9:8;11:9,
21;15:13,20;16:21;
23:1;26:4;28:6;29:14,
25;30:4;35:8;39:24;
42:3,6,11,17;43:12,12,
13;44:18,21,22,25;
45:8;46:19,22;48:13;
52:3;54:2
**upset (7)**
54:17;60:2,12,14;
79:2,4,24
**upsets (1)**
74:18
**upside (1)**
70:12
**Urbana (5)**
11:24;14:1,13;15:12,
20
**Urbana-Champaign (1)**
11:17
**urge (1)**
5:8
**use (3)**
21:10;70:25;71:6
**using (1)**
26:11
**usually (1)**
63:11

## V

**vantage (4)**
38:22;42:12;48:3;
51:8

**VAYR (18)**
4:5;21:5;27:5,8,9,19,
25;28:2;57:10;64:24;
77:7;78:4,9,11,14;82:2,
5;85:4
**vehicle (46)**
9:6,13;16:21;29:1,5;
30:10,13;31:16;32:9,
25;33:6,15;35:1,6,8,11,
15,17,21;36:4,6,8;37:2,
6;39:16;41:19;43:14;
44:23;45:1,5;48:25;
49:19,19;53:24,25;
55:3,6,8,9,10;60:3,19,
23;79:10;81:12,14
**venture (1)**
80:16
**video (15)**
7:16,24;8:1,4,15,17;
9:10;10:1,5;31:8;
32:22,23;61:6,11;
84:22
**view (2)**
7:18;43:17
**violated (4)**
66:18;68:1,22;74:15
**violations (1)**
18:7
**vision (1)**
42:19
**visual (1)**
51:20

## W

**waist (7)**
43:6;44:21,21,22,25;
45:23;52:3
**wait (2)**
33:22;40:20;64:7
**waive (2)**
85:18,21
**walk (2)**
35:11;46:24
**walked (1)**
28:25
**walking (3)**
24:12;31:1;46:14
**walks (1)**
30:9
**waste (1)**
19:5
**watch (6)**
7:24;32:17;51:5;
60:18,20,21
**watched (2)**
8:4,20
**watching (4)**
8:1;41:12;51:10;
53:20
**way (10)**
35:11;46:18,19;47:4;
56:17,21;60:14;62:17;

70:3;83:24
**weapon (1)**
81:18
**weapons (1)**
81:10
**wearing (1)**
43:21
**week (2)**
14:24;15:11
**well-being (1)**
76:20
**weren't (7)**
39:17;41:6;55:2,5,7;
61:9;65:12
**what's (4)**
32:17;73:6;75:17;
85:14
**whenever (1)**
16:5
**whole (4)**
11:17;35:14;43:17;
85:13
**who's (2)**
75:9;80:17
**willing (1)**
62:24
**window (7)**
29:10,15;39:10;
49:12,16,24;50:4
**windows (2)**
39:24;40:1
**wings (1)**
34:14
**wish (1)**
13:13
**within (12)**
23:20,23;24:5,7,13,
13;25:12;26:8,8;42:12;
64:8;73:17
**without (3)**
28:20;62:13;63:24
**witness (12)**
9:23;11:4;20:18,20,
23;21:1,4;33:24;76:10;
78:8,10,12
**witnessing (1)**
41:14
**woman (2)**
70:2;71:10
**word (2)**
29:19,19
**words (2)**
5:12;71:5
**work (19)**
13:25;14:12;15:2,4;
16:8;19:19;24:22;
44:15;55:25;56:18,21;
60:3,6;62:17;63:7,12;
65:8,10,12
**worked (2)**
14:3;63:17
**working (8)**
14:4,5,17,18,22;20:4,

13;21:7
**works (1)**
75:10
**world (1)**
5:19
**worried (1)**
83:12
**worries (1)**
56:2
**worry (1)**
56:5
**worth (1)**
17:5
**write (1)**
29:25
**writing (1)**
14:2
**wrong (3)**
19:21;22:21;52:1
**Wylesha (27)**
6:12;7:8;28:11;
29:13,15;30:12;31:2,
12;32:1,3,13,14,15;
33:5;34:11;35:17;
37:14;39:21;54:6;
55:10;61:21;79:9;
77:19;78:17;81:18,20;
82:7
**Wylesha's (2)**
31:18;36:6

## Y

**year (16)**
13:10,10;17:18,20;
18:3,4;19:16,16;23:12,
23,24,25;24:1,4,5;38:9
**years (8)**
19:14;21:11,12;
23:22;52:18;72:20,20;
84:6

## Z

**zero (2)**
84:25;85:2

## 1

**10:00 (4)**
62:20,21;63:12,21
**100 (1)**
5:3
**11:00 (2)**
62:22;63:13
**16 (1)**
15:6
**17 (1)**
15:9
**18 (2)**
15:9,9

**2**

**2:56 (1)**
  4:1
**20 (2)**
  16:17,17
**2006 (2)**
  18:3,4
**2009 (1)**
  18:4
**2015 (6)**
  11:25;12:1,2,5,20;
  15:5
**2017 (6)**
  15:3,4,5,6,7,11
**2017ish (1)**
  21:14
**2018 (1)**
  15:23
**2018ish (1)**
  21:14
**2019 (9)**
  6:18;7:3;13:10;
  14:19;15:13;21:17;
  24:2,4;28:10
**2020 (2)**
  13:11;15:1
**24 (4)**
  16:17;62:15,16;64:8

**3**

**3:45 (1)**
  64:23
**3:46 (1)**
  64:23

**4**

**4:04 (1)**
  85:24

**6**

**6:00 (2)**
  65:18,22

**7**

**7:00 (2)**
  65:19,22

**8**

**8th (5)**
  6:18;7:3;21:17;28:9;
  65:21

**9**

**9:30 (3)**
  63:2,21;64:1

**9:40 (1)**
  63:2
**9:50 (1)**
  63:2
**9th (1)**
  65:24