**In The Matter Of:**

*AYRES v.*
*SHERIFF DEPUTIES CODY CHRISTENSEN, et al.*

---

*SHANE COOK*
*March 10, 2020*

---

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Exhibit G

Original File 0310coos.txt
Min-U-Script® with Word Index

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                  URBANA DIVISION

 3
   WYLESHA AYRES,
 4               Plaintiff,

 5        -vs-          No. 19-cv-2148

 6 SHERIFF DEPUTIES CODY
   CHRISTENSEN and CORY FLOYD,
 7 CHAMPAIGN COUNTY SHERIFF'S
   OFFICE, and CHAMPAIGN
 8 COUNTY, ILLINOIS,
                Defendants.
 9

10

11

12

13        DEPOSITION OF CAPTAIN SHANE COOK

14              MARCH 10, 2020

15                1:30 P.M.

16

17

18

19

20        Shelley L. Marvin:  CSR# 84-003926

21   Area Wide Reporting Service & Video Conferencing
              301 West White Street
22           Champaign, Illinois  61820
                (800) 747-6789
23

24

25
```

Page 2

```
 1                     INDEX

 2 APPEARANCES:

 3 For the Plaintiff:
          Matthew J. McCarter
 4        NATHAN & KAMIONSKI, LLP
          33 West Monroe Street
 5        Suite 1830
          Chicago, Illinois  60603
 6        Email:  mmccarter@nklawllp.com

 7
   For the Defendants:
 8        Bryan J. Vayr
          HEYL ROYSTER
 9        301 North Neil Street
          Suite 505
10        Champaign, Illinois  61820
          Email:  bvayr@heylroyster.com
11

