E-FILED
Friday, 18 December, 2020 04:01:50 PM
Clerk, U.S. District Court, ILCD



Wylesha Ayres Plaintiff
vs.
SHERIFF DEPUTIES CODY CHRISTENSEN
and CORY FLOYD, CHAMPAIGN COUNTY
SHERIFF'S OFFICE, and CHAMPAIGN COUNTY,
ILLINOIS,

Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION
No.: 19-2148

Prepared by Joseph J. Blaettler

ECPINJ

PO Box 219
Brookside, NJ 07926
Phone: 973-725-9677
Fax: 973-543-1218

4/15/2020

**Exhibit J**

## I. Introduction

I have been retained by Shneur Z. Nathan Esquire of Nathan and Kamionski in the matter of WYLESHA AYRES Plaintiff, v. SHERIFF DEPUTIES CODY CHRISTENSEN, and CORY FLOYD, CHAMPAIGN COUNTY SHERIFF'S OFFICE, and CHAMPAIGN COUNTY, ILLINOIS, Defendants.

Ms. Ayres is the Plaintiff in this matter and is represented by Mr. Nathan. I was requested to review the material and evidence obtained in this matter and to provide my professional opinion as to whether proper police policies and procedures, to include Terry Stops and police pat-down searches, were followed based upon nationally recognized standards of police training and procedure. My resume and credentials are included with this report.

My report is based on my 33 years of law enforcement and criminal justice experience, training, and education in the field of investigations, supervision, procedures, and operations. My opinions are based within a reasonable degree of certainty in these fields. I reserve the right to amend and supplement this report in the event additional information and documents become available to me.

The following documents have been supplied to me by counsel for the Plaintiff:

- Deposition of Wylesha Ayres
- Deposition of Latika Graham
- Deposition of Cody Floyd
- Deposition of Shane Cook
- Deposition of Cory Christensen
- Body Worn Camera video of Cory Christensen
- Body Worn Camera video of Cody Floyd
- A.R.M.S print out of Wylesha Ayres
- Champaign County Sheriff's Office Policy Search and Seizure 332
- Champaign County Sheriff's Office Policy Contacts and temporary Detentions 404
- Champaign County Sheriff's Office Policy Custodial Searches 900
- Champaign County Sheriff's Office Policy Report Preparation 320
- Champaign County Sheriff's Office Policy Traffic Function and Responsibility 500
- Champaign County Sheriff's Office Policy Investigation and Prosecution 600
- Full Student Training History of Cody Floyd
- Full Student Training History of Cory Christensen
- Answers and Affirmative Defenses to Plaintiff's First Amended Complaint

**Exhibit J**

- Champaign County's Response to Plaintiff's Third Request for Production and Scheduling Documents (Ayres 000594-000601)

## II.    **Summary of Incident**

May 8, 2019 at approximately 10:00pm (2200 Hours) Deputy Cory Christensen of the Champaign County Sheriff's Department conducted a motor vehicle stop of Wylesha Ayres who was operating a Jeep Patriot. Ms. Ayres was the driver of the vehicle and Latika Graham was the owner of the vehicle and front seat passenger. Additionally, there were two young children secured in the rear seat of the Ayres' vehicle. Deputy Christensen first observed Ms. Ayres' vehicle at the intersection of North Mattis and West Bloomington Avenue in Champaign, Illinois. When Deputy Christensen first observed Ms. Ayres, he was traveling southbound on Mattis and Ms. Ayres was traveling northbound. When Deputy Christensen first saw the Ayres' vehicle, he observed only one headlight illuminated. Deputy Christensen got behind the Ayres' vehicle and ran the registration, which was expired. Upon learning that the registration had expired, Deputy Christensen conducted a motor vehicle stop by activating his emergency lights. After activating his emergency lights, Ms. Ayres pulled over to the right side of Anthony Drive. Deputy Christensen exited his police vehicle and approached on the passenger side. At the passenger side window, he obtained identification and/or information from both the driver, Ms. Ayres and her passenger, Ms. Graham. Deputy Christensen advised the occupants of the reason for the stop and that the stop was being recorded. After obtaining the occupants' identification, Deputy Christensen returned to his vehicle to conduct computer background checks on the adult occupants and requested a backup. Deputy Floyd 521 advised he was responding as a backup. According to Deputy Christensen, he requested a second car to respond to his location because of an odor of cannabis emanating from the Ayres' vehicle.

When Deputy Floyd arrived on scene, he approached the passenger side of Deputy Christensen's patrol vehicle and had a brief conversation with him. It should be noted that the first 30 seconds of the conversation from Deputy Floyd's perspective were not recorded due to the 30 second buffer on Deputy Floyd's body worn camera (BWC). Deputy Floyd's video audio starts at "do you want me to hang back?" as Deputy Christensen walks towards the Ayres vehicle. Deputy Floyd positioned himself between the rear of the Ayres vehicle and the front of Deputy Christensen's patrol unit. Ms. Ayres rolled down her window and Deputy Christensen

**Exhibit J**

advised her she was not under arrest and but she was to step out of the vehicle, which she did. At the rear of the vehicle Deputy Christensen explained the reason for the stop and remarked that he had smelled an odor of marijuana coming from inside the car. Ms. Ayres acknowledged that she had previously smoked some marijuana. Deputy Christensen then asked if there was anything in the car and Ms. Ayres replied no. Deputy Christensen then stated I am going to pat you down real quick, is that okay? Ms. Ayres did not verbally approve, but did turn around and raise both arms out to her side parallel to the ground.

Using an open hand with his palms facing Ms. Ayres and his fingers open, Deputy Christensen began patting down/touching Ms. Ayres. Deputy Christensen twice grabbed/touched Ms. Ayres' buttock area. After the second touch Ms. Ayres verbally objected to the touching of her private area and made a comment about Deputy Christensen touching her butt. Deputy Christensen replied he was just checking for weapons. At that point Ms. Ayres walked slightly away and Deputy Christensen walked to the passenger side of the Ayres' vehicle. At the passenger side he had a brief conversation with Ms. Graham and had her step out of the vehicle. When she was out of the vehicle Deputy Christensen conducted a search of the vehicle, to include the trunk.

While Ms. Ayres was at the rear of her vehicle with Deputy Floyd, she can be heard telling Floyd that 'no one should be touching my ass.' Deputy Floyd replied by stating "I didn't see him touch your bottom, sorry." At that point Ms. Graham walked back to Deputy Floyd and Ms. Ayres. Ms. Ayres repeated the comment about Deputy Christensen touching her ass. Once Deputy Christensen completed his search both Ms. Ayres and Ms. Graham returned to their vehicle and both deputies began to walk away. Ms. Graham's physical person was never searched. After 04:59 of recording, Deputy Floyd's BWC is turned off.

After the vehicle was searched both occupants were allowed to return to their vehicle while Deputy Christensen returned to his vehicle to issue citations. Deputy Floyd also returned to his patrol vehicle. After completing the citation/s Deputy Christensen returned to the Ayres' vehicle and engaged in a short conversation with both occupants. Deputy Christensen handed Ayres a copy of the citation; she refused to sign it. He walked back to his patrol vehicle, at which time he turned off his BWC. The total time of the stop was 16 minutes and 49 seconds.

When the stop was completed all parties left the scene. Approximately 20 minutes later Deputy Floyd conducted a second stop on the Ayres' vehicle. Deputy Floyd pulled the Ayres vehicle over for the same violation- expired registration. Deputy Floyd claims he did not realize it was the same vehicle and once he did, he ended the stop. Rather than approach the Ayres' vehicle Deputy Floyd pulled alongside the vehicle and allowed Ms. Ayres to go on her way.

## III.    Summary of Depositions

### Deposition of Cory Christensen February 20, 2020

- Christensen states correct when asked if he attended PTI in 2014 prior to being fully commissioned as a police officer in Monticello. Christensen states yes, at PTI, he did receive training on how to conduct a search. Page 20
- Christensen states yes that there were different ways to conduct searches of a person that he learned during his training.  He states, from what he can recall, there were different ways of searching - Terry stops to search incident to arrest, proper techniques on searching a male incident to arrest, female incident to arrest.
- When asked his understanding of a Terry stop, Christensen uses an example and states the other night an armed robbery occurred in the City of Urbana. A description of the subject is given out. Black male, red sweatpants, black jacket. He's in the vicinity and sees that subject. A firearm was implied during that robbery. That Terry stop -- got out with that person, Terry stopped them, patted them down to ensure that there was no weapon on their person due to them matching the description of where the crime -- in the vicinity where the crime had occurred
- When asked if it's a search for a weapon on a particular individual who's suspected of a crime, Christensen states he had reasonable suspicion to believe this subject was involved in the crime that was reported to the dispatch center. Page 21-22
- When asked what he is looking for in a Terry stop, Christensen states any weapons.
- When asked the difference between a search of a male suspect and a female suspect, Christensen states there's no difference, but he was trained in performing a search incident to arrest specifically on a female. Page 23-24
- When asked what he understands to be the difference between a Terry stop and a search incident to an arrest, Christensen states a Terry stop is a reasonable suspicion that that subject was involved in some kind of crime. You are patting down the exterior of that person, ensuring that they don't have any weapons or anything that could harm the deputy or officer on their person. You're not digging into their pockets. It is a pat-down or frisk of their exterior. Page 25-26
- Christensen is asked if he is familiar with the Champaign County Sheriff's Department policies and procedures regarding conducting searches and he responds yes. When asked what his understanding is of the policies and procedures of conducting searches of a member of the opposite sex, Christensen states when applicable, or if possible, have a deputy of the same sex on scene or respond to that scene to conduct the search.
- When asked if he was at a traffic stop and wanted to request the presence of a female officer to search a female suspect, how would he do that, Christensen states he would get

on the radio and ask METCAD, who's the dispatch center, to have a female deputy respond to my location. Page 37-39

