E-FILED
Tuesday, 12 January, 2021  07:00:38 PM
Clerk, U.S. District Court, ILCD

5590-21
KEF/tlp

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| WYLESHA AYRES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.:   19-2148 |
| | ) | |
| SHERIFF DEPUTIES CODY CHRISTENSEN and | ) | |
| CORY FLOYD, CHAMPAIGN COUNTY SHERIFF'S | ) | |
| OFFICE, and CHAMPAIGN COUNTY, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF JON B. BLUM

I, JON B. BLUM, being duly sworn and under oath, over 21 years of age and under no legal disability, state that if called as a witness I would competently testify to the following:

1.      Attached to this Affidavit is a true and accurate copy of the expert report I prepared for this case.

2.      I would testify consistent with this report if called to testify in trial.

Further Affiant sayeth not.

Dated:  __1.12.2021__          /s/   Jon B. Blum_____
                                                          Jon B. Blum


Under penalties as provided by law pursuant to 28 U.S.C. § 1746, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes to be true.

                                            /s/   Jon B. Blum_____
                                                          Jon B. Blum

Exhibit K

1

# Expert Opinion Report

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINIOS
URBANA DIVISION

## Case No. 19-2148

Wylesha Ayres, PLAINTIFFS,

v.

Sheriff Deputy Corey Christensen, Sheriff Deputy Cody Floyd,
Champaign County Sheriff's Office and Champaign County,
Illinois, DEFENDANTS.

| Prepared By | Date Completed |
|---|---|
| Jon B. Blum | July 8, 2020 |

| Case No. 19-2148 | Expert Opinion Report |
|---|---|

## I.  Case Materials

All case materials were provided by defense counsel or obtained by me before July 8, 2020. Opinions herein were formed after reviewing items in the table below and applying my combined 28 years of experience as a sworn law enforcement officer, international instructor, and training curriculum developer. My resume and case vitae are attached to this report. Should additional information relevant to my opinion be discovered at a later date, I respectfully request an opportunity to review same and amend this report if needed.

| # | Case Materials | Pages |
|---|---|---|
| 1 | Complaint; Amendments; Responses | 178 |
| 2 | CCSO Policies #320, 322, 404, 500, 600, 900 | 20 |
| 3 | CCSO CAD Call Details (traffic stop on May 8, 2019) | 2 |
| 4 | Traffic Citation / Stop Receipt (May 8, 2019) | 2 |
| 5 | Cody Floyd: Deposition | 132 |
| 6 | Cody Floyd: Personnel File | 149 |
| 7 | Cody Floyd: Body Worn Camera Video from May 8, 2019 (5:00) | 1 |
| 8 | Cory Christensen: Deposition | 201 |
| 9 | Cory Christensen: Personnel File | 126 |
| 10 | Cory Christensen: Body Worn Camera Video from May 8, 2019 (16:57) | 1 |
| 11 | Wylesha Ayres: Criminal history; ARMS report | 67 |
| 12 | Wylesha Ayres: Deposition | 160 |
| 13 | Letika Graham: Deposition | 86 |
| 14 | Shane Cook: Deposition | 198 |
| 15 | Joseph Blaettler: Plaintiff's Expert Opinion Report | 40 |
| 16 | Joseph Blaettler: Deposition | 155 |
| 17 | The Federal Law Enforcement Informer (Dept. of Homeland Security) | 13 |

TOTAL   **1531**

***Continued on the next page***

## II.    Incident Summary

Champaign County Sheriff Deputy Cory Christensen (DEFENDANT) was working uniform patrol around 10:00 p.m. on Wednesday, May 8, 2019. Deputy Christensen saw a sliver Jeep Patriot at the intersection of North Mattis Avenue and West Bloomington Avenue in Champaign, Illinois. One of the Jeep's front headlights was not working. Deputy Christensen turned his marked patrol vehicle around to follow the Jeep. While driving behind the Jeep, Deputy Christensen ran a query on the Jeep's registration plate through the Illinois **L**aw **E**nforcement **A**gencies **D**ata **S**ystem (LEADS). LEADS is a statewide computer system used by Illinois officers to access the **N**ational **C**rime **I**nformation **C**enter (NCIC), motor vehicle license plates, individual drivers' licenses, arrest warrants and stolen property. According to LEADS, the Jeep's registration plate had been expired for two months.

At 9:56 p.m., Deputy Christensen turned on his patrol vehicle's emergency lights and stopped the Jeep on Anthony Drive near the intersection of Dobbins Drive.[1] The Jeep was stopped in an area known for high rates of violent felonies, gun violence and illegal drug activity.[2]

For safety reasons, Deputy Christensen made initial contact with the Jeep's occupants by walking up to the front passenger window where Ms. Letika Graham was seated. As soon as Deputy Christensen reached the open front passenger window, he *"detected cannabis emanating from the interior of the [Jeep]."*[3] Ms. Graham owned the Jeep, but was letting her life partner, Ms. Wylesha Ayres (PLAINTIFF) drive. There were two infant children in Jeep's rear seat.

Deputy Christensen immediately introduced himself, explained the reason why he stopped the Jeep, and said he would *"not issue a citation"*[4] for the registration violation. Ms. Ayres, 27, did not have any identification, but provided her full name and date of birth to Deputy Christensen.

