E-FILED
Monday, 10 May, 2021  01:19:51 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| **WYLESHA AYRES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 19-CV-2148** |
| | ) | |
| **SHERIFF'S DEPUTIES CORY** | ) | |
| **CHRISTENSEN and CODY FLOYD,** | ) | |
| **CHAMPAIGN COUNTY SHERIFF'S** | ) | |
| **OFFICE, and CHAMPAIGN COUNTY,** | ) | |
| **ILLINOIS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Plaintiff, Wylesha Ayres, filed an Amended Complaint (#22) pursuant to 42 U.S.C. § 1983, alleging that Defendants Champaign County Sheriff's Deputies Cory Christensen and Cody Floyd, Champaign County Sheriff's Office, and Champaign County, violated her right to be free from an unreasonable search under the Fourth Amendment to the United States Constitution. Defendants filed a Motion for Summary Judgment (#53) on November 16, 2020, to which Plaintiff filed a Response (#56) on December 18, 2020. Defendants filed a Reply (#58) on January 12, 2021. For the following reasons, Defendants' Motion for Summary Judgment (#53) is GRANTED.

BACKGROUND

The following background facts are taken from Defendants' Undisputed Statements of Material Facts, Plaintiff's Additional Facts section in her Response, and the exhibits attached by the parties to their filings, including the video records of the traffic stop and search of Plaintiff's person and vehicle.

Before discussing the factual background of this case, the court would note that many of the facts leading up to and following the performance of the search of Plaintiff's person are undisputed. However, what happened during the search is sharply disputed between the parties. The court will present both parties' versions of what happened during the search, along with what the court observes on the police video recordings, keeping in mind that, on summary judgment, "the district court [is] required to take all evidence, including reasonable inferences from that evidence, in the light most favorable to the plaintiff." *LaBrec v. Walker*, 948 F.3d 836, 839 (7th Cir. 2020).

*The Parties*

Defendants Cory Christensen and Cody Floyd are deputies for the Champaign County Sheriff's Office who were on-shift during the evening hours of May 8, 2019.

Plaintiff Wylesha Ayres is a 27-year old woman, who has completed her education up to 11th grade. By the night of the stop, she had been patted down "a little less than a hundred" times, including at traffic stops. She has past convictions for robbery and burglary. On the evening of May 8, 2019, she was giving her friend Letika Graham a ride to work. Two children, one Plaintiff's and the other Ms. Graham's (one

an infant, the other seven years old), were in the back seat of the car. Before the May 8, 2019, incident, neither Deputy Christensen nor Deputy Floyd had ever interacted with Plaintiff.

*The Traffic Stop*

At around 9:55 pm on May 8, 2019, Defendant Christensen pulled over a Jeep Patriot (hereinafter the "SUV") that Christensen identified as having an expired registration sticker on its license plate, in violation of the Illinois Motor Vehicle Code. Christensen activated his lights and initiated a traffic stop near Anthony Drive and Dobbins Drive in Champaign, Illinois. The area where the stop occurred is known to the Sheriff's Office as a high-crime area, and Christensen personally knew the area as a significant location for gun violence and narcotics distribution. During the traffic stop it was dark out, which Christensen's experience told him was less safe than had the stop occurred earlier in the day.

Christensen exited his squad car at 9:56 pm, and approached the passenger side of the SUV. Christensen informed the driver and passenger (who he learned were Plaintiff and Graham, respectively) that he had stopped them for an expired registration sticker. He told them he was not going to issue a citation, but asked to see their driver's licenses. Both Plaintiff and Graham provided Christensen with their licenses. During this initial conversation, Graham informed Christensen that she was on her way to work.

Christensen testified that, during this initial interaction, he detected an odor coming from the SUV that he believed to be marijuana.  However, during this initial interaction, Christensen never told Plaintiff that he smelled marijuana coming from the SUV.  At the time in 2019, marijuana possession, outside of small amounts or medical uses, was illegal in Illinois.  Even possession of medical marijuana was illegal in a car unless the marijuana was in a sealed, "tamper-evidence" medical marijuana container.

Christensen then returned to his squad car with the licenses.  On the way back, Christensen asked for a second officer to come to the scene so Christensen could conduct a "PC" (presumably "probable cause") search.  Christensen also testified that he decided to search Plaintiff due to "officer safety."  Christensen testified that he called for the second officer due to the odor of marijuana he detected emanating from the interior of Plaintiff's vehicle.  In Christensen's experience and training, he has learned that individuals who possess illegal drugs or weapons on their person will often try to discard, hide, or destroy those items if given an opportunity to do so, especially if the suspect is able to leave the scene where they are interacting with (and being watched by) law enforcement.

Christensen did not try to obtain a warrant because, in his experience, it typically took two hours to obtain a warrant at night after the courthouse had closed.  He also made no attempt to request a female deputy attend the scene because he knew there were no female deputies on duty at that moment.

4

As Christensen got back into his squad car, he was advised that Deputy Floyd would respond to the scene.  From the computer in his squad car, Christensen ran Plaintiff's and Graham's information "through the checks that [he does] on every traffic stop[.]" Specifically, Christensen checked both Plaintiff and Graham though the LEADS[1] and ARMS[2] databases.  In Christensen's experience, LEADS and ARMS were reliable sources of information and he could trust their accuracy.  From his searches of LEADS and ARMS, Christensen obtained information indicating that Plaintiff: (1) had an expired driver's license; (2) was not licensed to use medical marijuana; (3) had been arrested numerous times, and had some criminal convictions, including for robbery; (4) was documented by the Urbana Police Department as being a gang member; (5) had a previous contact with the Champaign Police Department, wherein she had been in a vehicle with two guns inside, one of which was found to be stolen; and (6) in the Champaign Police Department incident, the vehicle in question was driven by Quantrell Ayres, an individual known to Christensen to be a violent/dangerous

---

[1]"The Illinois Law Enforcement Agencies Data System ("LEADS") is a statewide shared-information resource available to law enforcement, where participating state, county, and municipal entities input certain information relating to individuals which may be useful to law enforcement, such as information relating to an individual's criminal history - including past arrests, charges, and convictions - outstanding warrants, license/registration information, etc."  (#53-10), Defendants' Exhibit H, Declaration of Cory Christensen, ¶ 1.

[2]"The Area-Wide Records Management System ("ARMS") can simply be described as a version of LEADS that is local to the Champaign-Urbana area, and which is accessible to participating agencies, including the Champaign County Sheriff's Office. Like LEADS, the ARMS system also contains information relating to local law enforcement's contacts with and notes regarding a given individual, among other information."  (#53-10), Defendants' Exhibit H, Declaration of Cory Christensen, ¶ 2.

5

criminal and suspected drug dealer, who shared Plaintiff's last name and was involved in a drug-related shooting. Christensen's search did not reveal any alerts about Graham.

While Christensen was performing the LEADS and ARMS searches, Deputy Floyd arrived on scene. Christensen informed Floyd that he had smelled marijuana in the SUV, that Plaintiff was reported to be a gang member,[3] and that Christensen intended to have Plaintiff and Graham leave the vehicle so that he could search it.