12

13 EXAMINATION BY:                      PAGE

14     Mr. McCarter                   4, 180
       Mr. Vayr                     124, 193
15

16 EXHIBITS:

17        Exhibit No. 1                 93
18        Exhibit No. 2                107

19

20

21

22

23

24

25
```

Page 3

```
 1          Deposition of CAPTAIN SHANE COOK, taken

 2 on behalf of the Plaintiff at 301 North Neil

 3 Street, Suite 505, Champaign, Illinois, at

 4 1:30 P.M. on March 10, 2020, before Shelley

 5 Marvin, CSR in and for the State of Illinois, CSR

 6 License No. 84-003926.

 7    Deposition taken pursuant to the evidentiary

 8 provisions of the Illinois Code of Civil Procedure

 9 and the Rules of the Supreme Court promulgated

10 pursuant thereto.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1       (Whereupon the deposition commenced at
 2 1:31 P.M.)
 3          CAPTAIN SHANE COOK,
 4 the deponent herein, called as a witness, after
 5 having been first duly sworn, was examined and
 6 testified as follows:
 7       MR. McCARTER: This is the deposition of
 8 Captain Shane Cook in the U.S. District Court for
 9 the Central District of Illinois, 19-cv-2148,
10 Wylesha Ayres versus Champaign County Sheriff's
11 Office, et al.
12          EXAMINATION
13 BY MR. McCARTER:
14    Q.   Good afternoon, Captain.  I know I just
15 introduced myself.  But for the record, my name is
16 Matthew McCarter.  I represent the Plaintiff
17 Wylesha Ayres in this case.
18       First, before we get started, have you
19 given a deposition before?
20    A.   I have.
21    Q.   Okay.  So you're going to be pretty
22 familiar with the ground rules, but I'd just like
23 to go over them ahead of time just to make sure
24 that we're all on the same page.
25       If you can keep all of your answers out
```

Page 5

1  loud.  And what I mean by that is no shrugs of the
2  shoulders, no huh-uhs or uh-huhs or shakes of the
3  head.  That makes it a little easier for our court
4  reporter to take everything down.  As well, it
5  makes it easier for Bryan and I when we go back
6  and review the transcript in a few months here.
7  Does that make sense?
8    A.  It does.  And I'll try my best.
9    Q.  We'll be happy to remind you if you slip
10 up, but I have a feeling you'll be just fine.
11         Sometimes I do my best to ask a good
12 question, but I get a little lost in my words.  If
13 at any time you don't understand my question, feel
14 free ask me to rephrase it, and I'll do my best to
15 do so.  On the flipside of that, though, if you do
16 answer a question, I'm going to understand that
17 you understood the question.  Does that make
18 sense?
19   A.  It does.
20   Q.  Perfect.  The court reporter here is
21 taking down everything we say.  So we might get a
22 little conversational later where you're going to
23 know where I'm going with the question and want to
24 give me the answer ahead of time.  But just for
25 the sake of a clean record and she doesn't have to

Page 6

1  listen to two of us talking over each other, if
2  you wouldn't mind waiting for me to get my
3  question out and then give your answer.  And I'll
4  pay you the same courtesy by waiting for you to
5  give your answer before asking my next question.
6  Does that make sense?
7    A.  It does make sense.
8    Q.  And again, we're on your time.  If you
9  need to use the washroom, break, stretch your
10 legs, or if something comes up at work and you
11 need to step out to make a phone call, that's
12 fine.  We would be happy to take a break.  The
13 only thing we ask is that we don't take a break
14 when there's a question pending.  Does that make
15 sense?
16   A.  Absolutely.
17   Q.  Now, I have just some preliminary
18 questions that I ask everyone.  Are you under the
19 influence of any drugs or alcohol today?
20   A.  I am not.
21   Q.  Taking any medications that might effect
22 your memory?
23   A.  No.
24   Q.  Under a doctor's care for any continuing
25 or chronic illnesses?

Page 7

1    A.  No.
2    Q.  That's good.  Do you wear glasses?
3    A.  I do.
4    Q.  I see you don't have them today.  Do you
5  wear contacts?
6    A.  Contacts.
7    Q.  Okay.  Do you have your contacts in
8  today?
9    A.  I do.
10   Q.  Do you wear hearing aids?
11   A.  No, I don't.
12   Q.  Great.  Other than with your attorney,
13 have you discussed the facts of this case with
14 anyone?
15   A.  No, not the facts of the case.
16   Q.  Okay.  Have you discussed with anyone
17 other than your attorneys the fact that you're
18 giving a deposition today?
19   A.  Yes.
20   Q.  Okay.  Who was that?
21   A.  The Sheriff.  So my boss.
22   Q.  Okay.
23   A.  As well as I've mentioned it to Deputy
24 Christensen and the lieutenant of patrol.  His
25 name is Tony Shaw.

Page 8

1    Q.  Can you spell Shaw for me?
2    A.  Yeah, it's S-h-a-w.
3    Q.  And you said Mr. Shaw is a lieutenant of
4  patrols?
5    A.  Lieutenant of patrol.
6    Q.  Okay.  Let's start with the Sheriff.
7  What did you discuss with the Sheriff when talking
8  about your deposition here today?
9    A.  Basically he's aware that I've done some
10 meetings with counsel, as well as today was the
11 day for the deposition and kind of the time.
12   Q.  Date and time?
13   A.  Date and time.
14   Q.  Okay.  Anything else with the Sheriff
15 regarding your deposition today or the facts of
16 this case?
17   A.  No.
18   Q.  What about with Lieutenant Shaw, what
19 have you discussed with him?
20   A.  Pretty much the same.  He knows the date
21 and time.  He understood who was involved in the
22 case.
23   Q.  All right.  In preparing for your
24 deposition today, did you review any documents or
25 video?

Page 9

1   **A.   Yes.**
2   Q.   And let's start with documents.  Can you
3   tell me which documents you've reviewed?
4   **A.   Sure.  I reviewed a citation that was**
5   **generated by Deputy Christensen.  And**
6   **documentation for me, audio and video recording, I**
7   **include the body camera footage.**
8   Q.   Okay.
9   **A.   So I have reviewed that, as well.**
10  Q.   The citation -- I just want to make sure
11  we're on the same page -- would that be the
12  citation issued to Wylesha Ayres on May 8th of
13  2019?
14  **A.   Yes.**
15  Q.   Okay.  And the body-worn camera, did you
16  review body-worn camera from Deputy Christensen on
17  May 8, 2019?
18  **A.   Yes.**
19  Q.   Did you review body-worn camera from
20  Deputy Floyd on May 8, 2019?
21  **A.   I have.**
22        MR. VAYR: If I may.  I apologize.  I
23  think the way the question was phrased, it was
24  asking whether you reviewed the video on May 8th,
25  2019.  I think you were saying that you had

Page 10

1   reviewed the video that was generated on that date
2   by Floyd and Christensen; is that correct?
3        THE WITNESS: That is correct, yes.
4   BY MR. McCARTER:
5   Q.   So you didn't review any video footage
6   of the incident on May 8, 2019?  You reviewed
7   video footage of the incident from May 8, 2019; is
8   that a fair characterization?
9   **A.   That is accurate, yes.**
10  Q.   Okay.  Captain, have you seen any news
11  articles or reporting about the facts underlying
12  this case?
13  **A.   No.**
14  Q.   Okay.  And so on the same token, I take
15  it you haven't heard anyone discuss any news
16  articles or media publishings about the facts of
17  this case; is that fair?
18  **A.   Yeah, no.**
19  Q.   Just some background information.  Can
20  you tell me how old you are today?
21  **A.   I'm actually 45.**
22  Q.   And just for identification purposes,
23  can you tell me the last four digits of your
24  Social Security number?
25  **A.   6558.**

Page 11

1   Q.   And can you tell me what town you live
2   in?
3   **A.   St. Joseph, Illinois.**
4   Q.   Captain, where did you go to high
5   school?
6   **A.   I went to three different high schools.**
7   Q.   Lucky you.
8   **A.   So I graduated from Centennial High**
9   **School in Champaign, Illinois.**
10  Q.   What were the other two high schools
11  that you attended, but did not graduate from?
12  **A.   Little Rock, Arkansas.  Central High**
13  **School.**
14  Q.   And the second?
15  **A.   Warren High School in the city of**
16  **Warren, Arkansas.**
17  Q.   After high school, did you continue your
18  education?
19  **A.   I didn't.  I went in the military.**
20  Q.   What branch of the military?
21  **A.   Army.**
22  Q.   How long were you in the Army?
23  **A.   I was in there a total of eight years.**
24  Q.   What was the highest rank you achieved
25  while in the Army?

Page 12

1   **A.   Sergeant.**
2   Q.   Where did you do your basic training
3   while in the Army?
4   **A.   Fort Leonard Wood, Missouri.**
5   Q.   While in the Army, did you receive any
6   training in military policing?
7   **A.   Not in military policing.**
8   Q.   Okay.  Did you receive any training
9   while in the Army on policing practices in
10  general?
11  **A.   No.**
12  Q.   I take it you were honorably discharged?
13  **A.   I was.**
14  Q.   Do you remember when that was?
15  **A.   From active duty, October of 1996.**
16  Q.   Did you then, after your active duty,
17  enroll in the Reserves?
18  **A.   National Guard.**
19  Q.   National Guard.  Are you still a member
20  of the National Guard?
21  **A.   I'm not.**
22  Q.   Did you enroll in the National Guard
23  right after being discharged in 1996?
24  **A.   Yes.**
25  Q.   Okay.  And when did you end your

Page 13

1  association with the National Guard then?
2  **A.   2000.**
3  Q.   Did you receive any higher rank while in
4  the National Guard other than sergeant?
5  **A.   No, that was the highest rank.**
6  Q.   After being discharged from the Army in
7  1996, did you enter the work force?
8  **A.   I did.**
9  Q.   What did you do?
10 **A.   Actually installed fireplaces and**
11 **swimming pools.**
12 Q.   Fireplaces and swimming pools.  And what
13 company or organization was that for?
14 **A.   The first company was Bright Ideas.**
15 Q.   What was the second one?
16 **A.   Rasmussen Pool & Patio.**
17 Q.   Did you work both at the same time, kind
18 of a part-time for each?  Or did you work for one
19 and then end your employment there and move to the
20 second employment?
21 **A.   Yes.  So I worked for one, moved to the**
22 **second company while I was attending college.**
23 Q.   Okay.  You mentioned you attended
24 college.  Where did you go?
25 **A.   Parkland.**

Page 14

1  Q.   Did you graduate from Parkland?
2  **A.   I did not.**
3  Q.   After Parkland, did you attend any other
4  educational facilities?
5  **A.   I have over the course of my law**
6  **enforcement career.**
7  Q.   Okay.  We'll talk about that in a few
8  moments here.  But before beginning your career as
9  a law enforcement officer, other than Parkland,
10 did you attend any other colleges or universities?
11 **A.   No.**
12 Q.   Okay.  What did you study at Parkland?
13 **A.   CAD.  Computer-aided drafting.**
14 Q.   Now, after Parkland and working
15 installing fireplaces and swimming pools, did you
16 have any other employment?
17 **A.   I did.  I worked at Menard's.**
18 Q.   How long did you work at Menard's?
19 **A.   Year and a half, approximately.**
20 Q.   Can you tell me your job title, if you
21 recall it, at Menard's?
22 **A.   Yeah.  I was a building materials**
23 **estimator.**
24 Q.   Okay.  After Menard's, where did you
25 work?

Page 15

1  **A.   Actually Menard's, my next job was in**
2  **law enforcement.**
3  Q.   Okay.  Which department?
4  **A.   So I started at Parkland.**
5  Q.   Parkland, like a school officer?
6  **A.   Yeah.  So it's Parkland College, which**
7  **is a local community college.**
8  Q.   So what was your job title at Parkland?
9  **A.   Under them, they're called public safety**
10 **officials.  So public safety officer.**
11 Q.   I appreciate your patience as I take
12 some notes as we go along here.
13 **A.   No, that's fine.**
14 Q.   When did you start working as a public
15 safety officer at Parkland Community College?
16 **A.   January of 1999.**
17 Q.   Just stepping back for a few moments.
18 While working at Menard's for a year and a half as
19 a building materials estimator, did you have any
20 disciplinary issues?
21 **A.   No.**
22 Q.   While working installing fireplaces and
23 swimming pools before attending Parkland Community
24 College, did you have any disciplinary issues?
25 **A.   No.**

Page 16

1  Q.   As a public safety officer for Parkland
2  Community College, can you tell me what some of
3  your job responsibilities were?
4  **A.   Yeah.  I mean essentially it's law**
5  **enforcement.  You're just on the community college**
6  **campus.  So you're restricted jurisdictionally.**
7  Q.   If you can estimate for me, how big is
8  Parkland Community College campus?
9  **A.   Population-wise, they say they have**
10 **about 9,000 that are in and out of Parkland.**
11 **Acreage-wise, I'm guessing 100 acres.**
12 Q.   When you were hired on at Parkland as a
13 public safety officer, did you have to undergo any
14 training to begin your work?
15 **A.   I did.**
16 Q.   And where did you do that training?
17 **A.   University of Illinois Police Training**
18 **Institute.**
19 Q.   Okay.  If I refer to the Police Training
20 Institute as PTI, would you understand what I was
21 talking about?
22 **A.   I would.**
23 Q.   If you can remember, do you recall when
24 you started your classes at PTI as a public safety
25 officer for Parkland?

Page 17

1  A.  The dates, I can't give you.  I can give
2  you the months.  So January of '99 through
3  March of '99.
4  Q.  So it's about a three-month course?
5  A.  Yes.
6  Q.  Did you attend classes every day at PTI?
7  A.  Yes.
8  Q.  Do you recall some of the classes that
9  you took?
10  A.  A variety of classes.  A lot of them
11  revolved around constitutional law, state law.
12  Scenario-based training.  Control tactics.
13  Firearms training.
14  Q.  Do you recall some of the subjects that
15  were discussed in the con law class at PTI?
16  A.  A variety of kind of the gamut at that
17  time.  I don't recall everything in detail.
18  Q.  Okay.  Same question for the state law
19  class, do you recall some of the subjects that
20  were covered in the state law class at PTI?
21  A.  Yeah.  Mainly laws that applied to use
22  of force issues, search and seizure issues.  So
23  very general and basic law enforcement
24  requirements.
25  Q.  You mentioned scenario-based training.

Page 18

1  Can you tell me what scenario-based training
2  encompassed at PTI when you were there?
3  A.  Sure.  So they had a variety of
4  scenarios set up.  And those can range from a
5  traffic stop, simulated traffic stop to an actual
6  domestic incident to simple report taking.  Theft
7  of bikes, criminal damage to property type
8  scenarios where you're interacting and role
9  playing as the officer.
10  Q.  Now, when you're role playing as the
11  officer, who's role playing it as either the
12  civilian or the victim of any particular scenario?
13  A.  They had a variety of people.  Some, I
14  think they hired in civilians.  And then I also
15  think they used some of their staff at the time.
16  Q.  Okay.  You also mentioned control
17  tactics at PTI.  Can you tell me some of the
18  subjects that were covered in the control tactics
19  course in PTI?
20  A.  Sure.  They mainly focused on the actual
21  execution of an arrest.  And that went as far as
22  placing a subject in handcuffs and then searching
23  them incident to an arrest.  Maintaining safety
24  for all parties.
25  Q.  And lastly, you also mentioned firearms

Page 19

1  training at PTI.  I would assume that's -- and
2  correct me if I'm wrong -- was that just the safe
3  operation of various firearms that may be used by
4  public safety officers?
5  A.  It was, as well as just repetition on
6  your firearm that you're going to be assigned.
7  Q.  Okay.  Now, you mentioned in the control
8  tactics portion of the training as well as in the
9  state law that you received some training on
10  searches.  Can you tell me the difference between
11  those two classes where you received training in
12  how to perform the search?
13  A.  In regards to the mechanics of the
14  search?  Or when a search should be conducted?
15  Q.  Well, what was the difference in the
16  training in the state law courses that you took
17  and then in the training in the control tactic
18  courses that you took regarding searches?
19  A.  So the state and constitutional
20  classroom environment was really the bookwork, so
21  the studying behind that.  The control tactics
22  portion you referred to is more the physical
23  hands-on portion.
24  Q.  Let's start with the state law class.
25  Can you tell me what you recall learning in the

Page 20

1  state law class regarding the bookwork, you said,
2  and when a search may or may not be performed by
3  an officer?
4  A.  Yeah.  I can give you the basics.  I
5  don't remember all the details from 1999.
6  Q.  That's fine.  We'll start with the
7  basics and work our way from there.
8  A.  All right.  So searches, as far as, you
9  know, we discussed search warrants.  We discussed
10  search incident to an arrest.  We discussed
11  consent searches, exigent circumstances, community
12  caretaking.
13  Q.  Any others?
14  A.  Not necessarily in that class.  I have
15  additional training in searches, but that came
16  later in my career.
17  Q.  Okay.  Did that additional training in
18  searches come in your capacity in working for the
19  Champaign County Sheriff's Office?
20  A.  Some of it did, yes.
21  Q.  So we'll cover that in a moment.  Back
22  to the control tactics course that you took at
23  PTI, can you tell me what you recall about some of
24  the physical hands-on training that you learned at
25  PTI in how to actually conduct a search?

Page 21

1   A.   So basically in regards to the actual
2   search using the mechanics of the search, they
3   were showing you how to do it properly and safely
4   for all parties involved.  And so once an arrest
5   was in effect, so handcuffs were placed on a
6   subject, they showed us how to physically divide
7   the body into quadrants and then search that
8   portion of the body, again looking for weapons and
9   contraband.  Obviously maintaining the officer's
10  safety aspect, especially if you're transporting
11  someone.
12      Q.   Now, you mentioned this training in
13  regards to once a suspect was placed under arrest.
14  Did you also receive any physical hands-on
15  training in conducting a search for a suspect who
16  was not yet placed under arrest?
17      A.   Correct.  We did.
18      Q.   Was there any difference that you
19  understood between the hands-on performance of the
20  search between somebody who's arrested and not yet
21  arrested?
22      A.   Yes.  But depending on the
23  circumstances.
24      Q.   Okay.  What were some of the factors
25  that you learned in your course at PTI that helped

Page 22

1   you to determine the circumstances that may
2   require a particular type of search?  Does that
3   make sense?
4       A.   Yes.  So a search incident to arrest --
5   I'll use that as an example to start off with --
6   at that time it's considered a full search.  We're
7   able to go in the pockets, check what I consider a
8   more -- it's a more thorough search of the person.
9   Okay?  And again, we're able to go in the pockets,
10  check the waist band.  If they're wearing a hat,
11  take the hat off, search the hat.
12          The other side of that is if you get
13  into the details of Terry versus Ohio, it may be a
14  stop and frisk suspect where it's a pat-down only,
15  you're not going in the pockets.  It's a shortened
16  duration.  Is that a -- is that what you were
17  looking for?
18      Q.   Yeah.
19      A.   Okay.
20      Q.   Other than not going in the pockets and
21  being a shorter duration, did you -- your course,
22  if you recall, cover anything else that was
23  different between a search incident to an arrest
24  and a stop and frisk under Terry v. Ohio?
25      A.   In regards to the pat-down, kind of

Page 23

1   being on the outside of everything and, you know,
2   you're really focused on the weapon aspect of
3   that.  Contraband that could harm somebody.
4       Q.   In your training at PTI, did you learn
5   what factors may contribute to an officer
6   determining that a Terry stop, we'll call it,
7   search was necessary?
8       A.   So reasonable suspicion comes into play.
9   So a crime again could have occurred, about to
10  occur, or it's just kind of predicted that
11  something's going to happen.  So a stop and frisk
12  of that subject or subjects.  And that's kind of
13  under the stop and frisk and pat-down arena versus
14  a search, okay, going in the pockets.  What I
15  consider very thorough, a little more intrusive as
16  a search versus the pat-down, stop and frisk.
17      Q.   Can you tell me what you understand
18  reasonable suspicion to mean?
19      A.   I think you can have articulable facts
20  that have been established to again outline maybe
21  a potential crime that's occurred or about to
22  occur.  And you can articulate that.
23      Q.   For a pat-down search pursuant to
24  Terry v. Ohio, are you looking for evidence of a
25  crime?

Page 24

1       A.   Yes.
2       Q.   Okay.  Are you looking for anything
3   else?
4       A.   Weapons.
5       Q.   Other than con law, state law, scenario
6   training, control tactics and firearm training,
7   did you receive any other courses of training at
8   PTI?
9       A.   There were other courses.  Not in
10  duration for the entirety of the academy, but
11  blocks of instruction.  I don't recall exactly the
12  title of those courses.  But there were blocks of
13  instruction.
14      Q.   Would blocks of instruction, would that
15  just be not a full blown class maybe, but just a
16  day or two on a particular topic?
17      A.   Yes.  Day or two, or even an hour or
18  two.  It could be that short.
19      Q.   Okay.  After PTI, but still working for
20  Parkland Community College, did you undergo any
21  additional training at Parkland?
22      A.   I did.
23      Q.   Do you recall what subjects that
24  covered?
25      A.   The training I did there actually was

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

SHANE COOK
March 10, 2020

Page 25

1  EMT medical training.
2  Q. Anything else?
3  A. They put you through what they call a
4  field training program. And so that is them
5  teaching their way of their agency practices,
6  policies.
7  Q. How long did your EMT training last at
8  Parkland?
9  A. It was taught through the Fire Service
10  Institute at the U of I. And I want to say it was
11  a three-week course.
12  Q. How long was your field training at
13  Parkland Community College?
14  A. It was about eight weeks, if I recall
15  correctly.
16  Q. Now, you mentioned you were a public
17  safety officer at Parkland. Did you ever have --
18  were you ever promoted to a different job title at
19  Parkland?
20  A. No.
21  Q. Any disciplinary issues at Parkland
22  Community College?
23  A. No.
24  Q. After -- when did you leave Parkland
25  Community College?

Page 26

1  A. So January of 2000.
2  Q. Why did you leave?
3  A. Parkland College wasn't the policing
4  that I wanted to be involved with.
5  Q. Okay. Did you take a new job after
6  Parkland?
7  A. I did.
8  Q. Where at?
9  A. Rantoul Police Department.
10  Q. When did you start at Rantoul? Or