- When asked if there are any special requirements, based on the policies and procedures of the Champaign County sheriff's department, regarding how to conduct a search of a member of the opposite sex, Christensen states "No. Can I add a respectful manner." Page 40
- When asked if there is anything that he's aware of in the policies and procedures regarding what part of the member of the opposite sex you're allowed to search, Christensen states, in the policy and procedure, no.
- When asked if anything changes in how he conducts a search if the subject of that search is a male or female, Christensen states no. They're both going to be conducted in a respectful manner, in an unobtrusive way. Page 41
- When asked during these searches of female suspects, had he, prior to conducting that search, requested the presence of a female officer, Christensen states yes. Page 42
- When asked if he is aware of any policy or procedure that exists that requires any sort of reporting to be done if an officer has to search a member of the opposite sex, Christensen states no.
- When asked on May 8th, 2019, the first time that he recognized the Silver Jeep Patriot that Ms. Ayres was operating, Christensen states the car was traveling on Mattis northbound. He was traveling southbound.
- He first noticed one headlight. Only one headlight was illuminated.
- When asked what he did when he first saw the car, Christensen states he turned around and got behind the vehicle and then ran the affixed registration on the back of the vehicle. He observed it was expired by two months. Page 53-54
- When asked if LEADS is a system that's unique to the Champaign County sheriff's department, Christensen states no, police agencies throughout the state of Illinois use LEADS.
- After he learned the plate was expired, he remained behind the vehicle, activated the red and blue emergency lights on his Champaign County Sheriff's Office marked squad car to conduct a traffic stop pursuant to two Illinois Vehicle Code violations. When he turned on his lights, the vehicle pulled off to the right side of Anthony Drive. Page 56
- Christensen states he approached the passenger side of the vehicle. Ms. Graham, the passenger rolled the window down.
- He asked for the driver's identification. Page 57-58
- Christensen states he called for a second unit. When he got back to his squad car, he started conducting the checks on his computer that he does on every traffic stop. When he got back to his squad car, Deputy Floyd advised he would be en route.
- When asked why did he radio for a second unit at that time, Christensen states due to the odor of cannabis he detected emanating from the interior of the vehicle. He detected the odor as soon as he walked up to the front passenger window. Page 59
- Christensen states the information he got back on Ayres from LEADS was that her driver's license was expired and he also observed via her criminal history that she's had numerous arrests and some convictions. When asked how did those two pieces of information inform his decision making about how to conduct the search on May 8th, 2019, Christensen states essentially officer safety after observing what she'd been arrested for. Page 66

**Exhibit J**

- When asked if he recalls what information came back about what Ms. Ayres was arrested for, Christensen states he doesn't recall and didn't learn anything else from LEADS. Page 67
- When asked what he learned from the ARMS search about Ayres, Christensen states she had been arrested locally and out of county, that she had been paroled, that she had been an offender of numerous robberies, that she had recently been in a vehicle where a stolen firearm was in it. Page 68-69
- In the summary section of the ARMS report, it says city tow and then it spaces down. Two guns located in a vehicle. One found to be stolen. When asked what did that information mean to him, Christensen states that Ms. Ayres had been in a vehicle on 7|7 of 2018 where two guns were located inside, one of which was found to be stolen. Page 76
- When asked if anything else on this page, 221, informed his decision-making process for May 8th, 2019, Christensen states yes, it heightened his officer safety. Due to the contacts he observed Ayres being involved in, as well as gang affiliation. Page 82
- Christensen states when Deputy Floyd arrived, he walked up to his squad car. Christensen told him that he could detect weed coming from inside the vehicle. That is all he could recall telling Floyd. Christensen states he recalls mentioning information to what he observed via ARMS, but doesn't recall specifically verbatim what he told Floyd. Page 89-90
- When asked what happened as he approached the vehicle, Christensen states he asked Ms. Ayres in a respectful manner if she would please exit the vehicle. He approached the driver's side. He informed her she was not under arrest.
- She did exit the vehicle. They walked back in between the rear of the vehicle she was operating and the front of his squad car. Page 91
- Christensen states Floyd was standing in the vicinity of his front passenger headlight. After he and Ayres stepped to the back of the Jeep in front of his squad car, he informed her that he could detect the odor of cannabis coming from the interior of the vehicle. He asked her if there was any cannabis inside the vehicle; she stated there was not. She admitted to him that she had smoked earlier. Page 92
- He decided to search Ayres. He asked her if he could ensure that she didn't have any weapons on her person. He decided to search Ayres when he observed that she was included on a Champaign uniform police report where a stolen firearm and another firearm were located inside the vehicle.
- When asked what information led him to the conclusion that he was going to search Ayres, Christensen states officer safety. Page 93
- Christensen states no when asked if prior to learning the information in the ARMS report, did he have any information to indicate that Ayres might be a danger or a threat to the other individuals or herself in the silver Jeep Patriot. Christensen states he had suspicion that due to her past, being involved in felony arrests or felony crimes, that he had reasonable suspicion to believe that there could be a weapon on her person. It was her past that informed that opinion. It wasn't anything that happened at that search on May 8, 2019. Page 93-94
- Christensen states he doesn't recall when asked whether he asked Ms. Ayres if she had any weapons on her as she stepped out of the car. Christensen states no, that he never had to take control of Ayres' hands. When asked what happened next after he and Ayres were

between the squad car and Jeep, Christensen states he recalls asking her if he could ensure that she didn't have any weapons on her person, at which point he observed her bring her left and right arms up essentially like an airplane. When he says like an airplane, perpendicular to the ground, straight out to her side.

- **MR. VAYR**: Parallel to the ground. **(by Mr. Mc Carter)** Thank you, counsel.
- Christensen states no he did not request the presence of a female officer. If he were to request the presence of a female officer, he would have asked METCAD over the radio with his badge number if there's a female officer available. He did not do that.
- Deputy Floyd did not ask for presence of a female officer at the scene. There were no females working on the night of May 8, 2019, in the Champaign County Sheriff's department.
- In conducting the search of Ayres, he was looking for any weapons that could either harm him or Deputy Floyd. The basis of his suspicion that Ayres might have had a weapon was due to her past contacts with law enforcement. They also presume, based off training and experience, that anyone could be armed. Page 95-97
- Prior to searching Ms. Ayres, Christensen states Ayres was respectful, but again no one is happy when they get pulled over. She was compliant. She did not make any threats toward him or anyone else in the vehicle. He does not recall her cursing at him. She seemed frustrated.
- When asked what he did after asking for consent to search Ayres and then she indicated as such by placing her hands parallel to the ground, Christensen states she was still facing him when she raised her arms parallel from the ground. He asked her if she would turn around and put her back towards him. Page 98-99
- When asked if he conducted a search of Ayres, Christensen states yes. He checked the areas of her person where she could possibly be concealing a weapon. Her waistband, down her right of her thigh, inside of her thigh, right of her thigh, on each leg. Each side of the thigh, and then also her back pockets.
- Christensen states her two back pockets, when asked if he searched her buttocks, because she had baggy pants on, and due to his training and experience, numerous types of weapons could be concealed in a pocket. When asked how did he search her inner thigh, Christensen states with his hand. He ran his hand down her inner thigh where her pants were baggy.
- When asked how far down her inner thigh did he go with his hand, Christensen states above her knee, but cannot estimate how far above the knee he stopped. Page 101
- Christensen was asked how he searched her buttocks. At first, he just ran his hands over it, and then because they were baggy, he ran his right hand over her right back pocket to ensure there was no weapon inside of her rear right back pocket. He did not repeat that for the left pocket. Page 102
- When moving his hand across her buttocks searching her back side for a weapon, his palm was against Ms. Ayres' body and his fingers were closed. Page 103
- He was asked if searching the private parts of a person's body, including their buttocks, with the palm of your hand, fingers closed in a high five gesture, was something that he learned of through his training with the Champaign County Sheriff's Department, Christensen states no. The last training for search of a person that was held was at the Police Training Institute six years ago.   He does not recall if he learned it at PTI.