Deputy Christensen asked Ms. Graham and Ms. Ayres to wait inside the Jeep until he returned. While walking back to his patrol vehicle from the Jeep at 9:58 p.m.,[5] Deputy Christensen used his portable radio to call dispatchers and request back-up. Deputy Cody Floyd was nearby and arrived on the scene at 10:00 p.m.[6]

---

[1] Cory Christensen's Body Worn Camera Video; Cory Christensen's Deposition (p. 167); CCSO CAD Call Details
[2] Cory Christensen's Deposition (p. 168); Cody Floyd's Deposition (p. 122-123)
[3] Cory Christensen's Deposition (p. 59)
[4] Cory Christensen's Body Worn Camera Video
[5] Cory Christensen's Body Worn Camera Video
[6] Cory Christensen's Body Worn Camera Video; Cody Floyd's Body Worn Camera Video; CCSO CAD Call Details

Per standard traffic stop protocols, Deputy Christensen conducted a LEADS query on Ms. Graham and Ms. Ayres. According to LEADS, Ms. Ayres' driver's license had expired thirteen months ago in April 2018.

Deputy Christensen also conducted an **A**rea-wide **R**ecords **M**anagement **S**ystem (ARMS) query on Ms. Graham and Ms. Ayres. ARMS is a computerized reporting data base that is shared by the Champaign County Sheriff's Office, Champaign Police Department, University of Illinois Police, Urbana Police Department, and Village of Rantoul Police Department. Ms. Ayres had *"numerous contacts with different agencies that share ARMS."*[7] According to ARMS data, there were specific officer safety *"alerts..and numerous arrests"*[8] for Ms. Ayres that included the following:[9]

- parole
- gang affiliation
- several aliases*
- involved in multiple robberies
- arrested locally and in other Illinois counties

**\*Deputy Christensen used booking photos available in ARMS to confirm Ms. Ayres' identity.**

At 10:03 p.m.,[10] Deputy Christensen walked directly to the Jeep's driver door to talk with Ms. Ayres. Deputy Floyd provided back-up by standing along the shoulder of North Mattis Avenue between Deputy Christensen's patrol vehicle and the Jeep.

To explain his findings and intentions privately, Deputy Christensen asked Ms. Ayres to step out of the Jeep. Ms. Ayres was wearing a grey ball cap, dark colored t-shirt and red pants. The pants were *"baggy…hanging…[and] loose fitting."*[11] Her t-shirt was also partially untucked and covering portions of her waist.

Deputy Christensen said, *"You are not under arrest"* and *"Do you have any weapons on you?"*[12] Ms. Ayres said, *"No."*[13] While walking toward the rear of the Jeep, Deputy Christensen instructed Ms. Ayres to *"Keep your hands out of your pockets."*[14]

[7] Cory Christensen's Deposition (p. 63)
[8] Cory Christensen's Deposition (p. 66-72)
[9] Wylesha Ayres' ARMS Record
[10] Cory Christensen's Body Worn Camera Video
[11] Cory Christensen Deposition (p. 99); Cody Floyd's Deposition (p. 80)
[12] Cory Christensen's Body Worn Camera Video
[13] Cory Christensen's Body Worn Camera Video
[14] Cory Christensen's Body Worn Camera Video

Ms. Ayres and Deputy Christensen talked briefly while standing between the Jeep and patrol vehicle. Ms. Ayres said she did not know her driver's license was expired. When questioned about the smell of marijuana coming from inside the Jeep Ms. Ayres said, *"I had smoked earlier."* [15] Deputy Christensen asked, *"Do you mind if I just pat you down real quick? Is that Ok? Want to turn around for me?"* [16] Without answering, Ms. Ayres raised both of her arms out parallel to the ground and turned her back toward Deputy Christensen.[17]

Ms. Graham was watching the interaction between Deputy Christensen and Ms. Ayres from inside the Jeep *"to see what's going."* [18] Ms. Graham intended to video the event using her cell phone, but the battery was dying.[19] When Ms. Ayres raised both of her arms for the pat-down search, Ms. Graham opened the Jeep's passenger door slightly and said, *"I need to be at work!"* [20] To keep Ms. Graham inside the Jeep, Deputy Floyd said, *"hang on just a second."* [21]

With Deputy Floyd standing less than five feet away, Deputy Christensen began his pat-down search of Ms. Ayres where her clothing was noticeably loose or bulky. Approximately five seconds into the pat-down, Ms. Ayres *"dropped [her] arms,"* [22] said, *"Whoa. Don't touch my butt"* [23] and *"walked off."* [24] Deputy Christensen said, *"I need to make sure you don't have any weapons on you."* [25]

Deputy Floyd instructed Ms. Ayres to stand near the front of the patrol car so Deputy Christensen could talk with Ms. Graham. Deputy Christensen explained to Ms. Graham that he smelled marijuana coming from inside the Jeep. Deputy Christensen instructed Ms. Graham to stand outside the Jeep near Ms. Ayres and Deputy Floyd so he could search inside for contraband. Ms. Graham was initially reluctant to get out of the Jeep. She insisted there was *"no weed in the car…and had to be at work…by 10:00 p.m."* [26]

By request, Ms. Graham and Ms. Ayres were allowed to stand near the Jeep so they could watch their two infant children (who remained in the rear seat) while Deputy Christensen searched the interior for less than 2 minutes.[27] Deputy Christensen did not find any illegal drugs or contraband inside the Jeep.