*The Pat-down Search*

Christensen testified that he limited the eventual pat-down of Plaintiff and his search of the SUV to the actions he believed were necessary to accomplish his purpose, so as not to prolong the stop and prevent Graham from getting to work.

The Video Recordings[4]

At 22:03:00, Christensen put on a pair of gloves he called his "snow gloves," which did not appear to be rubber gloves but rather light winter gloves, exited his car, and approached the driver's side of the SUV. While approaching the SUV, Christensen told Floyd to stand back; Floyd stayed back by Christensen's vehicle. When Christensen arrived at the SUV's driver-side door, he said to Plaintiff: "Hey Wylesha, hop out real quick. You're not under arrest, okay?" Christensen went on to say he

---

[3]Plaintiff denies being a gang member.

[4]When the court identifies a time in connection with an action on the video, the court is referring to the time stamp depicted in the top left corner of the officers' video recordings, which is in military time. The video in this case is officer body camera video.

would "explain it to ya" after Plaintiff asked what was going on.  At 22:04:03, as Plaintiff exited the SUV, Christensen asked if she had any weapons[5] on her; Plaintiff said she did not.

Plaintiff and Christensen walked to the back of the SUV, and stopped.  At 22:04:11, Christensen tells Plaintiff she has an expired driver's license, to which Plaintiff responds "I do?"  At 22:04:41, Christensen tells Plaintiff that he could smell marijuana when he walked up to the SUV.  Plaintiff then admits that she had smoked marijuana earlier.  He then asked Plaintiff if she had any drugs in the SUV that she was aware of.  Plaintiff said she did not.

At 22:04:56, Christensen asked "Do you mind if I pat you down real quick?  Is that okay?"  Before he finished asking, Plaintiff extended her arms so they were parallel to the ground, and looked at the ground.  Christensen then asked Plaintiff to turn around, and she complied.

Plaintiff's pants, in the video, appear to be slightly baggy "running" or "sweat" pants.  There does appear to be a slight "sag," and the area below the buttocks does hang off from the buttocks a bit, to form a "loose-fitting web" of pant fabric.

Christensen initiated the search at 22:04:58 on the video.  Christensen begins with his left hand on Plaintiff's side, and sweeps across the buttocks, appears to feel under the buttocks, and then puts his hands around Plaintiff's pants pockets.  Christensen

---

[5]Christensen testified that his training and personal experience told him that individuals who are drug dealers or users often have a weapon or items that could be used as a weapon on their person.

then pats above the waist, then very quickly moves down to pat in the middle of the buttocks, and then says "we're good[,]" ending the search. The entire search took seven seconds, ending at 22:05:05. At 22:05:06, Plaintiff says to Christensen "woah, don't touch my butt[,]" and walks away. Christensen replies that he is just checking for weapons. Prior to this statement, Plaintiff did not communicate to Christensen that his pat-down search made her uncomfortable.

At times during the search, based on Christensen's body camera following the movement of Christensen's head, Christensen's hands are not visible. These moments are only a fraction of a second.

Defendant Floyd was, in the court's estimation, five to seven feet away from Christensen and Plaintiff during the search. Floyd's video provides a full picture of Christensen searching Plaintiff. However, the view is only of the front and right side of Plaintiff's body. Christensen's left hand, at the end of the search, can be seen at the middle of Plaintiff's buttocks, but it does not appear Christensen "inserted" his fingers between Plaintiff's buttocks. If he did, it was a very slight, incidental contact that lasted a fraction of a second.

<u>Christensen and Floyd's Version Based on Their Testimony</u>

Christensen testified that Plaintiff was wearing jogging pants that Christensen perceived as "baggy" around the waist/back-pocket area, and were loose enough that he could not rule out that she had a weapon or an item that could be used as a weapon on her by sight alone.

Christensen asked Plaintiff to turn around so her back was towards him.

8

Plaintiff did as asked.  Christensen patted the outside of Plaintiff's waistband area and pant pockets with his gloved hand.  The pat-down lasted approximately seven seconds.

Floyd testified that he witnessed "part of" the pat-down search.  Floyd was standing in the vicinity of Christensen's front passenger headlight.  Floyd testified that he saw Plaintiff's front and right side.  However, his attention was divided, because at the same time, he was also watching the passenger side of the SUV, where Graham was seated.  Floyd testified that he saw Christensen search Plaintiff's "waistline," but he did not observe Christensen search below the waistband.  Floyd did not see Christensen touch Plaintiff's buttocks or crotch-area, and did not witness Christensen use his fingers to search in between Plaintiff's legs.  If Floyd had "witnessed inappropriate action," he "would have intervened" by stopping the search.  He had no reason to suspect that Christensen would perform an improper pat-down search.

Christensen testified that, during the search, he focused on areas where his experience and training informed him there was most likely to be a weapon of some fashion: the pants waistband, pockets, and areas of the pants where a weapon could fall if initially tucked in a waistband.

Christensen testified that, during the search, his "inner hands" were facing towards Plaintiff, and his fingers were closed, akin to a "high five" gesture.  He stated that he used this technique because it improved his ability to feel a small object, such as a weapon, on someone's person.

Christensen testified that, during the search, he ran his hands up Plaintiff's inner thighs, but stopped short of touching where Plaintiff's inner thighs would connect to

9

her crotch area. Christensen testified that he also searched a loose-fitting "web" of pant fabric that appeared to be loosely hanging down from Plaintiff's buttocks, and which included a portion of her back pant pockets. He searched this "web" area because he had personally found weapons, including brass knuckles, in this portion of an individual's pants before May 8, 2019. Christensen testified that his hands did not touch or make contact with Plaintiff's genitalia.

Plaintiff's Version of the Search

Plaintiff testified that, at the time of the stop, she was not wearing baggy pants. She also testified that her pants were not "sagging." Plaintiff testified that Christensen's pat-down of her was "very feel [sic] toward [her] private areas." By "private areas" Plaintiff meant her buttocks. Plaintiff further testified that Christensen was "more so rubbing than patting" her body, and that his pat-down of her felt more like a "grope" instead of a pat-down. Plaintiff testified that Christensen "fondled" her buttocks in a way "that [she] had never been fondled with in the first place." Plaintiff said that Christensen touched areas of her body that she never in her life knew that a "male officer could touch."

Plaintiff stated that Christensen repeatedly touched her buttocks. She testified that Christensen swiped across her buttocks, then ran his hand across both parts of her buttocks, and then reached in between her buttocks. Plaintiff testified that she could feel Christensen's fingers in between her buttocks. She testified that Christensen was rough by the way he was grabbing her during the pat-down. Plaintiff testified that, after Christensen touched in between her buttocks, she told him "Woah, bro. Don't

touch my butt, please."  Plaintiff testified that she then "walked off" regardless of what Christensen had to say, "because he had [done] too much" at that point.

Plaintiff testified that Christensen did not search her chest area, back, lower legs, or under her armpits.  Plaintiff felt that Christensen was trying to belittle her as opposed to actually trying to search her.

Plaintiff testified that Floyd was not "too far" away from the pat-down search as it was occurring.  Plaintiff testified that Floyd was closer than ten feet away, and did nothing other than stand there as the search occurred.