11  strike that. When were you hired on at Rantoul
12  Police Department, if you recall?
13  A. January of 2000. I don't remember the
14  actual day. January of 2000.
15  Q. When you were hired, what was your
16  initial title?
17  A. Patrolman.
18  Q. As a patrolman at Rantoul Police
19  Department, what were some of your job duties and
20  responsibilities?
21  A. Protecting the citizens of the
22  community. General patrol duties. You know, that
23  again, it's your basic patrolman.
24  Q. When you were hired at Rantoul, did you
25  have to undergo any additional training?

Page 27

1  A. I did.
2  Q. Where did you do that training?
3  A. I did, again, a field training program
4  in-house.
5  Q. Any other training other than the
6  in-house field training?
7  A. I had a variety of trainings over the
8  years I was there.
9  Q. Let's start with the field training. Do
10  you recall some of the subjects that were covered
11  in the field training at the Rantoul Police
12  Department?
13  A. Yeah. It ranges from interpersonal
14  operations to control tactics, knowing policy and
15  procedure, being proficient at geography, being
16  proficient at your firearms, being proficient at
17  knowing the law as being implemented in
18  enforcement.
19  Q. How were the policies and procedures
20  portion of that taught? Or how did you receive
21  instruction on the policies and procedures of the
22  Rantoul Police Department?
23  A. They had a policy manual that they would
24  issue an officer.
25  Q. Is this a physical book?

Page 28

1  A. It is a physical book.
2  Q. So you received the book. Did you have
3  to pass any tests regarding the material contained
4  in the book?
5  A. Yeah. It wasn't necessarily a test,
6  written test. It was proficiency testing with
7  your field training instructor.
8  Q. What do you mean by proficiency testing?
9  A. So you'd go over policy and procedure.
10  And it may be a narrative scenario, it may be a
11  real world incident that you're handling. And
12  it's a checklist that basically matches up with
13  the policy and procedure. And if you showed
14  proficiency, whether scenario-based or in a real
15  world incident, that was a task that was
16  completed.
17  Q. In your time during the field training
18  at Rantoul Police Department, was your
19  understanding of the Rantoul policies and
20  procedures ever deemed to be insufficient?
21  A. Not to my knowledge, in my capacity.
22  Q. So you were never informed that your
23  understanding of a particular policy or a
24  particular procedure was subpar; is that correct?
25  A. Correct.

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

SHANE COOK
March 10, 2020

Page 29

1  Q.  Okay.  Any other disciplinary actions at
2  Rantoul Police Department?
3  A.  No.
4  Q.  Captain Cook, why did you want to be a
5  police officer?
6  A.  Well, honestly, I didn't know I'd be
7  doing this profession.  I wasn't a seven-year-old
8  looking to be a cop.
9  Q.  Fair.  So how did you get into the law
10  enforcement career then?
11  A.  I worked with a gentleman who said he
12  was going to test at Parkland College.  And I was
13  attending Parkland College.  I didn't believe that
14  they had a police department at the time.  And I
15  showed up and he didn't.
16  Q.  From there, the rest is history, right?
17  A.  Yeah.
18  Q.  Other than being a patrolman, did you
19  hold any other positions in the Rantoul Police
20  Department?
21  A.  Supervisory as far as rank, no.
22  Instructors, yes.
23  Q.  What do you mean by that?
24  A.  I ended up becoming a field training
25  instructor.  I was a firearms instructor.  I was a

Page 30

1  TASER instructor.
2  Q.  Other than a TASER, any other specific
3  weapon that you were giving training in as part of
4  a field training instructor at Rantoul Police
5  Department?
6  A.  Firearm proficiency with both handgun
7  and rifle.
8  Q.  Other than being an instructor
9  patrolman, any other positions within the Rantoul
10  Police Department?
11  A.  No.
12  Q.  How long did you work for the Rantoul
13  Police Department?
14  A.  I left there in December of 2004.
15  Q.  Why did you leave the Rantoul Police
16  Department?
17  A.  Wanted to spread my wings.
18  Q.  And did you take employment after
19  Rantoul then?
20  A.  I did.  I actually transferred to the
21  Sheriff's Office.
22  Q.  Would that be the Champaign County
23  Sheriff's Office?
24  A.  Correct.
25  Q.  Did you start with the Champaign County

Page 31

1  Sheriff's Office in December of '04 then?
2  A.  Yes.
3  Q.  When you were first hired on at --
4  strike that.
5      If I refer to the Champaign County
6  Sheriff's Office as just the Sheriff's Office, do
7  you understand what I'm talking about?
8  A.  Yes.
9  Q.  Excellent.  When you were first hired on
10  at the Sheriff's Office, what was your job title?
11  A.  I was a deputy.
12  Q.  What were some of your job duties and
13  responsibilities as a deputy?
14  A.  Again, community caretaking, patrol
15  related activities, general safety of the
16  community.  I did traffic enforcement, community
17  awareness.  Handled and investigated patrol-level
18  crimes.
19  Q.  How long were you a deputy in the
20  Sheriff's Office?
21  A.  I became a sergeant in, let's see --
22  '04 -- I became a sergeant in '08.
23  Q.  Between the time you started as a deputy
24  and the time that you were promoted to a sergeant,
25  did your job duties and responsibilities as a

Page 32

1  deputy ever change?
2  A.  I did.  I actually served as an
3  investigator in between deputy and sergeant.
4  Q.  What were some of your job duties and
5  responsibilities as an investigator?
6  A.  So the investigations side is more
7  complicated investigations that patrol was not --
8  had the time or experience to handle.  So that
9  came to investigations and we looked into those
10  more thoroughly.
11  Q.  Do you recall how long after you were
12  hired at the Sheriff's Office that you then became
13  an investigator?
14  A.  It was roughly approximately two years.
15  Q.  Two years?  How did you, for lack of a
16  better term, qualify to be an investigator?  Was
17  there a particular test you had to take or
18  recommendation of a fellow officer?
19  A.  No test.  There was an interview
20  process, as well as they were looking at previous
21  experience, resume.
22  Q.  So if my math is correct, you became an
23  investigator roughly in the winter of 2006; is
24  that correct?
25  A.  That sounds about right, yeah.

Page 33

1   Q.   And then did you hold the position of
2   investigator until your promotion to sergeant in
3   2008?
4   A.   Correct.
5   Q.   Okay.  Before getting to your work as a
6   sergeant, so only focusing on your time as a
7   deputy and then as an investigator, did you
8   personally have any involvement with the
9   development, review or updating of any policies
10  and procedures at the Champaign County Sheriff's
11  Office?
12  A.   No, not in that capacity.  I didn't at
13  that time.
14  Q.   What kind of training was that?
15  A.   Again, each agency did a field training
16  program.
17  Q.   Do you recall some of the things that
18  were covered in the field training at the
19  Sheriff's Office?
20  A.   The policy and procedures, the -- their
21  practices on how they do things.  And that went
22  from fieldwork all the way to the report writing
23  aspect.  Yeah.  Basically you're conforming to the
24  agencies each time you go to a different agency.
25  Q.   Did you ever go back to attend PTI as a

Page 34

1   member of either the Sheriff's Office or the
2   Rantoul Police Department?
3   A.   Attending PTI at academy level, no.  I
4   did attend PTI for certain instructor courses.
5   Q.   Okay.  So just a course in one
6   particular subject, like a seminar; would that be
7   fair?
8   A.   Yeah.  Possibly a rifle instructor
9   course, which would be 40 hours.
10  Q.   Other than rifle instruction, do you
11  recall any other of these courses that you may
12  have attended at PTI?
13  A.   Firearms instructor, which is separate
14  from the rifle.  TASER, I believe, was through
15  PTI, as well.  Juvenile officer certification.
16  Q.   Now, since you've started with the
17  Sheriff's Office in 2005, have you worked
18  continuously with the Sheriff's Office until
19  today?
20  A.   You said 2005.  I actually started in
21  December '04.
22  Q.   Excuse me, yes -- strike that.  Since
23  '04, being hired on at the Sheriff's Office, have
24  you worked continuously with the Sheriff's Office
25  to today?  Or have you ever had a break in

Page 35

1   employment with them?
2   A.   No, it's been the whole timeframe.  No
3   break in service.
4   Q.   As part of your field training going
5   over the policies and procedures as a deputy with
6   the Sheriff's Office, if you were ever unsure of a
7   policy or procedure, had some questions about it,
8   how would you go about finding some answers to
9   those questions?
10  A.   At a deputy level, if you had questions,
11  your best avenue would be to approach your first
12  line supervisor.
13  Q.   Okay.  And would that just be kind of an
14  informal conversation then?
15  A.   It could be.
16  Q.   What else could it be?
17  A.   There could be trainings that were
18  offered kind of in-house to go over maybe a new
19  policy that had been passed down.  Any new
20  information to clarify things.
21  Q.   These in-house trainings, who would
22  conduct these trainings for the Sheriff's Office?
23  A.   At that time, it came down from the
24  lieutenant of patrol to the sergeants, and then to
25  the deputy level.

Page 36

1   Q.   These in-house trainings, would they
2   just be for new policies?  Or would they ever
3   offer this in-house training as a refresher course
4   for existing policies?
5   A.   Both.  And again, it was -- in my time
6   as a deputy, it was far and few between.  The
7   in-house training was what I consider very
8   informal.  It's not a classroom setting.  It may
9   be just done on shift at a shift level.
10  Q.   If you could estimate for me, can you
11  tell me how often these in-house trainings may
12  have taken place?  Would it have been once every
13  three months, every six months, once a month for
14  instance?
15  A.   What I'm recalling may be once, twice
16  every six months.
17  Q.   I'd like to move now to your promotion
18  to a sergeant in 2008.  As a sergeant for the
19  Sheriff's Office, what were some of your duties
20  and responsibilities?
21  A.   So at that time, I left investigations,
22  came back to the patrol division.  So I was a
23  first line supervisor at patrol level.  And again,
24  you know, as a sergeant, you're still assisting
25  the deputies handling calls, but you're also there

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

SHANE COOK
March 10, 2020

Page 37

1  for quality control and reviewing reports.
2     Q.   As a sergeant, are you still in the
3  field?
4     A.   You are.
5     Q.   Do you still respond to calls?
6     A.   Yes.
7     Q.   Okay. I'd like to take this moment just
8  to kind of step back from your career to kind of
9  talk about the Sheriff's Office in general.
10       Obviously in terms of hierarchy, the
11 Sheriff is at the top. But can you walk me
12 through the organizational hierarchy of the
13 department?
14    A.   Sure. As you stated, the Sheriff is the
15 top. He's the elected official. There's a second
16 person, the Chief Deputy, who's an appointed
17 position by the Sheriff. Underneath that, the --
18 so there's a merit commission. So you have
19 elected, appointed, a merit commission that
20 governs everything below that.
21    Q.   Okay.
22    A.   They're not present in the department.
23 That's kind of like a board that's appointed.
24    Q.   I see.
25    A.   Then it's captain. There's currently --

Page 38

1  there's three lieutenants, and then there's eight
2  sergeants, and then the deputies are below that.
3  Deputies and investigators.
4     Q.   Is there only one captain?
5     A.   There's only one captain.
6     Q.   Get back to the merit commission. Do
7  you know how many people sit on this commission?
8     A.   I do. There's three.
9     Q.   Is there -- the merit commission, are
10 they appointed by the Sheriff or in conjunction
11 with county government? How does one become --
12    A.   As far as I remember, I think they're
13 appointed by the Sheriff.
14    Q.   You mentioned three lieutenants. And
15 then I know we talked briefly about Lieutenant
16 Shaw, who's in the patrol division. Are there any
17 other divisions within the Sheriff's Office?
18    A.   Yes.
19    Q.   What are those divisions?
20    A.   There's -- I'll give you how it's broke
21 down. We have court security division. We have a
22 law enforcement division, otherwise known as
23 patrol. And then we have a corrections division.
24    Q.   With three lieutenants, I take it then
25 one lieutenant kind of is in charge of each one of

Page 39

1  those divisions?
2     A.   Actually, what I referenced, the
3  framework I referenced was solely for the law
4  enforcement.
5     Q.   Okay. Are you familiar with the
6  organization for the court security division?
7     A.   Yes.
8     Q.   And how many lieutenants would be
9  assigned to the court security division?
10    A.   They're not. There's actually one
11 sergeant that is a first line supervisor for court
12 security. There are 12 court security officers.
13 The sergeant reports to Lieutenant Apperson, who
14 is our investigations lieutenant. It falls under
15 his hospice [sic].
16    Q.   What about for the corrections division,
17 can you tell me the organizational hierarchy of
18 that division?
19    A.   I'm going to break it down as best as I
20 can remember. I work with them, but ...
21    Q.   Just looking for the best you know.
22    A.   So they have a captain, as well. Their
23 title is a superintendent of the jail.
24    Q.   Okay.
25    A.   There are three lieutenants there, as

Page 40

1  well. And then if I recall right, I think they
2  also have eight sergeants. I may be shorting them
3  one, but I think they have eight sergeants. And
4  then they have their correctional officers.
5     Q.   Have you ever spent time in the court
6  security division?
7     A.   I actually was their supervisor at one
8  point, yes.
9     Q.   Okay. Would that be after your
10 appointment as sergeant in 2008?
11    A.   No. When I became a lieutenant.
12    Q.   Okay. Have you ever worked in the
13 corrections division?
14    A.   I did.
15    Q.   When was that?
16    A.   2013. I was only there shy of a year.
17 I was actually put in there as their captain, the
18 superintendent of the jail.
19    Q.   Okay.
20    A.   So that's the only capacity I've worked
21 in the jail.
22    Q.   And that was just for about a year?
23    A.   Yeah, shy of a year.
24    Q.   Okay. We might come back around to
25 that, but I want to now get back to your time as a

Page 41

1  sergeant.
2         As a sergeant in the patrol division,
3  was it ever your responsibility to conduct any of
4  the field training or the in-house training that
5  we talked about earlier?
6  **A.   To conduct it or to review?**
7  Q.    Well, I kind of want to talk about both.
8  So let's start with conducting it.
9  **A.   Okay.**
10 Q.    Have you ever conducted the field
11 training as a sergeant in the patrol division?
12 **A.   Not as a sergeant.**
13 Q.    Have you ever conducted the in-house
14 training as a sergeant in the patrol division?
15 **A.   Yes.**
16 Q.    Do you recall the subjects that you
17 covered in an in-house training as a sergeant in
18 the patrol division?
19 **A.   Yes.  I did firearms.  I did control
20 tactics, defensive tactics, TASER instruction.**
21 Q.    Any others?
22 **A.   No.  Those were my kind of areas that I
23 focused on.**
24 Q.    Now, you also mentioned review of
25 training as a sergeant.  Can you tell me what you

Page 42

1  mean by review of training as a sergeant?
2  **A.   Sure.  If you have a recruit on your
3  shift that's being trained FTI, then the sergeant
4  monitors progress, helps address any issues if
5  they should arise.  So that's the review I'm
6  referring to.**
7  Q.    How do you conduct that review?  Do you
8  receive reports?  Do you ride along with the new
9  deputy and his instructor?
10 **A.   No, you don't ride along with the deputy
11 and their instructor.  You do receive maybe some
12 verbal consults from the FTI, the field training
13 instructor.  You may also review the paperwork
14 that's being -- the evaluation forms for a
15 recruit.**
16 Q.    Did you receive any training in how to
17 either conduct or review the field training or the
18 in-house training as a Sheriff with the Sheriff's
19 Office -- as a sergeant with the Sheriff's Office?
20 **A.   Not as a sergeant.  I did as a deputy.**
21 Q.    Okay.  That seems a little odd to me.
22 So let me try to rephrase my question.  I'm
23 wondering if you received any training in how to
24 either review or conduct either the field training
25 or the in-house training.  And your answer puzzles

Page 43

1  me a little bit.  You receive that training in how
2  to conduct training as a deputy?
3  **A.   Yeah.  I'll explain it.  It might make
4  sense.**
5  Q.    Please.
6  **A.   As a deputy, I was a field training
7  instructor.  So I had received training on how to
8  properly be a field training instructor and
9  complete evaluation training forms.**
10        **As a sergeant, I come to the level of
11 supervision.  I didn't receive necessarily any
12 additional field training, but I was still
13 reviewing paperwork and processes and reports as a
14 sergeant at that level.**
15 Q.    Okay.  That makes more sense.
16 **A.   Okay.**
17 Q.    In your training as a deputy in how to
18 conduct this training for others, what were some
19 of the methods that you were taught in how to
20 communicate things such as policies and procedures
21 to a new deputy?
22 **A.   What we were trained to do and relayed
23 information was we would literally at that time,
24 we had a hard copy policy and procedure.  And we
25 would read it.  We had a check off list from our**

Page 44

1  **field training guide on what we were to cover, and
2  we literally would read that verbatim and see if
3  it applied to scenarios.**
4  Q.    When you say check off list, I'm
5  picturing just kind of an 8 by 11 check sheet of,
6  you know, titles of various policies and
7  procedures; is that correct?
8  **A.   Yes.**
9  Q.    And you would just walk through those
10 with the trainee and discuss if those policies and
11 procedures are applicable to any scenario,
12 correct?
13 **A.   Correct.  We would try and explain it to
14 them, how it would apply in the future to things.**
15 Q.    In conducting this sort of training, did
16 you ever have a deputy who, for whatever reason,
17 struggled to understand a particular policy and
18 procedure?
19 **A.   Not necessarily policy and procedure
20 issues, no.**
21 Q.    Okay.  In your capacity as a sergeant,
22 did you ever work on the development, review or
23 update of any policy and procedure at the
24 Sheriff's Office?
25 **A.   No.**

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

SHANE COOK
March 10, 2020

Page 45

1    Q.    After, I believe -- okay, so we talked
2  about you were promoted to sergeant in 2008.  How
3  long were you a sergeant at the Sheriff's Office?
4    A.    **Right at three years.**
5    Q.    Okay.  After sergeant, what was your
6  next promotion?
7    A.    **Lieutenant.**
8    Q.    Do you recall the month and year of
9  that?
10    A.    **Year, I want to say 2011.  Month, I**
11  **don't recall.**
12    Q.    Being promoted to lieutenant, were you
13  in any particular division?
14    A.    **I was actually admin support lieutenant.**
15    Q.    Sounds thrilling.
16    A.    **Uh-huh.**
17    Q.    What were some of your duties and
18  responsibilities as an admin support lieutenant?
19    A.    **So at that time, admin support, I did**
20  **have the court security division under myself --**
21    Q.    Okay.
22    A.    **-- as well as the front office clerical**
23  **staff.  And really, it was heavily based upon the**
24  **civil process side.  Business, finance.  As you**
25  **mentioned, the fun stuff.**

Page 46

1    Q.    I just want to be clear.  When we talk
2  court security, that's just securing the actual
3  courthouses within Champaign County, correct?
4    A.    **Yes, sir.**
5    Q.    How long did you work as an admin
6  supervisor -- a lieutenant admin supervisor in
7  this court security civil process department?
8    A.    **I was there approximately two years.**
9    Q.    Okay.  In this capacity as lieutenant
10  admin support, did you ever have any work on the
11  development, review or update of any policies and
12  procedures of the Sheriff's Office?
13    A.    **I did review and actually kept in touch**
14  **with the court security policies at that time.**
15    Q.    Was it just a review and keeping in
16  touch with the court security policies?  Or were
17  there any other policies and procedures that you
18  performed this work with?
19    A.    **No, it was mainly the court security**
20  **division.**
21    Q.    Okay.  When you were promoted to
22  lieutenant, did you have to undergo any additional
23  training for that position?
24    A.    **Not at that time, no.**
25    Q.    At any time during your time as a

Page 47

1  lieutenant admin supervisor, did you have to
2  undergo any additional training?
3    A.    **There was -- no, not as a lieutenant.**
4  **That didn't come 'til captain.  So no.**
5    Q.    Okay, we'll get there as we progress
6  along here.
7              After two years of working as a
8  lieutenant in the admin supervisor position, did
9  you move to any other positions as a lieutenant?
10    A.    **Not as a lieutenant, no.**
11    Q.    Okay.  What was your next position after
12  lieutenant?
13    A.    **Captain of law enforcement.**
14    Q.    Captain of law enforcement, that
15  encompasses the patrol division, correct?
16    A.    **It does.**
17    Q.    Do you recall when you were promoted to
18  captain?
19    A.    **It was in 2013.**
20    Q.    Do you recall the month, by chance?
21    A.    **No, I don't.**
22    Q.    That's all right.  Your promotion to
23  captain, was that based on any sort of test that
24  you had to pass?
25    A.    **No.  It really ended up being resume and**

Page 48

1  interview.
2    Q.    Okay.  When you were promoted to captain
3  of the law enforcement division, did you receive
4  any additional training?
5    A.    **I did.**
6    Q.    What was that training in?
7    A.    **I'm going to throw you a monkey wrench.**
8    Q.    I'll try to catch.
9    A.    **All right.  I'm assigned now to the jail**
10  **as a superintendent of the jail.**
11    Q.    Okay.  You kind of hinted at it earlier,
12  so I should have seen it coming.  So I just want
13  to make sure I understand.
14              So in your capacity as a captain of law
15  enforcement, you're actually assigned as
16  supervisor of the Champaign County jails?
17    A.    **Yes, sir.**
18    Q.    Okay.  What are some of your duties and
19  responsibilities as a supervisor of the jail?
20    A.    **At that time, it was learning jail**
21  **operations.  That was new to me.**
22    Q.    How is this training conducted?
23    A.    **Hands-on.**
24    Q.    So you had an instructor and you were