**Exhibit J**

- Christensen states they could have received training at PTI, but cannot recall when asked if he received some any training on how to conduct such a search of an individual of the opposite sex in either their buttocks or their crotch. When asked if he said anything to Ayres during the search, he recalls her stating something along the lines of 'whoa, dude, don't touch my butt' as he was finishing or concluding the search. He responded that he was not touching her butt. He was just ensuring that she had no weapons on her. Page 104-106
- After she said 'don't touch my butt', or words to that effect, he completed his search. She then stood by Deputy Floyd. Page 107
- After searching the trunk, he informed Ms. Ayres and Ms. Graham that they could get back into the vehicle. He never searched Ms. Graham because he observed that she didn't have any contacts as far as weapons. He was trying to expedite the process so he could get her to work. Page 114
- After searching the trunk, he returned to his squad car to complete a traffic citation for no valid Illinois license. That was the only citation that he issued that night. Page 117
- He returned to his squad car after performing the search of the Jeep, and did not conduct any other additional investigation into either Ms. Ayres or Ms. Graham. Christensen states he doesn't recall exactly what she said. She was frustrated and refused to sign the citation. Page 118
- Christensen states Ayres' demeanor changed at the end of his search. She seemed standoffish. Page 123-124
- Christensen states yes, her demeanor did change, because he doesn't believe anyone enjoys being searched by a police officer. Page 125

**BY MR. VAYR:**

- Christensen states yes that he understands a Terry stop or a search incident to arrest to be the legal justifications for a given search as compared to a search itself, the mechanics of the search.
- When asked what is the least intrusive type of search that he is aware of or was trained on, Christensen states a pat-down.
- Christensen states essentially patting down the exterior of a person's clothing, whatever they're wearing, to where any weapon could be concealed. Page 129-130
- Christensen estimates the pat-down of Ayres took less than fifteen seconds. He focused his search on the waistband and her pant pockets. Page 140
- Christensen states yes that he's feeling the outside of where her pockets are, rather than searching her thigh or buttocks. Christensen states yes that it just so happens that pockets hang over the thigh and the buttock of an individual. Christensen states yes that he passed over the back pockets once. Page 141
- Christensen states correct when asked if it is his testimony that he did not grab Ms. Ayres' buttocks. He did not grab her crotch. He did not search or insert his hand into her buttocks.
- He did not search or insert his hand into her crotch. Page 145
- Christensen states yes that if you have a reasonable suspicion to believe that a weapon involved with a crime was on the person. When asked if it is his understanding of Terry

**Exhibit J**

that the question isn't so much whether the weapon involved was associated with a crime, it's just whether the individual has a weapon, Christensen states yes. Page 146

- Christensen states applicable or available when asked if a female should be summoned. Page 157
- Christensen states a supervisor or deputy needs to be summoned to the stop or location when asked if there is an alternative policy if a female is not available. Christensen states yes that you have to have a witness come by and watch the search. Page 158
- He called Deputy Floyd and he was there to witness the search. Page 159
- When asked if the Champaign County Sheriff's Office did not train him on the specific mechanics of what particular specific types of searches entail, Christensen states correct that he brought up they did a control tactics and handcuffing, and the only training he recalls going over is how to conduct a search incident to arrest, so when you have someone in custody. Page 160
- Christensen states yes that LEADS and ARMS are something that he can rely on to be correct. Page 165
- Christensen states correct that the hot spots for weapons or contraband is the waistline and pants pockets. He opted not to search her arms, her armpits or her pants or have her lift her hat. Page 179
- When asked if he recalls did Ms. Ayres make the "don't touch my butt" comment during the search or after he had stopped performing the pat-down search, Christensen states immediately after he checked her rear right pocket is when she verbally stated that to him, and that's when he concluded the search. It happened concurrently. Christensen states correct that before that she hadn't done anything that indicated to him that the search was making her uncomfortable or anything.
- When asked that it's not a Champaign County Sheriff's Office rule to perform highly intrusive searches that are meant to intimidate or harass people, Christensen states correct. If someone engaged in that type of conduct, it would be contrary to policy. Page 185-187

**R. Mc CARTER:**

- When asked if, prior to searching Wylesha Ayres on May 8, 2019, did he make any attempt to reach out to a female officer at the Champaign County sheriff's department, Christensen states no. Page 190
- He didn't call to see if a female officer was available to come to the site of the stop from the Champaign Police Department.
- He didn't contact the Urbana Police Department to see if they had a female officer who was available to come to the site of the search.
- When he was searching Wylesha Ayres, he was searching for a weapon.
- Christensen states correct that he also performed a search in ARMS where he discovered that she was listed in an incident that also involved Quantrell Ayres. Nothing in that incident indicated that she was an aggressor in that incident. He didn't know her level of involvement in that incident one way or the other.
- In the ARMS search she was also mentioned as being associated with the Corner Hustlers.

**Exhibit J**

- He didn't know if that was an association from the past. He didn't know if she was an active member. He didn't know the level of her involvement in that street gang. He didn't know if she was currently involved in that street gang.
- He didn't know if she currently was associated with any active members of that street gang. Page 192-193
- He did make actual contact with her body with his hand during the search. While performing the search of her back side and her outer and inner thighs, his hand was actually touching her body.
- During the prior searches that he's conducted of female suspects, he has documented them in written reports. Page 194-195

**BY MR. Mc CARTER**

- When asked since he's been at the Champaign County Sheriff's Department, had he received any training specifically on how to conduct a pat-down search of a female suspect, Christensen states not to his knowledge.
- When asked since he's been at the Champaign County Sheriff's Department, had he received any training on how to conduct a probable cause search of a female suspect, Christensen states not specifically a female. Page 198-199

**Deposition of Wylesha Ayres January 28, 2020**

- Ayres states she has had pat-down searches before. Page 17
- Ayres does recall the two traffic stops that occurred on May 8th, 2019, both of those were by Champaign County Sheriff's Office deputies. Page 21
- The first traffic stop she believes was at Dobbins Down Road. Page 31
- Ayres states the officer informed Letika through the passenger side that the license plate was expired. He then said he was going to just run their names and give them a little warning because he could understand people forget to get those renewed. They gave him their information. He went to the back and he came back and he said he smelled weed in the car. Page 33
- He then said he would need to search the vehicle; she already knew what was coming. Earlier she was cleaning out her vehicle and smoking around the vehicle. Page 63
- When asked if Christensen said, "Can I search you?" or "I'm going to search you.", Ayres states she doesn't recall. She states he said he needed to search her. He did not say she was under arrest at any point. Page 71-72
- Ayres states yes, she turned around because that's what you're supposed to do for a pat-down. She says if they tell you they need to do something you're supposed to abide by what they say. Ayres states "No, she's never felt like she could have said no."
- When asked to describe what Officer Christensen's pat-down search was like, Ayres states it was very feely toward my private areas. Page 74-75
- Ayres states it was more rubbing than patting. Ayres states he did not search her shoulders.

**Exhibit J**

- Ayres states he did not search her chest area. Ayres states he did not search under her armpits. Ayres states he did not search her arms. He did search below her rib cage but above her waistline. Page 76
- When asked if she recalls where Deputy Floyd was during the pat-down search, Ayres states he was right there. Ayres states her eyes are just kind of staring straight ahead during the search. Page 80
- Ayres states her eyes did not stare straight ahead for the entirety of the search. She states after he touched her butt, that's when she got to looking around. When asked if in the middle to the end of the search is when the butt touch happened, Ayres states fondled, yes. Page 81
- When asked where her eyes went at the middle to the end of the search, Ayres states when it first happened, she was thinking maybe it was an accident, so she was looking around because she was going to say something. And then he did it again and that's when she dropped her arms. Page 82
- When asked what parts specifically does she recalls Christensen touching, Ayres states the first time was her butt and she tried to say, okay, maybe it's close, just swiped across it, and the second time was like in between, in between her butt.
- When asked how many times, Ayres states the first time he did it was a swipe and the second time he ran across both parts of her butt. Then the third time was the end when it went in between, but I mean it's all in the same it's all in the same time. It's all right then and there. Page 86-88
- Ayres states he repeatedly went to her butt constantly. When asked if he touched any other part of you that you took offense to, besides her butt, Ayres states the rubbing, everything was kind of weird. The search was kind of weird in the beginning. She's been searched by several males and ain't never had a problem with it. The feeling of it is like he was trying to belittle her as opposed to searching. Page 89
- Ayres states he was a little rough, the way he was grabbing her. Page 90
- When asked if his touching her butt was something that was problematic, Ayres states in between. Ayres states it felt more like a grope. Page 91-92
- Ayres states he's going in the same areas over and over again. He's searching the same area over and over again. Page 95
- When asked about butt touch one, he goes to the front pockets, butt touch two, Ayres states then he came back after butt touch two and -- to the butt. The last one was when he was -- that's when she walked off. She recalls her butt being fondled in a way that she's never been fondled with in the first place. Page 96
- Ayres states she recalls him putting his hands in between the -- she felt it in there, the butt part. When asked was there anything else during the search that she recalls Christensen's fingers doing, Ayres states just the way the whole search, it was not a normal search to her. Page 98
- When asked if her memory, is that she walked off because of that second butt touch and not because Christensen said the search is over, Ayres states she was walking off regardless because he had done too much. Page 102
- Ayres states she stood next to Officer Floyd, and she and Officer Floyd were bickering back with him about what he (Christensen) had did. Page 103

**Exhibit J**

- Ayres states yes, she was told that when they ask you to do something, you were supposed to do it or you go to jail when asked about complying with a request for a pat-down. She states she's been told that over the years by other officers. Page 117
- Ayres states when he asked her to do something, she just responded to just do it because she had kids in the car and she didn't want to have any other altercations that the kids could have seen. Page 119
- When asked if there was a situation where she was in a car with an individual named Quantrell Ayres and he was arrested, Ayres states no, she was never in a car with her brother while he's been arrested. She states again that she never has been in a car with her brother with a stolen gun. Page 125
- Ayres states no when asked if she has ever been a member of anything that she would classify as a gang. When asked if Corner Hustlers means anything to her, Ayres states Four Corner Hustlers means a lot to everybody. It's everywhere around the world. She's never been in a gang. She doesn't have no tattoos affiliated with a gang nor can anybody place her with a gang. Page 127