[15] Cory Christensen's Body Worn Camera Video
[16] Cory Christensen's Body Worn Camera Video; Deputy Cody Floyd's Body Worn Camera Video
[17] Cory Christensen's Body Worn Camera Video; Deputy Cody Floyd's Body Worn Camera Video
[18] Letika Graham's Deposition (p. 32)
[19] Letika Graham's Deposition (p. 32-22)
[20] Deputy Cody Floyd's Body Worn Camera Video
[21] Deputy Cody Floyd's Body Worn Camera Video
[22] Wylesha Ayres' Deposition (p. 32)
[23] Cory Christensen's Body Worn Camera Video; Deputy Cody Floyd's Body Worn Camera Video
[24] Wylesha Ayres' Deposition (p. 87, 96)
[25] Cory Christensen's Body Worn Camera Video; Deputy Cody Floyd's Body Worn Camera Video
[26] Cory Christensen's Body Worn Camera Video; Cody Floyd's Body Worn Camera Video
[27] Cory Christensen's Body Worn Camera Video

At 10:08 p.m.,[28] Ms. Ayres and Ms. Graham were allowed back into the Jeep and Deputy Floyd cleared the scene. At 10:11 p.m.,[29] Deputy Christensen issued Ms. Ayres a citation for having an expired license and explained there was a mandatory court appearance for the violation. Ms. Ayres refused to sign the citation. Deputy Christensen cleared the traffic stop at 10:13 p.m.[30]

The entire traffic stop lasted less than sixteen minutes and was recorded - in its entirety – by Deputy Christensen's body worn camera.

## III.   Opinions

### A.   **It was reasonable for Deputy Christensen to conduct a pat-down search of Ms. Ayres for weapons**.

A *pat-down* or *frisk* is a warrantless and limited search of a person's outer clothing and other areas in his or her immediate control for weapons only. To conduct a frisk for weapons, the initial stop by law enforcement must be lawful. However, both the *stop* and *frisk* must be independently justified. In this matter, the initial stop of Ms. Ayres was justified because she was driving a motor vehicle with an expired license plate on a public roadway.

To proceed from the *stop* to a *frisk*, law enforcement officers must have specific and articulable facts that reasonably suggest the suspect is armed and dangerous. The test used to determine whether a frisk is justified is an objective one insofar as a reasonable officer under the same or similar circumstances would believe the person stopped could be armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 27 (1968)

The following facts made it reasonable for Deputy Christensen to believe Ms. Ayres could have been armed and dangerous:

1.   Investigation type

According to annual FBI Law Enforcement Officer Killed and Assaulted (LEOKA) reports, traffic enforcement is consistently one of the most dangerous job tasks performed by law enforcement professionals.[31]

---

28 Cory Christensen's Body Worn Camera Video
29 Cory Christensen's Body Worn Camera Video
30 Cory Christensen's Body Worn Camera Video
31 https://ucr.fbi.gov/leoka

2.      Location and time of day

The Jeep was stopped at 10:00 p.m. in an area with one of the highest crime rates in Champaign County for gun violence and illegal drug activity. [32] Darkness makes it more difficult for officers to see and easier for suspects to hide evidence of a crime.

3.      Evidence of illegal drug activity

It is widely recognized in the law enforcement industry that illegal drug activity and weapons go hand-in-hand. Deputy Christensen immediately smelled marijuana coming from inside the Jeep upon initial contact. During Deputy Christensen's career as a law enforcement officer and canine handler, he has found weapons while investigating illegal drug activity.[33]

4.      Ms. Ayres criminal history[34]

Information made available to Deputy Christensen through ARMS revealed that Ms. Ayres had a criminal history that included violent offenses (e.g., robbery, burglary). Ms. Ayres had been arrested by multiple law enforcement agencies within Champaign County and agencies in other Illinois counties. ARMS data also showed Ms. Ayres had prior gang affiliations. Ten months earlier, Ms. Ayres was inside a motor vehicle stopped by another law enforcement agency. She was accompanied by a violent offender known by Deputy Christensen. Officers found two guns inside the vehicle occupied by Ms. Ayres and one of them was stolen.

In this matter, the presence of infant children in the Jeep did not make it any less reasonable that Ms. Ayres could have been armed and dangerous.

B.      **Deputy Christensen followed agency policy when conducting the pat-down search of Ms. Ayres**.

1.      **C**hampaign **C**ounty **S**heriff's **O**ffice (CCSO) policy "establishes guidelines for….conduct[ing] pat-down searches. The decision to temporarily detain a person and complete…a pat-down search shall be left to the deputy based on the totality of the circumstances,

---

[32] Cory Christensen's Deposition (p. 168); Cody Floyd's Deposition (p. 122-123)
[33] Cory Christensen Deposition (p 143-144)
[34] Wylesha Ayres ARMS Record

officer safety considerations, and constitutional safeguards. [Deputy Christensen] had articulable facts that criminal activity may be afoot and [Ms. Ayres] was connected with that possible criminal activity."[35] Specific articulable facts known by Deputy Christensen included the location of the stop, time of day, evidence of illegal drug activity by Ms. Ayres, and Ms. Ayres' criminal history.