*The Automobile Search*

After patting down Plaintiff, Christensen searched the SUV for marijuana.  His search of the SUV, depicted on his body camera footage, included searching the center console, inside a zipped-shut purse/wallet, the glove compartment, and a backpack that was in the SUV's trunk.  Plaintiff and Graham were outside the SUV during the search, standing near Deputy Floyd, who was by Christensen's squad car, about ten feet from the SUV.  Plaintiff and Graham voiced their displeasure about Christensen's pat-down search and vehicle search.  The search of the car lasted less than two minutes.

11

Neither Christensen nor Floyd saw either Plaintiff or Graham smoking marijuana or anything resembling marijuana.  No marijuana was recovered, either from the occupants of the vehicle or inside the vehicle.

*Conclusion of the Traffic Stop*

After searching the SUV, Christensen, Plaintiff, and Graham returned to their respective cars.  Ultimately, Christensen wrote Plaintiff a traffic citation, and concluded the stop at 10:12 pm.  Plaintiff suffered no physical injuries as a result of the traffic stop.

*After the Traffic Stop*

Defendant Floyd conducted a second traffic stop on Plaintiff's vehicle approximately 20 minutes after the first traffic stop.  The basis for the stop was the same traffic violation as Christensen's stop.  During the second stop, Floyd laughed and acknowledged that Plaintiff had already been pulled over.

*Effect of the Search on Plaintiff*

The video of Christensen's pat-down search of Plaintiff was published in an online news article.  The pat-down made Plaintiff feel violated and harassed.  She felt low and she "punched holes" in the walls of her home.  She cried to Latika Graham about the pat-down.  Since the pat-down, Plaintiff's mood has changed.  She is more on edge, gets jumpy, frantic, and worried that something is going to happen to her whenever she sees the police.  She also sees a mental health counselor approximately once a week as a result of this incident.

*Plaintiff's Policing Expert*

Plaintiff's expert, Joseph J. Blaettler, has over 33 years of law enforcement and criminal justice experience, training, and education in the fields of investigations, supervision, procedures, and operations.  Blaettler, in his "Report" attached as Exhibit J to Plaintiff's Response (#56), states that a visual inspection should be used in lieu of a pat-down.  Blaettler further states that searches utilizing finger manipulation or palm touching should be avoided whenever possible in favor of a search utilizing the back of a stiff, bladed hand.  Blaettler states that the search of a female by male officers requires special care to avoid unnecessarily invading the private areas.

*Champaign County Sheriff's Office Policy*

It is Champaign County Sheriff's Office policy that a male deputy should request a female deputy to perform a search on a female person.  It is also policy that once a deputy of the opposite sex of a subject makes reasonable attempts to locate a deputy of the same sex to conduct a pat-down search of the subject, the deputy must then report the attempts made to locate a same-sex deputy and whether the deputy located a same-sex deputy to conduct the pat-down search.

Christensen did not document the traffic stop in any formal written report.  He was also not aware of the Sheriff's Office policy requiring him to document reasonable attempts made to locate a same-sex deputy of the subject of the pat-down search.

*Procedural History*

Plaintiff's Amended Complaint (#22) alleges five counts against Defendants:
Count I alleges a violation of the Fourth Amendment for unreasonable search and
seizure against Defendant officers, pursuant to 42 U.S.C. § 1983; Count II alleges failure
to intervene to protect Plaintiff from a violation of her constitutional rights pursuant to
§ 1983 against Defendant Floyd; Count III alleges a state law tort of intentional infliction
of emotional distress against Defendant officers; Count IV alleges a state law claim of
respondeat superior against Defendant Champaign County Sheriff's Office; and Count
V alleges a state law claim of indemnification against Defendants Champaign County
and Champaign County Sheriff's Office.

## ANALYSIS

Defendants, in their summary judgment motion, argue that Defendant officers
did not violate Plaintiff's Fourth Amendment rights during the traffic stop and search
of Plaintiff's person and car.  Defendants also argue that summary judgment should be
granted in favor of Defendant Floyd on Plaintiff's failure to intervene claim and in favor
of Defendant officers on Plaintiff's Illinois intentional infliction of emotional distress
claim.

*Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In
ruling on a motion for summary judgment, a district court "has one task and one task

14

only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture.  See *Singer*, 593 F.3d at 533.  In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings.  *Waldridge*, 24 F.3d at 920.  "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal."  *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a

sufficient showing of evidence for each essential element of its case on which it bears

the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing

*Celotex Corp.*, 477 U.S. at 322-23.

    *Scope of Plaintiff's Fourth Amendment Claim*

    Before addressing the merits of Defendants' summary judgment argument on

Plaintiff's Fourth Amendment claim, the court must determine the scope of that claim.

Defendants, in their summary judgment motion, break down Plaintiff's Fourth

Amendment unreasonable search claim into several components: (1) whether Plaintiff

was seized, and was the seizure reasonable; (2) whether the pat-down search of Plaintiff

herself was reasonable, specifically: (a) was the search of Plaintiff's person legally

justified; and (b) did the actual mechanics of the pat-down search of Plaintiff violate the

Fourth Amendment; and (3) whether the search of Plaintiff's automobile was justified.

The court will address all of these claims in order to properly identify the true scope of

Plaintiff's Fourth Amendment claim, based on what Defendants argue in their summary

judgment motion and how Plaintiff addresses Defendants' arguments in her Response.

    First, Defendants concede that Plaintiff was seized when Defendant Christensen

initiated the traffic stop.  An expired registration sticker provides probable cause for a

traffic stop in Illinois.  *People v. Williams*, — N.E.3d —, 2020 IL App (3d) 180024, at ¶ 33,

2020 WL 8614552, at *6 (Ill. App. Ct. Dec. 7, 2020).  Plaintiff does not contest that

Christensen had probable cause to stop her vehicle.

Next, having seized Plaintiff via the traffic stop, Defendants argue that Plaintiff essentially concedes that the search of her vehicle was reasonable by failing to respond to Defendants' argument in that respect.  Failure to respond to an opposing party's argument implies concession of that argument.  *Cintora v. Downey*, 2010 WL 786014, at *4 (C.D. Ill. Mar. 4, 2010); *Golomb v. Indiana University Health Care Associates, Inc.*, 2020 WL 6946467, at *1 (S.D. Ind. Nov. 24, 2020), citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).  To be sure, Plaintiff does state in a footnote on page six of the Response that "Plaintiff does not contend that Defendant Christensen had probable cause to search Plaintiff's vehicle at the time of the traffic stop."  However, Plaintiff's one-sentence, undeveloped, conclusory and generalized argument that Christensen did not have probable cause to search her vehicle at the time of the traffic stop is not sufficiently supported by evidence and argument so as to survive summary judgment.  See *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 899 (7th Cir. 2018); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010), quoting *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) ("we have warned that 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.'").