25  actually at the jail learning how day-to-day

Page 49

1  operations were conducted?
2   **A.   I had the outgoing captain and we were**
3  **in the same office together, and we basically**
4  **talked every day and kind of institutional**
5  **knowledge passed.**
6   Q.   So kind of like a shadow program, for
7  lack of a better term?
8   **A.   Yeah, that's good.**
9   Q.   How long were you working as the
10  supervisor of the jail?
11   **A.   I left there at approximately ten months**
12  **in.  It was a short stint.**
13   Q.   Now, you left the position as supervisor
14  of the jail, but were you still a captain in law
15  enforcement?
16   **A.   Yes, sir.**
17   Q.   Okay.  Other than in your capacity as a
18  supervisor at the jail, being a captain in law
19  enforcement, did you have to undergo any
20  additional training?
21   **A.   I have.**
22   Q.   And what was that training in?
23   **A.   So I've been to a jail administrator**
24  **certification course.  I've been to command and**
25  **general staff course through the University of**

Page 50

1  **Illinois.  It was offered at the Fire Service**
2  **Institute.  I attended the FBI Academy in 2017.**
3   Q.   The command and general staff training,
4  what were some of the subjects that were covered
5  in that training?
6   **A.   That course, it's a little deceiving by**
7  **the title.  But it was really a NIMS compliance**
8  **course.**
9   Q.   What do you mean by NIMS?
10   **A.   So the National Incident Management**
11  **System.  So it was based around handling large**
12  **scale incidents, critical incidents.  And how you**
13  **would -- the inner operability with the other**
14  **agencies.**
15   Q.   How long did that training last?
16   **A.   That was only a week long course.**
17   Q.   And then you also mentioned FBI
18  training, correct?
19   **A.   Yes, sir.**
20   Q.   Where did that training take place?
21   **A.   That was at Quantico.**
22   Q.   How long was that?
23   **A.   It's ten weeks, was the total academy**
24  **time.  And that's the national academy; not the**
25  **recruit FBI academy.**

Page 51

1   Q.   Right.
2   **A.   Yeah.**
3   Q.   Do you recall some of the subjects that
4  were covered in the FBI Training Academy for ten
5  weeks?
6   **A.   Well, we signed up for our blocks of**
7  **instruction there.**
8   Q.   Okay.
9   **A.   Most of those blocks of instruction**
10  **revolved around leadership training.**
11   Q.   So it was something that you were kind
12  of able to pick and choose the best classes that
13  were applicable to your position; is that fair?
14   **A.   Yes, sir.**
15   Q.   Other than leadership training, did you
16  sign up for any others?
17   **A.   Yeah, there was, you know, some**
18  **emotional survival classes.  The leadership**
19  **courses.  Media-related courses, PIO.  So those**
20  **were really the foundation there.**
21   Q.   You mentioned an emotional support
22  class.  What did that entail?
23   **A.   Yeah.  Officer well-being.  Obviously**
24  **it's a topic around the nation now.  So there were**
25  **actually courses developed around that subject**

Page 52

1  matter.
2   Q.   Excellent.  You also mentioned PIO.
3  I've never heard of that abbreviation.
4   **A.   Public information officer.  So media**
5  **relations.**
6   Q.   As a captain in law enforcement here,
7  did you have any work in the development, review
8  or update of any of the policies and procedures of
9  the Champaign County Sheriff's Office?
10   **A.   I have.**
11   Q.   Let's start with development.  As a
12  captain in the Sheriff's Office, have you worked
13  on the development of any policies and procedures?
14   **A.   Not development as much as review.**
15   Q.   Okay.  Can you tell me what policies and
16  procedures that you worked in as review as a
17  captain?
18   **A.   There's been many policies.  And I'll**
19  **explain.  2015, we went from a hard copy manual to**
20  **an online version of policy and procedures.  We**
21  **use a company called Lexipol.**
22   Q.   If I understand, Lexipol is just kind of
23  a third party provider that operates the software
24  that the training materials are actually kept on;
25  is that correct?

Page 53

1  A.  Yes, sir.
2  Q.  Other than this transition from hard
3  copy to online materials, have you been involved
4  with the review of any other policies and
5  procedures within the department?
6  A.  I helped review these as they were being
7  issued out.  As far as the development and initial
8  review, our former Sheriff was an attorney.  No, I
9  was like a third -- third down the line for
10  review.
11  Q.  Okay.  So maybe let's just break that
12  down a little bit.  What do you mean by review?
13  Review -- strike that.
14      What do you mean by review of the
15  policies and procedures in part of this transition
16  from hard copy training materials to electronic
17  materials?
18  A.  So my previous supervisor who was the
19  Chief Deputy, that's the role, the title, he
20  worked heavily on the implementation of Lexipol.
21  And so when he was getting policies from Lexipol,
22  the company, he would do his review, draft
23  amendments.  He would work with the Sheriff at the
24  time.  And then kind of when they had what they
25  considered I guess really a final draft, then they

Page 54

1  would maybe push it to me to see if there was
2  anything that I recognized from an operational
3  standpoint.
4  Q.  In reviewing these policies and
5  procedures from an operational standpoint, what
6  were you looking for?
7  A.  Consistent practices with operations as
8  I knew it at the time to see if it was consistent
9  with our operations.  Because my understanding of
10  Lexipol, it's almost like canned policies and you
11  tweak them not only to your agency, but making
12  sure it's best practice with the state, as well.
13  Q.  So if I understand correctly, it wasn't
14  necessarily taking the existing hard copy policies
15  and procedures of the Sheriff's Office and then
16  just typing them up, for lack of a better word,
17  and installing them in Lexipol.  But you would
18  receive draft policies from Lexipol, review them,
19  and modify them as best you could to suit the
20  needs of the Champaign County Sheriff's Office; is
21  that correct?
22  A.  Yeah, that's accurate.
23  Q.  Okay.  Whether -- I know you mentioned
24  it earlier, but I just didn't write it down.  When
25  did this transition take place?

Page 55

1  A.  2015 is when it started.
2  Q.  When did it conclude?
3  A.  Actually, I think it's still ongoing to
4  some degree.  I think the bulk of the policies
5  were issued by 2017.
6  Q.  Are you familiar with how Lexipol
7  drafted their versions of the policies and
8  procedures that they initially sent to the
9  Champaign County Sheriff's Office for review?
10  A.  No, sir.
11  Q.  You don't know if they took a policy and
12  procedure from another jurisdiction and sent it
13  over for review?
14  A.  No, I don't.  No.
15  Q.  Once -- how does the Lexipol system work
16  to communicate these policies and procedures to
17  deputies?
18  A.  So actually there's an administrative
19  portal that our Chief Deputy would access.  And so
20  any updates, any changes would be accepted and
21  then essentially pushed out.  And so
22  electronically, they're notified via their e-mail.
23  Q.  Once a deputy receives a notification
24  via e-mail, what are they required to do?
25  A.  It lets them know there's been some type

Page 56

1  of update in Lexipol.  They would then sign into
2  their accounts, and then check.  So you either
3  acknowledge the policies once you've read them.
4  And it's electronic.  And there's also a component
5  of it called daily training bulletins.
6  Q.  I want to start with that first
7  component, the acknowledgment.  So if I understand
8  correctly, a deputy might receive a notification
9  that a policy's been updated, changed.  And in the
10  acknowledgment portion, he reviews that policy and
11  then clicks a check box I've reviewed this
12  particular policy; is that fair?
13  A.  Yeah.  Lower right, it basically says "I
14  acknowledge" and you click that tab.
15  Q.  Okay.  And then you also mentioned a
16  second component of that.  I believe you said it
17  was -- actually, I forgot the term you used.  What
18  was the second component you mentioned regarding
19  what the deputy sees when notified of the policy
20  and procedures updated?
21  A.  Sure, they get notifications.  And
22  there's another component called daily training
23  bulletins.
24  Q.  What is a daily training bulletin?
25  A.  Once a month, a package is pushed out.

Page 57

1  **And the package contains information --**
2  **scenario-based information that relates to**
3  **individual policies randomly selected by Lexipol.**
4  **And they basically read, review, and then they'll**
5  **answer, you know, a question or two to see if they**
6  **understand how the policy applies to scenarios**
7  **that they may encounter.**
8  Q.   So this isn't something that is sent out
9  daily; but monthly, correct?
10  **A.   Yes, sir.**
11  Q.   Okay.  How many of these questions come
12  out in a particular month?
13  **A.   It really does vary.  But generally it's**
14  **20 to 30.**
15  Q.   Does the Champaign County Sheriff's
16  Office have any input in what questions come out
17  on any particular month?
18  **A.   No.  This is automatically generated and**
19  **pushed through Lexipol.**
20  Q.   Okay.  So Lexipol is the ones who make
21  the determination about what policies and
22  procedures are going to be tested on any
23  particular month; is that fair?
24  **A.   Yes, sir.**
25  Q.   Okay.  Do you know how Lexipol makes

Page 58

1  that determination?
2  **A.   I don't.**
3  Q.   If the Champaign County Sheriff's Office
4  wanted to test on a particular policy by sending
5  20 to 30 questions to a deputy, is that something
6  they could do?
7  **A.   I'm not for sure.**
8  Q.   Okay.  So you're not aware of that ever
9  happening in the past; is that fair?
10  **A.   No, huh-uh.**
11  Q.   As your -- in your position as a
12  captain, are you ever involved in the updating of
13  any policy and procedure?
14  **A.   Now I am, yes.**
15  Q.   What do you mean by now?
16  **A.   We had a changing of our administration**
17  **during the last election cycle.  So I've become a**
18  **little more involved now trying to teach, train.**
19  Q.   I know we've talked kind of a lot about
20  your teaching and training of other deputies.  But
21  I want to focus more specifically on the policies
22  and procedures themselves.  And since this
23  administration changed over since the last
24  election, have you ever been involved in updating
25  a policy?  And I'm focusing on the policy itself,

Page 59

1  not necessarily the communication of that update
2  to deputies.  Does that make sense?
3  **A.   Yeah.  Maybe rephrase it.  I think I**
4  **understand it.**
5  Q.   So I want to know -- let's set aside for
6  a moment once a policy has been updated for
7  whatever reason to reflect any new information.
8  And I'm not concerned with how that update is then
9  communicated to the deputies, but more focused on
10  your involvement.  Do you have any say or input in
11  how that policy is updated?
12  **A.   Yes.  As of late, I have, more so.**
13  Q.   Can you tell me when the last election
14  cycle was?
15  **A.   December of 2019.**
16  Q.   So since December of 2019, you've now
17  had more of a hands-on role in the updating of
18  these policies?
19  **A.   I've explained it to my supervisor on**
20  **the process and what was involved because who she**
21  **replaced is actually who implemented the system**
22  **and knew the ins and outs in more detail.**
23  Q.   Okay.  So are you more focused on, you
24  know, if the new administration wants to update a
25  policy, here's how they can do it?  Is that fair?

Page 60

1  **A.   That's fair.**
2  Q.   So you don't necessarily have much
3  involvement in what that updated policy actually
4  looks like; is that fair?
5  **A.   I do see the content that's pending.**
6  Q.   Okay.
7  **A.   As far as approval, I don't do the**
8  **approval of it.**
9  Q.   Do you propose changes to content if you
10  see something that maybe isn't consistent with
11  existing policies?
12  **A.   Yeah, I would give recommendations.**
13  Q.   Okay.  Since December of 2019, have you
14  given recommendations on a proposed updated
15  policy?
16  **A.   Yes.**
17  Q.   Do you recall what policy it was that
18  these proposals were addressing?
19  **A.   I don't.  But I can explain.**
20  Q.   Please.
21  **A.   My recommendations were based upon**
22  **sometimes it is small as an update that gets**
23  **pushed out is grammatical changes that have**
24  **nothing to do with really the context.  It's more**
25  **grammar.  So little things like that.**

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

SHANE COOK
March 10, 2020

Page 61

1    There's also, when they send it, best
2  practice, modified, federal and state.  So they
3  let you know what the content they're pushing.
4  The question is do we accept their recommendation
5  or not.  So that's done at a higher level and also
6  a lot of times at this current time consulted with
7  our legal.
8    Q.   This recommendation that you're talking
9  about, is that something that comes from Lexipol?
10   A.   Yes, sir.
11   Q.   Okay.  Since your involvement began in
12 the update of these policies and procedures, are
13 you aware of any time that a recommendation from
14 Lexipol has been denied by the Champaign County
15 Sheriff's Office?
16   A.   Yeah, I know that there have been some
17 recommendations that have not been implemented in
18 our policy.
19   Q.   Do you know what policy that
20 recommendation was addressing?
21   A.   I don't, no, sir.  I couldn't tell you
22 that.
23   Q.   Now, it sounds like you're not
24 necessarily involved in the decision-making
25 process regarding whether or not any

Page 62

1  recommendation from Lexipol is going to be
2  accepted or denied.  But do you know how that
3  process works?
4    A.   As far as who would accept it and how it
5  is implemented then?
6    Q.   Let me try to ask you a little bit of a
7  better question.  Do you know who's involved in
8  that process of determining whether or not a
9  recommendation from Lexipol is going to be
10 accepted, denied or modified by the Sheriff's
11 Office?
12   A.   Sure.
13   Q.   Who would those people be?
14   A.   Pre-December '19, that would be Sheriff
15 Dan Walsh, Chief Deputy Allen Jones.  Both have
16 retired.
17   Q.   Since 2019?
18   A.   It would be Chief Deputy Shannon
19 Barrett, Sheriff Dustin Harmon.
20   Q.   So it's just the Sheriff and the Chief
21 Deputy who are involved in that process?
22   A.   Yeah.  And the Sheriff may reach out to
23 legal, which is the State's Attorney's office for
24 us.  But that correspondence isn't at my level.
25   Q.   Other than the Sheriff, Chief Deputy and

Page 63

1  any potential State's Attorney that might get
2  involved, are you aware of any other individual or
3  entity that's involved in determining whether a
4  Lexipol recommendation is accepted or denied?
5    A.   No, I think that would cover it.
6    Q.   Captain Cook, have you ever testified in
7  court as an expert witness before?
8    A.   Not as an expert witness.
9    Q.   Have you given testimony in court in
10 your capacity as just a law enforcement
11 individual?
12   A.   Yes.
13   Q.   And have those been in individual
14 criminal cases?
15   A.   Criminal.  Yeah, nothing civil.  Yeah,
16 criminal.
17   Q.   Have you ever been retained as an expert
18 witness in any civil litigation?
19   A.   No.
20   Q.   You mentioned you did give depositions
21 before when we first started.  In what capacity
22 have you given a deposition before?
23   A.   As a patrolman in the Rantoul Police
24 Department, I had litigation against me and other
25 officers.

Page 64

1    Q.   Other than at Rantoul, have you given a
2  deposition in any other cases?
3    A.   No.  No.
4    Q.   Do you recall when -- what year this
5  incident occurred that was the subject of the
6  litigation with Rantoul Police Department?
7    A.   2002, 2003.
8    Q.   Just briefly, can you describe, if you
9  remember, the allegations of that civil complaint?
10   A.   Yeah.  There was one subject claimed a
11 false arrest.  And then there was an unlawful
12 entry claim, as well.
13   Q.   Any others?
14   A.   No, that's it.
15   Q.   Are you aware of how that litigation
16 resolved?
17   A.   Summary of judgment.
18   Q.   Summary judgment in your favor --
19   A.   Yes.
20   Q.   -- or in favor of the Plaintiffs in the
21 case?
22   A.   I think it was our favor.
23   Q.   You're doing great so far.  I think this
24 is our first hiccup.  If you can, wait for me to
25 get the whole question out before giving your

Page 65

1 answer.
2 **A. Sorry.**
3 Q. It's my job to remind you, but you're
4 doing good so far.
5 Have we now covered all the capacity
6 that you've worked in as a training officer in the
7 Champaign County Sheriff's Office?
8 **A. Yes.**
9 Q. Okay. Have you ever had occasion to
10 train any of the deputies involved in this case,
11 Deputy Christensen or Deputy Floyd?
12 **A. No.**
13 Q. Have you ever reviewed any reports of
14 the training of Deputy Christensen?
15 **A. Report-wise, when he went through, I may**
16 **have reviewed what I called daily observation**
17 **reports. I don't recall anything that stood out**
18 **in my mind.**
19 Q. What's a daily observation report?
20 **A. So when an FTI is training somebody,**
21 **that is their documentation for that day.**
22 Q. So it's filled out by the instructor?
23 **A. Correct.**
24 Q. Is it something that's filled out every
25 day or only when deemed necessary by the

Page 66

1 instructor?
2 **A. No, it's filled out every day.**
3 Q. Have you ever reviewed any reports
4 regarding Deputy Floyd's training?
5 **A. No, no.**
6 Q. Not even these daily briefs?
7 **A. No.**
8 Q. Captain, how you doing so far? Would
9 you like to take a break or keep going?
10 **A. No, I'm good. I'm good.**
11 Q. Excellent. I'd like to get a little
12 broader again and talk about the Sheriff's Office
13 in general. Are you familiar with how many
14 deputies are currently employed in the patrol
15 division?
16 **A. Yes.**
17 Q. How many?
18 **A. There's a total of 54 assigned spots for**
19 **law enforcement.**
20 Q. Now, you said there's 54 assigned. Are
21 those 54 filled?
22 **A. Let's see. Did we have one retire?**
23 **Yeah, we're full right now.**
24 Q. Okay.
25 **A. The 54 does include the Sheriff and**

Page 67

1 **Chief. So just I don't know if that makes a**
2 **difference.**
3 Q. Okay. So 54 officers in the patrol
4 division encompasses the whole division, including
5 senior management; is that fair?
6 **A. Yes, sir.**
7 Q. Do you recall how many individual
8 deputies there are?
9 **A. I believe it's 38 currently.**
10 Q. Testing your memory a little bit here.
11 Do you happen to recall how many deputies were
12 employed in the patrol division back in May of
13 2019?
14 **A. Same number. Would have been 54. How**
15 **many were actively employed, I can't recall that,**
16 **because we have had a lot of retirements.**
17 Q. Okay. How many women are currently
18 employed as the 38 deputies in the patrol
19 division, if you know?
20 **A. Yeah. Four.**
21 Q. If you know, back in May of 2019, how
22 many women were employed as deputies in the patrol
23 division?
24 **A. Four.**
25 Q. Would it be the same four?

Page 68

1 **A. Yes, sir.**
2 Q. In the patrol division, how is a day
3 broken out into individual shifts?
4 **A. Our current staffing, we're on 12-hour**
5 **shifts.**
6 Q. Would that staffing have changed back in
7 May of 2019?
8 **A. May of 2019, yeah. May of 2019, we were**
9 **on eight-hour days. We didn't go to 12-hour days**
10 **until the latter part of '19.**
11 Q. So eight-hour days, there is essentially
12 three shifts, correct?
13 **A. Yes, sir.**
14 Q. Okay. How many deputies would be
15 assigned to any particular shift back in May '19
16 when there was the eight-hour shifts?
17 **A. So the shift number itself isn't**
18 **consistent as far as staffing. We have preferred**
19 **staffing levels. So five would be required to**
20 **work day shift, seven required to work evening,**
21 **and five required to work midnights.**
22 Q. Why is there a difference?
23 **A. Call volume.**
24 Q. Okay. Has that distribution been
25 consistent throughout the time that the Sheriff's

Page 69

1  Office was running these eight-hour shifts?
2  **A.  It has fluctuated over the time I've**
3  **been there. But it's been consistent with those**
4  **numbers at that time for several years, since I**
5  **was a sergeant.**
6  Q.  Okay.  Is there any policy or procedure
7  of the Sheriff's Office regarding how many women
8  are assigned to a particular shift?
9  **A.  No, sir.**
10  Q.  Do you know why?
11  **A.  I don't.**
12  Q.  Are you aware of any discussions with
13  senior management within the Champaign County
14  Sheriff's Office regarding assigning at least one
15  woman to every particular shift?
16  **A.  No.**
17  Q.  Have you ever worked as a training
18  manager?
19  **A.  I guess in my capacity now, somewhat.**
20  Q.  Okay.  But you've never held an official
21  title as a training manager; is that fair?
22  **A.  Yeah, no official title as a training**
23  **manager.**
24  Q.  I want to move now to some of the
25  specific policies and procedures of the Sheriff's

Page 70

1  Office.  And I want to start with searches of
2  individuals.  And what I mean by searches of
3  individuals is putting aside a search of a
4  property and search of a vehicle for right now.
5  But can you tell me, searches of an
6  individual, does the Champaign County Sheriff's
7  Office have policies regarding different types of
8  searches of individuals?
9  **A.  There is policy that outlines searches,**
10  **which does cover searches with individuals.**
11  Q.  Have you ever been involved in the
12  development, review or update of that policy
13  regarding searches of individuals?
14  **A.  I have reviewed it.  I have not been**
15  **part of any updates of it.  And I'm not aware of**
16  **any updates since we obtained the first Lexipol**
17  **policy.**
18  Q.  Okay.  Do you recall when you obtained
19  the first Lexipol policy and reviewed that policy
20  if you made any proposed changes?
21  **A.  No, I have not.**
22  Q.  Are you aware of anybody within the
23  Champaign County Sheriff's Office who made
24  proposed changes to the original Lexipol policy
25  regarding searches?

Page 71

1  **A.  I'm not aware of anybody, no.**
2  Q.  What is your understanding of when a
3  pat-down search may be performed on an individual?
4  **A.  The pat-down? I mean, the stop and**
5  **frisk concept can apply, Terry v. Ohio. I think**
6  **the pat-down can also apply consensually.**
7  Q.  Is there any distinction in the policies
8  and procedures of Champaign County Sheriff's
9  Office about performing a pat-down on either a
10  member of the same sex as an individual officer or
11  member of the opposite sex?
12  **A.  Let me -- the question is is there a**
13  **policy governing it?**
14  Q.  Let me try to ask a better question.
15  **A.  Okay.**
16  Q.  Is there a policy of the Champaign