**MR. McCARTER:**

- Ayres states no that in all of her prior searches that have taken place at a traffic stop, she has never had an officer search her buttocks in such a manner as on May 8th, 2019 at the first traffic stop. Page 134
- When asked during the search of her person how far away was Officer Floyd, Ayres states he wasn't too far. He was like really like right there. Closer than 10 feet. Page 135
- When asked if there were three instances where Christensen allegedly touched her butt, Ayres states yes like the swipe, the amount of times she was fondled. Ayres states correct that she didn't make a big deal out of the first time. The first time she just tried to make it feel like it was a gloss over. It wasn't nothing extrusive[sic] as the last part. Ayres states yes, that she wanted to cooperate with the officer. Ayres states yes that the second time it was a little more intrusive and he slid his hand across. Ayres states yes that the third time, that's when he was a little more forceful and inserted his hand in between the two cheeks of her buttocks. She did testify that it felt more like a grope. When asked how did that make her feel, Ayres states it made her feel low of myself. This was the first instance that she had a male police officer touch her in such a manner. Page 137-138
- Ayres states she didn't want it to happen no more, she wasn't going to allow it to happen no more, the search. Ayres states yes, for the most part she tried to stay calm. She wanted to cooperate with the officers and didn't want to escalate the situation. Ayres states yes that one of the reasons she didn't want to escalate the situation was she had two children in the back seat of the Jeep. Page 139
- When asked to elaborate on how it made her feel, Ayres states it made her feel low. As a woman, she felt like they were trying to make a mockery of who she was, her character, her past. Page 140

**Deposition of Shane Cook March 10, 2020**
- Cook states there are policies that outlines searches in the Champaign County Sheriff's Office. Page 70

**Exhibit J**

- Cook states yes, that there is a policy of the Champaign County Sheriff's Office regarding conducting searches of members of the opposite sex. His understanding of that policy is that if it is a person of the opposite sex, reasonable attempts should be made to try to get the same sex there to assist with that search and/or pat-down. If that is done, then it needs to be properly documented.
- When asked if it has to be documented if an attempt to radio or contact a member of the same sex as the subject or actually getting a member of the same sex of the subject to the scene to conduct that search, Cook states that he thinks in both contexts. Page 71-72
- When asked if a male deputy at a particular scene thought it necessary to search a female suspect, could he contact a female employee of any of those other divisions outside of patrol Cook states yes, they explore that option. Page 75
- When asked if a male deputy's going to search a female suspect and either has not reached out for a female deputy or a female deputy is unavailable, is he aware as to any policy and procedure that governs how that male is to perform that search of a female, Cook states no, not in narrative form like describing it.
- Cook states no, he's not aware of training when asked if other than narrative form, is he aware of any policy and procedure of the Sheriff's Office which governs how that search is to be performed by a member of the opposite sex. Page 79
- Cook states he would think that you request a female if they're available, if they're working. Sometimes neighboring agencies may have a female working, when he was asked what efforts would be made to find a female. Cook states they can request assistance from any agency. Page 83
- Cook states he has personally requested the presence of a female officer from somebody outside of his department. He has done it on more than one occasion. When asked if he is aware of any specific search techniques that deputies are trained on regarding searching a member of the opposite sex, Cook states he is familiar with one technique that he was taught in the academy. Page 84
- When asked if he is aware of the Sheriff's Office giving any training to their deputies regarding how to search a female suspect, Cook states yes, they've treated them universally. Their searches are consistent in the same manner regardless of the sex. He doesn't remember it ever being taught at the Sheriff's Office. The Sheriff's Department doesn't give any training in the technique in performing a search for a member of the opposite sex, but Cook can't answer why that is. Page 86
- Cook states he is aware why Deputy Christensen searched Ayres. His understanding is that he generated the traffic stop. There was the odor of cannabis. She admitted to actually smoking cannabis at some point. He asked her to exit the vehicle because he was going to search the vehicle. He then did a pat-down of Ms. Ayres. Cook states minor possession is a non-violent crime. Page 96-98
- Cook states no that Ayres never made threats to Christensen or Floyd. When asked if he was aware if Deputy Christensen documented in the citation or in the body-worn camera that he attempted to locate a female to perform the search, Cook states he doesn't believe that was done.
- When asked how the Champaign County Sheriff's Office trains its officers regarding evaluating reasonable suspicion to believe a suspect has a weapon, Cook states he doesn't know if he would say there's specific training for that, other than at the academy level. Page 101-102

- Cook states correct that he would agree that somebody who had citations for various traffic violations, criminal history, isn't necessarily indicative of possession of a weapon, correct. Page 105
- When asked if an officer did perform a search of a person, but did not have an adequate reasonable basis to believe that that suspect possessed a weapon, how might the department respond, Cook states he thinks if the department was aware, it would be investigated to make sure that compliance was met in the future and, again, there was no violation. Page 117-118
- Cook didn't see anything in the video that led him to believe that Ayres might be a danger to herself. Cook didn't see anything in the body worn camera footage videos that might indicate Ayres might be a danger to anybody. Cook states he doesn't trust people, from his experience in his years of service. He wants everybody to be in a safe environment. He thinks officer safety and her safety are of the highest importance.
- Cook states he thinks the constitutional rights need to be upheld.

**BY MR. VAYR:**

- Cook states yes, it is it his understanding that PTI training would, as part of its training, include how to properly perform opposite sex searches. Page 131
- Cook states yes that reasonable attempts should be made to get a same sex officer to do the search and that those attempts should be documented. Cook states yes that Christensen had a witness there. Page 154-156
- Cook states a pat-down search, which is less intrusive, maybe could be done at a traffic stop.
- It is Cook's understanding that if an officer has a reasonable suspicion, they could conduct a Terry stop. Page 169-170.

**BY MR. McCARTER:**

- Cook states the Champaign County Sheriff's Office does not offer training specifically on how to pat-down a female suspect. He states there has been training over the course of his time at the Sheriff's Office that has touched on that subject. It's not a consistent basis. He does know there has been some training on it, between 2004 and present day.
- Cook states he cannot specifically say of any training that is offered by the Champaign County Sheriff's Office on how to search a female's buttocks. He cannot say of any training about how to perform a search of a female's crotch. Page 182-183
- Cook agrees that Christensen did not try to contact a female deputy on May 8, 2019. Page 188-190
- Cook states yes, that when performing a pat-down search for weapons, a deputy's supposed to be thorough. Christensen never searched Ms. Ayres' hat. Christensen never searched her socks or shoes or chest area. Cook agrees that cannabis in a small amount does not indicate that a person has a violent tendency. Under Illinois law, the possession of cannabis under 30 grams is now legal. Page 191-192

**Deposition of Latika Graham January 28, 2020**

**Exhibit J**

Regarding May 8th, 10 2019:

- Graham states as they are on the side of the road, the officer got out of the car and walked over to the vehicle. He approached the passenger side and he was speaking into the passenger window.
- When asked what he said to Wylesha, Graham states her plates were suspended, and he was very nice about it. He said that I see your plates are – she states she is unable to say word for word what he said. Page 28-29
- He then got their information and he walked back to his vehicle. Then he came back and asks Wylesha to step out of the vehicle. Page 30
- Graham states she got out of the vehicle when she saw that they were searching her. Page 32
- Graham states she stepped out of the vehicle and said, "Hold on, what are you doing?" "You're not supposed to be searching her." Page 33
- When asked if as soon as she saw Ayres arms start to go parallel to the ground, she started to raise her arms, she left the car, Graham states she can't say she jumped out of the vehicle, but as soon as she saw it, she instantly was 'like this isn't right.' Page 34-35
- When asked about the physical pat-down, Graham states she could see pretty good out of the back window. The lights were going off, so she saw them touch her. Page 39
- When asked how the search concluded as she remembers, Graham states after the search ended, the officer made her step back out of the vehicle so he could search the vehicle. Page 53
- When asked if Ayres spoke with her about this traffic stop after it happened, Graham states other than the fact that she felt violated. Page 66
- Graham states Ayres cries to her. She says nobody knows how she feels and everybody thinks it's a joke. And it's not right. They shouldn't be able to do her like that. Page 67-68
- When asked if she recalls what words Ayres used when describing that to her, Graham states -   grabbed my ass. Page 71

**Deposition of Cody Floyd February 20, 2020**

- Floyd states a pat down search would be necessary when there's reasonable suspicion that a weapon may be concealed. When asked what his understanding of the term reasonable suspicion is, Floyd states it means to have a reasonable belief to think that a crime has been committed, is being committed, or is about to be committed. Page 27
- Officer Floyd received training in how to conduct a pat-down search at PTI. Floyd states a pat-down search would be conducted by placing the hands over the top of one's clothing and feeling for contraband that may be underneath the clothing.
- When asked if he means palm against the suspect or palm facing out from the suspect, Floyd states it depends on where you are patting down on the suspect. When asked when he would use his palm facing out from a suspect, Floyd states if he were to do a search of a female, he would use either a bladed hand or the back of his hand to search, particularly around private areas of the female. One reason would be to not have my actions misconstrued. Page 45-46