"Once a valid stop has been made, and consistent with the deputy's training and experience, a deputy may pat a suspect's outer clothing for weapons if the deputy has a reasonable, articulable suspicion the suspect may pose a safety risk. The purpose of this limited search is not to discover evidence of a crime, but to allow the deputy to pursue the investigation without fear of violence." [36]

Under CCSO policy, valid circumstances used to justify a pat-down search include, but are not limited to the time of day, location of stop, and knowledge of suspect's propensity to carry weapons.[37] The traffic stop involving Ms. Ayres occurred at 10:00 p.m. in a location known for violent crime and illegal drug activity.[38] Credible information obtained through ARMS about Ms. Ayres' criminal history and her associations with violent persons known by Deputy Christensen demonstrated a propensity to possess weapons.

"Whenever practicable, a pat-down search should not be conducted by a lone deputy. A cover deputy should be positioned to ensure safety and should not be involved in the search." [39] Less than two minutes after making initial contact with Ms. Ayres, Deputy Christensen requested back-up and waited for Deputy Floyd to arrive before conducting the pat-down search of Ms. Ayres.

"Whenever a deputy stops a person in a public place and pat-down searches the person or the person's property, the deputy should issue a stop receipt providing the reason for the stop."[40] Deputy Christensen issued Ms. Ayres the required stop receipt documenting the pat-down search.[41] Overall, Deputy Christensen adequately documented the traffic stop.

---

[35] CCSO Policy #404: Contacts and Temporary Detentions
[36] CCSO Policy #404: Contacts and Temporary Detentions
[37] CCSO Policy #404: Contacts and Temporary Detentions
[38] Cory Christensen's Deposition (p. 168); Cody Floyd's Deposition (p. 122-123)
[39] CCSO Policy #404: Contacts and Temporary Detentions
[40] CCSO Policy #404: Contacts and Temporary Detentions
[41] Citation / Traffic Stop Receipt issued to Wylesha Ayres

2.    CCSO policy #900 states that all custodial searches "shall be conducted with concern for safety, dignity, courtesy, respect for privacy and hygiene, and in compliance with policy and law to protect the rights of those who are subject to any search."[42]

It should be noted that CCSO policy #900 covers custodial searches, specifically <u>searches incident to arrest</u>, <u>strip searches</u>, and <u>body cavity searches</u>. A pat-down search for weapons only, like the one conducted on Ms. Ayres, is covered in CCSO policy #404 and #322 and less intrusive than searches covered in CCSO policy #900. In this matter, Deputy Christensen followed agency policy when conducting the pat-down search of Ms. Ayres.

CCSO policy #322(e) [43] states the deputy performing "search" of a member of the opposite sex should make a "reasonable effort" to summon a deputy of the same sex; and, if "not practicable" to get a female, to call for a witness to the search. Here, Deputy Christensen knew there were no female CCSO patrol deputies on duty at the time. [44] Since it was not "practicable" for a female CCSO deputy to arrive on scene, Deputy Christensen requested back-up to witness the pat-down search of Ms. Ayres. "*Seven…CCSO deputies cover a thousand square miles…during the evening shift…which is a 20-30 minute one-way trip*" [45] when responding to fellow deputy requests for back-up. By coincidence, CCSO Deputy Floyd was nearby and on the scene within two minutes. The prompt response by Deputy Floyd allowed Deputy Christensen to complete his investigation in less than sixteen minutes and accommodate Ms. Graham's need to be at work, all while complying with CCSO policies.

Deputy Christensen was not required to contact the Urbana or Champaign Police Departments to see if they had a female patrol officer on duty or available to conduct the pat down search of Ms. Ayres. Requesting assistance from agencies with overlapping or adjacent jurisdictions is done with prudence to ensure limited resources are used effectively. Conducting a brief and limited pat-down search does not warrant using limited external-jurisdiction resources.

---

[42] CCSO Policy #900: Custodial Searches
[43] CCSO Policy #322: Search and Seizure
[44] Cory Christensen's Deposition (p. 60)
[45] Shane Cook's Deposition (p. 75-76)

Other criminal justice agencies like the department of corrections and Immigration Customs Enforcement (ICE) have same sex (officer and suspect) search protocols. However, searches of prisoners and detained illegal immigrants generally occurs in more secure environments (not rapidly evolving roadside traffic stops) and with the luxury of a same sex officer immediately available. Same sex searches required by the Transportation Security Administration (TSA) in airports also occurs in more secure environments with officers from both sexes readily available on-site. Additionally, many TSA airline passenger screening searches are conducted randomly under different legal standards or on people not suspected of being armed or dangerous.

Deputy Christensen was respectful and courteous when he asked Ms. Ayres, *"Do you mind if I just pat you down real quick? Is that Ok?"* [46] Without answering, Ms. Ayres extended both of her arms out parallel to the ground.[47] Ms. Ayres' consent to the search was implicit and she did not communicate any sensitivity or concern about the forthcoming pat-down search for weapons by a male law enforcement officer.

Deputy Christensen started the pat-down where, in his experience, a weapon is most likely to be hidden by suspects. This includes hot spots[48] or the suspect's *"pockets [and] waistline."*[49] Deputy Christensen initially focused on areas where Ms. Ayres' clothing was noticeably oversized or loose, which was the waist and front and rear pant pockets.