Even addressing Plaintiff's conclusory argument, the court finds Christensen's search of the vehicle was supported by probable cause.  Warrantless searches are per se unreasonable under the Fourth Amendment, subject to only certain exceptions, such as the "automobile exception," which allows authorities to search a car without a warrant if they have probable cause.  *United States v. Kizart*, 967 F.3d 693, 695 (7th Cir. 2020). Probable cause to search a vehicle exists when, based on the totality of the

17

circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place, and there is no dispute that the smell of burnt marijuana gives police probable cause to search a vehicle's interior.  *Kizart*, 967 F.3d at 695; *United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008) ("A police officer who smells marijuana coming from a car has probable cause to search that car."); *People v. Litwin*, 40 N.E.3d 784, 793 (Ill. App. Ct. 2018) ("It is well settled that the smell of cannabis emanating from a vehicle is sufficient to give an officer probable cause to search the vehicle...").

At the time of the traffic stop in 2019, marijuana, outside of small amounts or medical uses, was illegal in Illinois, and even possession of medical marijuana was illegal in a car unless the marijuana was in a sealed, "tamper-evidence" medical marijuana container.  Christensen smelled marijuana coming from the SUV during his initial interaction with Plaintiff.  Plaintiff even admitted to Christensen that she had been smoking marijuana earlier in the day.  Thus, to the extent Plaintiff has not conceded the argument, the court finds the search of Plaintiff's SUV was reasonable and not a violation of the Fourth Amendment.

*Count I: Whether Defendant Christensen's Search of Plaintiff Was Unreasonable Under the Fourth Amendment*

Remaining for determination on Plaintiff's Fourth Amendment unreasonable search claim is whether: (1) the search of Plaintiff's person was legally justified and (2) whether the search of Plaintiff's person itself was so intrusive as to be unreasonable under the Fourth Amendment.

<u>Whether the Search of Plaintiff's Person Was Legally Justified</u>

First, in support of their argument that Christensen had legal justification to search Plaintiff's person, Defendants argue that: (1) Plaintiff consented to a search of her person and (2) Christensen had reasonable articulable suspicion to search Plaintiff due to the smell of marijuana emanating from the SUV and for officer safety.

As an initial matter, Christensen did not violate Plaintiff's Fourth Amendment rights when he asked her to exit the SUV.  See *United States v. Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011), citing *Pennsylvania v. Mimms*, 434 U.S. 106, 112 n.6 (1977) ("During a valid traffic stop, an officer may order the driver and passengers out of the vehicle without violating the Fourth Amendment."); *United States v. McChesney*, 2009 WL 4638846, at *5 (N.D. Ind. Dec. 2, 2009) ("officers may order a driver out of his car during a traffic stop for any or no reason").

Once out of the vehicle, Defendants argue that Plaintiff consented to a search of her person by Defendant Christensen.  The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

19

Warrants shall issue, but upon probable cause."  U.S. Const. art. IV.  The U.S. Supreme

Court has "held that a warrantless search of the person is reasonable only if it falls

within a recognized exception."  *Missouri v. McNeely*, 569 U.S. 141, 148 (2013).  It is well-

established that a search is reasonable when the subject consents, and sometimes

consent to a search need not be express, but may fairly be inferred from context.

*Birchfield v. North Dakota*, 136 S.Ct. 2160, 2185 (2016).

An "explicit verbal consent" is not necessary to constitute "consent" for purposes

of the Fourth Amendment, and it is well-established that consent may be manifested in

a non-verbal as well as verbal manner.  *United States v. Villegas*, 388 F.3d 317, 324 (7th

Cir. 2004); *United States v. Walls*, 225 F.3d 858, 863 (7th Cir. 2000).

Here, Christensen asked Plaintiff if he could pat her down "real quick[,]" and if

that was "okay?"  Before Christensen could finish asking Plaintiff the question, Plaintiff

extended her arms so they were parallel to the ground, and looked at the ground.

Christensen asked her to turn around, and Plaintiff complied.

Gestures such as Plaintiff's, in response to a request to search by officers, have

been held to be evidence of consent.  The Eighth Circuit has held that a defendant's

raising of his arms in response to a police request to search the defendant's torso was

sufficient under the circumstances to indicate consent to a search.  *United States v.

Mendoza-Cepeda*, 250 F.3d 626, 628-29 (8th Cir. 2001).  The Eleventh Circuit has found

that a defendant's turning away from the officer and placing his hands on the police

cruiser as if preparing to be searched gave implied consent.  *United States v. Chrispin*,

181 Fed.Appx. 935, 938 (11th Cir. May 26, 2006).  Likewise, the Ninth Circuit has held

that the defendant consented to a search when, in response to an officer request that he allow the officer to search him for weapons, the defendant raised his hands and placed them upon his head. *United States v. Vongxay*, 594 F.3d 1111, 1119-20 (9th Cir. 2010).

However, even if the court finds that Plaintiff's non-verbal gestures indicated her consent to be searched by Defendant Christensen, that consent must still have been given voluntarily and without coercion in order to be valid. See *United States v. Richards*, 741 F.3d 843, 848 (7th Cir. 2014). To determine whether consent was provided voluntarily, the court considers: (1) Plaintiff's age, education, and intelligence; (2) whether Plaintiff was informed of her constitutional rights; (3) whether Plaintiff was in custody; (4) how long Plaintiff was detained; (5) whether Plaintiff consented immediately or after Christensen made several requests; and (6) whether Christensen used physical coercion. See *Richards*, 741 F.3d at 848. The court's determination does not depend on a single controlling factor, but rather the court carefully considers "all of the surrounding circumstances." *Richards*, 741 F.3d at 848, citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

The court finds that, considering all the factors and surrounding circumstances, Plaintiff's consent for Christensen to search her person was voluntarily given without coercion. Defendants, in support of their argument that Plaintiff voluntarily consented to the search, cite to the district court's decision in *United States v. Correa*, 2013 WL 5663804 (N.D. Ill. Oct. 17, 2013), where the court found consent was voluntary where: the defendant was 30 years old at the time of his arrest; was a fluent English speaker from Chicago; and completed two years of high school. *Correa*, 2013 WL 5663804, at *4.

The district court also noted that although the defendant was not advised that he could refuse consent, he previously had been arrested fifteen times for a variety of offenses, several of which stemmed from traffic stops; that he consented immediately to the officer's first request; and that no physical coercion was used and the defendant was not yet in police custody. *Correa*, 2013 WL 5663804, at *4. The Seventh Circuit affirmed the district court's finding that the defendant had voluntarily consented to the search. *United States v. Correa*, 908 F.3d 208, 222 (7th Cir. 2018).

The court finds *Correa* informative and persuasive. Plaintiff is 27 years old, speaks fluent English, and has an 11th grade education, which weighs in favor of voluntariness. Although Plaintiff had not been advised of her constitutional rights, like the defendant in *Correa* she had extensive experience with law enforcement, had been patted down a little less than "a hundred times," and had prior convictions for burglary and robbery. Thus the court agrees with Defendants that, given this background and experience with law enforcement, Plaintiff was likely not ignorant of her constitutional rights.

The length of detention in this case was somewhat minimal. The pat-down happened less than nine minutes after the traffic stop was initiated, well within the time frame held reasonable by the Seventh Circuit for searches to be conducted during traffic stops where reasonable suspicion exists that a crime has been committed. See *Hall v. City of Chicago*, 953 F.3d 945, 954 (7th Cir. 2020). Further weighing in favor of consent is that Christensen had to ask Plaintiff only once for consent to search, and Plaintiff began raising her hands to be searched before he could even finish asking the question.