17  County Sheriff's Office regarding conducting of
18  searches of members of the opposite sex?
19  **A.  Yes, sir.**
20  Q.  And can you tell me what your
21  understanding of that policy is?
22  **A.  Yes.  My understanding of that policy is**
23  **that if it is a person of the opposite sex,**
24  **reasonable attempts should be made to try to get**
25  **the same sex there to assist with that search**

Page 72

1  **and/or pat-down.  If that is done, then it needs**
2  **to be properly documented.**
3  Q.  What is your understanding of reasonable
4  attempt?
5  **A.  In our operations, a reasonable attempt**
6  **would be knowing who your fellow deputies are.  It**
7  **could be sending a message via the computer and/or**
8  **over the air requesting assistance, radio.**
9  Q.  Any others?
10  **A.  I think that over the air would be the**
11  **most common practice.**
12  Q.  And then you also mentioned, if done, it
13  has to be documented.  When you say that, if done,
14  do you mean the standard to radio or contact a
15  member of the same sex as the subject?  Or
16  actually getting a member of the same sex of the
17  subject to the scene to conduct that search?
18  **A.  I think in both contexts.**
19  Q.  I think you said it should be documented
20  or reported.  I forget the exact language.  But
21  that report, let's call it, what should that
22  report contain, if anything?
23  **A.  So it could be different depending on**
24  **the circumstances.  I can explain.**
25  Q.  Yeah, that would be great.

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

SHANE COOK
March 10, 2020

Page 73

1    A.    So 2015 is when we kind of started going
2  toward our body camera practice.  2015 is also
3  when we had Lexipol starting to be implemented.
4  So our body cameras themselves became somewhat a
5  documentation for us, best evidence.  There's also
6  written reports that we do that may involve more
7  detailed information pertaining to a crime or
8  incident.  And that's a documented typed out
9  narrative.
10     Citations, they also have documentation
11  on them that could be completed depending on the
12  circumstances.
13     Q.    Is there anywhere in a citation to
14  document whether or not the subject was searched
15  by the deputy?
16     A.    Yes, sir.
17     Q.    Okay.  Is there anywhere in the citation
18  to document the sex of the deputy who performed
19  that search?
20     A.    No, not the sex of the deputy.
21     Q.    Is there anywhere in that citation to
22  document the sex of the subject of that search?
23     A.    Yes.
24     Q.    Okay.  I just want to make sure I have
25  the year correct.  You said 2015 was about the

Page 74

1  time that the Sheriff's Office started their body
2  camera program; is that correct?
3     A.    Yes, sir.
4     Q.    Okay.  You mentioned part of performing
5  a search of the opposite sex by a deputy involves
6  knowing the other deputies on a shift.  Is my
7  remembrance of your testimony correct?
8     A.    Yes.
9     Q.    Okay.  But if I understand you
10  correctly, there's not a female deputy assigned to
11  each shift, right?
12     A.    That's correct, yeah.
13     Q.    Now, it's entirely possible that a
14  female suspect will be requiring a search on any
15  particular shift, correct?
16     A.    Absolutely.
17     Q.    So can you explain to me why the
18  Sheriff's Department doesn't assign a female
19  officer to every shift?
20     A.    I'll try and explain it.
21     Q.    Just looking for the best you know.
22     A.    Sure.  The union -- we have unions
23  involved with our labor force.  And so sign ups
24  based on shifts is done by seniority.  And a lot
25  of times that dictates how the staffing sign up

Page 75

1  goes for each team.
2     Q.    If it was necessary to conform with any
3  policy and procedure, could the Sheriff's Office
4  dictate how many of a particular sex of a deputy
5  are on each shift?
6     A.    I would have to refer to the Sheriff on
7  that.
8     Q.    Okay.  Now, we talked about several
9  other divisions within the department.  If a male
10  deputy at a particular scene thought it necessary
11  to search a female suspect, could he contact a
12  female employee of any of those other divisions
13  outside of patrol?
14     A.    Could we explore that option?  Yes.  I
15  think that is fair.
16     Q.    So what I mean by that, if on a
17  particular shift a male deputy is in the presence
18  of a female suspect that he believes needs to be
19  searched, and he knows that there's no female
20  deputy in his patrol shift, could he for instance
21  contact the jail to have a female corrections
22  officer come perform that search?
23     A.    I think he could contact them.
24  Unfortunately, the reality is there are minimum
25  staffing levels.  So take one body potentially out

Page 76

1  of the jail if they're working that shift, I don't
2  know, that could jeopardize their security issue.
3     We're unique in the sense our deputies
4  cover a thousand square miles.  This could occur
5  anywhere in the county, which is a 20 to 30 minute
6  one-way trip.  So I think there are a lot of
7  factors involved in that.
8     Q.    Are you aware of any deputy in the
9  patrol division who's out in the field contacting
10  the Champaign County jail for the presence of a
11  female corrections officer to perform a search?
12     A.    Am I aware of?  No, I'm not.
13     Q.    Backing up just a little bit.  We were
14  talking about some of the documentation of
15  attempting to get a female deputy to a particular
16  scene to perform a search.  Are you aware of any
17  disciplinary actions that an individual deputy has
18  received for not completing that documentation?
19     A.    No, sir.
20     Q.    Are you aware of an individual deputy
21  who has not completed that documentation?
22     A.    I am aware as in regards to probably
23  pre-body cameras, pre-2015.  I don't think any
24  discipline was ever taken that I'm aware of.
25     Q.    Since 2015, are you aware of any deputy

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

SHANE COOK
March 10, 2020

Page 77

1 who has either performed a search of a female
2 suspect or who has called for a female deputy to
3 perform a search of a female suspect who has not
4 completed this report?
5 A. Which report? I'm sorry.
6 Q. Let me try to rephrase. Are you aware
7 of any male deputy who has either performed a
8 search of a female suspect or has requested the
9 presence of a female deputy to perform the search
10 of a female suspect who has not completed a
11 written report?
12 A. A written narrative? I'm sure that
13 that's occurred when it's traffic-related. So
14 they'll complete their citation information. But
15 again, everything's contained on their body
16 camera.
17 Q. I know you said you're sure. But are
18 you, as you sit here today, aware of any instances
19 like that?
20 A. I'm not aware of any, no, sir.
21 Q. I understand some Sheriff's Office
22 deputies work with a canine, correct?
23 A. Yes, sir.
24 Q. Are you aware of any of the training
25 that that deputy and the canine undergo?

Page 78

1 A. I'm aware of the training. The details
2 of the training, I've never actually sat through
3 their training blocks.
4 Q. So you don't know any of the specific
5 classes that that deputy and his canine will
6 undergo?
7 A. No. Curriculum-wise, no, I couldn't
8 give you the details on that.
9 Q. Do you know how long that training
10 regimen might last for any individual deputy and
11 his canine?
12 A. Yeah. It's several weeks of actual
13 hands-on training with the canine. And then
14 afterwards, the State of Illinois requires annual
15 recertifications. So they're constantly
16 throughout the year doing training.
17 Q. Do you know where that training takes
18 place?
19 A. There's online training. There's
20 in-house training that they do at ILEAS, which is
21 in Urbana, Illinois.
22 Q. ILEAS, you said?
23 A. Yes.
24 Q. Can you spell that, if you can?
25 A. I-L-E-A-S. That's just the -- that's

Page 79

1 the name of the building. So ...
2 Q. If a male deputy's going to search a
3 female suspect and either has not reached out for
4 a female deputy or a female deputy is unavailable,
5 are you aware as to any policy and procedure that
6 governs how that male is to perform that search of
7 a female?
8 A. No, not in narrative form like
9 describing it.
10 Q. Okay. Other than narrative form, are
11 you aware of any policy and procedure of the
12 Sheriff's Office which governs how that search is
13 to be performed by a member of the opposite sex?
14 A. No. I'm aware of training.
15 Q. Okay. So no policy and procedure, but
16 aware of training. Can you explain to me the
17 training that you're aware of?
18 A. Yes. I'm aware that all of us as law
19 enforcement, we go through control tactics and
20 arrest tactics at the academy level. We also have
21 instructors, in-house instructors that we try and
22 do refresher training on.
23 As far as the frequency, you know, it
24 could be one time a year, it could be twice a
25 year. That's something we've been working on.

Page 80

1 Q. When you say frequency, is that any
2 individual deputy undergoing that training maybe
3 once or twice a year?
4 A. Yes, sir.
5 Q. Okay. Is each deputy required to
6 undergo training in how to perform a search of a
7 female suspect when they first are hired on by the
8 Champaign County Sheriff's Office?
9 A. From the field training program?
10 Q. Either the field training program or any
11 other training that's available. Is a deputy
12 instructed on how to perform a search of a female
13 suspect? And when I say search, I'm talking
14 specifically a search of their person.
15 A. Sure. Yes, I believe, in the academy,
16 they do cover that specific scenario.
17 Q. And when you say academy, you mean PTI?
18 A. Yes, sir.
19 Q. Other than the PTI, are you aware of
20 anything else?
21 A. I believe in our in-house training, we
22 cover it, as well.
23 Q. How's it covered in the in-house
24 training?
25 A. Physically showing them and actually

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

SHANE COOK
March 10, 2020

Page 81

1 conducting the searches.
2    Q.   How often does the deputy undergo that
3 in-house training?
4    A.   The frequency has varied.  We try and do
5 at least once a year on our, you know, control
6 tactics.
7    Q.   Are you aware of any deputy -- strike
8 that.
9         Are you aware of any male deputy
10 performing a search of a female suspect where how
11 the search was performed fell below the training
12 at either PTI or the in-house training?
13    A.   So the question is they didn't perform
14 to the standard?
15    Q.   Let me try to rephrase the question.
16 Are you aware of any male deputies who have failed
17 to search a female suspect in the manner they were
18 instructed either at PTI or the in-house training?
19    A.   I'm not aware of that, no.
20    Q.   Okay.  So you're not aware of any male
21 officer suffering any disciplinary action from
22 failing to perform a search to the standards
23 either at PTI or the in-house training; is that
24 correct?
25    A.   Yeah, that's correct.

Page 82

1         MR. McCARTER: Captain Cook, I usually
2 like to take a break every hour.  So we can go off
3 the record, take a few minutes, five minutes for a
4 bathroom break or so.
5         MR. VAYR: Sure, that's fine.
6         (A break was taken from 3:03 to
7 3:09 P.M., and the deposition continued as
8 follows:)
9 BY MR. McCARTER:
10    Q.   Captain Cook, can a female suspect
11 request the presence of a female officer to
12 perform a search of her person?
13    A.   Sure.
14    Q.   And if a female suspect does request the
15 presence of a female officer to perform the search
16 and one is not available on a particular shift,
17 how would the Champaign County Sheriff's Office
18 kind of handle that situation?
19    A.   I think the request would never be
20 prohibited.  So that we would try and accommodate.
21 But reasonable measures for us could only go so
22 far.  If the person's been taken into custody and
23 it's a search incident to an arrest pending
24 transport to the facility, ultimately the
25 transport has to occur.  But I think reasonable

Page 83

1 efforts would be made.
2    Q.   Any idea what those reasonable efforts
3 would be?
4    A.   I can speak firsthand.  I think that you
5 would radio over using the radio and you would
6 request a female if they're available, if they're
7 working.  Sometimes neighboring agencies may have
8 a female working.
9    Q.   I kind of want to explore that a little
10 bit.  So obviously the Champaign County Sheriff's
11 Office works in connection with the other
12 municipalities and various departments within
13 their jurisdiction, correct?
14    A.   Yes, sir.
15    Q.   Can a deputy with the Champaign County
16 Sheriff's Office request the presence of a female
17 officer from say the Champaign Police Department?
18    A.   We can request assistance from any
19 agency.
20    Q.   Okay.  Are you aware of any male
21 deputies in the Sheriff's Office requesting the
22 presence of a female officer outside of the
23 Sheriff's Department?
24    A.   I'm not aware personally of anything
25 going on currently with that.  I know that I've

Page 84

1 done it before.
2    Q.   You've personally requested the presence
3 of a female officer from somebody outside of your
4 department?
5    A.   Yes, sir.
6    Q.   Okay.  When was the last time you did
7 that?
8    A.   Oh, years ago.  I couldn't even give you
9 a year.
10    Q.   Just happened the one time?  Or did you
11 do that on more than one occasion?
12    A.   I would say it was more than one
13 occasion.
14    Q.   When you requested the presence of a
15 female officer from a neighboring jurisdiction,
16 did one respond?
17    A.   I only remember of one time that one
18 responded.
19    Q.   Okay.  Are you aware of any specific
20 search techniques that are -- that deputies are
21 trained on regarding searching a member of the
22 opposite sex?
23    A.   I am familiar with one technique that I
24 was taught in the academy.
25    Q.   What is that technique?

Page 85

1    A.   And when it comes to a female -- I know
2   that I have to use hand gestures, so I don't know
3   how you want to describe that or articulate it for
4   you.
5    Q.   Why don't you perform the hand gestures,
6   and Bryan and I will do our best to interpret it
7   for the court reporter.
8    A.   Okay.  So when it comes to the breast
9   region, to come straight up with flat hands to the
10   bottom of the cup.  And the same way coming down
11   to the top of the breast.  That was one particular
12   that was gender-based.
13    Q.   Okay.  And let me stop you right there.
14   And Bryan, correct me if I'm wrong, but it looks
15   like you took both your hands, had your fingers
16   closed in kind of like a high five gesture and
17   placed the palm to the body and then moved it up
18   to the bottom of the breasts and then down from
19   about the collarbone to the top of the breasts; is
20   that fair?
21    A.   That's fair.
22    Q.   Any other techniques?
23    A.   No, that was it.
24    Q.   Are you aware of the Champaign County
25   Sheriff's Office giving training to their deputies

Page 86

1   on that technique?
2    A.   That particular technique, I'm not
3   aware.
4    Q.   Are you aware of the Sheriff's Office
5   giving any training to their deputies regarding
6   how to search a female suspect?
7    A.   Yes.  Yeah, and we've treated them
8   universally.
9    Q.   What do you mean by that?
10    A.   Our searches are consistent in the same
11   manner regardless of the sex.  I just don't
12   remember this ever being taught at the Sheriff's
13   Office.
14    Q.   And when you say this, again you're just
15   referring to the technique that we described
16   earlier, correct?
17    A.   Yes, sir.
18    Q.   Okay.  So if I understand you, the
19   Sheriff's Department doesn't give any training in
20   the technique in performing a search for a member
21   of the opposite sex; is that fair?
22    A.   That's fair.
23    Q.   Why is that?
24    A.   I can't answer that.
25    Q.   Okay.

Page 87

1    A.   I don't know.  Maybe I'll answer it that
2   way.
3    Q.   Why does the Sheriff's Department
4   require documentation in whatever form it comes in
5   of a male officer's attempt to either contact a
6   female officer to come to a scene or contact a
7   female from another department to come to a scene
8   to perform a search of a female suspect?
9    A.   Why --
10    Q.   Yes.
11    A.   -- is the question?
12    Q.   Why is the question.
13    A.   To be in compliance with the way our
14   policy's currently written.
15    Q.   Do you know why the policy currently
16   requires such documentation?
17    A.   I don't.
18    Q.   If a male deputy performed a search of a
19   female suspect at a traffic stop, let's say, and
20   the incident was theoretically recorded on his
21   body camera, at least to the best of his
22   knowledge, so he's not aware of any mechanical
23   issues with the camera or anything that might have
24   prevented the recording, is that deputy required
25   to flag or somehow notify his supervisors that

Page 88

1   this particular recording has captured a search of
2   a member of the opposite sex?
3    A.   No.
4    Q.   Why is that?
5    A.   It's never been a -- it's never been
6   implemented in regards to that description.
7    Q.   Has the notification of supervisors by a
8   deputy regarding that deputy's search of a member
9   of the opposite sex ever been required?
10    A.   No.
11    Q.   Do you know why?
12    A.   I don't.
13    Q.   Are you aware in -- strike that.  Are
14   you aware of how long body camera footage is
15   stored by the Champaign County Sheriff's Office?
16    A.   Yes, sir.
17    Q.   How long is the retention policy for
18   videos captured by an officer's body-worn camera?
19    A.   The minimum retention period is 90 days.
20    Q.   Is there a maximum retention period?
21    A.   There is in regards to if a video should
22   be flagged for an arrest situation pending
23   prosecution and/or the appeal process.
24    Q.   Is there any scenario that a video from
25   an officer's body-worn camera would be deleted or

Page 89

1  erased sooner than 90 days?
2     **A.  It can't.  It is a programming issue and**
3  **the minimum is 90 days.**
4     Q.  Are you aware of what the name of this
5  program is?
6     **A.  Previously, it was Vievu, was our body**
7  **camera itself, as well as the software management.**
8  **We are actually right now in the process of**
9  **transferring to Evidence.com, which is Axon TASER.**
10     Q.  Would Vievu have been the software that
11  was in use in May of 2019?
12     **A.  Yes, sir.**
13     Q.  Are you aware of any complaints that the
14  Champaign County Sheriff's Office has received
15  from females regarding how a search was conducted
16  by a male deputy?
17     **A.  No, sir.**
18     Q.  Are you aware of any complaints made to
19  the Champaign County Sheriff's Office by anybody
20  regarding how a search was conducted by a deputy
21  of the opposite sex?
22     **A.  No, sir.**
23     Q.  Are you aware of any policy and
24  procedure of the Champaign County Sheriff's Office
25  governing -- strike that.

Page 90

1        In a situation where a male deputy is
2  going to perform a search of a female suspect for
3  whatever reason, either he couldn't find another
4  female officer to come out or circumstances
5  require the search to take place now, are you
6  aware of any requirement of the Champaign County
7  Sheriff's Office as to where that search should
8  take place?
9     **A.  No.  And I'm focused on patrol law**
10  **enforcement.  No.**
11     Q.  Okay.  Have you ever performed a search
12  of a female suspect?
13     **A.  Yes.**
14     Q.  How many times, if you can give me your
15  best estimate?
16     **A.  I don't know.  100 times maybe.**
17     Q.  Each time you've performed a search of a
18  female suspect, have you documented that search
19  either on video or in a formal written report?
20     **A.  So video, I didn't have 'til 2015.  I**
21  **was not in patrol any longer.  Narrative form, if**
22  **any time I made an arrest of a female suspect and**
23  **I had an arrest report, it would be documented**
24  **search incident to an arrest.**
25     Q.  I'm sorry, I didn't mean to cut you off

Page 91

1  there.
2     **A.  No.  Citations, any time it was**
3  **traffic-related that resulted in a search, it**
4  **would be documented on that form, as well.**
5     Q.  On the citation?
6     **A.  On the citation, yes, sir.**
7     Q.  At times when you haven't documented
8  performing a search of a female suspect, have you
9  suffered any disciplinary action?
10     **A.  No, sir.**
11     Q.  Have you ever had a discussion with your
12  supervisor regarding the lack of documentation of
13  a search of a female suspect?
14     **A.  No, sir.  Never.**
15     Q.  If an officer -- a male officer does
16  conduct a search of a female suspect and either
17  creates a formal written report or it's captured
18  on body camera, when would a supervisor review
19  that footage or that report?
20     **A.  Review it just as a quality control**
21  **measure?  Or review it just period?**
22     Q.  Just period.  I'm concerned about all --
23  any reason that a supervisor might review either a
24  written report or body captured footage of a
25  search of a member of the opposite sex.

Page 92

1     **A.  Sure.  All written reports are reviewed**
2  **at two layers.  The sergeant first line, and then**
3  **it goes to the lieutenant of investigations.  So**
4  **those reports are always approved, reviewed.**
5  **Citations are also reviewed by the first line**
6  **level.  Not every body camera video footage is**
7  **reviewed.**
8     Q.  But is every citation reviewed by at
9  least that first level?
10     **A.  Yes.**
11     Q.  And that would be a sergeant?
12     **A.  That would be a sergeant.**
13     Q.  A sergeant who's reviewing a citation,
14  what is he looking for?
15     **A.  Usually it's the common errors.  Missed**
16  **fields, making sure that the statute's actually**
17  **filled out, appropriate bond is collected and/or**
18  **annotated.  The racial profiling information which**
19  **covers the searches we keep talking about, that's**
20  **completed, as well.**
21     Q.  If a sergeant reviewing this citation
22  discovers that any of that information that you
23  just listed is missing or incomplete in some way,
24  what would that sergeant do?
25     **A.  They would then get with the deputy to**

Page 93

1  try and figure out why is it missing, is this an
2  error, what the case is pertaining to, what they
3  found.
4      Q.   Would that deputy suffer any
5  disciplinary action?
6      A.   No. I think unless that's a repetitive
7  problem or it's absolutely the wrong information,
8  wrong statute for the traffic stop or something,
9  that could lead to maybe some discipline. But I
10 think most of that is kind of a counseling
11 session.
12     Q.   Are you aware of any deputy receiving
13 disciplinary action for improperly completing a
14 citation?
15     A.   I'm not, no, sir.
16         MR. McCARTER: Can we go ahead and mark
17 this as an exhibit?
18         (Whereupon Deposition Exhibit No. 1 was
19 marked for identification by the court reporter.)