**Exhibit J**

- Floyd states his technique would change depending on which sex the suspect is. If he was searching the chest of a male, he would have his palm down against them. If he was searching the chest of a female, he would use a bladed hand to do so.
- Floyd states other changes to your search technique if the subject of the search is a member of the opposite sex is if he was feeling around the waistline of a female, he would use a bladed hand. If he was searching around the waistline of a male, he would likely use palm down.
- Floyd states he would use a bladed hand when it's female so not to have his actions misconstrued, to be respectful of the person being searched. Page 47-48
- Floyd states yes that when searching a member of the opposite sex, he is required to search that person in view of another officer. Page 51
- Champaign County does have policies and procedures regarding searches of suspects of the opposite sex of the officer. His understanding of the policies is that Deputies can perform searches of suspects of the opposite gender with at least another witness, witnessing deputy, or supervisor present. Page 52
- When asked if there are any policies and procedures regarding requesting a member of the suspect's sex to come and perform that search, Floyd states his understanding of the policy is that if a male deputy was to search a female suspect, if reasonable the male deputy should request a female deputy to perform the search. Page 53
- Floyd states he has been present on a scene where a male officer has requested the presence of a female officer to search a female suspect. Page 54
- Floyd states when he arrived, he believes Christensen was on Anthony Drive near the intersection with Dobbins in Champaign Township in Illinois. When he arrived, he approached the passenger side of Deputy Christiansen's squad car. Page 71
- Floyd states he then spoke with Christensen about his traffic stop. Floyd doesn't recall the exact words exchanged and how the conversation was started, but he believes we discussed the nature of the traffic stop and his preliminary findings. Page 72
- Floyd believes he told him that the traffic stop was conducted for an expired license plate.
- Christensen informed him that he could smell the odor of cannabis coming from inside of the vehicle. Christensen also informed him of the driver's criminal history. He doesn't recall exactly what he said. Christensen informed him of some kind of criminal history of the driver of the vehicle. Page 73
- Floyd states he doesn't recall if he did or did not smell the odor of marijuana while he was at the scene. When asked what Christensen's plan was for the rest of the traffic stop, Floyd states he believes Christensen informed him that he wanted to have the driver and passenger exit the vehicle, and he was going to conduct a search of the vehicle and possibly the persons. Floyd doesn't recall exactly what Christensen stated. Page 74
- Floyd doesn't recall anything to indicate that the driver or passenger had committed any sort of criminal offense. Floyd states he doesn't remember the specifics of what Christensen told him about the driver's criminal history. Page 75
- After the conversation, Floyd observed Deputy Christensen approach the driver's side of the vehicle, and he believes he asked Ayres to exit the vehicle. Page 76
- Floyd states at the back of the Jeep, Deputy Christensen spoke with Ayres. Floyd doesn't recall exactly what he stated at the very beginning of that conversation. Then he recalls Christensen asking Ayres for permission to search her, and he observed Ayres turn around and put her arms up at her side. Page 77

- Floyd states Christensen performed a pat-down search of Ayres. He witnessed part of the search. Page 78
- Floyd states from what he can recall, he saw him search her waistline. Floyd states he didn't observe Christensen search below the waistband of Ayres' pants. Floyd doesn't recall if Deputy Christensen was using a bladed hand during his search. Floyd doesn't recall if Deputy Christensen was using the palm out technique with his palm facing out. When asked if he saw Deputy Christensen search anywhere other than Ms. Ayres' waistband, Floyd states he doesn't recall witnessing it. Page 81-82
- When asked if Ayres reacted during the search, Floyd states he believes she did at one point, yes. Floyd believes she said something to the effect of, 'whoa, don't touch me there.' Floyd believes later, after the search was completed, Ayres informed him that he touched her buttocks. She told him that after the search was completed.
- When Ayres said something to the effect of "whoa," Floyd was asked did he recall what Deputy Christensen did? Floyd states he doesn't recall him doing anything at that point. Floyd believed the search was completed. Page 84
- Floyd did not witness Deputy Christensen search Ayres' back side. Floyd did not witness Deputy Christensen search Ayres' crotch. Floyd did not witness Deputy Christensen use his fingers to search in between Ms. Ayres' legs. Floyd states if he witnessed inappropriate action, yes, he would have intervened. He would have stopped the search if he believed it to be inappropriate. Page 85
- Floyd believes she said something along the lines of I don't want or I don't like people to touch my butt. She seemed upset. Floyd doesn't recall smelling the odor of marijuana. Page 86
- When asked if she seemed aggravated at all during the search of her person by Deputy Christiansen, Floyd states not until she made the, "whoa" comment. Page 87
- Floyd states he believes the passenger said something to the effect of 'that's not right and a male shouldn't search a female.' Page 90
- When asked if he saw anything that might indicate to him that she had a weapon on her, Floyd states in his brief observation of her walking from the driver's side of the vehicle to the back of the vehicle, he did not observe anything of that nature, no. Floyd states he was not aware of any bulge in her clothes that might have indicated a weapon. Page 96

Regarding a previous search:

- Floyd recovered cannabis. When asked about the amount, he states it was not weighed. It was such a small amount that it was destroyed on scene in front of the suspects. He did not issue any citations or tickets. No one was arrested. Fellow officers on scene did not issue citations or tickets or arrest anyone. Page 110
- When asked how Ayres appeared after the search of Deputy Christiansen, Floyd states her tone changed into a more upset tone, that she was displeased with how the search was conducted. Page 111

## BY MR. VAYR

- When asked if it his understanding that the level of intrusiveness of a search can play into whether same sex officer is warranted to perform that search, Floyd states absolutely.

**Exhibit J**

- Floyd states correct that if a pat-down search, the least intrusive type of search, is being done, that can be done by a male officer if consistent to the policy. Page 116-117
- Floyd states he did not see her back or back side during the search. Page 131
- Floyd states Ayres said something immediately after the pat-down search concluded. Page 133
- When asked if it is his understanding that one of the guidelines is to be respectful of the person you are searching and to try to respect their privacy rights while also doing a search, Floyd states correct.
- When asked if it's not the policy of the Champaign County Sheriff's Office to do highly intrusive searches when they're unwarranted, Floyd states correct. Page 143-144

**BY MR. Mc CARTER:**

- Floyd states it's possible that the search of a female could involve a level of intrusiveness that the female is not otherwise accustomed to as you're a male that she doesn't know.
- Floyd states there were no restraints placed on the two deputies at the scene by the Champaign County Sheriff's Department.
- Floyd states he was not aware of any facts to indicate that this particular silver Jeep Patriot was involved in any prior crimes.
- Floyd states he was not aware of anything to indicate that the driver, Wylesha Ayres, was involved in any active crime investigation by the Champaign County Sheriff's Department.
- Floyd states he was not aware of anything to indicate that the passenger was involved in any active crime investigation by the Champaign County Sheriff's Department. Page 147

## IV. Analysis and Opinion

Having reviewed the material referenced above, it is my professional opinion based on 33 years of law enforcement and criminal justice training, education, experience, and knowledge of police policy and procedures (to include Terry Stops and pat-down searches) that on May 08, 2019 at approximately 10:00pm, Deputy Christensen of the Champaign County Sheriff's Office engaged in an improper pat-down search of Plaintiff Ayres. The fact that any pat-down search was conducted was improper and the manner in which it was executed was improper based on the method he (a male officer) used which was highly intrusive of the Plaintiff's (a female) privacy. The actions of Deputy Christensen were a gross deviation of recognized police policy. It is further my opinion that Deputy Floyd failed to intervene in this matter.

### A. The Pat-Down Search Was Not Supported by Articulable Suspicion

**Exhibit J**

Given the minor traffic violation that occurred, Deputy Christensen had sufficient basis to stop Plaintiff's vehicle. There is no disputing that law enforcement officers, while in the performance of their duties, have a legal right to stop and question parties when certain legal justifications exist. However, the traffic stop did not grant Deputy Christensen a generalized license to search Plaintiff's person and certainly did not provide a general license to search her female private areas.

Deputy Christensen claimed that he smelled marijuana coming from the Ayres' vehicle. Whether he, in fact, smelled marijuana emanating from the vehicle appears to be a matter of factual dispute and something I therefore decline to comment upon. Therefore, I offer no opinion on the stop itself or the search of the vehicle. In this matter Deputy Christensen conducted a motor vehicle stop on the Plaintiff based on observed motor vehicle infractions. He then conducted a vehicle search based on his claim that he smelled marijuana. No marijuana or other contraband was recovered by Deputy Christensen during this vehicle search.

Once the Plaintiff was removed from her vehicle Deputy Christensen conducted a pat-down search of her person. Deputy Christensen's pat-down search falls under what is known in law enforcement as a Terry Stop and Frisk. As described more fully below, Deputy Christensen's decision to engage in any pat-down of Ms. Ayres was inconsistent with basic law enforcement norms taught and practiced throughout the nation because Deputy Christensen (and any objective officer similarly situated) had no articulable basis to suspect that Ms. Ayres was armed and dangerous.