Approximately five seconds into the pat-down search, Ms. Ayres said *"Whoa. Don't touch my butt"*[50] and walked away from Deputy Christensen. Deputy Christensen said, *"I need to make sure you don't have any weapons on you,"*[51] but was satisfied with his hot spot[52] search and did not resume the pat-down of other areas where weapons are commonly hidden by suspects (e.g., ankles, shoes, under her hat, etc.).

[46] Cory Christensen's Body Worn Camera Video
[47] Cory Christensen's Body Worn Camera Video; Deputy Cody Floyd's Body Worn Camera Video
[48] Cory Christensen Deposition (p. 133, 135, 140)
[49] Cory Christensen's Deposition (p. 135)
[50] Cory Christensen's Body Worn Camera Video; Deputy Cody Floyd's Body Worn Camera Video
[51] Cory Christensen's Body Worn Camera Video; Deputy Cody Floyd's Body Worn Camera Video
[52] Cory Christensen Deposition (p. 133, 135, 140)

| Case No. 19-2148 | Expert Opinion Report |

C.    **Methods used by Deputy Christensen to conduct the pat-down search of Ms. Ayres followed best practices**.

Law enforcement officers should not conduct non-custodial or consent person searches alone. Deputy Christensen requested and waited for Deputy Floyd to arrive before doing the pat-down search of Ms. Ayres. When searching thoroughly for weapons, the safety of everyone involved does not vary according to the suspect's sex. The CCSO *"trains deputies to search all persons universally…consistent in the same manner regardless of sex."* [53]

The threat associated with concealed weapons goes beyond traditional weapons like handguns and knives. "Weapons come in all sorts of shapes, sizes, and disguises – cell phone guns, lipstick knives, credit card razors, cigarette lighter switchblades, and stun guns, just to name a few."[54]

To avoid missing hidden weapons when conducting pat-down searches, there are a variety of best practices[55] officers can use such as: look for unusual bulges or bulky clothing where a weapon could be hidden; place or slide palms over area to be searched; or grab, pull and/or explore outside of clothing.

Deputy Christensen followed best practices by *"checking the exterior of [Ms. Ayres'] clothing for any bulges that would resemble a weapon."* [56] He saw that Ms. Ayres' pants were *"loose or baggy."* [57] Ms. Ayres' pants *"fit to the point where you could not see any leg definition through them…and seated lower on her hips rather than her waistline."* [58]

*"Every time [Deputy Christensen] encountered a weapon, it's been located along the subject's waistline or in their pockets."*[59] Deputy Christensen used the palm of his hands when searching Ms. Ayres' waist, thighs, and rear pant pockets to feel for weapons. His fingers were together or *"closed [because] with your fingers open, you could miss [an] object."* [60] During previous pat-down searches of other suspects, Deputy Christensen found weapons…hidden in the loose fabric of baggy pants. [61] Deputy

53 Shane Cook's Deposition (p. 86)
54 The Federal Law Enforcement Informer. Department of Homeland Security (April 2010)
55 The Federal Law Enforcement Informer. Department of Homeland Security (April 2010)
56 Cory Christensen's Deposition (p. 99)
57 Cory Christensen's Deposition (p. 99)
58 Cody Floyd's Deposition (p. 137-138)
59 Cory Christensen's Deposition (p. 179-180)
60 Cory Christensen's Deposition (p. 103)
61 Cory Christensen's Deposition (p. 143)

Christensen checked Ms. Ayres' right back pocket a second time *"due to it being baggy to ensure there was no weapon inside."* [62]

"It is not uncommon for male officers to search females inadequately for fear of being complained on." [63] Against this backdrop, Deputy Christensen focused on hot spots[64] to look for weapons and *"immediately concluded the search"* [65] when Ms. Ayres said, *"Whoa. Don't touch my butt"* [66] and walked away. Deputy Christensen did not resume the pat-down and search other areas where Ms. Ayres could have hidden a weapon. Although Deputy Christensen's decision to stop the pat-down search was not an error, a reasonable officer could have interpreted Ms. Ayres' conduct as an attempt to distract Deputy Christensen from doing a thorough pat-down search. For example, suspects are more likely to physically move, resist, criticize, insult, or attempt to intimidate officers who are on the cusp of finding incriminating evidence during a search.

Although not required by law, individual law enforcement agencies may, at their own discretion, issue policies or provide additional training to address searches conducted by officers on persons of the opposite sex. Most agencies, including the CCSO, have policies that require the investigating officer, witness and suspect to be of the same sex when conducting highly intrusive *strip* and *body cavity* searches. Officers are generally allowed to search suspects of the opposite sex for less intrusive *pat-down* and *incident to arrest searches*. Some policies include specific nuances like having a witness present and using the back or blade of the hand when searching near female breasts or genital areas of either sex. Again, agencies may implement *pat-down* search policies and protocols relevant to a suspect's sex, but it is not a national standard or requirement.