22

The court further finds that no physical coercion was used on Plaintiff by Christensen in asking her to consent to the search.  Christensen did not brandish his firearm or any other weapon, or threaten Plaintiff in any way.  Finally, it is arguable whether Plaintiff was in custody at the time consent was given.  Relevant factors for this analysis include whether the encounter occurred in a public place; whether the individual consented to speak with the officers; whether the officers informed the individual that she was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed.  *United States v. Ruiz*, 785 F.3d 1134, 1145 (7th Cir. 2015).

Here, the encounter occurred on a public road; Plaintiff consented to speak with Christensen; Christensen told Plaintiff she was not under arrest; Plaintiff was not moved to another area; and Christensen maintained a conversational, even tone of voice when speaking with her.  On the other hand, Christensen was armed and in uniform, and was backed up on scene by another officer, Floyd.  On the whole, the court finds Plaintiff was not in custody.  However, even if Plaintiff was arguably in custody at the time of the search, this alone does not make the consent coerced.  See *United States v. Modir Trading*, 2013 WL 3774005, at *8 n.10 (N.D. Ill. July 18, 2013).  The court finds that, based on a totality of the circumstances, Plaintiff's consent to the search was voluntary and not coerced.

Plaintiff, in her Response, does not respond to Defendants' argument that she

23

consented to a search of her person.  Indeed, on page 30 of her Response, Plaintiff

appears to concede this point, stating that "[a]lthough Ayres may have consented to the

search, the manner of the pat-down search of Ayres's person was patently

unreasonable."  The court finds that, based on Plaintiff's consent to the search,

Christensen's decision to conduct a pat-down search of Plaintiff's person was legally

justifiable.

Because the court has found that Plaintiff validly consented to the search of her

person, the court need not address whether Christensen had reasonable articulable

suspicion to search Plaintiff for weapons and/or drugs.

<u>Manner In Which Christensen's Pat-Down Search of Plaintiff was Conducted</u>

Defendants argue that, as Plaintiff consented to the search of her person,

Christensen's brief pat-down search for weapons and/or drugs did not violate

Plaintiff's rights under the Fourth Amendment.

Plaintiff responds that the manner in which Christensen searched Plaintiff

violates the Fourth Amendment because: (1) the justification for the search is

problematic because Christensen had no reason to believe Plaintiff was armed; (2)

Christensen did not have probable cause to search Plaintiff for drugs, and his doing so

exceeded the allowable parameters for an officer safety search under *Terry v. Ohio*, 392

U.S. 1 (1968); (3) Christensen did not even attempt to call for a female officer to search

Plaintiff, in violation of Sheriff's Department policies and general good policing

practice; and (4) the manner in which the search was performed was patently

unreasonable because Christensen "groped" and "fondled" Plaintiff by touching her

buttocks multiple times and "inserting his fingers into the crevice of her buttocks."

The court will first address, in general, the standards for evaluating the constitutionality of the manner in which a search is conducted.  A search, even if justified, must be reasonable in its manner and scope of execution to comport with the Fourth Amendment.  *Maryland v. King*, 569 U.S. 435, 448 (2013).  Courts "evaluate the constitutionality of a given search by 'balancing ... the need for the particular search against the invasion of personal rights that the search entails[,]'" and, in doing so, "consider 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" *Campbell v. Miller*, 499 F.3d 711, 716 (7th Cir. 2007), quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  "The more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted."  *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983).

First, as discussed above, Christensen acquired legal justification for the search via Plaintiff's consent.  Christensen indicated to Plaintiff that he was concerned about weapons on her person, and the smell of marijuana coming from her car.  Plaintiff denied having weapons on her, but admitted to smoking marijuana earlier.  Christensen asked Plaintiff if it was okay to search her "real quick," and Plaintiff immediately, freely consented.  However, while the court has found the pat-down search to be legally justified, the question of whether an otherwise permissible search is conducted in a reasonable manner is a different one.  *Campbell*, 499 F.3d at 718.

Here, Christensen conducted a very brief search limited to the outside of Plaintiff's clothing.  The search was quick and perfunctory, confined to areas that Christensen's training and experience informed him may conceal weapons.  The nature of Christensen's search was also dictated by Plaintiff's baggy pants, which the court confirmed via the video were indeed baggy and hanging somewhat loosely off of Plaintiff's waist.  The court observed Christensen very quickly and efficiently search around Plaintiff's waist, pockets, and buttocks area to feel for the outline of anything that could be identified as a weapon.  Christensen felt around the mesh area of Plaintiff's pants hanging off her buttocks because his training and experience informed him that suspects sometimes store weapons in such an area.  There was nothing the court observed on the video that was invasive or would go beyond the necessary scope of a pat-down search for weapons.  Rather, Christensen, during a lawful investigatory traffic stop, conducted (with Plaintiff's consent) a carefully limited protective search of Plaintiff's outer clothing in an attempt to discover weapons which might be used to

26

assault him, including a pat-down of Plaintiff's buttocks area, which is reasonable under the Fourth Amendment.  See *United States v. Leo*, 792 F.3d 742, 749 (7th Cir. 2015).

The court finds the arguments raised by Plaintiff in support of her claim that the search was unreasonable to be unavailing.  First, Plaintiff cites to decisions of the U.S. Supreme Court in *Sibron v. New York*, 392 U.S. 40 (1968) and the district court in *Lessley v. City of Madison, Ind.*, 654 F.Supp.2d 877 (S.D. Ind. 2009), but those cases are distinguishable.

In *Sibron*, the Court found the officer violated the Fourth Amendment by going beyond the bounds of a *Terry* stop weapons search by immediately placing his hands in the suspect's pockets and removing drugs, with no attempt at an initial limited exploration for weapons.  *Sibron*, 392 U.S. at 65.  Further, the Court found that the officer did not have a reasonable suspicion to search the suspect for drugs or weapons, and that the search was not even a *Terry* search, because the officer, based on his testimony, was clearly searching for drugs.  *Sibron*, 392 U.S. at 63-64.

Here, unlike in *Sibron*, Christensen had consent from Plaintiff to search her for weapons, at the least, and possibly for drugs as well.  Christensen's search, as described above, was limited to a very brief pat-down search of the outside of Plaintiff's clothing in areas where weapons were likely to be concealed.  Further, unlike in *Sibron*,

27

Christensen did have some knowledge of illegal drug activity on Plaintiff's part, such as the smell of marijuana emanating from Plaintiff's SUV and Plaintiff's admission that she had been smoking marijuana earlier.

The district court decision in *Lessley* is likewise distinguishable.  There, the district court held that, following a traffic stop, the officers lacked probable cause to search the pockets of the plaintiff passengers for drugs based only on "the smell of marijuana emanating more generally from the car."  *Lessley*, 654 F.Supp.2d at 897.  Here, however, Christensen had more than just a general odor of marijuana emanating from the car.  Christensen also had Plaintiff's admission that she had been smoking marijuana earlier, possibly giving rise to an inference that the smell of marijuana in the car came directly from Plaintiff.  In any event, Christensen searched Plaintiff for weapons, conducting a brief pat-down search of the outside of Plaintiff's clothing to which Plaintiff consented, as opposed to the non-consensual search of the plaintiffs' pockets for drugs in *Lessley*.  See *Lessley*, 654 F.Supp.2d at 889.