20 BY MR. McCARTER:
21     Q.   Captain, I've just handed you what's
22 been marked as Cook No. 1. And for the record,
23 this is Bates numbered Ayres 578. This is a
24 document that was produced to my office in
25 discovery in this case. And first, are you

Page 94

1  familiar with this document?
2      A.   I am.
3      Q.   Okay. And how are you familiar with it?
4      A.   It's one of our Lexipol policies.
5      Q.   And what does this Lexipol policy cover?
6      A.   This one is titled search and seizure.
7      Q.   Do you know when this Lexipol policy was
8  adopted by the Champaign County Sheriff's Office?
9      A.   I don't know the exact date. I do know
10 it'll be 2015 or after.
11     Q.   So are you aware if this policy would
12 have been in effect in May of 2019?
13     A.   Yes, this would have been.
14     Q.   Okay. So it would have been before
15 May of 2019, correct?
16     A.   Correct.
17     Q.   Do you know how this particular policy
18 was developed? And what I mean by that is we
19 talked about how Lexipol will submit a draft
20 policy to the Sheriff's Office and then it
21 undergoes some review and potential modification
22 by the department itself.
23         Are you aware of any modifications that
24 were made to a Lexipol policy that was sent to the
25 office which resulted in this policy?

Page 95

1      A.   No, sir.
2      Q.   Are you aware of who may have reviewed
3  this policy and proposed any changes to it?
4      A.   The only two people that I assume had
5  any real involvement with this would have been
6  Deputy Chief Allen Jones or Sheriff Dan Walsh.
7      Q.   Captain, I'd like you to just take a
8  moment and look over the policy because I'm going
9  to have some questions about it substantively.
10     A.   (Reviewing.)
11     Q.   All set?
12     A.   Yes, sir.
13     Q.   Prior to the change over from the hard
14 copy to the online policy and procedure materials
15 maintained by Lexipol, has the policy that's in
16 front of you, does that accurately reflect what
17 the policy is regarding searches -- specifically
18 searches of members of the opposite sex before
19 2015?
20     A.   So this meaning the same subject
21 language as pre-2015?
22     Q.   Let me try to clean that question up a
23 little bit.
24     A.   Okay.
25     Q.   Reviewing this policy and procedure, is

Page 96

1  it the same or substantially the same policy and
2  procedure regarding searches of members of the
3  opposite sex as before 2015?
4      A.   I cannot honestly answer that. I don't
5  recall that policy in detail.
6      Q.   Are you aware of the policy and
7  procedures of the Champaign County Sheriff's
8  Office ever changing -- whether or not it was 2015
9  or some other time -- regarding searches of
10 members of the opposite sex?
11     A.   I'm not aware of this particular subject
12 matter changing or being amended in my time.
13 Lexipol being implemented, that's the only time it
14 went kind of to more what I would consider
15 updated.
16     Q.   Now, you mentioned you reviewed the body
17 camera of Deputy Christensen in this case,
18 correct?
19     A.   Yes.
20     Q.   As well as Deputy Floyd?
21     A.   Yes, sir.
22     Q.   And you reviewed the citation, correct?
23     A.   Yes.
24     Q.   Are you aware of any other documentation
25 that exists regarding the stop on May 8, 2019

Page 97

1  regarding Wylesha Ayres and Latika Graham?
2  A.  No.  No internal documentation other
3  than what's been generated based on litigation.
4  Q.  Nothing that either of the deputies
5  would have completed that you're aware of that's
6  maintained by the Sheriff's Office, correct?
7  A.  No, sir.  Yes.
8  Q.  Okay.  In your review of those three
9  materials, so the two body-worn cameras and the
10  citation, are you aware of any documentation that
11  outlines the reason for the search of Wylesha
12  Ayres?
13  A.  No.  I'm trying to recall the actual
14  form on the citation itself that was issued.  But
15  I don't recall it giving in detail that
16  information.
17  Q.  Are you aware of why Deputy Christensen
18  searched Wylesha Ayres on May 8, 2019?
19  A.  I am.
20  Q.  What's your understanding as to why that
21  search happened?
22  A.  So he generated the traffic stop.  There
23  was the odor of cannabis.  She admitted to
24  actually smoking cannabis at some point.  He asked
25  her to exit the vehicle because he was going to

Page 98

1  search the vehicle.  And then he did a pat-down of
2  Ms. Ayres.
3  Q.  Do you know why Ms. Ayres was originally
4  the subject to a traffic stop that day?
5  A.  I think it was a registration violation
6  was actually the probable cause for the stop.
7  Q.  So a non-violent crime?
8  A.  Non-violent crime.
9  Q.  And you mentioned the deputy had claimed
10  he had smelled marijuana, correct?
11  A.  Yes, sir.
12  Q.  Now, the possession of marijuana, that's
13  a non-violent crime, correct?
14  A.  Minor possession, yes.  The possession,
15  yes.  Non-violent.
16  Q.  It's not an armed robbery involving a
17  weapon?
18  A.  No, sir.
19  Q.  It's not a battery or violence from one
20  person to another, right?
21  A.  You're right.
22  Q.  When Deputy Christensen was performing
23  the search of Wylesha Ayres' person, so not the
24  car that she was in that night, are you aware of
25  what -- strike that.

Page 99

1  What do you believe Deputy Christensen's
2  reasonable suspicion to be to believe that
3  Ms. Ayres possessed any sort of weapon on May 8,
4  2019 prior to his pat-down search?
5  MR. VAYR: Objection, speculation,
6  foundation.  You can answer.
7  BY MR. McCARTER:
8  Q.  If you know.
9  A.  No, I always view it as totality of the
10  circumstances.  I think the odor, the admission,
11  it's my understanding that there was a review of
12  some information with Ms. Ayres.  So there was
13  some facts.  And again, the totality.
14  He was officer safety wise and also
15  safety of everybody involved in the stop.  That's
16  why I do think he conducted this pat-down for
17  weapons and/or contraband.
18  Q.  Deputy Christensen never found any
19  contraband on Ms. Ayres' person, did he?
20  A.  No, sir.
21  Q.  He never found a weapon on Ms. Ayres'
22  person?
23  A.  No, sir.
24  Q.  Deputy Christensen never reported seeing
25  a bulge on Ms. Ayres' person, correct?

Page 100

1  A.  Never reported seeing, no, sir.
2  Q.  And a bulge, that could indicate the
3  possession of a weapon, correct?
4  A.  No, I didn't ever see a report or hear
5  anything about that.
6  Q.  Just generally, a bulge on a person
7  could indicate the possession of a weapon, though,
8  correct?
9  A.  It could, yes, sir.
10  Q.  And that's not present in this case,
11  right?
12  A.  From what I saw on the body video and
13  what I know, no.
14  Q.  You're not aware of Deputy Christensen
15  mentioning that on the body camera that I saw a
16  bulge, correct?
17  A.  No, I don't recall that.
18  Q.  All right.  You're not aware of Deputy
19  Christensen finding any contraband in the car,
20  correct?
21  A.  No, sir.
22  Q.  You're not aware of Deputy Christensen
23  finding any weapons in the car?
24  A.  No.
25  Q.  Prior to performing the pat-down search

Page 101

1  of Ms. Ayres, Ms. Ayres never made any threats to
2  Deputy Christensen, correct?
3     A.   No.
4     Q.   She never made any threats to Deputy
5  Floyd?
6     A.   No.
7     Q.   And you're not aware of any other
8  threats she made to any of the other passengers in
9  the car she was operating on May 8, 2019, correct?
10    A.   No, sir.
11    Q.   In the materials that you reviewed
12 regarding the search on May 8, 2019, are you aware
13 of anywhere that Deputy Christensen documented
14 either in the citation or in the body-worn camera
15 his attempts to locate a female deputy to perform
16 the search of Ms. Ayres?
17    A.   No, I don't believe that was done.
18    Q.   I believe that's the last question I
19 have regarding the policy.  So you can put that
20 away for a moment.
21         What's your understanding of a Terry
22 stop?
23    A.   Terry stop can be done when there's
24 reasonable suspicion, again, about a crime, crime
25 is committed, about to be committed, the potential

Page 102

1  of weapons being involved.  So it's a stop and
2  frisk situation.
3     Q.   When frisking pursuant to a stop and
4  frisk, what's your understanding of what the
5  officer is frisking for?
6     A.   Weapons.
7     Q.   Okay.  Are you aware of anything that
8  might indicate that Ms. Ayres had a weapon on
9  May 8, 2019?
10    A.   At that time, no, sir.
11    Q.   What do you mean at that time?
12    A.   I'm not aware of anything personally.
13    Q.   Have you since become aware of anything
14 that might indicate that Ms. Ayres had a weapon on
15 May 8, 2019?
16    A.   No.
17    Q.   How does the Champaign County Sheriff's
18 Office train its officers regarding evaluating
19 reasonable suspicion to believe a suspect has a
20 weapon?
21    A.   I don't know if I would say there's
22 specific training for that, other than at the
23 academy level.  I think a lot of that is based on
24 experience, the circumstances involved with what
25 you're dealing with at the time.

Page 103

1     Q.   If a deputy comes to the Champaign
2  County Sheriff's Office after having completed
3  training at PTI, but for whatever reason is
4  insufficiently trained in an aspect of law
5  enforcement, how might the Champaign County
6  Sheriff's Office react to that situation?
7     A.   If it came to our attention, then
8  obviously we would try to address it, whether it's
9  going to be discipline issues, whether it's
10 remedial training issue, whether it's even a
11 retention issue, especially if they're a
12 probationary employee.
13    Q.   Are you aware of any Champaign County
14 Sheriff's Deputy that has joined the force after
15 completing PTI who was inaccurately trained in the
16 performance of a search of an individual?
17    A.   No, not in that -- no.
18    Q.   Does the Sheriff's Office do anything to
19 reinforce the training of PTI regarding when to
20 perform a search of an individual?
21    A.   Yes.
22    Q.   How often does that training take place?
23    A.   It's not on a regular basis.  It's
24 something that we are working on.  Our training
25 revolves each year based on our operational

Page 104

1  constraints.
2     Q.   What are some of the factors that an
3  officer would consider when determining whether or
4  not he has a reasonable suspicion to believe a
5  suspect has a weapon?
6     A.   I think what they're presented with
7  initially.  And again, the dispatch information
8  can tell a lot.  But also once you arrive on scene
9  and who you're dealing with.  And again, totality
10 of the circumstances really dictates kind of our
11 actions.
12    Q.   What do you mean by the information they
13 might receive through dispatch?
14    A.   You know, when we -- when we respond to
15 calls, dispatch will let us know that we may be
16 responding to a domestic battery, an armed
17 robbery, a sexual assault.  So that gives us some
18 idea of what we potentially could encounter.  And
19 then once we get on scene, then we start
20 investigating further.
21    Q.   Anything else from dispatch that might
22 inform an officer's determination of reasonable
23 suspicion?
24    A.   Ongoing information.
25    Q.   What do you mean by ongoing?

AYRES v.
SHERIFF DEPUTIES CODY CHRISTENSEN, et al.

SHANE COOK
March 10, 2020

Page 105

1    A.    A lot of times they'll give you the
2  initial dispatch.  And then as you're responding
3  to the scene, they'll give victim description,
4  suspect or suspects description, weapons
5  displayed.  Just additional information to see
6  once you get there if you're able to validate some
7  of it to make sure it's consistent.
8    Q.    So it sounds like the more information,
9  the better, right?
10    A.    Absolutely.
11    Q.    So considering who a suspect is and
12  whether or not they might be armed, it's important
13  to know that suspect's criminal history, correct?
14    A.    Yes.
15    Q.    And when that history occurred?
16    A.    Yes.
17    Q.    And the nature of that criminal history,
18  correct?
19    A.    Yes.
20    Q.    You would agree with me that somebody
21  who had citations for various traffic violations,
22  that quote-unquote criminal history isn't
23  necessarily indicative of possession of a weapon,
24  correct?
25    A.    Correct.

Page 106

1    Q.    Now, it's also important to consider
2  that suspect's history and their involvement in
3  other activity that may or may not have involved a
4  weapon, correct?
5    A.    Yes.
6    Q.    Are you aware of Ms. Ayres' criminal
7  history?
8    A.    I became aware of it.  I was not aware
9  of it until this information.
10    Q.    What's your understanding of Ms. Ayres'
11  criminal history?
12    A.    She has what I would consider violent
13  charges against her in her criminal history.  I
14  don't know every detail of it.  And I don't know
15  of all the convictions.  I know that there were
16  various charges.
17    Q.    What did you review to learn about
18  Ms. Ayres' criminal history?
19    A.    I actually didn't review any
20  documentation as much as kind of went over
21  information as we were preparing for this.
22    Q.    What information did you have that
23  allowed you to learn about Ms. Ayres' criminal
24  history?
25    A.    Information that Cory -- Deputy

Page 107

1  Christensen, sorry, had generated when he was
2  doing the traffic stop.
3        (Whereupon Deposition Exhibit No. 2 was
4    marked for identification by the court reporter.)
5  BY MR. McCARTER:
6    Q.    Captain, I've just handed you what's
7  been marked as Exhibit 2 in this deposition.  Can
8  you just take a moment to look that over?
9    A.    Sure (reviewing).
10    Q.    All set?
11    A.    Yes, sir.
12    Q.    Have you -- do you recognize this
13  document?
14    A.    I do.
15    Q.    What do you recognize it to be?
16    A.    It's one of our local databases that we
17  referred to as ARMS.
18    Q.    Have you reviewed this document before?
19    A.    Not this particular one and not in its
20  entirety.  But I have seen the information about
21  the two guns located in her vehicle.
22    Q.    So just so the record's clear, we're
23  looking at Ayres 217 through Ayres 221.  Deputy,
24  you mentioned the information on a particular
25  page.  Which page were you referring to?

Page 108

1    A.    It is 219.
2    Q.    Okay.  And on this page, we see in --
3  first off, what do you understand this page to
4  indicate?
5    A.    It looks like basically a tow entry.
6  And it's giving a summary.  And it looks like
7  Officer Marshall, who is an officer, not a deputy
8  any longer, Champaign city incident.  And it just
9  has the summary of a city tow and two guns located
10  in the vehicle, one found to be stolen.
11    Q.    Nothing on this page, Ayres 219,
12  mentions Wylesha Ayres, correct?
13    A.    It does not.
14    Q.    Nothing on this incident in Ayres 219
15  mentions Latika Graham, correct?
16    A.    Correct.
17    Q.    I'd like to turn your attention to the
18  next page, Ayres 220.
19    A.    220.
20    Q.    Can you tell me the information
21  displayed on this page?
22    A.    Yeah.  Looks like it's Deputy Cory
23  Christensen is being signed in.  And it's just
24  giving some information.  Victim, offender.
25  Victim is society.  Offender is Ayres.  Looks like

Page 109

1  Quantrell.  And then Wylesha is the other one.
2  Q.  When you say other one, she's listed as
3  an other, correct?
4  A.  Yes, yes.
5  Q.  Wylesha Ayres is not listed as an
6  offender?
7  A.  No.
8  Q.  What's your understanding of why
9  somebody might be listed as an other in this
10  particular report from ARMS?
11  A.  It could be an associate of the suspect
12  and/or victim.  So it can be listed as other.  So
13  it's just a correlation of all parties involved,
14  but maybe not classified as suspect or victim.
15  Q.  Can you give me some examples of what
16  that association may be?
17  A.  And it can really vary.  I mean, it
18  could be the occupant in a car.  It could be maybe
19  not a direct witness, but somebody that has said
20  hey, this person may have been here.  And the
21  investigation's not completed, so they're still
22  trying to validate that information.  So it's
23  really trying to connect the dots and figure out
24  relationships and how they would be involved in an
25  incident.

Page 110

1  Q.  Based on looking at Ayres 220, you can't
2  tell me why Wylesha Ayres is listed as an other on
3  this particular report, correct?
4  A.  Not on this one, correct.
5  Q.  I'd like to turn your attention to page
6  221.  What's your understanding of what we're
7  looking at on this page?
8  A.  So this is a name inquiry that Deputy
9  Cory Christensen ran.  And just kind of gives
10  general information about Wylesha, photograph,
11  descriptors, addresses, known addresses.
12  Q.  I'd like to direct your attention to
13  roughly the bottom quarter of this page.  You'll
14  see on the right-hand side in red, it says
15  4 Corner Hustlr.  Do you see that?
16  A.  I do, under the gang affiliation.
17  Q.  Well, it says gang, correct?
18  A.  Yes.
19  Q.  What is your understanding of what that
20  entry on this particular report means?
21  A.  That entry under that field would
22  indicate that somebody believes she is affiliated
23  with this gang called 4 Corner Hustlr.
24  Q.  It doesn't say if she's an active
25  member?

Page 111

1  A.  No, sir.
2  Q.  Past member?
3  A.  No, sir.
4  Q.  It doesn't discuss at all the nature of
5  that alleged association, correct?
6  A.  That's correct.
7  Q.  If a deputy wanted to investigate
8  further into that particular entry, how could he
9  do that?
10  A.  There probably are search fields in the
11  ARMS database that could be accessed.  Not
12  necessarily -- and I don't know the ins and outs
13  of ARMS like investigators do.  But they have
14  investigations inside of ARMS that they may be
15  entering information in.
16  Q.  Would that information be available to
17  Deputy Christensen in his ARMS report that is
18  available to him in his squad car on any
19  particular traffic stop?
20  A.  I think -- I don't know if all the
21  detailed information may be entered if it's on the
22  investigation side, because it's based upon
23  permission settings.  And he may be considered a
24  patrol setting, not an investigation setting.
25  Q.  So if somebody is considered patrol

Page 112

1  deputy, is there any way that he can investigate
2  further into the nature of this particular entry,
3  4 Corner Hustlr?
4  A.  At the time of the stop?
5  Q.  Yeah.  Let me try to reask that.  So
6  we've kind of talked like an investigator might
7  have access to some more information and more
8  fields just by nature of their access to the
9  system, correct?
10  A.  Yes, sir.
11  Q.  Now, a deputy on a particular traffic
12  stop -- and I want to -- let's make it more
13  specific to Ms. Ayres on May 8, 2019.  Is there
14  any method or way that Deputy Christensen as a
15  patrol deputy could access additional information
16  regarding the nature of this supposed
17  4 Corner Hustlr association?
18  A.  Yes.  And I'll give you my personal
19  opinion on how that could be done.  If he didn't
20  have the access to that other additional
21  information that may be on the investigative side,
22  I could say a phone call could be made maybe to an
23  investigator or the individual that was listed on
24  the previous page, again, prolonging the stop.
25  But that would be, I guess, the measures he could

Page 113

1  have taken.
2  Q.   Deputy Christensen didn't take those
3  measures, though, did he, on May 8, 2019?
4  A.   Not that I'm aware of, no, sir.
5  Q.   Is there any requirement to how long a
6  traffic stop should be conducted by the Champaign
7  County Sheriff's Office?
8  A.   A time limit set on the stop?  No.  But
9  it should remain within the scope of the traffic
10  stop.
11  Q.   What do you mean by the scope of the
12  traffic stop?
13  A.   What the probable cause was for the
14  initial stop.  And then, you know, if a deputy or
15  officer develops an investigation and further the
16  stop, they'll look into that, as well, which may
17  determine the length of the stop.
18  Q.   If during the course of the
19  investigation of a particular traffic stop a
20  deputy believes that he has reasonable suspicion
21  for the commission of another crime, would you
22  expect that to prolong the stop?
23  A.   Yes, sir.
24  Q.   Would you expect that deputy to
25  follow-up on that investigation to its completion?

Page 114

1  A.   Yes.  To the best of their ability, yes.
2  Q.   But just to be clear, Deputy
3  Christensen, he never reached out to an
4  investigator regarding Ms. Ayres' association with
5  the 4 Corner Hustlrs, correct?
6  A.   Not at the time of the stop that I'm
7  aware of, no, sir.
8  Q.   You're not aware of Deputy Christensen
9  asking Deputy Floyd to investigate further
10  Ms. Ayres' association with the 4 Corner Hustlrs,
11  correct?
12  A.   No, sir.
13  Q.   You're not aware of Deputy Christensen
14  mentioning to Deputy Floyd his basis for his
15  reasonable suspicion that Ms. Ayres might have a
16  weapon, correct?
17  A.   No, sir.
18  Q.   I believe that's all the questions I
19  have about Exhibit B [sic], so you can set that to
20  the side.
21  A.   Okay.
22  MR. McCARTER: We've been going for just
23  short of an hour again, Captain Cook.  Are you
24  doing okay?
25  THE WITNESS: I'm fine.

Page 115

1  MR. McCARTER: Would you like to
2  continue?  Madame Court Reporter?
3  THE COURT REPORTER: I'm fine.
4  MR. McCARTER: Excellent.
5  BY MR. McCARTER:
6  Q.   In your capacity with the Champaign
7  County Sheriff's Office, have you ever disciplined
8  another officer?
9  A.   Yes.
10  Q.   What for?
11  A.   I've disciplined officers for a variety
12  of things.  But tardiness, wrong statute on a
13  citation, you know, conduct that -- we have a
14  conduct policy.  So sometimes the conduct is not
15  good and that's looked into.  And that -- I've
16  done more discipline on the civilian side than the
17  support side because of my administrative support
18  time.
19  Q.   I see.  Have you ever disciplined an
20  officer for failing to document a particular
21  traffic stop?
22  A.   No, sir.
23  Q.   Are you aware of any deputies being
24  disciplined for failing to properly document a
25  traffic stop?

Page 116

1  A.   I am aware of a deputy being disciplined
2  for failure to have the body camera on for the
3  duration of a stop, yes.
4  Q.   Are you aware of any deputy suffering
5  disciplinary action as a result of a search of a
6  person he performed?
7  A.   Yes.
8  Q.   When was that?
9  A.   The timeframe?  Four years ago, roughly.
10  Q.   Did you -- you did not institute that
11  disciplinary action, correct?
12  A.   No, sir, I was not the first -- the one
13  that implemented it.  No, sir.
14  Q.   How did you become aware of it?
15  A.   Another supervisor advised me.
16  Q.   What about that particular deputy's
17  search of a suspect person required disciplinary
18  action?
19  A.   There was contraband that was missed on
20  the search that ultimately got into our
21  correctional facility.
22  Q.   Was that suspect arrested?
23  A.   Yes, sir.
24  Q.   Do you know who this other supervisor