Stop and Frisk

Based on nationally accepted police training and procedure standards, a stop-and-frisk refers to brief non-intrusive police stop of a suspect. The Fourth Amendment and police procedure taught throughout the country requires that before stopping a suspect, the police must have a reasonable suspicion that a crime has been, is being, or is about to be committed by the suspect. If the police reasonably suspect that the suspect is armed and dangerous, the police may frisk the suspect, meaning that the police will give a quick pat-down of the suspect's outer clothing. The frisk is also called a "Terry Stop", derived from the Supreme Court case *Terry v. Ohio*, 392 U.S. 1 (1968). *Terry* held that a stop-and-frisk must comply with the Fourth Amendment, meaning that the stop-and-frisk cannot be unreasonable. According to

the *Terry* court, a reasonable stop-and-frisk is one "in which a reasonably prudent officer is warranted in the circumstances of a given case in believing that his safety or that of others is endangered, he may make a reasonable search for weapons of the person believed by him to be armed and dangerous.".[i]

A Terry Stop, also referred to as stop and frisk, is a two-part analysis. The first part being the stop of the person which must be based on reasonable suspicion. Once the officer has reasonable suspicion to lawfully stop the person, additional articulatable reasonable suspicion must be developed to conduct a pat-down search. Absent additional reasonable suspicion to believe a person is armed and a threat to the officer or others, a pat-down search is unconstitutional and a violation of the person's 4th Amendment right to be free from which unreasonable searches and seizures[ii]

In the case of *Thomas v. Dillard*[12], the Court of Appeals for the Ninth Circuit discussed what is required to conduct a legal pat-down; under the Fourth Amendment to the United States Constitution, frisking a person for weapons requires reasonable suspicion that a suspect is armed and presently dangerous to the officer or to others. To establish reasonable suspicion a suspect is armed and dangerous, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. A frisk of a person for weapons requires reasonable suspicion that a suspect is armed and presently dangerous to the officer or to others. A lawful frisk does not always flow from a justified stop, rather, each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined. A mere "inchoate and unparticularized suspicion or hunch" that a person is armed and dangerous does not establish reasonable suspicion, and circumstances suggesting only that a suspect would be dangerous if armed are insufficient. There must be adequate reason to believe the suspect is armed.[13] A frisk is not the foregone conclusion of a lawful stop and officers are required to have reasonable, articulable suspicion that an individual is armed and dangerous before performing a pat-down for weapons. The standard does not, however, require an officer to be absolutely certain an individual is armed. Police officers can take reasonable and necessary measures to protect their personal safety and to maintain the status quo during the course of a stop. Such measures can

include using handcuffs, drawing a weapon, or placing the suspect on the ground for the officers' protection. In each case, the court asks whether the "quantum of force" applied was reasonable.

Deputy Christensen's frisk of Ms. Ayres did not meet the requirements of the second part of the stop and frisk analysis even according to Champaign County Sheriff's Office's policy. Policy 404.4 (only permitting a pat-down search "if the deputy has a reasonable, articulable suspicion the suspect may pose a safety risk").

As per Defendant Champaign County Sheriff's Office's own policies:

**Policy 404**                          **Champaign County Sheriff's Office**

Champaign County SO Policy Manual Contacts and Temporary Detentions

### 404.1  PURPOSE AND SCOPE

The purpose of this policy is to establish guidelines for temporarily detaining but not arresting persons in the field, conducting field interviews (FI) and pat-down searches, and the taking and disposition of photographs.

**Pat-down search-** A type of search used by deputies in the field to check an individual for dangerous weapons. It involves a thorough patting-down of clothing to locate any weapons or dangerous items that could pose a danger to the deputy, the detainee, or others.

**Reasonable suspicion-** When, under the totality of the circumstances, a deputy has articulable facts that criminal activity may be afoot and a particular person is connected with that possible criminal activity.

### 404.2  POLICY

The Champaign County Sheriff's Office respects the right of the public to be free from unreasonable searches and seizures. Due to an unlimited variety of situations confronting the deputy, the decision to temporarily detain a person and complete an FI, pat-down search, or field photograph shall be left to the deputy based on the totality of the circumstances, officer safety considerations, and constitutional safeguards.

### 404.3.1  INITIATING A FIELD INTERVIEW

When initiating the stop, the deputy should be able to point to specific facts which, when considered with the totality of the circumstances, reasonably warrant the stop. Such facts include but are not limited to an individual's:

(a) Appearance or demeanor suggesting that he/she is part of a criminal enterprise or is engaged in a criminal act.

(b) Actions suggesting that he/she is engaged in a criminal activity.

(c) Presence in an area at an inappropriate hour of the day or night.

(d) Presence in a particular area is suspicious.

(e) Carrying of suspicious objects or items.

(f) Excessive clothes for the climate or clothes bulging in a manner that suggest he/she is carrying a dangerous weapon.

(g) Location in proximate time and place to an alleged crime.

(h) Physical description or clothing worn that matches a suspect in a recent crime.

(i) Prior criminal record or involvement in criminal activity as known by the deputy.

### 404.4 PAT-DOWN SEARCHES

Once a valid stop has been made, and consistent with the deputy's training and experience, a deputy may pat a suspect's outer clothing for weapons if the deputy has a reasonable, articulable suspicion the suspect may pose a safety risk. The purpose of this limited search is not to discover evidence of a crime, but to allow the deputy to pursue the investigation without fear of violence. Circumstances that may establish justification for performing a pat-down search include but are not limited to:

(a) The type of crime suspected, particularly in crimes of violence where the use or threat of weapons are involved.

(b) Where more than one suspect must be handled by a single deputy.
(c) The hour of the day and the location or area where the stop takes place.
(d) Prior knowledge of the suspect's use of force and/or propensity to carry weapons.
(e) The actions and demeanor of the suspect.
(f) Visual indications which suggest that the suspect is carrying a firearm or other dangerous weapon.

Whenever practicable, a pat-down search should not be conducted by a lone deputy. A cover deputy should be positioned to ensure safety and should not be involved in the search.

### 404.5 STOP RECEIPTS

Whenever a deputy stops a person in a public place and pat-down searches the person or the person's property, the deputy should issue a stop receipt providing the reason for the stop and containing the member's name and badge number (725 ILCS 5/107-14).

During depositions Deputy Christensen was asked to describe a Terry Stop and answered as follows:

> Well, Terry stop is a reasonable suspicion that that subject was involved in some kind of
>
> crime. So essentially you are just patting down the exterior of that person, ensuring that

they don't have any weapons or anything that could harm the deputy or officer on their person. You're not digging into their pockets. Essentially just a pat down or frisk of their exterior.

It should be noted that in this incident it does not appear that Deputy Christensen even believed a crime was committed or suspected. The reason for the stop was related to motor vehicle infractions. In Illinois, the odor of cannabis, and even possession of under ten grams of cannabis was not a crime and was considered a civil offense.[1] Here, even according to the version of events characterized by Deputy Christensen, an objective officer in his position had no basis to believe that there was anything more than a mere odor of cannabis in play. However, Deputy Christensen's deposition testimony reflects that he was operating under the flawed misunderstanding—flawed from the perspective of the constitution and his police agency's own written policy—that he had the right to do a pat-down search any time he conducted any stop. This is inconsistent with Terry, inconsistent with CCSO Policy 404.4, and inconsistent with how police officers throughout the country are trained to identify reasonable, articulable suspicion prior to intruding on a citizen's physical person.

In regard to the night of the incident and the time leading up to the pat-down search of the Plaintiff, Deputy Christensen was asked during depositions a series of questions regarding his actions leading up to the pat-down of Plaintiff.

- Conducted an ARMS[2] check of Ms. Graham which had no bearing on how he was going to conduct the stop. She had no alerts next to her name. Page 65

---

[1] ILCS 550/4) (from Ch. 56 1/2, par. 704)   Sec. 4. Except as otherwise provided in the Cannabis Regulation and Tax Act and the Industrial Hemp Act, it is unlawful for any person knowingly to possess cannabis.   Any person who violates this Section with respect to: (a) not more than 10 grams of any substance
containing cannabis is guilty of a civil law violation punishable by a minimum fine of $100 and a maximum fine of $200. See also State v. Eskridge, 1997-NMCA-106, ¶ 26, 124 N.M. 227 (pat-down search not justified based on suspicion of small amount of marijuana).

[2] Area-wide Records Management System (ARMS)

A.R.M.S. is a records software package developed by Urbana and shared with the University of Illinois Police and the Champaign Police Department. Urbana has hired a full-time programmer to administer the program. The cost is shared by all three agencies. In 2001, the field report writing system was completed. When the local IWIN switch is implemented, the report writing software will interact wirelessly with the A.R.M.S. program so that officers can write reports in the field.

- Conducted a LEADS check of Plaintiff which showed her driver's license was expired and she had numerous arrests and some convictions. When asked how the information informed his decision making about how to conduct the search? He stated just officer safety. When asked if this placed him on edge? He stated no. Page 66

- Conducted an ARMS search of Plaintiff which showed she had been arrested, had been on parole, had been an offender in numerous robberies and had recently been in a vehicle where a stolen firearm was inside. Page 69

- During the ARMS search it showed Plaintiff had gang affiliations, but Deputy Christensen was unaware how the officer who inputted the information came to such a determination. Page 82

- On the date and time of the incident Deputy Christensen did not conduct a search or investigation of the police intel website of Plaintiff. When asked why? He stated at the beginning of his shift he searched the site and did not observe Plaintiff's name on it. Page 85

- If Deputy Christensen wanted to find out more information about Plaintiff's alleged gang affiliation he could have, but he chose not to. When asked why, he stated he was treating the matter as a simple traffic stop with the odor of cannabis detected from the interior of the vehicle.  Page 88

- Based on Deputy Christensen's responses during deposition, nothing he learned during his computer checks of Plaintiff rose to the level of reasonable suspicion that Plaintiff was armed. He was treating the matter as a simple traffic stop along with the odor of cannabis.