Deputy Christensen followed best practices by using the palms of his gloved hands to conduct a brief pat-down search of Ms. Ayres for weapons. Deputy Christensen focused on Ms. Ayres' waistline and pant pockets where her clothing was loose and, according to his training and experience, most likely to conceal a weapon. To search Ms. Ayres' front and rear pant pockets thoroughly, Deputy Christensen needed to touch her upper thighs and *"swipe [his hand] across [the] butt."* [67] During a re-check of Ms. Ayres' right rear pocket, Deputy Christensen used his hand to push the loose pant fabric inward toward her buttocks. Deputy

[62] Cory Christensen's Deposition (p. 102)
[63] Spurling, Ryan. Female Search & Seizure; PoliceOne.com
[64] Cory Christensen Deposition (p. 133, 135, 140)
[65] Cory Christensen's Deposition (p. 185)
[66] Cory Christensen's Body Worn Camera Video; Deputy Cody Floyd's Body Worn Camera Video
[67] Wylesha Ayres' Deposition (p. 88)

Christensen did not reach into any pocket or touch Ms. Ayres' bare skin at any time during the pat-down. Deputy Christensen also did not search anywhere above Ms. Ayres' waist or search her crotch area.[68]

In summary, Deputy Christensen began the interaction by being *"very nice"*[69] about the Jeep's expired registration and saying he would not issue a citation for the violation. An officer in Deputy Christensen's position could reasonably have gone much further in his investigation by arresting Ms. Ayres and searching her incident to arrest. The odor of marijuana and admission by Ms. Ayres that she *"had smoked earlier"*[70] provided ample justification for Deputy Christensen to conduct a bumper-to-bumper search of the Jeep; any investigation of the occupant's persons could have been head-to-toe. However, Deputy Christensen used his discretion effectively. He recognized Ms. Graham's *"frustration about wanting to get to work"*[71] and chose to *"make [the stop] quick"*[72] and as minimally burdensome as possible for Ms. Ayres, Ms. Graham and the infant children. Deputy Christensen focused his pat down on hot spots, allowed both infant children to remain in the Jeep while searching its interior, and only issued Ms. Ayres a citation for the driver's license violation and not the registration violation. Deputy Christensen took less than sixteen minutes to make sure the environment was safe for everyone.

## IV.  Authorship

I, Jon B. Blum, spent a total of 38.50 hours reviewing case materials in Section I and authoring this report at a rate of $175.00 per hour. See attached fee schedule.

Signature: _____

Date: July 8, 2020

**\*End of Report\***

[68] Wylesha Ayres' Deposition (p. 77-78)
[69] Letika Graham's Deposition (p. 29)
[70] Cory Christensen's Body Worn Camera Video
[71] Cory Christensen's Body Worn Camera Video
[72] Cory Christensen's Body Worn Camera Video

## JON B. BLUM
Jon@force-concepts.com • 919.524.2191
PO Box 295 • Willow Spring • NC • 27592

## Areas of Expertise

Law enforcement best practices with specific expertise on recruitment and retention, training, curriculum development, use of force and emergency vehicle operations.

## Professional Experience

**FORCE CONCEPTS, Inc.**
*Vice President of Training & Development (2005-Present)*: Privately held company provides consulting services for law enforcement and other public safety professionals. Administer job task analyses to develop valid training programs and accountability instruments. Develop government mandated curriculums for licensing, continued employment or advanced in-service training. Trial consultant and expert witness on law enforcement best practices. Achievements: *Documenting Force* curriculum is nationally certified and approved in 35 states. More than 250K *Documenting Force* publications sold in US & Canada. Awarded contracts to overhaul the Commonwealth of Massachusetts (MPTC) and State of Washington (CJTC) basic law enforcement certification curriculums.

**NC Department of Justice / Justice Academy**
*Adjunct Instructor / Curriculum Developer (2002-Present)*: Develop, update and revise Basic Law Enforcement Training and other state-mandated curricula.

**International Assn. of Directors of Law Enforcement Standards & Training**
*Adjunct Instructor / Curriculum Developer (2014-Present)*: Develop and deliver training curricula for law enforcement agencies throughout the United States. Includes curriculum development for the USDOJ COPS Office and International Association of Chiefs of Police.

**Town of Garner Police Department**
*Personnel Manager & PIO (2002-2005)*: Internationally accredited agency with 68 full-time employees protecting and serving 26,000 residents. Responsible for all agency recruitment, personnel development, training and related compliance record systems. Implement comprehensive short and long-term strategies to enhance community relations, manage department's overall image and create agency brand. Authored and distributed press releases in a Top 20 market. Grant print, previously recorded, and live television interview request from media. Achievements: Overhauled job applicant selection process with quantifiable cognitive and physical skill tests. Created social media and electronic platforms for cohesive messaging, timeliness, and efficiency. Managed all media requests for nationally publicized and unsolved death of 17-year old resident.

# JON B. BLUM

**NC Department of Justice / Justice Academy**
*BLET Coordinator (1999-2002)*: Internationally accredited agency responsible for State's certification curriculums and training approximately 23K criminal justice personnel annually throughout North Carolina and United States. Responsible for all development aspects of state-mandated 17-week Basic Law Enforcement Training (BLET or POST) certification curriculum. Collaborate with 300+ SMEs and practitioners for 33 individual lessons. Develop practical skill exercise scripts and testing instruments. Provide technical assistance to all 70+ training academies throughout the State. Chair 16-member committee, establish agendas and use consensus building skills to secure agreements. Report research findings and make recommendations to NC Criminal Justice Education & Training Commission. Achievements: Engineered state-wide electronic distribution systems for training materials; Delivered Academy's first distance learning course; NC Attorney General's Award for BLET leadership.