Even if a person has freely consented to a search by an officer, "[i]t is well established that a criminal suspect may limit the scope of consent to a search," but the burden is on the criminal suspect to do so.  *United States v. Thurman*, 889 F.3d 356, 367-68 (7th Cir. 2018).  Whether a search extends beyond the scope of consent is a question of fact to be determined from the totality of all the circumstances, "and the standard for measuring the scope of consent 'is that of 'objective' reasonableness—what would the

28

typical reasonable person have understood by the exchange between the officer and the suspect?'" *Thurman*, 889 F.3d at 368, quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

Here, the court finds that Christensen's search did not exceed the scope of the search to which Plaintiff consented. Before asking Plaintiff if he could search her, Christensen asked her if she had any weapons on her person. He also discussed the smell of marijuana coming from the SUV, and asked if there were any drugs in the SUV. Thus, at the least, Plaintiff knew she was consenting to a search for weapons. Christensen limited his brief pat-down search to the outside of Plaintiff's clothing in the areas where Christensen's training and experience informed him that weapons were commonly found.

Plaintiff next argues that, while she is not claiming that it is illegal for a male officer to pat-down a female suspect, Christensen's search was problematic because neither he nor Floyd made any attempt to locate a female deputy to pat-down Plaintiff, nor did they document that failure, in violation of Champaign County Sheriff's Department policy, and the manner of Christensen's search makes his gender pertinent, because he "touched [Plaintiff's] private areas."

Plaintiff's argument in this regard is unavailing. Courts have held that there is no constitutional right to have a pat-down search performed by an officer of the same gender. See *Madyun v. Franzen*, 704 F.2d 954, 957 (7th Cir. 1983) ("Assuming the truth of Madyun's allegations, the challenged search would have been no more than a simple frisk or pat-down, done outside the clothing, without any deliberate attempt to examine the 'genital-anal' areas. Since the search procedure would not have intruded

29

unreasonably on Madyun's First Amendment privacy rights or his Fourth Amendment rights, his refusal to comply with Officer Howard's order was not justified by his reliance on those asserted rights."); *Martin v. Swift*, 781 F.Supp. 1250, 1253-54 (E.D. Mich. 1992); *Stokes v. New York*, 2007 WL 1300983, at *12 n.9 (E.D.N.Y. May 3, 2007); *Caldwell v. Rubbo*, 1 F.3d 1232, 1993 WL 306052, at *1 (4th Cir. Aug. 10, 1993) ("Caldwell had no constitutional right to have the pat-down search performed by someone of her gender.").

As it pertains to Christensen's failure to call for a female deputy in violation of Sheriff's Department policy, Christensen testified that he knew it would have been fruitless because there were no female deputies on duty that night who could perform the pat-down search, and Plaintiff has presented no evidence that this statement is false or a lie.  Further, even if Christensen violated Sheriff's Department policy, § 1983 protects Plaintiff from constitutional violations, not violations of police department policies or regulations.  See *Estate of Biegert by Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020), quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("As we have previously stated, § 1983 'protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices.'").  Also, for reasons explained below, the parties' genders are not pertinent because Christensen did not gratuitously touch Plaintiff's "private areas."

Finally, the real core of Plaintiff's argument is the actual, physical manner in which Christensen conducted his search, claiming that he "groped" and "fondled" her buttocks under the guise of a pat-down search. Plaintiff argues that Christensen "did not just pat[-]down Plaintiff's back pockets or the 'web' of her pants. He touched her buttocks multiple times and inserted his fingers into the crevice of her buttocks." Plaintiff's Response (#56), at p. 26. Plaintiff argues that the fact that Christensen did not pat-down Plaintiff's legs, ankles, back, or chest belie his argument that he was searching for weapons, as does the fact that "[o]nce Plaintiff protested to Defendant Christensen not to touch her buttocks, he stopped the search. If Defendant Christensen was indeed concerned over his safety or the safety of others, he would have completed the search, patting down the remaining parts of Plaintiff's body. Yet, he did not." Plaintiff's Response (#56), at p. 29.

The court has watched the video of Christensen's pat-down search of Plaintiff multiple times. When video footage firmly settles a factual issue, there can be no factual dispute about it, and the court will not indulge factual assertions that clearly contradict the video. See *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018). It was a standard, brief, outside of the clothing search for weapons. Such searches, even if the buttocks are included in the search, have been upheld as reasonable in the *Terry* stop weapons search context. See *United States v. Thomas*, 512 F.3d 383, 388-89 (7th Cir. 2008) (upholding reasonableness of *Terry* pat-down search of the outer clothing that included the area between the buttocks that revealed drugs). Plaintiff, in a conclusory fashion, uses words like "grope" and "fondle," but the court sees nothing on the video that would

31

meet the definition of those words.  See *Anderson v. Cornejo*, 199 F.R.D. 228, 260 (N.D. Ill. 2000) ("Conclusorily stating that she was groped does not show that she was subjected to an intrusive search.  A plaintiff must describe what she means by groped so that it can be determined whether she was subjected to an intrusive pat-down search.  Similarly, Shelton's conclusory statement that she was groped in an extraordinarily intrusive manner does not provide the specifics necessary to show that she was subjected to an intrusive pat[-]down search.").

Further, if there was any contact from Christensen's fingers with the area between Plaintiff's buttocks, it was incidental and lasted a fraction of a second as Christensen swept his hands along that area in the completion of his search.  It certainly was not an invasive or abusive violation of Plaintiff's anal or genital area so as to make the search unreasonable under the Fourth Amendment.  See *Anderson*, 199 F.R.D. at 258 ("Pat[-]downs become intrusive and require reasonable suspicion when the inspector reaches under the traveler's clothes, particularly in the breast and crotch area.").

Plaintiff also argues that Christensen's ending of the search after she told him not to touch her butt is indicative of some kind of guilt or acknowledgment on Christensen's part that the search was improper or that he was not actually looking for weapons.  However, the video clearly shows that Christensen says "we're good" at

22:05:05, ending the search, followed by Plaintiff at 22:05:06 saying to Christensen "woah, don't touch my butt[.]"  By the time Plaintiff told Christensen to not touch her butt, the search was already over.

Finally, Plaintiff's expert, Joseph Blaettler, states in his report that: (1) a visual inspection should be used in lieu of a pat-down when conducting a cross-gender search; (2) searches utilizing finger manipulation or palm touching should be avoided whenever possible in favor of a search utilizing the back of a stiff, bladed hand; and (3) the search of a female requires special care to avoid unnecessarily invading the private areas.  The court finds that those statements do not create a genuine issue of material fact.