25  was that made the determination to discipline that

Page 117

1  particular deputy?
2  **A.  The initial write up, I think that was**
3  **Lieutenant Apperson.**
4  Q.  Can you spell Apperson for us?
5  **A.  A-p-p-e-r-s-o-n.**
6  Q.  How was that particular deputy
7  disciplined?
8  **A.  There was formal documentation.  And it**
9  **was a first offense with no previous, if I recall**
10 **correctly.  And so he received a -- it's called an**
11 **oral warning, but it's not oral; it's documented,**
12 **progressive discipline.**
13 Q.  Okay.  Was there any union push back on
14 that particular disciplinary action?
15 **A.  No, sir.**
16 Q.  Are you aware of any Sheriff's Deputy
17 who's ever been disciplined by failing to
18 intervene to prevent a constitutional violation?
19 **A.  No, sir.**
20 Q.  Are you aware of any complaints that a
21 deputy had failed to intervene to prevent a
22 constitutional violation?
23 **A.  No, sir.**
24 Q.  If an officer did perform a search of a
25 person, but did not have an adequate reasonable

Page 118

1  basis to believe that suspect possessed a
2  weapon, how might the department respond?
3  **A.  I think if the department was aware, it**
4  **would be investigated to make sure that compliance**
5  **was met in the future and, again, there was no**
6  **violations.**
7  Q.  Anything else?
8  **A.  No.  Ultimately, any findings of an**
9  **investigation, the course of action has to be**
10 **approved and accepted by the Sheriff.**
11 Q.  I want to get back to your review of the
12 body-worn camera by the two deputies in this case.
13 **A.  Sure.**
14 Q.  When watching that video, did you see
15 anything in it that led you to believe that
16 Ms. Ayres might be a danger to herself?
17 **A.  A danger to herself?  No, sir.**
18 Q.  Did you see anything in both of those
19 body-worn camera footage videos that might
20 indicate Ms. Ayres might be a danger to others?
21 **A.  I didn't see any indication that she**
22 **would be a danger to anybody.  Don't take this the**
23 **wrong way.  I just -- I don't trust people, openly**
24 **from experience in my years of service.  So I want**
25 **everybody to be in a safe environment.  I think**

Page 119

1  **officer safety and safety of her are of the**
2  **highest importance.**
3  Q.  Well, you would agree with me it's not
4  higher in importance than somebody's
5  constitutional rights, would you?
6  **A.  Yeah, no, I think the constitutional**
7  **rights need to be upheld.**
8  Q.  So I want to get back to my original
9  question.  Did you see anything in either of the
10 video of Christensen or the video of Floyd that
11 indicated that Ms. Ayres might be a danger to
12 anyone else on the scene on May 8, 2019?
13 **A.  I didn't see anything, no, sir.**
14 Q.  Did you hear any comments made by anyone
15 in either of those two videos that may indicate
16 that Ms. Ayres might be a danger to anyone else on
17 the scene on May 8, 2019?
18 **A.  I didn't hear anything.**
19 Q.  Ms. Graham, Latika Graham was the
20 passenger in Ms. Ayres' vehicle on May 8, 2019.
21 Are you aware of that?
22 **A.  Yes, sir.**
23 Q.  Okay.  Ms. Ayres -- strike that.
24 Ms. Graham was not searched on May 8, 2019,
25 correct?

Page 120

1  **A.  Correct.**
2  Q.  What's your understanding as to why?
3  **A.  The focus for Deputy Christensen was on**
4  **Ms. Ayres as being the driver of the vehicle.**
5  **Also the admission of smoking the cannabis, the**
6  **odor of cannabis.  So the focus was on Ms. Ayres**
7  **at that time.**
8  Q.  Why did Deputy -- based on your
9  understanding, why did Deputy Christensen search
10 the vehicle on May 8, 2019?
11 **A.  Well, he had to -- I mean, he had**
12 **probable cause with the odor of cannabis.**
13 Q.  What was he looking for, based on your
14 understanding?
15 **A.  Cannabis.  Actual cannabis.**
16 Q.  When searching for potential contraband
17 in a vehicle, is it important to search all the
18 occupants of that vehicle?
19 **A.  Not necessarily all the occupants of the**
20 **vehicle.  I think there was Ms. Graham as a**
21 **passenger, and I believe there were two children**
22 **in there, as well.  Or children in the backseat.**
23 **So -- and they were never removed from the**
24 **vehicle, the children.**
25 Q.  If an officer approaches the passenger

Page 121

1 side window of a vehicle on a traffic stop and
2 smells the odor of cannabis, do you think it's
3 reasonable that that officer searches the
4 passenger of that car?
5     A.   Searches or -- just based upon the
6 probable cause of odor?
7     Q.   Let me try to rephrase my question.  If
8 a deputy on a particular traffic stop approaches
9 the passenger window of a car and smells the odor
10 of cannabis, do you expect based on your
11 understanding of the policies and procedures of
12 the Sheriff's Office that that deputy should
13 search the passenger's person for suspected
14 cannabis?
15         MR. VAYR: Objection, hypothetical.  You
16 can answer.
17         THE WITNESS: Okay.
18     A.   I think that the passenger could be
19 searched.  But I also think that it would depend
20 on the overall circumstances, not just because of
21 the odor.  If the passenger admitted to possessing
22 cannabis earlier or smoking, that may further that
23 or you may want to investigate that further.
24     Q.   Any other factors that may weigh in on
25 that determination?

Page 122

1     A.   Searching the vehicle I think would
2 weigh on it because of, again, a safety concern.
3 If I remove that subject to search the vehicle, I
4 would want to pat the subject down again for
5 weapons.  My back is to them as I'm trying to
6 search the vehicle.  That's always a
7 consideration.
8     Q.   I just want to make sure that I
9 understand your answer correctly.  So when
10 removing that passenger from my hypothetical from
11 the car, you would expect them to be patted down
12 for weapons just because you're going to be paying
13 attention next to the search of the car and not
14 necessarily that passenger; is that fair?
15     A.   That's fair.  Personally, I've always
16 tried to get consent on any search or pat-down.
17 That's just my practice.
18     Q.   Based on your experience, Captain, does
19 the presence of young children have any indication
20 as to whether a particular traffic stop might
21 become violent or hostile?
22     A.   Not the presence of the children one way
23 or the other.
24     Q.   It doesn't have any impact one way or
25 the other as to whether or not that particular

Page 123

1 traffic stop is going to turn hostile or violent?
2     A.   Yes, in my opinion, no.  You need to
3 treat all traffic stops the same.
4     Q.   In May of 2019, was it the policy of the
5 Champaign County Sheriff's Office to arrest
6 suspects for possession of marijuana?
7     A.   In May of 2019 -- and again, it would
8 depend upon the amount.  Usually 30 grams or over
9 at that time could be a custodial arrest, meaning
10 taking them into custody.
11         Small amounts of cannabis alone, with no
12 other factors and no other offenses, a lot of
13 times where a notice to appear could be issued.
14 And that was really our practice, NTA in lieu of
15 arrest.
16     Q.   Can you just explain to me what a notice
17 to appear is?
18     A.   Sure.  Notice to appear is essentially a
19 summons to court to answer for the violation that
20 maybe an officer or deputy interacted with you on.
21 So you will be given the section that you
22 violated, criminal section.  We go by state.  We
23 don't have ordinances.  And then you'll have a
24 court date and time to appear.
25         MR. McCARTER: If you don't mind, I'm

Page 124

1 just going to take a few moments to look over my
2 notes here.
3         THE WITNESS: Sure.  Can I check my
4 phone?
5         MR. McCARTER: Absolutely.  Captain, I
6 think those are all the questions that I have
7 right now.  I may have some more after counsel's
8 done with his Redirect (sic), but I want to thank
9 you for your time.
10         THE WITNESS: Thank you.
11             EXAMINATION
12 BY MR. VAYR:
13     Q.   Just give me one moment.  If you'll
14 forgive me, I'm just going to go off of my notes,
15 so we might be bouncing around a little bit.  I
16 might ask you a question just to try to orient you
17 to the type of testimony before we get to the
18 substance.
19         Back when you were talking about your
20 education and experience that you personally
21 received from the Police Training Institute, I
22 think you testified somewhat to the effect that
23 you went to PTI for instructor training.  Do I
24 have that vaguely remembered correctly, at least?
25     A.   Yes.

Page 125

1  Q.   Okay.  I just wasn't sure, I think you
2  testified that you went to the equivalent of
3  seminars.  And it sounds like you got certificates
4  for completing those seminars, correct?
5  A.   Yes.
6  Q.   Did you also go -- I'm just not sure if
7  this was clear from your testimony -- did you go
8  to those PTI seminars or any PTI education that
9  trained you how to become an instructor?
10  A.   Yes.
11  Q.   Okay.  So you did receive specific how
12  to be an instructor-related training from PTI?
13  A.   Yes, sir.
14  Q.   Okay.  And what subjects did you receive
15  that instruction on?  Let me -- I'm sorry, I'll
16  ask that question later.  Let me try to put it in
17  some more context.  I'll withdraw that question.
18  A.   Okay.
19  Q.   At what time did you receive that
20  instructor-specific-related education from PTI?
21  What year, if you recall?
22  A.   Firearms instructor, 2001 or '2.  Rifle
23  instructor, again 2002.  And that's PTI instructor
24  certifications.  And then I have other
25  certifications as an instructor, but outside of

Page 126

1  PTI.
2  Q.   Okay.  Sounds good.  Let's unpack those
3  a little bit.  Did you -- so I think I heard you
4  say that the only PTI instructor certifications
5  you received we can probably agree are related to
6  the use of firearms; is that fair?
7  A.   Fair.  And also master control tactics
8  instructor.
9  Q.   And that's a PTI certification you have?
10  A.   Yes.
11  Q.   So what does a PTI certification for
12  being a master control tactics instructor entail?
13  What was your course work?
14  A.   Really, it's very little course work.
15  It's more hands-on.  And you demonstrate
16  proficiency based on the hands-on skills.  And
17  then kind of toward the end of the course, you'll
18  take a test to review use of force and when to
19  apply the physical skills.
20  Q.   Okay.  And now this is use of force.
21  I'm imaging things like straight arm take-downs or
22  handcuffing procedures.  Was searches involved in
23  that at all?
24  A.   It was.
25  Q.   Okay.  And were those the type of

Page 127

1  searches -- the gamut of searches that you
2  described earlier in your testimony of a person?
3  A.   Yes, sir.
4  Q.   And so it sounds like you went through
5  this course and you would have received a
6  certification from PTI essentially saying you're
7  good enough to teach on these subjects?
8  A.   Correct.
9  Q.   That's at least your understanding of
10  it?
11  A.   Correct.
12  Q.   Okay.  And that was through PTI alone,
13  correct?
14  A.   Yes.
15  Q.   And you also mentioned that you received
16  what I will call instructor or I think you called
17  it certification instruction certificates from
18  other entities that were not PTI, correct?
19  A.   Yes.
20  Q.   What entities were those?
21  A.   Mobile training unit, TASER instructor
22  course.  I received rapid response instructor,
23  which is active shooter instructor.  That was
24  actually through ITOA.  And instructors were Jeff
25  Chadwin and Ed Moen.  Yeah.

Page 128

1  Q.   So besides the MTU TASER instruction and
2  the ITOA with the individuals you mentioned, did
3  you receive any other specific instructor
4  certification from any entity besides the PTI?
5  A.   No.
6  Q.   Okay.  So let's talk briefly, because I
7  don't know if mobile -- I don't know if MTU was
8  defined earlier.  Can you please tell me what an
9  MTU is?
10  A.   Yeah.  So the state of Illinois has
11  MTUs, which is classified as mobile training
12  units.  They're designated to certain regions of
13  the state.  And they assist with the ongoing and
14  continued education for law enforcement.
15  Q.   And now, how often are -- let me strike
16  that.
17      The MTU that you went to for instructor
18  certification, do you recall when, roughly, you
19  went?
20  A.   The TASER instructor course would have
21  been '02 or '03 roughly.  I was at Rantoul Police
22  Department at the time.
23  Q.   Okay.  And now you also mentioned
24  something called ITOA.  What is that?
25  A.   The Illinois Tactical Officers

Page 129

1  Association.
2  Q.  Okay.  And is that -- so it sounds like
3  that's a state-run or state-created entity, at
4  least?
5  A.  Yes.
6  Q.  Which one?  State-created?
7  A.  State.
8  Q.  Okay.  And so when you go -- so is that
9  in Chicago?  Is that in Springfield?  Where's that
10  located?
11  A.  It's actually around the state.  Most of
12  the meetings take place, I believe, in Oak Brook,
13  Illinois.  That training, that course was actually
14  given in Springfield and the instructors were
15  really from the Cook County area.
16  Q.  Okay.
17  A.  Part of the NIPUS group.
18  Q.  Now, you might have testified to it and
19  I just don't recall.  So for the IOTA instructor
20  certification that you received, what was your
21  instructor certification in?
22  A.  At the time, it was classified as active
23  shooter.
24  Q.  Okay.
25  A.  It's referred to now as rapid response.

Page 130

1  Q.  Would there have been any training
2  specific to searches and providing instructions on
3  searches included in that ITOA active shooter
4  training?
5  A.  No, I don't recall anything around
6  searches.
7  Q.  And now, okay -- so now focusing -- I
8  believe you were asked some questions about, you
9  know, if an officer went to the academy, PTI, in a
10  previous law enforcement job, at least what was
11  insinuated in your testimony was that that officer
12  would not need to go to the academy again once
13  they joined the CCSO.  Do I have that correct?
14  A.  As long as they come from an agency
15  within the state of Illinois.
16  Q.  Understood.  So if, for example, an
17  officer is joining you from New York City, they
18  would have to pass the Illinois-specific academy,
19  which is PTI?
20  A.  Yes.  Or basically the Illinois Training
21  & Standards Board accept that academy's
22  curriculum.
23  Q.  Okay.  So then it's your understanding
24  that the PTI requirement is driven by Illinois law
25  and regulations?

Page 131

1  A.  Yes.
2  Q.  Okay.  And now is it fair to say -- I'm
3  not a law enforcement officer myself.  Is it fair
4  to say that at PTI, you would expect an officer --
5  a law enforcement officer to receive education on
6  let's call it the basics of the law enforcement
7  profession?
8  A.  Yes.
9  Q.  And would that -- would the basics, as
10  I'm loosely using the phrase, would that encompass
11  how to perform a search of an individual's person?
12  A.  Yes.
13  Q.  And would you assume then based on
14  your -- you know, having gone through the program
15  yourself and then also in your capacity as an
16  instructor who is certified by PTI, is it your
17  understanding that PTI training would, as part of
18  its training, include how to properly perform what
19  I'll call opposite sex searches?
20  A.  Yes.
21  Q.  Okay.  When I say opposite sex searches,
22  do you understand that I mean a search by an
23  officer who is of a different sex or perhaps a
24  different gender identity than the individual
25  who's being searched?

Page 132

1  A.  Yes.
2  Q.  And so the impression I get is that, you
3  know, just like if -- for example, if I was to
4  move to a different law firm, I wouldn't need to
5  go to law school again.  If you go from one law
6  school academy to another -- excuse me, if you go
7  from one police institution in Illinois to
8  another, you don't need to go back to school
9  again?
10  MR. McCARTER:  Object to form and
11  foundation.  You can answer.
12  A.  Yes.
13  Q.  At least with regards to the CCSO?
14  A.  Municipalities and Sheriff's Office and
15  universities have all the same requirements.
16  State Police is a different academy and different
17  curriculum.
18  Q.  So if it's a municipal level, it's --
19  A.  Correct.
20  Q.  Okay, thank you.  So now when you were
21  testifying about how Lexipol communicates policy
22  updates to departments through the open "daily
23  training bulletin", I believe you testified
24  something to the effect of you weren't aware of
25  any occasion where someone at the Sheriff's Office

Page 133

1  asked Lexipol to push out a particular policy.
2  Did I get your testimony correct?
3  **A.  Yes, that's correct.**
4  Q.  Okay.  Now, if a Champaign County -- if
5  the Champaign County Sheriff's Office wanted to
6  provide training on a specific policy, the
7  Champaign County Sheriff's Office would presumably
8  be able to do so, correct?
9  **MR. McCARTER:** Foundation.  You can
10  answer.
11  **A.  Are you talking about do it through**
12  **Lexipol?  Or just do it as an agency?**
13  Q.  The latter, doing it as an agency.
14  **A.  Sure, yes.**
15  Q.  So then at least you're not aware of an
16  instance where the CCSO influenced Lexipol's
17  decision to determine what policies are going to
18  be pushed out in a given month, but that's a
19  separate consideration from what policy the CCSO
20  itself decides to emphasize or train its officers
21  on, correct?
22  **A.  Yes.**
23  Q.  Okay.  And I believe you've testified
24  that policy refreshers or reviews are done on a,
25  you know, at least a somewhat I think you said an

Page 134

1  annual basis or a couple times a year?
2  **A.  I'm sorry, the policy?**
3  Q.  Did you -- let me rephrase the question.
4  Fair point.
5  I believe you testified that the
6  Champaign County Sheriff's Office does a policy
7  review or refresher about once or twice a year.
8  Did I get that right?
9  **A.  So ...**
10  Q.  For deputies.
11  **A.  Not necessarily the Lexipol.  That is a**
12  **continual basis, and there's no consistency in the**
13  **frequency.  Policies can be updated at any given**
14  **time.  But it's going to be based upon any federal**
15  **or state changes and then the recommendations are**
16  **pushed.**
17  Q.  I guess my question was more focused on
18  I'll use the term in-house training.  Actually, I
19  should set some foundation.
20  I think you testified that the Champaign
21  County Sheriff's Office does provide training to
22  law enforcement deputies, correct?
23  **A.  Yes.**
24  Q.  And then what kind of broad categories
25  of training or kind of broad venues would you

Page 135

1  describe that training as taking place in?
2  **A.  I would consider that more hands-on**
3  **training.  And sometimes the hands-on training**
4  **will apply to our use of force policy in**
5  **particular.**
6  **When we do control tactics training,**
7  **defensive tactics, we do cover searches in that.**
8  **Again, the physical and the mechanics more so than**
9  **I would say the actual policy when we're doing**
10  **that training block.**
11  Q.  Okay.  Just because I don't think this
12  came out in your testimony -- or at least I don't
13  know if it was clear.  My understanding, at least
14  on what you testified, is that there's both formal
15  and informal training that happens at the
16  Sheriff's Office?
17  **A.  Yes.**
18  Q.  Okay.  What would be the types of
19  informal training, if you will?
20  **A.  So informal training I would categorize**
21  **as for a term hip pocket training.  And the hip**
22  **pocket training is, you know, short and focused**
23  **training.  It can be done at the shift level.  And**
24  **be done by current instructors, field training**
25  **instructors and the sergeants themselves.**

Page 136

1  **And again, it may be a topic on shift**
2  **that has surfaced and they're like hey, let's just**
3  **focus on this and make sure everybody's clear, has**
4  **a clear understanding and direction on it.**
5  Q.  You used a phrase, I think it was hip
6  pocket?
7  **A.  Yes.**
8  Q.  So what do you mean by that?  Like what
9  does that phrase mean?
10  **A.  So hip pocket's actually an old military**
11  **term and meaning it's literally hip pocket.**
12  **There's no PowerPoint, there's no formal document**
13  **about the training.  It's knowledge based on**
14  **training.  And again, it's short and focused.**
15  **Ten-minute quick talk with the guys and gals to,**
16  **again, make sure everybody's clear and has**
17  **direction.**
18  Q.  And so if issues -- I think you were
19  saying then if issues were to come up during a
20  particular shift -- for example the first line
21  sergeant was noticing an issue with his or her
22  deputies on that shift, a hip pocket training
23  could be used as an informal mechanism to try to
24  take corrective action; is that fair?
25  **A.  That's fair.**

Page 137

1  Q.  So is there any other type of what you
2  would consider informal training that the
3  Sheriff's Office does in the law enforcement
4  division for its deputies?
5  A.  No, not informal.
6  Q.  Okay.  And then that would obviously
7  mean there's formal training.  I think you've
8  testified about this a little bit.  But there is
9  formal training, correct?
10  A.  Yes.
11  Q.  So let's focus this -- just as a general
12  matter, what does formal training mean at the
13  Sheriff's Office?
14  A.  So formal training after the academy
15  level, we have our own MTU.  So our own mobile
16  training unit.  That offers a variety of courses
17  throughout the year.  Those are courses that you
18  go and attend at a designated location.  And they
19  will meet mandates that are set by the Illinois
20  Training & Standards Board.
21  Q.  So you said they're your own MTU.  What
22  it sounds like, it's MTU that the Sheriff's Office
23  perhaps facilitates their deputies' attendance at,
24  but the Sheriff's Office is not putting on the
25  MTU; is that correct?

Page 138

1  A.  That's correct.  It's independent of the
2  agencies, but as a collective group, the budget is
3  maintained by multiple jurisdictions.
4  Q.  And would searches and proper search
5  mechanics and techniques, is that something you're
6  aware of is covered in mobile training units as a
7  general concept?
8  A.  They do offer courses periodically that
9  cover not only the mechanics, but also the legal
10  updates that apply.
11  Q.  I guess it makes sense that those
12  programs would be offered periodically because, in
13  your experience, there are multiple potential
14  things that a law enforcement deputy could receive
15  training on, correct?
16  A.  Yes.
17  Q.  It's not just searches?
18  A.  Correct.
19  Q.  Okay.  And then did you mention -- I
20  might have just missed it.  Did you mention any
21  type of formal training that you guys would do
22  besides MTU-based stuff at the Sheriff's Office?
23  A.  MTU is more of a classroom setting,
24  okay?  And then we also have through the Illinois
25  Training & Standards Board access to online

Page 139

1  training.  And the online training has, you know,
2  essentially a curriculum that you will read,
3  answer scenario-based or test questions.  At the
4  end of the completion of a course, it'll give you