- Once Deputy Floyd arrived on scene Deputy Christensen advised him that he detected the odor of weed coming from inside the vehicle. When asked anything else? He stated he told Floyd that he had lost his gloves, that is all he recalled. Page 90. Deputy Christensen never informed Deputy Floyd that he had any concerns Plaintiff was armed and dangerous and he intended to conduct a pat-down.

- Approaching the driver's side window, Deputy Christensen asked Plaintiff to step from her vehicle. She did so. Page 91

- Deputy Christensen, the Plaintiff, and Deputy Floyd all went to the rear of Plaintiff's vehicle where Deputy Christensen explained to Plaintiff the reason for the stop.

**Exhibit J**

- After explaining to Plaintiff the reasons for the stop, Deputy Christensen stated it was at that point that he decided to conduct a pat-down search of Plaintiff. When asked why, he stated that she was included on a Champaign police report where a stolen firearm and another firearm were located inside the vehicle. Page 93. Plaintiff denies ever being in any vehicle where firearms were recovered.

- Prior to learning the information in LEADS and ARMS, Deputy Christensen had no information that Plaintiff might be a danger or threat to the other individuals in the Silver Jeep Patriot or to herself. Page 94

- When asked if he deemed Plaintiff to be a danger to him, Deputy Christensen stated he had suspicion which he based on her prior arrest. Deputy Christensen stated there was nothing in that moment that informed his opinion. His opinion to search was based on Plaintiff's past. Page 95

Other than generally pointing to Plaintiff's past criminal history, Deputy Christensen fails to articulate any other reasonable suspicion which would lawfully allow him to conduct a search of the Plaintiff.

Under the totality of the circumstances here, police training and procedure would not permit an officer in Deputy Christensen's position to engage in the automatic decision to pat Ms. Ayres down without any articulable suspicion. All of the factors potentially relevant to the decision of whether or not to engage in a pat-down militate against any articulable suspicion for a pat-down search in this case. (a) The type of law enforcement interaction occurring here was a traffic stop and did not involve any indication of suspected violence. In fact, there were children in the vehicle and the conversations presented to Deputy Christensen indicated no cause for additional alarm. (b) There were 2 male deputies available to interact with 2 female suspects and their children and the threat level was perceived by the officers at the scene to be so low that they did not deem it necessary to search Ms. Graham. (c) The location of the stop was on a public road and not in any high-crime area. (d) The actions and demeanor of Ms. Ayres and Ms. Graham as captured on the BWC indicate total compliance with the directives of the law enforcement officers. (e) There were no furtive movements made or any visual indications whatsoever that would have led an objectively reasonable officer to believe that Ms. Ayres was in the possession of a weapon. Given the totality of these circumstances, an officer trained and

operating according to nationally accepted standards could not have reasonably concluded that there was an articulable basis to suspect that Ms. Ayres was armed and dangerous. Even the corporate designee witness for the Champaign County Sheriff's Office, Captain Cook, appears to agree that the circumstances here were not indicative of a weapon being present.

As per my review of this matter, Deputy Christensen did not have any reasonable suspicion that the Plaintiff was armed and dangerous and therefore his pat-down search of the Plaintiff was a violation of her right to be free from unreasonable search and seizure. Other than Plaintiff's prior arrest history, Deputy Christensen fails to point to any other fact/s which would lead an objectively reasonable officer to believe that the Plaintiff was armed and dangerous, thereby allowing the officer to engage in a pat-down search. Even if Deputy Christensen would have decided to arrest Ms. Ayres—which he did not—this would not have required the kind of intrusive search discussed below. A custodial arrest would have involved handcuffing and allowed for a private search, likely by a female deputy, at the police station. But that is not the direction that Deputy Christensen chose to take. He did not deem it necessary to arrest Ms. Ayres and therefore a search incident to arrest analysis is not applicable here. The circumstances here concern a Terry Stop analysis. Therefore, given the articulable information available to Deputy Christensen, he lacked reasonable articulable suspicion that Plaintiff was in possession of a weapon and a danger to anyone. Thus, based on nationwide standards of policing, Deputy Christensen lacked any justification to conduct a pat-down search.

**B. The Manner of the Search Violated Basic Police Training and Norms**

Having reviewed the video tape of this incident, it is my opinion that the manner in which Deputy Christensen conducted the search of a female within his control was inappropriate and a gross deviation of nationally recognized police policy and procedures in conducting a pat-down search on a member of the opposite sex. This is true even if, for the sake of argument only, Deputy Christensen had a lawful basis to conduct a search of Plaintiff's body. Contrary to the assertion by Deputy Christensen that there is no difference between how an officer is supposed to search a citizen of the same gender and the manner of the search to be conducted when a cross-gender search is involved, national standards of police training and procedure do, in fact,

require heightened privacy, sensitivity, and care be exerted during such searches of individuals of the opposite gender.

One helpful starting point is Champaign County Sheriff's Office Policy 322.4, which states:

### 322.4  SEARCH PROTOCOL

Although conditions will vary and officer safety and other exigencies must be considered in every search situation, the following guidelines should be followed whenever circumstances permit:

(a) Members of this department will strive to conduct searches with dignity and courtesy.

(b) Deputies should explain to the person being searched the reason for the search and how the search will be conducted.

(e) When the person to be searched is of the opposite sex as the searching deputy, a reasonable effort should be made to summon a deputy of the same sex as the subject to conduct the search. When it is not practicable to summon a deputy of the same sex as the subject, the following guidelines should be followed:

1. Another deputy or a supervisor should witness the search.

2. The deputy should not search areas of the body covered by tight-fitted clothing, sheer

    clothing, or clothing that could not reasonably conceal a weapon.

The above policy makes it plain that even the Champaign County Sheriff's Office written policy has in fact recognized that additional care must be utilized during searching people of the opposite sex. For example, Transportation Security Administration protocol requires that males pat down males and females' pat down females. ICE detainee search protocols similarly recognize the sensitivities and power differential effect caused by cross-gender searches and therefore state: "Cross-gender pat-down searches of female detainees shall not be conducted unless in exigent circumstances" and, even then, must be done in the "least intrusive" manner and conducted "in ways that preserve the dignity of detainees."[3]

The CCSO policy states "a reasonable effort should be made to summon a deputy of the same sex as the subject to conduct the search." Based on Deputy Christensen's deposition

---

[3] https://www.ice.gov/doclib/detention-standards/2011/2-10.pdf

**Exhibit J**

testimony, he failed to make a reasonable attempt to locate a female officer to conduct the pat-down. Deputy Christensen takes the position that no female officer from the Champaign County Sheriff's Office was working that night so he conducted the pat-down. Even assuming this unverified assertion by Deputy Christensen to be true, prior to engaging in the pat-down, Deputy Christensen made no attempt to see if a female officer was available. Similarly, he made no attempt to see if a female from a neighboring department (or another section within his own law enforcement agency) was available to respond and conduct the search. Tellingly, Deputy Christensen failed to document that he attempted to find a female officer to conduct the search and failed to document the search at all. Deputy Christensen's actions were a direct violation of his own department policies as well as nationally recognized police policies and procedures.

During depositions Capt. Cook of the Champaign County Sheriff's Office and head of patrol was ask what the procedures are for attempting to locate a female officer to conduct a search. He acknowledged that any attempt to locate a female officer should be documented.[4] Deputy Christensen failed to document any attempt to locate a female officer to conduct the search and failed to adequately document the fact that he even searched Ms. Ayres.

Moreover, during the pat-down search Deputy Christensen failed to utilize recognized and taught methods for searching a party of the opposite sex. Although there are instances where cross-gender pat-down searches are unavoidable as reflected by Champaign County Sheriff's Office policy, these are inherently intrusive, disfavored, and must be handled with the utmost respect and prudence. Deputy Christensen attempts to explain away his violation of basic police protocols that are captured on the BWC by claiming that his conduct was consistent with his training. Specifically, he testified to the following:

- When asked the difference between a search of a male suspect and a female suspect, Christensen states there's no difference. Page 23-24

- When asked if there are any special requirements, based on the policies and procedures of the Champaign County sheriff's department, regarding how to conduct a search of a member of the opposite sex, Christensen states "No. Can I add a respectful manner." Page 40

---

[4] Cook Deposition Page 71-72

**Exhibit J**

- When asked if there is anything that he's aware of in the policies and procedures regarding what part of the member of the opposite sex you're allowed to search, Christensen states, in the policy and procedure, no.  Page 41

- When asked if anything changes in how he conducts a search if the subject of that search is a male or female, Christensen states no. They're both going to be conducted in a respectful manner, in an unobtrusive way. Page 41

This testimony by Deputy Christensen regarding police training and search protocol is not accurate. A June 2009 National Prison Rape Elimination Commission Report recognizes the obvious when it found a connection between cross-gender searches and the level of sexual impropriety between inmates and correctional staff.[5] Although it is not my role to say whether Detective Christensen was actually taught that he is supposed to search a female subject in the manner he did (even though I saw no evidence other than his testimony or training history regarding how he was actually trained to search a female), it is my expert opinion that law enforcement personnel in the nation are in fact taught to exercise special care when searching someone of the opposite gender.