**Town of Chapel-Hill, North Carolina**
*Reserve Police Officer (1999-2002)*: Voluntary part-time police officer used to supplement full-time officer cadre. Required to work patrol or specialized events a minimum of 10-hours per month.

**Winston-Salem Police Department**
*Corporal/Police Officer (1991-1999)*: Internationally accredited agency with 720 full-time employees protecting and serving 198K residents. Enforce criminal laws, investigate violations and arrest offenders. Conduct interviews, complete official reports and testify in both state and federal courts. First-line supervisor for 10 patrol division officers. Other duty assignments included *SWAT, Planning & Research Unit, Field Training Officer, Academy Instructor*, and *Accreditation Coordinator*. Achievements: Recruit Class XXIX Colleague/Tise Award; Promotion to Corporal in 1995; DWI Enforcement Award; Citizen Satisfaction Award.

**International Association of Chiefs of Police**
*Adjunct Instructor (2000-2007)*: A nonprofit R&D organization with 20K members serving law enforcement executives in 100+ countries. Provide technical assistance, curriculum development and delivery for law enforcement executives on *Use of Force, Report Writing, Media Relations* and *Wellness Programs.*

## Education

**Master of Public Administration** - *MPA*
University of North Carolina at Greensboro (1998)

**Bachelor of Science** - *Criminal Justice*
University of North Carolina at Charlotte (1991)

# JON B. BLUM

| Memberships |
|---|

- <u>IADLEST</u>
  International Association of Directors of Law Enforcement Standards and Training

- <u>IALEFI</u>
  International Association of Law Enforcement Firearms Instructors

- <u>ILEETA</u>
  International Law Enforcement Educators & Trainers

| Certifications & Training |
|---|

**Basic Law Enforcement Training (BLET)**
North Carolina Department of Justice

**Advanced Law Enforcement Certificate**
North Carolina Department of Justice

**General Instructor (BLET)**
North Carolina Department of Justice

**Specialized Subject Control Instructor**
North Carolina Department of Justice

**Specialized Physical Fitness Instructor**
North Carolina Department of Justice

**Public Safety Fitness Specialist**
Cooper Institute for Aerobics Research

**Oleoresin Capsicum Spray Instructor**
Federal Laboratories

**RedMan Simulator Instructor**
H&K Industries

**Taser Instructor**
Taser International

**Baton Instructor**
ASP International

# JON B. BLUM

| Featured Presentations (last 10 years) |
|---|

- _Testing Standards for Law Enforcement_
  International Association of Directors of Law Enforcement Standards and Training; Annual Training Conference; Milwaukee, WI

- _Changing the Classroom Paradigm_
  International Association of Directors of Law Enforcement Standards and Training; Annual Training Conference; Boston, MA

- _Documenting the Use of Force_
  International Association of Law Enforcement Firearms Instructor ATC; Orlando, FL & San Diego, CA; New Mexico Sheriff's Association; Annual Training Conference; Albuquerque, NM

- _Suicide by Cop_
  International Association of Law Enforcement Firearms Instructor ATC; West Palm Beach, Florida

- _Investigative Reports on the Use of Force_
  North Carolina Internal Affairs Investigator's Association ATC; Raleigh, North Carolina