The report was attached as Exhibit J to Plaintiff's Response (#56), but contains no accompanying affidavit verifying its authenticity, and therefore the report is inadmissible as evidence at summary judgment.  See *Scott v. Edinburg*, 346 F.3d 752, 759-60 (7th Cir. 2003) ("However, Marsh's report was introduced into the record without any supporting affidavit verifying its authenticity and is therefore inadmissible and cannot be considered for purposes of summary judgment."); see also *Estate of Williams v. Indiana State Police*, 26 F.Supp.3d 824, 837-39 (S.D. Ind. 2014).

However, presuming the report were admissible, it would not defeat summary judgment.  Even if Christensen's physical, instead of visual, search of a female suspect was not good policy, § 1983 protects Plaintiff from constitutional violations, not violations of police department policies or regulations.  See *Biegert*, 968 F.3d at 699.  Still, expert testimony regarding relevant professional standards can give a trier of fact a

baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights. *Jimenez v. City of Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013). Moreover, the type of search conducted by Christensen has been upheld by the Seventh Circuit as reasonable. See *Thomas*, 512 F.3d at 388-89. The Fourth Amendment does not categorically bar opposite sex pat-down searches of the type conducted by Christensen. See *Madyun*, 704 F.2d at 957 n.3 ("Madyun points to no case in which opposite sex frisk searches have been held to violate prisoners' *federal* constitutional rights.") (emphasis in original).

For all of the above reasons, summary judgment is GRANTED in Defendants' favor on Count I of the Amended Complaint.

*Count I: Qualified Immunity*

Even if the court were to find Christensen's pat-down search of Plaintiff violated her rights under the Fourth Amendment, which the court does not, Christensen would still be entitled to qualified immunity.

Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018). To be clearly established, a legal principle must be "settled law," and it must clearly prohibit the officer's conduct in the particular circumstances before the officer. *District of Columbia v. Wesby*, 138 S.Ct. 577, 581 (2018). In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate," a demanding standard that protects all but the

34

plainly incompetent or those who knowingly violate the law. *Wesby*, 138 S.Ct. at 589.

The rule must be "settled law," which means it is dictated by "controlling authority" or

"a robust 'consensus of cases of persuasive authority[.]'" *Wesby*, 138 S.Ct. at 589-90,

quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011). It is not enough that the rule is

suggested by then-existing precedent, but rather the precedent must be clear enough

that every reasonable official would interpret it to establish the particular rule the

plaintiff seeks to apply. *Wesby*, 138 S.Ct. at 590.

> The Supreme Court has held:
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." This requires a high "degree of specificity." We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established."

*Wesby*, 138 S.Ct. at 590 (citations omitted).

While a case "directly on point" is not required, the dispositive question is

whether the violative nature of the *particular* conduct is clearly established, and the

inquiry must be undertaken in light of the specific context of the case, not as a broad

general proposition. *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 998 (7th Cir. 2019). The

specificity of the rule in question is especially important in Fourth Amendment cases.

*Wesby*, 138 S.Ct. at 590. Ordinarily, to show that the law was "clearly established,"

plaintiffs must point to a "closely analogous case" finding the alleged violation unlawful. *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018). This court must look first to controlling Supreme Court precedent and Seventh Circuit decisions on the issue and, if no controlling precedent exists, the court may broaden its survey to include all relevant case law in order to determine whether there was such a clear trend in the case law that the court can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time. *Reed*, 906 F.3d at 547. Neither an unpublished circuit court decision nor a district court decision can clearly establish the law because they are not authoritative as precedent and therefore do not establish the duties of nonparties. *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995).

Alternatively, in some rare cases, where the constitutional violation is patently obvious, plaintiffs may not be required to present the court with any analogous cases, and instead, plaintiffs can demonstrate clearly established law by proving the defendant's conduct was so egregious and unreasonable that no reasonable official could have thought he was acting lawfully. *Reed*, 906 F.3d at 547. Outrageous conduct obviously will be unconstitutional, but even as to actions less than an outrage, officials can still be on notice that their conduct violates established law in novel factual circumstances. *Reed*, 906 F.3d at 547.

36

In support of her argument that her right to be free from the type of search performed by Christensen was clearly established, Plaintiff cites to two Seventh Circuit cases. See Plaintiff's Response (#56), at pp. 33-36. First, Plaintiff cites to *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983), for the proposition that police officers cannot engage in "extreme or patently abusive" searches of a person. *Mary Beth G.*, 723 F.3d at 1270. While a true statement, Plaintiff does not go on to apply the facts and holding of *Mary Beth G.,* which involved strip searches, to the facts of this case. Rather, Plaintiff just cites the "extreme or patently abusive" quote, thus defining the right in question at a high level of generality, which is not enough to show that the specific rights in question were clearly established law at the time of Christensen's alleged constitutional violation. See *Kisela*, 138 S.Ct. at 1152.

Plaintiff next cites to the Seventh Circuit's 1983 decision in *Madyun*, noting that in that case the court "held that a pat-down search where the officer used both hands to feel along the plaintiff's buttocks and genital areas was unreasonably intrusive." Plaintiff's Response (#56), at p. 34. That is not an entirely accurate description of *Madyun*'s holding.

In *Madyun*, the male plaintiff, a religious Muslim inmate at an Illinois prison, was to be frisked by a female prison guard before he could pass through security to a prison visit with his wife. He told the female guard he would only submit to a frisk by a male guard due to his religion. Eventually, a male officer performed the search. The search the female guard would have performed was described as follows:

The resident is asked to raise his arms. I then run my thumbs under his

37

collar, take my hands and rub them across the top of his arms, come back under his arms to his armpits and down his sides to his waist. I run my finger around his waistband. I run my hands down the outside of his legs and back up to mid thigh. I then reach around and pat his chest area and his back.

*Madyun*, 704 F.2d at 956 n.1.

The plaintiff, however, alleged that he would have been subjected to a frisk search involving his "genital-anal" area, even though the court found no evidence in the record to support his claim. The plaintiff alleged in his original complaint that "[a] 'frisk-search' conducted in accord with departmental practice and/or instruction would have entailed [the female guard's] touching plaintiff across his buttocks and between his legs in close proximity to or actual contact with plaintiff's genitals." The Seventh Circuit found that, "[t]aking this allegation for the most that it might suggest, namely, that frisk searches might result in some incidental contact—through a prisoner's clothing—with the genital area, it is a far cry from proof that the instant frisk involved a deliberate search of the genital area." *Madyun*, 704 F.2d at 957. The court found the plaintiff's claim was distinguishable from *Sterling v. Cupp*, 607 P.2d 206 (Ore. 1980), modified, 625 P.2d 123 (Ore. 1981), "in which the Oregon Supreme Court struck down, under the state constitution, a frisk search procedure whereby women prison guards manually examined the genital-anal area of male inmates." *Madyun*, 704 F.2d at 957.

The court then noted that the plaintiff, in his affidavit in response to the guard's affidavit, stated, "[the guard's] affidavit omits the fact that she ... is required, per department standards, to run her hands along the inside of a prisoner's legs well above 'mid-thigh' in the crotch area. Further, she is required to feel across a prisoner's

buttocks in the event that he has concealed something in the back pocket of his pants."
The court found that, "[a]ssuming the truth of [the plaintiff's] allegations, the
challenged search would have been no more than a simple frisk or pat-down, done
outside the clothing, without any deliberate attempt to examine the 'genital-anal'
areas." *Madyun*, 704 F.2d at 957.