5  a certification certificate which then shows the
6  legal mandates that you've met for the state of
7  Illinois.
8  Q.  How often do those -- does that online
9  training occur?
10  A.  The actual individual deputies are able
11  to register for any course they want at any given
12  time.  So they can do that year round.
13  Q.  Is there a requirement at the Sheriff's
14  Office that they do a certain minimal level of
15  training?
16  A.  Yes.  And that's actually set for all
17  peace officers in the state by the Illinois
18  Training & Standards Board.
19  Q.  What is that minimum, if I can ask, if
20  you know?
21  A.  Yeah, I can give you kind of a rundown.
22  It's continually being built on.  Annually, the
23  two annual mandates that have to be met by all
24  peace officers is a legal update and a use of
25  force update.  So that has to be done annually.

Page 140

1  You get into constitutional, constitutional use of
2  law, authority.  That's one of the mandates.
3  Procedural justice.  Civil rights.  Domestic
4  violence.  Psychology of domestic violence.
5  Trauma inform, sexual assault response.  So these
6  are all different mandates.  The two that I told
7  you were annual, there's three-year and then
8  there's five-year mandates.  Some training and/or
9  course has to be completed in those timeframes.
10  Q.  This is a state requirement, correct?
11  A.  It is.
12  Q.  And the Champaign County Sheriff's
13  Office is, in your understanding, in compliance
14  with the state requirement?
15  A.  Actively always trying to stay in
16  compliance, yes.
17  Q.  And when you say actively always try to
18  stay in compliance, do you mean that maybe there's
19  a particular deputy who is asleep at the wheel, so
20  to speak, and not doing the online education they
21  need to?
22  A.  Not necessarily asleep at the wheel.
23  But you can complete a course online, but before
24  it populates into the database, it could be a
25  delay of two to three weeks.  And if it's the next

Page 141

1   month and you completed it January and it doesn't
2   get in the system 'til February, it might show out
3   of compliance.
4       Q.   So then it sounds like what you're
5   talking about then is more of a time delay --
6       A.   It is.
7       Q.   -- as compared to your staff not
8   actually undergoing the requirements?
9       A.   Yes.  I actively monitor that and try to
10  keep up on it.
11      Q.   Have you ever had a situation -- let me
12  rephrase it.  Actually, never mind, strike the
13  question.
14          So besides the MTUs, the Illinois State
15  Training Board online training, and then the
16  Lexipol online scenarios you mentioned before, is
17  there any other type of what you would consider
18  formal training that the Champaign County
19  Sheriff's Office provides its deputies?
20      A.   No.  We try and do our hands-on.  No,
21  that's it.  That's our training mechanisms.
22      Q.   Okay.  Is there a setting where --
23  excuse me.  Is there a type of training that the
24  Sheriff's Office does where, you know, the folks
25  are all put into a room and there's a Power Point

Page 142

1   and you guys talk about a specific topic like
2   that?
3       A.   There has been.  In-house, there has
4   been that form of training.  Again, the frequency
5   and the topic has varied over the years.
6       Q.   Is there a minimum frequency with
7   regards to this particular type of in-house formal
8   training that the Sheriff's Office tries to meet,
9   as you understand it?
10      A.   Yeah.  We try and do a four-hour block
11  of training each quarter.
12      Q.   And the topic, I would assume, varies
13  with each quarter?
14      A.   Yes.
15      Q.   Okay.  Has that topic ever been related
16  to searches?
17      A.   In the past two years, we have had a
18  control tactics course that was offered which
19  would have covered some searching.  But more,
20  again, the mechanics.
21      Q.   Understood.  So besides the in-house
22  formal training that you just described and then
23  the MTU training, the Illinois State training --
24  Illinois State Board training, and then the
25  Lexipol training, is there any other type of what

Page 143

1   you would consider formal training that the
2   Sheriff's Office provides its deputies?
3       A.   No, that would be it.
4       Q.   At least nothing comes to your mind at
5   this time?
6       A.   Yeah.
7       Q.   All right.  So as I understand it, I
8   think you testified that Lexipol was brought into
9   the picture for the Sheriff's Office to start
10  assisting them with their policies around 2015; is
11  that correct?
12      A.   That's correct.
13      Q.   And that was -- Sheriff Dan Walsh and
14  Chief Deputy Allen Jones at the time would have
15  been the decision-makers about that?  I believe
16  that was your testimony?
17      A.   Yes, yes.
18      Q.   So therefore, you just weren't in a
19  position at that time in 2015 to be -- like you
20  have not been the Sheriff or the Chief Deputy, for
21  example, since 2015, correct?
22      A.   No.  No, I have not.
23      Q.   Okay.  And so perhaps it sounds like
24  they would seek your input, you would review a
25  policy, and if you thought there was a correction

Page 144

1   to be made you'd offer it.  But for the most part,
2   the decision was being made by the Sheriff and the
3   Chief Deputy?
4       A.   Yes, that's accurate.
5       Q.   Do you have any insight into why Lexipol
6   -- not necessarily specifically, but why the
7   transition was made in 2015 to go from a
8   handwritten set of policies to the online policy
9   book that Lexipol offers?
10      A.   Yeah.  I think part of the thought
11  process on that was that our handwritten old
12  policy manual was outdated and hard to keep up
13  with as far as making sure everybody had the same
14  updates for consistency purposes.  So I think the
15  viewpoint was that Lexipol would be able to
16  deliver policy and kind of be a living document as
17  updates are ongoing.
18      Q.   So it sounds like then the hope was that
19  Lexipol would maybe keep a finger on the pulse of
20  the law and if an update needed to be made, they
21  could recommend it and then also provide software
22  that would enable you to more consistently nudge
23  officers?
24      A.   Yes.
25      Q.   Is that your understanding?

Page 145

1    A.   Yes.
2         MR. McCARTER: Object to form and
3    foundation.
4    BY MR. VAYR:
5    Q.   Do you have any -- so I think you
6    mentioned about the Lexipol policies -- or while
7    we're on the subject, I think you mentioned
8    something to the effect of Lexipol offered I think
9    what you called canned policies.  But then there
10   was a review process done at the Sheriff's Office
11   to adapt those to the particular needs of the
12   Sheriff's Office.  Do I remember that correctly?
13   A.   Yes.
14   Q.   So that's your understanding of what the
15   process was with regard to Lexipol and adapting
16   them to CCSO?
17   A.   Correct.
18   Q.   Do you know of any examples of like a
19   Lexipol policy that was deemed to not be
20   applicable to the Sheriff's Office or was
21   rejected, if you know personally?  It's possible
22   you don't know.
23   A.   Yeah, I mean, I can give you one.  I
24   think there was one about -- for instance, where
25   they came from, it talked about an internal

Page 146

1    dispatch.  Like our agency-controlled
2    telecommunications, there was some policy that may
3    have been pushed that way.  We don't have that.
4    That's not applicable to us.  We contract with a
5    multi-jurisdictional dispatch.  So that's one that
6    had been pushed that obviously didn't fit our
7    operation.
8    Q.   Got it.  And so there may have been
9    other position policies that were rejected in that
10   line?
11   A.   Yes, yeah.
12   Q.   I think you testified to this a little
13   bit, but now we're -- so you testified or at least
14   you were asked what factors kind of determine who
15   gets put on a particular shift in the law
16   enforcement division at the Sheriff's Office.  And
17   I think you mentioned something about a union
18   contract?
19   A.   Yes.
20   Q.   So maybe to the extent that there are
21   other factors, so what does determine -- like what
22   is the universal stuff that determines who gets
23   put on one shift at the Sheriff's Office?
24   A.   As far as the number of slots on a
25   shift, management reserves that right.  Okay?  As

Page 147

1    far as who signs up for the slots, the available
2    slots on a shift, that is seniority sign up based
3    upon the union contract.
4    Q.   And so it's your understanding that the
5    collective bargaining agreement between -- that
6    applies to the deputies has a requirement that
7    more senior deputies get first pick of the shift
8    of their choosing?
9    A.   Yes.
10   Q.   Is there any other factor that you're
11   aware of that determines who gets put on what
12   shift?
13   A.   Our canine units, we do -- we did try
14   and spread them out to shifts so that we could use
15   that resource and tool.  But as far as that,
16   that's really the only exception outside of
17   seniority for the shift bid.  It's called a shift
18   bid.
19   Q.   And you said that you guys did try to
20   spread out the canine unit, suggesting that that's
21   not the case anymore.  Could you explain what you
22   meant by that?
23   A.   Yeah.  Our operations -- so we had three
24   shifts before.  We had three canines for patrol.
25   So that was kind of how we managed that.  Now

Page 148

1    we're on 12 hours, which is four teams.  So two
2    day teams and two night teams.  We only have three
3    canines.  So our resources aren't spread across
4    all four teams.  We have a power shift in there,
5    too.
6    Q.   Would it -- as far as -- have you been
7    involved in the hiring process at all at the
8    Champaign County Sheriff's Office for road
9    deputies?
10   A.   Yes.
11   Q.   From roughly what periods of time?
12   A.   Interview process since 2011 as a
13   lieutenant.  We all have been part of the
14   interview process at administration level.
15   Q.   Okay.  And have you ever been in a
16   position where you would make -- so for example,
17   if you interviewed someone, I would assume you
18   would make a recommendation one way or the other
19   whether they should continue on through the hiring
20   process?
21   A.   Yes.
22   Q.   What would be the next step after the
23   interview?
24   A.   The next step after the interview is the
25   background check.

Page 149

1    Q.   Okay.  And the background check
2  presumably is checking to see if they have a
3  criminal history, for example, or something that
4  would make them unfit to be a deputy?
5       MR. McCARTER: Objection to foundation.
6    A.   Yes.
7    Q.   Yes?
8    A.   Yes.
9    Q.   So far as you know, that's correct?
10   A.   That's correct.
11   Q.   Okay.  Have you been involved in the
12  background process at all for any candidates?
13  Initializing it or whatever?
14   A.   I have.
15   Q.   Okay.  What does the background process
16  entail?
17   A.   Basically the candidate will fill out a
18  more thorough application.  And then that
19  application, once completed to include
20  fingerprints, will be given to investigations and
21  assigned to an investigator.  And then that's --
22  basically a field investigation is done.  So it's
23  a complete reference check, as well as, you know,
24  personal references, work history, financial.
25  It's very thorough.

Page 150

1    Q.   So then after the background check,
2  what's the next step in the hiring process?
3    A.   If you make it past the background and
4  we are seriously looking at you, then it's a
5  contingency dependent upon the psychological test,
6  as well as a medical physical screening.
7    Q.   Okay.  And then assuming the person is
8  medically and physically fit for duty, what
9  happens next?
10   A.   Then it's -- you know, if there's a spot
11  open, they would be offered the job.  If they're a
12  new hire, then they would attend the academy.
13   Q.   Okay.  And so for that process you just
14  described, has that been consistent during your
15  time at the Champaign County Sheriff's Office?
16   A.   That process I described is what I'm
17  familiar with from 2011 on.  Prior to coming to
18  administration, I don't know.  I'm assuming it's
19  similar.
20   Q.   So from your perspective, since 2011 as
21  on the administrative side of the law enforcement
22  division at the Sheriff's Office, do you have any
23  insight into the gender distribution of applicants
24  for deputy positions?
25   A.   No.

Page 151

1    Q.   Let me rephrase.  Let me try rephrasing
2  the question.  You described your involvement in
3  the hiring process.  Have you ever -- presumably
4  through that process, you also are able to tell
5  whether someone who is applying is a male or
6  female, correct?
7    A.   Yes.
8    Q.   Do you have that -- now, to the extent
9  that you know whether a candidate was a male or a
10  female, is that limited only to the particular
11  candidates that you personally interviewed?  Or do
12  you have a broader understanding about the number
13  of males and females that have applied to the
14  Sheriff's Office?
15   A.   I only know about the candidates we've
16  interviewed that's come in front of us.
17   Q.   So how many candidates would you say --
18  I'm sorry, was your previous answer you're only
19  aware of the ones that you personally interviewed?
20   A.   Yes.
21   Q.   Okay, there you go.  So of the ones that
22  you personally interviewed, how many candidates
23  have you -- how many interviews and people that
24  you've shepherded through the hiring process have
25  you done?

Page 152

1    A.   I'll estimate this.  Over the last --
2  I've probably interviewed, since 2011, 150
3  applicants.
4    Q.   And of those 150 applicants, do you have
5  a memory of how many of them were male?
6    A.   I'm not going to be able to give you an
7  accurate figure.  I will say more -- definitely
8  interviewed more males than females.
9  Percentage-wise, 30 percent females maybe.
10   Q.   Okay.  And I'm not asking you to guess
11  or speculate.  What I'm asking you to do is that,
12  based on your memory at least as you understand it
13  then, it sounds like you've interviewed about 150
14  people and maybe about -- and about 30 percent of
15  those were females?
16   A.   Yeah.
17   Q.   Now, of those females, of that 30
18  percent, taking that figure, realizing it's an
19  estimate and not a rigorous number, of that 30
20  percent, do you know how many you personally --
21  how many were ultimately hired by the Sheriff's
22  Office?
23   A.   In the law enforcement?  In that
24  timeframe, I'm going to say four.
25   Q.   So four individuals?

Page 153

1   **A.   Yeah.**
2   Q.   Is that the same four individuals, the
3   same four females you testified would have been on
4   shift on May 8 -- excuse me, that would have been
5   employed by the law enforcement division on May 8,
6   2019?
7   **A.   Two of them are.  And I'm trying to --**
8   **the other two did not complete the probationary**
9   **period.**
10  Q.   Okay.  Are you familiar with the -- is
11  it your understanding that the Champaign County
12  Sheriff's Office tries to hire deputies without
13  regard to their gender or sex?
14         MR. McCARTER: Objection, speculation.
15  **A.   Yeah, I think we're looking for the most**
16  **qualified candidate.**
17  Q.   And so when you personally -- so I'm
18  asking you to speak to your own processes.  When
19  you are interviewing a candidate, doing the
20  background check, having their psychological and
21  medical evaluation, and then going through the
22  probationary period, is the gender or sex of a
23  candidate something that would stand out as either
24  a plus or minus sign for candidate?  Or do you
25  instead make your decisions based on the

Page 154

1   qualifications of the candidate, irrespective of
2   sex or gender?
3   **A.   Qualifications of the candidate.**
4   Q.   Okay.  In your capacity as a street
5   investigator or street deputy or when you were
6   sergeant, basically I'm asking when you were on
7   the street, not behind a desk --
8   **A.   Okay.**
9   Q.   -- when you're on the street, do you
10  have any confident estimation of how many
11  incidents you responded to involved male suspects
12  as compared to female suspects?
13         MR. McCARTER: Form.
14  BY MR. VAYR:
15  Q.   It's okay if you don't, but I'm just
16  asking.
17         MR. McCARTER: Form, foundation,
18  speculation.
19         MR. VAYR: I saw some bug eyes, so it's
20  okay.
21  **A.   I don't.  I mean, no, I really don't.**
22  Q.   Fair enough.  Move on.  So turning now
23  to the Champaign County Sheriff's Office's policy
24  regarding what I'll refer to as opposite or mixed
25  sex searches.  You testified that reasonable

Page 155

1   attempts should be made to get a same sex officer
2   to do the search and that those attempts should be
3   documented.  I have your testimony correct, right?
4   **A.   Yes.**
5   Q.   What happens if a female officer cannot
6   be summoned?  What does the opposite sex officer
7   now on the scene have to do or can do?
8   **A.   Try and have a witness and/or another**
9   **deputy or officer present to observe it.**
10  Q.   Okay.  So then is your understanding of
11  the policy then that reasonable efforts should be
12  made to try to obtain a female -- or excuse me, a
13  same sex deputy.  But failing that, the deputy,
14  the same sex -- excuse me, the opposite sex deputy
15  should then just have a witness come by to witness
16  the search that's about to occur?
17  **A.   Yes.**
18  Q.   Okay.  Is it your understanding, based
19  on your review of the body camera footage, that
20  Cody Floyd was witnessing the pat-down search of
21  Wylesha Ayres?
22  **A.   Yes.**
23  Q.   And so setting aside your testimony that
24  you did not see or identify a moment where Deputy
25  Christensen made a reasonable effort to try to get

Page 156

1   a female deputy on scene, he at least complied
2   with the back half of the policy in that he had a
3   witness there?
4   **A.   Yes.**
5   Q.   Okay.  You were asked whether a female
6   correctional officer could be summoned from the
7   jail to respond to a traffic stop and do a search
8   of a female person on the scene of a traffic stop.
9   Do you recall being asked that question?
10  **A.   Yes.**
11  Q.   And if I recall, your testimony was
12  something to the effect of, you know, pulling the
13  correctional officer out of the jail might have
14  security implications for the jail given that they
15  will now be short staffed.  I think that was your
16  testimony.
17  **A.   Yes.**
18  Q.   Okay.  Is it possible that -- let me
19  rephrase the question.
20         If the need for a search was -- if the
21  type of search that was going to be performed was
22  serious enough, so like a body cavity search or a
23  strip search, would it be an option to a
24  correctional officer to then take the female
25  searchee to the jail so that that person could

Page 157

1  then be searched by a female officer in some
2  semblance of privacy?
3  **A.   For a body cavity search or strip**
4  **search, yes, that would be a better and more**
5  **appropriate setting.**
6  Q.   Because you were asked about whether a
7  search needs to be done at a particular place.  Is
8  it your understanding of the Champaign County
9  Sheriff's Office's policy that let's say the level
10  of intrusiveness of a search will dictate where
11  the search could be done while respecting the
12  privacy rights of the individual being searched?
13  **A.   Yes.  You know, I have to clarify here.**
14  Q.   Please.
15  **A.   Very extreme from a search incident to**
16  **an arrest or a pat-down to a strip search or body**
17  **cavity search.  Body cavity search will probably**
18  **be a search warrant and a medical expert**
19  **performing.  A strip search is generally in a jail**
20  **setting, generally speaking.  And so to me, those**
21  **are two very different dynamics involved there.**
22  Q.   Right.
23  **A.   The thing about getting a person to the**
24  **jail is you still have to transport them.  And if**
25  **a person's sitting behind an officer or deputy,**

Page 158

1  **they need to be reasonably searched for contraband**
2  **or weapons because the transport can create an**
3  **issue.**
4  Q.   And that would be the search incident to
5  arrest context there?
6  **A.   Yes.**
7  Q.   Okay.  So now you've just testified,
8  though, like you have your more extreme searches,
9  like body cavity searches or strip searches, and
10  then you have your less intrusive searches, like
11  pat-downs or what I'll call a probable cause
12  search.  So you would agree that there's kind of a
13  difference of intrusiveness between these
14  searches?
15  **A.   Yes.**
16  Q.   And so the Champaign County Sheriff's
17  Office's policy regarding searches does not
18  specifically distinguish between these types of
19  searches, correct?  Or at least the search you
20  were shown as an exhibit today did not
21  specifically distinguish between them, correct?
22  **A.   Yes.**
23  Q.   It just used the term searches?
24  **A.   Correct.**
25  Q.   But a body cavity search is a search,

Page 159

1  correct?
2  **A.   It is.**
3  Q.   And so it would be your understanding
4  given the policies and customs of the Sheriff's
5  Office that if, for example, a body cavity search
6  were to be done, that would not be done at, for
7  example, a traffic stop?
8  **A.   Yes.**
9  Q.   But a pat-down search, which is less
10  intrusive, maybe could be done at a traffic stop?
11  **A.   Yes.**
12  Q.   Okay.  Would you agree -- would you
13  agree that a pat-down search is a less intrusive
14  type of search than, you know, a probable cause
15  search or a strip search?
16  **A.   Yes.**
17  Q.   Would you agree that it is, short of a
18  purely visual inspection, the least intrusive type
19  of search that an officer could mechanically do on
20  an individual?
21  **A.   Yes.**
22  Q.   Depending of course what the officer
23  searches, I would assume?
24  **A.   Yes.**
25  Q.   Okay.  So if a pat-down search needed to

Page 160

1  be done at a traffic stop, be it -- let's say for
2  a Terry justification, is that the type of search
3  that you believe a prudent officer would take the
4  detainee to the jail to go be searched by a same
5  sex member?
6  **A.   No.**
7  Q.   All right.  And that would be presumably
8  related to the security concern you just had; you
9  would have someone coming into the deputy's car
10  who has not been checked for weapons?
11  **A.   Correct.**
12  Q.   As a general proposition, is it true
13  that the Champaign County Sheriff's Office's
14  policy cannot prescribe a specific set of
15  instructions to be followed in every single
16  circumstance?
17  **A.   Yes.**
18  Q.   And by that, I mean they function as
19  guidelines or guiding principles that are to be
20  applied to the circumstances that an officer finds
21  in front of him or her?
22  **A.   Correct.**
23  Q.   So they're, again, guidelines, not a,
24  you know, thou must do one, two, three to perform
25  a search; is that fair?