One elementary rule that is uniformly taught to police officers who may find themselves in a situation where a cross-gender search is unavoidable is that a visual inspection should be utilized in lieu of a pat-down if at all possible. In other words, if it is possible to tell based on the fit of a female citizen's clothing that no weapon is being concealed in a private area—such as the breasts, buttocks, or genital area—no physical search should be conducted. This basic principle was violated here because the BWC shows that Ms. Ayres' pants were tight enough that a visual inspection would plainly reveal to an objectively reasonable officer that no gun was concealed in the region of her buttocks.

Yet another basic principle of cross-gender body searching that was violated here is the "bladed hand" principle.[6] Law enforcement officers are trained that searches utilizing finger manipulation or palm touching should be avoided whenever possible in favor of a search utilizing the back of a stiff, bladed hand.[7] The bladed hand principle requires law enforcement

---

[5] Byrd v. Maricopa County Sheriff's Dept. 2011 U.S. App. Lexis 86 (9th Cir. en banc).

[7] See, e.g., National PREA Resource Center, Guidance in Cross-Gender and Transgender Pat Searches (Feb. 2015); 28 CFR Section 115.15 Limits to cross-gender viewing and searches; Madyun v. .Franzen, 704 F.2d 954, 957 (7th Cir.

**Exhibit J**

officers in Deputy Christensen's position to use the backs or edges of the hands to do the search, not the palms. Interestingly, Captain Cook's testimony appears to implicitly recognize that the search of a female by male deputies require special care so as not to unnecessarily invade private areas when he testified that there was no written policy on it but there is training. Pages 79-80

Having reviewed this matter it is my opinion, in addition to the opinions set forth above, that Deputy Christensen:

- Failed to use reasonable efforts to avoid the need for a cross-gender pat down search
- Failed to minimize the intrusion of the pat-down by minimizing unnecessary touching and groping
- Failed to treat the Plaintiff in a dignified manner
- Failed to be respectful of the Plaintiff
- Failed to respect the fundamental privacy rights of Plaintiff
- Failed to conform to national standards regarding reporting of cross-gender searching

The manner in which Deputy Christensen conducted the pat-down search of Plaintiff was a violation of nationally recognized policy and procedures in searching parties of the opposite sex and was a gross deviation of the standard of conduct for conducting searches on the opposite sex.

### C. Failure to Intervene by Deputy Floyd

On the date and time Plaintiff was stopped, Deputy Floyd responded as a backup. When he arrived, he spoke briefly with Deputy Christensen and then waited at the rear of Plaintiff's vehicle until Deputy Christensen escorted the Plaintiff to the rear of her vehicle. There is no disputing that Deputy Floyd was present when Deputy Christensen engaged in his inappropriate and improper pat-down of Plaintiff. Deputy Floyd takes the position that he was there but he did not see Deputy Christensen grab Plaintiff's buttock. Assuming Deputy Floyd did not see the actual touching of Plaintiff's buttock, he was certainly aware of it. As per Deputy Floyd's BWC he is clearly heard engaging in conversation with the Plaintiff. Plaintiff stated to Deputy Floyd

1983)(frisk should exclude a "deliberate search" of genital area); Torres v. Wisconsin Dept. of Health & Social Services, 838 F.2d 944, 953 (7th Cir. 1988)(addressing privacy concerns of female inmates).

"No one is supposed to touch my ass." Deputy Floyd can be heard stating "I didn't see him touch your bottom."

Officers around the country are taught that they cannot stand by while their fellow officers violate the rights of individuals with whom they are interacting. This is known within the police community as "failure to intervene." According to the Champaign County Sheriff's search protocol applicable to cross-gender searches such as this one, "a deputy or a supervisor should witness the search." Thus, the policy required Deputy Floyd to actually witness the search. To the extent that Deputy Floyd claims he did not witness the search, this would constitute an additional violation of policy by both Deputy Christensen and Deputy Floyd.

It is Deputy Floyd's position that he did not intervene because he did not see the violation. He should have intervened and stopped the search from proceeding in the first place by immediately requesting a supervisor to the scene and reporting the misconduct.

It is also clear that Deputy Floyd was aware of Ms. Ayers' allegation that Deputy Christensen searched her improperly because the BWC records Ms. Ayers telling Deputy Floyd, "No one is supposed to touch my ass." Yet Deputy Floyd took no action to report the allegation to his superiors and took no action to ensure that the search itself was documented as required by Champaign County Sheriff policy. Deputy Floyd was made aware of possible wrong-doing by a fellow deputy; he had a duty and obligation to report the incident. By failing to report the incident, Deputy Floyd failed to intervene.

During depositions Capt. Cook was asked what the procedure would be if an officer did not have an adequately reasonable basis to believe that that suspect possessed a weapon, how might the department respond? Cook states he thinks if the department was aware, it would be investigated to make sure that compliance was met in the future and, again, there was no violation[8]. At some point in time Capt. Cook did become aware of the pat-down search of Plaintiff and her complaint of inappropriate touching. After possessing said knowledge, Capt. Cook failed to conduct a full investigation of this matter and take appropriate actions to

---

[8] Cook Deposition Pages 117-118

discipline and/or correct Deputy Christensen's behavior. Capt. Cook's failure to intervene and investigate this matter was a gross deviation of recognized police policy and procedures.

## V. Conclusion

During Deputy Christensen's deposition testimony, he stated that he viewed the stop of Plaintiff as a simple traffic stop with the odor of cannabis detected from the interior of the vehicle[9]. By Deputy Christensen's own admission, no crime had taken place or was suspected of taking place. Other than Plaintiff's unconfirmed past history, Deputy Christensen had no reasonable articulable suspicion that Plaintiff was armed and dangerous or a threat to anyone.

Lacking reasonable articulable suspicion Deputy Christensen, in violation of the legal standards which police officers are trained in, and in violation of recognized police policy and procedures-- to include his own department policy, conducted an improper and inappropriate pat-down of the Plaintiff.

While patting the Plaintiff down Deputy Christensen, at least twice, touched Plaintiff's buttock in an inappropriate manner and in violation of how police officers across the country are trained and in violation of generally accepted police procedure.

Champaign County Sheriff's Office has in place several policies related to searching parties they come in contact with. As per the policies:

- Respect the fundamental privacy rights of individuals[10]
- Members of the department will strive to conduct searches with dignity and courtesy[11]
- Minimize the intrusiveness of the search[12]
- Conduct searches in a respectful manner[13]

---

[9] Deposition Christensen Page 88
[10] CCSO Policy 322
[11] CCSO Policy 322
[12] CCSO Policy 322
[13] Christensen Deposition Page 40

Report Prepared by Joseph J. Blaettler 33

**Exhibit J**

As per my review of this matter, including the video of the incident, Deputy Christensen:

- Failed to Respect the Plaintiff's privacy
- Failed to conduct the search with dignity
- Failed to show proper courtesy to the Plaintiff
- Failed to treat the Plaintiff with respect
- Failed to uphold community standards
- Made a search which was unreasonably intrusive of Plaintiff's person

While Deputy Christensen was conducting the search Deputy Floyd stood by and did not intervene. Deputy Floyd takes the position that he did not see Deputy Christensen "grab Plaintiff's ass." One of the purposes of Deputy Floyd's presence at the scene was to be a witness (if Floyd and Christensen were following CCSO written policy), yet he now claims he did not witness the pat-down. If Deputy Floyd did not witness the search, he certainly knew of Plaintiff's claims and complaint. Rather then immediately notify a supervisor of possible misconduct, Deputy Floyd stood by and did nothing. The inaction of Deputy Floyd and his failure to document or report the fact of the search and manner of the search violates acceptable police tactics, training and procedure in the sense that it is commonly referred to as a 'failure to intervene.'

During his deposition, Deputy Christensen stated on numerous occasions that he lacked training in how to search a party of the opposite sex. Although the CCSO has written policies in place for searching females (such as reasonable attempts to have a female search another female) Deputy Christensen made no attempt to locate a female officer to conduct the search or document his efforts to do so. Lacking the proper training to conduct a search of a person of the opposite sex, he, in violation of recognized policy and procedures, conducted an improper and inappropriate search of the Plaintiff. Both Deputies Christensen and Floyd failed to document the fact that they searched the person of Ms. Ayres and the manner in which the search was conducted. This violated CCSO's written policies and violated generally accepted police practices. The CCSO written policy expressly states:

404.5 Stop Receipts

**Exhibit J**

Whenever a deputy stops a person in a public place and pat-down searches the person or person's property, the deputy should issue a stop receipt providing the reason for the stop and containing the member's name and badge number (725 ILCS 5/107-14).

To date, no stop receipt has been produced by Defendants.

All of my opinions have been made within a reasonable degree of certainty regarding police policy and procedures. I reserve the right to amend and supplement this report in the event additional information and documents become available to me.

Joseph J. Blaettler

ECPINJ

---

i Cornell Law School Legal Information Institute
ii 4th Amendment

**Exhibit J**