| Publications |
|---|

- _Handguns: Ownership & Safety_
  ISBN# 0-9786592-1-X

- _Domestic Violence Investigations_
  ISBN# 1-932990-16-X

- _Documenting the Use of Force: Corrections_
  ISBN# 1-932990-60-7

- _Documenting the Use of Force: Police_
  ISBN# 1-932990-15-1

# JON B. BLUM
## Case Vitae

| Case | # | Issues | Notes |
|------|---|--------|-------|
| Jones v. City of Durham, et. al | 02CVS-2620 | Vehicle Operations; Training | D |
| Hastings Massasoit v. Sheriff Lane Carter | 04CV-0151 | Use of Force; Training; Policy | |
| Denton v. Franklin County Sheriff's Dept. | 05CVS-0298 | Use of Force; Training; Policy | |
| Blair v. County of Davidson | 05CV-0011 | Use of Force; Training; Policy | R; D |
| Gentry v. Goforth & Davidson County Sheriff | 07CVS-1586 | Deadly Force; Training; Policy | R |
| McCloud v. Hildebrand & City of Hickory | 07CVS-2544 | Deadly Force; Training; Policy | R; D |
| Absher v. Wilkes County Sheriff, et al. | 08CV-0107 | Use of Force; Training; Policy | R; D |
| Cook v. County of Bladen | 08CVS-0303 | Deadly Force; Training; Policy | R |
| Lunsford v. Franklinton Police Department | 08CVS-0567 | Vehicle Operations; Training | R |
| Lyons v. Kings Mountain Police Department | 08CVS-1373 | Use of Force; Training; Policy | R |
| Barber v. City of Concord | 09CVS-16400 | Vehicle Operations; Training | R |
| Robinson v. Bladen County Sheriff's Office | 7:10 CV146 | Use of Force; Training; Policy | R |
| Catoe v. City of Columbia, SC | 09CP4005132 | Deadly Force; Training; Policy | R; P |
| Michael Pyrtle v. Rockingham County Sheriff | 1:10 CV-0683 | Use of Force; Training; Policy | R; P; D |
| Patricia Jackson v. Wal-Mart | CP-26-02175 | Unlawful Restraint; Training | R; P; D; T |
| Ramsey v. Marion County | 19407 | Use of Force; Training; Policy | R |
| Wallace vs. City of Spring Lake | 10-CVS-6793 | Search & Seizure; Training | R; D |
| Ballentine v. Town of Coats | 5:11-CV-524 | Use of Force; Training; Policy | R |
| Strickland v. Town of Coats | 5:12-CV-630 | Use of Force; Training; Policy | R |
| Foster v. Bradley County Tennessee | 1:12-CV-00179 | Deadly Force; Training; Policy | R |
| Truhan v. Walston | 12: CVS-450 | Vehicle Operations; Policy | R |
| Booth v. Town of Weldon | 4:12-CV-117-D | Use of Force; Training; Policy | |
| Smith v. Phillip Redmond, et al. | 5:12-CV-153 | Arrest; Training; Retention | R; D |
| Lucas v. Brake | 5:12-CV-735-FL | Use of Force; Training; Policy | R |
| Johnson v. City of Fayetteville | 5:12-CV-00456-F | Negligent Retention | R |
| Carpenter v. Statesville Police Department | 5:14-CV-16 | False Arrest; Training | R |
| Stafford v. Guilford County Sheriff | 1:14-CV-267 | Use of Force; Training; Policy | R |
| Suba v. City of Johns Creek | 1:14: EV-001901 | Use of Force; Training; Policy | |
| Jarrell v. Department of Public Safety | IC# TA-24434 | Emergency Vehicle Operations | P; D; T |
| Harrison v. City of Greenville, NC | 4:15-CV-00017 | Use of Force; Training; Policy | R; P |
| Batchelor v. Geske, Holt, Newland & Hammond | 5:15-CV-00122 | Use of Force; Training; Policy | R |
| Iandolo v. City of Hickory Police Department | 14 CVS 1160 | Use of Force; Training; Policy | R |
| Anderson v. City of Greenville, SC | 6:15-CV-3259 | Use of Force; Training; Policy | R |
| Swilling v. City of Greenville, SC | 14-CP-23-03013 | Deadly Force; Training; Policy | R |
| Laba v. City of Charlotte | 3:15-CV-316 | False Arrest; Training; Policy | R |

Notes column: **R=R**eport/Affidavit submitted; **D=D**eposition taken; **T=T**rial testimony; **P** = retained by **P**laintiff

# JON B. BLUM
## Case Vitae

| Case | # | Issues | Notes |
|------|---|--------|-------|
| Sierad v. Greenville County Sheriff (SC) | 6:16-CV-02840 | Use of Force | R |
| Christian v. Anderson County Sheriff (SC) | 8:16-CV-02338 | Use of Force; Training; Policy | R |
| Ferrell v. Town of Lillington | 5:15-CV-00677 | Emergency Vehicle Operations | R; P; D |
| State of North Carolina v. Joshua Hopkins | Criminal | Use of Deadly Force | R |
| Falls v. City of Greenville, SC | 2017-CP-23 | Use of Force; Training | |
| Burroughs v. Rockingham County Sheriff | 1:17-CV-462 | Use of Deadly Force; Training | R |
| Mann v. City of Urbana, IL | 17-CV-2300 | Use of Force | R |
| Knibbs v. Momphard (Macon County Sheriff) | 1:19-CV-00130 | Use of Deadly Force; Training | P; R |
| Harris v. David Ramey (High Point Police Dept) | 19-CVS-131 | Use of Force | R |
| Hyatt and Barrett v. Buncombe County Sheriff | 1:19-CV-00250 | Arrest, Search and Seizure | |
| Ayres v. Champaign County Sheriff's Office | Case No. 19-2148 | Search & Seizure | R |
| Dawson v. AnMed Health & City of Anderson | CP-400909 | Search & Seizure | |

Notes column: **R**=**R**eport/Affidavit submitted; **D**=**D**eposition taken; **T**=**T**rial testimony; **P** = retained by **P**laintiff

# Jon B. Blum

Expert Witness Services
PO Box 295; Willow Spring, NC 27592
919.524.2191
jon@force-concepts.com

<u>Consultations</u>: Preliminary discussions with potential clients are free.

<u>Fees & Rates</u>: A $1500.00 retainer fee is applied to services requested.

| SERVICE | DESCRIPTION | RATES |
|---|---|---|
| **Case Analysis** | • *Document review*<br>• *On-Site / Scene visits*<br>• *Opinion report composition* | $175.00<br>*Hour* |
| **Testimony**<br>Deposition | *Does not include travel expenses* | $300.00<br>*Hour* |
| **Testimony**<br>Trial | *Does not include travel expenses* | $2500.00<br>*Day* |
| **Travel**<br>Day | *Roundtrip travel <u>less than</u> 300 miles from Willow Spring, NC. Includes mileage, tolls, parking and per diem.* | $75.00<br>*Hour\** |
| **Travel (per diem)**<br>Overnight | *Roundtrip travel <u>greater than</u> 300 miles from Willow Spring NC. Includes mileage (or rental car), per diem and lodging. <u>Does not</u> include air expenses.* | $400.00<br>*Day\** |

**\*Updated January 2020**