The decision in *Madyun* actually supports the court's finding that Christensen
did not violate Plaintiff's Fourth Amendment rights with his search. There is no
evidence, or even allegation, that Christensen came into contact in any way with
Plaintiff's genitals. There is no evidence, based on the video of the search, that
Christensen did anything more than feel across Plaintiff's buttocks in the event she was
concealing a weapon in the back pocket of her pants, "no more than a simple frisk or
pat-down, done outside the clothing, without any deliberate attempt to examine the
'genital-anal' areas." *Madyun*, 704 F.2d at 957. As stated above, any contact between
Plaintiff's buttocks was entirely incidental to Christensen's constitutionally compliant
pat-down of Plaintiff's backside and buttocks area.

Plaintiff does cite to two district court cases from the Northern District of Illinois,
in arguing that "the manner by which Defendant Christensen patted Plaintiff down has
been known to be inappropriate and unreasonable." Plaintiff's Response (#56), at p. 34.
However, both those cases are distinguishable. In *Stewart v. Rouse*, 1999 WL 102774
(N.D. Ill. Feb. 22, 1999), the court denied summary judgment where the plaintiff alleged
the defendant officer aggressively groped her, grabbed her groin, and grabbed her
breasts with both hands, which "could certainly be construed as an allegation that [the

defendant] did not just search [the plaintiff] but fondled her[.]" *Stewart* 1999 WL 102774, at *4.  Further, according to the plaintiff, the defendant "inappropriately grabbed her while joking with another officer that he had yet to 'search' her" and the defendant allegedly "conducted the pat-down in conjunction with several other patently improper actions, namely stroking [the plaintiff's] buttocks and punching her in the face while she was handcuffed." *Stewart*, 1999 WL 102774, at *4.

In *Doe v. Calumet City, Ill.*, 754 F.Supp. 1211 (N.D. Ill. 1990), the searches at issue were strip searches involving exposure of naked body parts to officers, including sometimes instructions to squat.  *Doe*, 754 F.Supp. at 1217-18.

Nothing even close to the type of conduct in *Stewart* or *Doe* occurred in this case.  Those cases are inapplicable.

Further, based on the Seventh Circuit's decision in *Madyun*, the court can say with certainty that this is not the rare case where the constitutional violation is patently obvious, so that Plaintiff is not required to present the court with any analogous cases, and that Christensen's conduct was so egregious and unreasonable that no reasonable official could have thought he was acting lawfully.  See *Reed*, 906 F.3d at 547.  Defendant Christensen is entitled to qualified immunity on Count I of Plaintiff's Amended Complaint.

40

Thus, in addition to there being no Fourth Amendment violation, summary judgment is also GRANTED in Defendants' favor on Count I on the basis of qualified immunity.

*Count II: Whether Defendant Floyd Failed to Intervene to Protect Plaintiff from a Violation of Her Constitutional Rights Pursuant to § 1983*

In Count II, Plaintiff claims that Defendant Floyd failed to intervene during the unreasonable pat-down search conducted by Christensen in violation of the Fourth Amendment.

"An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

The court has already concluded that Defendant Christensen did not commit an underlying constitutional violation; thus, Defendant Floyd cannot be liable for failure to intervene to prevent Christensen from infringing Plaintiff's constitutional rights. See *Pryor v. Corrigan*, 2021 WL 1192581, at *13 (N.D. Ill. Mar. 30, 2021); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]"). The court has also determined that Christensen would be entitled to qualified immunity on the Fourth

41

Amendment unreasonable search claim because such a claim was not clearly established, and it follows then that Floyd would not have known a constitutional violation was being committed, and therefore cannot be liable for failure to intervene. See *Gill*, 850 F.3d at 342.  Summary judgment is GRANTED in Defendant Floyd's favor on Count II.

*Count III, IV, and V: Illinois State Law Claims*

The court has granted summary judgment in favor of Defendants on all of Plaintiff's federal claims, leaving only Plaintiff's state law claims of intentional infliction of emotional distress, respondeat superior, and indemnification remaining.  This case is in federal court due to Plaintiff's § 1983 claims.  Plaintiff pleads jurisdiction under 28 U.S.C. § 1331, federal question jurisdiction.  It is not here on diversity grounds, as Plaintiff is a citizen of Illinois and she has not alleged that any Defendant is a citizen of another state.  In order to keep the case in federal court, this court must exercise supplemental jurisdiction over the remaining state law claims.

"The supplemental jurisdiction statute provides that a district court 'may' decline to exercise jurisdiction over supplemental state-law claims for several enumerated reasons, including where 'the district court has dismissed all claims over which it has original jurisdiction.'"  *In re Repository Technologies, Inc.*, 601 F.3d 710, 724 (7th Cir. 2010), quoting 28 U.S.C. § 1367(c)(3).

A federal court's decision to exercise supplemental jurisdiction over state law claims is discretionary, and, absent unusual circumstances, "district courts relinquish supplemental jurisdiction over pendent state law claims if all claims within the court's

original jurisdiction have been resolved before trial." *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 352 (7th Cir. 2019).

In *Coleman*, the plaintiff sued the defendant police officers in federal court under § 1983, alleging constitutional violations and state torts. Specifically, the plaintiff alleged that the defendant officers obtained a statement from an alleged accomplice through coercive interrogation techniques, employed improper and unduly suggestive identification procedures, and suppressed impeachment evidence. After disposing of the § 1983 claims and a state law malicious prosecution claim on the merits at summary judgment, the district court declined to exercise supplemental jurisdiction over the plaintiff's remaining state law claims of intentional infliction of emotional distress, civil conspiracy, respondeat superior, and indemnification. The Seventh Circuit affirmed the district court's decision, holding that it saw "no abuse of discretion in the district court following that typical approach in this case." *Coleman*, 925 F.3d at 352.

Other courts, in circumstances similar to those facing the court in the instant case, have also declined to exercise supplemental jurisdiction over the remaining state law claims once the § 1983 claims have been disposed of at summary judgment. See *Williams v. City of Berwyn*, 2011 WL 65971, at *3 (N.D. Ill. Jan. 7, 2011); *Horne v. Wheeler*, 2005 WL 2171151, at *8 (N.D. Ill. Sept. 6, 2005). Thus, in the exercise of its discretion, the court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims in Counts III, IV, and V. Those counts are dismissed without prejudice.


IT IS THEREFORE ORDERED:

43

(1)   Defendants' Motion for Summary Judgment (#53) is GRANTED.

Judgment is GRANTED in favor of Defendants and against Plaintiff on

Counts I and II of Plaintiff's Amended Complaint. The court relinquishes

supplemental jurisdiction on the remaining counts, which are dismissed

without prejudice.

(2)   The final pretrial date of June 28, 2021, and jury trial date of July 20, 2021,

are hereby VACATED.

(3)   This case is terminated.

ENTERED this __10th__ day of _____May_____, 2021.

s/ COLIN S. BRUCE
U.S. DISTRICT  JUDGE